**EXHIBIT "5"**

**Creedon Controls Inc.**
Electrical Contractors

## Section I: Project Narrative
## Summary

Background

    Creedon Controls, Inc. ("CCI") performed it Work for the following entities:
- Bank One (Banc One Building Corporation),
- Tishman Construction Corporation (of Maryland), ("TCC")
- Forest Electric Corporation ("FEC")

Summarized are some the key factors and conditions experienced:
- leading up to the award
- working on this project to the present
- nearing project completion in August 2004.

    The site of the work is Bank One, Brandywine Site Core Data Center ("CDC") II located at 4001 Governor Printz Blvd., Wilmington, DE.

    This work was performed between September 2003 and July 2004, eleven months to present.

    The three projects are:
- General Power and Lighting ("GP&L"), # 6B, CCI Project # 2357
- IT Cable Conveyance Phase I ("ITCI"), # 21B, CCI Project # 2367
- IT Cable Conveyance Phase II ("ITCII), # 22B, CCI Project # 2377

    This summary is divided into the following parts:
- Site Layout
- GP&L
    - Bid
    - Project Conduct
- ITCI
    - Bid
    - Project Conduct
- ITCII
    - Bid
    - Project Conduct
- All Projects
- Bank One Management Team
- Project Plan v. Execution and Estimate to Complete
- Total Cost Analysis
- Schedule to Complete from May 2004

Page 1 of 10

006561

Creedon Controls Inc.
Electrical Contractors

Site Layout

The building drawings and project schedule were divided into eight areas, labeled A thru H. Areas A & C were Data Centers; Area B housed the Uninterrupted Power Supply (UPS), related switchgear and batteries. Area D housed generator, incoming switchgear, mechanical, and general switchgear rooms, loading dock and support rooms. Areas E & F each had separate chiller rooms, HVAC rooms, electric distribution rooms and support rooms. Area G housed more generators, incoming switchgear, mechanical and general switchgear rooms, and additional support rooms. The last area is H, which is used for Administrative Offices.

The mechanical areas (D, E, F & G) were separated from the Data Centers, UPS area, and Administration Building by a corridor located between columns L and M. This Corridor referred to as the L&M corridor, runs the entire width of the building and is the main access route for all materials, tools, lifts and manpower from the loading docks, to all areas of the building.

Confusion existed with the area designations because the Area designations and the Drawing designation were for some reason different:

| Area Designation | Drawing Designation |
|---|---|
| C | A |
| B | B |
| A | C |
| D | D |
| D | E |
| D | F |
| D | G |
| Administration | H |

General Power and Lighting Project

Bid

The request for proposal was rather unique for the GP&L project. No pre-bid meeting was scheduled for this major project. It is extremely rare not to have a pre-bid meeting; it is even rarer for a project of this magnitude with the level of sophistication of the Owner and lead contractors, especially when the scope of Work is not sufficiently defined. There were over 200 drawings and many were issued for information only. Vague statements like, "contractor to furnish control systems", made it impossible to

**Creedon Controls Inc.**
Electrical Contractors

determine what the scope of work actually was without further clarification, as there were many control systems shown on the furnished drawings.

CCI's bid on the first project, GP&L, was competitive and CCI was asked to come in and review it for scope. At that time it was learned that some bid items desired by the Owner were not included in CCI's proposal and several items were included in the CCI proposal that were not required. This resulted from FEC's failure to: properly conduct a bid process and respond to CCI's numerous pages of questions submitted during the bidding process and attached to CCI's bid. CCI wasted a week bidding work not part of their scope. This was CCI's first introduction to a poorly managed project by Forest. At this time, however, CCI assumed on a project of this size with an Owner of Bank One's stature, it was inconceivable that this was anything more than an anomaly or just one poor FEC pre-award event.

