**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CREEDON CONTROLS, INC., a Delaware
corporation,

                    Plaintiff,

      v.

BANC ONE BUILDING CORPORATION, an
Illinois corporation, and FOREST ELECTRIC
CORPORATION, a New York corporation,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. NO. 05-CV-300-JJF

JURY TRIAL DEMANDED

**DEFENDANT BANC ONE BUILDING CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**(VOLUME I)**

 

**ASHBY & GEDDES, P.A.**
Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302)-654-1888

-and-

Of Counsel:

**PAUL, HASTINGS, JANOFSKY
& WALKER, LLP**

75 East 55th Street
New York, New York 10022
212-318-6000

Dated: July 14, 2006

*Attorneys for Defendant Banc One Building
Corporation*

171278.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF UNDISPUTED FACTS.......................................................... 4

    A.    The CDC2 Project- Background............................................. 4

    B.    The Award of the 6B Package at CDC2 to CCI ....................... 6

    C.    The Forest-CCI Subcontract Agreement ................................ 7

    D.    CCI Notifies Forest of Its Claim............................................ 10

    E.    The May 2004 Proposed Agreement ...................................... 10

    F.    CCI Notifies BOBC of Its Claim ........................................... 12

    G.    The Instant Action................................................................. 12

ARGUMENT - BOBC IS ENTITLED TO SUMMARY JUDGMENT WITH
RESPECT TO ALL OF THE CLAIMS ASSERTED AGAINST IT IN THE
AMENDED COMPLAINT .................................................................................. 14

    A.    The Standards on this Motion ................................................ 15

    B.    CCI Has No Viable Contract Claim Against BOBC .............. 15

        1.    BOBC Is Not a Party to Any Contract with CCI.......... 15

            a.    The October 2003 Agreement is between Forest and
                CCI................................................................... 15

            b.    There is no May 2004 Agreement, and in any event,
                BOBC is not a party to it................................... 18

            c.    Forest never had agency authority .................... 19

        2.    There is No Privity of Contract Between CCI and BOBC .......... 22

        3.    The Damages Sought By CCI Are Barred By The Contract
            Terms ............................................................................. 23

    C.    CCI's Unjust Enrichment Claim Fails As a Matter of Law.................... 25

    D.    CCI's Claim Pursuant to 6 Del. C. §3509 Must Be Dismissed As
        Against BOBC .................................................................... 26

CONCLUSION ...................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Ableman v. Katz,*
  481 A.2d 1114 (Del. 1984) .................................................................................27

*Albert v. Alex Brown Management Services, Inc.,*
  2005 WL 2130607 (Del. Ch. Aug. 26, 2005) .....................................................19, 20

*America Legacy Found. v. Lorillard Tobacco Co.,*
  886 A.2d 1 (Del. Ch. 2005)...............................................................................17

*Anderson et. al. v. Liberty Lobby, Inc., et. al.,*
  477 U.S. 242 (1986)..........................................................................................15

*Arthur Jordan Piano Co., Inc. v. Lewis,*
  154 A. 467 (Del. Super. Ct. 1930) .....................................................................19, 20

*Billops v. Magness Construction Co.,*
  391 A.2d 196 (Del. 1978) ..................................................................................21, 22

*Builders Supply of Delaware, Inc. v. Manbeck,*
  1998 WL 442845 (Del. 1998)............................................................................25, 26

*Citadel Holding Corp. v. Roven,*
  603 A.2d 818 (Del. 1992) ..................................................................................17

*Cohen v. Delmar Drive-in Theatre, Inc.,*
  84 A.2d 597 (Del. Super. Ct. 1951) .............................................................17, 23, 25

*Crumlish v. Price,*
  266 A.2d 182 (Del. 1970) ..................................................................................20

*Delaware v. Mass. Bonding & Insurance Co.,*
  49 F. Supp. 467 (D. Del. 1943)..........................................................................20

*Dupont v. Wilmington Trust Co.,*
  45 A.2d 510 (Del. Ch. 1946)..............................................................................17

*Eagle Industrial v. DeVilbiss Health Care,*
  702 A.2d 1228 (Del. 1997) ................................................................................17

*East Coast Plumbing & HVAC, Inc. v. Edge of the Woods, L.P.,*
  2004 WL 2828286 (Del. Super. Ct. 2004)..........................................................25

*F.D. Rich Co., Inc. v. Wilmington Housing Authority,*
  392 F.2d 841 (3d Cir. 1968)................................................................24

*Finnegan Construction Co., v. Robino-Ladd Co.,*
  354 A.2d 142 (Del. Super. Ct. 1976) ...........................................20, 21

*First National Bank of Arizona v. Cities Service Co.,*
  391 U.S. 253 (1968).............................................................................15

*Friel v. Jones,*
  206 A.2d 232 (Del. Ch. 1964).............................................................19

*Galvagna v. Marty Miller Construction, Inc.,*
  1997 WL 720463 (Del. Super. Ct. 1997)......................................23, 25

*Gilbane Building Co. v. The Nemours Found.,*
  606 F. Supp. 995 (D. Del. 1985).........................................................25

*Gizzi v. Texaco, Inc.,*
  437 F.2d 308 (3d Cir. 1971)..........................................................20, 21

*Graham v. Keene Corp.,*
  616 A.2d 827 (Del. 1992)....................................................................26

*Loppert v. Windsortech, Inc.,*
  865 A.2d 1282 (Del. Ch. 2004)...........................................................18

*Melson v. Melson (In re Will of Melson),*
  711 A.2d 783 (Del. 1998)....................................................................27

*In re Murphy Marine Services,*
  2002 WL 1000146 (Bankr. D. Del. 2002) ...........................................18

*Myers v. Myers,,*
  408 A.2d 279 (Del. 1979) ....................................................................18

*Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,*
  394 A.2d 1160 (Del. 1978) ..................................................................14

*Oliver B. Cannon & Sons, Inc. v. Dorr Oliver, Inc.,*
  312 A.2d 322 (Del. Super. 1973)........................................................22

*Pierce Assocs, Inc. v. Nemours Found.,*
  865 F.2d 530 (3d Cir. 1988).........................................................23, 25

*Playtex Family Products, Inc. v. St. Paul Surplus Lines Insurance Co.*,
    564 A.2d 681 (Del. Super. Ct. 1989) ........................................................................14

*In re Universal Pictures Co., Inc.*,
    37 A.2d 615 (Del. Ch. 1944)...................................................................................20

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) .........................................................................................16

*William M. Young Co. v. Bacon*,
    1991 WL 89817 (Del. Super. Ct. 1991).....................................................................17

