# EXHIBIT C

**Creedon v. Forest Electric and Banc One Building Corp**
**Link, Dennis (Rough)**
**5/31/2006**

**Printed : 7/13/2006**

Page 3

THE REPORTER: This is the videotape deposition of Dennis Link taken by the defendant in the matter of Creedon Controls, Inc., a Delaware corporation, plaintiff, vs. Banc One Building Corporation, an Illinois corporation, and Forest Electric Corporation, a New York corporation, defendants, Civil Action No. 05-CV-300, held in the offices of Ashby & Geddes, 222 Delaware Avenue, Wilmington, Delaware, on May 31, 2006, at approximately 9:34 a.m.

The court reporter is Julie Parrack from the firm of Wilcox & Fetzer. The videographer is Sharon Ellis, a video specialist from Discovery Video Services, in association with Wilcox & Fetzer.

Counsel will now introduce themselves and the reporter will swear in the witness.

MR. SEGLIAS: Edward Seglias for the plaintiff, Creedon Controls.

MR. BRADLEY: Paul Bradley, McCarter & English, for Forest Electric.

MR. McDONALD: Paul McDonald of Paul, Hastings, Janofsky & Walker for Banc One Building Corporation.

Page 4

Witness, the deponent herein, having first been duly sworn on oath, was examined and testified as follows:

BY MR. McDONALD:

Q. Morning, Mr. Link.

A. Good morning.

Q. Just introduced ourselves a second ago, so we will proceed with the deposition now. Have you ever been deposed before?

A. Yes.

Q. Okay, so you're familiar with how this process goes then? I ask questions and you respond to them yes or no or in any type of way that's verbal?

A. Yes.

Q. Okay. And if there's a question you don't understand, you understand that you have the opportunity to ask me to rephrase it or to explain it to you. Do you understand that as well?

A. Yes.

Q. Okay. And if your counsel objects to a question, you understand that you can wait until the objection has been made or discussed before you answer. Do you understand that as well?

Page 5

A. Yes.

Q. Okay. Go ahead and get started then. I want to start off by asking you when you first established a relationship with anyone affiliated with Creedon Controls?

A. I first met Pat Creedon I think around December of 2003.

Q. Okay. And what was the occasion or the context in which you met Miss Creedon?

A. It was a social event related to the construction industry.

Q. Okay. What social event was that?

A. It was something, it was an event related to the international foundation, and Pat and I were mutually involved in different funds, such as a pension fund or deferred income fund.

Q. Were you sitting on a board together or was it some --

A. We both sat on boards, but different boards. And the administrative people that represented the different boards were, were in fact conducting the social event.

Q. Okay. And at that particular time, what type of conversation did you have, if any?

Page 6

A. Just general conversations, nothing specific.

Q. Okay. At that time did she mention to you anything regarding the Banc One project that we're here today to discuss?

A. It's December 2003. I don't think so.

Q. Oh, that's -- yes.

A. But I, I just don't recall.

Q. Okay. When was the first time that she did mention the Banc One Building project to you that we're here to discuss today?

A. She called me sometime in March of 2004.

Q. Okay. And do you remember that conversation?

A. No, I don't remember it specifically.

Q. Okay. What do you remember about that conversation?

A. She did at that time mention a project that she was working on. The project was the Banc One Tishman Forest project. The CDC II project.

Q. Okay. And what do you recall that she told you at that time?

A. She was looking for some assistance, and based upon our conversation in December she recognized that I might be of some help to her.

Q. Okay. Now, the conversation in December, what

127

1  Q. In your experience, do you consider that to be
2  reasonable?
3  A.
4       MR. BESTE: For the record, let me object
5  to the extent that you're asking him to state a legal
6  conclusion which is clearly not his field.
7  A. Well, actually, I've seen similar language
8  before. But I'm not really sure what they mean by,
9  shall not apply to ordinary field modifications
10 without further clarification. So I have to say that
11 in this particular case, I would ask for clarification
12 before I would, would be able to understand what it is
13 that they're saying there.
14 Q. Okay, and the clarification issue is in
15 relation to the last paragraph, the last sentence of
16 the paragraph?
17 A. That is correct.
18 Q. Okay. But the portion that, I guess the
19 concept of performing work only after receiving a
20 change order, is that a concept that you believe to be
21 reasonable?
22 A. Absolutely not.
23 Q. Okay. And why do you say that?
24 A. Because you'd never complete a project if the

128

1  contractors all waited for written documentation to do
2  the work. For example, on this project, there are
3  PCOs that have never been changed to change orders,
4  and Forest told us to bill them and have paid us for
5  them. So that in effect, if you wait for this to
6  happen, there isn't a project that would ever be
7  completed.
8  Q. What's your understanding of the normal process
9  for submitting and consideration -- submission,
10 consideration and approval or rejection of change
11 orders?
12 A. The normal process is if a subcontractor in
13 this particular case, such as Creedon, identifies
14 something that they feel is contrary to their scope,
15 that they would bring this to the attention of the, of
16 the general contractor, or in this particular case the
17 agent of Banc One, and it would be up to them to act
18 quickly upon it so that it doesn't delay the work and
19 permits the contractor without with that acceleration
20 to continue on schedule.
21 Q. When you say the agent of Banc One, what makes
22 you say that in relation to the document that's been
23 marked as Link C?
24 A. I'm not referring to this document.

129

1  Q. Okay. So based upon the document as you see in
2  Link C, is it correct to say you have no basis to say
3  that there's any agency in relation to Banc One?
4  A. I can't say that, because I haven't read the
5  document from end to end and it's like 10, 12 pages.
6  Q. And you've reviewed this document before; is
7  that fair to say?
8  A. Yeah, probably March or April of 2004.
9  Q. Okay. Is there a specific document you're
10 referring to when you make the statement about agency
11 in regards to Banc One?
12 A. Yes. It's the, the document that was submitted
13 identified as a Banc One prime contract, which was
14 subsequently presented to Creedon prior to any final
15 submission with respect to this subcontract agreement.
16 Q. Is that the May '04 document you're referring
17 to?
18 A. I believe it's May '04, correct.
19 Q. Okay. And is that the first document or the
20 first date in time that you recall seeing something
21 that gave you that impression, the impression that
22 there is agency in regards to Banc One?
23 A. Yes, the first written document, that's my
24 recollection.

