# EXHIBIT F

**Creedon v. Forest Electric and Banc One Building Corp**
**Angerame, Paul - Vol. 1**
6/1/2006

Printed : 7/13/2006

```
                              1
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
       CREEDON CONTROLS, INC., a  )
       Delaware corporation,      )
                                  )
             Plaintiff,           )
                                  ) Civil Action
          v.                      ) No. 05-CV-300-JJF
                                  )
       BANC ONE BUILDING          )
       CORPORATION, an Illinois   )
       corporation, and FOREST    ) Volume One
       ELECTRIC CORPORATION, a New ) Pages 1 - 142
       York corporation,          )
                                  )
             Defendants.          )

             Rule 30(b)(6) deposition of FOREST
       ELECTRIC CORPORATION, by and through its corporate
       designee PAUL ANGERAME, taken pursuant to notice at
       the law offices of Cohen, Seglias, Pallas, Greenhall &
       Furman, P.C., 1007 Orange Street, Suite 1130,
       Wilmington, Delaware, beginning at 1:37 p.m., on
       Thursday, June 1, 2006, before Julie H. Parrack,
       Registered Merit Reporter, Certified Realtime Reporter
       and Notary Public.
       APPEARANCES:
             EDWARD SEGLIAS, ESQUIRE
             COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
               1007 Orange Street, Suite 1130
               Wilmington, Delaware  19801
                 On behalf of Plaintiff
                    WILCOX & FETZER
            1330 King Street - Wilmington, Delaware 19801
                         (302) 655-0477
                         www.wilfet.com
```

```
                                                     2
   1   APPEARANCES CONT'D:
   2         JONATHAN CHOA, ESQUIRE
             PAUL, HASTINGS, JANOFSKY & WALKER LLP
   3           725 East 55th Street
               New York, New York  10022
   4              -and-
             RICARDO PALACIO, ESQUIRE (As Noted)
   5         ASHBY & GEDDES
               222 Delaware Avenue, 17th Floor
   6            Wilmington, Delaware  19899
                  On behalf of Defendant Banc One Building
   7         Corporation
   8         PAUL A. BRADLEY, ESQUIRE
             McCARTER & ENGLISH, LLP
   9            919 North Market Street, Suite 1800
                Wilmington, Delaware  19899
  10               On behalf of Defendant Forest Electric
             Corporation
  11
                        - - - - -
  12
  13             PAUL ANGERAME,
  14         the deponent herein, having first been duly
  15         sworn on oath, was examined and testified as
  16         follows:
  17   BY MR. SEGLIAS:
  18   Q.  Good afternoon, Mr. Angerame.
  19   A.  Good afternoon.
  20   Q.  I'm going to call you Paul, because I think it
  21   will, it will help move things along a little bit,
  22   help the court reporter also a little bit.
  23   A.  Right.
  24   Q.  So if you don't mind, you know, I'll just refer
```

```
                                                     3
   1   to you by your first name.
   2       I'm going to ask you some questions today
   3   about the Banc One project.  I think you're familiar
   4   with the litigation that involves currently Creedon
   5   Controls, Forest Electric and Banc One.  Is that
   6   right?
   7   A.  Yes.
   8   Q.  Okay.  You have been brought here as a
   9   corporate representative of Forest Electric.  Has it
  10   been explained to you what's involved in that
  11   capacity?
  12   A.  Yes, it has.
  13   Q.  Okay.  And have you had a chance to review the
  14   notice of deposition in connection with your presence
  15   here today?
  16   A.  I did originally when I -- when that was first
  17   issued.
  18   Q.  I'm going to give you a copy of it.
  19       MR. SEGLIAS:  We can mark this as Angerame
  20   A.  I have a copy for Mr. Bradley.
  21       (Angerame Exhibit No. A was marked for
  22   identification.)
  23   Q.  This is the notice of deposition that was sent.
  24   Have you seen this before, Paul?
```

```
                                                     4
   1   A.  Yes, I have.
   2   Q.  Have you seen what's been attached as Exhibit
   3   A?
   4   A.  Yes.
   5   Q.  Are you prepared to address the subject matter
   6   which is identified on Exhibit A?
   7       MR. BRADLEY:  Before you answer that,
   8   please note in the record that I sent a letter, at
   9   least one letter to Mr. Beste regarding the nature and
  10   scope of this request and with our objections to the
  11   different requests.
  12       MR. SEGLIAS:  Okay.
  13       MR. BRADLEY:  With that, you can answer.
  14   BY MR. SEGLIAS:
  15   Q.  Yes, and I'll find out which ones you're
  16   prepared to talk about and which ones you can tell me,
  17   "I know nothing about, you'll have to see somebody
  18   else about that."  So let's just go down that, and I
  19   can identify those and we won't waste any time
  20   addressing issues that are unrelated to what you're
  21   familiar with.  Are you prepared to talk about item
  22   No. 1?  And you can just review that, I won't read it
  23   out loud.
  24       (Charles A. Patrizia, Esq., entered the
```

