# EXHIBIT H

Creedon v. Forest Electric and Banc One Building Corp
# Creedon, Patricia - Vol. 1
5/22/2006

**Printed : 7/13/2006**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a )
Delaware corporation, )
            )
    Plaintiff, )
            ) Civil Action
    v.      ) No. 05-CV-300-JJF
            )
BANC ONE BUILDING )
CORPORATION, an Illinois )
corporation, and FOREST ) Volume One
ELECTRIC CORPORATION, a New ) Pages 1 - 243
York corporation, )
            )
    Defendant. )

Videotape Rule 30(b)(6) deposition of CREEDON CONTROLS, by and through PATRICIA CREEDON, taken pursuant to notice at the law offices of Ashby & Geddes, P.A., 222 Delaware Avenue, 17th Floor, Wilmington, Delaware, beginning at 9:40 a.m., on Monday, May 22, 2006, before Julie H. Parrack, Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

APPEARANCES:
   EDWARD SEGLIAS, ESQUIRE
   COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
     1007 Orange Street, Suite 1130
     Wilmington, Delaware 19801
       On behalf of Plaintiff
   WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

2

1  APPEARANCES CONT'D:
2    CHARLES A. PATRIZIA, ESQUIRE
     MELISSA G. WARREN, ESQUIRE
3    PAUL, HASTINGS, JANOFSKY & WALKER LLP
       875 15th Street, NW
4      Washington, D.C. 20005
         -and-
5    RICARDO PALACIO, ESQUIRE
     ASHBY & GEDDES
6      222 Delaware Avenue, 17th Floor
       Wilmington, Delaware 19899
7        On behalf of Defendant Banc One Building
         Corporation
8
     PAUL A. BRADLEY, ESQUIRE
9    McCARTER & ENGLISH, LLP
       919 North Market Street, Suite 1800
10     Wilmington, Delaware 19899
         On behalf of Defendant Forest Electric
11       Corporation
12  ALSO PRESENT: ANDY BUCKMASTER, VIDEOGRAPHER
13         - - - - -
14         THE VIDEOGRAPHER: This is the videotape
15  deposition of Patricia Creedon taken by the defendant
16  in the matter of Creedon Controls vs. Banc One
17  Corporation, Civil Action No. 05-CV-300, held in the
18  offices of Ashby & Geddes, 222 Delaware Avenue,
19  Wilmington, Delaware, on May 22, 2006, at
20  approximately 9:40 a.m.
21         The court reporter is Julie Parrack from
22  the firm Wilcox & Fetzer. My name is Andy Buckmaster,
23  a video specialist from Discovery Video Services,
24  Inc., in association with Wilcox & Fetzer.

3

1   Counsel will now introduce themselves and
2   the reporter will swear in the witness.
3         MR. PATRIZIA: This is Chuck Patrizia from
4   the law firm of Paul, Hastings, Janofsky & Walker
5   representing Banc One. With me is Melissa Warren,
6   also of my firm, representing Banc One.
7         MR. BRADLEY: Paul Bradley, McCarter &
8   English, representing Forest Electric.
9         MR. SEGLIAS: Edward Seglias, Cohen
10  Seglias, representing the plaintiff, Creedon Controls.
11        PATRICIA CREEDON,
12  the deponent herein, having first been duly
13  sworn on oath, was examined and testified as
14  follows:
15  BY MR. PATRIZIA:
16  Q.  Miss Creedon, good morning, I'm Chuck Patrizia.
17  I believe that we met during some other discussions,
18  and it's good to see you again this morning.
19       Your counsel, Mr. Seglias, and I have
20  agreed that during this deposition we will, since you
21  are also designated as what the lawyers would call a
22  30(b)(6) witness, that we'll cover all of the issues
23  that your testimony would include, both your personal
24  knowledge and your knowledge as the institutional

4

1   witness for Creedon Controls in one long effort, I'm
2   afraid.
3         When I use the term "you" in asking you a
4   question, I will mean you personally, what your
5   personal knowledge is. If I ask a question about what
6   Creedon Controls did, it would include your own
7   personal knowledge and whatever other additional
8   knowledge you have gained in preparation as the
9   30(b)(6) designated witness.
10        Do you understand that?
11  A.  I'm sure I do, yes.
12  Q.  If at any time during this deposition you want
13  to talk to your lawyer, let me know and we'll take an
14  appropriate break. I may ask you to answer the
15  pending question, but we can work that out with
16  Mr. Seglias if we need to. And if you otherwise need
17  a break at any time to get up and stretch or anything
18  like that, just let me know. I have a bad back, so
19  there will be times when I get up, even if the court
20  reporter tells me that he's not quite done with an
21  hour, I may need to stretch occasionally. So if you
22  see me stand up, it's just to ease my back a little
23  bit.
24  A.  Okay.

