# EXHIBIT M

# Creedon v. Forest Electric and Banc One Building Corp
## Street, Fred (Rough)
5/30/2006

Printed : 7/13/2006

**2**

```
1     UNEDITED DRAFT TRANSCRIPT
2     (REPORTER'S NOTE: Since this deposition has
      been real-timed and is in rough draft from, please be
3     aware that there is a discrepancy regarding page and
      line numbers when comparing the real-time screen, the
4     rough draft, rough ASCII, and the final document.
      Also please be aware the real-time screen
5     and the unedited, uncertified rough draft
      transcript/ASCII may contain untranslated steno, an
6     occasional reporter's note, a misspelled proper name,
      and/or nonsensical English word combinations. All
7     such entries will be corrected on the final, certified
      transcript.
8     We, the party working with real-time,
      understand that if we choose to use the real-time
9     rough draft screen, ASCII or printout, that we are
      doing so with the understanding the rough draft is an
10    uncertified copy. We understand the real-time rough
      draft may not be used as a final transcript for any
11    purpose including, but not limited to, being quoted
      from or being filed with any court, but is only to
12    enhance notetaking.
      We further agree not to share, give, copy,
13    scan, fax, or in any way distribute this real-time
      rough draft in any form (written or computerized) to
14    any party. However, our own experts, co-counsel, and
      staff may have limited internal use of same with the
15    understanding that we agree to destroy our real-time
      rough draft and/or any computerized form, if any, and
16    replace it with the final transcript and/or any
      computerized form upon its completion.
17    (In re: Creedon v. Banc One)
      (C.A. No. 05-CV-300-JJF)
18    (Deposition of: FRED STREET)
      (Taken on: May 30, 2006)
19
20
21
22
23
24
```

**3**

```
1         THE VIDEOGRAPHER: This is the videotape
2     deposition of Mr. Fred Street taken by the defendant
3     in the matter of Creedon Controls incorporated, a
4     Delaware corporation, plaintiff, versus Banc One
5     Building Corporation, an Illinois corporation, and
6     Forest Electric Corporation, a New York Corp.,
7     defendants, civil action number 05-CV-300. This
8     deposition is being held in the offices of Ashby &
9     Geddes, Wilmington, Delaware, on May 30th, 2006. We
10    are going on the record at approximately 9:32 a.m.
11        The court reporter is Julie Parrack from
12    the firm of Wilcox & Fetzer, Wilmington, Delaware. My
13    name is Lindsay DuPhily, and I am the videotape
14    specialist of Discovery Video Services in association
15    with Wilcox & Fetzer.
16        Counsel will now introduce themselves and
17    then the court reporter will swear in the witness.
18        MR. BESTE: Robert Beste with Cohen
19    Seglias, Pallas, Greenhall & Furman, attorneys for
20    Creedon Controls, Inc.
21        MR. BRADLEY: Paul Bradley, McCarter &
22    English, on behalf of Forest Electric.
23        MR. McDONALD: Paul McDonald of Paul,
24    Hastings, Janofsky & Walker on behalf of Banc One
```

**4**

```
1     Building Corporation.
2
3             Witness,
4         the deponent herein, having first been duly
5         sworn on oath, was examined and testified as
6         follows:
7             THE WITNESS: I do.
8     BY MR. McDONALD:
9     Q.  Morning, Mr. Street.
10    A.  Morning.
11    Q.  We must jet briefly a second ago. Again, my
12    name is Paul McDonald. I represent the defendant,
13    Banc One Building Corporation. Have you ever been
14    deposed before?
15    A.  Yes.
16    Q.  Okay, so you're familiar with how these things
17    basically proceed then?
18    A.  Yes.
19    Q.  Okay. Obviously I will ask you questions. If
20    you don't understand them, you understand that you can
21    let me know that?
22    A.  Yes.
23    Q.  And you understand that you're to answer
24    verbally so that this can be taken down as a
```

