# EXHIBIT N

Creedon v. Forest Electric and Banc One Building Corp
**Angerame, Paul - Vol. 2**
6/14/2006

Printed : 7/13/2006

143

```
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
       CIVIL TRIAL DIVISION
              -----
CREEDON CONTROLS, INC.,   : CIVIL ACTION
et al.                    :
       vs.                :
BANC ONE BUILDING CORP.,  :
et al.          : NO. 05-CV-300-JJF
              -----
       Wednesday, June 14, 2006
            VOLUME 2
              -----
   Continued oral deposition of PAUL ANGERAME, held
at COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN, P.C.,
United Plaza, 30 South 17th Street, 19th Floor,
Philadelphia, Pennsylvania, beginning at 3:00 p.m.,
on the above date, before LANCE A. BRUSILOW,
Registered Professional Reporter and Approved
Reporter for the United States District Court.
              -----
         brusilow+associates
          135 South 19th Street
              Suite 350
         Philadelphia, Pa. 19103
             215.564.1717
            www.brusilow.com
```

144

```
              APPEARANCES
COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN, P.C.
BY: EDWARD SEGLIAS, ESQUIRE
Nemours Building
1007 Orange Street
Suite 1130
Wilmington, Delaware 19801
ph: 302.425.5089
fax: 302.425.5097
(eseglias@cohenseglias.com)
Counsel for Plaintiff
MARON & MARVEL, P.A.
BY: PAUL A. BRADLEY, ESQUIRE
1300 North Broom Street
Wilmington, Delaware 19806
ph: 302.425.5177
fax: 302.425.0180
(pab@maronmarvel.com)
Counsel for Forest Electric Corporation
PAUL, HASTINGS, JANOFSKY & WALKER, LLP
BY: JONATHAN CHOA, ESQUIRE
Park Avenue Tower
75 East 55th Street
First Floor
New York, NY 10022
ph: 212.318.6451
fax: 212.230.5151
(jonathanchoa@paulhastings.com)
Counsel for Banc One Building Corporation
              -----
```

145

1  (It is hereby agreed by and among
2  counsel that sealing, certification and
3  filing are waived; and that all
4  objections, except as to the form of the
5  question, are reserved until the time of
6  trial)
7  PAUL ANGERAME, having been
8  previously sworn, was examined and
9  testified further as follows:
10  (EXAMINATION)
11  BY MR. SEGLIAS:
12  Q.   Paul, we're here on a continuation of
13  your deposition. When we last met, we were in
14  Wilmington and we were going through various exhibits
15  related to the project.
16       Before we get started with some more
17  exhibits, though, I would like to talk to you about
18  Creedon's contractor balance on the 6B project.
19  A.   Okay.
20  Q.   My understanding is that it's about
21  211,000 and a few dollars. Does that sound --
22  A.   I don't know the exact figure, but
23  that's...
24  Q.   Sounds about right?

146

1  A.   Sounds about right.
2  Q.   Is Forest in possession of that money?
3  A.   I mean, again that may call for a
4  legal...
5  Q.   Well, have you been --
6  A.   ...understanding.
7       MR. BRADLEY: The answer is yes.
8  Obviously I'm not under oath, but Forest
9  has possession.
10  BY MR. SEGLIAS:
11  Q.   So, Forest has been paid that money by
12  Banc One, which is to be paid by Forest to Creedon,
13  correct?
14  A.   If it were to be released by the bank,
15  yes.
16  Q.   What is holding the release of that
17  $211,000, as you understand it?
18  A.   As I understand it, a signed lien
19  waiver, final waiver, and I believe the bank also has
20  a position that there is a back-charge that needs to
21  be settled.
22  Q.   And how much is that back-charge?
23  A.   To my understanding, approximately
24  $15,000.

259

1 contracts with its subs; is that right?
2      MR. BRADLEY: Objection to the
3   form.
4      THE WITNESS: I don't know that
5   they would or would not, but certainly
6   you know, this would change in some
7   manner.
8 BY MR. CHOA:
9   Q.   Can you describe in which manner it
10 would change?
11  A.   Again, not --
12  Q.   Just to your understanding.
13  A.   I guess what would be helpful for me
14 is if I were to see the ultimate document that was
15 distributed to the trade contractors, and that would
16 kind of help.
17  Q.   We'll probably get to that. You might
18 have discussed this in your earlier deposition.
19      Donna's e-mail to you on 10/15 at
20 11:06, "Please advise of the following," did you ever
21 advise her on this issue discussed in the e-mail?
22  A.   I didn't really see it as a question.
23  Q.   Do you understand the difference that
24 she's describing there, "If we are to have no

