# EXHIBIT T

 "Charlie Doble"
       To: "Paul Angerame" <paulangerame@forestelectric.net>
<cdoble@creedoncont
       cc:
rols.com>
       Subject: Contract No. 6B - General Light and Power

06/01/2004 04 02 PM

From: Pat Creedon [mailto:pcreedon@creedoncontrols.com]

Paul - attached please find my follow-up to the issues raised in our
telephone conversation on Friday, May 28, 2004.  Please contact me at your
earliest convenience when you have had a chance to review.

Thank you,
Pat

FEPA052904.doc 06-01-04.d(

FE 000715

**Creedon Contr~~ ~s Inc.**
Electrical Contractors

3424 Old Capitol Trail
Wilmington, Delaware 19808
Telephone (302) 892-2000
Fax (302) 892-2002
www.creedoncontrols.com

May 28, 2004

Mr. Paul Angerame, Vice President
Forest Electric Corp.
4001 Governor Printz Boulevard
Wilmington, DE 19802

Reference:     Contract No. 6B – General Lighting & Power (Our Project: 2357)
               Change Order: Order of Magnitude through 4/25/04
               Contract Execution

Dear Mr. Angerame:

   This letter is a follow-up to our phone conversation on Friday, May 28, 2004.

   Four issues were discussed requiring follow-up at this time:

1. Agreement on change order: Order of Magnitude through April 25, 2004 for change orders submitted with our May draft application for payment
2. Settlement of events beyond our control and scope at bid time considering a mark-up of cost based upon a consolidation of the General Lighting & Power, Conveyance I and Conveyance II projects
3. Contract No. 6B terms negotiation and execution
4. Withholding of payment approved and processed for the March application for payment

Issue #1: Change Order Order of Magnitude

   We previously submitted to you a list of change order descriptions totaling just less than ninety individual events resulting in costs to Creedon outside our control and scope based upon our original estimate. This list was discussed in our April 21, 2004 meeting at Tishman's site office with you, representing Forest Electric and Tom Keene, representing Tishman; Karl Auwarter representing Bank One was scheduled, but did not attend.

   We were able to prepare a detailed estimate of the labor and material expended on these events that we refer to as the "Order of Magnitude". The total for this Order of Magnitude is $1,300,030. This number was arrived at using an independent interview process of Charles Doble, our project manager, Paulie Brainard, our day shift foreman and Fred Street, our night shift foreman. This process involved a discussion of each event, a review of the daily logs of each foreman and the laboring and some material costing of each event. This total further supports the same order of magnitude of that illustrated in the total cost analysis bar chart we

FE 000716

**Creedon Controls In**

Electrical Contractors

Paul Angerame
May 28, 2004
Page 1 of 4

prepared and provided to you earlier in April.

We would be able to estimate with support the impact of the number of change orders proposed and issued to date, the impact of the stacking of trades, the Cost escalation of materials, e.g. copper and steel, purchased later than planned due to information and schedule delays, schedule related cost increase related to labor scheduling, cost and schedule impact related to the time and completeness of RFI and submittal responses, cost and schedule impact related to the number , timing, definition and magnitude of change orders. This Order of Magnitude does not reflect these costs, but if added would further support the reasonableness of the total cost requested. Additionally we have productively approached our work, which efficiencies would more than compensate for any inefficiencies that we may have introduces during the project.

Item #2: Consolidated Mark-up

Having established that the order of magnitude of the changes is reasonable, the next issue is the mark-up appropriate to these costs; the Order of Magnitude for the critical events presented to date is at cost only. In our discussion with you the issue of mark-up was discussed. Regardless of our own personal opinions on the subject, the National Electrical Contractors Association (NECA) research and documentation establishes that for electrical contractors of Creedon's size in the Eastern Region, which includes Delaware, total overhead is greater than 17%, and with as little as a 20% mark-up, this would only yield approximately 3% for profit; profit is of course the cash needed to grow a business.

Further investigation yields that RSMeans in their Electrical Cost Date edition proffers that a 20% mark-up of prime cost for overhead and profit for projects of this size. NECA and RSMeans know the industry; they have done extensive research and agree, regardless of how well Creedon manages overhead, Creedon or Forest's opinion, 20% is fair and reasonable.

This is a mark-up for a subcontractor with the risk associated with a substantial payroll, management requirements and cash flow needs. In reality this is different and cannot be compared to the risk associated with a general contractor or construction manager with a minimal payroll and mark-up on the risk taken by others.

We also believe that a 20% mark-up for overhead and profit is fair and reasonable under the circumstance of this project, and we would like you to explain, why NECA and RSMeans' research is lacking, if you feel that a lower mark-up is appropriate.

Item #3: Contract 6B

In May 2004 we were given a 60 page contract including exhibits, lists and schedules dated October 2, 2003 for our review. This contract bears no relationship to the 9 page sample contract presented with the bid package, when we were asked to bid the General Lighting &

FE 000717

**Creedon Controls In**
Electrical Contractors

Paul Angerame
May 28, 2004
Page 2 of 4


Power project at Brandywine for Bank One. Additionally the nine page contract was a subcontract between Forest Electric Corporation and the sixty page contact is a prime contract between Banc One Building Corporation and Creedon.

As you know at bid time we indicated in writing that we took exception to the sample contract presented and would need to negotiate changes. Let me say that for reasons we may attribute to the subject project, we never had our meetings to finalize our written agreement and have mutually agreed to proceed under essentially an oral agreement.

We were surprised when we recently received the new contract to execute. However we immediately began our review of this document for the purpose of meeting with you to review the terms and conditions and make the changes necessary for execution. Understandably we require more time to complete our review, and expect in a couple a weeks we will be able to meet for the purpose of discussing and completing the steps necessary to provide you with an executed contract, to the extent that it may be required at the conclusion of the project.

We will continue our efforts, shared with the accelerated time requirements to complete the subject project, and we expect to be able to present you with a list of issues we would want to discuss prior to execution. However we still do not have the Prime Contract for review

Item #4: Withholding Approved Payment for March

It is with grave concern that we received your message in our conversation on Friday relative to your intention to withhold payment of our March application for payment that was approved in draft for payment and finalized the end of March, two months ago. Waiting two months is excessive given that you are paying for some expenses that go back three months to the beginning of March.

An objective third party may see the threat of withholding undisputed and earned payments as an extreme demonstration of bad faith. Until now the execution of this project perhaps has strained our working relationship, but all our efforts have be amicable and in good faith. We thought that it was your intention to act in good faith and amicably. This recent threat leaves this thought in question.

You have permitted, in fact encouraged and pressured Creedon to make a significant financial commitment to this project, which we have done in good faith. Now you are threatening further economic duress to induce Creedon to execute a contract without adequate review and negotiation that might result in further economic duress and loss of revenue. In fact any action taken under these circumstances could be rendered invalid and result in serious consequences for all parties to this contract. Bank One is in the business of lending money and can not plead ignorance relative to the financial and business impact of asking Creedon to make

**FE 000718**

**Creedon Controls Inc**
Electrical Contractors

Paul Angerame
May 28, 2004
Page 3 of 4


an interest-free loan to the Bank of two to three months from mid-March to present, let alone hold this money as well as April and May's payments until Contract 6B is executed as presented.

We ask that you reconsider this action and move payments along as quickly as possible including reduction of retainage as we discussed previously.

We will await your prompt response to the issues raised in this letter. In the meantime we will continue to make every effort including the continued financial commitments in labor, material, expenses and overhead to complete this project as effectively as possible.


Very truly yours,



Patricia Creedon
President


**FE 000719**