**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CREEDON CONTROLS, INC., a Delaware )
corporation, )
)                    C.A. NO. 05-CV-300-JJF
Plaintiff, )
)
v. )
)
BANC ONE BUILDING CORPORATION, an )      JURY TRIAL DEMANDED
Illinois corporation, and FOREST ELECTRIC )
CORPORATION, a New York corporation, )
)
Defendants. )
)

**COMPENDIUM OF UNREPORTED CASES CITED IN
DEFENDANT BANC ONE BUILDING CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**ASHBY & GEDDES, P.A.**
Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302)-654-1888

-and-

Of Counsel:

**PAUL, HASTINGS, JANOFSKY
& WALKER, LLP**

75 East 55th Street
New York, New York 10022
212-318-6000

Dated: July 14, 2006

*Attorneys for Defendant Banc One Building
Corporation*

<u>**CASES**</u>                                                                                          <u>**TAB**</u>

*Albert v. Alex Brown Management Services, Inc.,*
    2005 WL 2130607, (Del. Ch. Aug. 26, 2005) ..................................................A


*Builders Supply of Delaware, Inc. v. Manbeck,*
    1998 WL 442845 (Del. 1998)..........................................................................B


*East Coast Plumbing & HVAC, Inc. v. Edge of the Woods, L.P.,*
    2004 WL 2828286 (Del. Super. Ct. 2004)........................................................C


*Galvagna v. Marty Miller Construction, Inc.,*
    1997 WL 720463 (Del. Super. Ct. 1997)..........................................................D


*In re Murphy Marine Services,*
    2002 WL 1000146 (Bankr. D. Del. 2002) ........................................................E


*William M. Young Co. v. Bacon,*
    1991 WL 89817 (Del. Super. Ct. 1991).............................................................F


*Wilson v. Active Crane Rentals, Inc.,*
    2004 WL 1732275 (Del. Super. Ct. 2004)……………………………………..……G

171259.1

# EXHIBIT A

Westlaw.

Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Todd **ALBERT**, Joseph M. Bryan, Jr., Kevin Calderwood, Katherine D. Crothall, Scott W. Frazier, FU Family Revocable Trust, Robert B. Goergen, Sr., Robert G. Goergen, Jr., Todd A. Goergen, Hasan 1995 Living Trust, Wai Yan Ho, Willis James Hindman, Johnson Family Living Trust, Michael R. Kidder Revocable Trust, Mark and Ann Kington, Jeffrey A. Koser, Marlenko Inc., Elaine McKay Family, LP, David Mixer, MRW Trust, James Murray, Jim K. Omura 1996 Trust, Jennifer Owen and Michael J. Ross, Nicholas Peay, Douglas G. Smith, Frederick G. Smith, Jane Vei-Chun Sun, Mark Wabschall, Karen L. Walsh, Warmenhoven 1995 Children's Trust, Yan 1996 Revocable Trust, Barbara J. Zale, and Charles A. Ziering,
Plaintiffs,
v.
**ALEX. BROWN MANAGEMENT SERVICES**, INC.; Deutsche Bank Securities, Inc.; Deutsche Bank, AG; Richard Hale; Gary Fearnow; Bruns Grayson; E. Robert Kent, Jr.; Truman T. Semans; DC Investment Partners, LLC; Doctor Robert Cants, III; and Michael W. Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable Trust, Dr. Steven J. Berlin, Estate of Robert B. Blow, Luther C. Boliek, Stephen E. Coit, Sara Crowder, Gerald K. and Teresa K. Fehr, FU Family Revocable Trust,

