

Not Reported in A.2d                                                Page 1

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

**c**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
**EAST COAST PLUMBING & HVAC, INC.**
Plaintiff,
v.
**EDGE OF THE WOODS, LP,** Hydrim Company,
LLC, and Unlimited Construction Company,
Inc. Defendants.
**No. Civ.A. 99L-11-046CLS.**

Submitted April 22, 2004.
Decided July 30, 2004.

Thomas C. Marconi, Losco & Marconi, P.A.,
Wilmington, Delaware, for Plaintiff.

Donald L. Logan, Tighe Cottrell & Logan, P.A.,
Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

SCOTT, J.

I. INTRODUCTION

**\*1** The issue before the court in this matter is
whether Defendants are obligated to make final
payment to plaintiff East Coast Plumbing & HVAC,
Inc. ("East Coast"). A bench trial was held
December 1--3, 2003. At the request of the court,
the parties submitted proposed findings of fact and
conclusions of law. This is the court's ruling. For
the reasons stated below, the court finds for East
Coast.

II. PARTIES' CONTENTIONS

East Coast maintains it is owed $19,850.00 on a
plumbing contract and $7,808.00 on an HVAC
contract it had with Defendant Unlimited
Construction Company, Inc. ("Unlimited"). East
Coast claims it fully complied with the requirements
of both contracts and Unlimited breached both
contracts by failing to fully pay East Coast. East
Coast also seeks recovery from Edge of the Woods,
LP ("EOTW") and Hydrim Company, LLC
("Hydrim") on theories of *quantum meruit* and
*quantum valebant,* and imposition of a mechanic's
lien in the amount of $27,658.00 on the lands and
structures of the 44 units at Water's Edge
Condominiums ("the Project") where the equipment
was installed. East Coast also seeks recovery of pre-
and post-judgment interest, costs, and attorney's
fees.

Defendants counter that East Coast only has a
claim against Unlimited, not EOTW or Hydrim, as
the payment in question is with respect to contracts
between East Coast and Unlimited. Defendants
further argue a mechanic's lien is improper as East
Coast has not sought liens against the individual
condominiums, even though East Coast knew the
Project was condominiums. As a defense to
payment, Defendants claim East Coast installed
improper equipment that did not comply with owner
EOTW's specifications. Defendants argue East
Coast was obligated to install equipment "identical"
to that in the existing 220 condominiums at the site.
Defendants point to language in East Coast's
subcontracts with Unlimited that they claim
supports this contention. [FN1] Defendants note as
well that East Coast's contract with Unlimited, in
the pre-printed standard language part of the
contract, obligates East Coast to perform all work
"... to the complete satisfaction of the Contractor,
the Architect and Owner." [FN2] Defendants claim
the water heaters installed under the plumbing
contract are an inadequate size. Defendants also
claim the air conditioning ("A/C") units installed in
the two-bedroom condominiums of the Project are
undersized. Defendants state they have received

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

many complaints from residents of the 44 condominiums regarding the inadequacies of the water heaters and A/C units. Defendants further argue that the equipment installed by East Coast under the HVAC contract differed from what was specified on its bid and submittal. Unlimited states it fulfilled its contractual obligation to East Coast and, therefore, East Coast is the breaching party. Hydrim also asserts a counterclaim against East Coast for $52,120.00--the amount it claims it would cost to replace the undersized A/C units and water heaters. Defendants also dispute the payment of attorneys' fees, claiming they had a good faith belief in the vitality of their defenses.

> FN1. Defendants point to ¶ 26 of the subcontract which states in part "... CONTRACTOR'S approval thereof shall not relieve SUBCONTRACTOR from responsibility or liability for any mistakes, error, or deviation, or of SUBCONTRACTOR'S obligation to perform its work in strict accordance with the CONTRACT DOCUMENTS." (emphasis in original) Defendants argue the CONTRACT DOCUMENTS include Unlimited's contract with Hydrim that they allege called for materials to be the same as those in the existing condominiums.

> FN2. Paragraph 5 of both the plumbing and HVAC contracts.

### III. FINDINGS OF FACT

**\*2** EOTW is the owner of the land at the site of the Project. Hydrim is the owner of the expansion rights that resulted in the construction of the 44 condominiums of the Project, the construction of which is the subject of the contracts at issue here. These 44 condominiums are in addition to 220 condominiums previously constructed by EOTW between 1989 and 1995 in the same area. [FN3] Unlimited was the general contractor with Hydrim for the construction of the Project. After construction of the 44 condominiums, they were initially owned by EOTW and rented as apartments. EOTW later began offering the condominiums for

sale to individual owners.

> FN3. These 220 condominiums will be referred to as "the existing condominiums" in this ruling.

The condominium available for inspection by subcontractors prior to their submitting bids for the Project was a two-bedroom model. This model had a 40- gallon water heater. This model had a two-ton A/C unit installed. Information concerning possible problems with the HVAC systems in the existing two-bedroom models was communicated by persons associated with EOTW and/or Hydrim to East Coast prior to East Coast's submitting a bid for the HVAC contract.

East Coast entered into two subcontracts with Unlimited regarding the Project. In late 1998, East Coast entered into one contract with Unlimited to provide for installation of hot water heaters in all 44 condominiums ("the plumbing contract"). In early 1999, East Coast entered into a second contract with Unlimited to provide for installation of the A/C units in all 44 condominiums ("the HVAC contract").

The plumbing bid East Coast submitted to and that was accepted by Unlimited specified in Appendix A that 40-gallon water heaters would be installed in all condominiums of the Project. There were no other attachments to the plumbing subcontract. Prior to the actual installation of any water heaters, East Coast presented a submittal to Unlimited indicating the specific model and size of water heaters to be installed. No change orders [FN4] regarding the size of the water heaters to be installed were provided to East Coast by Unlimited. Other items to be installed pursuant to the plumbing contract were the subject of change orders provided to East Coast. East Coast installed 40-gallon water heaters in all condominiums of the Project. Unlimited did not receive full payment from Hydrim for the plumbing contract. Unlimited paid East Coast all but $19,850.00 of the total due on the plumbing contract. This amount includes $7,850.00 unpaid for Building 2700 of the Project, $8,000.00 unpaid for Building 2800 of the Project, and $4,000.00

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

unpaid for Building 2900 of the Project.

> FN4. Change orders are communications from the owner and/or contractor that request changes in specifications of items proposed for installation in the submittals.

The bid for the HVAC contract between East Coast and Unlimited provided for installation of A/C units "as per existing units." There were no other attachments to the HVAC subcontract. Based on communicated concerns regarding the functioning of the A/C units in the existing two-bedroom condominiums, East Coast consulted with Phil Atkins ("Atkins") of distributor Ferguson Enterprises. Atkins indicated that a 1.5-ton unit was the smallest-size unit manufactured. Atkins calculated the 1.5-ton units would provide adequate cooling for both the one- and two-bedroom condominiums, while a 2.5-ton unit was appropriate for the three-bedroom condominiums. Prior to the actual installation of any A/C units, East Coast presented a submittal to Unlimited specifying the makes and models of the A/C units to be installed. This submittal called for installation of "large" 1.5-ton A/C units in the two-bedroom condominiums. [FN5] East Coast did not receive any change orders from Unlimited regarding the size of the A/C units to be installed in the two-bedroom condominiums. East Coast installed A/C units in all condominiums per the submittal. Unlimited did not receive full payment from Hydrim for the HVAC contract. Unlimited paid East Coast all but $7,808.00 of the total due on the HVAC contract. This amount includes $2,608.00 unpaid for Building 2800 of the Project and $5,200.00 unpaid for Building 2900 of the Project.

> FN5. One and one half-ton A/C units were installed in the one-bedroom condominiums and 2.5-ton units were installed in the three-bedroom condominiums. Installation of the A/C units in those condominiums is not at issue.

*3 Unlimited is an ongoing company that has not filed for bankruptcy. There is no indication Unlimited is unable to pay its bills.

All of the water heaters and A/C units installed met the specifications of county building codes.

IV. CONCLUSIONS OF LAW

At the conclusion of trial, the court indicated the parties should address the issue of what weight the court should give to so-called expert testimony that was not given to a reasonable degree of engineering [FN6] probability. Neither of the parties addressed this issue in their post-trial submissions to the court. The court concludes, therefore, that to the extent the testimony offers opinion and not fact, the testimony will be disregarded as it does not meet the requirements of Delaware Rule of Evidence 702. [FN7]

> FN6. Based on the testimony proposed, the court concludes the appropriate expert field is mechanical engineering.

