IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CREEDON CONTROLS, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | C.A. No. 05-CV-300-JJF |
| v. | ) | |
| | ) | |
| BANC ONE BUILDING | ) | |
| CORPORATION, an Illinois corporation, | ) | |
| and FOREST ELECTRIC | ) | |
| CORPORATION, a New York Corporation, | ) | |
| | ) | |
| Defendant | ) | |

===========

**APPENDIX SUBMITTED IN SUPPORT OF DEFENDANT
FOREST ELECTRIC CORP.'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

===========

MARON & MARVEL, P.A.

Paul A. Bradley (DE Bar #2156)
1201 North Market Street
Suite 900
Wilmington, DE 19801
(302) 425-5177
Counsel for Defendant
Forest Electric Corp.

Date: July 14, 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a )
Delaware corporation, )
                         )
          Plaintiff, )
                         ) Civil Action
     v.                  ) No. 05-CV-300-JJF
                         )
BANC ONE BUILDING        )
CORPORATION, an Illinois )
corporation, and FOREST  ) Volume One
ELECTRIC CORPORATION, a New ) Pages 1 - 243
York corporation,        )
                         )
          Defendant. )

          Videotape Rule 30(b)(6) deposition of
CREEDON CONTROLS, by and through PATRICIA CREEDON,
taken pursuant to notice at the law offices of Ashby &
Geddes, P.A., 222 Delaware Avenue, 17th Floor,
Wilmington, Delaware, beginning at 9:40 a.m., on
Monday, May 22, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

          EDWARD SEGLIAS, ESQUIRE
          COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
            1007 Orange Street, Suite 1130
            Wilmington, Delaware  19801
            On behalf of Plaintiff

