**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CREEDON CONTROLS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BANC ONE BUILDING CORPORATION, an Illinois corporation, and FOREST ELECTRIC CORPORATION, a New York corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. NO. 05-CV-300-JJF<br><br><br><br><br>JURY TRIAL DEMANDED |

**DEFENDANT BANC ONE BUILDING CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FOREST ELECTRIC CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON AGENCY AUTHORITY**

Dated: August 08, 2006

**ASHBY & GEDDES, P.A.**

Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302)-654-1888

-and-

Of Counsel:

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**

75 East 55th Street
New York, New York 10022
212-318-6000

*Attorneys for Defendant Banc One Building Corporation*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

A. The CDC Project ..... 3

B. The Trade Manager Agreement ..... 4

C. The Forest-CCI Subcontract Agreement ..... 4

D. Forest's Unilateral Effort to Designate Itself as BOBC's Agent ..... 4

ARGUMENT ..... 6

A. The Terms Of The Trade Manager Agreement Preclude Forest From Being BOBC's Agent ..... 6

B. Forest Cannot Rely On Its Belated, Unilateral Attempt To Designate Itself As BOBC's Agent As Evidence of Its Supposed Agency ..... 8

C. Forest's Attempt to Designate Itself as BOBC's Agent Was In Bad Faith And Must Fail ..... 9

CONCLUSION ..... 10

# TABLE OF AUTHORITIES

**Page**

## CASES

*Continental Insurance Company v. Rutledge & Company*, 750 A.2d 1219 (Del. Ch. 2000)....7

*Delaware v. Mass. Bonding & Insurance Co.*, 49 F. Supp. 467 (D. Del. 1943)....9

*Eagle Industries, Inc. v. DeVilbus Health Care, Inc.*, 702 A.2d 1228 (Del. Supr. 1997)....7, 8

*Eugene A Delle Donne and Son, L.P. v. Applied Card Systems, Inc.*, 821 A.2d 885 (Del. Supr. 2003)....7

*Finnegan Construction Co.*, 354 A.2d 142 (Del. Super. Ct. 1976)....8

*Industrial America, Inc. v. Fulton Industrial*, 285 A.2d 412 (Del. Super. 1971)....1

*Qwest Communications Int'l Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 705 A.2d 579 (Del. Ch. 1997)....7

*Rodgers v. Erickson Air-Crane Co. L.L.C. v Gallagher-Kaiser Corp*, No. 98C-07-014-WTQ, 2000 WL 1211157 (Del. Super. Ct. Aug. 17, 2000)....8

*Speakman v. Price*, 80 A. 627 (Del. Super. 1911)....7

*Universal Prod. Co. v. Emerson*, 179 A. 387 (Del. Super. 1935)....6

*Universal Studios, Inc. v. Viacom, Inc.*, 705 A.2d 579 (Del. Ch. 1997)....7

Defendant Banc One Building Corporation ("BOBC") submits this memorandum of law in opposition to the motion by defendant Forest Electric Corp. ("Forest") for partial summary judgment on agency authority.

**PRELIMINARY STATEMENT**

In its Motion for Partial Summary Judgment, Forest asks the Court to hold as a matter of law: 1) that Plaintiff Creedon Controls, Inc. ("CCI") agreed to, and is bound by, the subcontract agreement attached to Forest's October 2, 2003 offer letter (the "Forest-CCI Subcontract Agreement"); but 2) when entering into this, or any other contract with CCI, Forest was acting as agent for the Project Owner, BOBC. Forest's first point – that the Forest-CCI Subcontract Agreement governs – is indisputably true. As Forest correctly notes in support of its motion with respect to that point, CCI's President, Patricia Creedon, executed and accepted Forest's October 2, 2003 offer, *without modification*, and, an *ex post facto* rationalization "cannot defeat the terms of the agreement to which Creedon gave written assent, as overt manifestation of assent, not subjective intent, controls the formation of a contract."[1]

For these very same reasons, Forest's claim that it had authority to act as agent for BOBC is indisputably false and legally erroneous. The detailed and specific trade manager agreement for electrical work between Forest and BOBC (the "Trade Manager Agreement"), which was signed by Philip Altheim, Forest's Chairman and CEO, nowhere designates Forest as BOBC's agent or authorizes Forest to enter into contracts in BOBC's name. To the contrary, the Trade Manager Agreement prohibits Forest from entering into any contract that creates a contractual obligation between the subcontractor

[1] See Brief of Defendant Forest Electric Corp. In Support Of Its Motion For Partial Summary Judgment ("Forest Mem.") at 10 (citing *Indus. Am., Inc. v. Fulton Indus.*, 285 A.2d 412, 415 (Del. Super. 1971)).

and BOBC. In addition, the Trade Manager Agreement specifically requires Forest to enter into subcontracts that bind the subcontractor to Forest.