After the bid review meeting on this first project CCI had several days to revise its price based on a "Scope of Work" issued by FEC. CCI's bid revision was negotiated with Paul Angerame, Vice President of Forest (on-site in-charge person during the projects) and this project was awarded to CCI by FEC at $3,184,600. The basis of CCI's price was its bid scope, schedule, prepared at bid time, and normal industry conduct of the project. The project commenced immediately with a March 2004 completion date. The project was planned working 10 hours per day, 6 days per week.

Project Conduct

GP&L (CCI Project 2357) is the larger of the three project performed by CCI for Bank One, Tishman and Forest. It started in September 2003 and is now in the final stages of completion. It included lighting in areas A thru G, General Power Receptacles in areas A through G, and all electrical requirements in the Administration Building with a few exceptions. This package also included Feeders, Power and Lighting Panels, Automatic Transfer Switches, Inverter Systems, Lighting Control System, and Empty Voice and Data Conduits.

Reviewing this project in retrospect, there are many areas where the low priority of this package to the Construction Manager, Engineer and Owner becomes evident. Some factors include:

- From the beginning, the amount of time required for submittal and engineering review, or to get answers to Request for Information (RFI's) was long, or in the case of some RFI's were never answered in writing. The onus was on the contractor to submit documentation that required a "yes" or "no" answer and initials, otherwise a long delay should be expected.
- The concrete decks were not poured in alphabetical order. TCC proceeded with A, C, G, B, F, E, D and then H. None of CCI's work could start in an area until the deck was poured. At bid time CCI reasonably expected that

006563

**Creedon Controls Inc.**
Electrical Contractors

the concrete pours would be contiguous versus randomly poured throughout the building. This caused CCI to move labor, material and equipment over long distances under extremely difficult and crowded conditions.

- In mid-December 2003 about the time that deck G was being poured, the Construction Manager required all trades to move all their material, tools, and break areas from trailers and storage vans outside the building onto the freshly poured concrete slabs so that TCC could start the footers for the Administration Building and rough grading for the parking lot. Although not realized at the time, this was the beginning of CCI's biggest labor problems. There were hundreds of men working on the site at this time. Now all of the gang boxes, lunch tables, material and equipment that were outside were added to the bulk material (i.e. duct work, piping, equipment, switchgear and high reach lifts) already on the slab. The result was like building a "dam in the river". It stopped or reduced the flow of tools, material, equipment and lifts from one area of the building to another. When CCI finally got tools, equipment and material to an area, the floor was covered with stored items, which blocked the work. This was further exacerbated as more and more large equipment arrived and walls started to be built. CCI spent more time each day moving CCI's equipment and the equipment of others than CCI did installing CCI's work. When this started, CCI was working in Data Centers A and B and it appeared it would be a temporary problem, but as the job progressed it only got worse instead of better.

- Another major obstacle emerged in mid-January. The major L&M corridor has two five feet wide by three feet deep trenches where chilled water supply and return piping goes from the chiller rooms to the data centers. The trenches run down the middle of the corridor for about forty to fifty feet at two separate locations. At the Bear site, an exact duplicate site also under construction, the trenches were covered with 1" thick steel plating which allowed work to continue. At CCI's site, these trenches were left open for approximately five to six weeks creating another "dam in the river" that slowed the job progress.

- Another major obstacle to CCI's Work was that the major UPS switchgear, that filled eight rooms in Area B, was too large to fit through the doors in the rooms where it was to be located. Because of this, each room only had three walls built so that the equipment could eventually be set. CCI was not able to finish any lighting, branch power, or data conduit runs. After fighting CCI's way to an area, CCI would install half the work and then pack up and fight its way to another area only to return at a later date to do more work and/or finish.

- It's important to note that this affected lighting, branch power, and data work, and that the majority of CCI's work was suspended from or installed onto the roof support steel 25 to 27 feet above the slab. This was not work that would be readily accessible under the best of conditions. CCI was

006564

**Creedon Controls Inc.**
Electrical Contractors

trying to install work 25' in the air with the floor covered with other's material, tools and equipment. CCI could only install half of its work before having to move, and the major route to move was down a corridor with two, five foot wide trenches blocking the way.