*Wilson v. Active Crane Rentals*, Inc.,
    2004 WL 1732275 (Del. Super. Ct. 2004).................................................................22

*Winston v. Mandor*,
    710 A.2d 835 (Del. Ch. 1997)...................................................................................16

*Wise v. Dawson*,
    353 A.2d 207 (Del. 1975) .........................................................................................20

*Zeeb v. Atlas Powder Co.*,
    87 A.2d 123 (Del. Ch. 1952).....................................................................................20

## STATUTES

Fed. R. Civ. P. 56(c) ...............................................................................................1, 14

6 Del. Chapter §3509 ............................................................................................ Passim

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a Delaware )
corporation, )
                               )      C.A. NO. 05-CV-300-JJF
           Plaintiff, )
                               )
       v. )
                               )
BANC ONE BUILDING CORPORATION, an )      JURY TRIAL DEMANDED
Illinois corporation, and FOREST ELECTRIC )
CORPORATION, a New York corporation, )
                               )
           Defendants. )
                               )
                               )
                               )

## DEFENDANT BANC ONE BUILDING CORPORATION'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Defendant Banc One Building Corporation ("BOBC"), by its attorneys, Ashby &

Geddes, P.A. and Paul, Hastings, Janofsky & Walker LLP, respectfully submits this

Memorandum of Law in support of its Motion for Summary Judgment, pursuant to

Federal Rule of Civil Procedure 56, determining that Plaintiff Creedon Controls, Inc.

("CCI"), as a matter of law, has no contract with BOBC, is not in privity with BOBC and

cannot otherwise recover on its claims against BOBC.

## PRELIMINARY STATEMENT

In this case, CCI claims that it is entitled to additional compensation for electrical

work performed under a lump sum contract at a facility owned by BOBC. The factual

record, as set forth in the Statement of Undisputed Facts which follows, shows that there

are no genuine issues of material fact. CCI admits that it entered into a lump sum

contract as a subcontractor to Defendant Forest Electric Corporation ("Forest") to

perform specific work at the facility.  CCI alleges that its work was hindered and delayed, and its costs of performance thereby increased, by actions of other trade contractors and by the alleged failure of Forest to properly manage the overall work.   There is absolutely no conduct – no blame – assigned to BOBC.  Nonetheless, in an effort to draw the owner into this suit, CCI now asserts that it had a contract with BOBC – not with Forest – and asserts claims against BOBC upon this basis.

As shown below, Forest's trade manager contract with BOBC expressly required that Forest be bound, in contract, to its electrical subcontractors, and, importantly, strictly prohibited the creation of any contractual obligation binding upon BOBC.

The documents and testimony uniformly establish that at the time CCI began performance at the facility in October 2003, Forest presented a "Subcontract Agreement" to CCI, which expressly provided that "SUBCONTRACTOR agrees to be bound and obligated to FEC [Forest]".  *See* Subcontract Agreement attached to Oct. 2, 2003 letter ("Forest-CCI Subcontract Agreement"), attached as Exhibit A.  CCI's contract was with Forest, and the CCI representatives have testified in depositions that they believed, and understood, that CCI was working under contract to Forest.

CCI's assertion of privity with BOBC rests fundamentally on a single reference above the signature line of a draft document which was rejected by CCI, and never executed.  In that document, Forest purported to identify itself as both Trade Manager and as an "agent" for BOBC.  *See* May 4, 2004 letter to CCI and attached May 2004 "Single Project Construction Services Agreement" ("May 2004 Proposed Agreement"), attached as Exhibit B.  This document, sent approximately eight months after CCI

entered into the subcontract agreement with Forest and had begun work, never ripened

into a contract with CCI. In any event by its own terms, any agreement resulting from

the May 2004 proposal would have been "between Electrical Trade Manager [Forest] and

Construction Contractor [CCI]" – nowhere does that draft mention the owner, BOBC, as

a party to the contract. Forest's reference to itself as "agent" occurs only in the empty,

unexecuted signature line, and was without notice to or consent by BOBC. Forest's

putative identification of itself as agent was in flat violation of Forest's Trade Manager

Agreement with BOBC. Moreover, it occurred only <u>after</u> CCI had given Forest notice of

its claim for additional compensation. CCI did not, indeed, could not, have relied on that

putative agency in entering into a contract in or about October 2003 and performing the

work.

   Similarly, the documentary record and deposition testimony shows that CCI never

believed that it had any contractual relationship with BOBC, nor relied upon any claim

of agency by Forest. Indeed, once it made its claim to Forest CCI only sought to involve

BOBC as an "objective party" to mediate its dispute with Forest, and did not view BOBC

as the counter-party to any contract. CCI never suggested that BOBC had any

contractual obligation until it was convenient to do so in this lawsuit.

   CCI named BOBC in the lawsuit only as part of a "deep pocket" litigation

strategy. A CCI representative admitted in deposition that CCI "believed [BOBC] had

control of the purse strings," and that, in CCI's view, "basically it's [BOBC's] project,

and [BOBC] determines whether money is paid or not paid, and we felt that if we could

get a decision at that level, then problem is solved because [BOBC] would merely say

this money is for [CCI], pay it to them. And that's really what's going on here."

Deposition of Dennis Link on May 31, 2004 ("Link Dep."), attached as Exhibit C, 217:18 - 219:2; 221:3 - 222:9.  The Court should not countenance this baseless attempt to shake down the owner, BOBC, and judgment should be entered in its favor for the reasons set forth more fully below.

## STATEMENT OF UNDISPUTED FACTS

A.    The CDC2 Project – Background

BOBC is a special purpose corporation whose role is the construction, ownership and operation of banking related facilities for its parent and affiliates.  In or about early 2003, BOBC was tasked by its then-parent, Banc One Corporation, to construct two, state of the art, "Tier 4" data centers, now known as CDC1 and CDC2.  Such data centers are major hubs for storage, retrieval and operational access to customer financial data, *i.e.*, data related to accounts, credit card or other transactions and similar information.  Each "Core Data Center" is more than 240,000 square feet (or some five and ½ acres) under roof.  Given the importance of the facilities to ongoing business needs, the magnitude of the projects and the need to complete them on a prompt schedule, BOBC recognized it would need significant resources to manage the construction.  BOBC selected Tishman Construction of Maryland ("Tishman"), a subsidiary of Tishman Construction of New York, as the "Construction Manager" as its agent for the overall project, and contracted co-defendant Forest as the "Trade Manager for Electrical Work" for the project.  *See* BOBC-Tishman Construction Manager Agreement, attached as Exhibit D; BOBC-Forest Trade Manager Agreement ("Trade Manager Agreement"), attached as Exhibit E.