130

1  Q. Okay. Was there anything other than something
2  that occurred in writing or appeared in writing that
3  gave you that impression of agency as regards to Banc
4  One prior to May 4th?
5  A. Yes.
6  Q. May '04?
7  A. Yes.
8  Q. And what would that be?
9  A. The conversations that we had. When I came
10 onto the project in the March/April period, I had the
11 opinion and the impression that there was some kind of
12 an agency agreement that existed. Forest was kind of
13 a representative for Tishman, and then Tishman in turn
14 was the one that had the contract with, with Banc One.
15 However, it just general conversation. Nothing
16 specific in writing.
17 Q. Did anyone from Banc One ever tell you that
18 either Tishman or Forest was their agent?
19 A. I don't recall.
20 Q. Okay. Moving on to the next page in this
21 document, which is CL 1145, Roman numeral VI,
22 subcontractor shall furnish sufficient forces to
23 assure proper performance of the work and to maintain
24 proper and timely progress of its work, both without

131

1  additional compensation. If in the opinion of FEC
2  subcontractor fails to furnish such forces or maintain
3  such progress, FEC at its option shall be entitled to
4  terminate the subcontract agreement." Do you see that
5  provision?
6  A. Yes.
7  Q. And in your opinion, is that a reasonable
8  provision?
9       MR. BESTE: Again, object to the extent
10  you're asking him to form a legal conclusion.
11  A. I think as stated it's not reasonable.
12  Q. Okay. What part of it in your opinion is
13  unreasonable as stated?
14  A. The, the portion which indicates without
15  qualification sufficient forces without, and then the
16  last part of that sentence, without additional
17  compensation. It has to be qualified.
18  Q. And how would you qualify it?
19  A. I would qualify it by relating it to the
20  responsibility that subcontractor for such requirement
21  to in effect accelerate by adding additional work
22  force and their responsibility for that, that need.
23  And under those circumstances, it would be reasonable.
24  Q. And is it similar to -- under the circumstances

132

1  you just described with the, with the additions you
2  described, is this similar to other provisions you've
3  seen in your experience?
4  A. That is correct.
5  Q. Okay. Moving on to the next page, CL 1146.
6  Looking at Roman numeral, that's XIV, time of
7  performance is of the essence of this subcontract
8  agreement and the subcontractor agrees at that it will
9  perform its work in accordance with the construction
10  schedule prepared from time to time by FEC or the
11  construction manager and that it will not delay any of
12  the work being performed by other contractors or
13  subcontractors, or the progress of the project,
14  including that of the construction manager or FEC.
15  Subcontractor agrees at that it will be responsible
16  for all damages caused by its delay during the course
17  of the performance of its work." And this is the
18  portion that I'm really interested in. Should the
19  subcontractor's work be delayed, hindered, obstructed,
20  interfered with and or accelerated by a cause or
21  causes beyond the control of the subcontractor, the
22  sole remedy available to the subcontractor shall be an
23  equitable extension of time for the performance of its
24  work provided FEC is correspondingly entitled to such

133

1  equitable extension of time from owner or construction
2  manager. Under no circumstances shall subcontractor
3  be entitled to any increase in the contract price, or
4  to damages as a consequence or result of such delay,
5  hindrance, obstruction, interference, and/or
6  acceleration, and subcontractor's sole remedy shall be
7  any equitable extension of time for the performance of
8  its work. Do you sue that?
9  A. Yes.
10  Q. And understanding your counsel is going to
11  lodge the same objection, I'm going to ask this
12  question. Is this in your opinion, your experience, a
13  reasonable provision?
14      MR. BESTE: Same objection and including
15  to the issue of what is or is not reasonable.
16      MR. BRADLEY: I join that objection.
17  A. Yes, it is, it is not reasonable as stated.
18  Q. And what portion of it do you take exception
19  to?
20  A. Well, I think it has to be rewritten, but the,
21  it talks about the subcontractor not being
22  responsible, but if the general contractor is not
23  performing in a way that is normally expected and as a
24  result of that is responsible for the difficulties

134

1  that are experienced, then it has to be qualified
2  accordingly.
3  Q. Okay. And have you, have you seen provisions
4  similar to this where it has been qualified --
5  A. Absolutely.
6  Q. -- in a manner that you agree with?
7  A. I'm sorry for interrupting.
8  Q. That's all right.
9  A. Yes, absolutely, and you know, provisions such
10  as there has to be participation by the subcontractor
11  in the development of the schedule and things of that
12  sort, and that's the kind of language that I've seen
13  that further qualifies this.
14  Q. Okay. Is that some -- what you talked about
15  earlier, you talked about in terms of having regular
16  meetings and those types of things?
17  A. No, we're talking about the contract language
18  and what am I used to seeing.
19  Q. Okay.
20  A. As a qualification to what is written here.
21  Q. Moving on to what is Link -- what I'll have
22  marked as Link D. The next tab.
23      (Link Exhibit No. D was marked for
24  identification.)

195

1   A.  That is correct.
2   Q.  Okay.
3   A.  Well, the first document is the, I think would
4   be -- yes, I mean it would be appropriate to say Paul
5   Angarame.
6   Q.  Right. Okay. Now, if you look at Link R, the
7   May 4, 2004 document, the single project construction
8   services agreement, if you look on page 6114, it's the
9   first page, it identifies as a construction contractor
10  Creedon Controls Incorporated. Is that correct?
11  A.  Yes.
12  Q.  And identifies as the electrical trade manager
13  Forest Electric Corporation; is that correct?
14  A.  Yes.
15  Q.  Okay. And the first sentence of the document
16  says, "the single project construction services
17  agreement is made as of the second day of October
18  2003. And we understand that's backdated. Is that a
19  fair statement?
20  A.  We're reading the bottom now?
21  Q.  Yes, I'm sorry, the first sentence at the
22  bottom of the single project construction services
23  agreement is made as of the 2nd day of October 2003.
24  And again, that's backdated?