17

1  point?
2  A. There was no schematic drawings. Like I said,
3  the only drawing that may have been available was a
4  one-line document, which we described -- give you a
5  little more detail -- which we just described the
6  electrical installation, power installation.
7  Q. And so the one drawing that you got, was it
8  30-by-24 or --
9  A. It was probably a D, what they would call a
10  D-size drawing.
11  Q. Did it show the building footprint?
12  A. No.
13  Q. Was there any demarcation of a building outline
14  on it?
15  A. No.
16  Q. What information did it have on it?
17  A. Purely electrical, purely electrical
18  information.
19  Q. Okay.
20  A. And in the executive summary they may have
21  described the square footage footprint.
22  Q. Was there actual drawing on there, Paul, or was
23  it just all handwritten information?
24  A. No, it was a drawing. It was a drawing of, a

18

1  one-line drawing of the facility.
2  Q. So it was generally how to power up and
3  maintain power in the facility?
4  A. Exactly.
5  Q. And what it would cost to do that?
6  A. Exactly.
7  Q. Okay, thereafter, what did you do?
8  A. Forest actually had initially hired an
9  individual to run this project, to be the project
10  manager. And I had some interaction with him, you
11  know, I think he had attended some meetings down here.
12  Again, I wasn't with him and I was kind of on the, you
13  know, not really involved in the project yet. So he,
14  he may have attended some meetings here. I think he
15  might have spoken to some subcontractors, local
16  subcontractors.
17  Q. What was his name?
18  A. I think his last name was Mulvahill. I don't
19  remember his first name.
20  Q. Was he from New York or down here?
21  A. From New York.
22  Q. All right, you had some -- you prepared
23  preliminary budgets, you had some conversations with
24  Mr. Mulvahill. What followed then?

19

1  A. Then at some point Philip Altheim, who is the
2  chairman of Forest, asked me to get more involved in
3  the project, become more involved in the project.
4  Q. Okay, and what did you do in that regard?
5  A. And I was also interested, you know, as I think
6  about it, I might have actually came -- I may have
7  came to him first and said, "I'm really interested in
8  this project, I'd like to become more involved,"
9  and --
10  Q. Okay, obviously at some point you did.
11  A. Yes.
12  Q. I'm just trying to get to that.
13  A. Yes, so at that point I guess after some
14  discussions with Philip and some of the other senior
15  executives, they decided to have me lead that project.
16  Q. Okay. And so had Forest at that point in time
17  entered into a contract with anyone?
18  A. No.
19  Q. What were you asked to do at that point?
20  A. Start attend -- I started to attend meetings
21  here in Wilmington.
22  Q. And let's start with the first one.
23  A. Right.
24  Q. Who all was in attendance at that meeting?

20

1  A. It was the complete design team. There was a
2  lot -- it was a lot of people. I mean there was the
3  architect, Gensler was the architect. I don't -- I
4  can try to remember some of the people's names. But
5  it was --
6  Q. No, I'm more interested in who was represented.
7  A. Oh --
8  Q. Gensler?
9  A. Gensler, Banc One, Tishman, EYP,
10  Thornton-Tomasetti, Van Demark Lynch, the principal
11  design team, as well as the owner and the construction
12  manager.
13  Q. Okay, and Forest?
14  A. And Forest.
15  Q. Now, what was discussed at these preliminary --
16  I'll call them preliminary meetings, and they're
17  preliminary because the work at the site hasn't
18  started yet.
19  A. Mainly design issues. There was a design
20  criteria log that was reviewed every week. It was all
21  design, preparatory design discussions leading up to,
22  you know, the start of the project.
23  Q. Did Forest prepare any design documents --
24  A. No.