37

1  Q. Banc One.
2  A. Um-hum.
3  Q. Knowing Mr. Doble's experience and the
4  experience of the other two project managers that you
5  had on staff, was it your view that Mr. Doble had
6  particular qualifications for reviewing a job of this
7  scope?
8  A. Yes.
9  Q. Do you know whether Mr. Doble had had
10  particular training in estimation of jobs?
11  A. Yes.
12  Q. What training did Mr. Doble have, do you know?
13  A. He had training through his prior employer.
14  Q. Who was his prior employer?
15  A. Hatzel & Buehler.
16  Q. How long had Mr. Doble been working with
17  Creedon Controls at this point, which is September
18  2003?
19  A. He's been with me since 1995.
20  Q. Once Mr. Doble had initially reviewed the RFP,
21  did he have any discussions with you about whether or
22  not to submit a bid?
23  A. No.
24  Q. Did you review his proposed bid prior to its

38

1  submission?
2  A. What do you mean by "review"?
3  Q. Did you get a copy of it and look at it?
4  A. Yes, we -- yes, I looked at his bid.
5  Q. Did he discuss any of the elements in the bid
6  with you?
7  A. We had discussions about the length of the
8  project and the scope of the project and, yes.
9  Q. Would you tell me as much as you recall today
10  about those discussions?
11  A. I guess it depends on which bid you're talking
12  about, because it was bid more than once.
13  Q. Well, we've got an invitation to bid, which is
14  the September 23 date for best and final price.
15  A. Best and final. Well, after his bid or scope
16  review and bid review, the second or third time, I
17  can't remember which, he felt that his numbers were
18  good. We looked it over, and he was, he was
19  comfortable in his position. And we talked about how
20  he created his manpower loading and how he arrived at
21  his number.
22  Q. What did he tell you about how he had created
23  his manpower loading?
24  A. That's something that we don't generally

39

1  discuss.
2  Q. Okay. Would he have discussed those issues
3  with the other project managers?
4  A. He may have.
5  Q. Was there any process for someone other than
6  the project manager doing the original estimate to
7  review an estimate and double check the assumptions or
8  the other aspects of the estimate going in?
9  A. No.
10  Q. Looking at the first page of Creedon No. 2,
11  which is FE 4010, you see where it says that you're
12  invited to submit a lump sum proposal? It's the first
13  paragraph under "To all bidders"?
14  A. Yes.
15  Q. What's your understanding of a lump sum
16  proposal?
17  A. One number to cover all of the job.
18  Q. And it would be your understanding that Creedon
19  Controls would be at risk if the job cost more than
20  that; and by the same token, Creedon Controls would
21  have the benefit if the cost were less than had
22  originally been estimated? Is that correct?
23  A. Correct.
24  Q. At the time either that this request for best

40

1  and final price was received or in the course of
2  discussions with Mr. Doble, did you personally, you
3  Patricia Creedon, review the RFP and what was to be
4  included in the best and final price?
5  A. No.
6  Q. Have you since that time reviewed this document
7  to determine what was in the best and final price?
8     MR. SEGLIAS: When you say in this
9  document, you mean a completed form? Because this one
10  isn't, of course, completed, so --
11     MR. PATRIZIA: That's true.
12  Q. But this is what was being requested, so I
13  guess the question is better put what was being
14  requested for inclusion?
15  A. No.
16  Q. Okay. If you would turn to the page which is
17  Bates stamped FE 4015, if you see item 9 on that page,
18  item numbered 9?
19  A. Yes, yes.
20  Q. Is it typical in your work to provide two-week
21  look-aheads each week during the construction of a
22  project?
23  A. Not me personally, no.
24  Q. Do your project managers do that?

137

1  MR. SEGLIAS: Well review the document,
2  see if that --
3  THE WITNESS: Okay. okay.
4  A. I suppose the term "electrical trade manager."
5  Q. Did anybody from Forest Electric ever show you
6  a contract in which Forest Electric was appointed an
7  agent?
8  A. Paul Angarame told me they signed, he said they
9  signed a contract very similar to this, yes.
10  Q. Did he show you such a contract?
11  A. No, he did not.
12  Q. Did he show you any contract in which Forest
13  was appointed an agent of the Banc One Building
14  Corporation?
15  A. No, he did not.
16  Q. Did you ever see any document in which Forest
17  or Tishman sought approval from Banc One Building
18  Corporation to enter into a contract with Creedon
19  Controls?
20  A. No, I did not.
21  Q. Did you ever see a document in which Forest or
22  Tishman represented that the contract that they were
23  entering into or that Forest was entering into was a
24  subcontract with Creedon Controls?