**5**

```
1     transcript?
2     A.  Yes, I do.
3     Q.  Even though we have a video here, still any
4     type of movements can be interpreted a number of ways.
5     So I want to be sure you understand that?
6     A.  Yes.
7     Q.  And you also understand from time to time your
8     attorney may object. If that's the case, you can wait
9     until after the objection has been made. If there is
10    an instruction not to answer, we can then, your
11    counsel and I will talk about that. Otherwise, you
12    understand you're to answer; is that correct?
13    A.  Yes.
14    Q.  Okay. Also you understand that if there's a
15    question that calls for you to speculate or anything
16    of that nature, something that you're not able to
17    understand, again, please let me know that.
18    A.  Absolutely.
19    Q.  Okay. Is there anything that, anything that
20    you've done or you had today that you think will
21    affect your ability to understand what's proceeding
22    here today?
23    A.  No.
24    Q.  Okay. All right, I want to start off talking
```

## 58

1  it affect your work on night shift from November 13th
2  through December 10th?
3  A. Basically everybody had to carry a flashlight
4  to go to work or to go to the bathroom.
5  Q. And is there any delay that you attribute to
6  that?
7  A. I would say not delay, but added expense. We
8  had to supply flashlights for our whole crew.
9  Q. And do you know what happened to that added
10 expense or added cost?
11 A. No, sir.
12 Q. Okay, moving to the next page, 005498, there's
13 a notation at December 16th, I believe, that says all
14 material and in building now, no trailer or boxes on
15 site." Is that referring back to the other issue we
16 discussed earlier, in terms of where the material was?
17 A. Yes, this, this is now, we were directed that
18 there be no more material outside. Everything had to
19 be moved inside. No more trailers, no more box
20 trailers or storage. Everything had to move inside.
21 Q. Okay. And what effect did that have on your
22 work, if any?
23 A. Just about brought everything to a halt.
24 Tremendous impact.

## 59

1  Q. Okay. And when you say brought everything to a
2  halt, how long did that, I guess that impact or that
3  standstill or whatever you want to call it, how long
4  did that last?
5  A. Basically it was ongoing.
6  Q. Okay. Now, if it was ongoing, how did you
7  adjust to that issue of the material now being inside
8  the building?
9  A. Go back to just like the very beginning, you
10 have to move everything out of your way to be able to
11 perform your job task.
12 Q. You say you were instructed to do that, who
13 gave you that instruction?
14 A. I was told about this by our daytime general
15 foreman.
16 Q. And who was that?
17 A. At this time that would have been Mr. Rob
18 Sharp.
19 Q. And what's your understanding as to why you
20 were instructed to move the material into the
21 building?
22 A. I was told this was a directive by Tishman so
23 they could do site work.
24 Q. When you say site work, what do you mean by

## 60

1  that?
2  A. Grading for the excavation contractor.
3  Q. Okay. This is related to the excavation
4  contractor, as far as you understand?
5  A. Yes.
6  Q. Okay. But this does not -- or maybe I should
7  ask the question, does this relate to the issue with
8  the grading contractor that you described earlier?
9  A. Same contractor.
10 Q. Okay. But is this issue a part of the problem
11 you described earlier that I believe you testified
12 ended in November of 2003, or is this a separate
13 issue?
14 A. This is a separate issue.
15 Q. Okay.
16 A. This is the same contractor.
17 Q. Of the two issues you described of the --
18 excuse me. Try to say it a little slower. Excavation
19 contractor, the issue described earlier and this issue
20 now that's in December of 2003, which one did you
21 consider to be more impact full?
22 A. This issue, but let's -- I want to make one
23 thing clear. It's not -- I'm not blaming the
24 excavation contractor for this impact. Material was

## 61

1  simply moved out of his way so he could perform his
2  job. But it impacted everybody on this job, not just
3  me.
4  Q. Now, the other issue you described earlier that
5  you said ended in November of 2003, was that an issue
6  similar where you don't blame the excavation
7  contractor or was that something that the excavation
8  contractor --
9  A. That's correct. He was directed how to do his
10 work, just like everybody else on that job.
11 Q. Okay. And in fact, the problems that we
12 discussed earlier, whether they be with the excavation
13 contractor or the drywall contractor, the laborers,
14 what's your understanding as to whether or not they
15 were instructed to do any of those things?
16 A. My understanding is absolutely they were
17 instructed.
18 Q. Okay. And what's your understanding as to who
19 instructed them, if anyone?
20 A. Tishman.
21 Q. Okay. And where do you have, where do you get
22 that understanding?
23 A. The laborers worked for Tishman.
24 Q. Okay. And in terms of the drywall contractor,