260

1 exposure, we could use Banc One's form of agreement
2 and place us for Agent for Owner. With the sample
3 Subcontracts being used, we have exposure"?
4   A.   I understand what she's asking or
5 expressing.
6   Q.   Can you just explain what your
7 understanding is of that?
8   A.   Well, she's questioning, I guess,
9 through me what form of agreement is to be used. At
10 this point in time we had just had our letter of
11 intent and sample generic subcontract that's been
12 issued to the trade contractors. I guess what she's
13 expressing is that, in light of this document, are we
14 to use this form of agreement.
15  Q.   And at this point, on 10/15/03, did
16 Tishman have a contract with Forest?
17  A.   No.
18  Q.   Do you remember when the
19 Tishman/Forest contract was entered into?
20  A.   (No response)
21  Q.   To the best of your memory.
22  A.   Again, it sounds as if you're asking
23 me to make a . . .
24  Q.   I don't want a legal conclusion. Was

261

1 there a time, Paul, in your mind where you thought,
2 "Okay, now we have a contract with Tishman," we being
3 Forest?
4      MR. BRADLEY: Objection to the
5   extent that he answered that in a prior
6   deposition.
7      THE WITNESS: There was a point in
8   time where we were engaged or we entered
9   into a formal agreement, and that was
10  sometime, I believe, in the late first
11  quarter of '04.
12 BY MR. CHOA:
13  Q.   Now, you had mentioned the letter of
14 intent. What did you mean by that?
15  A.   Well, once we evaluated the proposals
16 for a specific RFP, Forest would make an award
17 recommendation to the bank, receive signoff on that
18 award recommendation, and then at that point issue a
19 letter of intent to the trade contractors.
20  Q.   Was there any document attached to
21 these letters of intent?
22  A.   There was, I believe, a sample
23 subcontract attached to the letters of intent.
24  Q.   And what do you mean by "sample"?

262

1   A.   As it was described in the letter of
2 intent, Forest had not entered into an agreement at
3 that point, and ultimately the agreement that we'd be
4 entering into with the trade contractors would
5 include terms and conditions that were expressed in
6 our agreement.
7   Q.   So, what was the purpose of sending
8 the sample subcontract agreement?
9      MR. BRADLEY: Objection to the
10  extent that the letter of intent speaks
11  for itself.
12     THE WITNESS: That in the interim
13  between the time the letter of intent was
14  issued and an ultimate agreement was
15  developed between Forest and the bank,
16  that this would be the basis for the
17  contractor to move forward.
18 BY MR. CHOA:
19  Q.   So, the subcontract would contain the
20 terms under which the subcontractor would begin its
21 work; is that correct?
22  A.   It would be an outline of the terms or
23 a starting point for the terms.
24  Q.   What do you mean by "starting point"?

263

1  A.  Well, I think the letter does express
2  that there is no agreement between Forest and the
3  bank, and that there may be additional conditions
4  that would apply.
5  Q.  And who drafted the subcontract
6  agreement?
7  A.  I don't know.
8  Q.  Did Forest Electric draft it?
9  A.  I'm not sure where the document came
10  from.
11  Q.  Do you know if Tishman drafted it?
12  A.  No. I would say it channeled through
13  Forest.
14  Q.  What do you mean by "channeled
15  through"?
16  A.  Again, I don't know who wrote it, but
17  I received it from the New York offices.
18  Q.  So, you don't know if Forest Electric
19  drafted it itself or if -- I'm sorry, strike that.
20  So, you don't know who drafted the
21  agreement?
22  A.  No.
23  Q.  What were your instructions to do with
24  the subcontractor when you received it from the New

264

1  York office?
2  A.  To attach it to the letter of intent
3  when we sent it to the successful trade contractors
4  for each package.
5  Q.  And why at this time, at the time the
6  RFPs were going on, did Forest Electric not have an
7  approved form of subcontract to use with its subs?
8  A.  Because at that point there was no
9  formal agreement between Forest and the bank.
10  Q.  So, was it Forest Electric's
11  understanding that the bank or Tishman, as the bank's
12  agent, would have approval over the form of contract
13  Forest Electric was to use with its subcontractor?
14  A.  Again, I can't form a legal opinion
15  based on that, but I guess my understanding was that
16  until that contract was established, that this would
17  be the basis of the agreement between Forest and our
18  trade contractors.
19  Q.  Was it your understanding that to
20  establish the form of subcontract Forest Electric
21  would use, Tishman would have input?
22  A.  I guess my understanding is that the
23  bank was driving the agreement, and that ultimately
24  the bank would sign off on the form of subcontract as