Ralph Glasgal, Robert G. Goergen, Jr.1985 Trust, Todd A. Goergen 1985 Trust, Peter O. Hausmann, Willis James Hindman, William F. Kaiser, Mark and Ann Kington, Timothy K. Krauskopf, William T. McConnell, Philip R. McKee, David Mixer, MRW Trust, James Murray, Paul D. and Judith F. Newman, W.L. Norton, Gregory Packer, Howard E. Rose, Ruben Family Limited Partnership, 5 S Trust, Saladrigas Family Ltd. Partnership, Ricardo A. Salas, Jose M. Sanchez, Samuel Siegel, Silverman 1996 Irrevocable Trust, Douglas G. Smith, Frederick G. Smith, Ronald B. Stakland, Strauch Kulhanjain Family Trust, Bruce E. Toll, Alexander R. and Marjorie L. Vaccaro, Yanover Family Ltd. Partnership, Michael Yokell, and Justin A. Zivin,
Plaintiffs,
v.
**ALEX. BROWN MANAGEMENT SERVICES**; Deutsche Bank Securities, Inc.; Deutsche Bank, AG; Richard Hale; E. Robert Kent, Jr.; Truman T. Semans; DC Investment Partners, LLC; Doctor Robert Crants, III, and Michael W. Devlin, Defendants.
**No. Civ.A. 762-N, Civ.A. 763-N.**

Submitted July 22, 2005.
Decided Aug. 26, 2005.
Jeffrey S. Goddess, Jessica Zeldin, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Steven E. Fineman, Hector D. Geribon, Daniel P. Chiplock, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, New York, for the Plaintiffs.

Michael D. Goldman, Peter J. Walsh, Jr., Melony R. Anderson, Potter Anderson & Corroon LLP, Wilmington, Delaware; Christopher P. Hall, Kevin Rover, John Vassos, Marilyn B. Ampolsk, Morgan Lewis & Bockius, LLP, New York, New York, for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 2

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

the Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G.

Daniel Griffith, Marshall Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, for Defendants DC Investment Partners, LLC, Dr. Robert Crants, III, and Michael W. Devlin.

Richard D. Allen, Thomas W. Briggs, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendants Richard Hale, Gary Fearnow, Bruns Grayson, E. Robert Kent, Jr. and Truman T. Semans.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 In a recent opinion in these two related cases on the defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court addressed the defendants' statute of limitations argument and concluded that any claims arising before November 11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred. [FN1] Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> FN1. The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs.,* 2005 Del. Ch. LEXIS 100, at *43-58 (Del. Ch. June 29, 2005). Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

In this opinion, the court now addresses the issues

raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred. [FN2] The Plaintiffs' Response Brief [FN3] identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments ....;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> FN2. The factual allegations specifically discussed in the earlier opinion are as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *78-*79.

FN3. The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties.

**\*2** The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings. [FN4] Therefore, the court cannot (and does not) make any final findings on the materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine whether, under the facts alleged in the complaints, these disclosure (or

non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

FN4. *O'Malley v. Boris,* 742 A.2d 845, 850 (Del.1999)

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN5]

FN5. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1983) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

*3 The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Fund[s'] portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no

allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations [FN6] relate to failures to disclose allegedly material information. There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

> FN6. Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

### III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

A. *Breach Of Fiduciary Duty (Count 1)*

1. *Failure To Provide Financial Statements*

The complaints allege that the Managers failed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

*4 There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports. [FN7] The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty. [FN8] Thus, this factual allegation does not state a claim for breach of fiduciary duty.

> FN7. Partnership Agreements § 11.2.

> FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

*2. Withdrawal Allegations*

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds." [FN9]

> FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by

allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." [FN10] A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. [FN11]

> FN10. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *accord Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989).

> FN11. *Citron,* 569 A.2d at 66

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." [FN12] "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." [FN13] In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason." [FN14]

> FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.,* 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 6

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

of stockholders' or actions which are 'without the bounds of reason.'") (citations omitted).