> FN7. While the court does not want to elevate form over function in requiring expert testimony to be given "to a reasonable degree of [speciality] probability," the testimony presented at trial clearly failed to meet the standards the Delaware Supreme Court regarding admissibility of expert testimony. *See MG Bancorporation, Inc. v. LeBeau,* 737 A.2d 513, 522 (Del.1999) (adopting the view of the United States Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 who held "the trial judge must determine whether the [proffered] testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline' ").

A. The plumbing contract.

The court concludes the plumbing contract is unambiguous on its face. The court will not rewrite an unambiguous contract to create an ambiguity or alter the explicit terms of that contract. [FN8] The court finds there is no indication the contract documents between Unlimited and Hydrim [FN9] were incorporated into the contract between East

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

Coast and Unlimited. The court holds merely mentioning the contract documents between Unlimited and Hydim/EOTW does not incorporate them by reference into the plumbing contract between East Coast and Unlimited. Even if the contract documents had been incorporated by reference, the court holds the specific terms of the subcontract prevail over any general terms of the contract between Unlimited and Hydim. Additionally, the court finds the documentation provided to East Coast concerning the existing condominiums to be lacking in detail regarding the specification of the mechanical equipment to be installed in the condominiums of the Project. The court notes that while EOTW and Hydrim at trial repeatedly stated how important it was to them that the condominiums of the Project be "identical" to those already built, nowhere was this requirement made an explicit part of the plumbing contract between East Coast and Unlimited.

> FN8. *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997) (holding extrinsic evidence could not be used to vary the terms of a contract).

> FN9. *See* n. 1, *supra.*

The court holds that the requirement that East Coast perform work "to the complete satisfaction" of Unlimited and EOTW was fulfilled when East Coast installed the water heaters as specified in the plumbing contract. East Coast did exactly what it said it would do. East Coast cannot be liable for damages when it does exactly what it said it would do but EOTW (who was not even a party to the contract) later claims East Coast should have known that it should have done something else. To the extent Hydrim and/or EOTW has a complaint that the water heaters installed did not conform to the specifications of the general contract, the court holds that dispute is between Unlimited and Hydrim and/or EOTW. The dispute is not between East Coast and Hydrim and/or EOTW.

The court finds Defendants' assertion of having received "numerous" complaints regarding the

functioning of the water heaters in the two- and three-bedroom condominiums was not supported by credible testimony at trial.

**\*4** By its unambiguous terms, the plumbing contract between East Coast and Unlimited called for 40-gallon water heaters to be installed in all of the condominiums of the Project. The court noted in its Findings of Fact that East Coast installed 40-gallon water heaters in all of the condominiums. The court concludes East Coast fulfilled its terms of the plumbing contract. The court, therefore, holds that Unlimited breached its plumbing contract with East Coast when it refused to make the final payment of $19,850.00. On the plumbing contract, the court finds for East Coast in the amount of $19,850.00. The court holds this amount was due September 26, 1999, which is 30 days after the completion of the plumbing work.

B. The HVAC contract.

The court finds the HVAC contract is ambiguous on its face by the inclusion of the term "as per existing units." The court concludes, however, that this ambiguity was clarified when East Coast sent the submittal to Unlimited, prior to installation of any equipment, specifying the sizes of the A/C units that would be installed. The fact that the specifications in this submittal were different from what initially had been submitted to Unlimited is held not relevant to a determination of the terms of the HVAC contract.

As noted in the Findings of Fact, this submittal specified installation of 1.5-ton A/C units in the one-bedroom condominiums, "large" 1.5-ton A/C units in the two-bedroom condominiums, and 2.5-ton A/C units in the three-bedroom condominiums of the Project. As with the plumbing contract, the court holds that there is no indication the contract documents between Unlimited and Hydim [FN10] were incorporated into the HVAC contract between East Coast and Unlimited. The court holds merely mentioning the contract documents between Unlimited and Hydim/EOTW does not incorporate them by reference into the HVAC contract between East Coast and Unlimited.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

As with the plumbing contract, even if the documents had been incorporated by reference, the court holds the specific terms of the subcontract prevail over any general terms of the contract between Unlimited and Hydrim. The court finds the documentation provided to East Coast concerning the existing condominiums to be lacking in detail regarding the specification of the mechanical equipment to be installed in the condominiums of the Project. The court again notes that while EOTW and Hydrim at trial repeatedly stated how important it was to them that the condominiums of the Project be "identical" to those already built, nowhere was this requirement made an explicit part of the HVAC contract between East Coast and Unlimited. To the extent Hydrim and/or EOTW has a complaint that the A/C units installed did not conform to the specifications of the general contract, the court holds that dispute is between Unlimited and Hydrim and/or EOTW. The dispute is not between East Coast and Hydrim and/or EOTW.

FN10. *See* n. 1, *supra.*

The court did not consider the trial testimony of Robert Cannon regarding the issue of sizing the A/C units in reaching its conclusions. The court concludes Mr. Cannon was not properly qualified to testify as a mechanical engineer, [FN11] nor did he testify to the requisite reasonable degree of engineering probability. [FN12] The court finds Defendants' assertion of having received "numerous" complaints regarding the functioning of the A/C units in the two-bedroom condominiums was not supported by testimony at trial.

FN11. *See* n. 6, *supra.* Mr. Cannon is a professional electrical engineer.

FN12. *See* n. 7, *supra.*

*5 The court noted in its Findings of Fact that East Coast installed A/C units as specified in the submittal in all of the condominiums of the Project. For the same reason noted for the plumbing contract, the court holds that requirement that East Coast perform work "to the complete satisfaction" of Unlimited and EOTW was fulfilled

when East Coast installed the A/C units as specified in the submittal. The court concludes East Coast fulfilled its terms of the HVAC contract. The court, therefore, holds that Unlimited breached its HVAC contract with East Coast when it refused to make the final payment of $7,808.00. On the HVAC contract, the court finds FOR East Coast in the amount of $7,808.00. The court holds this amount was due September 25, 1999, 30 days after the completion of the HVAC work.

C. Prejudgment interest.

Under Delaware law, a party is entitled to prejudgment interest as a matter of right. [FN13] A party must, however, affirmatively request this award. [FN14] Such interest is calculated from the date payment is due. [FN15] The determination of the date payment was due is a question of law. [FN16] When the interest rate is not specified, 6 *Del. C.* § 2301(a) specifies that "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due." [FN17] The court takes judicial notice that the Federal Reserve Discount Rate in effect on September 25 and 26, 1999 was 4.75%. [FN18] The court concludes the prejudgment rate to be applied is 9.75%. The pre-judgment interest due on the plumbing and HVAC contracts as of July 30, 2004, therefore, is $13,058.78, with a per diem pre-judgment interest charge of $7.39 per day.

FN13. *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 826 (Del.1992) (internal citations omitted).

FN14. *Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd.,* 822 A.2d 1024, 1037 (Del.2003) (internal citations omitted).

FN15. *Citadel Holding Corp.,* 603 A.2d at 826.

FN16. *Id.*

FN17. 6 *Del. C.* § 2301(a).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 6

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

FN18.    *See*    http://www.fed
eralreserve.gov.releases/h15/data/d/dwb/txt

D. *Quantum meruit* and *quantum valebant* claims.

The court holds the total amount above--$40,716.78--is owed to East Coast by Unlimited. In the event Unlimited is unable to pay this full amount, the court holds Hydrim and EOTW liable for any balance remaining on theories of *quantum meruit* and *quantum valebant.*

The contracts at issue are between East Coast and Unlimited. Damages for breach of those contracts are owed to East Coast by the breaching party, Unlimited. As noted in the findings of fact, Unlimited is a viable, ongoing company and there is no indication it cannot pay its bills. Unlimited, however, states that the reason it did not pay East Coast is because it (Unlimited) was not paid by Hydrim.

The law in Delaware is clear that in the absence of a contract between a subcontractor and an owner, a subcontractor who supplies labor and materials on the order and credit of a general contractor cannot recover against the owner based upon *quantum meruit.* [FN19] There is, however, an exception to this general rule that allows a subcontractor to recover from an owner when the subcontractor cannot recover payment from the contractor with whom he contracted directly and the owner has not paid the contractor. [FN20] The court finds the case at bar falls squarely within the exception to the general rule. Unlimited states it did not pay East Coast because it was not paid by Hydrim. Therefore, to the extent East Coast cannot recover from Unlimited for the above damages, it may recover from Hydrim and EOTW. Therefore, the court finds Unlimited, Hydrim, and EOTW jointly and severally liable.