                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

A-000001

2

```
 1   APPEARANCES CONT'D:

 2        CHARLES A. PATRIZIA, ESQUIRE
          MELISSA G. WARREN, ESQUIRE
 3        PAUL, HASTINGS, JANOFSKY & WALKER LLP
            875 15th Street, NW
 4          Washington, D.C.  20005
                   -and-
 5        RICARDO PALACIO, ESQUIRE
          ASHBY & GEDDES
 6          222 Delaware Avenue, 17th Floor
            Wilmington, Delaware  19899
 7          On behalf of Defendant Banc One Building
            Corporation
 8
          PAUL A. BRADLEY, ESQUIRE
 9        McCARTER & ENGLISH, LLP
            919 North Market Street, Suite 1800
10          Wilmington, Delaware  19899
            On behalf of Defendant Forest Electric
11          Corporation

12   ALSO PRESENT:  ANDY BUCKMASTER, VIDEOGRAPHER

13                - - - - -

14             THE VIDEOGRAPHER:  This is the videotape

15   deposition of Patricia Creedon taken by the defendant

16   in the matter of Creedon Controls vs. Banc One

17   Corporation, Civil Action No. 05-CV-300, held in the

18   offices of Ashby & Geddes, 222 Delaware Avenue,

19   Wilmington, Delaware, on May 22, 2006, at

20   approximately 9:40 a.m.

21             The court reporter is Julie Parrack from

22   the firm Wilcox & Fetzer.  My name is Andy Buckmaster,

23   a video specialist from Discovery Video Services,

24   Inc., in association with Wilcox & Fetzer.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1           Counsel will now introduce themselves and

2     the reporter will swear in the witness.

3           MR. PATRIZIA:  This is Chuck Patrizia from

4     the law firm of Paul, Hastings, Janofsky & Walker

5     representing Banc One.  With me is Melissa Warren,

6     also of my firm, representing Banc One.

7           MR. BRADLEY:  Paul Bradley, McCarter &

8     English, representing Forest Electric.

9           MR. SEGLIAS:  Edward Seglias, Cohen

10    Seglias, representing the plaintiff, Creedon Controls.

11           PATRICIA CREEDON,

12         the deponent herein, having first been duly

13         sworn on oath, was examined and testified as

14         follows:

15    BY MR. PATRIZIA:

16    Q.   Miss Creedon, good morning, I'm Chuck Patrizia.

17    I believe that we met during some other discussions,

18    and it's good to see you again this morning.

19           Your counsel, Mr. Seglias, and I have

20    agreed that during this deposition we will, since you

21    are also designated as what the lawyers would call a

22    30(b)(6) witness, that we'll cover all of the issues

23    that your testimony would include, both your personal

24    knowledge and your knowledge as the institutional



1    witness for Creedon Controls in one long effort, I'm

2    afraid.

3            When I use the term "you" in asking you a

4    question, I will mean you personally, what your

5    personal knowledge is.  If I ask a question about what

6    Creedon Controls did, it would include your own

7    personal knowledge and whatever other additional

8    knowledge you have gained in preparation as the

9    30(b)(6) designated witness.

10           Do you understand that?

11   A.    I'm sure I do, yes.

12   Q.    If at any time during this deposition you want

13   to talk to your lawyer, let me know and we'll take an

14   appropriate break.  I may ask you to answer the

15   pending question, but we can work that out with

16   Mr. Seglias if we need to.  And if you otherwise need

17   a break at any time to get up and stretch or anything

18   like that, just let me know.  I have a bad back, so

19   there will be times when I get up, even if the court

20   reporter tells me that he's not quite done with an

21   hour, I may need to stretch occasionally.  So if you

22   see me stand up, it's just to ease my back a little

23   bit.

24   A.    Okay.



1    noon.  I expect my call will take half an hour, 45

2    minutes.  I'm happy to restart at 1:00 if that's

3    convenient.

4                MR. SEGLIAS:  That's fine.

5                THE VIDEOGRAPHER:  We're going off the

6    record at approximately 12:00 p.m.

7                (A luncheon recess was taken.)

8                THE VIDEOGRAPHER:  We're going back on the

9    record at approximately 1:08 p.m.

10   BY MR. PATRIZIA:

11     Q.    Haven't even started yet, Mr. Seglias.  Didn't

12   know I was that boring on this part of it.

13                MR. SEGLIAS:  No, it's not you, Chuck,

14   it's the after lunch, you know élan.

15     Q.    Now, Miss Creedon, did there come a time when

16   you did in fact receive more formal notification from

17   Forest Electric that Creedon Controls was the apparent

18   successful offeror?

19     A.    Yes.

20     Q.    In what form did that come to you?

21     A.    A letter of intent.

22                MR. PATRIZIA:  Let me have 3282.

23     Q.    Let me show you a document which has been

24   marked as Creedon No. 11.

1          (Creedon Exhibit No. 11 was marked for

2    identification.)

3    Q.    Ask if you recognize that document, Miss

4    Creedon?

5    A.    Yes, I do.

6    Q.    Is this the document that you referred to?

7    A.    Yes.

8    Q.    Looking at this document, below Mr. Angarame's

9    signature, there is another signature line which says

10   "Agreed to and accepted by."  Do you see that?

11   A.    Yes, I do.

12   Q.    Is that your signature?

13   A.    Yes, it is.

14   Q.    Above the "agreed to and accepted by," there is

15   a set of two lines of small type that begin "This

16   letter of intent is accepted and will be considered

17   executed."  Do you see that?

18   A.    Yes.

19   Q.    Whose language was that?  Did you insert that

20   language?

21   A.    Yes.

22   Q.    Where did that language come from; that is, is

23   that standard language for Creedon Controls or did you

24   develop it specifically for this or --



1       A.    It's an amalgamation, but on letters of intent,

2    I've only received a couple of letters of intent over

3    the course of being in business, so it's -- I can't

4    say it's verbatim to what I've used on the rare

5    occasion that I had a letter of intent, but basically

6    it's the same language.

7       Q.    And that was language that you physically had

8    inserted in this --

9       A.    Yes.

10      Q.    -- before you signed?

11      A.    Yes.

12      Q.    Okay.  And do you recall when you signed this?

13      A.    I believe it was in October.

14      Q.    Okay.  I notice at the top there is a fax line.

15   You see that?

16      A.    Yes.

17      Q.    October 7, 2003, 9:39 a.m., and I'm assuming

18   that where that hole punch is it was Forest Electric

19   CDC 2, do you see that?

20      A.    Yes.

21      Q.    Would that indicate that this was apparently in

22   Forest Electric hands not later than October 7th?

23      A.    No.  This, that may have been they faxed it to

24   me on that date, this could have been a fax.  I'm not



1    sure.

2        Q.    Do you have any reason to believe that it would

3    have been faxed to you after its apparent date of

4    October 2?

5        A.    Would you say that again?

6        Q.    Yeah.  You'll notice the letter is dated

7    October 2.

8        A.    Okay.

9        Q.    Okay?  So what you're suggesting to me is it

10   might have been faxed to you five days after its

11   apparent date of October 2.  Do you have any reason to

12   think that that's true?

13       A.    I have reason to believe that might be true.

14       Q.    And what is the reason that you believe it

15   might be true?

16       A.    I believe there was one -- more than one letter

17   of intent.

18       Q.    Well, I would agree with that.  But is it your

19   recollection that there was a letter of intent that

20   came in November as opposed to early October?

21       A.    Not my recollection.

22       Q.    Okay.  We'll deal with that.

23              In the second paragraph of the letter, it

24   says, "Although prime contract documents have not been



WILCOX & FETZER LTD.
Registered Professional Reporters

Patricia Creedon - Volume One                    94

1    finalized, it is the intent of the parties to begin

2    work and will endeavor to enter into and execute a

3    definite subcontract agreement defining the

4    construction services." Do you see that language?

5      A.    I do, yes.

6      Q.    What do you understand to be a subcontract

7    agreement?

8      A.    A subcontract agreement would be one where I

9    would be a subcontractor.

10     Q.    To Forest?

11     A.    Yes.

12     Q.    So your contract would be with Forest, which

13   would be the prime contractor; is that right?

14     A.    No, not necessarily. It said they would

15   endeavor, so I'm not assuming that the subcontract at

16   that point would be the contract that was presented to

17   me. That's why I put the language down before my

18   signature line. I wanted to see an executable

19   contract before I made any attempt to negotiate or to

20   sign.

21     Q.    And you understand that the language at the end

22   of the second paragraph is that subcontractor agrees

23   to be bound to the terms and conditions of the

24   subcontract agreement attached as Exhibit 1?



A-000009

1      A.    But my codicil line says I wanted to be able to

2   address terms and conditions in scope upon receiving

3   an executable contract.  So it's my practice that

4   after I have received an executable contract, to

5   negotiate terms and condition and sometimes scope.

6      Q.    All right, well let's look at your, I think you

7   called it a codicil.  Anywhere in those two lines does

8   it say that you expect to receive an executable

9   contract?

10      A.    Not verbatim, no.  It was my intention.

11      Q.    Within the 14-day period which is referenced in

12   your two lines of added language, 14 days from either