Forest's own assertions that CCI's *ex post facto* rationalizations, "cannot defeat the terms of the agreement to which Creedon gave written assent" apply equally to Forest's own assertions regarding its supposed agency. While Mr. Altheim testified that he *believed* Forest was "acting as agents, similar to the way [of] a construction manager,"[2] that testimony cannot vary, alter, or contradict the terms of the written agreement he executed on behalf of Forest.

Indeed, other than Forest's inadmissible parol evidence, Forest has no evidence to support its claim of agency. To the contrary, the very Forest-CCI Subcontract Agreement that Forest admits governs its relationship with CCI expressly provides that CCI was to be bound to Forest, and nowhere even mentions BOBC. Forest cannot support its "agency" by relying on its own admission that – in breach of its Trade Manager Agreement with BOBC and unbeknownst to BOBC – in May 2004, seven months after the Forest-CCI Subcontract Agreement was agreed to and after CCI first claimed damages, it unilaterally sought to designate itself as BOBC's agent in the signature block of a new proposed agreement it sent to CCI. Not only is it well-established law that agency can only be established by the principal's clear assent to authorize a party to act as an agent, but that proposed agreement was never even executed or agreed to.

Forest's claim of agency is nothing more than a disingenuous and baseless attempt to shift "exposure" for any liability to CCI from Forest to BOBC. In the face of the undisputed documentary evidence, and the law cited by Forest in support of its position

---

[2] Forest Mem. at 12-13 (citing Deposition of Philip Altheim on June 28, 2006 ("Altheim Dep.")).

that the Forest-CCI Subcontract Agreement governs its relationship with CCI, Forest is not entitled to summary judgment with respect to the agency issue. To the contrary, summary judgment should be granted to BOBC on that issue.

Irrespective of that issue, however, as Forest makes clear, neither Forest nor BOBC can be held liable to CCI for the damages it claims. The Forest-CCI Subcontract Agreement is the operative agreement between the parties, and that agreement expressly precludes the damages that CCI seeks in this action.

## STATEMENT OF FACTS

A. The CDC Project

In early 2003, BOBC was tasked by its then-parent, Banc One Corporation, to build two, state of the art, "Tier 4" data centers, now known as CDC1 and CDC2. Data centers are major hubs for storage, retrieval and operational access to customer financial data, *i.e.*, data related to accounts, credit card or other transactions and similar information. Each data center is more than 240,000 square feet under roof.

BOBC selected Tishman Construction Corporation of Maryland ("Tishman") as the "Construction Manager" for the overall project. *See* BOBC's construction manager agreement with Tishman ("BOBC-Tishman Construction Manager Agreement"), attached as Exhibit A. Forest and BOBC (through its agent, Tishman) entered into the Trade Manager Agreement under which Forest would be "Trade Manager for Electrical Work" for the project. *See* Trade Manager Agreement, attached as Exhibit B. As the electrical trade manager, Forest coordinated all work related to electrical power and data connections, and specifically agreed to enter into contracts with subcontractors on its own behalf, and in its own name, for completion of the electrical work required for the project. *Id.* at § 4.04.