- By the end of January through February, the block walls for the generator rooms on both ends of the building started to go up. The construction manager instructed the masons to un-load and store trucks loaded with block at the east end of the L&M corridor and on the loading dock on the West end of the building. This caused two additional bottlenecks and further reduced CCI's movement within the building.
- In March the dam burst. By this time, CCI had half finished work in every area of the building. The manpower for all crafts was peaking, lifts were everywhere. Rooms were filled with equipment that now blocked CCI's access to the ceiling. CCI couldn't get in before, and now that it could, the very items that kept CCI from finishing in the first place blocked CCI's access.
- At this point, the construction manager decided to go on a cleaning spree. TCC had allowed rooms and corridors to be blocked for three months and all of a sudden, it wasn't acceptable. TCC had laborers go through the site and throw away anything that looked like trash. Unfortunately where laborers are concerned, any thing that keeps then working looked like trash. This included CCI's lighting fixtures, conduit, wire, support steel, and most of its working as-built drawings. CCI had conduit runs to finish everywhere and the drawings showing where it stopped were thrown in the dumpster.
- In mid-March, CCI notified FEC in a phone conversation that there was a serious problem and that CCI would be following up with written documentation as soon as it could be quantified and qualified. In early April, CCI notified FEC in writing of the impact of these items and tried to estimate the scope of that impact. CCI was trying to put this information together while putting out fires throughout the job site.
- During the project in each room the Construction Manager, TCC, would request lights and receptacle power. CCI would have to wait until all equipment by others was installed to do the lights and receptacle power and typically before CCI could finish TCC would require all contractors to vacate the room without any scheduling time for CCI to finish their work, and TCC would schedule the painter to paint the floor. Had TCC scheduled a couple of days for the lighting, the painter could have followed and the rooms would be complete. By painting the floors first, TCC forced CCI to cover the floors with plywood to protect them and greatly increased the amount of time required for CCI to finish. This not only increased CCI's labor hour requirement, but insured CCI would fall further behind as each room now took longer to complete.

006565

**Creedon Controls Inc.**
Electrical Contractors

- April of 2004 TCC and FEC directed CCI to eliminate the night shift that was the most effective time for CCI to do its work, because of the limited activity on the site at nights. This dramatically decreased CCI's productivity and progress on the project.
- The construction manager in the Administration Building repeated the same strategy that hurt CCI's in the larger building (i.e. rooms were filled with tools, material, equipment and blocked to CCI's installation). This was done even though CCI recognized the problem and tried to schedule CCI's work in a productive manner. The lighting and branch power was still low priority and little or no coordination was offered. TCC and FEC's management strategy effectively ignored CCI's Work until a need such as lightings materialized, and then asked CCI to accelerate as if CCI were behind schedule, which was not the case.
- Referral to the Critical Events Summary (Exhibit II.F) is a more complete list of change order details through the first week of April 2004. CCI is in the process of completing the balance of the change order items and cost impact to present.

GP&L is 95% complete. About 2/3 of the building has been punch listed, but CCI still has some areas in the building where it had to return to complete work in rooms that were never made available, or to complete work on the roof which is fed from underneath.

IT Conveyance I Project:

Bid:

The request for proposal for the IT Conveyance I Package followed the same scenario as the power and light package, including lack of proper pre-bid meetings. The ITCI project had more complete drawings and the scope was better defined than the GP&L project. Due to the lack of a pre-bid meeting, it still took a bid review meeting, and re-pricing, before the final price was negotiated of $1,080,000.

Project Conduct

The first IT Conveyance Package Phase I (CCI Project #2367) started February 2004 and was completed April 2004. It included the installation of approximately 12,000 feet of Owner furnished cable tray installed overhead in Data Center A. It also included support steel and seismic support for the Tray System.

This project experienced much less interference than the GP&L project and completed profitably for CCI using essentially the same project management, supervision and manpower as the GP&L project.