Generally, as Trade Manager for Electrical Work, Forest had responsibility for coordinating all work related to electrical power and data connections, causing the electrical work on the project to be competitively bid and awarded, entering into contracts

with subcontractors on its own behalf for completion of the electrical work required for

the project, and supervising the work of all of its electrical subcontractors.  To set forth

the parties' understanding with regard to their roles and responsibilities, BOBC's agent

Tishman entered into a Trade Manager Agreement with Forest.  *See* BOBC-Forest Trade

Manager Agreement at ¶¶ 3.04, 4.04, 5.  A copy of this agreement was in Forest's

possession as early as September 15, 2003.  *Id.*

The Trade Manager Agreement does not vest Forest with authority to act as

BOBC's agent and does not authorize Forest to enter into contracts in BOBC's name.

Instead, the Trade Manager Agreement requires Forest to contract directly with

subcontractors on Forest's own behalf and that those subcontractor agreements be in

accordance with the Trade Manager Agreement:

> **By appropriate agreement, [Forest] shall require each subcontractor, to the extent of the Work to be performed by such subcontractor, (i) to be bound to [Forest] by the terms of the Contract Documents**, (ii) to assume toward [Forest] all of the obligations and responsibilities which [Forest], by the Contract Documents, assumes toward Owner, and (iii) to grant to [Forest] all of the rights which [Forest], by these Contract Documents, grants to Owner.  [Forest] shall require each subcontractor to enter into similar agreements with its subcontractors. **Nothing contained in the Contract Documents shall create any contractual obligation between any subcontractor and Owner**; provided, however, that each subcontract shall provide that Owner, at Owner's option, shall have the right to cause the subcontractor to perform for the benefit of Owner the remainder of the Work covered by such subcontract in the event that the Contract is terminated, so long as Owner shall have paid to [Forest] all amounts then due such subcontractor and thereafter Owner continues to pay the amounts due such subcontractor.

*Id.* at ¶ 4.04 (emphasis added).

As is typical in construction of large projects, the work of the individual trade contractors was set out in approved plans and specifications, broken into "packages" coordinated by the project managers. *See* Deposition of Paul Angerame on June 1, 2006 ("Angerame Dep. Vol. I."), attached as Exhibit F, 21:21-22:7. One package under Forest's management was the "General Lighting and Power" package—a scope of work to install the wiring and other components related to ordinary lighting and similar power needs in the building (the "6B Package"). *See id.* at 56:24-57:8.

B.    The Award of the 6B Package at CDC2 to CCI

In or about September 2003, Forest sent out a request for proposal for the 6B Package (the "RFP") to prospective subcontractors who had indicated interest and basic qualifications for the work. *See* RFP, attached as Exhibit G.[1] CCI was one recipient. Pursuant to the RFP, all of the prospective bidders were requested to provide a lump sum bid[2] to perform all of the work identified in the RFP and were directed to respond directly to Forest. The RFP did not identify Forest as a supposed "agent" for BOBC. *See* RFP at 1. In the RFP, Forest advised Creedon (and all of the other prospective bidders) of several key aspects of the work: first, that the overall project was going to be a large, complex, fast-track construction project which would require special coordination, and that the prospective bidders should include in their bids any amounts necessary to compensate them for these coordination issues or for having to work out of sequence (*see* RFP at Rider A §§ A.6, A.11, A.15, A.19, and C.6); and second, subcontractors were

---

[1]    The RFP requested bids to perform the work at each of CDC1 and CDC2. The two buildings are for most purposes, mirror images of each other. *See* RFP at 1.

[2] A "lump sum" proposal offers to do all the work described in the relevant design documents and specifications for a specified dollar amount. The provider is at risk if costs exceed the lump sum amount, and retains the benefit if costs are less than expected to complete the work. *See* Deposition of Patricia Creedon on May 22, 2006 ("Creedon Dep. Vols. I and II."), attached as Exhibit H, 39:15-23.

responsible for securing their own tools and materials, for collecting their debris in a

designated location and for safeguarding their own work.  (*See* RFP at Rider A §§ A.4,

A.7 and A.14).

Following the initial responses to the RFP and some discussion with prospective

bidders, Forest requested "best and final" offers.  On September 29, 2003, CCI submitted

its best and final bid to perform the 6B Package at CDC2 for a lump sum price of

$3,152,000 ("CCI Final Bid").  *See* CCI Final Bid, attached as Exhibit I, at 1.  On or

about October 2, 2003, Forest reviewed the received bids and recommended to Tishman

that CCI be awarded the 6B Package at CDC2 for the lump sum of $3,152,000.  *See*

Forest Award Recommendation, attached as Exhibit J, at 1.  Tishman, in turn, wrote to

BOBC and requested approval for Tishman to enter into an agreement with Forest to

complete the 6B Package at CDC2 for $3,152,000, and for Forest to enter into a

subcontract with CCI to perform the work.  *See* Tishman Award Recommendation,

attached as Exhibit K, at 1.  BOBC approved that request shortly thereafter.  *Id.*

C.    The Forest-CCI Subcontract Agreement

Forest notified CCI by letter dated October 2, 2003 that CCI had been selected to

perform the 6B Package at CDC2.  *See* October 2, 2003 letter ("October 2, 2003 Letter"),

attached as Exhibit L.  The award letter specifically stated that CCI was being awarded

the work as a subcontractor to Forest, and attached and referenced the Forest-CCI

Subcontract Agreement containing the terms on which performance would proceed.  *Id.*

Forest and CCI were the parties to that Agreement, and the Agreement emphasized that,

"SUBCONTRACTOR shall as an independent contractor of FEC . . ." perform the work.

Forest-CCI Subcontract Agreement at ¶ VII.  The Forest-CCI Subcontract does not

mention BOBC, and nowhere does it state in the cover letter or the Forest-CCI

Subcontract Agreement that Forest was acting as an agent for BOBC. Moreover, CCI's representative admitted that CCI began its work with the understanding that CCI would have a contract with Forest and no other party. Creedon Dep., Vol. II, 252:1-15.