196

1   A.  Yes, given this is May, then that would be
2   backdated.
3   Q.  Okay, and it says agreement. Between
4   electrical trade manager, that's Forest Electric,
5   correct?
6   A.  Um-hum.
7   Q.  And construction contractor, and that's Creedon
8   Controls, correct?
9   A.  That is correct.
10  Q.  Okay. Now, on Link S, the proposed revisions
11  to Link R, that document, if you look on page FE
12  003547, let me know when you're there.
13  A.  Yes.
14  Q.  Item No. 1, it says contract location first
15  page, last paragraph, first sentence. Proposed change
16  is between the change between electrical trade manager
17  and construction contractor to read between Banc One
18  Building Corporation, electrical trade manager, agent
19  and construction contractor. Do you see that?
20  A.  Yes, I do.
21  Q.  Okay. Who, who was the person that proposed
22  that change, you or Miss Creedon or Mr. Doble?
23  A.  I did.
24  Q.  Okay. And why did you propose that change?

197

1   A.  Because on page 3, 006116, it's clearly
2   identifying the signator as exactly what, all we did
3   was create consistency between what they wanted, who
4   they wanted to sign it and in what role they wanted it
5   signed, and what was previously presented.
6   Q.  And what are you referring to in particular on
7   006116?
8   A.  Owner, Banc One Building Corporation, an
9   Illinois corporation, by Forest Electric Corp. as Banc
10  One Building Corporation's agent and electrical trade
11  manager, by whoever the respective party would have
12  been.
13  Q.  Okay. And did you know who Philip Altheim was?
14  A.  Yes.
15  Q.  Okay, and who did -- who was Philip Altheim?
16  A.  Well I knew him as one of the people on the
17  project. I'm not sure who he worked for.
18  Q.  Okay, and did anyone at Banc One Building
19  Corporation tell you that Forest Electric Corporation,
20  you or anyone at Creedon to your knowledge, that
21  Forest Electric Corporation was their agent?
22  A.  Only to the degree that -- the answer to your
23  question is no, no one from Banc One came to me and
24  said that Forest Electric was the agent.

198

1   Q.  Okay. Is this particular, the section you just
2   read off on page 06116, is that the only written
3   example where you, that you point to indicating
4   your -- supporting your belief that Forest Electric
5   Corporation was acting as an agent for Banc One
6   Building?
7   A.  I can't say that. I would have to review the
8   documents that surrounded this and, you know, the
9   documents that were exchanged at this time. But as I
10  answered previously, clearly it's being asked that
11  this -- I just noticed this as we were discussing it,
12  clearly it's indicated here that Forest is the agent
13  and there was a disagreement between what you
14  originally read and the manner in which the document
15  is supposed to be executed.
16  Q.  Now, is it fair to say that we've talked about
17  this earlier today, you've made reference to Banc One
18  and agency, when you make that reference, is this the
19  specific item that you are thinking of when you made
20  that statement earlier?
21  A.  Not alone. This was one of the things I -- I
22  was thinking about this document, not specifically
23  that particular section of it. But there were
24  discussions on site with Forest Electric people which

### 199

1 further confirmed that agency.
2 Q. Okay. And but only with Forest Electric
3 people?
4 A. I can't say that either, but at least with
5 Forest Electric people.
6 Q. And who in particular at Forest Electric made
7 any such representation to you?
8 A. It was either Paul Angarame, Terry Peng, or Len
9 Beck.
10 Q. And you recall what was said or I mean the
11 general -- were was there a specific state or a
12 general thing that was said?
13 A. You know, we're going back to May 2004.
14 Q. Understood.
15 A. I'm trying to respond to your question. That's
16 my recollection.
17 Q. And let me ask you this. In your experience or
18 in your mind at the time that you drafted No. 1, the
19 first, the first proposed revision to the contract
20 that's in Link S, did you see any advantage or
21 disadvantage to a contract with Banc One Building
22 Corporation as opposed to one with Forest Electric?
23 Either way.
24 A. No. I mean as I testified this morning, it was

### 200

1 a total surprise even getting it. This is May. What,
2 we're six months into the project, 7 months into the
3 project, and all of a sudden, we have a contract as a
4 prime contract as opposed to the subcontract with Banc
5 One. I -- all we did was we, we accepted the fact
6 that it was given to us. We accepted the fact that,
7 you know, we had to do something with it and so what
8 we did was we didn't want to mark up the document or
9 anything like that, so we created an addendum which
10 reflected the issues that at this point in time were
11 beginning to negotiate.
12 Q. And those negotiations didn't resolve with, or
13 didn't end, I should say, with a final contract, did
14 they?
15 A. No, it did not.
16 Q. Okay. I want to turn to, this is in Link R,
17 to the next page, 006115, and this is No. 4, the
18 section regarding liquidated damages. Do you see
19 that?
20 A. Yes.
21 Q. It says in the document that Forest Electric
22 presented to you, it says liquidated damages will be
23 applicable to the project as set forth in section 7.03
24 of the general conditions. Now, in Link S, the

### 201

1 proposed changes that Creedon submitted to Forest
2 Electric, on page No. 4 on page FE 003547, says
3 replace -- will replace with not. In other words,
4 liquidated damages will not be applicable to this
5 project.
6 First question is, did you draft No. 4 in
7 terms of the proposed revisions for the contract?
8 A. I think I documented it. We discussed it, as
9 in many of these cases we discussed them among
10 ourselves.
11 Q. Okay, and when you say "among ourselves," is
12 this you, Miss Creedon and Mr. Doble?
13 A. Yes.
14 Q. Anyone else involved in that?
15 A. There may have been.
16 Q. Okay. Why did you propose the change to have
17 no liquidated damages, liquidated damages related to
18 this contract?
19 A. Well, liquidated damages are onerous, and I
20 don't remember now, but if the project was supposed to
21 be done in April and this is May, it just, there
22 wouldn't be any wisdom in agreeing to liquidated
23 damages at this point.
24 Q. I want to go back to Link R, which again is the