21

1   Q. -- for electrical?
2   A. No.
3   Q. Who did?
4   A. EYP.
5   Q. All right, so when you were in the meetings,
6   what did you understand your role to be?
7   A. Again, that we were going to be the electrical
8   trade manager.
9   Q. All right. And so what was your understanding
10  of what the electrical trade manager was to do on the
11  project?
12  A. My understanding, based on the speed and the
13  complexity of the project, was that the owners had a
14  desire to have, you know, an experienced electrical
15  contractor manage the electrical trades. And that was
16  going to be our role and responsibility.
17  Q. All right. I think we can, we can agree that
18  there was more than one electrical contractor working
19  on the job.
20  A. Yes.
21  Q. Whose decision was it to break up the
22  electrical work into smaller packages, or into
23  specific scopes of work, however you want to identify
24  it?

22

1   A. Well, the concept was, from my understanding,
2   was the desire of the bank to have an overall
3   electrical trade manager, but to break it up into
4   packages because of the size of the local and the
5   experience of some of the local contractors, that they
6   felt it was too much work for any single contractor
7   here.
8   Q. Did they ever ask Forest to self-perform any of
9   the work?
10  A. No. Not, you know, not that I am aware of.
11  Q. Has Forest self-performed work on projects of
12  this type?
13  A. Oh, absolutely.
14  Q. And it has entered into subcontracts with
15  contractors or owners to perform this type of work?
16  A. Yes.
17  Q. What did you understand the role of the
18  electrical trade manager to be once those packages had
19  been let to the various trade contractors?
20  A. Let me just take a step back, that was a big
21  role.
22  Q. I understand.
23  A. The role was to break down the scope into, into
24  pieces that made sense, and then to go through the

23

1   procurement process of preparing RFPs, you know,
2   receiving quotes and, you know, descoping the
3   individual contractors and making award
4   recommendations to the owner.
5   Q. So these are all what we might call
6   preconstruction activities?
7   A. Yes.
8   Q. Did you enter into a preconstruction contract
9   with anyone?
10  A. We were certainly directed.
11  Q. When I say you, obviously that's Forest.
12  A. Right, well we were, we were directed to do
13  this. Was there a document that said that? I
14  don't -- not at that point.
15  Q. Well, did there subsequently become a document
16  where Forest entered into a contract with somebody to
17  perform these services?
18  A. I don't know if that's a technical question or
19  not. Yes, I believe so.
20  Q. And who was the contract with, Forest contract
21  with? Not for the electrical trade packages, but
22  upstream, either, I assume either Tishman or Banc One.
23  A. Ultimately with the bank.
24  Q. Was there ever any contractual arrangement

24

1   between Forest Electric and Tishman?
2   A. No. Again, not a formal document.
3   Q. I understand you may have interfaced with them.
4   A. Right, yes.
5   Q. I don't doubt that. But I'm talking about a
6   formally executed document.
7   A. No, there was only one document that was
8   executed.
9   Q. With Banc One?
10  A. Yes.
11  Q. Did you execute that document on behalf of
12  Forest Electric?
13  A. No, I didn't.
14  Q. Who from Forest Electric did?
15  A. I believe, I believe it was Philip Altheim.
16  Q. All right. When you -- were you involved in
17  any contract negotiations with Banc One in connection
18  with the contract that we just identified?
19  Discussions, reviews, anything like that?
20  A. Not directly. No.
21  Q. What did you -- I assume indirectly, what were
22  you asked to do?
23  A. Well, our in-house paralegal, you know, may
24  have had some questions for me regarding scope and

### 53

1  meeting minutes?
2  A. Those meetings that were held in our trailer,
3  Forest kept those minutes.
4  Q. Who actually wrote them?
5  A. I would say one of the administrative people
6  with, you know, Leonard Beck's direction.
7  Q. It wasn't you?
8  A. No.
9  Q. Did you sit in on those daily meetings?
10 A. Often, not always.
11 Q. When you say often, on average how many times
12 per week?
13 A. Just by virtue of being in the trailer I would,
14 you know, I would be there and hear them, but if I
15 actively participate, you know, three days a week.
16 Q. Three days a week on average?
17 A. On average.
18 Q. Sometimes it might be more?
19 A. Sometimes it would be more.
20 Q. Sometimes less?
21 A. I agree with that.
22 Q. Depends on what's happening?
23 A. Yes. If I heard any -- yeah, if it needed my
24 input, I would get involved.