138

1  A. No, I did not.
2  Q. At the time that you submitted the comments
3  which are in Creedon 17, is it the case that Creedon
4  Controls had already made the claims which are at
5  issue in this litigation for additional payment?
6  A. I'm not sure if we had quantified what those
7  were at that time, but we had gone to the Banc One
8  management team and told them that there were some
9  circumstances beyond our control and that there would
10  be some change orders coming. We didn't -- we did --
11  at that point I'm not sure when we knew what the, what
12  the value of that was going to be at that time.
13  Q. Was one of your purposes in submitting the
14  comments which are in Creedon 17 to assure that you
15  were not waiving any claims for those change orders
16  that you were going to submit?
17  A. Yes.
18  Q. Would you look back at Creedon No. 15, please?
19  And look at page 684.
20  A. Yes.
21  Q. The second paragraph of Roman XIV.
22  A. Yes.
23  Q. What is your understanding of that paragraph?
24  MR. SEGLIAS: Object to the question to

139

1  the extent it calls for legal conclusion or a legal
2  answer. However, you can describe your layman's
3  understanding of what you think that means.
4  MR. PATRIZIA: I agree, Miss Creedon is
5  not counsel and I'm only asking for her layperson's
6  understanding.
7  MR. SEGLIAS: Right.
8  A. Well, I knew I didn't -- I knew I had questions
9  about it. I wasn't going to spend a lot of time
10  worrying what those questions were. That's why I put
11  a little notation on it, and if it had presented
12  itself in an executable contract form, I would have
13  sought more guidance on it.
14  Q. When you say you would have sought more
15  guidance, from whom would you have sought guidance?
16  A. Somebody knowledgeable in construction
17  contracts.
18  Q. Would that have included counsel, or was there
19  someone else you had in mind as knowledgeable?
20  A. Most likely would have, at that time, would
21  have been counsel.
22  Q. At the time that Creedon Controls began work on
23  the project in October of 2003, was it your
24  understanding that the work was under contract to

140

1  Forest Electric?
2  A. Would you repeat that?
3  Q. Yes. At the time Creedon Controls began work
4  on this project in October of 2003, was it your
5  understanding that there was a contract with Forest
6  Electric for this work?
7  A. It was my understanding there was a pending
8  contract.
9  Q. Well, let's go back a step, Miss Creedon. Was
10  it your understanding that you were beginning work
11  without any agreement at all?
12  A. It was my understanding I was proceeding with a
13  letter of intent.
14  Q. And that letter of intent was with Forest
15  Electric?
16  A. Correct.
17  Q. And it was your understanding that there would
18  be some written documentation of that agreement at
19  some point?
20  A. Correct.
21  Q. When did you expect to receive that written
22  documentation?
23  A. I expected to receive it shortly after I had
24  started the project.

141

1  Q. And was it your understanding that Creedon
2  Controls in commencing work in October of 2003 had
3  commenced work based on at least an oral contract?
4        MR. SEGLIAS: Objection. Calls for a
5  legal conclusion.
6        MR. PATRIZIA: Will you permit the witness
7  to answer to her layperson's understanding?
8        MR. SEGLIAS: I will.
9        MR. PATRIZIA: Thank you.
10 A. In my layperson's -- I'm not quite sure what an
11 oral contract is, so --
12 Q. Did you feel like you had an agreement?
13 A. I'm not sure how to answer that, because if
14 they had present -- if they had presented a contract
15 that we could not negotiate terms on, I was not -- I
16 was unclear of how that would resolve itself.
17 Q. Would you have stopped work if you couldn't get
18 a written agreement that met your requirements?
19 A. That would be supposition. I don't know.
20 Q. At the time that you first became aware
21 sometime in early 2004 that the work was going to take
22 longer and cost more to complete than was in your
23 original proposal, did you believe that you had a
24 contract?

142

1        MR. SEGLIAS: Objection, calls for a legal
2  conclusion.
3        MR. PATRIZIA: I don't think as phrased it
4  did. I asked her what she believed.
5        MR. SEGLIAS: Yes, but the term "contract"
6  and whether there's binding obligations between the
7  parties does have some request I think in there for
8  her to answer what essentially amounts to a legal
9  question. So if you can use a word other than
10 contract, I mean we talked about a letter of intent.
11 I think she's explained what she, what she understood
12 as a result of signing that document with the codicil
13 that she identified. But if you want to try to
14 rephrase it, maybe there's something that we can agree
15 on.
16       MR. PATRIZIA: Well, or you can permit her
17 to answer in layperson's terms.
18       MR. SEGLIAS: Can you repeat the question
19 then?
20       MR. PATRIZIA: Would you read the question
21 back, please?
22       (The requested portion was read.)
23       MR. SEGLIAS: With, with Forest? Or with
24 Banc One?