62

1   what's your understanding as to --
2   A. They worked for Tishman also.
3   Q. Okay. And the excavation contractor?
4   A. Worked for Tishman.
5   Q. Okay. Now, is there a distinction you're
6   drawing between people who worked for Tishman versus
7   someone else? Do you understand what I'm saying? Is
8   there, are there people who work for someone other
9   than Tishman that you dealt with?
10  A. Was my understanding that Creedon worked for
11  Forest Electric.
12  Q. Okay. And did you, was your understanding that
13  anyone else that you dealt with in terms of
14  contractors, and again, maybe I should back up for a
15  second. You talked earlier about there being 7
16  contractors that you worked with throughout 2357. Is
17  that, that's correct, is that --
18  A. 7 contractors that I had to coordinate with.
19  Q. Okay. Had you coordinate with, okay. And of
20  those 7, how many worked for Forest Electric based
21  upon your understanding, how many worked for Tishman,
22  and how many worked for anyone else, for that matter?
23      MR. BRADLEY: Object to form.
24  A. My recollection, that all the electrical

63

1   contractors worked for Forest Electric.
2   Q. And that would be Creedon and --
3   A. Are Furness Electric and Conti.
4   Q. Okay. And regarding the five additional
5   contractors, now I'm subtracting Furness and Conti
6   from the 7, what's your understanding as to who they
7   worked for?
8   A. Tishman.
9   Q. And again, that understanding is based upon
10  anything that you were told or that you saw or?
11  A. Basically what I was told and saw, who was
12  directing the work.
13  Q. Okay. And in terms of Tishman, who was on site
14  for Tishman who you saw directing any work?
15  A. There again, I don't recall the people that
16  worked for Tishman, their names. But during the
17  course of the job, they were out on the job site and
18  directed contractors.
19  Q. Okay. But they never directed Creedon, is that
20  a fair thing to say?
21  A. That is true.
22  Q. Okay. And you never got directions directly
23  from someone from Tishman?
24  A. No.

64

1   Q. No, meaning that you never did or --
2   A. Never did.
3   Q. Okay. Moving on to page 005409, which is
4   December 18th, looking at December 18th notation, it
5   says "too cold for" what is that, do you see where I
6   am?
7   A. Yes.
8   Q. "Too cold for" --
9   A. The reaches, our high reaches, batteries will
10  not charge.
11  Q. Okay. What, what was that problem about?
12  A. We were constantly being accused of using other
13  contractors' reaches and not plugging them in. This
14  was just, I went out and did a survey, and the problem
15  is that the batteries, as cold as it was in that
16  building, will not charge in a, you know, 12-hour or
17  14-hour period that they were giving them to charge.
18  And absolutely nothing to do with them not being
19  plugged in, it's a physical problem with the led acid
20  battery.
21  Q. Okay, when you say they were giving them the
22  charge, who is the "they" you're referring to?
23  A. Everybody. All, because at this point the only
24  people that were on night shift was Furness and

65

1   Creedon. So because Furness was working on the
2   underground, it was pretty obvious we were the only
3   ones that were using high reaches. So we were being
4   blamed for anything that was going on. It's, like I
5   say, this is just a notation to myself that I looked
6   into their problem and called them, called the
7   manufacturer the next day and found out that's the
8   problem. It's too cold.
9   Q. Okay, when you say that Creedon was being
10  blamed, who was, who was blaming Creedon for this
11  problem?
12  A. Forest Electric. They were, they complained to
13  Forest about us.
14  Q. When you say they, are you talking about other
15  contractors?
16  A. The other contractors.
17  Q. Okay. Do you know which contractors were
18  complaining?
19  A. Not in particular. Everybody had a reach there
20  I think was complaining.
21  Q. And were you contacted by Forest Electric?
22  A. Yes.
23  Q. Okay. And who contacted you?
24  A. Mr. Len Beck.