265

1  well, or form of agreement.
2  Q.  And was a letter of intent and
3  subcontract agreement that we've been describing sent
4  to Creedon Controls at any time?
5  A.  Yes.
6  Q.  And did someone from Creedon Controls
7  sign and return it to Forest?
8  A.  I believe so.
9      MR. CHOA:  I'm going to go ahead
10      and mark this as BB. This was probably
11      produced before.
12      (Exhibit BB was marked for
13      identification)
14  BY MR. CHOA:
15  Q.  For the record, Paul, can you please
16  review this letter of intent and attached subcontract
17  agreement? Was this what was sent to Creedon
18  Controls?
19  A.  Well, this document appears to be what
20  Creedon Controls sent back to Forest.
21  Q.  So, if they sent it back to Forest, I
22  presume that Forest had originally sent it to them?
23  A.  In some form.
24  Q.  Did there come a time you sent a

266

1  second letter of intent and subcontract agreement to
2  Creedon Controls for the same 6B work package?
3  A.  Yes, that has come to my attention.
4  Q.  Do you know why that was done?
5  A.  I believe there was a contract dollar
6  value change.
7      MR. CHOA:  I'm going to introduce
8      this as CC. You can review this and see
9      if this refreshes your recollection as to
10      whether Forest sent a second letter of
11      intent to Creedon.
12      (Exhibit CC was marked for
13      identification)
14      THE WITNESS:  This definitely has
15      a different dollar value associated with
16      it.
17  BY MR. CHOA:
18  Q.  And do you know why the dollar value
19  changed?
20  A.  I don't remember.
21  Q.  Did you ever have any discussions with
22  anyone at Creedon regarding the terms of the
23  subcontract?
24  A.  No.

267

1  Q. Did anyone at Forest Electric have any
2  conversations with Creedon regarding the terms of the
3  subcontract?
4  A. Not that I'm aware of.
5  Q. Do you know if these handwritten
6  notes on the subcontract agreement, were those notes
7  on the form returned to Forest?
8  A. I wouldn't know. I would not know. I
9  had never seen them before.
10 Q. And do you know at whose request the
11 second letter of intent was sent?
12 A. If I knew the circumstances
13 surrounding the dollar-value change, I might be able
14 to answer that, but I don't recall the details.
15 Q. Did Creedon request another letter?
16 A. No, I think the reason was a
17 difference in dollar value.
18 Q. So, then Forest would send -- if the
19 dollar value changed, as a general practice would
20 Forest Electric then second a second letter of intent
21 to reflect that?
22 A. I guess if it was incorrect to begin
23 with, I believe -- and I believe that was the case.
24 Q. Do you recall at what time,

268

1  approximately, Forest Electric received an approved
2  form of contract to use with the subcontractors?
3     And by "approved" I mean signed off by
4  Tishman or the bank or anyone who was obligated to do
5  so.
6  A. I don't remember exactly.
7  Q. Do you ever remember seeing drafts of
8  the subcontract agreement from Donna Lucas? To
9  clarify some terms, when I say "subcontract
10 agreement," let's keep that as referring to the
11 treatment that was attached to the letter of intent.
12 And when we talk about the other form, let's call it
13 the Banc One form of contract.
14 A. Okay.
15 Q. Did you ever receive drafts of the
16 Banc One form of contract from you Donna Lucas?
17 A. I believe I have .
18 Q. Did you review those drafts?
19 A. Yes.
20 Q. What did you review them for?
21 A. For scope, scope and terms relating to
22 change orders, if I recall correctly, markup.
23 Q. And what do you mean by "scope"?
24 A. By "scope" I'm referring to the

269

1  details of the work that's being laid out in these
2  particular packages, like 6A or 6B.
3  Q. Did you look at any of the other terms
4  of the contract?
5  A. I didn't review them, but Donna Lucas
6  may have and had comments regarding them.
7  Q. All right.
8     MR. CHOA: I'll show you this one,
9     and we're up to DD.
10    (Exhibit DD was marked for
11    identification)
12 BY MR. CHOA:
13 Q. Do you remember receiving this e-mail?
14 A. Yes.
15 Q. Do you remember what you did when you
16 received the e-mail?
17 A. I reviewed it. I reviewed the
18 contract.
19 Q. And did you do the same type of review
20 that you discussed prior, reviewing scope and some of
21 the other issues?
22 A. Yes.
23 Q. Did you review any other terms of the
24 contract?