FN13. *In re Walt Disney Co. Derivative Litig.*, 2005 Del. Ch. LEXIS 113, at *162, ___ A.2d. ___, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

FN14. *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 Del. Ch. LEXIS 116, at *42 (Del. Ch. Sept. 3, 1996) (citations omitted), *aff'd*, 692 A.2d 411 (Del.1997) (TABLE); *see also Solash v. Telex Corp.*, 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] sole discretion," [FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives.' " Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

**\*5** Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach

of fiduciary duty.

3. *Active And Competent Management And Disclosure Allegations*

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds. [FN16] The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

FN16. *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 7

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

(Cite as: 2005 WL 2130607 (Del.Ch.))

to limit the upside and downside potential of the Funds. [FN17] The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

> FN17. "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *9.

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

**\*6** The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing

the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff. [FN18]

> FN18. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. *Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years. [FN19] As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion." [FN20]

> FN19. *See* Partnership Agreements ¶¶ 6.3.

> FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

**\*7** This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed. [FN21]

> FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. *Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information--the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

C. *Fraud (Count 3)*

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. [FN22] In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. [FN23] Fraud

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." [FN24]

> FN22. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

> FN23. *Id.*

> FN24. *York Linings v. Roach,* 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

**\*8** For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to the claims asserted in Count 1 or Count 5.

D. *Gross Negligence (Count 7)*

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." [FN25] As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

> FN25. Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

E. *Unjust Enrichment (Count 8)*

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls . [FN26] It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

> FN26. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 10

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

York law); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

*F. Agency Liability (Count 11)*

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive." [FN27]

FN27. *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988).

**\*9** Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation--completely independent of a second corporation--may assume the role of a second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven. [FN28]

FN28. *Id.* (citing Restatement (Second) of Agency § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by

DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form [FN29] and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts. [FN30]

FN29. AB Management is a corporation, organized under the laws of Maryland.

FN30. Fund I Compl. ¶¶ 44, 45, 247, 250, 332, 334; Fund II Compl. ¶¶ 54, 179, 253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." [FN31] Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. [FN32] The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 11

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Therefore, this claim against DBSI cannot be dismissed.

> FN31. *Mason v. Network of Wilmington, Inc.,* 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) (internal quotations omitted).

> FN32. *Mabon, Nugent & Co. v. Texas Amer. Energy Corp.,* 1990 Del. Ch. LEXIS 46, at *14-*15 (Del. Ch. Apr. 12, 1990); *Phoenix Canada Oil,* 842 F.2d at 1477.

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee. [FN33]

> FN33. Fund I Compl. ¶¶ 153, 163, 239-240; Fund II Compl. ¶¶ 179, 253-259.

*10 First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control. [FN34] The complaints allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

> FN34. *Aronson,* 473 A.2d at 815; *see also In re W. Nat'l S'holders Litig.,* 2000 Del. Ch. LEXIS 82, (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories--actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent. [FN35] There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

> FN35. *Billops v. Magness Constr. Co.,* 391 A.2d 196, 197 (Del.1978).

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing. [FN36] In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable. [FN37] The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

> FN36. *Henderson v. Chantry,* 2002 Del. Ch. LEXIS 14, at *14 (Del. Ch. Feb. 5, 2002).

> FN37. *Billops,* 391 A.2d at 198.

For the above reasons, the plaintiffs have failed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 12

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

G. *Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)*

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties. [FN38] While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting. [FN39] However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. [FN40]

> FN38. *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.,* 871 A.2d 428, 437 n.8 (Del.2005); *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987).

> FN39. *See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 Del. Ch. LEXIS 19, at *26 (Del. Ch. Feb. 28, 2005).

> FN40. *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch.1984), *aff'd,* 575 A.2d 1131 (Del.1990).

**\*11** However captioned, civil conspiracy is vicarious liability. [FN41] It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. [FN42] Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold

Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty.

> FN41. *See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1238 (Del. Ch.2001) ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds,* 817 A.2d 149 (Del.2002).