FN19. *Cohen v. Delmar Drive-In Theater,* 84 A.2d 597, 598 (Del.Super.1951).

FN20. *Builders Supply of Delmarva, Inc. v. Manbeck,* 1998 WL 442845 at *3 (Del.Super.).

E. Mechanic's lien claim.

*6 The court finds a mechanic's lien against EOTW as owner is proper. In its original complaint, East Coast made claims against the individual buildings, designating the amounts claimed due East Coast on each of the structures. At the time of construction, the condominiums were located on a single parcel of land and all were owned by EOTW. 25 *Del. C.* § 2713 allows filing a mechanic's lien against multiple structures "owned by the same person." [FN21] The court finds the cases cited by EOTW distinguishable as the units in those cases were found to be separate units on separate parcels of land and a single claim was made against the owner. [FN22] In the present case, the claims were made separately against the individual buildings under each contract. The court concludes a mechanic's lien is proper under 25 *Del. C.* § 2713.

FN21. 25 *Del. C.* § 2713.

FN22. *DiMondi v. S & S Builders, Inc.,* 124 A.2d 725, 728 (Del.1956) (separate homes on separate lots); *Ramsey v. DiSabatino,* 347 A.2d 659, 661 (Del.Super.1975) (condominiums having separate foundations on separate lots).

E. Costs and attorney's fees.

As the prevailing party, East Coast is entitled to recover its trial costs under Superior Court Civil Rule 54(d) ("Rule 54"). East Coast has submitted costs of $2,708.50 for recovery under Rule 54, itemized as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 7

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

**(Cite as: 2004 WL 2828286 (Del.Super.))**

| | |
|---|---|
| Filing fee | $125.00 |
| Service fees | $107.00 |
| Title search | $115.00 |
| Postage for Notices | $946.00 |
| Trial transcripts | $1,415.50 |

The court concludes these are all reasonable costs of trial. The court, therefore, awards $2,708.50 to East Coast. The court orders this amount to be paid equally by all Defendants. Each Defendant, therefore, must pay $902.83 to East Coast.

The court declines to award attorney's fees to East Coast. The court finds the Defendants had a reasonable, albeit ultimately rejected, belief they were entitled to withhold payment to East Coast based upon the fact the equipment installed in the condominiums of the Project was not "identical" to that in the existing condominiums.

F. Hydrim's counterclaim.

Hydrim asserts a counterclaim for $52,120.00 against East Coast in Defendants' Response to East Coast's post-trial submission. Hydrim asserts this is the estimated cost to replace the undersized A/C units and water heaters. This is the first time such a counterclaim has been asserted in this action. Hydrim apparently believes this issue was addressed by the evidence given at trial, even though not raised in the pleadings. [FN23] This claim is rejected by the court. The court finds that while the issue of replacing the allegedly undersized equipment was discussed at trial, it was only to note that the equipment had *not* been replaced. The court further finds there has been no discovery regarding this issue, nor did Hydrim provide any support for how the amount was calculated. The court finds for East Coast on Hydrim's counterclaim.

FN23. Super. Ct. Civ. R. 15(b).

V. CONCLUSION

THEREFORE, the court holds for Plaintiff East Coast in the amount of $43,425.27 to be paid as

noted above.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 2828286 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in A.2d

Not Reported in A.2d, 1997 WL 720463 (Del.Super.)

**(Cite as: 1997 WL 720463 (Del.Super.))**

Page 1

**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Stephen P. **GALVAGNA**, T/A G & G Applicators, Plaintiff,
v.
**MARTY MILLER CONSTRUCTION**, INC., A Corporation of the State of Maryland, and Robert W. Hall and Janet D. Hall, His Wife, Defendants.
**No. CIV. A. 96L-01-015.**

Sept. 19, 1997.
James F. Wachler, Esquire, Tunnell & Raysor, Georgetown, DE, for plaintiff.

Richard E. Berl, Jr., Esquire, Berl & Jones, Georgetown, DE, for defendants, Robert W. Hall and Janet D. Hall.

Marty Miller, Berlin, MD, pro se.

MEMORANDUM OPINION

GRAVES, J.

**\*1** This is an action which plaintiff Stephen P. Galvagna, t/a G & G Applicators ("Plaintiff") has filed against Marty Miller Builders, Inc. ("Builders") as well as Robert W. Hall and Janet D. Hall (collectively referred to as "the Owners"). The complaint contains the following claims: a mechanics' lien claim; an *in personam* claim against Builders based upon contract; and an *in personam* claim against the Owners based upon *quantum meruit,* or unjust enrichment. Pending before the Court is the motion of the Owners to dismiss the complaint against them on the ground that Plaintiff has no cause of action against them.

FACTS
Builders, as general contractor, contracted with the Owners to build a commercial structure ("the structure") for the Owners near Fenwick Island, Delaware. The structure is a one-story steel fabricated building divided into three separate units containing approximately 10,000 square feet. After Owners and Builders entered into their contract, Plaintiff and Builders entered into an oral contract which provided that Plaintiff was to provide labor and materials to the structure. In connection therewith, Plaintiff installed tile, which included a decorative border defendant Robert W. Hall picked out, in the portion of the structure known as American Health & Fitness Center. The amount owed Plaintiff for labor and materials supplied is $7,220.00. Builders has not paid Plaintiff. Furthermore, the Owners have not paid either Builders or Plaintiff the sums allegedly due and owing. The principal of Builders, Marty Miller, agrees that Builders owes Plaintiff the sums alleged to be due and owing. However, he alleges that the Owners have not paid him, and that is the reason why he has not paid Plaintiff. The Owners argue they had no contract with Plaintiff, and Plaintiff should seek to recover the sums due and owing it from Builders.

In the Court's file on this action, there is a letter dated April 18, 1997, from the principal of Builders stating:
I completed the building and the next day the Hall's [sic] were open and doing business. I have been forced to close my corporation due to no money available. I have liquidated all assets to help pay off outstanding debts and legal fees and still have some remaining.... I have no money to hire an attorney here.

The procedural aspects of this case require review. Plaintiff has its *in personam* claims against

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1997 WL 720463 (Del.Super.)

**(Cite as: 1997 WL 720463 (Del.Super.))**

Page 2

Builders and the Owners. The mechanics' lien claim is barred due to Plaintiff's failure to include in the complaint the existence of, and the time of recording of, a first construction mortgage. *Builders' Choice, Inc. v. Venzon,* Del.Supr., 672 A.2d 1 (1995). Builders has asserted a counterclaim against Plaintiff and a cross-claim against the Owners. An arbitrator heard this matter. He entered a judgment in Plaintiff's favor and against Builders on the *in personam* claim. He also entered a judgment in the Owner's favor and against Plaintiff in connection with Plaintiff's *in personam* claim against the Owners. He entered judgment in the Owners' favor and against Builders on Builders' cross-claim, and judgment in Plaintiff's favor and against Builders on Builders' counterclaim. Plaintiff filed a demand for trial de novo, which stated as follows:

*2 Plaintiff-Claimant, by and through counsel, hereby requests a Trial de Novo in the above-captioned action from the undated Arbitrator's Order filed with the Court on November 12, 1996, with respect to the judgment entered in favor of defendants Hall and against Plaintiff-Claimant, if a request for a trial de novo can be made with respect to only a part of the Arbitrator's findings, or from the entire order entered in the above-captioned matter if so required.

In their briefing on the pending summary judgment motion, Plaintiff and Owners indicate that the only matter remaining in this action is Plaintiff's claim against the Owners. The indication is that the claims of, and involving, Builders are resolved. The general rule is that absent an agreement on the part of all parties otherwise, all claims in a case are subject to the trial de novo; i.e., the entire proceeding continues intact. In this case, a pretrial scheduling conference was held where all the parties were present thereat, and a scheduling order was entered. There is no indication from that proceeding that the only matter on appeal is the judgment in favor of the Owners and against Plaintiff. Consequently, the entire case is before the Court as a result of the demand for a trial de novo. However, the only matter which this Court now addresses is the Owners' pending motion for summary judgment.