13   October 2 or October 7 of 2003, did you provide any

14   comments or other materials to Forest Electric on this

15   draft?

16      A.    Nor would I, no.

17      Q.    No.  Did you have any outside counsel review

18   that?

19      A.    No.

20      Q.    If you turn to the next page in this document,

21   there are some handwritten notes on this form of the

22   subcontract, what's labeled the "subcontract

23   agreement."  Is that your handwriting?

24      A.    It is, yes.



1    Q.    Do you know when those notes were added to that

2    document?

3    A.    Do I know when.  No, I do not know.

4    Q.    Do you know whether you sent those comments to

5    Forest Electric?

6    A.    I did not try to negotiate a sample

7    subcontract, so I would not have sent this sample

8    subcontract or any notes associated with it.

9    Q.    Okay.  And you've called this a "sample

10   subcontract."

11   A.    Yes.

12   Q.    At the top it says "subcontract agreement."

13   A.    It's a sample subcontract -- I believed it to

14   be a sample subcontract, as there was no dates filled

15   in and I was -- at some point there may have been a

16   cover sheet on this saying "sample subcontract."

17   So...

18   Q.    Okay, it's not on this form of the document.

19   A.    May not be.

20   Q.    I'm not questioning whether there is or isn't.

21   We've got several different forms of this and I'm

22   trying to understand the sequence of them.

23   A.    Okay, but my belief when I signed this was this

24   was a sample subcontract.



1    Q.    Okay, and you gestured there and I have to make

2    the record complete.

3    A.    Okay.

4    Q.    So when you say you signed the first page,

5    which is CL 1143, it was your understanding or your

6    intent that the document which was attached and which

7    is labeled "subcontract agreement" was a sample.

8    A.    Correct.

9    Q.    Is there any statement in the second paragraph

10   of the letter, which is CL 1143, that the document

11   which was attached as Exhibit 1 is a sample agreement?

12   A.    It says to, and execute a definite subcontract

13   agreement.  So in that, that is, this is not a

14   definite subcontract agreement.  I read that to be,

15   and clearly it's not.

16   Q.    Okay.  So you read the, "It is the intent of

17   the parties to begin work and endeavor to enter into

18   and execute a definite subcontract" as indicating the

19   attached document was a sample?

20   A.    Correct.

21   Q.    You did not understand the phrase

22   "Subcontractor agrees to be bound to the terms and

23   conditions of the subcontract as attached hereto as

24   Exhibit 1" as indicating that when it says above your



1    signature "agreed to and accepted by" that you were

2    agreeing as stated in the second paragraph of the

3    letter?

4    A.    I would not have spent the time -- expended the

5    time or the energy to review in detail a sample that

6    may or may not be presented to me in an executable

7    form.  It would have been only on an executable form

8    that I would have wasted any of my resources in order

9    to execute or modify terms and conditions.

10           MR. PATRIZIA:  Okay.  Let me -- would you

11   mark that as No. 12, please, Creedon 12?

12           (Creedon Exhibit No. 12 was marked for

13   identification.)

14   Q.    Miss Creedon, I'm going to show you a document

15   which has been marked as Creedon No. 12.  And this

16   appears to be another copy of this same cover letter.

17   This one does not have the fax notation at the top.

18   Do you agree with me?  This is FE 3282?

19   A.    I do.

20   Q.    Would you also agree with me that this one

21   differs from CL 1143, in that on this one, there is a

22   date next to your name?

23   A.    Yes.

24   Q.    And on the earlier one there is not a date next



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    to your name.

2        A.    Correct.

3        Q.    Do you know when the date was inserted?

4        A.    No, I would only be assuming.

5        Q.    You'd be guessing or making an assumption.

6        A.    I'd be guessing, yes.

7        Q.    We don't want you to guess or assume.  Is that

8    your handwriting?

9        A.    It is.

10       Q.    Is that date in your handwriting?

11       A.    Yes, it is.

12       Q.    Could you have signed two of these documents in

13   or about October of '03?

14       A.    I could have.

15       Q.    What would have been the purpose of signing two

16   of them?

17       A.    I don't have any explanation why two would have

18   been signed.  Maybe -- no, I don't want to guess.

19       Q.    You indicated, I believe, to me that you did

20   not send in to Forest the handwritten notes which are

21   on the copy attached to Creedon No. 11.  Is that

22   right?

23       A.    Correct.

24       Q.    Did there come a time when you and any



1    representative of Forest discussed any of the terms

2    which are in the form of document attached to CL 1143?

3    A.    Not that I recall.

4    Q.    Nonetheless, it is the case that Creedon

5    Controls began work in the time frame of October 2003

6    on this project?

7    A.    Correct.

8    Q.    Do you know when you started work or when

9    Creedon Controls started work?

10    A.    I believe it was the second week in October.

11              MR. PATRIZIA:    Would you mark this one as

12    13, please.

13              (Creedon Exhibit No. 13 was marked for

14    identification.)

15    Q.    I'm going to show you another one which has

16    been marked as Creedon 13.    This is Bates stamped

17    00668.    This one appears to be another copy of this

18    cover letter.    This one has the fax legend at the top

19    and does not have the date at the bottom, so it's very

20    similar to CL 1143, right?

21    A.    Yes.

22    Q.    But it has underlining at two places.    Do you

23    see that?

24    A.    Yes.



1      Q.    One is in the last line of the second paragraph

2    of the letter, the words "as attached hereto" are

3    underscored.

4      A.    Yes.

5      Q.    And in the language you added at the bottom of

6    the page, the "allowing 14 days for response to

7    address terms, conditions, scope of work" are

8    underlined.

9      A.    Yes.

10     Q.    Do you see that?

11     A.    I do.

12     Q.    Do you know who made that underlining?

13     A.    No.

14     Q.    Is that your mark?

15     A.    No, it is not.

16     Q.    Do you have any idea who might have made that

17   underlining?

18     A.    No, I do not.

19     Q.    Do you know when that underlining would have

20   been made?

21     A.    No, I do not.

22     Q.    Would you agree with me that in light of what

23   is on CL 1143 it was done sometime after your

24   signature was put on?



A-000016

1    A.    I would.

2    Q.    I noticed you holding the two copies up to the

3    light.

4    A.    Correct.

5    Q.    Did you attempt to compare whether 1143 and 668

6    are the same document?

7    A.    I did.

8    Q.    And what was your conclusion, recognizing that

9    you're not qualified as an expert in questioned

10   documents, I'll agree to that, Mr. Seglias.  I just

11   want to know what her perception is.

12   A.    My perception is it might be the same document.

13   Q.    Is it your perception that CL 1143 and Creedon

14   12, the one with the date on it, are the same document

15   based on the same inspection?

16   A.    No, it's not the same document.

17   Q.    And what is the basis for your conclusion in

18   that regard?

19   A.    It's not the same signature and the one has a

20   date on it.

21   Q.    When you say it's not the same signature,

22   you're suggesting that your writing differs from time

23   to time as you sign documents?

24   A.    Correct.



1      Q.    So the one with the date was signed separately

2    from the one which is 1143?

3      A.    Correct.

4      Q.    Do you know which of them might have been

5    signed first?

6      A.    No.

7      Q.    Do you know whether they would have been signed

8    at the same time?

9      A.    My recollection is that they were not.  My

10   recollection is that the 3282 was the last one.

11     Q.    Creedon 12?

12     A.    Yes.

13     Q.    When you say "the last one," what do you mean?

14     A.    I don't know.  They -- of these three.

15     Q.    Of those three.

16     A.    Yes.

17     Q.    So of Creedon 11, 12 and 13, Creedon 12 is, in

18   your view, the one that was signed last because

19   Creedon 11 and 13 are the same document with only the

20   addition of underlining on Creedon 13; is that

21   correct?

22     A.    Correct.

23     Q.    Okay.  Now, did there come a time when there

24   was a pricing change on the amount of the contract as



A-000018

Patricia Creedon - Volume One

104

1    you began work?

2        A.    Yes.

3        Q.    What was the basis of the pricing change?

4        A.    The bid bond, a bid bond was not elected to be

5    taken.

6        Q.    And what do you mean by a bid bond?

7        A.    I mean the performance in payment bond.

8        Q.    There was a potential requirement that --

9        A.    Correct.

10        Q.    -- Creedon obtain a bond?

11        A.    Correct.

12        Q.    And Creedon did not obtain a bond because

13    Forest Electric chose not to require it?

14        A.    Correct.

15        Q.    And that changed the pricing?

16        A.    Correct.

17        Q.    Let me show you a document which we're going to

18    mark as Creedon 14.

19            (Creedon Exhibit No. 14 was marked for

20    identification.)

21        Q.    Do you have Creedon 14 in front of you?

22        A.    Um-hum.

23        Q.    If you'll compare Creedon 14 with, for example,

24    Creedon 11, you see the change in price?

**W&F**

Patricia Creedon - Volume One                    105