B. The Trade Manager Agreement

The Trade Manager Agreement that Forest entered into with BOBC – signed by Forest Chairman and CEO Philip Altheim – nowhere designates Forest as an agent. *See* Altheim Dep., attached as Exhibit C, at 46:6-21. Indeed, the Trade Manager Agreement prohibits Forest from acting as an agent, and expressly states, in Article 4, entitled "Subcontractors," that, "[n]othing contained in the Contract Documents shall create any contractual obligation between any subcontractor and Owner [BOBC]." *See* Trade Manager Agreement, at Banc One 03959 (Section 4.04). Section 4.04 requires Forest to enter into subcontracts that bind *only* Forest: "Electrical Trade Manager [Forest] shall require each subcontractor ... to be bound to Electrical Trade Manager by the terms of the Contract Document." *Id.*

C. The Forest-CCI Subcontract Agreement

On October 2, 2003, Forest presented CCI with an offer letter that attached the Forest-CCI Subcontract Agreement. *See* Forest's Oct. 2, 2003, award and offer letter to CCI and attached Forest-CCI Subcontract Agreement, attached as Exhibit D, at CL 1144 (Section I). CCI President Patricia Creedon signed and accepted the offer without modification. *See id.* at CL 1143. The Forest-CCI Subcontract Agreement, by its terms, states, "SUBCONTRACTOR agrees to be bound and obligated to FEC [Forest]" – *not BOBC* – and nowhere purports to identify, or designate, Forest as an agent. *See id.* at CL 1144 (Section I).

D. Forest's Unilateral Effort to Designate Itself as BOBC's Agent

Forest understood that the Forest-CCI Subcontract Agreement was in Forest's name, binding Forest, and that Forest had not executed that agreement as BOBC's agreement. Nevertheless, after the Forest-CCI Subcontract Agreement was accepted by

CCI, representatives of Forest began having internal discussions regarding a new subcontract agreement. On October 15, 2003, Donna Lucas, Forest's paralegal, sent Paul Angerame, Forest's Vice President, an email that said: "If we are to have no exposure, we could use Bank One's form of agreement and place us as Agent for Owner. With the sample Subcontracts being use[d], we have exposure." *See* Donna Lucas e-mail to Paul Angerame, dated Oct. 15, 2003 (the "Lucas/Angerame Email"), attached as Exhibit E, at FE 014334.

In late March 2004, over 5 months later, CCI began to assert to Forest that it was delayed in the performance of its work and had incurred additional costs. On April 6, 2004, CCI sent a letter to Forest asserting the same problems. *See* CCI letter to Forest, dated April 6, 2004, attached as Exhibit F. On May 4, 2004 – nearly eight months after CCI entered into the Forest-CCI Subcontract Agreement and one month after CCI sent its letter to Forest – Forest presented to CCI for the first time a different form of trade contract entitled the "Single Project Construction Services Agreement" (the "May 2004 Proposed Agreement"). The May 2004 Proposed Agreement, without BOBC's knowledge or approval, was modified by Forest to include a single reference to Forest as an "agent" of BOBC above Forest's signature line. *See* May 2004 Proposed Agreement, attached as Exhibit G, at 006116.

Regardless of the signature line, the May 2004 Proposed Agreement expressly purported to be an agreement "between Electrical Trade Manager [Forest] and Construction Contractor." *Id.* at 006114. Ultimately, neither Forest nor CCI agreed to the terms of the May 2004 Proposed Agreement, and that proposed agreement was never executed. *See* Forest Mem. at 12.

At no time did Forest seek BOBC's consent to amend its Trade Manager Agreement to permit it to act as BOBC's agent and bind BOBC to Forest's subcontractors. *See* Altheim Dep., at 55:2-57:1. Nor, at any time did Forest ever obtain such consent from BOBC. In fact, BOBC only gave its consent for Forest to enter into a subcontract with CCI. *See* Tishman's October 23, 2003 letter to BOBC ("Tishman Award Recommendation"), attached as Exhibit H.

## ARGUMENT

### THERE IS NOT A SCINTILLA OF EVIDENCE TO SUPPORT FOREST'S CLAIM THAT IT ENTERED INTO A CONTRACT WITH CCI AS BOBC'S AGENT

Forest has utterly failed to point to any evidence in support of its claim that it was acting as BOBC's agent when it entered into the Forest-CCI Subcontract Agreement with CCI. The undisputed documentary evidence establishes that Forest was only authorized to enter into contracts in its own name, and that it was not acting (or even purporting to act) as BOBC's agent in October 2003 when Forest and CCI agreed to the Forest-CCI Subcontract Agreement. Forest's motion for partial summary judgment on the agency issue should therefore be denied.