IT Conveyance II Project:

006566

**Creedon Controls Inc.**
Electrical Contractors

### Bid

The request for proposal for the ITCII was similar to the earlier package, ITCI. Drawings were specific to this package and CCI's job familiarity made it easier to anticipate FEC's requirements. Our bid was competitive and FEC negotiated this package with CCI considering that the additional work might partially offset the adverse impact on CCI related to Project 2357. The agreed upon contract amount was $1,561,825.

### Project Conduct

ITCII started May 2004 and was completed July 2004. It included changes to the overhead tray installed in Data Center A, overhead tray in Data Center B and the Pre-Production Room. It also included cable tray installed under the raised floors in Data Centers A and B. CCI furnished all the cable tray associated with this project through a vendor selected by FEC.

This job went smoothly as CCI was able to work in areas with a typically expected level of interference.

At this point, the two IT Conveyance jobs are 99% complete and waiting for punch list preparation by FEC for follow-up and completion by CCI.

### All Projects

Generally speaking, all work associated with the two IT Conveyance projects were confined to specific areas where there was virtually no interference with other crafts or the Bank One Management Team ("BOMT"). CCI was able to lay-out, plan, and install CCI's work with a manageable level of interference and still make a profit. Although there are claimable change orders for these projects, these two projects were delivered within budget and schedule timeframe.

The GP&L project experienced a level of interference far in excess of what can be typically expected at bid time; it was not manageable and forced the project to exceed budget and originally schedule timeframe. The scheduling of work and accessibility of work areas, interference of other trades, and the apparent low priority of this package by the Construction Managers could not have been anticipated.

All three projects were completed using the same Management Team, Field Supervisor, and Installation Manpower with the following Exceptions:

- In the normal course of the project as manpower needs changed, some field supervision and installers were added to or subtracted from the site.

006567

Creedon Controls Inc.
Electrical Contractors

- December 2003 the day shift general forman was replaced with a new general foreman.
- In June 2004 the day shift general forman was transferred to another job and the night shift general foreman took his place.

The original contract amount for all three projects was $5,826,425. Based upon financial spreadsheets on the project through June 30, 2004, change orders on GP&L through the first week of April, the new contract price should be $7,716,667 allowing a twenty percent mark up for overhead and profit consistent with three major industry publications including R. J. Means, Robert Morris Associates and the National Electrical Contractors Association, which considers aspects such as geographic region and size of labor payroll.

Based upon the foregoing, the current request for change order increase is approximately $1,900,000, which is reasonable based upon the Total Cost barchart (Exhibit I. B) and the Critical Events Summary (Exhibit II. F). This, of course should be adjusted for change orders on GP&L following the date of Exhibit II. F, any change orders associated with ITCI and ITCII and any inefficiency that might be attributable to CCI in the conduct of these projects.

Bank One Management Team

The project management team assembled for this project included Bank One, Tishman and Forest representation. At bid time Forest represented that CCI's contract was with them. Forest's Site Superintendent, at the start of the project, stated that he was CCI's primary contact at Forest and that all questions and paperwork should be processed through him. FEC represented that once the building shell was complete, Forest would be the Prime Contractor and would dictate schedule, equipment arrival, systems start-up, etc. Early in the project, CCI was aware of meetings among Bank One; Tishman, the Construction Manager, and Forest, but subcontractors were not invited to participate in these meetings.

There were daily coordination meetings that had little impact on the job's progress. They consisted of Tishman's Site Superintendent, in a very unprofessional manner demanding jobs be completed by unrealistic dates that had not been discussed or scheduled prior and without any subcontractor input. The subcontractor representatives referred to these meetings as "the daily lie meetings" because TCC or FEC would promise something would happen, and it usually didn't. CCI cannot remember one instance when it was promised that an area or room would be cleared or ready, and it was available when promised. This did not apply to the painting contractor, who somehow was able to get any room emptied of any contractor activity, tools or materials at a moment's notice.