In the Forest-CCI Subcontract Agreement, CCI expressly waived any right to collect any additional costs allegedly incurred as a result of claimed delay or interference in the performance of its work. CCI's sole remedy under the Forest-CCI Subcontract Agreement in the event of any claimed delay or interference is an extension of time within which to perform its work:

> Time of performance is of the essence . . . . Should the SUBCONTRACTOR'S Work be delayed, hindered, obstructed, interfered with, and/or accelerated by a cause or causes beyond the control of the SUBCONTRACTOR, the sole remedy available to the SUBCONTRACTOR shall be an equitable extension of time for the performance of its Work provided [Forest] is correspondingly entitled to such equitable extension of time from Owner or Construction Manager and **under no circumstances shall SUBCONTRACTOR be entitled to any increase in the Contract Price or to damages as a consequence or result of such delay, hindrance, obstruction, interference, and/or acceleration, and SUBCONTRACTOR'S sole remedy shall be any equitable extension of time for the performance of its work.**

Forest-CCI Subcontract Agreement, ¶ XIV (emphasis added). The Forest-CCI Subcontract Agreement also provided that CCI would be responsible for providing the necessary security for its own materials, equipment and tools, and that CCI would be responsible for any risk associated with the loss of its materials, equipment or tools. *Id.* at ¶ IV.

The award letter asked CCI to sign and return the letter to indicate its acceptance of the award and specifically stated that CCI would be bound by the terms of the Forest-CCI Subcontract Agreement. *See* Oct. 2, 2003 Letter. CCI, by its President, Ms. Patricia

Creedon, accepted and agreed to those terms by counter-signing the letter on October 15, 2003. *Id.* At her deposition, Ms. Creedon testified that it was her understanding that CCI was proceeding with its work on the basis of the letter of intent with Forest. Creedon Dep. Vol. I 142:4-11. At his deposition, CCI's general foreman, Mr. Fred Street, similarly testified that it was his understanding that CCI's contract was with Forest. Deposition of Fred Street on May 30, 2006 ("Street Dep."), attached as Exhibit M, 62:10-11. Paul Angerame, as a representative of Forest, also testified that the Forest-CCI Subcontract Agreement provided the terms under which CCI began its work. Deposition of Paul Angerame on June 14, 2006 ("Angerame Dep. Vol. II."), attached as Exhibit N, 262:12-17.

Contemporaneous with the execution of the award letter and commitment to the terms of the Forest-CCI Subcontract Agreement, CCI commenced work on the 6B Package. At the end of October 2003, the pricing was adjusted to increase the lump sum amount by approximately $32,000 to include an allowance item. *See* Oct. 2, 2003 letter as revised on Oct. 31, 2003, attached as Exhibit O. Forest sent a revised letter of award, also dated as of October 2, 2003, again requesting a countersignature to confirm the award, and again stating that CCI would be bound by the terms of the same form of Forest-CCI Subcontract Agreement. *See id.*; Angerame Dep. Vol. II, 265:24-266:3. On November 5, 2003, CCI again executed the letter, acknowledging its agreement to be bound to the terms of the Forest-CCI Subcontract Agreement. *See* Oct. 2, 2003 letter as revised on Oct. 31, 2003. For the next five months, CCI continued to perform the work on the 6B Package at CDC2. CCI never rejected the Forest-CCI Subcontract Agreement nor asserted that that agreement was not the operative agreement between the parties.

CCI never supplied comments. Similarly, throughout this period from October 2003 until late March 2004, CCI submitted payment requisitions based on its lump sum pricing and in doing so, represented that it was making appropriate progress on the work. *See* CCI Payment Applications numbered 1 - 6, attached as Exhibit P.

        D.       <u>CCI Notifies Forest of Its Claim</u>

        In or about late March 2004, CCI for the first time gave verbal notice to Forest that CCI would claim it had been delayed in completing its work, and asserted its belief that it was entitled to additional compensation to complete the 6B Package. Creedon Dep. Vol. I, 196:24-197:10. On April 6, 2004, when its work on the 6B Package should have been almost complete, CCI gave written notice to Forest of its claim for alleged delays and additional costs. *See* April 6, 2004 letter from CCI to Forest, ("April 6, 2004 Letter") attached as Exhibit Q. Forest and CCI met with each other several times over the course of the following two months and CCI provided Forest with additional documentation which CCI asserted further supported its claims. *See* July 23, 2004 letter from CCI to BOBC, Tishman and Forest ("July 23, 2004 Letter"), attached as Exhibit R. BOBC did not participate in any of these meetings, nor was BOBC advised that these meetings were occurring. *See* Deposition of Thomas Hennessey on June 28, 2006 ("Hennessey Dep."), attached as Exhibit S, 23:13-24:10.

        E.       <u>The May 2004 Proposed Agreement</u>

        In May 2004, after CCI had been performing the 6B Package work for over seven months and after Forest had notice of the CCI claim, Forest – for the first time – sent CCI a different form of trade contract entitled the "Single Project Construction Services Agreement". *See* May 2004 Proposed Agreement. This contract was substantially similar to the Trade Manager Agreement, and under the Trade Manager Agreement that

agreement was to be used for subcontracting. *See* Trade Manager Agreement, ¶ 4.04. This May 2004 Proposed Agreement was, by its own terms, an agreement between the "Electrical Trade Manager," which was defined in the agreement to be Forest, and the Construction Contractor, which was defined in the agreement to be CCI. *See* May 2004 Proposed Agreement, at 1. Unbeknownst to BOBC, though, Forest included in that proposed agreement a signature line which identified Forest as both Electrical Trade Manager and as "agent" for BOBC. *Id.* at 3.

CCI did not execute or agree to the May 2004 Proposed Agreement. Instead, it expressly noted it was a different form of agreement than Forest had initially provided to it in October 2003, and was different from the agreement it had believed was in place. *See* Email from Charles Doble on behalf of Patricia Creedon to Paul Angerame on June 1, 2004 and attachment, ("June 1, 2004 Email"), attached as Exhibit T. In mid-June 2004, CCI advised Forest by letter that it would not agree to the May 2004 Proposed Agreement, and provided Forest with a counter-offer, in the form of 16 pages of proposed changes to that form of agreement. *See* Email from Patricia Creedon to Paul Angerame on June 14, 2004 and attachments, attached as Exhibit U. Forest promptly advised CCI that it would not accept any of CCI's comments to the May 2004 Proposed Agreement. *See* email from Paul Angerame to Donna Lucas on August 4, 2004, attached as Exhibit V, Angerame Dep. Vol. II, 282:23-283:12; Email from Patricia Creedon to Dennis Link on June 16, 2004, ("June 16, 2004 Email"), attached as Exhibit W. The May 2004 Proposed Agreement was never executed by either party, and never became an agreement. On or about June 30, 2004, after Forest rejected CCI's proposed comments, CCI submitted a "History and Current Status" claim package to Forest, in which CCI

acknowledged that, "[a]t bid time Forest represented that CCI's contract was with them." *See* History and Current Status, attached as Exhibit X, at 8.