### 202

1 document presented that was presented to Creedon
2 Controls. And I want to go to page 006132.
3 A. Which tab is this?
4 Q. This is, this is R, Link R. This is the
5 document that was presented to Creedon.
6 A. I'm still lost.
7 Q. I think you're looking at the one that --
8 A. Is this R?
9 Q. That's S, I'm sorry.
10 A. No, that's my problem, go ahead. 00.
11 Q. 6132. And again, this is the document at that
12 was presented to Creedon.
13 A. I thought you said 63.
14 Q. I'm sorry.
15 A. Maybe you didn't, but I couldn't find it.
16 6132?
17 Q. Right.
18 A. I'm there.
19 Q. The first article 1, which is entitled work,
20 now this is a very large paragraph, to say the least.
21 So bear with me as I try to kind of direct you to
22 certain areas that I want to ask you about. If you go
23 down, and I'll count these off, try to make it easier,
24 11, the 11th line in 1.01.

203

1    A. Yes.
2    Q. When it talks about the for going shall not
3    relieve construction contractor of construction
4    contractor's responsibility to advise owner of any
5    inconsistencies in any of the plans and specifications
6    which a fully competent, first class contractor could
7    reasonably be expected to discover upon review of the
8    plans and specifications. Do you see that?
9    A. Yes.
10   Q. Now, in fact, to the extent that Creedon
11   recognized or reported any such inconsistencies, it
12   reported them to Forest Electric, not Banc One
13   Building Corporation. Isn't that correct?
14   A. Yes, I think fundamentally Creedon's contact on
15   this project was primarily with Forest and sometimes
16   with Tishman.
17   Q. Okay. Now given that answer, maybe I can skip
18   forward a bit. And that would be true of --
19   withdrawn.
20
21        MR. BRADLEY: Pardon me, what was the last
22   question?
23        (The requested portion was read.)
24   BY MR. McDONALD:

204

1    Q. Okay, I want to go to, we're still in Link R,
2    the document that was presented to Creedon. I want to
3    go now to page 006133, to article 2, entitled owner.
4    Let me know when you're there.
5    A. Yes, I'm sorry.
6    Q. Okay. Now, in that particular article, I want
7    to talk about 2.01, the first one. If you go to the
8    end of the first sentence, it says, "owner shall
9    furnish descriptions of all surveys describing the
10   physical characteristics, legal limitations and
11   utility locations for the area within which --
12   A. Excuse me, I'm going to interrupt you. I can't
13   find where that is.
14   Q. 2.01 under article 2.
15   A. Yes, yes.
16   Q. At the end of the very first sentence.
17   A. Oh, at the end of the first sentence.
18   Q. Right, I'm sorry. Right after the, I guess the
19   introductory clause, if you will. To the extent
20   required by construction contractor to perform the
21   work, owner shall furnish descriptions of all surveys
22   describing the physical characteristics --
23   A. I'm sorry, I still don't know where you are.
24   Could you just point to it on your document?

205

1    Q. I will, it's 2.01.
2    A. Just point on your document.
3    Q. Here, right there.
4    A. "To the extent required"?
5    Q. Right, I was going to start off at the end of
6    the sentence but I'll just do the whole thing.
7    A. Thank you.
8    Q. "To the extent required by construction
9    contractor to perform the work, owner shall furnish
10   descriptions of all surveys describing the physical
11   characteristics, legal limitations and utility
12   locations for the area within which the work is to be
13   performed and where materials are to be stored, which
14   work areas within the site are limited to the areas
15   designated such on Exhibit D to the agreement work
16   area.
17        My question is, in fact, is it true to say
18   that when Creedon communicated regarding, or the
19   communication it received regarding descriptions and
20   surveys on this project that it received them from
21   Forest and not from Banc One Building Corporation?
22   A. I can't say that I was privy to the exchange of
23   such information. It probably occurred early in the
24   project, so I really can't answer that question.

206

1    Q. Okay, if we go to No. 2.03, first sentence
2    says, "if construction contractor is in default of any
3    of its obligations under the contract documents, and
4    such failure or default continues for 7 days after
5    written notice from owner, owner may order
6    construction contractor immediately to stop the work,
7    or any portion thereof, until the cause for such order
8    has been eliminated." Do you see that?
9    A. Yes.
10   Q. In fact, when, in fact, Creedon communicated
11   with Forest and not Banc One Building Corporation when
12   it received noncompliance notices that either came
13   from or were made by Forest. Isn't that true?
14   A. To answer that question, my understanding of an
15   agency arrangement is I'm dealing with the owner when
16   I'm dealing with the owner's agent. So I, you know,
17   when you say we're dealing with Forest, who is the
18   agent of the owner, as far as I'm concerned we're
19   dealing with the owner.
20   Q. Okay. But I guess so then, your understanding
21   is that communications went through either Forest or
22   Tishman, and that based upon what you believe to be
23   the case, they were then agents of Banc One Building.
24   Is that what you're saying?

207

1  A. Well certainly with respect to this agreement,
2  it was clear to me either correctly or incorrectly,
3  that the, that Banc One was represented by Forest as
4  agent, and when we were dealing with Banc One, if this
5  particular agreement is the agreement that controls,
6  then we were dealing with Banc One, the owner, if we
7  were dealing with Forest.
8  Q. Okay. But again, you didn't deal with anyone
9  from Banc One Building Corporation to your knowledge
10 regarding any of the issues we just discussed in the
11 contract?
12 A. Again, I wasn't privy to all of those contacts,
13 but I did -- I don't recall the issue, other than
14 those which I testified to this morning, that involved
15 Banc One employees or -- employees.
16 Q. Understood.
17    MR. McDONALD: We can take a break since
18 we have I think five minutes left on this tape.
19    THE VIDEOGRAPHER: We're going off the
20 record at approximately 3:37 p.m.
21    (A brief recess was taken.)
22    THE VIDEOGRAPHER: We're going back on the
23 record at approximately 3:42 p.m.
24 BY MR. McDONALD:

208

1  Q. Now, I want to go to, and still might be best
2  if you kept R and S kind of off to the side because
3  we're probably going to go back to them a couple of
4  times and it might be easier to flip that way. But in
5  the notebook I want to go to -- excuse me, to Link T,
6  which is funny considering our conversation about tea
7  off records a second ago.
8     Link T on its face appears to be a July
9  23rd, 2004 letter from Miss Creedon done addressed to
10 CEO of Banc One billing corporation and CEO of Tishman
11 Construction corporation and the CEO of Forest
12 Electric Corporation, Philip Altheim, so I guess that
13 tells us who he is from a prior document when we
14 discussed it.
15    My first question is, to your knowledge is
16 this the first, the first correspondence or
17 communication that Creedon Controls had directly with
18 Banc One Building Corporation on the matter of the
19 critical events summary that we discussed earlier, the
20 order of magnitude?
21 A. I can't say that this is one of the original
22 documents, but I don't know, there were several of
23 these that I, that I recall that were sent. And I
24 don't know, you know, I don't have the time line in

209

1  front of me.
2  Q. Okay. Actually, it what might be helpful is I
3  think there is a time line inside the document itself
4  if we turn the next page, 005734. Miss Creedon seems
5  to, to give an accounting of communications or formal
6  notification that apparently was attached to the
7  original of this document, and if you go down that
8  list, you can tell me if I read something incorrectly.
9  There is a Creedon letter to Forest dated April 6,
10 2004, there is a Creedon letter to Forest dated April
11 20th, 2004; a Creedon meeting with Tishman and Forest
12 of April 21st, 2004; a Creedon e-mail to Forest dated
13 May 7th, 2004; Creedon e-mail to Forest dated May
14 13th, 2004; Creedon transmittal to Forest dated May
15 24th, 2004; Creedon letter dated May 28th, 2004 to
16 Forest; a Creedon letter dated June 17, 2004 to
17 Forest; a Creedon letter to Forest dated June 22,
18 2004; a Creedon e-mail to Forest dated July 12th,
19 2004; a Creedon e-mail to Forest dated July 13th,
20 2004; and a Creedon letter dated July 19th, 2004 to
21 Forest. Did I miss anything?
22 A. You read everything that was on 005734.
23 Q. Okay. Is there anything else --
24 A. At the bottom of the page.

210

1  Q. Is there anything else mentioned in the letter
2  as a communication, a formal notification,
3  communication?
4  A. Would you like me to read the three pages to
5  determine whether --
6  Q. You can certainly do that if you'd like to.
7  A. Well it's up to you. Are you going to ask me,
8  if you want an answer to that question that would be
9  helpful to me.
10 Q. I'm sure it will take you maybe a minute to do
11 that if you'd like to.
12 A. A cursory review indicates that, that there may
13 have been an additional document prior to this. It
14 says this letter, this is on 005733, the last sentence
15 of -- let me call it the preamble, it says, this
16 letter is one last attempt to open a meaningful
17 dialogue to discuss and settle a change order." And I
18 don't he no if there was any prior letters that were
19 sent, I do know there was more than one sent.
20 Q. Okay, but at least on the face of the document,
21 other than that possible reference, there is no other
22 indication that there was any prior communication with
23 Banc One Building Corporation regarding the order of
24 magnitude. When I say order of magnitude, I'm talking

Page 211

1 about the change order, critical events change order
2 issue that came up, there's no prior indication,
3 indication of any prior communication with Banc One
4 Building Corporation regarding that, isn't that
5 correct?
6   A.  Yes.
7   Q.  Okay. And in fact, if we look at Link U, the
8 next document in line, which on its face seems to be a
9 letter from Creedon Controls Incorporated dated June
10 22nd, 2004 addressed to Terry Peng, the contract
11 administrator at Forest Electric Corporation, and that
12 document is addressed from you; is that correct?
13   A.  I signed that letter.
14   Q.  Okay. And did you write that letter?
15   A.  I presume that I did. There may have been team
16 participation, but it certainly went out under my
17 hand.
18   Q.  Okay. And that's a letter that you wrote to
19 Forest Electric Corporation and --
20   A.  To Terry Peng.
21   Q.  Right. And not to Banc One Building
22 Corporation?
23   A.  That is correct.
24   Q.  Okay. And you copy Paul Angarame of Forest

Page 212

1 Electric Corporation on it and Patricia Creedon; is
2 that correct?
3   A.  That is correct.
4   Q.  Okay. If we go to Link V.
5       (Link Exhibit No. V was marked for
6 identification.)
7   Q.  The next document which appears to be a letter
8 from Creedon Controls Incorporated, a memorandum, I
9 should say, I apologize, from Creedon Controls
10 regarding a Creedon Controls meeting with Forest
11 Electric on Thursday, July 8th, 2004, memo is written
12 to document the reference meeting with Paul Angarame
13 vice president, Forest Electric, the meeting was
14 attended by Paul Angarame, Pat Creedon and Dennis
15 Link. Do you recognize this document?
16   A.  Yeah, as we read it I do, yes.
17   Q.  Okay. And this is also a document that you
18 prepared; isn't that correct?
19   A.  This also looks like it went out under my hand.
20   Q.  Okay.
21   A.  I don't know to what extent I was responsible
22 for everything that's in there, but I definitely, it
23 was a memo from me to Forest.
24   Q.  And again, it makes no reference to, to Banc

Page 213

1 One Building Corporation, does it?
2   A.  A cursory review indicates that, it's certainly
3 addressed to Forest and I don't see any references in
4 here with respect to Banc One.
5   Q.  Okay. If we go to Link W?
6       (Link Exhibit No. W was marked for
7 identification.)
8   A.  Oh, wait a minute. There was a third page.
9   Q.  I'm sorry.
10   A.  In, in V.
11   Q.  Is there? Do you recall that being attached
12 to, to V? Or it may be just a matter of having been
13 next in line in the document production. Was that
14 part of the first two pages, which 004941 and 004942?
15   A.  It doesn't say enclosure on 004942. There's no
16 reference to any other documents from a cursory
17 review, so it looks like someone is documenting the
18 meeting.
19   Q.  Well moving on to Link W, which on its face
20 appears to be e-mail correspondence with Paul Angarame
21 of Forest Electric dated July 12th of '04, do you see
22 that?
23   A.  Yes.
24   Q.  And this again is correspondence that you