### 54

1  Q. All right, now, when you sat in those meetings,
2  did you break out the schedule and talk about it?
3  A. Again, speaking philosophically for me as a
4  project manager, that's a tool and it's an overall
5  tool. It's not something that you need to sit down
6  with a foreman and go over on a daily basis. On a
7  daily basis you would go over with the foreman what
8  the expectations are for the next few days, the next
9  week.
10 Q. I don't want to -- you know, no disrespect
11 intended, but I don't want to know your philosophy. I
12 just want to know whether you remember sitting in
13 meetings and breaking out the schedule and talking
14 about, "Here's what we're going to do over the next
15 week, you, Mr. Electrical contractor, are going to do
16 this," and talk about the schedule that your
17 scheduling consultant had actually prepared. Do you
18 remember doing that?
19 A. I understand. No, that conversation doesn't
20 occur.
21    MR. SEGLIAS: Gone a little over an hour.
22 Anybody want a little rest room break or anything
23 else? I mean I can keep plowing on, but I'll give
24 you -- might want a couple minutes.

### 55

1     MR. BRADLEY: Two minutes.
2     (A brief recess was taken.)
3     (Mr. Patrizia and Mr. Palacio left the
4  room at this time.)
5  BY MR. SEGLIAS:
6  Q. Okay, now that we've lost half our audience,
7  was Scheduling Solutions on site?
8  A. Not the whole time.
9  Q. How often would they come to the site?
10 A. We'll have to check the records. Every other
11 week.
12 Q. Once a week fair? Okay.
13 A. (Nodded affirmatively.)
14 Q. And where are they located?
15 A. New Jersey. I'm not really sure of the town.
16 I think it's Trubeck (Phonetic), New Jersey, but I'm
17 not sure of the town, the name of the town.
18 Q. I want to ask you a little bit about the
19 bidding process. Was there a prebid meeting, Paul,
20 you know where any potential bidders would come in and
21 you'd explain to them what the work was?
22    MR. BRADLEY: Is there -- I mean are you
23 talking about for the 6B contract or anything or --
24 Q. Yeah, let's start -- I was talking generally

### 56

1  with regard to the various electrical trade packages,
2  but we could break them down by scopes of work, 6B or
3  otherwise if you want. But go ahead, I mean start
4  with like 6B. Did you have a preconstruction meeting
5  for that work? I'm sorry, a prebid meeting.
6  A. We didn't make it a practice having prebid
7  meetings, no.
8  Q. So it didn't happen for 6B?
9  A. No, but I can go through the process. I mean
10 there was certain --
11 Q. We'll get to that.
12 A. Sure.
13 Q. And the other trade packages, you didn't, there
14 was no prebid meeting per se where all the potential
15 bidders would meet to talk about the scope of work
16 related to that contract?
17 A. No.
18 Q. All right, what was the process then?
19 A. The process was we would come up with a list of
20 bidders, submit that list through Tishman to the bank,
21 and the bank would approve the bidders' list.
22 Q. These would be potential bidders?
23 A. Correct.
24 Q. Would that list be broken down per package?

57

1   A. Yes.
2   Q. Okay.
3   A. Yes. So, for instance, for 6B we came up with
4   a group, a list of potential bidders, submitted them
5   for approval, got an approval, and then we would --
6   obviously previously had prepared our RFP packages, we
7   would send out our RFP packages to the approved
8   bidders.
9   Q. Okay, with regard to the 6B contract, how many
10   bidders were there?
11   A. On the Brandywine site, I'd have to check the
12   record. But I would say at least four, possibly five,
13   six.
14   Q. Is that people who thought -- who had interest
15   or is that actual bidders?
16   A. The actual bidders, we have to look at the
17   record to see who actually responded, but yeah, the
18   packages would go out, right, maybe not everybody
19   would bid on it.
20   Q. Yeah, okay. All right. All right, with
21   respect to the 6B work, who prepared the invitation
22   for bids? And this is actually, I can show you a
23   document that's previously been marked. I'm not going
24   to remark stuff that's already been marked. Try not