143

1        MR. PATRIZIA: With Forest.
2        MR. SEGLIAS: Or somebody else?
3        MR. PATRIZIA: With Forest. That's fine.
4        MR. SEGLIAS: With Forest. This is your
5  belief only.
6        THE WITNESS: I know.
7        MR. SEGLIAS: If you don't know, you don't
8  know.
9        THE WITNESS: I don't know.
10 BY MR. PATRIZIA:
11 Q. Okay. At the time you contacted Mr. Link and
12 asked Mr. Link to assist Creedon Controls in moving
13 forward on the issues of the additional amount to
14 complete the project, did you ever tell Mr. Link that
15 you had a contract with Forest Electric?
16 A. Not that I recall.
17 Q. Did you provide him a copy of the letter of
18 intent and the form of agreement?
19 A. I may have.
20 Q. Did he ever give you any indication of his view
21 as to whether or not there was an agreement?
22 A. Not that I recall.
23 Q. Certainly you anticipated that you would be
24 paid recurrently for the work that was being done

144

1  during the period you were performing it; is that
2  right?
3  A. Yes.
4  Q. What was the basis on which you submitted
5  claims for or invoices for payment?
6  A. Would be the G704, G703 of the American
7  Institute of Architects.
8  Q. And that's a form document?
9  A. It is.
10 Q. And why would you have used that form?
11 A. It was accepted.
12 Q. Had it been given to you as the form of
13 documentation for use in receiving payments?
14 A. I can't say it was given to us, no. It may
15 have been, but those are routinely used in
16 construction.
17       MR. PATRIZIA: Give me the set of
18 submissions for invoices.
19 Q. Miss Creedon, I'm going to give you in
20 sequence, I hope, copies of the submissions of the
21 payment applications. So the first one will be 19?
22 18.
23       (Creedon Exhibit No. 18 was marked for
24 identification.)

193

1  Q. And that's the same conversation that we
2  discussed a little bit ago as your first understanding
3  from Mr. Doble that the contract completion was going
4  to cost more than was in the original amount?
5  A. Correct, correct.
6  Q. And this occurs sometime in March of '04 as
7  you're looking at the February numbers?
8  A. Correct.
9  Q. Was there something about that conversation in
10 which he indicated that there had been delays on site,
11 or simply that it was going to cost more to complete
12 the work?
13 A. It was more that the, the contract was spread
14 so far over so many areas that it was hard to get a
15 read on how much was being done at any one time in any
16 one room in any one area. So it was -- it was not as
17 anticipated on bid day where they, he could work crews
18 and it could be contiguous or within a certain area at
19 a certain time. So there was -- when he came and
20 talked to me, it was a number of reasons why he felt
21 that we weren't going to be -- it wasn't just one
22 reason. There were several reasons why he didn't
23 think, based on the February numbers, that we were
24 going to be able to complete for the contract amount.

194

1  Q. All right. And let me try to go back and just
2  be sure I understand that. In a conversation in March
3  of '04, Mr. Doble indicates to you that it's going to
4  cost more to complete the project.
5  A. Correct.
6  Q. He indicated to you that one reason for that is
7  that work was being done at a number of different
8  locations across the entire site as part of the 6B
9  contract, and therefore it was difficult for him to
10 know how much was being accomplished across the whole
11 contract? Is that what I understood?
12 A. Well, you could talk to -- you would probably
13 be better to talk to him about that. He was giving me
14 examples of why the contract was going to cost more or
15 why he was -- go ahead.
16 Q. No, that's fine. I'm sorry. Finish your,
17 finish your answer.
18 A. And I believe that was one of them.
19 Q. Do you recall other examples that he gave you
20 at that time?
21 A. The L&M corridor, there was a trench in the L&M
22 corridor. They were having problems breaching it with
23 lifts, aerial lifts. We were doing all of our work 25
24 to 29 feet in the air and we had no way to cross the

195

1  great divide.
2  Q. Do you know when the great divide was installed
3  in the corridor?
4  A. No, I do not.
5  Q. And when you say L&M trench, what do you mean?
6  A. It's an L&M corridor that runs across the
7  mid-section of the building separating the admin from
8  the other areas.
9  Q. It's best if I not testify. What does the
10 acronym L&M stand for?
11 A. Oh, no idea.
12    MR. SEGLIAS: L ampersand M?
13    MR. PATRIZIA: Yes, L ampersand M.
14 A. That's a good question.
15 Q. You always just heard it referred to as the
16 L&M?
17 A. L&M, because I believe it was referred to on
18 the drawings as the L&M corridor.
19    MR. PATRIZIA: We're down to about three
20 minutes. Why don't we stop here and I'll take up a
21 new topic when we're back.
22    THE VIDEOGRAPHER: We're going off the
23 record at approximately 3:49 p.m.
24    (A brief recess was taken.)