270

1  A. I wouldn't, unless Donna specifically
2  asked me to, you know, work through a particular
3  issue.
4  Q. And at this point have you heard
5  anything from Tishman regarding the terms of this
6  contract?
7  A. It was my understanding that any
8  agreement that was going to be submitted to the trade
9  contractors needed to wait until the master agreement
10 was established between Tishman and the bank
11 initially.
12 Q. Do you know if such agreement was
13 established by February 18th, the date of this
14 E-mail?
15 A. I don't believe it was, but I'm not
16 certain.
17 Q. Now, Donna Lucas writes to you, "I
18 have taken the Banc One agreement and tried to modify
19 it into a (Draft) subcontract agreement."
20    Do you know why she did that?
21 A. The agreement had to be modified so
22 the parties were changed to reflect the trade
23 contractor.
24 Q. Do you know who instructed her to

**279**

1  Tishman is an agent of the bank.
2      MR. CHOA: Right, I understand
3  that.
4  BY MR. CHOA:
5  Q.  When I say "Tishman" I mean Tishman
6  employees. When I say "Banc One" I mean actual Banc
7  One employees, not Tishman on behalf of Banc One.
8  A.  No, it would have been through
9  Tishman.
10  Q.  So, there were no discussions with the
11  bank regarding Forest's authorization to act as
12  agent?
13  A.  Not with me.
14  Q.  Now, what happened after this April
15  12th, 2004 e-mail?
16  A.  After this e-mail we issued this
17  agreement to the trade contractors.
18  Q.  Can you just clarify what you mean by
19  "issued"?
20  A.  We modified this agreement to reflect
21  the scope for the individual packages, and then we
22  transmitted it to the successful bidders for each of
23  those packages.
24  Q.  Was such a bank form of agreement sent

**280**

1  to Creedon?
2  A.  Yes.
3  Q.  Did Creedon sign that contract?
4  A.  No.
5  Q.  What did Creedon do?
6  A.  They held on to it for quite some
7  time -- I don't know the exact duration of time, but
8  I would say it was two months -- then they issued
9  some comments on the agreement.
10  Q.  At that time, the two months that they
11  held on to it, did you have any conversations with
12  anyone at Creedon about that contract?
13  A.  I didn't personally, but I believe we,
14  as Forest, called their accounting department to ask
15  where the signed contract was.
16  Q.  And what did Creedon say?
17  A.  I don't know exactly, but that they
18  didn't sign it to that point.
19  Q.  Did you ever tell Tishman at this time
20  that Creedon was refusing to sign the agreement?
21  A.  Yes, they were aware of it.
22  Q.  What did Tishman do, to your
23  knowledge?
24      MR. BRADLEY: To the extent you

**281**

1  know.
2      MR. CHOA: Strike that. I'll
3  start over.
4  BY MR. CHOA:
5  Q.  Did Tishman instruct you, as Forest,
6  to do anything regarding Creedon's failure to sign
7  the bank form of agreement?
8  A.  Other than expressing some concern and
9  desire to get the contracts signed.
10  Q.  Was Forest negotiating terms with
11  Creedon at this time?
12  A.  Terms of the contract?
13  Q.  Right.
14  A.  No.
15  Q.  Did Tishman instruct Forest to
16  negotiate terms of the contract with Creedon?
17  A.  No. If anything, the form of the
18  contract was not open for negotiation.
19  Q.  Did there come a time where Creedon
20  sent comments on the bank form of agreement to
21  Forest?
22  A.  Yes.
23  Q.  Who did those comments go to?
24  A.  I believe they were e-mailed to me.