> FN42. *Gilbert,* 490 A.2d at 1057.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." [FN43] While Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. [FN44]

> FN43. *Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del. Ch.1989) (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

> FN44. *IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *12-*13 (Del. Ch. Dec. 21, 1998).

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal. [FN45] With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI. [FN46] This knowledge is thereby imputed to DBSI.

> FN45. *J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc.,* 287 A.2d 686, 689 (Del.Super.1972), *aff'd,* 303 A.2d 648 (Del.1972).

> FN46. Fund I Compl. ¶¶ 45, 47-51, 247-251; Fund II Compl. ¶¶ 55, 57- 61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

*H. Accounting (Count 10)*

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result. [FN47] As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

> FN47. *Jacobson v. Dryson Acceptance Corp.,* 2002 Del. Ch. LEXIS 4, at *12-*13

(Del. Ch.2002).

### V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1. [FN48]

> FN48. The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

**\*12** The demand requirement in the limited partnership context is codified in 6 *Del. C.* § 17-1001. That statute states:

> A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases. [FN49] Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

> FN49. *Litman v. Prudential-Bache Prop., Inc.,* 611 A.2d 12, 15 (Del.Ch.1992).

The Delaware Supreme Court's recent decision in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 14

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.* revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" [FN50] "[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." [FN51] "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." [FN52]

> FN50. 845 A.2d 1031, 1033 (Del.2004).

> FN51. *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del.Ch.2004).

> FN52. *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del.Ch.2004).

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. *Breach Of Contract And The Non-Disclosure Allegations*

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." [FN53] The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and

fiduciary duties. Generally, non-disclosure claims are direct claims. [FN54] Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests.

> FN53. *Tooley,* 845 A.2d at 1039.

> FN54. *See, e.g., Dieterich,* 857 A.2d at 1029 (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy,* 1992 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 17, 1992) (same).

**\*13** Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy. [FN55] While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

> FN55. *Tooley,* 845 A.2d at 1033.

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. *Gross Negligence And Failure To Provide Competent And Active Management*

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

[FN56] The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim. [FN57] The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

> FN56. *Tooley,* 845 A.2d at 1039.

> FN57. *See, e.g., Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement ... represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. [FN58] If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

> FN58. *Tooley,* 845 A.2d at 1033.

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed. [FN59] In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. However, in the interest of justice, the court dismisses these claims with leave to replead. [FN60]

> FN59. *Haber v. Bell,* 465 A.2d 353, 357

(Del. Ch.1983).

> FN60. In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

### VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdiction over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin. [FN61]

> FN61. DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship.,* 1999 Del. Ch. LEXIS 161, at *12 (Del. Ch. July 16, 1999) (quoting 6 *Del. C.* § 17-109(a) and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebutted, the court must take as true the facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations. [FN62]

> FN62. *See Hart Holding Co. v. Drexel Burnham Lambert, Inc.,* 593 A.2d 535, 539 (Del. Ch.1991) (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2nd Cir.1981)) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

**\*14** According to the Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. [FN63] In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process? [FN64]

> FN63. *See Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins,* 532 A.2d 609, 617 (Del.Super.1987) (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis,* 486 A.2d 669 (Del.1984)).

> FN64. *LaNuova D & B, S.P.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986).

A. *The Long-Arm Statute*

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under 10 *Del. C.* § 3104, the Delaware long-arm statute. Section 3104(c) provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident ... who ... (1) Transacts any business or performs any character of work or service in the State ... [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State...." Section 3104 has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause. [FN65] Furthermore, when *in personam* jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party. [FN66]

> FN65. *Id.*

> FN66. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at \*13.

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

Page 17

meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities included in the Funds.

In *RJ Associates,* Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under Section 3104(c)(1). Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by 'controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners. [FN67]

> FN67. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *18.

*15 The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates.* First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial securities accepted by the Funds. [FN68] Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies." [FN69] Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

> FN68. *See* Fund I Compl. ¶ 71; Fund II Compl. ¶¶ 82, 241.