DISCUSSION

Summary judgment may be granted only when no issues of material fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979). Once the moving party meets its burden, then the burden shifts to the non-moving party to establish the existence of material issues of fact. *Id.* at 681. Where the moving party produces an affidavit or other evidence sufficient under Super. Ct. Civ. R. 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. Super. Ct. Civ. R. 56(e); *Celotex Corp. v.. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of his or her case, then summary judgment will be granted. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 59 (1991), *cert. den.,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992); *Celotex Corp. v. Catrett, supra.* If, however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

In their motion, the Owners argue that because Plaintiff, a materialman, did not have a direct contract with them, then Plaintiff is not entitled to an *in personam* judgment against them. Plaintiff argues that in this case, where the Owners would be unjustly enriched because they never have paid anyone for the labor and materials Plaintiff supplied, then Plaintiff is entitled to recover pursuant to theories of *quantum meruit* or restitution.

*3 Although Plaintiff has not argued entitlement to recover based upon a third-party beneficiary status, I will address that issue first. In construction matters, the parties generally craft their contracts to insulate the owner from the subcontractor; the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 3

Not Reported in A.2d, 1997 WL 720463 (Del.Super.)

**(Cite as: 1997 WL 720463 (Del.Super.))**

owner and general contractor deal with one another while the general contractor and subcontractor deal with one another. *Pierce Associates, Inc. v. Nemours Foundation,* 3rd Cir., 865 F.2d 530, 535-39 (1988), *cert. den.,* 42 U.S. 907, 109 S.Ct. 3218 (1989). The contracts generally do not allow for the subcontractor to be considered a third-party beneficiary of the contract between the contractor and the owners. *Id.* Only when the contract explicitly states that it intends for the subcontractor to be a third-party beneficiary do the courts allow the subcontractor to sue the owner based upon a third-party beneficiary status. *Id.*

A review of the contract submitted in this matter shows that there is no third-party beneficiary status bestowed upon Plaintiff in the contract between Builders and the Owners which gives it the right to seek payment of the sums due and owing it. Consequently, Plaintiff is not a third-party beneficiary of the contract between Builders and the Owners. *Id.* For the same reasons, the Owners are not third-party beneficiaries of the contract between Builders and Plaintiff. *Id.*

I now turn to the law addressing the issue of whether a subcontractor may bring a claim based upon *quantum meruit,* or implied contract. In *Cohen v. Delmar Drive-In Theatre,* Del.Super., 84 A.2d 597, 598 (1951) ("*Cohen* "), the Superior Court held:

 3. A materialman, as subcontractor, may not recover a personal judgment against a property owner in the absence of a contract between them [Citations omitted.]

 4. A materialman who, as subcontractor, furnishes materials upon the order and credit of a general contractor or of another sub-contractor, cannot recover in an action *in personam* against the owner upon the basis of implied contract arising from the receipt and acceptance of the benefit of the materials furnished. [Citations omitted.]

The Superior Court followed this rule in *William M. Young Company v. Bacon,* Del.Super., C.A. No. 89L-JA2, Graves, J. (May 1, 1991) ("*Young* "). The Court held that based upon *Cohen,* the

subcontractor could not recover against the owners of the property *who had paid* the general contractor. Plaintiff argues that *Young* is distinguishable because in this case, the Owners have not paid Builders, and the Owners would be unjustly enriched if Plaintiff is not allowed to pursue them.

Other pertinent cases to examine are *Chrysler Corp. v. Airtemp Corp.,* Del.Super., 426 A.2d 845 (1980) and *Gilbane Building Company v. Nemours Foundation,* D.Del., 606 F.Supp. 995 (1985). In the case of *Chrysler Corp. v. Airtemp Corp.,* 426 A.2d at 853-36, the Superior Court held that it would not consider a *quantum meruit* theory to find a third-party beneficiary liable unless there existed an inability to recover under the underlying or express contract or it would be unconscionable for the third-party beneficiary to retain the benefits. Similarly, in *Gilbane Building Company v. Nemours Foundation,* 606 F.Supp. at 1007-08, the Delaware District Court granted the owner's summary judgment motion against the subcontractors because there were no allegations that the subcontractors would be unable to recover from the general contractor on the express contract or that the owner had failed to pay the general contractor for the services the subcontractors rendered thereby unjustly enriching the owner.

*4 Here, in light of the letter from Builders' principal indicating Builders has closed down and liquidated its assets, it may well be that Plaintiff cannot recover from Builders. Furthermore, Plaintiff and Builders have alleged that the Owners have not paid Builders for the services and material Plaintiff supplied. The Owners have not disputed this allegation, and it is accepted as true for summary judgment purposes. Based upon what is before the Court in this summary judgment proceeding, it is reasonable to conclude that the Owners may be unjustly enriched by the labor and materials which Plaintiff provided. Consequently, I hold that on the facts of this case, Plaintiff is entitled to pursue against the Owners the *in personam* claim based upon *quantum meruit.*

For the foregoing reasons, the Owners' motion for summary judgment is denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1997 WL 720463 (Del.Super.)

**(Cite as: 1997 WL 720463 (Del.Super.))**

IT IS SO ORDERED.

Not Reported in A.2d, 1997 WL 720463 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in B.R.                                                    Page 1

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

**(Cite as: 2002 WL 1000146 (Bankr.D.Del.))**

**c**

Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Delaware.
In re: **MURPHY MARINE SERVICES**, INC., et
al., Debtors.
**No. 01-926 (MFW), 01-927(MFW),
01-928(MFW), 01-929(MFW), 01-930(MFW), 01-
931(MFW), 01-932(MFW), 01-933(MFW),
01-950(MFW).**

April 5, 2002.

Laura Davis Jones, Esquire, Christopher J. Lhulier, Esquire, Pachulski Stang Ziehl Young & Jones, Wilmington, Counsel for the Debtors.

Richard L. Epling, Esquire, Pillsbury Winthrop LLP, New York, NY, Counsel for the Debtors.

Alan W. Behringer, Esquire, Welch & Associates, Wilmington, Counsel for Tianjin Tianma Shipbreaking Co., Ltd.

Teresa D. Currier, Esquire, Eric Lopez Schnabel, Esquire, Klett Rooney Lieber & Schorling, Wilmington, Counsel for the Official Committee of Unsecured Creditors.

Michael B. Fisco, Esquire, Anne F. Larsen, Esquire, Faegre & Benson LLP, Minneapolis, MN, Counsel for the Official Committee of Unsecured Creditors.

Office of the United States Trustee, Wilmington.

MEMORANDUM OPINION [FN1]

FN1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of

Bankruptcy Procedure 9014.

WALRATH, Bankruptcy J.

**\*1** Before the Court is the Motion of NPR, Inc. ("NPR") for a determination that it is owed liquidated damages from Tianjin Tianma Shipbreaking Co., Ltd. ("Tianjin") for breach of a contract for sale of a vessel and the cross-motion of Tianjin for damages from NPR for breach of that contract. After a hearing and consideration of the affidavits and exhibits proffered, we conclude that NPR's motion must be denied and damages awarded in favor of Tianjin.

I. *FACTUAL BACKGROUND*

On March 21, 2001, Murphy Marine Services, Inc., and several of its affiliates, including NPR (collectively "the Debtors"), filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors provide integrated cargo transportation and logistics management services in the marine industry. These services are performed in New Jersey, Pennsylvania, Delaware, Florida and Puerto Rico.

Shortly after the filing, NPR entered into a contract with Tianjin by which NPR agreed to sell the vessel SS Nuevo San Juan ("the Vessel") in an "as is, where is" condition to Tianjin for $700,000 in cash ("the Sale Contract"). Because NPR was in chapter 11, NPR advised Tianjin at the time the contract was executed that Bankruptcy Court approval was required and a provision to that effect was added to the Sale Contract. (Sale Contract at § 26.) On April 10, 2001, the Sale Contract was revised and signed by all the parties via facsimile. On April 12, 2001, Tianjin paid a deposit of $140,000. The Sale Contract provided for delivery of the Vessel by NPR to Tianjin between April 20 and May 10 at NPR's option.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 2

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

**(Cite as: 2002 WL 1000146 (Bankr.D.Del.))**

On April 11, 2001, Tianjin hired a towing company to tow the Vessel to China ("the Towing Contract"). The Towing Contract required Tianjin to pay a delay fee of $5,500 for each day the tug remained in port waiting for the Vessel, as well as a cancellation fee of $80,000. The contract provided for delivery of the Vessel to the towing company between April 25 and May 10, 2001.

NPR filed a motion on April 24, 2001, for approval of the Sale Contract. A hearing on the Motion was held on May 14, 2001, at which time the Sale Contract was approved. (Exhibit 7 to Cai Affidavit.) Although the Sale Contract originally required delivery of the Vessel between April 20 and May 10, because the sale was contingent on Bankruptcy Court approval, delivery was not possible within that period.