```
 1        A.    Yes, I do.

 2        Q.    And what is the change?

 3        A.    It's the bond.

 4        Q.    Well, it goes from, in Creedon No. 11, from

 5   3,152,000 to 3,184,000.

 6        A.    Correct.

 7        Q.    So the price has increased.

 8        A.    Yes, it did.  I was mistaken.

 9        Q.    What was the basis of the price increase?

10        A.    I believe it was the bond.

11        Q.    Do you have any other recollection as to what

12   the basis of the 3.184 is for?

13        A.    I still think it was, I think it was the bond.

14        Q.    You believe it was the bond?

15        A.    I believe it was the bond, yes.

16        Q.    Okay.  Now, if you look at the bottom of that

17   page, above your signature line, there is no inserted

18   language.  Do you see that?

19        A.    Correct.

20        Q.    Do you know whether or not you sent this

21   document to Forest Electric?

22        A.    No, I do not.

23        Q.    Now, I will represent to you -- Mr. Seglias and

24   Mr. Bradley can agree or disagree -- that the Bates
```



1    stamp at the bottom, the FE 3284 number, indicates

2    that this document came from Forest Electric's files.

3    This is the copy which is in Forest Electric's files.

4    Do you see that the second page of that document is

5    the insurance --

6    A.    Yes, I do.

7    Q.    -- identification sheet?

8    A.    Yes.

9    Q.    And after that is a certificate of liability

10   insurance.  What is your understanding of the source

11   of that insurance identification sheet?

12   A.    It was -- the certificate is -- which number

13   are you on?

14   Q.    I'm on 3285.

15   A.    Oh.

16   Q.    Which is the cost identification work sheet.

17   Do you see that?

18   A.    Okay, I do see that, yes.

19   Q.    Is that information that Creedon Controls

20   supplied?

21   A.    Correct.

22   Q.    To whom was that information supplied?

23   A.    To Forest Electric.

24   Q.    And this is for the purpose of the OCIP, the



1    O-C-I-P all caps?

2    A.    Yes.

3    Q.    And what is an OCIP?

4    A.    It's an acronym, owner --

5    Q.    Owner-controlled insurance?

6    A.    Owner-controlled insurance program, yes.

7    Q.    So that means the owner of the project held an

8    insurance policy that was to be used by all of the

9    trade contractors?

10   A.    That's my understanding, yes.

11   Q.    And this shows a contract value.  Do you see

12   that line, under the heading after the phone numbers?

13   A.    Yes.

14   Q.    Of 3.152 million, which was the original price,

15   not the price in the cover letter?

16   A.    Correct.

17   Q.    And it shows a start date of October 15th, '03?

18   A.    Correct.

19   Q.    And then thereafter, there is at 3289 a W-9

20   form.  Do you see that?

21   A.    I do.

22   Q.    Is that your signature on the W-9?

23   A.    It is.

24   Q.    And that's dated October 31?



1     A.    Correct.

2     Q.    What was the purpose of the W-9, do you know?

3     A.    The W-9 is requested usually to know what your

4  EIN number is.

5     Q.    So that when you get paid, the tax man gets his

6  appropriate --

7     A.    Um-hum.

8     Q.    -- share, as they say?

9     A.    Yes.

10    Q.    Now, I'm going to show you another copy of that

11  document.  And this one we're going to mark as Creedon

12  15.

13          (Creedon Exhibit No. 15 was marked for

14  identification.)

15    Q.    This one is Bates stamped 00681 through 690?

16    A.    Yes.

17    Q.    You see that this appears to be the same

18  original letter as in Creedon 14, Forest Electric

19  3284?

20    A.    Yes.

21    Q.    Except that in this one, the two-line addition

22  has been made above your signature?

23    A.    Yes.

24    Q.    And a date has been added after your name?



1       A.    No, it's the same date as the one --

2       Q.    Same date?

3       A.    Yes.

4       Q.    I'm sorry, yes, it is the same date, 11-05.

5       A.    Yeah.

6       Q.    Do you know when the two-line addition was

7   made?

8       A.    I believe it was at the same time.

9       Q.    Do you know whether the version which is

10  Creedon 15 with the two-line addition above your

11  signature line was the one that was sent to Forest

12  Electric?

13      A.    I believe it was.

14      Q.    Even though the one which is in Forest

15  Electric's file does not have that two-line

16  addition --

17      A.    Yes.

18      Q.    -- whereas No. 15, Creedon 15, which is 00681

19  is the one from Creedon's files?

20      A.    Yes.

21      Q.    And attached to that document is 682 through

22  686, is another copy of the subcontract agreement,

23  with the same handwritten changes.

24      A.    Correct.



A-000024

1    Q.    Or handwritten marginalia, I'm sorry, not

2    changes.

3    A.    Correct.

4    Q.    That were in Creedon 11.

5    A.    Correct.

6    Q.    Do you know whether or not you made those

7    changes subsequent to November 5th of '03?

8    A.    What changes?

9    Q.    I'm sorry, the comments which are on these form

10    of subcontract agreement at 00682.

11    A.    No, I do not know that.

12    Q.    You'll notice that in 00682 the third paragraph

13    has a contract amount of 3.152?

14    A.    Yes.

15    Q.    Which is the original contract value, not the

16    one on the revised version.

17    A.    Correct.

18    Q.    Subsequent to November 5 of 2003, did you have

19    any conversations with Forest Electric about the terms

20    of the form of subcontract agreement which is attached

21    to the letter which is dated October 2 but has a

22    revised date of 10-31-03 which is either 14 or 15?

23    A.    Would you repeat that question?

24    Q.    Yes.  Did you have any conversations with any



1    representative of Forest Electric subsequent to

2    November 5, 2003, about the terms of the form of

3    subcontract agreement which are shown on 00682 in

4    Creedon 15?

5        A.    Not that I recall.

6        Q.    Did you, as the work progressed in October or

7    November, receive what you would regard as an

8    executable copy of the subcontract?

9        A.    No, I did not.

10       Q.    Do you know when, if ever, Forest executed

11   prime contract documents such as those that are

12   referenced in the second paragraph of Creedon 15?

13       A.    No, I do not.

14       Q.    Did you ever receive any such document?

15       A.    No.    Wait, say that question again.    Ask that

16   question --

17       Q.    Yes, did you ever receive such a document, that

18   is, prime contract documents executed by Forest?

19       A.    No, I did not see any.

20       Q.    Subsequent to your receipt of the cover letter

21   which is in Creedon 15, did you consult with counsel?

22       A.    Again, no.    It was a sample.

23       Q.    You believed it to be a sample agreement?

24       A.    Yes.



1    Q.   Did you within the 14 days subsequent to

2    November 5 of 2003 give any indication to Forest

3    Electric that your signature on the document which is

4    Creedon 15 was not effective as it stood for whatever

5    purpose was indicated on the cover letter?

6    A.   I was waiting for a prime -- I was waiting for

7    an executable contract.

8    Q.   When you say you were waiting for an executable

9    contract, Creedon Controls had begun work already?

10   A.   Correct.

11   Q.   In fact, you were already preparing to submit

12   invoices to Forest Electric for payment?

13   A.   Correct.

14   Q.   Did you at any time in the course of submitting

15   those invoices give any indication that you did not

16   have an executed contract in your view?

17   A.   I believe there were conversations that no

18   executable contract had been received yet.

19   Q.   When did those conversations occur, Miss

20   Creedon?

21   A.   During the billing, billing cycles, which were

22   generally about the 25th of the month.

23   Q.   Who had those conversations?

24   A.   It was my recollection that it was between the



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    Do you see that?