#### A. The Terms Of The Trade Manager Agreement Preclude Forest From Being BOBC's Agent

Forest, in the part of its motion regarding the Forest-CCI Subcontract Agreement, correctly states the applicable law: "it is the terms of [the Forest-CCI Subcontract Agreement] which determine[] any contractual rights or liabilities with regard to the Bank One Project." Forest Mem. at 8. (citing *Universal Prod. Co. v. Emerson*, 179 A.

387, 394 (Del. Super. 1935); *Speakman v. Price*, 80 A. 627, 629 (Del. Super. 1911)).[3]

Forest does not dispute that the Trade Manager Agreement is the operative agreement between itself and BOBC. Forest does not claim that the provisions of that agreement are unclear, nor can it. The agreement expressly and clearly states that Forest may not enter into any agreement that binds BOBC to any of Forest's subcontractors. *See* Trade Manager Agreement, at § 4.04, Banc One 03959. In other words, Forest was not authorized to enter into contracts in BOBC's name or as BOBC's agent.

In an effort to escape the consequences of the plain language of the Trade Manager Agreement, Forest attempts to rely on parol evidence (i.e., the testimony of Mr. Altheim) to establish that Forest believed that it had the authority to act as BOBC's agent because it understood that it had a "no risk" arrangement and that "no risk" for Forest meant that subcontractors would not be bound to Forest, but rather would be bound to BOBC. *See* Forest Mem. at 12-3. Forest admitted, though, that Altheim's understanding was never memorialized (Altheim Dep. at 41:11-49:8) and that the Trade Manager Agreement is the only agreement that governs the relationship between Forest and BOBC (*id.* at 36:16-20).

---

[3] As Forest further correctly points out:

> As the terms of the [Forest-CCI Subcontract Agreement] are clear, they should be given their plain meaning. *Eugene A Delle Donne and Son, L.P. v. Applied Card Systems, Inc.*, 821 A.2d 885, 887 (Del. Supr. 2003); *Eagle Industries, Inc. v. DeVilbus Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. Supr. 1997) (Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position or either party would have no expectations inconsistent with the contract language); *Continental Insurance Company v. Rutledge & Company*, 750 A.2d 1219 (Del. Ch. 2000); *Universal Studios, Inc. v. Viacom, Inc.*, 705 A.2d 579, 589 (Del. Ch. 1997). Moreover, "contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless'. *Qwest Communications International Inc. v. National Union Fire Insurance Company of Pittsburgh, Pa.*, 821 A.2d 323, 328 (Del. Ch. 2002).

Forest Mem. at 8-9.

Because the Trade Manager Agreement is unambiguous, Altheim's subjective beliefs, just like Ms. Creedon's, are utterly beside the point. As the cases cited by Forest make clear, it is well-established that a party may not, under any circumstances, introduce parol evidence to vary or contradict the unambiguous terms of a written agreement. See *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1986) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." ); *Rodgers v. Erickson Air-Crane Co. L.L.C. v Gallagher-Kaiser Corp*, No. 98C-07-014-WTQ, 2000 WL 1211157, at *4 (Del. Super. Ct. Aug. 17, 2000) ("[P]arole evidence is inadmissible to vary, alter, or contradict a written instrument or the terms thereof where the instrument is complete, integrated, final, unambiguous and valid.") (attached as Exhibit I).[4]

To establish its supposed "agency," then, Forest would need to demonstrate subsequent conduct by BOBC that somehow retroactively amended the Trade Management Agreement. Forest has not presented any such evidence – let alone even made such an argument.

B. Forest Cannot Rely On Its Belated, Unilateral Attempt To Designate Itself As BOBC's Agent As Evidence of Its Supposed Agency

Forest's attempt to self-designate itself as an agent of BOBC by including a single reference to Forest as "agent" above its signature line in the May 2004 Proposed Agreement must also fail because agency cannot be created by a purported agent's own unilateral act without the principal's clear consent. *See, e.g., Finnegan Construction Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976) (holding agency authority can never be derived

[4] If parol evidence was admissible on the issue of Forest's alleged agency, it would clearly demonstrate that Forest knew it was never authorized to be BOBC's agent and that the insertion of the agency language in

from the acts of the purported agent alone); *Delaware v. Mass. Bonding & Ins. Co.*, 49 F.Supp. 467, 471 (D. Del. 1943) (holding that a purported agent cannot prove its agency authority by its own acts or declarations).