CCI's bid was based upon what could be normally expected on projects of this magnitude and sophistication , such as, weekly meetings with a one and three week look-

**Creedon Controls Inc.**
Electrical Contractors

ahead schedules, frequently updated project schedules based upon contractor inputs, minutes of meetings to document responsibility for agreed action at meetings, i.e., professionally conducted coordination and project management meetings with participant contractor input. This would have allowed each contractor to participate in the scheduling and to anticipate where the other contractors would be focusing their work. Adjustments could have been made for material delays, equipment problems, or labor problems.

Project Plan v. Execution and Estimate to Complete

As can be seen from Creedon Controls – Actual & Projected Comparison (Exhibit I. A), the GP&L project did not unfold as anticipated at bid time. Most projects do not, but the difference between planned and actual should be minimized, explainable and the damaged party compensated. Some reasons for the differences in order of typical significance include:

- Change orders related to changes in scope by the owner for various reasons, not discussed in this report.
- Schedule acceleration requested by the owner to maintain the original completion date to accommodate the lost time related to owner requested scope changes.
- Acceleration required by a contractor related to delays caused by others. This usually has a schedule impact and requires acceleration to stay on schedule; this requires change order compensation to the delayed contractor.
- Delays caused by the contractor's own fault. The delaying contractor has a responsibility to make the effort necessary to stay on schedule and not delay others.
- Acceleration requested by the owner to finish the project ahead of the original schedule.

Review of Exhibit I. A, shows a project that was originally scheduled to complete in April 2004, will not complete, as far as CCI's Work is concerned, until August 2004, four months later. Overall the project went from approximately twenty-five weeks to approximately forty-three weeks, a 72% schedule overrun. Extension of overall project time like this has a significant effect upon contractors. In addition the peak manpower went from a planned level of twenty-four (1440/60) electricians to as high as 43 electricians (2558/60). This increase in planned manpower adds significantly to the supervision (unproductive manpower) on the project and this need to add supervision generally lags the unexpected additional manpower need, decreasing the productivity of the under-supervised direct labor force until corrected. Additional un-productivity arises from the shortage of tools and equipment to maintain an efficient work force.

As can be easily visualized the large maroon shaded area greatly dwarfs the area outlined by the ivory bars, which represent the projection at bid time. Additionally the

006569

**Creedon Controls Inc.**
Electrical Contractors

overtime shaded in blue is much greater than the area outlined by the purple bars projected at bid time.

Exhibit I.A characterizes the magnitude of the claim change order applicable to CCI's Work on this project.

Total Cost Analysis

Exhibit I.B represents an updated version of the initial projection of the labor overrun on the project prior to the detailed change order calculation in Section II, Exhibit II.B.

This projection through revised through June 30, 2004 indicates that CCI is entitled to a change order claim in the magnitude of 30,067 hours, which approximates just less than $1,900,000. Exhibit II.B details eighty-seven events through the first week of April 2004 totaling approximately $1,300,030. Exhibit II.B is undergoing revision from April through August and it is expected that it will support in order of magnitude the labor cost projections of Exhibit I.B revised through the end of the project.

CCI recognizes some minor inefficiency may be attributable to its Work, but the Bank One Team has failed to present any response to the cost projections or detail originally presented to them over three months ago in the originals of Exhibit I.A and Exhibit I.B, respectively.

Schedule to Complete from May 2004

In an interest to reduce the inefficiencies prevalent on this project, it was agreed between CCI and FEC that a schedule would be prepared that described CCI's plan from May 13, 2004 to completion of the current scope the GP&L project, projected to June 25, 2004. This schedule was to enable FEC to clear the way for CCI's Work and minimize the many delays experienced by CCI to date through the end of the project. CCI requested that FEC provide forty-eight hours notice of any impediment to CCI's work in a given area as scheduled.

This schedule was not honored by the Bank One Project Management team and the delays and inefficiencies continued as before.

006570