      F.    <u>CCI Notifies BOBC of Its Claim</u>

      CCI first notified BOBC of its claim that it allegedly was delayed in the performance of its work and that it had incurred additional cost in connection with the 6B Package in a letter dated July 23, 2004 to BOBC, Tishman and Forest. *See* July 23, 2004 Letter. On August 11, 2004, CCI again wrote to BOBC, this time requesting BOBC's assistance in resolving the claim it submitted to Forest. *See* August 11, 2004 letter from CCI, attached as Exhibit Y. At no point in either letter did CCI claim that it had a contractual relationship with BOBC. Rather, in the second letter, CCI made clear that it was seeking BOBC's "assistance" in "mediating" its claim with Forest and stated that it "understandably want[ed] to be paid for [its] work and [it] would like to achieve this in concert with Banc One" because BOBC would have the "ability to be objective." *Id.*

      G.    <u>The Instant Action</u>

      In April 2005, CCI commenced the instant action against BOBC and Forest in the Superior Court of the State of Delaware in and for New Castle County. The action was removed to this Court in May 2005.

      In its Amended Complaint, CCI asserts five separate causes of action against BOBC. *See* D.I. 91. In its first cause of action, CCI asserts a claim for a mechanics lien in the amount of $2,983,758, representing the additional costs it allegedly incurred as a result of putative delays and interference with its performance of the 6B Package. *See id.* at ¶ 11. In its second cause of action, CCI asserts a claim for breach of contract against BOBC based on allegations that the Single Project Construction Services Agreement, as modified by CCI's 16 pages of comments, although never signed or sent to BOBC and

expressly not accepted by Forest, somehow constitutes a binding contract between CCI and BOBC. *See id.* at ¶ 17. In its fourth cause of action, CCI alleges that Forest interfered with its ability to properly perform the 6B Package under the terms of its agreement and purports to assert a claim for breach of the implied duty of good faith and fair dealing against both BOBC and Forest. *See id.* at ¶ 37. In its fifth cause of action, CCI alleges a claim against both BOBC and Forest for unjust enrichment. *See id.* at ¶ 45. In its seventh cause of action, CCI alleges a claim against BOBC pursuant to 6 Del. C. Chapter § 3509 seeking attorney's fees, costs and expert witness fees based on BOBC's alleged failure to pay it the amounts it claims are due. *See id.* at ¶ 56. On June 15, 2006, BOBC served and filed its answer to the Amended Complaint ("BOBC Answer to Amended Complaint" D.I. 107) denying, among other things, all of the allegations that BOBC is a party to any contract with CCI. *See* BOBC Answer to Amended Complaint.

At a conference held on June 1, 2006, the Court directed that BOBC file its motion for summary judgment seeking a declaration that BOBC is not a party to any contract with CCI and, thus, that CCI has no viable breach of contract or unjust enrichment claim against BOBC. Between that conference and June 28, 2006, the parties completed all non-expert discovery. On July 7, 2006, the Court issued an amended scheduling order directing that BOBC's motion be filed on or before July 14, 2006. *See* D.I. 114. For the reasons discussed below, BOBC's motion for summary judgment should be granted in its entirety.

## ARGUMENT

## BOBC IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO ALL OF THE CLAIMS ASSERTED AGAINST IT IN THE AMENDED COMPLAINT

The claims asserted by CCI against BOBC all fail as a matter of law. First, CCI has no viable contract claim against BOBC because there is no evidence that BOBC was a party to any contract, express or implied, with CCI. Despite its late-blooming assertions to the contrary, CCI was expressly engaged as a subcontractor to Forest and its contract, the Forest-CCI Subcontract Agreement, is with Forest – not BOBC. Forest was not BOBC's agent and was not authorized to – and did not – enter into any contract with CCI in BOBC's name. Under well-established Delaware law,[3] a subcontractor has privity of contract only with its prime and not with the owner. CCI's contract claim against BOBC therefore fails. Moreover, to the extent that CCI had any evidence to support the existence of a contract with BOBC – which it does not – CCI's claim for damages as a result of any supposed "delay" or "interference" is barred by the express provisions of the agreement it accepted when it began work on the project. And, because CCI has no contract claim against BOBC, its claim under 6 Del. C. Chapter § 3509 must be dismissed as a matter of law as well. Second, CCI cannot recover against BOBC for unjust enrichment because, among other things, CCI can point to no evidence to demonstrate that BOBC received value in excess of the contract sum or that Forest cannot

---

[3] Delaware law applies to the instant case as agreed under ¶ XIII of the Forest-CCI Subcontract Agreement. In any event, Delaware choice of law rules also favor the application of Delaware law where, as here, the contract was negotiated, made, and performed in Delaware and CCI is a Delaware corporation. *See Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.*, 564 A.2d 681, 688-89 (Del. Super. 1989) (holding that in contract cases, Delaware courts place considerable emphasis upon (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location and subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties (citing *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160 (Del. 1978)).

pay the amounts, if any, that may be due to CCI.  For all of these reasons, BOBC's motion for summary judgment should be granted.

A.    The Standards on this Motion

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *See Anderson et. al. v. Liberty Lobby, Inc., et. al.,* 477 U.S. 242, 248, (1986).  The parties' disagreement must be genuine.  A genuine issue of fact exists only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (citations omitted).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).  In *First National Bank of Arizona* v. *Cities Service Co.,* 391 U.S. 253 (1968), the Supreme Court noted Rule 56(e)'s provision that a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

B.    CCI Has No Viable Contract Claim Against BOBC

1.    BOBC Is Not a Party to Any Contract with CCI

a.    *The October 2003 Agreement is between Forest and CCI*

To succeed on its breach of contract claim against BOBC, CCI must prove that: (1) it entered into a contract with BOBC; (2) BOBC breached that contract; and (3) CCI

suffered damages as a result of that breach. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997). Simply put, there is not a scintilla of evidence to support CCI's belated claim that its contract, whether that contract be written or oral, is with BOBC. Despite CCI's attempts at revisionist history, all of the relevant documents and CCI's own testimony establish that CCI never entered into, let alone believed it was entering into, a contract with BOBC. In October 2003, at the time it undertook the work on the 6B Package and for at least eight months thereafter while it performed that work, both CCI and Forest understood that CCI was, had been and would continue to be a subcontractor to Forest.