Page 214

1 prepared. Is that correct, the bottom e-mail in
2 particular, second one is a response to you. But the
3 bottom e-mail is addressed to Paul Angarame and
4 signature line seems to indicate it came from you. Is
5 that correct?
6   A.  Yes, I'm not reading it, but, you know, we're
7 kind of moving through these documents rather quickly.
8 But certainly it indicates that it was to Paul and I
9 have my name at the, there appears to be my name at
10 the end. So therefore, I would say it's an e-mail
11 from me to Paul.
12   Q.  Okay. A couple of questions occurred to me.
13 One is what's your relationship, your business
14 relationship with Creedon Controls at that time, as of
15 the time you're writing these, I think now we're gone
16 through four different pieces of correspondence,
17 prepared by you on Creedon Controls' letterhead or
18 utilizing Creedon Controls' e-mail? What's your
19 relationship with Creedon Controls during this time
20 period?
21   A.  I testified this morning that one of the roles
22 that I was participating in was to communicate and to
23 receive communications. So really, it's consistent
24 with the role that they had brought me on. In other

215

1  words, to deflect some of the time that was being
2  consumed by Charlie Doble, and to handle as many of
3  these things that I could handle to permit him to do
4  the more of the field work and the management.
5  Q. Now, were you added, officially added to the
6  employee roles or were you being paid a different type
7  of capacity? How was that being handled?
8  A. Are you asking whether I was 1099 or W-2?
9  Q. Yes.
10  A. Okay. I would have been 1099. My employment
11  did not change.
12  Q. Okay.
13  A. Or I should say the corporation would have been
14  1099. I got a W-2 from the corporation.
15  Q. Now, now, if we -- one second, I thought I had
16  something. One second.
17  A. Let me clarify something, when I say I got a
18  W-2 from the corporation, the company that I work for,
19  Karden Construction Services.
20  Q. Okay. Karden.
21  A. Yes.
22  Q. Actually there's one other document I think I
23  didn't mention yet in this chain, should be an easy
24  one to dispense with, Link X which I think is another

216

1  letter from you on behalf of Creedon Controls to Paul
2  Angarame of Forest Electric on July 19th, 2004.
3  That's Link X.
4       (Link Exhibit No. X was marked for
5  identification.)
6  Q. Do you see that?
7  A. Yes.
8  Q. Okay. And have I described that accurately?
9  A. Link X 4944 is on Creedon letterhead, addressed
10  to Paul Angarame, and was signed by Dennis Link.
11  Q. Okay. Now, isn't it true that Creedon, and I
12  say Creedon, that could be Patricia Creedon or Creedon
13  Controls, that when Creedon contacted Banc One
14  Building Corporation or wrote to the CEO of Banc One
15  Building Corporation, the letter that's reflected at
16  Link -- excuse me, at Link T, the letter to the CEO of
17  July 23rd, 2004, that the reason why Creedon wrote to
18  Banc One Building Corporation at that time was because
19  it viewed Banc One as a potential objective third
20  party to resolve this dispute?
21  A. What we were looking for was someone with
22  construction experience. It was the Banc One project,
23  and but we were looking for someone that was outside
24  the project team that was put together by Banc One.

217

1  Because we felt that there was no way to resolve this
2  amicably given the attention that this matter, or the
3  little attention this matter was given, unless we got
4  someone who did not have a vested interest in the
5  direct financial outcome with respect to, you know,
6  whatever arrangement existed between Forest and Banc
7  One or Tishman and Banc One. You know, I don't know
8  if there was -- I've been involved in projects where
9  there were bonuses and things like that. So
10  therefore, if we're awarded additional money, then
11  what would happen is someone, it would be to someone's
12  detriment, they wouldn't get that bonus. So we were
13  looking for somebody outside that sphere to that could
14  objectively look at the situation and draw a
15  conclusion, since Banc One was in charge, they had the
16  leverage to; we believe they had the leverage to
17  respond and to enforce.
18  Q. And what you just testified to, I want to see
19  if that's consistent with some of the, I think some
20  correspondence that you've written. I want to direct
21  your attention to Link Y.
22       (Link Exhibit No. Y was marked for
23  identification.)
24  Q. Which on its face appears to be an e-mail from

218

1  you to Patricia Creedon dated September 1st, 2004, RE
2  the Banc One project meeting. And what, a couple
3  things I want to direct your attention to. One, the
4  very first sentence, it says, or after it says Pat
5  regarding this e-mail, and there is an e-mail that's
6  attached at the bottom from Paul Angarame, Forest
7  Electric Corporation which appears it was forwarded to
8  you for your input, Paul indicates at your request he
9  is setting up this meeting with him and Forest's
10  attorney. I do not think that you requested a meeting
11  with him and his attorney. You skip down to the next
12  paragraph, their attorney, again, if I'm reading
13  something incorrectly, please let me know. Their
14  attorney, meaning Forest Electric's attorney, is
15  hardly the objective third party that you requested to
16  stand in on any future meetings. If there is going to
17  be an attorney present, it should be one from Banc
18  One." Then further down on the, the, not the next
19  paragraph, but the paragraph after that, I believe
20  that you want to have a meeting with people who will
21  make the decision to pay and how much." That
22  consistent with what you just testified to regarding
23  the reasons why you wanted Banc One to become involved
24  in resolving this dispute?