58

1   to anyway.
2       But this was marked as Creedon Exhibit 2,
3   and it's identified, Paul, as an invitation to bid. I
4   know it's on Forest stationery, so one would assume or
5   could assume Forest prepared that, but I don't want to
6   jump to that conclusion.
7   A. Forest prepared this. This is actually -- this
8   is not an RFP, this is a best and final.
9   Q. It says "Invitation to bid."
10   A. But it's best and final. That's the
11   distinction.
12   Q. All right.
13   A. Forest prepared this document.
14   Q. Okay.
15   A. And assembled it.
16   Q. And all of the various terms that are
17   identified in there, terms, conditions, things of that
18   sort, you can thumb through that, is that all language
19   that Forest prepared?
20   A. No, not necessarily. I mean we assembled the
21   RFP, but the documents that are contained in it come
22   from different sources. Certainly the project notes
23   and specifications and the general scope of work is
24   all prepared by, was prepared by Forest. The drawing

59

1   list was prepared by Forest based on the design
2   drawings. The rider A, general conditions, the rider
3   A, general conditions, a lot of these came from
4   Tishman to us to include in this document.
5   Q. Do you know if Forest added any of their own or
6   is it -- can you say?
7   A. Well, I can see that our name is here, so we
8   may have modified it to, you know, to be more
9   appropriate for us, you know, delivering this
10   document. But I think some of the details came from
11   Tishman. And this schedule, we prepared this schedule
12   that was included in the best and final.
13   Q. And that schedule reflects what?
14   A. This schedule is just a duration schedule
15   without dates that would represent, you know, what we
16   would have anticipated the durations, you know, the
17   construction durations to be for this particular piece
18   of work.
19   Q. Do you know if those durations held?
20   A. I have to do that comparison.
21   Q. You don't know?
22   A. I'd really have to make the comparison to
23   answer that.
24   Q. All right, let me, just to try to get some

60

1   documents out on the table, a little bit of
2   housekeeping, show you what I'm going to mark as, I'm
3   going to take this out of order but we'll get back
4   into order. This is, I have this identified as
5   Exhibit C. And tell me -- that one actually belongs
6   to Paul. We'll mark officially your copy.
7       (Angerame Exhibit No. C was marked for
8   identification.)
9   Q. Can you tell me what we're looking at, Paul?
10   A. This is a project contact list.
11   Q. Is this something that was prepared by Forest?
12   A. Yes.
13   Q. And it seems to identify, we went over a bunch
14   of names, and it seems to identify personnel that were
15   stationed at Brandywine, not all of them, but some of
16   them.
17   A. Yes, I agree.
18   Q. Okay. Michael Garrison, was he on the, was he
19   on the Brandywine job?
20   A. No, he was at the Bear site.
21   Q. Did you have responsibility for both sites?
22   A. Yes.
23   Q. Did you spend time over at the Bear site?
24   A. Yes.

141

```
 1
 2
 3
 4
 5
 6        Replace this page
 7        with the Errata Sheet
 8        after it has been
 9        completed and signed
10        by the Deponent
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

142

```
 1            CERTIFICATE
 2   STATE OF DELAWARE)
                     )
 3   NEW CASTLE COUNTY)
 4        CERTIFICATE OF REPORTER
 5        I, Julie H. Parrack, Registered Professional
     Reporter and Notary Public, do hereby certify that
 6   there came before me on the 1st day of June, 2006, the
     deponent herein, PAUL ANGERAME, who was duly sworn by
 7   me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
 8   deponent and the answers given were taken down by me
     in Stenotype notes and thereafter transcribed by use
 9   of computer-aided transcription and computer printer
     under my direction.
10
          I further certify that the foregoing is a true
11   and correct transcript of the testimony given at said
     examination of said witness.
12
          I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
14
15        _____
          Julie H. Parrack, RMR, CRR
16        Certification No. 102-RPR
          (Expires January 31, 2008)
17
18
     DATED:_____
19
20
21
22
23
24
```