196

1     THE VIDEOGRAPHER: We're going back on the
2  record at approximately 4:00 p.m.
3  BY MR. PATRIZIA:
4  Q. All right, Miss Creedon, we were talking about
5  the conversation you had with Mr. Doble in March of
6  '04, and in which he indicated to you, I believe you
7  said for the first time in March of '04, that the
8  contract was not going to be able to be completed for
9  the amount remaining on the contract. And it is
10 correct that that was the first time that he said that
11 to you?
12 A. Yes.
13 Q. And when we broke, we were talking about
14 examples that he had given to you as to why that was
15 true.
16 A. Um-hum.
17 Q. Were there any other examples that you can
18 think of that he gave you in March of '04 as to the
19 reason that the contract could not be completed on
20 time?
21 A. I don't -- I can't recall.
22 Q. Okay. What did you do in response to that
23 conversation with Mr. Doble, if anything?
24 A. I believe I called Mr. Angarame and told him

**Page 197**

1  that after review of my February numbers that it
2  looked like the project was in serious trouble, and
3  that I would be getting him something in writing as
4  soon as I could.
5  Q. This conversation occurred soon after this
6  meeting with Mr. Doble?
7  A. That's my belief, yes.
8  Q. And it would have been sometime therefore in
9  March of '04?
10 A. Yes.
11 Q. Did you confirm that conversation to
12 Mr. Angarame through an e-mail or any notes in your
13 file or anything like that?
14 A. I don't believe so.
15 Q. What other steps did you take, if any,
16 immediately after the conversation with Mr. Doble
17 about this?
18 A. Started trying to quantify the numbers, what,
19 what really happened. Was the -- were the spikes in
20 February an anomaly and were they, was it just
21 isolated events and that we could recover, were there,
22 or was it something that was systemic and was going to
23 continue.
24 Q. Did you reach a conclusion on that question?

**Page 198**

1  A. Well, the hope was that we would identify what
2  had happened and that we would mitigate anything going
3  forward.
4  Q. When you had the telephone conversation with
5  Mr. Angarame, what response, if any, did Mr. Angarame
6  make to you?
7  A. It was minimal.
8  Q. When you say minimal, do you recall anything
9  else about that conversation?
10 A. Not really.
11 Q. When did you first contact Mr. Link about
12 gaining his assistance in relation to these issues?
13 A. I believe it was in March.
14 Q. How did you get Mr. Link's name?
15 A. I had met him previously.
16 Q. Where, in what context?
17 A. I sit as a trustee on a, on the Health and
18 Welfare Funds for Local 313, and he was sitting as a
19 trustee for Local 98 trust funds, and we met through
20 an investment counsel or consultant at a function.
21 Q. When you say trust funds, these are retirement
22 and health and welfare trust funds --
23 A. Correct.
24 Q. -- for the local?

**Page 199**

1  A. Correct.
2  Q. And this is the local IBEW?
3  A. That is correct.
4  Q. I'm going to show you a document that we'll
5  mark as 36.
6      (Creedon Exhibit No. 36 was marked for
7  identification.)
8  Q. This is an e-mail from you to Mr. Link dated
9  March 31st. From your recollection, looking at this
10 e-mail, does this timing make sense? It appears that
11 you were made aware last Thursday, which if the
12 calendar is right, would have been the 25th of March?
13 A. Possibly. Possibly, yes.
14 Q. And it says, "Since time is of the essence,
15 will we be ready to put Forest on alert that there
16 will be claims." Do you see that?
17 A. Yes.
18 Q. Do you know whether or not by the time you sent
19 this e-mail to Mr. Link you had already had that first
20 conversation with Mr. Angarame, or did that
21 conversation occur later?
22 A. I believe it was before, before this e-mail.
23 Q. So when you say in this e-mail, "Will we be
24 ready to put Forest on alert," Forest was already on

**Page 200**

1  alert that there would be changes?
2  A. I meant in written form.
3  Q. So this e-mail was meant to say "We would need
4  to tell Forest in writing" --
5  A. Yes.
6  Q. -- "that there would be something going on."
7  A. Yes.
8  Q. Okay. Then you say, "Am I covered for the
9  clause that reads 'recognized?'" Do you see that?
10 A. Yes.
11 Q. What do you mean by "the clause that reads
12 recognized"?
13 A. Something in the general conditions or the
14 documents that I've seen to date.
15 Q. So the documents that you would have seen to
16 date were the Forest form of subcontract; is that
17 right?
18 A. The sample subcontract, yes, if that's one they
19 produced, yes.
20 Q. Then it says, "I am just a little concerned we
21 won't be ready to put a line item on the WIP before my
22 meeting with the banker."
23 A. Correct.
24 Q. What does that mean?