**282**

1  Q.  What did do you when you received that
2  e-mail?
3  A.  I forwarded them, I believe, to Donna
4  Lucas and perhaps to outside counsel.
5  Q.  Outside counsel for Forest?
6  A.  Yes.
7  Q.  Did you review the comments?
8  A.  I read them.
9      MR. BRADLEY: Just so I can
10  clarify, you're talking about the
11  addendum that Creedon sent to Forest?
12      MR. CHOA: That's right.
13      MR. BRADLEY: Okay.
14      MR. CHOA: Actually, I'll
15  introduce this as FF, which may refresh
16  or familiarize.
17      (Exhibit FF was marked for
18  identification)
19  BY MR. CHOA:
20  Q.  Does this e-mail look familiar to you,
21  Paul?
22  A.  Yes, it does.
23  Q.  And you write to Donna Lucas, "At the
24  time I informed Creedon that no changes would be

283

1   accepted."
2          How did you inform Creedon? By that I
3   mean, was there a writing? Was there an oral
4   discussion? Was there another method?
5       A.   I would say it would be an oral
6   discussion.
7       Q.   And do you remember the details of
8   that oral discussion?
9       A.   Not specifically.
10      Q.   Do you remember if substantive issues
11  were discussed?
12      A.   No, I would say they were not.
13      Q.   And do you remember what Creedon's
14  reaction was when you informed them that no changes
15  would be accepted?
16      A.   I don't think they had a reaction at
17  that point.
18      Q.   Did you do anything else after
19  receiving the e-mail at the bottom of this chain?
20          MR. CHOA: For the record, the e-mail
21  is 6/14.
22  BY MR. CHOA:
23      Q.   It's from Pat Creedon to you,
24  attaching the addendum for the comments to the bank

284

1   form of agreement.
2       A.   Other than forwarding it to Donna
3   Lucas, I don't believe so.
4           MR. CHOA: I'm going to submit
5   this as GG.
6           (Exhibit GG was marked for
7           identification)
8   BY MR. CHOA:
9       Q.   Have you ever seen this letter before,
10  Paul?
11      A.   Yes.
12      Q.   Now, this is dated June 14th, 2004,
13  and it says "Second Request" and it's sending to Pat
14  Creedon copies of the Single Project Construction
15  Services Agreement. Is that your understanding of
16  this letter?
17      A.   Yes.
18      Q.   Do you know why a second request was
19  made?
20      A.   I'd like to comment that I believe
21  this is attached to documents that weren't related to
22  this first page. But to answer your question, it was
23  sent because we received no response from the first
24  request.

285

1       Q.   So, you sent the second request?
2       A.   Correct.
3       Q.   Did you receive any response to the
4   second request?
5       A.   Ultimately we received -- the response
6   to the second request was the addendum that Creedon
7   sent to us by e-mail.
8       Q.   The addendum seems to have the same
9   date as the sending of the second request. Do you
10  know which one came first?
11      A.   I don't.
12      Q.   So, you don't know if the second
13  request was sent as a result of receiving the e-mail
14  with the addendum?
15      A.   I don't know the answer to that.
16      Q.   To clarify the record, you are
17  correct, the attachments are not correct, so let's
18  just remove everything but the first page and just
19  leave the first page as the only exhibit, just the
20  cover letter.
21          What happened after the second request
22  was sent to Creedon?
23      A.   I guess it's a question of timing, but
24  it would appear that we got this...

286

1       Q.   This e-mail?
2       A.   ...this e-mail at around the same
3   time.
4       Q.   Did anything else happen?
5       A.   Not that I recall.
6       Q.   Did Forest Electric ever receive a
7   signed copy of the bank form of agreement?
8       A.   No.
9       Q.   Did Creedon ever convey to Forest
10  orally that it approved of the bank form of
11  agreement?
12      A.   Not specifically.
13      Q.   What do you mean by "not
14  specifically"?
15      A.   Well, it appears that I did have a
16  conversation with Pat Creedon and we discussed the
17  fact that there would be no changes accepted.
18      Q.   Did she ever tell you "Creedon accepts
19  this contract," this contract being the bank form of
20  agreement?
21      A.   No, not as directly as that.
22      Q.   Indirectly?
23      A.   Again, I'm not making a legal
24  judgment.

```
 1              CERTIFICATION
 2
 3              -----
 4
 5         I hereby certify that the testimony and
 6   the proceedings in the aforegoing matter are
 7   contained fully and accurately in the stenographic
 8   notes taken by me and that the copy is a true and
 9   correct transcript of the same.
10
11
                _____
12              LANCE A. BRUSILOW
                Registered Professional Reporter
13              Certified Realtime Reporter
14
15
16         The foregoing certification does not
17   apply to any reproduction of the same by any means
18   unless under the direct control and/or supervision of
19   the certifying shorthand reporter.
20
21              -----
22
23
24
```