> FN69. Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. *Due Process*

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice. [FN70] In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. [FN71] The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. [FN72] Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction. [FN73]

> FN70. *AeroGlobal,* 871 A.2d at 440 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945)).

> FN71. *Id.*

> FN72. *Sternberg v. O'Neil,* 550 A.2d 1105, 1120 (Del.1988).

> FN73. *Id.; see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (U.S.1985) (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 18

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence. [FN74]

FN74. Partnership Agreements § 3.5.

In *RJ Associates,* Justice Jacobs found that the following contacts were sufficient to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49 . 5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement. [FN75]

FN75. *RJ Assocs.,* 1999 Del. Ch. LEXIS 161, at *19-*20.

**\*16** While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates.* DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence. [FN76] They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

FN76. Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes,* former Chancellor Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner . [FN77] Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

FN77. 600 A.2d 43, 52 (Del. Ch.1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware law is especially concerned with. [FN78]

FN78. *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**(Cite as: 2005 WL 2130607 (Del.Ch.))**

undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware. [FN79]

> FN79. *See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 975 (Del. Ch.2000) ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that ... they will be subject to personal jurisdiction in Delaware courts.").

**\*17** For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

VII.

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 850324 (Trial Motion, Memorandum and Affidavit) DC Investment Partners, LLC's, D. Robert Crants, III's and Michael W. Devlin's Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Complaint (Mar. 18, 2005)

• 2005 WL 850325 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion to Dismiss of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc., and

Deutsche Bank, AG (Mar. 18, 2005)

• 2005 WL 850387 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 8, 2005)

• 2005 WL 850386 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 7, 2005)

• 2005 WL 418240 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)

• 2005 WL 418241 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, Doctor Robert Crants, III and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)

• 2005 WL 418242 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, D. Robert Crants, III and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)

• 2005 WL 418243 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 1998 WL 442845 (Del.Super.)

**(Cite as: 1998 WL 442845 (Del.Super.))**

**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Superior Court of Delaware.
**BUILDERS SUPPLY** OF DELMARVA, INC., a
**Delaware** Corporation, and Michael D.
Rhodes, Plaintiffs,
v.
Harold I. **MANBECK** and Rodney A. **Manbeck**,
Defendants.
**No. CivA 96C-11-022.**

Date Submitted: June 12, 1998.
Date of Decision: June 23, 1998.
James B. Tyler, Georgetown, DE, for plaintiffs.

Gregory A. Morris, Hudson, Jones, Jaywork,
Fisher, & Liguori, for defendants.

MEMORANDUM OPINION

GRAVES, J.

**\*1** This is an action which plaintiffs Builders
Supply of Delmarva, Inc. ("Builders") and Michael
D. Rhodes ("Rhodes") [FN1] have brought against
Harold I. Manbeck and Rodney A. Manbeck
("defendants"). Presently pending before the Court
is defendants' motion for summary judgment. This
is my decision on the motion.

> FN1. Initially, Ethan Rhodes stated claims.
> However, the parties stipulated to the
> dismissal of his claims with prejudice.
> Consequently, reference to "plaintiffs" is
> to Builders and Rhodes only.

FACTS
Most of the facts are taken from the pleadings

because defendants failed to submit any affidavits,
interrogatories, or deposition testimony in support
of their motion for summary judgment as Superior
Court Civil Rule 56 requires. The remaining facts
are those to which the parties have agreed in their
briefing.

Defendants own 221 N. New Street, Dover,
Delaware, which is real estate improved by a
townhouse ("the property"). On October 27, 1994,
Rhodes and defendants entered into what they
apparently considered to be an informal "Lease
Purchase Agreement" which provided for the
purchase of the property. This Lease Purchase
Agreement provided in pertinent part as follows:
* Purchase Price 60,000 (sixty thousand)
* Purchaser Agrees to Pay 450.00 Per mo. until
settlement or until the assumeable [sic] mortage
[sic] of approx 48,000 + is approved [FN2]

> FN2. Rhodes paid defendants $450 per
> month in rent from December 1, 1994 until
> March 1, 1996.