The parties commenced discussions in early May regarding whether the time for delivery under the Sale Contract would be extended and when the Vessel would be delivered. In a fax dated May 4, 2001, Tianjin agreed to extend the deadline from May 10 to May 18, 2001, if NPR would agree to reimburse it for the costs of the tug caused by the delay in delivery. (Exhibit 6 to Cai Affidavit.) On May 18, 2001, Tianjin sent a notice cancelling the Sale Contract as a result of NPR's failure to deliver the Vessel on time. (Exhibit 9 to Cai Affidavit; Exhibit 5 to Yu Affidavit.)

**\*2** Despite the cancellation notice, the parties continued discussions and on July 12, 2001, Tianjin's attorney confirmed by letter that NPR had agreed to reduce the purchase price by $124,000 and that the Vessel would be delivered after government approvals had been obtained at a date mutually agreed by the parties. (Exhibit 14 to Cai Affidavit.)

NPR advised the Court of this modification of the Sale Contract at the next hearing held in the case, on July 17, 2001. At that hearing, the Debtor advised the Court that it did not believe it needed an Order of the Court approving that modification, asserting that the original Order was sufficient. [FN2] At that time, the Official Committee of

Unsecured Creditors ("the Committee") consented to the modification but the lenders asked for additional time to consider it. As a result of these representations, we stated that we would approve the modification without further Order if the Debtors obtained the consent of the secured lenders to the modification.

> FN2. It is unclear why the Debtors felt no further Court order was necessary. The original Sale Order approved the sale pursuant to the terms of the Sale Contract, which specified a purchase price of $700,000 with "final sale subject to Bankruptcy Court approval" and no provision for modification.

Immediately after that hearing, NPR advised Tianjin of the Court's direction and stated that rather than a reduction of $124,000 in the purchase price, NPR would agree only to reduce the price by the actual amount that Tianjin had to pay the towing company in damages and demanded proof of payment of those damages as well as evidence that the towing company was not an affiliate of Tianjin. (Exhibit 15 to Cai Affidavit.) By fax dated July 23, 2001, Tianjin protested these changes. (Exhibit 16 to Cai Affidavit.) However, two days later Tianjin did provide evidence that it was not related to the towing company and that it had made arrangements to pay $118,500 in compensation to the towing company over time. (Exhibit 3 to Hausmann Affidavit.)

On July 27, 2001, NPR advised Tianjin's counsel that the Vessel was available for delivery immediately. (Exhibit 5 to Hausmann Affidavit.) At that time NPR stated that it expected to receive any portion of the reduction in the purchase price which was not actually paid by Tianjin to the towing company. (*Id.*) In response, Tianjin asserted that additional damages were being suffered by it as a result of the delay (and the depression in the market for scrap metal) and requested an additional reduction in the purchase price. (Exhibit 6 to Hausmann Affidavit.) On August 1, 2001, counsel for Tianjin advised that it was prepared to accept delivery of the Vessel subject to additional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                              Page 3

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

**(Cite as: 2002 WL 1000146 (Bankr.D.Del.))**

modifications to the Sale Contract, including the requirement that NPR obtain a certificate attesting that the Vessel was towage-worthy. (Exhibits 7 & 8 to Hausmann Affidavit.)

At this point NPR declared Tianjin in default. (Exhibit 9 to Hausmann Affidavit.) Tianjin responded by asserting that the Sale Contract had already been terminated on May 18, 2001, because of NPR's default. (Exhibit 10 to Hausmann Affidavit.) NPR advised Tianjin that it would agree to the towage certificate requirement if Tianjin would accept delivery of the Vessel promptly. (*Id.*) There is no evidence that Tianjin responded.

*3 Consequently, NPR filed the instant Motion for Order Terminating Agreement for the Sale of a Certain Vessel Free and Clear of Liens, Claims, Encumbrances, Rights of Offset and Rights of Recoupment to Tianjin Tianma Shipbreaking Co., Ltd., and Authorizing Debtors to Collect Liquidated Damages. In response, Tianjin filed an Objection to the Debtors' Motion and a Motion to Compel the Debtors to Abide by Terms of a Post-Petition Contract Regarding the Sale of a Certain Vessel and Return Deposit Funds and Pay Damages Fees and Costs According to the Default Clause and Plain Language of the Contract.

At the hearing on the Motions, both NPR and Tianjin agreed that the Court could declare the Sale Contract terminated. A subsequent hearing was set for October 23, 2001, to determine which party had defaulted on the Sale Contract and what damages would be assessed for that default. At the hearing evidence was presented and the matter was taken under advisement. On or about November 14, 2001, additional briefs and affidavits were submitted to clarify certain facts.

II. *JURISDICTION*

This Court has core jurisdiction under 28 U.S.C. § 157(b)(2)(B), (C), (N) and (O).

III. *DISCUSSION*

To provide stability and finality to judicial sales of

a debtor's assets pursuant to section 363 of the Bankruptcy Code, debtors and buyers are bound and obligated to consummate a sale once it has been authorized by the bankruptcy court. *In re Chateaugay Corp.,* 186 B.R. 561, 593 (Bankr.S.D.N.Y.1995); *In re Oyster Bay Cove, Ltd.,* 161 B.R. 338, 342 (Bankr.E.D.N.Y.1993). *See also In re Winston Inn & Restaurant Corp.,* 120 B.R. 631, 635 (E.D.N.Y.1990) ("To induce bidding at such sales and reliance upon them, the purpose of the law is that they shall be final"). A debtor and a buyer in a bankruptcy sale is bound by the contract as stated and as embodied in the approval order. *In re Silver Bros. Co., Inc.,* 179 B.R. 986, 1007 (Bankr.D.N.H.1995). This is especially so because judicial sales, unlike ordinary private commercial transactions, involve parties other than the particular parties to the transaction. *Id.* at 1007.

A. *Original Contract Performance*

The Sale Contract as executed on April 14, 2001, established a deadline for delivery of the Vessel between April 24 and May 10. However, the Sale Contract also provided for approval by the Bankruptcy Court as a condition precedent to closing, which was not obtained until May 14, 2001. [FN3] Further, pursuant to Rule 6004(g) of the Federal Rules of Bankruptcy Procedure: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Thus, the sale order was not final and delivery could not have taken place before May 24, 2001.

> FN3. That date was the first omnibus hearing at which the Motion could be heard consistent with the 20-day notice requirements of Fed. R. Bankr.P.2002.

The Sale Contract thus contains two conflicting clauses. It provides for delivery of the Vessel no later than May 10, 2001, while requiring Bankruptcy Court approval which was not final until May 24, 2001.

*4 An implied covenant of good faith and fair

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

**(Cite as: 2002 WL 1000146 (Bankr.D.Del.))**

dealing inheres in every contract. *Chamison v. HealthTrust, Inc.,* 735 A.2d 912, 920 (Del. Ch.1999); *Wilgus v. Salt Pond Inv. Co.,* 498 A.2d 151, 159 (Del. Ch.1985); *Chateaugay,* 186 B.R. at 594 (an implied covenant of good faith under New York law). The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract. *See Restatement (Second) of Contracts,* § 205 comment a (1981) (good faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"). "In attempting to construe the contracting parties' intent fairly and reasonably, a court must consider the specific language of the contract and the context within which that contract was formed." *Chateaugay,* 186 B.R. at 594 (*citing Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989)).

The Sale Contract was originally executed on March 29, 2001. However, in light of NPR's recent bankruptcy filing, the parties agreed to add a requirement for Bankruptcy Court approval of the Sale Contract. That intent was manifested by the modification of the Sale Contract executed on April 14, 2001. We conclude that the parties intended to effect delivery only after the Order approving the Sale Contract became final. Thus, the deadline for delivery of the Vessel was May 24, 2001.

However, it is clear that NPR was not able to tender delivery of the Vessel on May 24, 2001, because of other factors. Specifically, NPR had not obtained government approval of the sale, as required by section 24 of the Sale Contract. In fact, NPR did not tender delivery of the Vessel until July 27, 2001; over two months later.

Although Tianjin's notice of default dated May 18, 2001, was premature, it did not preclude NPR from tendering delivery of the Vessel on May 24, 2001. Had NPR tendered delivery on May 24, 2001, and had Tianjin not accepted delivery, then Tianjin would have been liable for breach of contract. Consequently, we conclude that as of May 24, 2001, NPR was in breach of the Sale Contract for failure to tender delivery of the Vessel.