2    A.    Yes.

3    Q.    What was your intent there?

4    A.    I would assume that all contractual

5    documentations associated here within would include

6    the contract between Banc One and the Banc One

7    management team.

8    Q.    Were you ever shown contracts between Banc One

9    Building Corporation and Tishman Construction of

10    Maryland?

11    A.    No.

12    Q.    Were you ever shown contracts between Banc One

13    Building Corporation and Forest Electric?

14    A.    No.

15    Q.    Were you aware of a designation of Forest

16    Electric as trade manager for the electric trades?

17    A.    Yes.

18    Q.    What was your understanding of what the trade

19    manager role was?

20    A.    They were not going to be performing any

21    electrical work.  They would be managing the project,

22    the electrical portion of the project.

23    Q.    So all of the work would be performed by

24    subcontractors and Forest Electric would manage those



1    subcontracts for the electrical portion of the work?

2        A.    My understanding of an electrical trade manager

3    isn't that they're a general or, and the people below

4    them would be subcontractors.  My understanding of

5    that terminology is that they have very little skin in

6    the game and that they're working as the owner's rep.

7    So we're in actuality doing the work.  We're doing the

8    risk work.  So no, I don't, I don't -- my

9    understanding of trade manager is not, say, as a

10   general contractor.

11       Q.    If you look at the letter which is the first

12   page of Creedon 15, the first paragraph says that it's

13   the intent of the parties to enter into a subcontract

14   agreement.  Do you see that?

15       A.    Yes.

16       Q.    Does that change your understanding as to the

17   role of Forest Electric and the form of the contract

18   agreement?

19             MR. SEGLIAS:  I'm going to object to the

20   characterization of the first paragraph because I

21   don't see the words "intent of the parties."  So I'll

22   let the, I'll let the witness answer about what she

23   believes the intent of the first paragraph is.

24       Q.    Miss Creedon?



1     A.    And would you ask that question again?

2     Q.    Yes.   Do you see that in the first paragraph of

3     the first page of Creedon 15, which is 681, the first

4     paragraph says it's acknowledging our mutual desire to

5     enter into a subcontract agreement?

6     A.    And what about it?

7     Q.    Does that change your understanding as to the

8     role Forest played in the contracting process?

9     A.    Not really.

10    Q.    Was it your understanding that your contract to

11    perform the 6B work was going to be with Forest

12    Electric?

13    A.    Yes.

14    Q.    And Forest Electric was going to be, as we

15    discussed earlier, what I called the counter-party on

16    that contract?

17    A.    Yes.

18    Q.    Turn back to 683, which is the second page of

19    that form agreement.   On the left-hand side of what is

20    Roman VII, there is some writing.   Is that your

21    writing?

22    A.    Yes.

23    Q.    Can you tell me what that writing says?

24    A.    Looks like a question.   I can't --



A-000030

Patricia Creedon - Volume One

130

1  Q. Showing you a document that's been marked as

2 Creedon 16, Miss Creedon.  This appears to be a cover

3 letter from Forest Electric addressed to you dated May

4 4 referring to both the 6B and the 21B projects; is

5 that right?

6  A. Yes.

7  Q. Is this the form of contract you had in mind as

8 an executable contract?

9  A. Yes, it is.

10  Q. Was this contract in fact ever executed?

11  A. I believe I submitted an exhibit that I would

12 want to have had agreement on and then I would have

13 signed it, yes.

14  Q. Okay.  You submitted an exhibit that you would

15 have wanted as additional terms to this contract or

16 changed terms?

17  A. Negotiated -- yeah, they would have been

18 negotiable points to be considered.

19  Q. Were those points ever negotiated, to your

20 knowledge?

21  A. No, they were not.

22  Q. Was this document ever executed in its existing

23 form, regardless of any proposed additions?

24  A. No, it was not.



A-000031

1    Q.    Let me show you a document that we'll mark as

2    Creedon 17.

3              (Creedon Exhibit No. 17 was marked for

4    identification.)

5    Q.    You recognize that document?

6    A.    Yes, I do.

7    Q.    Okay, the first page is an e-mail from you to

8    Mr. Angarame?

9    A.    Yes.

10   Q.    And it's dated June 14th?

11   A.    Correct.

12   Q.    Which is approximately six weeks after the May

13   4 transmittal of the original form of document to you?

14   A.    Correct.

15   Q.    And it says there are proposed revisions; is

16   that right?

17   A.    Correct.

18   Q.    And the second page, which is FE 3546, is a

19   letter from you to Mr. Angarame also of the date June

20   14?

21   A.    Correct.

22   Q.    And then attached is addendum 1?

23   A.    Correct.

24   Q.    Who prepared addendum 1?



**WILCOX & FETZER LTD.**

Registered Professional Reporters

A-000032

1    A.    Dennis Link and myself.

2    Q.    Did you have counsel consult with you about

3    addendum 1?

4    A.    No, I did not.

5    Q.    What was your purpose in proposing addendum 1?

6    A.    To, to have the contract represent -- this

7    contract that was presented to me was postdated to

8    October 2nd.

9    Q.    Okay, "this contract" means the document

10   attached to Creedon 16?

11   A.    This, yes, the single project construction

12   service agreement contract No. 6B was dated October

13   3rd, October 2nd, 2003.

14        MR. SEGLIAS:    And that's part of Exhibit

15   16.

16        MR. PATRIZIA:    16, yes.

17        THE WITNESS:    Creedon 16.

18        MR. SEGLIAS:    Okay.

19   A.    The intent of this exhibit was to, or addendum

20   1 was to clarify what had actually happened on the

21   project instead of retroactively signing this, this

22   contract.

23   Q.    Okay.  And I'm sorry to do this, but we have to

24   keep the record a little straight.  What you've just



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    said I believe is that your intent in submitting

2    addendum 1, which is attached to Creedon 17, was to

3    clarify what had happened on the project since the

4    October 2 time frame, which was the effective date of

5    the form attached to Exhibit Creedon 16.  Is that

6    correct?

7         MR. SEGLIAS:  I would object to the form

8    of the question to the extent that you say that the

9    effective date of the form.  But with that proviso,

10   you can answer the question.

11     A.    I thought it very unusual that I would have

12   gotten a contract with a date so stale.  It was highly

13   un -- irregular, highly irregular.  I set about going

14   through the contract and saying well, I would like

15   to -- I would like to negotiate these terms.

16     Q.    In your experience since 1989 and the formation

17   of Creedon Controls, was it unusual for you to have

18   commenced work and to have worked for some six or

19   eight months on a project without a written agreement?

20     A.    There have been instances where the contract

21   did not come until later, but it was unusual, yes.

22     Q.    When you went to Wilmington Trust to seek the

23   additional credit lines in relation to this project,

24   did Wilmington Trust ask you for an executed contract



A-000034

1    for this job?

2      A.    No, they did not.

3      Q.    When you went to Wilmington Trust, did you give

4    Wilmington Trust a copy of either Creedon 11, 12, 15

5    or 16, that is, the letters from Mr. Angarame that are

6    countersigned by you on the bottom?

7      A.    I believe I gave him a letter of, a copy of the

8    letter of intent or Wilmington Trust a copy of a

9    letter of intent, yes.

10     Q.    Do you know which one of those you gave to

11   Wilmington Trust?

12     A.    No, I do not.

13     Q.    Do you know whether anyone from Forest Electric