C. Forest's Attempt to Designate Itself as BOBC's Agent Was In Bad Faith And Must Fail

The evidence establishes that Forest understood the prohibitions and requirements imposed upon it under Section 4.04 of the Trade Manager Agreement and knew full well that it was required to and would be entering into subcontract agreements in its own name and on its own behalf. *See supra* at pp. 4, 7. The evidence also establishes that Forest understood that by complying with those prohibitions and requirements, Forest - *not BOBC* – would have "exposure" to any potential claims by subcontractors like CCI in this lawsuit. *See* Lucas/Angerame Email ("[w]ith the sample Subcontracts being use[d], we have exposure"). The evidence further establishes that one month *after* CCI claimed that Forest had mismanaged the project causing CCI to suffer damages, Forest unilaterally altered the May 2004 Proposed Agreement, behind BOBC's back, to include a single reference to Forest as an "agent" above Forest's signature line, with the express purpose of shifting "exposure" for any liability from Forest to BOBC. *See supra* pp. 5-6, 9.

At no time did Forest provide BOBC, or Tishman, BOBC's agent, with "noisy" notice that Forest sought to bind BOBC as an agent. The text of the May 2004 Proposed Agreement made clear that the parties to that agreement were Forest and CCI and there is no evidence that Tishman even took note of the one word change in the signature line. By contrast, when Tishman, BOBC's actual agent, sought to enter into a contract in BOBC's

---

the May 2004 Proposed Agreement was meant to shift "exposure" from Forest to BOBC for any potential

name, it expressly sought authorization to enter into an agreement as BOBC's agent: "Please indicate your authorization on behalf of Bank One for Tishman Construction Corporation to enter into such an agreement [with Forest], and return to the undersigned. As soon as this authorization is received, we are prepared to enter into an agreement as your Agent." *See* Tishman Award Recommendation. It is entirely disingenuous for Forest to claim that, "Tishman approved the form of contract used by Forest Electric, which specifically identified Forest Electric as Banc One's agent." *See* Forest Mem. at 13.[5]

Forest's unilateral modification of the May 2004 Proposed Agreement to include a single, minute reference to agency above a signature line within a much larger, comprehensive document; Forest's failure to draw BOBC or Tishman's attention to such a fundamental, proposed change in Forest's contract with BOBC; and Forest's attempts to *specifically* bury that provision, together with BOBC and Tishman's reasonable expectation that Forest would abide by the terms of the Trade Manager Agreement, which prohibited Forest from being BOBC's agent, raise serious questions of bad faith on behalf of Forest.

**CONCLUSION**

For all of the foregoing reasons, and those fully set forth in BOBC's Memorandum of Law In Support of Its Motion For Summary Judgment, incorporated herein by reference, this Court should find that the facts permit only one undisputable

subcontractor claims, like CCI's claim in this lawsuit. *See* Lucas/Angerame Email.

[5] Moreover, there is no evidence that, as Forest alleges, Tishman by its authority to instruct Forest on "exactly the type of contracts to use" could somehow transform Forest into an agent of BOBC in contradiction to Section 4.04 of Forest's Trade Manager Agreement with BOBC. *See* Forest Mem. at 13. To the contrary, Tishman's own contract with BOBC limits the form of contracts available for use – "Schedule C-1, Schedule C-2, or Schedule C-3"– none of which could have designated Forest as an agent. *See* BOBC-Tishman Construction Manager Agreement, at ¶ 6, Banc One 07821-22 ("No Construction Service Agreement shall be entered into by Construction Manager unless and until Construction Manager

conclusion: Forest never had any authority to enter into any contract with CCI as BOBC's agent.

Respectfully submitted,

Dated: August 08, 2006

**ASHBY & GEDDES, P.A.**

By: [signature]

Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302)-654-1888

Of Counsel:

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**

75 East 55th Street
New York, New York 10022
212-318-6000

Attorneys for Defendant Banc One Building Corporation

171900.1

has ... included in the applicable Bid Package the form of agreement Owner desires to utilized for such bid (which shall be one of the forms attached hereto as Schedule C-1, Schedule C-2, or Schedule C-3")).