The RFP, which was sent by Forest to CCI, was for a subcontractor to perform the scope of work identified in the 6B Package. BOBC is nowhere mentioned in the RFP, and nowhere does the RFP identify Forest as BOBC's "agent." All of CCI's dealings and negotiations regarding the terms of its contract were with Forest, and CCI never once spoke with any representative of BOBC regarding the contract terms and arrangements. The award letters sent by Forest to CCI expressly state that the award was for a subcontractor to Forest to perform the work, and reference the accompanying Forest-CCI Subcontract Agreement, which is expressly a "subcontract" agreement between Forest and CCI. BOBC is nowhere mentioned in that agreement, and nowhere does that agreement identify Forest as BOBC's "agent." CCI twice executed the award letter, acknowledging its agreement to be bound by the terms of the Forest-CCI Subcontract Agreement, and at a minimum accepting that any contractual relationship would be a subcontract. Forest, similarly, sent the letters asserting that the arrangement was a

subcontract, and in seeking approval of the award, expressly sought approval for a subcontract with Forest. BOBC approved only that arrangement.

The undisputed evidence shows that CCI understood that it was working as Forest's subcontractor and that its agreement was with Forest and not BOBC. *See* Forest-CCI Subcontract Agreement; Creedon Dep. Vol. I 142:4-11. Even after CCI notified Forest of its alleged claim, CCI only sought BOBC's assistance in resolving that claim. Throughout this entire time period, CCI never once asserted that it understood its contract to be with BOBC, and concedes that it had no discussions whatsoever with BOBC concerning its contract.

Irrespective of whether the Court ultimately concludes that the operative agreement between the parties is the Forest-CCI Subcontract Agreement or some oral agreement reached between Forest and CCI at the time CCI undertook to perform the 6B Package, one thing is clear: BOBC is not a party to either such agreement. *See William M. Young Co. v. Bacon*, 1991 WL 89817 (Del. Super. Ct. 1991) (rejecting subcontractor's claim against owner); *see also Cohen v. Delmar Drive-in Theatre, Inc.*, 84 A.2d 597, 597-8 (Del. Super. Ct. 1951) (stating, "[a] materialman, as subcontractor, may not recover a personal judgment against a property owner...in the absence of a contract"). *See also Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228, 1233 (Del. 1997) (holding that courts look to the parties' intent at the time they entered into the contract); *Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 18-19 (Del. Ch. 2005) (finding that the court's ultimate guide in determining the legal entitlements of the parties to a contract is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted); *Citadel Holding Corp. v. Roven*, 603 A.2d 818,

822 (Del. 1992) (holding that it is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract) (citing *Myers v. Myers*, 408 A.2d 279 (Del. 1979)); *Dupont v. Wilmington Trust Co.*, 45 A.2d 510 (Del. Ch. 1946)); *accord Loppert v. Windsortech, Inc.*, 865 A.2d 1282, 1289 (Del. Ch. 2004) (holding that the parties' intention to prepare and adopt a written memorial will not prevent contract formation if the evidence reveals manifestations of assent that are in themselves sufficient to conclude a contract; upholding a contract where a later writing included additional, though not contradictory, terms to those initially orally agreed). Accordingly, BOBC cannot, as a matter of law, be liable for claimed damages, if any, arising under either of such agreements.

> b.    *There is no May 2004 Agreement, and in any event, BOBC is not a party to it*

In an effort to avoid the consequences of these clear circumstances, CCI now alleges that the operative agreement between the parties is the May 2004 Proposed Agreement, as modified by CCI's 16 pages of comments.  CCI's efforts to salvage its claim against BOBC fail.  As a preliminary matter, that proposed agreement did not modify or amend the agreement reached between CCI and Forest in October 2003, nor did it constitute an independent agreement, because Forest and CCI never agreed upon the terms of the May 2004 Proposed Agreement.  CCI rejected the May 2004 Proposed Agreement by sending its 16 pages of comments to Forest, and Forest rejected CCI's comments.  The May 2004 "agreement," which was never executed and never agreed to by either party, is therefore unenforceable as a matter of law.  *In re Murphy Marine Servs.*, 2002 WL 1000146 (Bankr. D. Del. 2002) (finding that a reply to an offer which purports to accept but is conditional on the offeror's assent to terms additional to or

different from those offered is not an acceptance but is a counter-offer). *See also Friel v. Jones*, 206 A.2d 232, 235 (Del. Ch. 1964) (noting that it is an elementary principle of contract law that an acceptance of an offer, in order to be effectual, must be identical with the offer and unconditional) (citing 17 C.J.S. Contracts § 43, page 681).

Equally as important, to the extent that the Court were to determine that the May 2004 Proposed Agreement were somehow enforceable, BOBC is not a party to that "agreement." The form of agreement was between the "Electrical Trade Manager," which was expressly defined in that form to be "Forest," and "Construction Contractor," which was expressly defined in that form to be "CCI," and the form of agreement specifically states that the Electrical Trade Manager and Construction Contractor "agree to the terms and conditions set forth in the Contract Documents." May 2004 Proposed Agreement, at 1.

c.    *Forest never had agency authority*

CCI nevertheless claims that Forest entered into the May 2004 Proposed Agreement as BOBC's agent and that BOBC is therefore a party to that supposed "agreement." To support its claim that Forest was acting as BOBC's agent, CCI must show that Forest was vested with either express authority or apparent authority. *Arthur Jordan Piano Co., Inc. v. Lewis*, 154 A. 467, 469 (Del. Super. Ct. 1930) ("One seeking to charge a principal for an agent's act must prove the agent's authority to so bind his principal"); *see also Albert v. Alex Brown Management Services, Inc.*, 2005 WL 2130607, at * 10 (Del. Ch. Aug. 26, 2005). There is no evidence to support either type of agency.

The Trade Manager Agreement, which is the agreement pursuant to which Forest performed its work on the CDC2 Project, did not vest Forest with the authority to act as

19

BOBC's agent and makes clear that Forest had no authority to contract in BOBC's name. *See* Trade Manager Agreement, ¶ 4.04.  To the contrary, the Trade Manager Agreement expressly prohibits Forest from entering into any agreement that would have the effect of binding BOBC to any of Forest's subcontractors. *See id.*  Accordingly, CCI's claim of "express authority" fails as a matter of law. *See Wise v. Dawson*, 353 A.2d 207, 208-09 (Del. 1975) (holding there were "no genuine issues of material fact to establish agency" and granting defendant's motion for summary judgment).