Link, Dennis (Rough) 5/31/2006 9:34:00 AM

219

1  A. Yes, I believe Banc One had control of the
2  purse strings.
3  Q. And in fact, also, if we go back to Patricia
4  Creedon's letter to the CEO of Banc One from July
5  23rd, 2004, which is Link T, is that also consistent
6  with her statement at the very beginning of that
7  letter on page 005733, this letter is to solicit
8  offsite assistance to resolve a communication problem
9  associated with our attempts to settle what we believe
10 to be a large, simple, well documented change order
11 claim on the referenced project, offsite assistance
12 referring to Banc One. Is that consistent with that
13 as well?
14 A. No. I mean Banc One did have people that were
15 in the sphere on this project who were immediately
16 responsible for the results of this project. And we
17 wanted somebody outside the on-site sphere. But Banc
18 One, once again, is the party that was paying the
19 money for the services that were provided, and so but
20 we wanted to go outside that. We wanted someone who
21 didn't have a direct vested interest, such as in a
22 bonus or something like that, with respect to their
23 performance on this project.
24 Q. Okay. And if we look at Link Z, which is

220

1  another letter, follow-up letter I believe from
2  Patricia Creedon to the CEO of Banc One Corporation,
3  dated August 11, 2004.
4         (Link Exhibit No. Z was marked for
5  identification.)
6  Q. If you could turn to the second page of that,
7  which is at Bates No. Banc One 00043, the not
8  including the bullet point at the top, the third full
9  paragraph, as owner of the referenced property, we
10 make another appeal for you to provide an individual
11 from Banc One not involved in the reference project,
12 knowledgeable in construction and claims settlement to
13 in effect mediate this change order claim. And then
14 she goes on to say, respect your selection of someone
15 that will be fair and open minded, and our comfort
16 with our position on this project VOPT's failure to
17 address any of the issues of our change order claim
18 and Banc One's ability to be objective, and then I
19 think there might be something that she left out
20 there, that we would make such an offer to settle this
21 matter using a Banc One mediated forum. Is that
22 consistent with what you have -- what you believe to
23 be the reason for bringing Banc One in to try to
24 resolve this dispute?

221

1  A. Yes. We, we believe that Banc One, once again,
2  is the party that can make such a settlement happen.
3  Q. Okay. And then the last, it's the last letter
4  I'll address in this particular line of questioning.
5  Is Link AA. Actually gotten past the Zs quicker than
6  I think you expected we would. August 16, 2004, this
7  is a letter, appears to be a letter from Creedon
8  Controls, Patricia Creedon, to a Miss Barto of Banc
9  One. Do you see that?
10 A. Yes.
11 Q. Have you seen this letter before?
12 A. I think so.
13 Q. Okay. And it says on the second paragraph, I
14 have had a serious communication problem with the site
15 management team on the subject project since March
16 2004. I am hoping there is a way to get some help
17 either through you or another, and again I think there
18 is a word missing, at Banc One. Then she goes down to
19 the end of the second paragraph, and says, I am
20 appealing to you to --
21 A. Third paragraph?
22 Q. You're right, I'm sorry, the third paragraph.
23 I am appealing to you to intervene on my behalf.
24 Again, is that consistent with your understanding as

222

1  to why Banc One, Creedon Controls sought to include
2  Banc One Building Corporation to mediate this dispute?
3  A. You know, you keep saying this, and you know,
4  basically it's Banc One's project, and Banc One
5  determines whether money is paid or not paid, and we
6  felt that if we could get a decision at that level,
7  then problem is solved because Banc One would merely
8  say this money is for Creedon Control, pay it to them.
9  And that's really what's going on here.
10 Q. Okay, I want to go back to Link R, which now we
11 are he several exhibits removed from. It's the May
12 4th, 2004 contract presented to Creedon under cover
13 letter of Forest Electric. And I want to go to page
14 006137, which is part of article 3. Let me know when
15 you're there.
16 A. Yes.
17 Q. And this is section 3.10, the last sentence of
18 that section, construction contractor shall consult
19 with owner on the actual progress of the work and if
20 requested by owner at any time, shall at no additional
21 cost to owner submit to owner a series of reports at
22 such intervals as may be requested by owner reflecting
23 the progress of the work. Do you see that?
24 A. Yes.

223

1  Q. Okay, a couple things. One is, isn't that
2  essentially the notification issue that we've
3  discussed before in terms of the notifying Forest
4  Electric through daily reports and those sorts of
5  things, daily meetings? Is that similar to the
6  provisions we've talked about before in the invitation
7  to bid and letter of intent?
8  A. It is true that Forest Electric asked for such
9  reports. And they had a form that we were asked to
10 use. Is that responsive?
11 Q. It is. But I also, I guess my question also
12 included, is that similar to provisions that we talked
13 about earlier in the invitation to bid and the letter
14 of intent in terms of daily progress reports?
15 A. I remember discussing those. Whatever I said
16 at that time is a matter of record.
17 Q. Okay. And then I want to go over to, this is
18 still in Link R, to page 006144. This is under
19 article 7 noted as time.
20 A. Yes.
21 Q. And if you look at 7.01, I hesitate to read the
22 entire paragraph because it's just pretty long. If
23 you could read it, though, take a moment to read it, I
24 believe you'll find that it has to do with certain

224

1  change orders and various things. But if you could
2  read it and we'll talk about it once you're done.
3  A. Yes.
4     THE VIDEOGRAPHER: Excuse me a second,
5  your mike.
6     THE WITNESS: It's getting covered by the
7  papers, sorry.
8  BY MR. McDONALD:
9  Q. Now, is it fair to say that that provision,
10 7.01 relates to issues of causes of delay and the
11 remedy being equitable extension of time or a change
12 order? Is that a fair statement?
13    MR. BESTE: Objection, calls for legal
14 conclusion.
15 A. The, they do address a number of items, item I
16 through, Roman numeral I, small letter I through Roman
17 numeral 7. There may be other incidents, but they're
18 putting -- appears to me that they're saying here are
19 some conditions that exist which can cause an
20 extension and then it puts some time limits on
21 notification.
22 Q. Okay. Is that similar to the, or I should say
23 it's similar to what we've discussed earlier in terms
24 of the invitation to bid and the letter of intent,