241

Creedon Exhibits Cont'd:
| | | | |
|---|---|---|---|
| 36 | E-mail, 3/31/04; CL 0836 | | 199 |
| 37 | Creedon Letter 4/6/04; 005675-5676 | | 202 |
| 38 | Memorandum to File Job 2357; 004856 | | 211 |
| 39 | Memorandum to File, 4/22/04; 004853-4855 | | 216 |
| 40 | Critical Events; 005680-5693 | | 221 |
| 41 | Banc One Projects History/Current Status | | 225 |

CL 0522-0763

- - - - -

242

Replace this page
with the Errata Sheet
after it has been
completed and signed
by the Deponent

243

CERTIFICATE
STATE OF DELAWARE)
             )
NEW CASTLE COUNTY)
    CERTIFICATE OF REPORTER
    I, Julie H. Parrack, Registered Professional
Reporter and Notary Public, do hereby certify that
there came before me on the 22nd day of May, 2006, the
deponent herein, PATRICIA CREEDON, who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.

    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                    _____
                    Julie H. Parrack, RMR, CRR
                    Certification No. 102-RPR
                    (Expires January 31, 2008)

DATED:_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CREEDON CONTROLS, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) Civil Action |
| v. | ) No. 05-CV-300-JJF ) |
| BANC ONE BUILDING CORPORATION, an Illinois corporation, and FOREST ELECTRIC CORPORATION, a New York corporation, | ) ) ) ) Volume Two ) Pages 244 - 397 ) ) |
| Defendant. | ) |

Videotape Rule 30(b)(6) deposition of CREEDON CONTROLS, by and through PATRICIA CREEDON, taken pursuant to notice at the law offices of Ashby & Geddes, P.A., 222 Delaware Avenue, 17th Floor, Wilmington, Delaware, beginning at 9:33 a.m., on Tuesday, May 23, 2006, before Julie H. Parrack, Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

APPEARANCES:
    EDWARD SEGLIAS, ESQUIRE
    COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
      1007 Orange Street, Suite 1130
      Wilmington, Delaware  19801
      On behalf of Plaintiff

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Patricia Creedon, Volume 2      C.A. # 05-CV-300-JJF                      May 23, 2006

Page 245

1  APPEARANCES CONT'D:
2      CHARLES A. PATRIZIA, ESQUIRE
       MELISSA G. WARREN, ESQUIRE
3      PAUL, HASTINGS, JANOFSKY & WALKER LLP
       875 15th Street, NW
4      Washington, D.C. 20005
         On behalf of Defendant Banc One Building
5        Corporation
6      PAUL A. BRADLEY, ESQUIRE
       McCARTER & ENGLISH, LLP
7      919 North Market Street, Suite 1800
       Wilmington, Delaware 19899
8        On behalf of Defendant Forest Electric
         Corporation
9
   ALSO PRESENT: ANDY BUCKMASTER, VIDEOGRAPHER
10
             - - - - -
11
12      THE VIDEOGRAPHER: This is the second day
13  of the videotape deposition of Patricia Creedon held
14  in the office of Ashby & Geddes on May 23rd, 2006 at
15  approximately 9:33 a.m. Counsel will now introduce
16  themselves.
17      MR. PATRIZIA: Charles Patrizia of Paul,
18  Hastings, Janofsky & Walker, representing Banc One
19  Building Corporation. With me is Melissa Warren of
20  the same firm.
21      MR. BRADLEY: Paul Bradley, McCarter &
22  English, on behalf of Forest Electric.
23      MR. SEGLIAS: Edward Seglias, Cohen
24  Seglias, on behalf of the Plaintiff, Creedon Controls.

Page 246

1  BY MR. PATRIZIA:
2  Q. Good morning, Miss Creedon. How are you this
3  morning?
4  A. Good, thank you. Good morning.
5  Q. Just a reminder that you are still under oath.
6      MR. PATRIZIA: Mr. Seglias, is there
7  anything we need to cover before we begin.
8      MR. SEGLIAS: I don't think so.
9  Q. Okay. Miss Creedon, yesterday when we were
10 talking about Exhibit 41, which I believe is still in
11 front of you, it is the large document which is the
12 report that was prepared for Wilmington Trust, you
13 indicated that, if you turn to page -- the third page
14 of that document, which is CL 0524, that I believe
15 Miss Cerase had prepared this table of actual and
16 projected hours?
17 A. Yes.
18 Q. Would you tell me what you understand to have
19 been her source for the actual hours?
20 A. I believe her source were the payroll records.
21 Q. The payroll records received from the union
22 hall?
23 A. There are no payroll records from the union
24 hall.