* Formal signing of Agreement A 6000.--Deposit
is due and Balance of 6,000.-- at formal
settlement.
* Sellers agree to allow purchasers to remodle
[sic] until settlement and reside in residence.
* Pro Rate tax to date of Settlement. Pro Rate
Insurance to date of Settlement. Split transfer tax.
* Purchaser Pays transfer fee for mortage [sic].
\*\*\*
Deposit on Sale Agreement at signing *450.00*

Ethan Rhodes, Rhodes' son, moved into the
townhouse, and plaintiffs made improvements to the
townhouse. Plaintiffs, without supporting
documentation, allege that most of the remodeling
work was done in December, 1994. Plaintiffs allege
the cost of labor and materials provided for these
improvements was $26,412.00. [FN3]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 1998 WL 442845 (Del.Super.)

**(Cite as: 1998 WL 442845 (Del.Super.))**

FN3. I note defendants contend in their opening brief filed on March 27, 1998, that plaintiffs have failed to produce documentation setting forth the exact damage sustained. This matter was addressed at an April 16, 1998 conference with this Court. The parties have not returned to the Court on this issue, and I assume it was resolved.

Rhodes and defendants entered into an Agreement of Sale on February 20, 1995 ("Agreement of Sale"). This Agreement of Sale provided in pertinent part as follows:

2. That the Premises are to be conveyed free and clear of all liens, encumbrances, easements, rights-of-way, reverters and restrictions excepting only easements visible upon an inspection of the Premises as of the date of this Agreement and the mortgage referred to in paragraph 4C of this Agreement.

4. At [sic] the consideration to by [sic] paid by Buyer to Seller for the Premises ... is Sixty Thousand Dollars ($60,000), payable as follows:

A. A down payment of Six Thousand Dollars ($6,000) consisting of Buyer's personal checks totalling that amount. The down payment shall be made payable to and held in escrow by Buyer's attorney, Henry M. Koch, Jr. (hereinafter "Escrow Agent') in a non-interest bearing account and shall be released by Escrow Agent to Seller upon receipt by Escrow Agent of a signed statement by Buyer that a current lien search has been obtained regarding the Premises which indicates no liens or encumbrances on the premises except for a first lien upon the Premises held by Citicorp of St. Louis Missouri. Buyer shall provide such written notice to Escrow Agent within five (5) business days of Buyer's receipt of the title report.

*2 ***

5. That from the date of this Agreement until the time of settlement, the Buyer's sons Ethan and Matthew Rhodes shall have permission to live within the Townhouse erected upon the Premises upon the condition that Buyer shall pay the sum of the seller's monthly loan payment under the current load....

***

9. That Seller shall deliver at the time of settlement, hereinafter provided for, a proper, fee simple, special warranty deed conveying the Premises and title thereto, in accordance with the terms and conditions of this Agreement, which title shall be good and marketable and insurable as such and in accordance with his Agreement's terms and conditions....

10. *** If the mortgage assumption herein provided for has not been approved within the aforesaid One Hundred Twenty (120) day period, and the application is still pending before Citicorp in it's [sic] capacity as mortgagee, Buyer shall have the right to continue settlement for an additional Sixty (60) days providing Buyer continues to make the Rental payments provided for in paragraph 5 of this Agreement. ***

11. That if Seller is unable to convey the title and/or Premises as specified, Buyer shall be entitled to the refund of the down payment, ..., and Buyer shall have the right to lease the Premises at the Rental rate as provided for....

***

13. That this Agreement contains the entire agreement and understanding between the parties hereto concerning the purchase of the Premises and there are no other written and/or unwritten agreements or understandings concerning the same.