**B. *Modification of Sale Contract***

NPR alleges, however, that the parties agreed to modify the Sale Contract by extending the deadline for delivery of the Vessel. NPR further alleges that, following the modification of the Sale Contract, Tianjin breached by failing to accept delivery of the Vessel. Based on the evidence presented, however, we are unable to conclude Tianjin and NPR had a "meeting of the minds" on a modified Sale Contract. There was never an offer by one side that was unconditionally accepted by the other side. Basic contract law supports this conclusion.

"The common law rule is that 'a reply to an offer which purports to accept but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer." ' *Honeywell, Inc. v. American Standards Testing Bureau, Inc.,* 851 F.2d 652, 659 (3d Cir.1988) (*quoting Restatement,* § 59).

*5 The communications between Tianjin and NPR were merely a series of offers and counteroffers that were never accepted by either side. On July 12, 2001, Tianjin's attorney asserted that NPR had agreed to reduce the purchase price by $124,000 and that the Vessel would be delivered after the government approvals had been obtained at a date mutually agreed by the parties. The letter constitutes a valid offer to modify the Sale Contract on those terms. In response, on July 17, 2001, NPR advised Tianjin that rather than a reduction of $124,000 in the purchase price, it would agree only to reduce the price by the actual amount that Tianjin had to pay the towing company in damages (and demanded proof of payment of those damages as well as evidence that the towing company was not an affiliate of Tianjin). This constitutes a counteroffer as there is a difference in price plus the additional requirement of evidence of non-affiliation. By fax dated July 23, 2001, Tianjin protested this change, thus rejecting the July 17 counteroffer.

On July 27, 2001, NPR advised Tianjin's counsel that the Vessel was available for delivery immediately. At that time NPR reiterated that it expected to receive any portion of the reduction in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.    Page 5

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

**(Cite as: 2002 WL 1000146 (Bankr.D.Del.))**

the purchase price which was not actually paid by Tianjin to the towing company. This communication constitutes a new offer from NPR to Tianjin. Tianjin again protested (asserting additional damages). This response was not an acceptance of NPR's offer but a rejection of it.

On August 1, 2001, Tianjin stated it was prepared to accept delivery of the Vessel subject to additional modifications to the Sale Contract, including the requirement that NPR obtain a certificate attesting that the Vessel was towage-worthy. This constitutes a counteroffer. NPR rejected this counteroffer, by declaring Tianjin in default.

As the communications between NPR and Tianjin demonstrate, there was nothing more than offers and counteroffers between the parties. There was never an instant where there was a "meeting of the minds" on the terms of a modified contract. Thus, the only contract that existed between Tianjin and NPR was the April 14 Sale Contract. That contract was breached by NPR's failure to tender delivery of the Vessel to Tianjin on May 24, 2001. Following the termination of the Sale Contract, the parties attempted to agree to new terms but never did.

C. *Damages Due for Breach of Contract*

Under the Sale Contract, upon breach by NPR, Tianjin is entitled to the return of its deposit for the purchase of the Vessel from NPR plus interest at 12%. (Sale Contract at § 14.) In addition, the Sale Contract provides that Tianjin is entitled to "due compensation for the losses caused to [Tianjin] by [NPR's] failure to exercise a legal transfer or to deliver the vessel in the manner and within the time specified." (*Id.*)

Tianjin asserts it incurred losses in the form of the amounts paid by Tianjin to the towing company under the Towing Contract. The Towing Contract required Tianjin to pay a delay fee of $5,500 for each day the tug remained in port waiting for the vessel, as well as a cancellation fee of $80,000.

*6 When the modification to the Sale Contract was

executed on April 10, 2001, Tianjin reasonably contracted with the towing company for the pick up of the Vessel. However, it was unreasonable for Tianjin to expect the Vessel to be tendered before May 24, 2001, or ten days after the hearing on the Motion to approve the sale. Thus, Tianjin is not entitled to damages for delay costs prior to May 24, 2001. [FN4] However, the $80,000 cancellation fee under the Towing Contract is a loss caused by NPR's failure to tender delivery of the Vessel.

> FN4. Tianjin asserts delay costs for seven days from May 11th to the 17th at the rate of $5,500 per day totaling $38,500. (Exhibit 10 to Cai Affidavit.)

IV. *CONCLUSION*

For the foregoing reasons, we deny the Debtor's motion for an award of liquidated damages and award damages to Tianjin for (1) its deposit plus interest at 12% per annum from May 24, 2001, to date of payment, and (2) the cancellation fee of $80,000 due by Tianjin to the towing company.

An appropriate order is attached.

ORDER

AND NOW, this 5TH day of APRIL, 2002, upon consideration of the Debtors' Motion for Order Terminating Agreement for the Sale of a Certain Vessel Free and Clear of Liens, Claims, Encumbrances, Rights of Offset and Rights of Recoupment to Tianjin Tianma Shipbreaking ., Ltd., and Authorizing Debtors to Collect Liquidated Damages and the Objection thereto by Tianjin and the Motion by Tianjin to Compel the Debtors to Abide by Terms of a Post-Petition Contract Regarding the Sale of a Certain Vessel and Return Deposit Funds and Pay Damages Fees and Costs According to the Default Clause and Plain Language of the Contract, it is hereby

ORDERED that the Debtors' Motion is DENIED; and it is further

ORDERED that Tianjin's Motion is GRANTED and NPR is directed to pay Tianjin (1) the deposit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                Page 6

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

**(Cite as: 2002 WL 1000146 (Bankr.D.Del.))**

in the amount of $140,000 plus interest accrued at a rate of 12% per annum, and (2) the $80,000 cancellation fee incurred by Tianjin to the towing company as a result of NPR's breach.

Not Reported in B.R., 2002 WL 1000146 (Bankr.D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1991 WL 89817 (Del.Super.)

**(Cite as: 1991 WL 89817 (Del.Super.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Re: WILLIAM M. YOUNG COMPANY, a corporation of the State of Delaware, Supplier
v.
Edward J. **BACON** and Martha L. **Bacon,** his wife, Owner, and Bradley Co., Inc., a corporation of the State of Delaware, General Contractor.
**Civ. a. No. 89L-JA2.**

Submitted: Jan. 22, 1991.
Decided: May 1, 1991.
John A. Sergovic, Jr., Althea E. McDowell, Sergovic & Ellis, Georgetown.

Richard F. Stokes, Marilyn L. Barker, Tunnell & Raysor, Georgetown.

GRAVES, Judge.

**\*1** This is a mechanic's lien action a lumber supplier has brought against a contractor and the owners of real property, wherein the supplier is seeking a mechanic's lien against the real property and a personal judgment against both the contractor and the owner for lumber provided by the supplier and used by the contractor in the construction of the owners' house. The owners have filed a motion for summary judgment, and this is the Court's decision on that motion.

*Facts*
Viewing the evidence in the light most favorable to the non-moving party, the following facts are indicated. On or about October 11, 1988, defendants, Edward J. Bacon and Martha L. Bacon,

his wife, owners of the subject property (hereinafter, "the Bacons") entered into a contract with defendant Bradley Co., Inc., a general contractor, (hereinafter, "Bradley"). Bradley agreed to construct a residence for the Bacons for a total contract price of $116,700.00, to be paid in ten draw payments as owrk on the house progressed.

Prior to the execution of the Bacon-Bradley contract, Bradley established a credit account with plaintiff, William M. Young Company, the lumber supply company (hereinafter "Young"). While it is unclear exactly when this account was opened, it was at least opened on February 8, 1988, approximately nine months prior to the Bacon-Bradley contract. Since that time, Bradley periodically had ordered lumber supplies from Young on this account.

After entering into the construction contract with the Bacons, Bradley ordered various lumber supplies from Young for use in the Bacon residence. Young delivered these supplies on October 19, 1988 and November 4, 1988. Young alleges that the price of these supplies is $9,793.86, together with service charges and interest.

Construction began on or about September 1, 1988, and the Bacons began making draw payments under the contract. By November 21, 1988, the Bacons had made six draw payments to Bradley totaling $76,700.00. No more payments were made after this date. On November 22, 1988, after the sixth draw payment, the Bacons became "concerned" that the work on their home was falling behind schedule. The Bacons and Bradley agreed upon revised completion schedules. The work continued. On December 15, 1988, after Bradley assured them that it would meet the second revised schedule, the Bacons left the area for the holidays. The Bacons received notice of a mechanic's lien filing by a plumbing and heating company on December 20, 1988. Subsequently, the Bacons

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1991 WL 89817 (Del.Super.)