14   ever told you that they had authority to negotiate the

15   terms of the contract document which is attached to

16   Creedon 16?

17     A.    It was my understanding that all the

18   contractors on the site got this contract.  So yes, I

19   believe they had authority to negotiate a contract.

20     Q.    Prior to the time of your sending the

21   communication which is Creedon 17, did you have any

22   other communication with Forest Electric as to the

23   basis of the contract document which was attached to

24   Creedon 16?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-000035

1    A.    Yes.

2    Q.    And what communication did you have?

3    A.    I had a telephone conversation with Paul

4  Angarame of Forest Electric.

5    Q.    And what was the substance of that

6  conversation, please?

7    A.    That it was going to take me a little longer

8  than 14 days to turn around the contract with any

9  revisions or points for negotiations.

10    Q.    And why was that?

11    A.    Because I allowed myself 14 days on an

12  eight-page sample subcontract, and I received a

13  60-page prime contract.  I knew it was going to take

14  me longer than 14 days.

15    Q.    When you say it was a 60-page prime contract --

16    A.    Pardon me?

17         MR. PATRIZIA:  Would you read that

18  question back to the witness, please?

19              (The requested portion was read.)

20    Q.    What do you mean?

21    A.    To me it looked like a prime contract.

22    Q.    Did you understand, did you have any

23  understanding whether the owner was a party to this

24  contract?



1    A.    I saw signature lines for people as

2    representatives of the owner, yes.

3    Q.    Did you look at the first page of the document

4    which is 6114 at the bottom, the last two lines which

5    says, "Electrical trade manager and construction

6    contractor agree to the terms and conditions"?

7    A.    And my modification in addendum 1 was to change

8    between electrical trade manager and construction

9    contractor to between Banc One Building Corporation,

10   electrical trade manager agent, and construction

11   contractor.

12   Q.    That was your proposal?

13   A.    That's my proposal.

14   Q.    The form as presented to you was between the

15   electrical trade manager and contractor; is that

16   right?

17   A.    Correct.

18   Q.    Why did you want the contract to be inclusive

19   of Banc One in your comments?

20   A.    My understanding was that Forest was working

21   on, as an agent for representing Banc One.

22   Q.    What was the basis of your information that

23   Forest was working as an agent?

24   A.    I don't recall off the top of my head.



1             MR. SEGLIAS:  Well review the document,

2      see if that --

3             THE WITNESS:  Okay, okay.

4      A.    I suppose the term "electrical trade manager."

5      Q.    Did anybody from Forest Electric ever show you

6      a contract in which Forest Electric was appointed an

7      agent?

8      A.    Paul Angarame told me they signed, he said they

9      signed a contract very similar to this, yes.

10     Q.    Did he show you such a contract?

11     A.    No, he did not.

12     Q.    Did he show you any contract in which Forest

13     was appointed an agent of the Banc One Building

14     Corporation?

15     A.    No, he did not.

16     Q.    Did you ever see any document in which Forest

17     or Tishman sought approval from Banc One Building

18     Corporation to enter into a contract with Creedon

19     Controls?

20     A.    No, I did not.

21     Q.    Did you ever see a document in which Forest or

22     Tishman represented that the contract that they were

23     entering into or that Forest was entering into was a

24     subcontract with Creedon Controls?



WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    No, I did not.

2    Q.    At the time that you submitted the comments

3    which are in Creedon 17, is it the case that Creedon

4    Controls had already made the claims which are at

5    issue in this litigation for additional payment?

6    A.    I'm not sure if we had quantified what those

7    were at that time, but we had gone to the Banc One

8    management team and told them that there were some

9    circumstances beyond our control and that there would

10   be some change orders coming.  We didn't -- we did --

11   at that point I'm not sure when we knew what the, what

12   the value of that was going to be at that time.

13   Q.    Was one of your purposes in submitting the

14   comments which are in Creedon 17 to assure that you

15   were not waiving any claims for those change orders

16   that you were going to submit?

17   A.    Yes.

18   Q.    Would you look back at Creedon No. 15, please?

19   And look at page 684.

20   A.    Yes.

21   Q.    The second paragraph of Roman XIV.

22   A.    Yes.

23   Q.    What is your understanding of that paragraph?

24            MR. SEGLIAS:  Object to the question to



1    Forest Electric?

2        A.    Would you repeat that?

3        Q.    Yes.  At the time Creedon Controls began work

4    on this project in October of 2003, was it your

5    understanding that there was a contract with Forest

6    Electric for this work?

7        A.    It was my understanding there was a pending

8    contract.

9        Q.    Well, let's go back a step, Miss Creedon.  Was

10   it your understanding that you were beginning work

11   without any agreement at all?

12       A.    It was my understanding I was proceeding with a

13   letter of intent.

14       Q.    And that letter of intent was with Forest

15   Electric?

16       A.    Correct.

17       Q.    And it was your understanding that there would

18   be some written documentation of that agreement at

19   some point?

20       A.    Correct.

21       Q.    When did you expect to receive that written

22   documentation?

23       A.    I expected to receive it shortly after I had

24   started the project.



1                        CERTIFICATE

2    STATE OF DELAWARE)
                      )
3    NEW CASTLE COUNTY)

4                  CERTIFICATE OF REPORTER

5         I, Julie H. Parrack, Registered Professional
     Reporter and Notary Public, do hereby certify that
6    there came before me on the 22nd day of May, 2006, the
     deponent herein, PATRICIA CREEDON, who was duly sworn
7    by me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
8    deponent and the answers given were taken down by me
     in Stenotype notes and thereafter transcribed by use
9    of computer-aided transcription and computer printer
     under my direction.

10
          I further certify that the foregoing is a true
11   and correct transcript of the testimony given at said
     examination of said witness.

12
          I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the event of this suit.

14

15                        
                     Julie H. Parrack, RMR, CRR
16                   Certification No. 102-RPR
                     (Expires January 31, 2008)

17

18   DATED: May 30 2006

19

20

21

22

23

24

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A-000041

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a )
Delaware corporation, )
                    )
        Plaintiff, )
                    ) Civil Action
     v. ) No. 05-CV-300-JJF
                    )
BANC ONE BUILDING )
CORPORATION, an Illinois )
corporation, and FOREST )
ELECTRIC CORPORATION, a New ) Volume Two
York corporation, ) Pages 244 - 397
                    )
        Defendant. )

          Videotape Rule 30(b)(6) deposition of
CREEDON CONTROLS, by and through PATRICIA CREEDON,
taken pursuant to notice at the law offices of Ashby &
Geddes, P.A., 222 Delaware Avenue, 17th Floor,
Wilmington, Delaware, beginning at 9:33 a.m., on
Tuesday, May 23, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

        EDWARD SEGLIAS, ESQUIRE
        COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
          1007 Orange Street, Suite 1130
          Wilmington, Delaware  19801
          On behalf of Plaintiff

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

A-000042