To the extent that CCI intends to claim that Forest had apparent authority to enter into a contract in BOBC's name, that claim fares no better.  It is well-established that apparent authority "can never be derived from the acts of the agent alone." *Finnegan Construction Co. v. Robino-Ladd Co.,* 354 A.2d 142, 144 (Del. Super. Ct. 1976); *Delaware v. Mass. Bonding & Ins. Co.,* 49 F. Supp. 467, 471 (D. Del. 1943) (holding that an agent cannot prove his authority by his own acts or declarations).  Apparent authority can only be found to exist where it is traceable to an act by the principal which creates an impression to a third party that the agent has the authority to bind the principal in a particular way. *See Finnegan Construction Co.*, 354 A.2d at 144 (stating that apparent authority is to be determined by indicia of authority which the principal holds out the "agent" as having); *Arthur Jordan Piano Co., Inc., 154 A.* at 472. ("Parties dealing with an agent, known to be such by them, must take notice of the nature and extent of his authority, and are bound at their peril to notice the limitations upon the authority granted"); *In re Universal Pictures Co., Inc.*, 37 A.2d 615 (Del. Ch. 1944) (overruled in part on other grounds by *Zeeb v. Atlas Powder Co.,* 87 A.2d 123 (Del. Ch. 1952)). *See also Gizzi v. Texaco, Inc.,* 437 F.2d 308 (3d Cir. 1971); *Crumlish v. Price,* 266 A.2d 182

(Del. 1970) (holding that apparent authority depends on manifestations by the alleged principal to a third person, and reasonable belief by the third person that the alleged agent is authorized to bind the principal). Furthermore, in order to establish a chain of liability to the principal based upon apparent agency, the third party must show that it relied on the apparent authority originated by the principal. *Gizzi,* 437 F.2d at 309; *Billops v. Magness Construction Co.*, 391 A.2d 196, 198 (Del. 1978); *Finnegan Construction Co.,* 354 A.2d at 144.

The evidence establishes that there was no conduct on the part of BOBC to indicate to CCI that Forest was BOBC's agent or had the right to contract in BOBC's name. Indeed, it is undisputed that CCI never once discussed or corresponded with BOBC concerning its contract during the entire course of the project. Link Dep. 130:17-19; 208:1-214:11; 215:22-217:17. Since BOBC had no contact with CCI, CCI cannot establish that BOBC's actions gave it the impression that Forest was BOBC's agent and could contract in BOBC's name. Moreover, the consultant engaged by CCI to act as a second "project manager" testified that BOBC never once represented to CCI that Forest was BOBC's agent. Link Dep., 197:18-24.

The only "evidence" of this supposed agency is a single line contained in the signature block of the May 2004 Proposed Agreement, where Forest purported to identify itself as both Trade Manager and an "agent" for BOBC. This unilateral act by Forest, however, cannot transform Forest into BOBC's agent or support an assertion that BOBC took any action which gave the impression to CCI that Forest had authority to contract with CCI in BOBC's name. *See Billops v. Magness Construction Co.*, 391 A.2d 196 at 198 (Del. 1978); *Finnegan Construction Co.,* 354 A.2d at 144.

Nor is there any evidence that CCI relied in any way on Forest's attempt to designate itself as BOBC's supposed agent.  By the time that the May 2004 Proposed Agreement was sent by Forest to CCI, CCI had not only been performing the agreement it reached with Forest for almost eight months with the understanding that it was a subcontractor to Forest, but CCI had already placed Forest on notice of its alleged claim for delay and interference damages.  *See* April 6, 2004 Letter.  CCI expressly told Forest that it saw a difference in the May 2004 Proposed Agreement that was contrary to the parties' understanding, and in its internal discussion expressly concluded that its agreement was with Forest.  *See* June 1, 2004 Email; June 16, 2004 Email.  There is no evidence that CCI modified its conduct in any way after receiving the May 2004 Proposed Agreement.  To the contrary, CCI continued to conduct itself as a subcontractor to Forest.  Accordingly, CCI's assertion that Forest entered into the May 2004 Proposed Agreement as an "agent" of BOBC fails.  *See Wilson v. Active Crane Rentals, Inc.*, 2004 WL 1732275 (Del. Super. Ct. 2004) (noting that the finding of apparent authority requires the  determination whether the principal made representations to the third party indicating that the purported agent was its agent, whether the third party relied on that representation, and whether that reliance was reasonable) (citing *Billops*, 391 A.2d at 198).

   2. <u>There is No Privity of Contract Between CCI and BOBC</u>

It is well-established under Delaware law that no privity of contract exists between an owner and a subcontractor, and that a subcontractor has privity only with its prime.  *See, e.g., Oliver B. Cannon & Sons, Inc. v. Dorr Oliver, Inc.*, 312 A.2d 322, 326 (Del. Super. Ct. 1973) ("Unless avoided, lack of privity would preclude [the owner] from recovering for breach of contract between [contractor and subcontractor]").  *See also*

*Pierce Assocs, Inc. v. Nemours Found.*, 865 F.2d 535 (3d Cir. 1988) (noting that

Delaware law recognizes that "the typical owner is insulated from the subcontractors both

during the course of construction and during the pursuit of remedies in the event of a

default. Conversely, the subcontractors are insulated from the owner"); *Galvagna v.*

*Marty Miller Constr., Inc.*, 1997 WL 720463, at *3 (Del. Super. Ct. 1997) ("Only when

the contract explicitly states that it intends for the subcontractor to be a third-party

beneficiary do the courts allow the subcontractor to sue the owner based upon a third-

party beneficiary status"; *Cohen,* 84 A.2d at 597-8. ("In the absence of an express

contract between them, there was no privity between [the subcontractor] and the

[owner]"). Because CCI has no privity with BOBC, CCI's breach of contract claim

against BOBC cannot stand.

        3.     The Damages Sought By CCI Are Barred By The Contract Terms

      In addition to the lack of privity of contract between BOBC and CCI, CCI is

precluded from recovering the types of damages it seeks in this action by the terms of the

applicable contract. CCI maintains that its lump sum proposal, i.e., its undertaking to

perform the 6B Package for a specified and fixed price, was contingent on its being able

to perform that work on exactly the schedule it assumed in responding to the RFP, but

that its work was hindered or delayed by the actions of other trades and by Forest's

management of the project. CCI seeks to recover those putative additional costs and

additional profit. CCI also seeks damages because it was supposedly unable to store its

tools, materials and equipment on site, and that CCI was required to provide its own

security for that equipment. Even assuming that CCI could prove that any of these

alleged events occurred and that it incurred additional cost as a result, CCI's claim for

damages is flatly at odds with the information it was required to consider in entering into

the contract, and with the terms of the agreement it entered into when it undertook the project.