225

1  isn't it?
2     MR. BESTE: Again, an objection, that
3  calls for legal conclusion. It's obviously not the
4  same, so it's a conclusion, a legal conclusion as to
5  whether it's similar to or any other similar phrase
6  you want to use.
7  Q. Does it address the same issue that's been
8  raised before in the invitation to bid and the, and a
9  letter of intent in terms of extensions of time for
10 events seen or unforeseen?
11 A. We did address some of those issues earlier
12 today, and without going back looking at it and
13 comparing it now, and the fact is I think, well
14 there's no question I qualified it when we did go
15 there. So does this relate, could this relate to some
16 of the issues that that relates to? Possibly.
17 Q. I guess my point is not so much whether or not
18 they say the exact same thing, I understand they may
19 not, but that these are, the issues, I guess, is it
20 fair to say that the issues from the standpoint of the
21 person presenting, whether it be an invitation to bid
22 or a letter of intent or a contract to Creedon, that
23 the position that was presented to Creedon was
24 relatively consistent on issues around time and

226

1  performance, change orders, the things we've been
2  talking about today?
3     MR. BESTE: Same objection, you're just
4  doing it by a different way. You're asking him to
5  compare legally what two contract clauses or proposed
6  contract clauses means. And I think that's unfair to
7  this witness.
8     MR. McDONALD: Well I wasn't really asking
9  for what it means so much as what it, had an it says
10 on its face.
11    MR. BESTE: And that's the basis of my
12 objection because you're asking him what it says, IE,
13 to interpret it.
14    MR. McDONALD: Well I think we had a
15 conversation earlier, I understand you weren't here
16 for it, where we went into detail as to Mr. Link's,
17 based upon his curriculum vitae, his experience in
18 litigation, settlement negotiations, litigation in
19 construction, interpreting contract clauses and things
20 of this nature. So I think, and at that time he was
21 able to answer questions. I think he's able to
22 provide an answer if it's, if you're worried that it
23 comes, goes into that area, obviously we can deal with
24 that in terms of litigation in terms of an exclusion

Link, Dennis (Rough)  5/31/2006  9:34:00 AM

123

1  I may have more, fewer or more, but those at a minimum
2  I would have wanted to renegotiate and to, and to
3  solidify with possibly different language.
4  Q. And regarding Link C, CL 1143 is the page
5  number, can you tell me anywhere in that language used
6  by Miss Creedon which starts this letter of intent is
7  accepted, where it says that it's conditioned upon
8  receiving a subsequent document in terms of a
9  contract?
10  MR. SEGLIAS: I'm going to object to the
11  question. The writing has, I think you're asking him
12  again essentially to interpret language which Miss
13  Creedon has already testified to. I don't think it's
14  a fair question.
15  Q. Well, counsel, he said that, he said his
16  interpretation was that it was conditioned upon
17  receiving a contract. And I just want to know where
18  in that particular language he is pointing to that
19  says it's conditioned upon receiving another, another
20  document.
21  MR. SEGLIAS: Well I think he's already
22  answered that previously. I'll allow the witness to
23  answer, but he's not here -- excuse me, I was about to
24  sneeze. He's not here as a corporate representative

124

1  for Creedon, so his opinion about what it means is
2  really not relevant to any issue in the case.
3  Certainly not contract formation, because he didn't
4  negotiate on behalf of Creedon, nor is he here to
5  speak on behalf of Creedon about whether or not a
6  contract was entered into by Forest -- with Forest and
7  Creedon.
8  MR. McDONALD: Understood.
9  Q. But even given that, Mr. Link, is there
10  anything in that particular sentence that says
11  anything about receiving another contract?
12  A. To do what is in that sentence in my opinion
13  requires a finalized contract to turn over to your
14  attorney for review, which is what I think she's
15  recommending there. And I don't know how you turn
16  something over that isn't final or isn't complete and
17  ask someone to look at it so they can look at
18  something subsequently that is final and complete.
19  And I'm saying that in the context of the fact that in
20  the second paragraph Paul Angarame says, the prime
21  contract documents have not been finalized." So
22  there's no way he can finalize his contracts on that
23  basis.
24  MR. McDONALD: Lunch break.

125

1  THE VIDEOGRAPHER: We're going off the
2  record at approximately 12:40 p.m.
3  (A lunch recess was taken.)
4  THE VIDEOGRAPHER: We're going back on the
5  record at approximately 1:37 p.m.
6  MR. BESTE: And this is Robert Beste with
7  Cohen Seglias, palace green hall & Furman on behalf of
8  plaintiff Creedon Controls, Inc., filling in for the
9  afternoon session.
10  BY MR. McDONALD:
11  Q. Okay. Good afternoon, Mr. Link.
12  A. Good afternoon.
13  Q. I want to finish up with a document that's been
14  marked as Link C before moving on. Hopefully it won't
15  take too long. I want to direct your attention to the
16  handwriting that we discussed earlier, or actually
17  there's handwriting on page CL 1144 which you
18  indicated that you believe based upon conversations
19  and observations to be the handwriting of Patricia
20  Creedon. I want you to look at Roman numeral I at the
21  end of that paragraph where it says in handwriting if
22  such conflicts exist, this document shall prevail. Do
23  you see that?
24  A. Yes.

126

1  Q. Okay. Is that part of the handwriting you
2  referred to that you said looked like Mrs. Creedon's?
3  A. It's actually printing, and the printing does
4  look like hers as well as the cursive.
5  Q. Okay. And did you ever have a conversation
6  with Miss Creedon as to what she meant when she added
7  "if such conflicts exist this document shall prevail"?
8  A. No, I did not.
9  Q. Okay. I'm going to ask you some questions
10  similar to the ones I asked before regarding the
11  invitation to bid. I have a couple provisions I want
12  to get your opinion on in terms of whether or not in
13  your experience they appear reasonable and based upon
14  what you understand happened in this particular
15  instance as well. Looking at Roman numeral III, the
16  portion of that which says, "subcontractor shall not
17  proceed with the work not set forth in Exhibit A until
18  it has received a written change order, or shall do so
19  at its own risk. This paragraph shall not apply to
20  ordinary field modifications which do not
21  substantially increase the contractor's cost of this
22  agreement and which will be performed without time or
23  price adjustment." Do you see that provision?
24  A. Yes.