Page 247

1  Q. This would be your payroll records?
2  A. Correct.
3  Q. That you submit to the union and then they,
4  they keep additional materials with regard to pension
5  benefits and things of that sort?
6  A. That's not exactly how it goes, but basically
7  it, that's a recap.
8  Q. Do you know whether or not the project manager
9  would be able on a weekly basis to keep track of the
10 number of hours being spent on the job?
11 A. Yes.
12 Q. Is it typical in your company, in Creedon
13 Controls, for the project manager to track on a weekly
14 basis the hours expended on a job?
15 A. Yes.
16 Q. When a project manager became aware that his
17 hours spent on a job were tracking ahead of what the
18 estimated job would be, what would you expect the
19 project manager to do in that circumstance?
20 A. Assess the situation and see if he was getting
21 ahead of his curve or behind his curve.
22 Q. When you say "ahead of his curve or behind his
23 curve," what do you mean?
24 A. Accelerating his estimate with a sooner

Page 248

1  completion date or exceeding his estimate with a more
2  hours expended than his estimate.
3  Q. In the course of your review of the 68 project,
4  did you ever have an occasion to go back and look at
5  the hours expended week by week to determine when the
6  project began to be ahead of the estimated hours for
7  the job?
8  A. Yes.
9  Q. And what conclusions did you reach when you did
10 that?
11 A. That we were ahead of the estimate when we
12 started the job and about February we were beyond the
13 estimate.
14 Q. Were the number of hours expended on the job
15 already greater than the projected hours to that point
16 at the end of December?
17 A. I could not recall that.
18 Q. If the projected hours were ahead at the end of
19 December, would you expect the project manager at that
20 point to try to make an estimate of the amount of work
21 remaining to be completed and the hours that would be
22 required to complete the work?
23 A. I would expect that, yes.
24 Q. And in fact, the work-in-process system would

2 (Pages 245 to 248)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Creedon Controls, Inc.  
Patricia Creedon, Volume 2  
C.A. # 05-CV-300-JJF  
Banc One Building Corporation  
May 23, 2006

Page 249

1  be sort of designed to force that issue, wouldn't it?
2  A. Correct.
3  Q. Do you recall whether you received a
4  work-in-process report from Mr. Doble for the 6B
5  project in December of 2003?
6  A. No, I don't recall.
7  Q. Do you recall whether you received such a
8  report in January of '04?
9  A. No, I don't recall.
10  Q. Do you keep copies of the work-in-process
11  reports?
12  A. Generally I keep copies, yes.
13      MR. PATRIZIA: Counsel, have the
14  work-in-process reports been produced?
15      MR. SEGLIAS: I can't tell you off the top
16  of my head whether they have or --
17      MR. PATRIZIA: We will certainly check,
18  but I would also ask you to check as to whether the
19  work-in-process reports have been produced, and if so,
20  what the Bates range on them is.
21  BY MR. PATRIZIA:
22  Q. Looking at that same document, Ms. Creedon,
23  which is Exhibit 41, would you turn to the page which
24  is Batesed CL 0535?

Page 250

1  A. Yes.
2  Q. At the top of that page there is a statement
3  that the original contract amount for all three
4  projects was 5,826,425. Do you see that?
5  A. I do.
6  Q. Why did you include the original contract
7  amount for all three projects in this discussion?
8  A. At the request of Forest Electric.
9  Q. Was this discussion going to Forest Electric?
10  A. This -- I'm sorry, what did you say?
11  Q. Was this discussion going to Forest Electric?
12  I thought you told me yesterday that this document was
13  prepared for the bank.
14  A. That is correct. We were trying to represent
15  what we knew at the time to our banker.
16  Q. And that paragraph goes on to say that the new
17  contract price should be 7,716,667, allowing a 20
18  percent markup for overhead and profit. Do you see
19  that?
20  A. I do.
21  Q. Do you know whether or not in the initial
22  proposal that Creedon Controls had made on the 6B
23  project the overhead and profit markup was 20 percent?
24  A. No, I do not.

Page 251

1  Q. Do you know what the overhead and markup was on
2  the original proposal as it went?
3  A. I guess it, it varies whether you're talking
4  about the total contract or against the cost. And in
5  construction it can be against a contract or against
6  cost, which would have a variation of plus or minus 3
7  percent.
8  Q. Did you look at either of those numbers when
9  the proposal went in?
10  A. I did. I don't recall off the top of my head
11  what it was.
12  Q. Does Creedon Controls have a policy that it
13  will always have a markup of 20 percent on every
14  proposal that it submits?
15  A. No, it does not.
16  Q. Do you know whether or not the overhead and
17  markup on the 21A and B contracts, the cable
18  conveyance tray projects, was that 20 percent overhead
19  and profit markup as they were submitted?
20  A. I do not recall that.
21  Q. In any event, the proposals would be able to be
22  analyzed to reach a determination of what the overhead
23  and markup were?
24  A. Correct.