On or about June 14, 1995, Rhodes paid $6,000.00 in earnest money to defendants. Thereafter, a dispute arose. Although no appropriately supported facts are set forth explaining the dispute, it is alleged the parties disputed the terms of the mortgage which Rhodes contemplated assuming and the state of the title. The parties did not settle on the property. Ethan. Rhodes was evicted from the property effective September 18, 1996. [FN4]

FN4. Defendants submit unverified documents pertaining to actions in the Justice of the Peace Court regarding the eviction proceedings against Ethan Rhodes. However, since the documents are not verified and since defendants have not shown how these proceedings are relevant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3

Not Reported in A.2d, 1998 WL 442845 (Del.Super.)

**(Cite as: 1998 WL 442845 (Del.Super.))**

to this matter, I shall not consider them.

Plaintiffs thereafter filed the complaint in this matter. Rhodes seeks recovery of his $6,000 down payment as a result of the settlement not going through. Builders and Rhodes seek the recovery of $26,412 for the cost of the improvements. Plaintiffs argue that if they are not reimbursed for the costs incurred in remodeling, then defendants would be unjustly enriched. Plaintiffs also claim they are entitled to an equitable lien on the property.

In their answer to the complaint, defendants deny plaintiffs are entitled to recover any sums, and they assert plaintiffs failed to state a claim upon which relief may be granted and this Court lacks subject matter jurisdiction.

In its motion for summary judgment, defendants argue as follows. First, they argue that Builders, as a materialman, may not recover a personal judgment against them in the absence of a contract with them. Second, they argue that they did not breach the contract of sale and were ready, willing and able to perform their obligations; consequently, Rhodes' refusal to settle gave them the right to terminate the contract and retain the down payment. Finally, they argue that since Rhodes was in default and they exercised their right to terminate the contract and retake possession, then they do not have to reimburse Rhodes for the improvements erected on the property.

### DISCUSSION

*3 Summary judgment may be granted only when no issues of material fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979). Once the moving party meets its burden, then the burden shifts to the non-moving party to establish the existence of material issues of fact. *Id.* at 681. Where the moving party produces an affidavit or other evidence sufficient under Super.Ct.Civ.R. 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial.

Super.Ct.Civ.R. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of his or her case, then summary judgment will be granted. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 59 (1991), *cert. den.,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992); *Celotex Corp. v. Catrett, supra.* If, however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

Although I am able to grant summary judgment on some issues in this case, I cannot do so with regard to those issues where defendants have not adequately supported their motion for summary judgment. Super.Ct.Civ.R. 56. For example, defendants maintain that they were ready and willing to go forward with settlement, and Rhodes breached the contract by not going forward with it. However, this issue is disputed, and since defendants did not support their contentions as the law requires, they did not meet their threshold burden for summary judgment. Where summary judgment is not granted, I set forth the law which will be applicable at trial in an effort to make matters proceed smoother thereat.

The first issue I address is whether Builders may pursue its claim based on the theory of quantum meruit. As explained in *Heather Construction v. Gangi,* Del.Super., C.A. No. 85A-OC-3, Chandler, J. (March 31, 1987) at 1:

An award in quantum meruit is a remedy in restitution measured by the reasonable value of services rendered or labor and materials supplied for the benefit of the defendant.

It is undisputed that defendants did not contract for the work to be performed, and Builders did not have a contract with defendants. The general rule is that, in the absence of a contract between the owner and contractor, a materialman may not recover an in personam judgment from the property owner. *Cohen v. Delmar Drive-In Theater,* Del.Super., 84 A.2d 597, 598 (1951); *Galvagna v. Marty Miller*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 4

Not Reported in A.2d, 1998 WL 442845 (Del.Super.)