**(Cite as: 1991 WL 89817 (Del.Super.))**

learned that Bradley had gone out of business and would not be completing their home.

On January 6, 1989, Young filed the present action seeking a mechanic's lien on the Bacons' house and lot, a personal judgment against Bradley, and a personal judgment against the Bacons on *quantum meruit* and third-party beneficiary theories. In addition, Young has advanced another ground for recovery *in personam* against the Bacons in its brief, although it failed to assert this ground in its complaint. That ground is that Bradley was acting as the Bacons' agent in procuring the lumber supplies from Young, and therefore, the Bacons are liable for breach of contract as principals.

*2 Bradley subsequently has filed bankruptcy, leaving Young and the Bacons as the litigants.

The Bacons filed a motion for summary judgment as to the mechanic's lien action and the *in personam* actions.

### Summary Judgment

On a motion for summary judgment, the Court's function is to examine the record to determine whether there are any genuine issues of material fact. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* Del.Supr., 312 A.2d 322 (1973) . If, after viewing the record in the light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment will be appropriate. *Moore v. Sizemore, supra; Pullman, Incorporated v. Phoenix Steel Corporation,* Del.Super., 304 A.2d 334 (1973). Summary judgment will not be granted under any circumstances where the record reasonably indicates that a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962).

### The Mechanic's Lien Claim

Title 25 of *Delaware Code,* Section 2707 reads in pertinent part as follows:

"No lien shall be obtained under this chapter upon the lands, structure, or both, of any owner which is used solely as a residence of said owner when the owner has made either full or final payment to the contractor, in good faith, with whom he contracted for the construction, erection, building, improvement, alteration or repair thereof. ..."

It is undisputed that the Bacons made six draw payments to Bradley which total $76,700.00. This would leave $40,000.00 remaining to be paid to Bradley under the Bradley-Bacon construction contract.

The Bacons have submitted affidavits with estimates that it will cost them $68,743.60 to have another contractor complete their house. While Young disputes this estimate, it provides the Court with nothing to cast doubt upon the estimate. Young must do no more than rely upon unverified pleadings or allegations to demonstrate the existence of a genuine issue of material fact. *Nix v. Sawyer,* Del.Supr., 466 A.2d 407, 413 n. 8 (1983) . Thus, I find no genuine issue of material fact that the cost of completing the house exceeds the $40,000.00 remaining unpaid on the Bradley-Bacon contract. For purposes of 25 *Del.C.* § 2707, full payment has been established. *Masten Lumber and Supply Co., Inc. v. Brown,* Del.Supr., 405 A.2d 101 (1979).

That portion of § 2707 which remains at issue is whether or not the Bacons' six payments to Bradley were made "in good faith".

"[T]he 'good faith' required under § 2707 ... is to be determined by the Court from all of the relevant circumstances." *Bedford v Sussex Electrical Const. Co.,* Del.Supr., 382 A.2d 246 (1978). If circumstances were such that the owner knew or should have known that one who provided labor or materials for the project had not been paid, then payments to the contractor thereafter are not made in good faith. *Id.* Stated another way, payments are not made in good faith if the owner had reason to believe that paying the general contractor directly would lessen the likelihood of the subcontractors and suppliers being paid. *Grier Lumber Company,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3

Not Reported in A.2d, 1991 WL 89817 (Del.Super.)

**(Cite as: 1991 WL 89817 (Del.Super.))**

*Inc. v. Tryon,* Del.Super., 337 A.2d 323 (1975).

**\*3** I find it unnecessary to review the facts presented by both parties to support their positions on the showing of good faith or bad faith. It appears from the briefs that the facts continue to evolve. If the trier of fact is to make this good faith determination from all relevant circumstances, then I am reluctant to find as a matter of law that the plaintiff is precluded from going forward on this factual issue. This is a situation in which it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances. *Ebersole v. Lowengrub, supra.*

### In Personam Theories

Plaintiff, either through the pleadings or in its brief, has raised three alternative theories of *in personam* recovery. They are *quantum meruit* or contract implied in law, third-party beneficiary, and agency. For the reasons set forth below, I find no legal basis for plaintiff to pursue any of these theories, and I grant summary judgment on each.

It has long been the rule in Delaware that "[a] materialman who ... furnishes materials upon the order and credit of a general contractor ... cannot recover in an action *in personam* against the owner upon the basis of implied contract arising from the receipt and acceptance of the benefit of the materials furnished." *Cohen v. Delmar Drive-In Theatre,* Del.Super., 84 A.2d 597, 598 (1951). Such a person "may not recover a personal judgment against a property owner in the absence of a contract between them". *Id.*

Young argues that the aforementioned rule of law is now of questionable validity due to the decisions in *Chrysler Corp. v. Airtemp Corp.,* Del.Super., 426 A.2d 845 (1980); *Gilbane Building Company v. Nemours Foundation,* D.Del., 606 F.Supp. 995 (1985); and *Pierce Association, Inc. v. Nemours Foundation,* 3rd Cir., 865 F.2d 530 (1988).

In *Chrysler Corp. v. Airtemp Corp., supra,* the express contract was between Chrysler and Fedders Corporation. As a result of the express contract, Airtemp Corp. was to receive services from

Chrysler for which Fedders agreed to pay Chrysler. A dispute arose between Chrysler and Fedders resulting in Fedders' refusal to make payments. Chrysler then sued Airtemp, on several theories, one of which was *quantum meruit* or implied contract.

In *Chrysler Corp. v. Air Temp Corp., supra,* the Court recognized that recovery under *quantum meruit* or implied contract would be considered only if there was no express contract governing the rights and obligations of the parties. Chrysler argued that since Airtemp was a third-party beneficiary of the above contract and not a party to the express contract, it should be permitted to recover from Airtemp under *quantum meruit.* The Court stated that it would not consider a *quantum meruit* theory to find a third-party beneficiary liable unless there existed an inability to recover under the underlying or express contract.

**\*4** Young argues that because Bradley is bankrupt, Young cannot collect on the express contract between Young and Bradley; therefore, Young should be permitted to recover from the Bacons, who received the benefit of the Young-Bradley contract.

This argument ignores *Roman Mosaic and Tile Co., Inc. v. Vollrath,* Pa.Super., 313 A.2d 305 (1973), cited with approval in *Chrysler Corp. v. Airtemp Corp.,* in its analysis of when a third-party beneficiary might be liable under *quantum meruit.* In *Roman Mosaic,* the Pennsylvania court noted that in order to pursue the *quantum meruit* or unjust enrichment theory against the third-party beneficiary, it must be shown that it would be unconscionable for the third-party beneficiary to retain the benefits.

*Gilbane Building Company v. Nemours Foundation, supra,* provides no more support for Young than does *Chrysler.* This case involved a series of claims, counterclaims and cross-claims. Relevant to the present case was a sub-contractor's action directly against Nemours, the owner. The Court granted the owner's summary judgment motion against the subcontractor because there was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4

Not Reported in A.2d, 1991 WL 89817 (Del.Super.)

**(Cite as: 1991 WL 89817 (Del.Super.))**

no allegation that the subcontractor would be unable to recover from the contractor on the express contract *and* there was nothing to show the owner had been unjustly enriched.

In the present case, the Bacons have not been unjustly enriched. They had paid Bradley for the materials Young supplied. Furthermore, they will pay, or have already paid, thousands of dollars in excess of their contract with Bradley in order to complete their residence.

*Direct Third-Party Beneficiary Theory*
Young argues that the case of *Pierce Associates v. Nemours Foundation,* 3rd Cir., 865 F.2d 530 (1989), supports a direct third-party beneficiary theory.

The *Pierce* court recognized a third-party may recover on a contract made for his benefit, but in order to allow the circumvention of the traditional insulation between owners and subcontractors, the contracting parties must intend to confer a third-party benefit. This intent must be found in the language of the contract. Thus, the contracting parties, i.e., the general contractor and the subcontractor, must have language in their contract that evidences an intent that the owner be a third-party beneficiary before the owner can pursue the subcontractor on a third-party beneficiary theory of recovery.

Young argues that *Pierce* holds that a third-party beneficiary status will exist unless the parties have negated same in the language of the contract. Young's position is incorrect.

Young has presented no facts which could lead the Court or the trier of facts to the conclusion that the Bacons were to be third-party beneficiaries of the Young-Bradley contract or that Young was to be the third-party beneficiary of the Bradley-Bacon contract.

There being no factual basis for direct liability under a third-party beneficiary theory, I must grant Bacon's summary judgment motion on this theory.