```
 1    APPEARANCES CONT'D:

 2            CHARLES A. PATRIZIA, ESQUIRE
              MELISSA G. WARREN, ESQUIRE
 3            PAUL, HASTINGS, JANOFSKY & WALKER LLP
                875 15th Street, NW
 4              Washington, D.C.  20005
                On behalf of Defendant Banc One Building
 5              Corporation

 6            PAUL A. BRADLEY, ESQUIRE
              McCARTER & ENGLISH, LLP
 7              919 North Market Street, Suite 1800
                Wilmington, Delaware  19899
 8              On behalf of Defendant Forest Electric
                Corporation
 9
      ALSO PRESENT:  ANDY BUCKMASTER, VIDEOGRAPHER
10
                       - - - - -
11

12            THE VIDEOGRAPHER:  This is the second day

13    of the videotape deposition of Patricia Creedon held

14    in the office of Ashby & Geddes on May 23rd, 2006 at

15    approximately 9:33 a.m.  Counsel will now introduce

16    themselves.

17            MR. PATRIZIA:  Charles Patrizia of Paul,

18    Hastings, Janofsky & Walker, representing Banc One

19    Building Corporation.  With me is Melissa Warren of

20    the same firm.

21            MR. BRADLEY:  Paul Bradley, McCarter &

22    English, on behalf of Forest Electric.

23            MR. SEGLIAS:  Edward Seglias, Cohen

24    Seglias, on behalf of the Plaintiff, Creedon Controls.
```

1    BY MR. PATRIZIA:

2       Q.    Good morning, Miss Creedon.    How are you this

3    morning?

4       A.    Good, thank you.    Good morning.

5       Q.    Just a reminder that you are still under oath.

6             MR. PATRIZIA:    Mr. Seglias, is there

7    anything we need to cover before we begin.

8             MR. SEGLIAS:    I don't think so.

9       Q.    Okay.    Miss Creedon, yesterday when we were

10   talking about Exhibit 41, which I believe is still in

11   front of you, it is the large document which is the

12   report that was prepared for Wilmington Trust, you

13   indicated that, if you turn to page -- the third page

14   of that document, which is CL 0524, that I believe

15   Miss Cerase had prepared this table of actual and

16   projected hours?

17      A.    Yes.

18      Q.    Would you tell me what you understand to have

19   been her source for the actual hours?

20      A.    I believe her source were the payroll records.

21      Q.    The payroll records received from the union

22   hall?

23      A.    There are no payroll records from the union

24   hall.



A-000044

1     Q.    On that same page, under the heading "Banc One

2     Management Team" the first paragraph, the second

3     sentence says, "At bid time Forest represented that

4     CCI's contract was with them." Do you see that?

5     A.    I do.

6     Q.    Do you understand that at the time Creedon

7     began work its expectation was that it was going to be

8     a contractor with Forest Electric?

9     A.    I do.

10    Q.    At the time that you entered into -- I'm sorry,

11    at the time that Creedon Controls entered into the

12    work in October of '03, did Creedon Controls have any

13    expectation that its contract was going to be with

14    anyone other than Forest Electric?

15    A.    No, it did not.

16    Q.    That section in the next paragraph talks about

17    daily coordination meetings. Do you see that

18    reference?

19    A.    Yes.

20    Q.    Who attended the daily coordination meetings

21    for Creedon Controls?

22    A.    I'm not sure.

23    Q.    Would it have been Mr. Doble?

24    A.    It could have been Mr. Doble.



1    Q.    And not from anyone else?

2    A.    No, I did not.

3    Q.    And you say in this sentence at the bottom of

4    0620 that it "created confusion regarding with whom we

5    have even an oral contract."  Do you see that?

6    A.    I did not say that, but I can read it, yes.

7    Q.    When you say you did not see it, this was

8    something that Creedon Controls submitted?

9    A.    I did not say that, right.  I'm just saying

10   that's not my terminology.

11   Q.    Whose terminology is that?

12   A.    I believe that's Dennis Link's terminology.

13   Q.    Was it Creedon Controls' understanding in

14   embarking on the work in October of 2003 that they

15   were undertaking, Creedon Controls was undertaking

16   that work pursuant to a contract?

17   A.    Yes.

18   Q.    Is it Creedon Controls' understanding that the

19   contract was not reduced to an executed written

20   contract?

21   A.    No, I was waiting for an executed contract.  At

22   no time did I think I wouldn't get a contract.

23   Q.    Indeed, Creedon Controls commenced the work

24   believing that it was working pursuant to a contract,



1    isn't that right?

2        A.    I anticipated a contract.

3        Q.    Well, when you say you anticipated a contract,

4    you anticipated a written contract --

5        A.    I did.

6        Q.    -- in fully executable form?

7        A.    Yes, an executable contract.

8        Q.    But you wouldn't have undertaken the work

9    unless you believed that you had a contract under

10   which you would be paid to perform that work; isn't

11   that right?

12       A.    Correct.

13       Q.    At the time that Creedon Controls began the

14   process of submitting its change orders for the claim

15   which is involved in this proceeding, were you told

16   that there was a combined overhead and profit limit to

17   which Creedon Controls should adhere in making its

18   submission?

19       A.    There were varying tellings or papers exchanged

20   about what would or would not be the overhead and

21   project profit on the project.

22       Q.    What was, what was your understanding of what

23   Forest believed was the appropriate limit?

24       A.    I cannot recall which one they finally decided



1     conversation where I asked that I have more time in

2     order to review the contract, and that pretty much

3     sums up, sums it up.

4          Q.    Did you receive a reply from Mr. Angarame with

5     regard to that letter?

6          A.    I believe I received a phone conversation.

7          Q.    What did Mr. Angarame say in the phone

8     conversation?

9          A.    That he had signed the same contract that I was

10    presented with, and that I should go ahead and just

11    sign it.  That they would give me more time to

12    negotiate or review the contract, and that they would

13    not withhold the payment from March.  That's all I can

14    recall at that time -- at this time.

15         Q.    Did you subsequently sign the contract?

16         A.    I believe I made an addendum to the contract

17    and accompanied it with a letter saying that I was

18    prepared to sign the contract at some time after the

19    addendum had been reviewed and negotiated.

20         Q.    Did you subsequently receive the payment for

21    March?

22         A.    Yes, I did, for March, yes.

23         Q.    And when was that received?

24         A.    Sometime in June.



1    two.   That would not have been unusual.

2        Q.    And beyond that, did you have any involvement