Both the RFP and the Forest-CCI Subcontract Agreement made clear that CCI was waiving any right it had to seek damages as a result of any alleged delays or interference with its work. The RFP specifically required that work was to commence in accordance with instructions from Forest, including interim schedules, and then expressly stated that "The Contractor understands that the work of this trade may not be continuous and that he may be required to work out of sequence at the direction of [Forest]. There shall be no charges for 'comeback time' or out-of-sequence work." RFP at Rider A§ C.6. Moreover, the Forest-CCI Subcontract Agreement specifically provides:

> Should the SUBCONTRACTOR'S Work be delayed, hindered, obstructed, interfered with, and/or accelerated by a cause or causes beyond the control of SUBCONTRACTOR, the sole remedy available to the SUBCONTRACTOR shall be an equitable extension of time for the performance of its Work…**and under no circumstances shall SUBCONTRACTOR be entitled to any increase in the Contract Price or to damages as a consequence or result of such delay, hindrance, obstruction, interference, and/or acceleration…**

Forest-CCI Subcontract Agreement ¶ 14 (emphasis added). The award letter specifically stated that CCI agreed to be bound by the terms of that Forest-CCI Subcontract Agreement, and CCI executed that letter on two separate occasions, below a line stating "Agreed to and Accepted By". CCI therefore cannot recover any additional costs supposedly incurred as a result of "delay" and/or "interference" with its work. *See F.D. Rich Co., Inc. v. Wilmington Housing Authority*, 392 F.2d 841, 843 (3d Cir. 1968) (applying Delaware law, finding that "such a clause is now universally accepted as valid").

Nor can CCI recover any of the costs it supposedly incurred to protect its materials, tools and equipment, or to replace those materials. The RFP made clear that CCI would be undertaking full responsibility for providing storage and security for its own materials, tools and equipment. RFP, Rider A, § 4. The Forest-CCI Subcontract Agreement provided that CCI was responsible for the safety of its own equipment, materials and tools and that CCI would bear the entire risk of loss if anything happened to that equipment or materials. Forest-CCI Subcontract Agreement, ¶ IV. CCI's "contract" claim against BOBC therefore fails for yet another reason.

C.    CCI's Unjust Enrichment Claim Fails As a Matter of Law

CCI's claim for unjust enrichment should similarly be dismissed as a matter of law against BOBC. The law in Delaware is clear that in the absence of a contract between a subcontractor and an owner, a subcontractor who supplies labor and materials on the order and credit of a general contractor cannot recover against the owner based upon quantum merit or unjust enrichment. *See East Coast Plumbing & HVAC, Inc. v. Edge of the Woods, L.P.*, 2004 WL 2828286, at *5 (Del. Super. Ct. 2004). *See also Pierce Assocs., Inc.*, 865 F.2d at 530; *Builders Supply of Delaware, Inc. v. Manbeck*, 1998 WL 442845, at *3 (Del. Super. Ct. 1998); *Cohen*, 84 A.2d at 597-98.

The only narrow exception to the privity requirement is inapplicable here. In Delaware, for a subcontractor to maintain a cause of action for unjust enrichment against an owner, the subcontractor must prove not only that the owner was *unjustly* enriched, which CCI cannot, but also that CCI cannot recover full compensation from its prime – here, Forest. *See Gilbane Building Co. v. The Nemours Found.*, 606 F. Supp. 995, 1008 (D. Del. 1985); *Galvagna v. Marty Miller Construction*, 1997 WL 720463 (applying the exception where the contractor was insolvent, the subcontractor's mechanic's lien claim

was defective, and it appeared that the owner was going to avoid altogether the cost of the materials and labor provided by the subcontractor).  It is the subcontractor's burden to allege and prove that it cannot collect from the prime contractor and the landowner would be unjustly enriched.  *See Builders Supply of Delmarva, Inc. v. Manbeck*, 1998 WL 442845 (Del. Super. Ct. 1998).  Even assuming for the purposes of this motion that CCI could establish that BOBC has received more value than that for which it has already paid  – which it did not – CCI has not even alleged that it would not be able to collect the additional amounts it seeks from Forest were it to prevail on any of its claims, and there is no evidence that Forest does not have the financial wherewithal to satisfy a judgment, if any, that CCI might obtain in this action.  CCI's unjust enrichment claim against BOBC should therefore be dismissed.

D.   CCI's Claim Pursuant to 6 Del. C. §3509 Must Be Dismissed As Against BOBC

In its fifth cause of action, CCI asserts a claim for attorneys' fees, expert witness fees and costs pursuant to 6 Del. C. § 6509 (b).  As a preliminary matter, that statute, on its face, does not apply in the context of this action.  Section 3509(b) provides for the recovery of "attorney's fees, arbitration costs and expenses for expert witnesses" in "arbitration proceeding[s]."  This action is not an arbitration proceeding, and CCI therefore has no claim under the statute.  Even if the Court were to conclude that the statute somehow applied outside the context of an arbitration, CCI's claim still fails.  The statute permits recovery only where the plaintiff is a "substantially prevailing party."  6 Del. C. §3509(b).  If BOBC's motion for summary judgment dismissing CCI's contract and unjust enrichment claims is granted, CCI cannot be considered a "substantially prevailing party" and its Section 3509(b) claim must be dismissed as well.  *See Graham*

26

*v. Keene Corp.*, 616 A.2d 827, 829 (Del. 1992) (holding that in considering an award of costs, the prevailing party is the one in whose favor a verdict is returned); *Ableman v. Katz*, 481 A.2d 1114, 1121 (Del. 1984) (overruled on other grounds in *Melson v. Melson (In re Will of Melson)*, 711 A.2d 783, 788 (Del. 1998)) (find that considering that an award of fees would come out of the pocket of the party who has already suffered the costs of defending the contest, the award of costs to the *losing* party "is plainly inequitable as well as unprecedented").

## CONCLUSION

WHEREFORE, BOBC respectfully requests that its motion for summary judgment be granted in its entirety, and that CCI be held to have no contract with, and no privity with BOBC; and that CCI's other claims against BOBC be held to be without basis. The Court should grant such other and further relief as it deems fair and just.

27

Respectfully submitted,

Dated:  July 14, 2006

**ASHBY & GEDDES, P.A.**

By:   /s/ Ricardo Palacio
Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302)-654-1888

Of Counsel:

**PAUL, HASTINGS, JANOFSKY
    & WALKER LLP**

75 East 55th Street
New York, New York 10022
212-318-6000

Attorneys for Defendant Banc One Building
Corporation

171276.1

LEGAL_US_E # 71357498.17

28