Page 252

1  Q. On that same page, under the heading "Banc One
2  Management Team" the first paragraph, the second
3  sentence says, "At bid time Forest represented that
4  CCI's contract was with them." Do you see that?
5  A. I do.
6  Q. Do you understand that at the time Creedon
7  began work its expectation was that it was going to be
8  a contractor with Forest Electric?
9  A. I do.
10  Q. At the time that you entered into -- I'm sorry,
11  at the time that Creedon Controls entered into the
12  work in October of '03, did Creedon Controls have any
13  expectation that its contract was going to be with
14  anyone other than Forest Electric?
15  A. No, it did not.
16  Q. That section in the next paragraph talks about
17  daily coordination meetings. Do you see that
18  reference?
19  A. Yes.
20  Q. Who attended the daily coordination meetings
21  for Creedon Controls?
22  A. I'm not sure.
23  Q. Would it have been Mr. Doble?
24  A. It could have been Mr. Doble.

3 (Pages 249 to 252)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Creedon Controls, Inc.                                    v.                    Banc One Building Corporation
Patricia Creedon, Volume 2            C.A. # 05-CV-300-JJF                                   May 23, 2006

Page 253

1  Q. Would it have been the general manager or the
2  general foreman on site for that shift?
3  A. Yes.
4  Q. Would both of them have attended?
5  A. Possibly.
6  Q. Was it their practice to keep notes from those
7  meetings?
8  A. I'm not sure.
9  Q. This seems to say that the daily coordination
10 meetings consisted of Tishman's site superintendent in
11 a very unprofessional manner demanding jobs be
12 completed by unrealistic dates.
13    Were there also contractor meetings with
14 Forest Electric in the Forest trailer?
15 A. I'm not sure.
16 Q. If there were, who would attend those meetings
17 for Creedon Control?
18 A. It would have been the same.
19 Q. Either Mr. Doble or the general foreman?
20 A. Correct.
21 Q. In the next paragraph there are references to
22 weekly meetings with a one- and three-week look-ahead
23 schedules. Do you see that in the last paragraph on
24 that page?

Page 254

1  A. The last paragraph?
2  Q. Yes.
3  A. Yes, I do.
4  Q. Did Creedon Controls, as part of its ongoing
5  performance of the 6B contract, prepare look-ahead
6  schedules of its own?
7  A. I'm not sure.
8  Q. Do you know whether or not there was an
9  expectation under the RFP that Creedon prepare such
10 look-ahead schedules?
11 A. I'm not sure.
12 Q. If there were such a provision in the RFP,
13 would Mr. Doble have prepared such look-aheads?
14 A. I would expect so.
15 Q. Did you, in the course of your review as the
16 project proceeded, that is as the 6B project, receive
17 copies of look-ahead schedules from Mr. Doble?
18 A. Not that I recall.
19 Q. Did Mr. Doble, in giving you any
20 work-in-process reports, reference any look-ahead
21 schedules?
22 A. No, and that would not have been typical.
23 Q. I'd like you to turn next to, in that same
24 document, pages that begin at CL 0579. For ease of

Page 255

1  reference, it's probably that set which is folded over
2  there that you have your hand on, yes, the, it's a set
3  of documents labeled Exhibit II.F.
4  A. Yes.
5  Q. Have you seen that document before?
6  A. I have.
7  Q. Do you know who prepared that document?
8  A. Yes.
9  Q. Who prepared that document?
10 A. That would have been Charlie Doble, Dennis
11 Link, Fred Street, Paul Brainard, John Mulrooney,
12 Kristin Carasa, and one or two other foremen or
13 general foremen on the site.
14 Q. Okay, are you aware of any other foremen or
15 general foremen on the site other than the people we
16 discussed yesterday, which were Mr. Street, Mr. Sharp,
17 Mr. Brainard and Mr. Mulrooney?
18 A. I am aware of other. I don't remember their
19 names. There were daily logs submitted, though.
20 Q. Let me ask you a couple of questions about the
21 daily logs, while --
22 A. Okay.
23 Q. -- while we're on that topic. I think you
24 indicated to me yesterday that the daily logs are kept

Page 256

1  by the foremen on the shift. Is that correct?
2  A. Yes.
3  Q. And those are kept in either a perfect bound
4  marble composition book or some similar bound form.
5  Is that correct?
6  A. Correct.
7  Q. And that at the end of the job or when a
8  foreman leaves, he turns that log over to Creedon
9  Controls; is that correct?
10 A. Yes.
11 Q. Do you know whether in the course of their
12 preparation of Exhibit II.F as part of Exhibit 41,
13 that is the table that we were just looking at a few
14 minutes ago, Mr. Link and/or Mr. Doble would have gone
15 back into the daily logs and reviewed them?
16 A. Yes.
17 Q. Do you know whether in the course of a review
18 by any person there were any additional notations or
19 other marks made on the daily logs?
20 A. There may have been.
21 Q. Would it be typical for someone to make
22 additional notations or marks on a daily log that had
23 already been prepared?
24 A. I can't answer that.

4 (Pages 253 to 256)