**(Cite as: 1998 WL 442845 (Del.Super.))**

*Construction, Inc.,* Del.Super., C.A. No. 96L-01-015, Graves, J. (September 19, 1997); *William M. Young Company v. Bacon,* Del.Super., C.A. No. 89L-JA2, Graves, J. (May 1, 1991). Yet, there is an exception to this rule. For instance, if the subcontractor may not recover from the party with whom it directly contracted, and the property owner has not paid the general contractor, then it may recover from the landowner. *Galvagna v. Marty Miller Construction, Inc., supra* at 5-7, and cases cited therein. The law is clear regarding the materialman's burden; even at the complaint stage, the materialman must allege that it cannot collect from the landowner and the landowner will be unjustly enriched. *Gilbane Building Co. v. Nemours Foundation,* D.Del., 606 F.Supp. 995, 1007-08 (1985). Builders has not alleged in its complaint or maintained in its answering brief that it cannot collect the sums due it from Rhodes. Consequently, summary judgment is granted against Builders' claim.

*4 I turn to Rhodes' claim for quantum meruit. Defendants have not attacked his ability to make such a claim. In light of that fact as well as the fact that defendants apparently were aware the improvements were being made, Rhodes may pursue his claim for quantum meruit.

The next issue is whether Rhodes may recover the reasonable value of the improvements in light of defendants' argument that if Rhodes breached the contract, he is not entitled to recover for the reasonable vale of improvements made. Of course, the threshold issue which must be resolved is whether Rhodes was legally justified in not purchasing the property. As noted above, that is an issue which will need to be resolved at trial. As authority for their argument Rhodes cannot recover the reasonable value of the improvements, defendants cite to 77 Am.Jur.2d, Vendor and Purchaser, § 563. [FN5] Therein, the general rule is stated:

> FN5. Case law in Delaware addressing this issue was not located.

Where the purchaser is in default and the vendor

exercises a right to terminate the contract and retake possession, the vendor generally is not required to reimburse the purchaser on account of improvements erected on the property, since a vendor who has neither waived his or her legal rights nor committed any default cannot be involuntarily taxed with improvements made *without his or her consent.* [Emphasis added.]

This general rule may not apply because it appears that here, the improvements were made with owners' consent. In certain situations, the Court may provide a remedy for costs incurred in making the improvements. *See Thibbitts v. Crowley,* Mass.Supr., 405 Mass. 222, 539 N.E.2d 1035, 1040 (1989); *Farnum v. Silvano,* Mass.Ct.App., 27 Mass.App.Ct. 536, 540 N.E.2d 202, 206 (1989). Consequently, whether Rhodes is entitled to reimbursement for the reasonable value of the improvements will be resolved at the trial in this matter.

If Rhodes breached the contract, then the next issue is whether defendants can retain the $6,000.00 deposit. Although there is no express provision providing that the deposit may be retained as liquidated damages, the Court may regard that deposit as such. *Wilkins v. Birnbaum,* Del.Supr., 278 A.2d 829, 830-31 (1971). If the amount retained is a fair estimate of seller's damages arising from the breach, then the deposit may be considered to be an agreement to liquidated damages. *Id.* at 831. It is Rhodes' burden to show that the actual damages were less. *Id.*

The final issue concerns the equitable lien plaintiff seeks. An equitable lien is an equitable remedy which only Chancery Court may award. *Clark v. Teeven Holding Co., Inc.,* Del.Ch., 625 A.2d 869, 878 (1992). Rhodes may not seek or obtain an equitable lien. Since this Court has jurisdiction over the action and since it can award a money judgment should Rhodes be successful, this matter will not be transferred to the Court of Chancery.

In conclusion, this Court grants summary judgment in part and denies it in part. Summary judgment is granted against Builders' claim, and it is granted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1998 WL 442845 (Del.Super.)

**(Cite as: 1998 WL 442845 (Del.Super.))**

against Rhodes' request for an equitable lien. However, summary judgment is denied as to Rhodes' claims for quantum meruit and for return of his $6,000 down payment.

*5 IT IS SO ORDERED.

Not Reported in A.2d, 1998 WL 442845 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C