*Agency Theory of Recovery*

*5 Young argues that as a matter of law, Bradley, as the general contractor, acted as the Bacon's agent.

Young relies upon two cases for this assertion, neither of which are supportive of Young's position.

The first case, *Maull v. Stokes,* Del.Ch., 68 A.2d 200 (1949), involved an accounting dispute between an owner and general contractor as to how the general contractor spent the owner's funds during the construction of the owner's house.

In *Maull,* the Court noted that by operation of the mechanic's lien law, an implied agency must exist that allows the general contractor's acts to be a basis for a subcontractor's or materialman's lien against an owner's property, even though the debt which may be the basis of the lien was created without the owner's knowledge. This dicta concerned an analysis of the theory of the mechanic's lien law and how a direct lien was permitted against the owner's property.

I refuse to construe *Maull* for anything other than an explanation of how the implied agency relationship creates the power to bind the owner's property by way of a mechanic's lien. *Maull* is not a basis for permitting the general contractor to bind the owner personally.

In furtherance of its agency argument, Young argues that a fiduciary relationship exists between an owner paying monies for the construction of a building and the general contractor who receives the monies. *Irwin & Leighton v. W.M. Anderson Co.,* Del.Ch., 532 A.2d 983 (1987). Young, without authority, then concludes that a fiduciary must be an agent. Simply because a fiduciary relationship exists between two people does not mean that one may bind the other to contracts with third persons. A fiduciary may or may not be an agent. *See* Restatement (Second) of Agency, Sec. 14B (1958).

The party asserting the existence of an agency relationship has the burden of proving it. *Facciolo v. State Division of Revenue,* Del.Supr., 358 A.2d 880 (1976). Young has provided no basis for the agency argument which was raised in its brief.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 5

Not Reported in A.2d, 1991 WL 89817 (Del.Super.)

**(Cite as: 1991 WL 89817 (Del.Super.))**

For the reasons aforestated, summary judgment is denied as to the mechanic's lien action and granted as to the *in personam* claims by Young against the Bacons.

Not Reported in A.2d, 1991 WL 89817 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1732275 (Del.Super.)
**(Cite as: 2004 WL 1732275 (Del.Super.))**

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Steven C. WILSON and Kristen v. Wilson, Plaintiffs,
v.
ACTIVE CRANE RENTALS, INC., a Delaware corporation, Defendant and Third-Party Plaintiff,
v.
COLBY ENTERPRISES OF PEMBERTON, INC., Third-Party Defendant.
No. Civ.A.01C-02-027WLW.

Submitted July 2, 2004.
Decided July 8, 2004.

Upon Consideration of Third-Party Defendant Colby Enterprises of Pemberton, Inc's Motion for Summary Judgment. Denied.

I. Barry Guerke, Parkowski & Guerke, Dover, Delaware, for Plaintiffs.

Norman H. Brooks, Marks, O'Neill, O'Brien & Courtney, Wilmington, Delaware, for Defendant.

David L. Baumberger, Chrissinger & Baumberger, Wilmington, Delaware, for Third-Party Defendant.

ORDER

WITHAM, J.

Introduction
*1 Before this Court is Third-Party Defendant Colby Enterprises of Pemberton, Inc.'s motion for summary judgment. Plaintiffs Steven and Kristen Wilson and Third-Party Plaintiff Active Crane Rentals, Inc. oppose the motion.

Background
This is a personal injury action arising out of a construction accident in which Steven Wilson ("Wilson" or "Plaintiff") sustained personal injuries. Third-Party Defendant/Fourth-Party Plaintiff Colby Enterprises of Pemberton, Inc. ("Colby") owns and operates eleven Burger King franchises and hired Fourth-Party Defendant Scott McLaughlin ("McLaughlin"), an independent contractor, to build a new restaurant in Glasgow, Delaware. According to

Colby, McLaughlin is not a Colby employee and had no authority to act on behalf of Colby. Defendant/ Third-Party Plaintiff Active Crane Rentals, Inc. ("Active Crane") allegedly rented a crane to Colby and/or McLaughlin for use during the construction project. Colby asserts that McLaughlin, not Colby, entered into the contract with Active Crane. Thus, Colby asserts that it cannot be held liable for a contract entered into without its knowledge or authority.

Colby has filed this motion for summary judgment contending that McLaughlin did not have actual or apparent authority to enter into a contract on behalf of Colby. Plaintiffs and Active Crane oppose the motion arguing that summary judgment is not appropriate for the issues of actual and apparent authority because they raise factual disputes to be decided by the jury. McLaughlin did not respond to the motion, but Plaintiffs submitted an affidavit signed by McLaughlin.

Discussion
Superior Court Civil Rule 56(c) provides that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." [FN1] The moving party bears the initial burden of showing that no material issues of fact are present. [FN2] The burden then shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. [FN3] Summary judgment should only be granted when, after viewing the record in a light most favorable to the non-moving party, there is no genuine issue of material fact. [FN4]

FN1. Super. Ct. Civ. R. 56.

FN2. *Martin v. Nealis Motors, Inc.,* 247 A.2d 831, 833 (Del.1968).

FN3. *Id.*

FN4. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322, 325 (Del.Super.Ct.1973); *see also McCall v. Villa Pizza, Inc.,* 636 A.2d 912 (Del.1994).

An agency relationship may be created by the act of the parties or by operation of law. Here, the acts of Colby, McLaughlin, and Active Crane must be evaluated to determine whether an agency

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relationship was created. Initially, the facts must be examined to assess whether McLaughlin had actual authority to act as Colby's agent. Actual authority is that authority which a principal expressly or implicitly grants to an agent. [FN5] Even if McLaughlin did not have actual authority, the facts would then be evaluated to determine whether he had apparent authority to act as Colby's agent. The determination of apparent authority would entail an examination of Colby's representations to Active Crane. This generally requires the fact finder to determine whether Colby made representations to Active Crane indicating that McLaughlin was its agent, whether Active Crane relied on that representation, and whether that reliance was reasonable. [FN6]

> FN5. *Billops v. Magness Construction Co.,* 391 A.2d 196, 197 (Del.1978).

> FN6. *Id.* at 198.

**\*2** Colby asserts that express actual authority did not exist between Colby and McLaughlin. According to Michael Colby's deposition testimony, McLaughlin had never been granted authority to act as its agent or enter into contracts on behalf of Colby. However, as the Court has decided that McLaughlin will be permitted to testify at trial, based on the affidavit submitted, evidence at trial could show that McLaughlin did have express authority to act as Colby's agent.

However, actual authority can still exist when the principal implicitly grants such authority to an agent. The determination of implied authority depends on the relationship between the principal and agent, not what a third party believes about the relationship. [FN7] That is, implied authority is authority that the agent reasonably believes he has as a result of the principal's actions. McLaughlin had built other similar restaurants for Colby in the past, and presumably had rented other equipment and made purchases over the course of the relationship. Although Mr. Colby testified that he did not give McLaughlin the authority to enter into contracts on Colby's behalf, McLaughlin's affidavit refutes that. [FN8] Therefore, this is a credibility issue for the jury to decide.

> FN7. *Guyer v. Haveg Corp.,* 205 A.2d 176, 180 (Del.Super.Ct.1964).

> FN8. Plaintiffs attached an affidavit signed by McLaughlin to their motion. Colby objected to the use of the affidavit. However, the Court has concluded that although Colby has obtained a default judgment against McLaughlin in this case, McLaughlin still may testify as a witness at the trial. Plaintiffs have properly identified McLaughlin as a witness. The jury will decide any credibility issues.

Based on the information presented and viewing the facts in a light most favorable to the non-moving parties, the Court believes it is possible for the jury to conclude that McLaughlin had implied authority to enter into a contract on Colby's behalf. Thus, the fact finder would have to examine the course of dealing between Colby and McLaughlin to determine whether facts existed upon which McLaughlin could have reasonably believed that he had authority to enter into the contract as Colby's agent. However, it is important to note that the Court is not concluding that implied authority actually existed, but merely that it is possible for the jury to find that the prior course of dealing between Colby and McLaughlin gave rise to an implication of actual authority given the state of the record. Therefore, Third-Party Defendant's motion for summary judgment should be denied. [FN9]

> FN9. Because the Court has concluded that there is a factual question for the jury to decide with respect to implied actual authority, it is not necessary for the Court to address the apparent authority issue at this time.

Conclusion

Accordingly, because there is a genuine issue of material fact, Third-Party Defendant's motion for summary judgment is *denied.*

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 1732275 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.