3    in that change order process?

4        A.    Not to my recollection, no.

5        Q.    Could you look at Exhibit 16, please.

6        A.    I may have to get up to do that.  I have

7    Exhibit 16.

8        Q.    Okay, thank you.  The -- it's first a letter

9    from Donald Lucas at Forest to you dated May 4, 2004,

10   and encloses the single project construction service

11   agreement.  Is that correct?

12       A.    That is correct, yes.

13       Q.    And that's for contract No. 6B?

14       A.    Correct.

15       Q.    And this is the contract that you received

16   obviously sometime in May 2004 for your review?

17       A.    Correct.

18       Q.    Is it your understanding that other contractors

19   on the Banc One project signed this agreement?

20       A.    That is my understanding, yes.

21       Q.    Is it your understanding that other electrical

22   contractors executed this agreement?

23       A.    That was my understanding, yes.

24       Q.    Now you were asked some questions about when



1    Forest Electric entered into a contract with Banc One

2    or Tishman.  Do you have any personal knowledge as to

3    when that occurred?

4        A..    No, I do not.

5        Q.    Do you know if any of the other contractors who

6    executed this agreement attached as Exhibit 16 made

7    any or proposed any changes that were made to the

8    contract?

9        A.    No, none at all.

10       Q.    And on page 006116, that's the signature page,

11   and does that identify Forest Electric as Banc One's

12   agent?

13       A.    It does.

14       Q.    And as the electrical trade manager?

15       A.    It does.

16       Q.    Okay, you can put that aside.

17              Now, did you receive a similar agreement

18   to -- agreement, single project agreement for the 21B

19   project?

20       A.    Yes, I believe I did.

21       Q.    Could you please get Exhibit 11 for me?

22       A.    I have Exhibit 11.

23       Q.    Thank you.  The -- this is the Forest Electric

24   letter to you dated October 2, 2003 called the letter

1    of intent; is that correct?

2        A.    That is correct.

3        Q.    And it attaches a subcontract agreement.  Is

4    that correct?

5        A.    Yes, it does, yes.

6        Q.    And in the letter at page CL 1143, it states in

7    the second paragraph that subcontractor agrees to be

8    bound to the terms and conditions of the subcontract

9    agreement as attached hereto as Exhibit 1.  Is that

10   correct?

11       A.    That does, yes.

12       Q.    And obviously you signed that agreement?

13       A.    Obviously.

14       Q.    And you signed a later agreement which changed

15   the amount of this 6B contract?

16       A.    I did.

17       Q.    And that enclosed the same subcontract

18   agreement?

19       A.    Same sample subcontract agreement.

20       Q.    And in addition, on the 21B project you signed

21   a similar letter of intent with a subcontract

22   agreement?

23       A.    A sample subcontract agreement, yes.

24       Q.    You say sample.  Does it say sample on the



1   subcontract agreement that you have?

2   A.   I believe at some point there was "sample" on

3   this.   I'm not sure if my copy doesn't have "sample"

4   on it.   I'm not sure.

5   Q.   And whether it says sample or not, the letter

6   clearly states that you agreed to be bound to the

7   terms and conditions of the subcontract agreement; is

8   that correct?

9         MR. SEGLIAS:   I'll object to the form of

10  the question.   The cover letter states what it states.

11  And Miss Creedon has already testified to this, and

12  she's already testified to the additional information

13  that she's included on the letter and what she

14  believes it all means.

15  Q.   Now, Miss Creedon, I want to give you Creedon

16  Exhibit No. 68.

17        MR. BRADLEY:   Now for the record, I'll

18  accept counsel's representation that she testified to

19  the precise question I asked.   If she hasn't, after

20  reviewing a day and a half of the transcript, then

21  I'll ask her to come back.

22  Q.   Ma'am, I've handed you Exhibit No. 68.   Is this

23  the bid form agreement that was completed for the 21A

24  contract cable conveyance system?



1              (Creedon Exhibit No. 71 was marked for

2    identification.)

3    Q.    Show you Exhibit 71.  And I'll represent to you

4    that this was produced by Wilmington Trust to your

5    counsel who then produced it to us, and it's Bates

6    numbered CWT page 23 and ends at 31, and this is the

7    subcontract agreement.

8              Does that refresh your recollection that

9    that was submitted to Wilmington Trust to secure the

10   loan?

11   A.    I'm sure I presented Wilmington Trust

12   everything I had regarding the project.  That would

13   have made them -- I would have produced that as well

14   as the letter of intent.  They would have asked me why

15   it wasn't notarize -- executed and they would have

16   asked me why it wasn't filled in, and I'm sure we had

17   a conversation regarding that.

18   Q.    Okay.  You say you're sure you had a

19   conversation about that.  As you sit here today, do

20   you recall any such conversation?

21   A.    I recall a lunch meeting between Marc

22   Pelletier, Charlie Doble and myself, wherein we talked

23   about the subcontract agreement and when I thought I

24   might get one that I could execute.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    And when, do you recall when that lunch meeting

2    was?

3    A.    I believe it was sometime in October of 2003.

4    Q.    And so as I understand your testimony, you

5    believe you submitted the letter of intent relating to

6    contract 6B as well as the subcontract agreement?

7    A.    I do believe I did.

8    Q.    And that eventually was accepted by Wilmington

9    Trust in order to give you that line of credit?

10   A.    However they make their determination.

11   Q.    At any time -- if this was asked before, please

12   tell me.  Did you have any discussions with Mr. Link

13   about the subcontract agreement?

14           MR. SEGLIAS:  Can we just get a

15   clarification, Paul, on which document we're talking

16   about?

17           MR. BRADLEY:  Sure.

18           MR. SEGLIAS:  The Forest form?

19           MR. BRADLEY:  Yes.  And you can look at

20   the one that's in front of you.

21           MR. SEGLIAS:  As opposed to the Banc One

22   form.

23   BY MR. BRADLEY:

24   Q.    The subcontract agreement submitted with the

397

# CERTIFICATE

STATE OF DELAWARE)
               )
NEW CASTLE COUNTY)

## CERTIFICATE OF REPORTER

      I, Julie H. Parrack, Registered Professional
Reporter and Notary Public, do hereby certify that
there came before me on the 23rd day of May, 2006, the
deponent herein, PATRICIA CREEDON, who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.

      I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Julie H. Parrack, RMR, CRR
Certification No. 102-RPR
(Expires January 31, 2008)

DATED: May 30, 2006