IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CREEDON CONTROLS, INC., a Delaware corporation, | ) ) |
| | ) C. A. No. 05CV300 (JJF) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BANC ONE BUILDING CORPORATION, an Illinois corporation; and FOREST ELECTRIC CORPORATION, a New York corporation, | ) ) ) |
| | ) |
| Defendants. | ) |

**ANSWERING BRIEF OF CREEDON CONTROLS, INC.
IN OPPOSITION TO FOREST ELECTRIC CORPORATION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Edward Seglias, Esq. (I. D. No. 2822)
Robert K. Beste, Jr., Esq. (I. D. No. 154)
Cohen, Seglias, Pallas, Greenhall & Furman, P.C.
1007 Orange Street, Nemours Bldg., Suite 1130
Wilmington, DE 19801
(302) 425-5089
Attorneys for Plaintiff

Date: August 8, 2006

## TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………ii

Nature and Stage of the Proceedings………………………………………………………..1

Statement of Facts…………………………………………………………………………...1

Legal Argument

    A.    Standard of Review……………………………………………..……………..19

    B.    Forest Entered into the Single Project Construction Services
           Agreement with Creedon on Behalf of BOBC………………………………....21

    C.    The No Damage for Delay Clause Is Not Enforceable………………..………26

Conclusion………………………………………………………………………..……….32

i

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Anchor Motor Freight v. Ciabattoni,*
   716 A.2d 154, 156, n.6 (Del. 1998)....................................................................................22

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 249 (1986)………………………………..................................................19, 20

*Anthony P. Miller, Inc. v. Wilmington Housing Authority,*
   165 F.Supp. 275 (D. Del. 1958)………………………………………………....................26

*Brittingham v. Board of Adjustment of City of Rehoboth,*
   Del. Super. Ct., No. C.A. 03A-08-002, 2002 WL 170690 *5 (Jan. 5, 2005)....................25

*Buchman Plumbing, Co. Inc. v. Regents of the University of Minnesota,*
   215 N.W.2d 479 (Minn. 1974)...........................................................................................28

*Charlton v. Paramus Bd. of Educ.,*
   25 F.3d 194, 197 (3d Cir. 1994)…...........................................………………….......…19

*Diamond Electric, Inc. v. Delaware Solid Waste Authority,*
   Del. Ch. Ct., No. 1395-K, 1999 WL 160161, *3 (Mar. 15, 1999)......................................22

*E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*
   686 A.2d 152, 156 (Del. 1996)......................................................................................21-22

*F. D. Rich v. Wilmington Housing Authority,*
   392 F.2d 841 (3d Cir. 1968)…………..............................................................................27

*Gillenardo v. Connor Broadcasting,*
   Del. Super., No. C.A. 98C-06-015-WLW, 2002 WL 991110 * 6 (April 30, 2002)..........22

*Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,*
   583 A.2d 1378, 1386 (Del. Super. 1990)...........................................................................29

*Heller v. Kiernan,*
   Del. Ct. Ch., No. C.A. 1484-K, 2002 WL 385545 *4 (Feb. 27 2002)................................29

*Hindes v. Wilmington Poetry Soc.,*
   138 A.2d 501, 502 (Del. Ch. 1958)……………………….....................................................22

*Hoffman v. U.S.,*
   340 F.2d 645 (U.S. Ct. Cl. 1964).......................................................................................28

ii

*Hornberger Management Co. v. Hawes & Tingle General Contractors*,
768 A.2d 983 (Del. Super. 2000)...................................................................................................25, 26

*Horowitz v. Fed. Kemper Life Assur. Co.*,
57 F.3d 300, 302 n.1 (3d Cir. 1995)…….............................................................................20

*J. A. Jones Construction Co. v. City of Dover*,
372 A.2d 540 (Del. Super. 1977)…….....................................................................26, 27, 31

*L.L. Hall Constr. Co. v. U.S.*,
379 F.2d 559 (U.S. Ct. Cl. 1966).......................................................................................28

*Leeds v. First Allied Connecticut Corp.*,
521 A.2d 1095 (Del. Ch. 1986)…………........................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 586 n. 10 (1986)…………...........................................................................20

*Middle States Drywall, Inc. v. DMS Properties-First, Inc.*,
Del. Super. Ct., No. C.V. 95L-01-041-SCD, 1996 WL 453418 *8 (May 28, 1996).........23

*Northwestern Nat'l Ins. Co. v. Esmark, Inc.*,
672 A.2d 41, 43 (Del. 1996)...............................................................................................21

*Pebble Bldg. Co. v. G.J. Hopkins, Inc.*,
288 S.E.2d 437 (Va. 1982)..................................................................................................29

*Pellaton v. Bank of New York*,
592 A.2d 473, 478 (Del. 1991).............................................................................................22

*Pennsylvania Coal Ass'n v. Babitt*,
63 F.3d 231, 236 (3d Cir.1995)…………………………………….........................................20

*Peter Kiewit & Sons' Co. v. Iowa Southern Utilities Co.*,
355 F.Supp. 376 (S.D. Iowa 1973)……………………………………………………........27

*Price v. Chaffinch*,
D. Del., No. 04-956-GMS, 2006 WL 1313178 *1 (May 12, 2006)…………….................20

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 150 (2000)……………..………………………………………………………….20

*Tippets-Abbett-McCarthey-Stratton v. New York St. Thruway Authority*,
212 N.Y.S.2d 275 (N.Y. Ct. Cl. 1966)...............................................................................28

iii

*Vale v. Atlantic Coast & Inland Corp.*,
99 A.2d 396 (Del. Ch. 1953)..............................................................................................22

*Wilson Contracting, Inc. v. Justice*,
Del. Super. Ct., No. 508 CIV.A. 1974, 1981 WL 377680 *1 Del. Super. 1981)..........26

## RULES

FED.R.CIV.P. 56..............................................................................................................19, 20

## RESTATEMENT

RESTATEMENT (SECOND) OF CONTRACTS §33.................................................................23

## TREATISES

Bruner & O'Conner, CONSTRUCTION LAW § 15:55-56.....................................................29

Bruner & O'Conner, CONSTRUCTION LAW §§ 15:75........................................................27

## I.    **NATURE AND STAGE OF PROCEEDINGS**

Forest Electric Corporation (hereinafter "Forest") has filed a Motion for Summary Judgment and Supporting Brief and Appendices. (D.E. 115–119). This is the Answering Brief by Creedon Controls, Inc (hereinafter "Creedon") in opposition to such motion.

## II.    **STATEMENT OF FACTS** [1]

### A.    **Forest Was Acting as Agent for Banc One.**

This case revolves around a multi-million dollar construction project by Banc One Building Corporation (hereinafter "BOBC"), at its property on the Governor Printz Boulevard, in Wilmington, Delaware, which is often referred to as the "Banc One Core Data Center II" (hereinafter "Data Center"). BOBC hired Forest Electric Corporation (hereinafter "Forest") as its "Electrical Trade Manager." Until recently, BOBC and Forest both agreed Forest was acting as agent for BOBC and Electrical Trade Manager, for the electrical contractors that would be doing the electrical work at the Data Center. BOBC has now completely altered its prior position which was given under oath.

The initial Complaint in this matter was filed in State Court, as a mechanics' lien action, and an action for damages for breach of contract. (D.E. 1, B-1). Paragraph 13 of the initial Complaint accurately states that Creedon entered into a contract with Forest, as subcontractor and/or agent of BOBC. In its Answer filed June 13, 2005, BOBC states: "[A]dmitted that Forest Electric Corp. acted as Electrical Trade Manager and agent for Banc One." (D.E. 5, B-16). Such Answer was sworn to be correct, by Affidavit of Scott A. Capaldi, Assistant Vice President, JPMorgan Chase & Co., successor in interest to BOBC. (D.E. 5, B-23-25). In such Affidavit,

1

Mr. Capaldi, on behalf of BOBC, specifically admits the contract was between Creedon and

BOBC:

"2. The applicable contract between the parties, Creedon Controls, Inc. ("CREEDON") and Banc One Building Corporation ("Banc One") is Single Project Construction Services Agreement Contract No. 6B (the "Agreement")."

The Single Project Construction Service Agreement referred to (B-328-386), is the very

document BOBC now seeks to discard. Although BOBC has now filed an amended Answer and

Affidavit, it cannot so blithely erase its former sworn statements.

Similarly, Forest supported its Answer to the Complaint with the affidavit of Paul

Angerame. (D.E. 3, B-26-28). That affidavit states:

"4. Forest Electric was the Electrical Trade Manager and Construction Manager for the electric trades acting as agent for Banc One Building Corporation ("Banc One"). "

Further, in Paragraphs 5a) and h) of that affidavit, Mr. Angerame states:

"a) The Construction Services Agreement Contract No. 6B was between Creedon and Banc One only with Forest Electric acting as agent for Banc One, the owner;

...

h) Forest Electric owes nothing to Creedon since it acted as agent of Banc One only."

BOBC now seeks to expand the already significant cost of this litigation, by filing the instant

motion, in the face of those clear admissions, and now claims that Forest was not acting as its agent.

**B. Forest's Contract Negotiations with BOBC and Creedon.**

The agreements between BOBC and Forest have their inception when Philip Altheim,

President and CEO of Forest, received communication from Michael Weinberg, head of the real

estate division at BOBC about the Project. Mr. Weinberg and Mr. Altheim have a long-standing

---

[1] BOBC has also filed a Motion for Summary Judgment in connection with Creedon's claims against BOBC. The below Statement of Facts is identical to the Statement of Facts in Creedon's Brief in response to

relationship, with a series of construction contracts that spanned twenty years. (Alt. 3-4; B-493-494).[2] Based on his conversations with Mr. Weinberg, Mr. Altheim assembled his team for the Data Center, long before Tishman Construction Corporation of Maryland (hereinafter "Tishman") was chosen as the construction manager. Ultimately, Mr. Altheim considered Forest and Tishman to be equal partners on the project. (Alt. 12-13; B-495). At this early and hectic stage, the parties were trying to put together a major project, from conception to completion, within a twelve-month period. It was ultimately completed in an eleven-month period; and, in the early stages, the parties did not focus on the formal contractual relationships between the three of them. (Alt.17; B-496).

There were specific discussions between Mr. Altheim and BOBC personnel, including Mr. Weinberg, Karl Auwarter and possibly Mr. Fahrenbach, that Forest was "...not taking this job at risk." In other words, Forest was to be an agency construction manager – managing the electrical contractors on a percentage fee basis, but not having any direct contractual obligation for the electrical contractors. Not only was the Data Center project to be "not at risk," but the mirror project of a data center in Bear, Delaware was also to be "not at risk." (Alt. 14-17; B-496). Mr. Altheim's understanding of this arrangement was that, as an electrical trade manager, Forest was not to be at risk with the electrical contractors, and was not to be contractually bound individually, to any of the electrical trade contractors. (Alt. 42; B-501-2). That Forest was to be "not at risk," was also discussed with Joseph Ryan, Executive Vice President at Tishman. (Alt. 18; B-497). Mr. Altheim did not participate in the review of

BOBC's Motion for Summary Judgment.

[2] References to deposition transcripts shall be as follows: Philip Altheim: Alt.__; Donna Lucas: Luc.__; Paul Angerame: Ang.__; Patricia Creedon: Creedon__; Dennis Link: Link__; Paul Brainard: Brain.__; John Mulrooney: Mul.__; Charles Doble: Doble__; Fred Street: Street__; Richard Werner: Wer.__

3

construction contract documents, but at all times it was understood that Forest was an electrical trade manager, and agent for BOBC, and a partner with Tishman, in representing BOBC. (Alt. 10-12, 18-24, 42-44; B-495, 497-499, 501). In fact, it was not until 2006, long after the project was completed, that Mr. Altheim, President and CEO of Forest, began first hearing that BOBC was now refuting the "not at risk" concept, and claiming that Forest was not acting as agent for BOBC. (Alt. 39; B-500).

As this "fast track" project begins, the parties are focusing more on getting the project built, rather than on the paperwork. The BOBC-Tishman contract is dated as of June 19, 2003, but it is not clear when the contract was actually executed. The contract between Tishman as construction manager, and Forest as electrical trade manager, is not signed until February, 2004. (Luc. 19-21; B-506). That contract is signed by Tishman and Forest, but Tishman is acting on behalf of BOBC as its agent only, and the contractual obligations are therefore between Forest and BOBC. (B-30-94). Even here, none of the dates match. The first page of the Tishman (BOBC)–Forest contract has an effective date of September 12, 2003, requiring return to BOBC by January 21, 2004; but the document was not executed until February, 2004. (Luc. 19; B-506). This is indicative of the procedure in this case, in which documents are dated at times that pre-exist their actual execution.

Although bids went out to various contractors and informal agreements were reached, until February, 2004, the principal parties had not agreed upon the appropriate form of agreement for themselves, let alone the electrical and other trades that were to work on the project, with or under them. Everyone was doing what construction companies do best – getting the building done within the time demands of BOBC. During this period, the delay in the contract formation resulted from the delay of BOBC to direct its construction mangers about the contract form it wanted for the various contracts. As a part of the effort to determine the contract documentation, Donna Lucas, a Forest

4

employee since 1987 and Senior Legal Assistant, began work on the contracts for Tishman (BOBC) – Forest, and for Forrest (BOBC) – electrical contractors. Ms. Lucas, Mr. Angerame, and Mr. Altheim (President of Forest) understood the role of Forest was as an electrical trade manager for the electrical trades, and agent for BOBC. (Alt. 22-39; Luc. 22-33; Ang. 30, 76, 92, 275-297; B-498-500, 507-509, 517-518, 520, 522-525).

At the beginning of the Project in September/October, 2003, the focus was on the construction, and not the documentation, since BOBC needed a number of the electrical contractors to begin to work early in the Project. Forest nonetheless sent a sample contract and a letter of intent to Creedon and other electrical contractors. By letter dated October 2, 2003, Forest sent Creedon a sample form of contract (the "Sample Form Contract"). (B-95). That letter set forth the specific bid pricing and indicated that a subsequent Subcontract Agreement would be developed, defining the services Creedon was to perform. The letter does focus on additional terms and conditions, customary representations, warranties, bonding, indemnities, and insurance; and, as part of the same sentence, refers to the attached contract form:

> Although the Prime Documents have not been finalized, it is the intent of the parties to begin Work and will endeavor to enter into and execute a definite [sic] Subcontract Agreement defining the construction services which shall include, in addition to other terms and conditions, customary representations, warranties, bonding, indemnities, and insurance from Subcontract Agreement executed, Subcontractor agrees to be bound to the terms and conditions of the Subcontract Agreement as attached hereto as Exhibit 1.

The letter of October 2, 2003 was reviewed by Patricia Creedon. She believed the letter and contract documents actually had a cover page stamped "sample." Ms. Creedon noted that nothing was filled in on the contract (Creedon 88-89; B-530), including a specific title for Forest, or the name of the contractor. The document indicates it has an Exhibit A (B-101), that sets forth the definition of the scope of work, but there is no such exhibit attached. The contract document refers to incorporating

5

agreements between other parties' drawings and specifications, which, at this point, had not been prepared. (B-96). There is an Exhibit A to the agreement, which is left substantially blank. There is an Exhibit B that refers to insurance requirements, but that exhibit was substantially changed at a later time. (B-102).

Ms. Creedon expected to see an executable contract that she would negotiate or sign, and not simply a sample. (Creedon 94; B-531A). Believing that she was proceeding under the letter of intent only, and expecting a formal contract to follow shortly thereafter, as stated in the letter of intent, Ms. Creedon signed the letter of intent. (Creedon 140-141; B-537). Before signing the letter of intent, however, Ms. Creedon added language above the signature, which she believed indicated the matter was subject to review and consideration of a final executable contract. A copy of that letter the Sample Form Contract are reproduced in the Appendix. (B-96). However, when Ms. Creedon returned the letter of intent, she did not return a copy of the "sample" contract that was attached. It is also noted that the form of letter reproduced by BOBC in Exhibit "L" to its Appendix, does attach the Subcontractor form with notes by Ms. Creedon. That contract form was not returned to Forest, and Ms. Creedon's notes were not returned to Forest at that time. They were received by Forest and BOBC only in the discovery in this litigation. (Creedon 96; B-531A). Ms. Creedon believed she was waiting for the follow-up contract, which she felt would be sent shortly thereafter; and she thought she was essentially proceeding under an oral contract evidenced by the letter of intent. (Creedon 140-141; B-537; Creedon 275-284; B-547-549).

Since Ms. Creedon believed the contract was a sample only, she did not have the initial "sample" form reviewed by her counsel, as she was awaiting an executable contract (Creedon 112; B-532), which ultimately was not delivered until May, 2004.(Creedon. 111-113; B-534). Thereafter, the parties renegotiated the overall contract price and, as a result, another sample contract was sent

6

to Creedon by another letter dated October 2, 2003, but which was apparently sent October 31, 2003. (B-106). Ms. Creedon again added the same language, clearly for the same reasons, and appears to have returned the sample contract to Forest on November 5, 2003. (B-106).

Although the October 2, 2003 letter attached as an exhibit to this Appendix (B-95) includes some underlining, that underlining was not done by Ms. Creedon. (Creedon 101; B-531B).

Dennis Link, an expert in construction project management, was retained by Creedon in the March/April, 2004 time period. He also understands that the October 2, 2003 letter of intent and sample form of contract did not present a sufficiently definitive agreement, since the prime contract had not yet been completed. (Link 109-111; B-562-563). Mr. Link points out that, to this day, Creedon has yet to receive a full set of documents from Forest. (Link 113; B-563).

After Creedon began its work, and still did not have an executable contract, further discussions occurred between Creedon's staff and Mr. Flemingloss, a financial officer at Forest, pressing Forest for an executable contract (Creedon 112-113; B-532); and, in November or December, 2003, Mr. Angerame told Ms. Creedon that Creedon did not yet have a contract because Forest did not yet have a contract. (Creedon 189-190; B-538-539).

While these discussions were going on between Forest and Creedon, similar discussions between BOBC, Tishman, and Forest, were winding towards completion by way of a series of e-mails, beginning October 1, 2003. (B-107). On that date, and at Paul Welsing's request, Ms. Valdes, from a Tishman-affiliated corporation, forwarded contract forms for the Wilmington and Bear Data Centers to Mr. Terry Peng, of Forest; and Mr. Peng then forwarded those contracts to Paul Angerame; and Mr. Angerame forwarded them to Donna Lucas at "[her]" request. (Luc. 42-45; B-510A). Ms. Lucas had previously requested that Mr. Angerame obtain from Tishman those contract forms that Tishman, as agent for BOBC, wanted for the electrical contractors.

7

(Luc. 43-45; B-510A). In turn, on October 10, 2003, Ms. Lucas sent an e-mail back to Mr.

Angerame, inquiring:

"Paul, please clarify if this is the agreement the Bank wants us to give to our subcontractors. If so, we will have to re-work the contract document. The attached document will bind our subcontractors to Bank One (Tishman being Agent & Construction Manager for Owner)." (B-107)

Ms. Lucas is obviously aware that the attached contact forms will bind the subcontractors to

Banc One. Ms. Lucas asked Mr. Angerame to clarify that Banc One wants to be bound to the

electrical contractors, and Ms. Lucas believes it is about this time (October, 2003) that she began

to understand Forest was only to be the agent for Banc One. (Luc.21; B-506). After further

review, Ms. Lucas sent an e-mail Mr. Angerame, on October 15, 2003, stating:

"If we are to have no exposure, we could use Bank One's form of agreement and place us as Agent for Owner. With the sample Subcontracts being use [sic], we have exposure." (B-107).

It is clear Ms. Lucas understands Forest would have "no exposure," as Mr. Angerame expected

Forest would have "no risk;" and, using a form that Tishman wanted Forest to use, makes Forest

agent for the owner; whereas, the "sample" subcontracts being used creates exposure to Forest.

The Single Project Construction Services Agreement attached to the series of e-mails

referenced above, is substantially the form of contract sent to Creedon in May, 2004; such

contract will be discussed *infra*. It is also noted that this form is "Banc One's form," and appears

to be obtained from forms generally available at Banc One. (Wer. 46-48; B-645).

Mr. Angerame concurs that, at this time, there were discussions about what form of

agreement was required by Banc One, and whether the electrical trade contractors would be

contracting directly with Banc One or with Forest. These discussions were continuing, since

Forest did not have a contract with BOBC. It was Tishman that had the overall responsibility of

8

deciding with BOBC the precise role of Forest and the electrical contractors, and whether it would be a direct contract with Forest, or Forest contracting with those contractors as agent for BOBC. (Ang. 87-93; B-519-520). BOBC has not taken any deposition testimony from Tishman, its construction manager, to further explore these discussions between BOBC and Tishman, and how the decision on the contract documents developed.

At this point, and through February, 2004, when the Forest-BOBC contracts were finally negotiated, there is very little documentation; and it appears the parties were again doing what they do best: trying to fast-track this project. Once the principals have their contracts in place, they turned their attention to the formation of a subcontractor agreement. On February 18, 2004, Ms. Lucas sent a proposed form of agreement to Mr. Angerame. This form specifically lists Forest as BOBC's agent and electrical trade manager. In forwarding this agreement to Mr. Angerame, Ms. Lucas states:

"I have taken the Bank One Agreement and tried to modify it into a **(Draft)** subcontract agreement. Take a look and call me after your review. I'm sure Tishman will have to bless this before we do anything." (B-215).

In March/April, 2004, Creedon retained Dennis Link, an expert in construction management, with 36 years of experience in construction management. Mr. Link will testify as a fact witness and also as an expert in this case. When Mr. Link first came to the Project, it was clear to him that Forest was acting as agent for BOBC. (Link. 196; B-565-567).

On March 29, 2004, Juliane Lynch, of Forest, forwarded to Mr. Keane, Mr. Welsing, Mr. Smith, and Mr. Koenig, all at Tishman, copies of a proposed contracts, with the following notation: "Subcontract Agreement attached for your review and approval." A copy of the e-mail was sent to Mr. Angerame. Two weeks later, Mr. Angerame again sent an e-mail to Mr. Keane at Tishman, stating:

9

"Per our conversation and your direction today Forest is utilizing the attached subcontract agreement for all Trade Management subcontracts on the Bank One CDCI and CDC II projects." (B-270)

The attached form of agreement appears to deal with the Bear Data Center Project, but is clearly

equally applicable to the CDC II project, which is the Wilmington Data Center. It is clear Mr.

Angerame of Forest and Mr. Keane of Tishman, had spoken on April 12, 2004, and Tishman, as

agent for BOBC, directed Forest to utilize the attached subcontract agreement. The agreements

that circulated to Tishman personnel on March 9, 2004, and to Keane on April 12, 2004, all have

Forest signing the form agreement as follows:

> "BANC ONE BUILDING CORPORATION,
> an Illinois Corporation,
>
> By:   Forest Electric Corp. as Banc One Building
> Corporation's agent and Electrical Trade
> Manager." (B-273).

In March/April, 2004, Creedon is discovering the significant delay and inefficiency damages that

it has suffered; and, although oral notice was previously provided, by letter dated April 6, 2004,

Mr. Charles Doble, Creedon's Project Manager, writes to Mr. Angerame at Forest, putting Forest

on formal notice of Creedon's damages, and stating:

"We conditionally acknowledged our intent to enter into an arrangement with FEC, but such arrangement was contingent upon sufficient time for our review of the documents including the Prime Contract, the Subcontract and a detailed Schedule among others. The Prime and Subcontracts have not been delivered to date. Three versions of the Schedule have been issued since bid time without any input from us." (B-325).

Mr. Doble's letter to Forest clearly prompted Forest to again focus on the need for contracts for

the electrical contractors. Thereafter, Forest finally has a form of agreement; and, by letter to

Creedon dated May 4, 2004, sends a new proposed Single Project Construction Services

Agreement. (B-327). This document is substantially in the same format as the Banc One form

10

that was used, going back through October 15, 2003. (B-107). That document clearly envisions the agreement is between BOBC and Creedon, entered into by Forest as its electrical trade manager and agent.

## C.    Forest Holds Itself Out as BOBC's Agent and BOBC Acknowledges Forest's Agency.

It is clear BOBC knew Forest was holding itself out as agent for BOBC. Ms. Lucas believes she also sent a copy of the proposed Creedon contract to Tishman, in advance. (Luc. 36-37; B-510). Ms. Lucas also believed there was an e-mail, from Mr. Angerame to Mr. Keane at Tishman, forwarding the agreement, which would be consistent with the April 12, 2004 e-mail from Mr. Angerame to Mr. Keane (B-270). It was specifically Ms. Lucas who added the specific "agent for" language onto the Creedon contract, because Ms. Lucas understood Forest was indeed to act as electrical trade manager and agent for BOBC. (Luc. 43-44; B-511). The only real change to the Creedon contract, from the Tishman-Forest contract, was that the signature page was changed to allow Forest to act as agent for Banc One. (Luc. 64-65; B-512). Creedon, and all of the other electrical contractors, received the same form; only Creedon did not sign as the other electrical contractors did. (Luc. 69-70; B-513-514). When Mr. Angerame signed the form contracts for Creedon and the other electrical contractors, he knew he was signing on behalf of BOBC, as their agent. (Luc. 64-65; B-512).

This May, 2004 proposed agreement (the "Single Project Construction Services Agreement") was the executable agreement Ms. Creedon had been waiting for, in excess of six months. (Creedon 129; B-534). The Single Project Construction Services Agreement lists Forest as the electrical trade manager, which Ms. Creedon understood to mean, "...they have very little skin in the game and that they're working as the owner's rep." (Creedon 124; B-533).  Ms.

11

Creedon believed Forest had authority to enter into this contract with Creedon, on behalf of and as agent for BOBC. (Creedon 136; B-536). Consistent with her belief that this document was the executable contract she had awaited for months; and for which she had 14 days to review through her attorney, Ms. Creedon then spoke to Mr. Angerame at Forest, indicating that, due to the expansive nature of the new contract form, she would need more than 14 days to review and comment upon the form of contract. (Creedon 135; B-536). Upon Ms. Creedon's review of the contract with Mr. Link, numerous changes to the proposed Single Project Construction Services Agreement were required. Ms. Creedon understood that Forest was working as an agent for and represented BOBC, who was the ultimate customer (Creedon 36-37; B-529); and Ms. Creedon sent her suggested changes to Mr. Angerame on June 14, 2004, via letter and e-mail. (B-387-404). Item 1 of the suggested changes rectified a mistake in the contract to make the terms match the understanding of the parties naming Forest as agent for BOBC. (Creedon 136; B-536). On page 9 of the suggested modifications, Ms. Creedon insists upon the deletion of the "no damage for delay clause" in section 7.02. (B-397, item 95). Although he complained about the magnitude of the changes, despite Mr. Angerame never rejected or responded to the proposed contract modifications. Nonetheless, Creedon continued its work at the Data Center through its completion.

In a large construction project which has so many documents, it is rare to find documents signed by all of the principal parties. One such example is in the change order process. Throughout this project, dozens of such change order documents, both signed and unsigned, were circulated, that deal with both the Wilmington and Bear Data Centers, and that deal with Creedon (B-419-421), as well as other electrical contractors at both the CDC II in Wilmington, Delaware, and the CDC I in Bear, Delaware. (B-422-473). Those documents lay bare for all,

12

including Tishman and BOBC, to see clearly that Forest is executing these change orders as agent for BOBC. If BOBC did not also understand that Forest was acting as its agent, why would it have signed such a document? Why would Tishman sign such a document, if it did not believe it had allowed Forest to act as agent for BOBC? Many of those documents captioned, "Notification of Change Letter" are in the form of communications sent directly to Mr. Karl Auwarter of BOBC, and signed by him. (B-419-473). Two change orders are for $1,809,054.56, and $1,761,455, and it is difficult to imagine documents of this significance would be signed by BOBC without noting the signature by Forest as "Agent for Bank One Building Corp." (B-450-464). It is further noted that the contracts signed by Forest for other electrical contractors at the Data Center are signed by Forest "…as Banc One Building Corporation's agent and Electrical Trade Manager." These forms are the same forms of agreement offered to Creedon. (B-474-482).

Even though the above clearly establishes that Forest acted as agent for BOBC, there is more: BOBC admits that, as agent for BOBC, Tishman had authority to tell Forest what type of contract form to use in the Forest-Creedon Contract, i.e., with Forest contracting for and on behalf of BOBC. (Wer. 92; B-646). It is noted that, after the deposition was concluded, BOBC again attempts to change its sworn testimony. (B-651). Creedon also directed its payment applications to BOBC, not to Forest. (B-708-722).

**D.     Significant Delay and Inefficiency Damages Suffered by Creedon.**

As set forth in the Amended Complaint (D.E. 91), Creedon is entitled to damages of no less than $3,416,348.00, plus additional amounts for penalties, interest, attorney's fees, and costs. Of that specific amount, $211,243.41 is for the contract balance improperly withheld by

13

BOBC and Forest as retainage.[3]  The remaining amount of $3,205,104.00 is for delay and inefficiency of BOBC and its agents, Forest and Tishman. Attached in the Appendix to this Answering Brief is the report of Mark I. Anderson, Executive Vice President and Chief Operating Officer of Warner Construction Consultants, Inc., and dated July 12, 2006 (hereinafter the "Anderson Report"). (B-653). In addition, the report of Dennis Link of Karden Construction Services, Inc., and dated July 31, 2006, is reproduced in the Appendix. (B-742).  The Anderson Report finds nine general categories of events that significantly impacted Creedon's costs. Those additional claims for damages are also supported as set forth in Proposed Change Order #51 (hereinafter "PCO") (B-693), PCO #52 (B-685-707), PCO #53 (B-684), and PCO #54 (B-685). Mr. Link and Mr. Doble of Creedon, together with others at Creedon, compiled two detailed lists of critical events that have damaged Creedon, and which are attached to PCO #51 and PCO #52, and set forth in the Appendix. (B-685-707), and details 115 areas (with subcategories) of which the CCI damages are comprised. The significant areas of damages can only be summarized here, but the above-referenced documents are incorporated herein.

The nine general categories in the Anderson Report are referenced below, and are elsewhere referred to throughout the deposition testimony:

## 1.    **Rescheduling and Altered Sequencing of Work**

The project schedule was initially provided in the bid documents. It provided for a scheduling of completion of building sections, in the following order: "A" and "C" first; then "B, D, E, F, G," all at the same time; and then "H." (B-658, Doble 58; B-615). "H" is the Administration Building, which was to be done last. The schedule shows that Creedon's work is

---

<sup>3</sup>     The parties have recently agreed to settle the contract balance portion of Creedon's claim, and are in the process of drafting a release.

14

to be completed within 5.5 months. Creedon relied on this initial Project schedule to estimate

not only the cost of the work, but how it would deploy its manpower and equipment so that it

could complete the work efficiently and profitably. The first schedule update was provided some

time after the bid, and had Creedon working in all of the scheduled areas simultaneously during

a fifteen-day time period. The sequencing was materially different than as previously described,

and the areas were not always ready for Creedon to begin work; so Creedon could not complete

its work in a given area and had to return later to certain areas at significant expense. (Link 34-

35; B-556; Brain. 78-79; B-577). Specific discussion of these and related delay issues are in the

Anderson Report (B-658-660), and PCO #51 item nos. 1-3, 5, 7-10, 15, 19, 28-32, 40-41, 44, 66-

67 (B-693-702); and PCO #52 item nos. 10, 19, 31. (B-703-707). There was no real planning by

Forest that was "shooting from the hip the whole job." (Mul. 67; B-593). Thereafter, updated

schedules were not provided. (Doble 63-65; B-616; Street 109-110; B-639-640).

## 2.    Failure to Timely Respond to Requests for Information (RFI)

The Anderson Report details items in this category (B-660), and see item nos. 27, 74-75.

(B-696-702). There is abundant deposition testimony regarding a failure of BOBC

representatives to timely respond to RFIs. (Link 25; B-554; Mul. 52-56; B-589-590).

## 3.    Failure to Timely Respond to Potential Change Orders (PCO)

BOBC representatives did not respond to requests for Change Orders (B-660-661). Drawings

would normally take five to seven days for approval; but, on this job, it took two weeks. (Street

76-77; B-636). There was confusion and delay in the PCOs (Doble 179-180; B-627).

## 4.    Elimination of the Night Shift

Due to the reduction in the movement of men and materials, better results could be

achieved at night. However, Forest forced Creedon to terminate its night-shift work after May 4,

15

2004, causing it further costs. (Creedon 215-216; B-540; Doble. 88; B-620). See Also B-707,
Item No. 32.

### 5. Restricted Access; and 6. Obstructed Work

The problems caused by painting sub-contractors are clearly seen in the records; Creedon
was given the painting schedule, and then Tishman changed it. (Street 639-640; B-639-640).
After floors were painted, they had to be covered with plywood. As soon as the floors were
painted, large equipment/batteries would be moved in, and Creedon had to work around the
equipment. (Street 87-89, 104-106; B-638-639). Creedon had to move out of a room to allow the
unscheduled painters to come in. (Brain. 96-98; B-581-582). The problem with the painters was
not only on the floor, but the painters also painted Creedon's color-coded conduit black, so it
was impossible to determine which wires went to what rooms. (Brain. 103-104; B-583).
Significant delays due to restricted access are extensive throughout this project (Brain. 86-94; B-
579-581; 102-109; B-583-584; Doble 72-73; B-618), and were due to poor management by
Tishman and Forest (Link 54; B-558). Thousands of tractor trailers came in at five minute
intervals, and Creedon had to stop its work in the area, to allow them to unload. (Mul. 87-89; B-
596). At one point, the excavating contractor came in at a different time than was scheduled, and
blocked the entrance to the Data Center. (Street 24-26; B-630-631). Creedon did not have access
to some of its materials, as they were blocked by the excavating contractor. (Street 107; B-639;
166-168; B-643). Entrances were unnecessarily closed to block access. (Street 37; B-633).

The Anderson Report (B-653), and PCO #51 item nos. 1, 5-6, 11-12, 13-14, 19-21, 26,
32, 34-37, 39, 42-43, 46-47, 51-53, 55-57, 59, 63-65 (B-693-702); and PCO # 52 item nos. 1, 11,
14, 16-17 (B-703-707), further detail these items of damages.

### 7. Limited Secure Storage

16

The material for the subcontractor was moved from the parking areas outside, to inside the building, to allow BOBC to begin work on the Administration Building. Because of this improper storage, the contractors had to store their materials wherever they could find space inside the building, greatly hampering the flow of men and materials. (B-663-664).

In addition, and as previously indicated, Creedon was the only contractor on site that did not have its own room throughout any significant portion of the Project; nor did it have a room which could be locked. Thousands and thousands of dollars of materials were stolen. Creedon had to hire security personnel at significant cost, to prevent theft of its valuable materials which were placed in an unlocked room. (Brain. 25-26; B-573-574; Mul. 101; B-599). Specific items are further detailed in the Anderson Report (B-663-664), and PCO #51 item nos. 17, 33, 68-69 (B-693-702), and PCO #52 item nos. 4, 6, 18, 22, 28, 30 (B-703-707).

### 8.    Rate of Manpower Consumption-Acceleration

Being forced to work in multiples areas at multiple times, and to return to the same areas to complete, excess manpower was required, which resulted in excess supervisory personnel. See Anderson Report (B-664-665), and PCO #51 item nos. 16, 18-20, 25, 28-29, 33, 36, 39, 43, 45, 48-50, 54-55, 60, 70-72, 76, 79-80 (B-693-702), and PCO #52 item nos. 2-9, 12-14, 16-17, 19-21, 23-27, 29, 33-36 (B-703-707). Light fixtures supplied by Wesco, as required by Forest, were often missing parts, requiring return to areas otherwise complete. (Brain. 99-101; B-582; Mul. 79; B-594; Doble. 70-76; B- 618-619).

Throughout the Project, Creedon made significant efforts to detail by color-coding, the wires that went to specific fixtures and receptacles. The Bank management team painted all of color-coded wires black, and Creedon was unable to determine where the conduits and wires

17

terminated. (Brain. 103-104; B-583). Substantial manpower was consumed by Creedon to correct this situation.

### 9.    Stacking of Trades

The manner in which this project unfolded was unreasonable, unexpected, and out of sequence. (Link 84; B-561). Multiple areas of unnecessary costs are outlined for this category, in the Anderson Report (B-665), and PCO #51 item nos. 16, 18, 28-29, 32, 36, 38-41, 45, 48-50, 56, 58, 60-62, 64, 70-73, 77, 80 (B-693-702), and PCO #52 item nos. 3-4, 7-9, 12-17, 20-21, 23-27, 29 (B-703-707). There are countless other unnecessary and abnormal delays and inefficiencies, caused at the project. (B-555, 559, 569, 592, 594, 597-598, 604, 612, 615-618, 629-635, 639-643). Although interaction with other contractors maybe normal, it is not normal for contractors to interfere with work to the degree at which it occurred on this project. (Doble 29-30; B-608-609).

### E.    Intentional and Bad Faith Conduct.

The problems created for Creedon were caused by more than poor planning by Forest and other BOBC representatives. Some of the conduct on site directed to Creedon was "vindictiveness," had the "appearance of conspiracy to defraud," or was "spiteful" conduct (Mul. 115-117; B-603). Tom Keene at Tishman directed the laborers to throw out 7,000 feet of Creedon's strut materials, bonded and waiting to be picked up and redelivered to the manufacturer. Up to $30,000 of unistrut was simply thrown in the trash. Creedon materials were thrown out three times in five days. (Mul. 112-118; B-602-604). In one instance, the workers put a Creedon 27-foot high reach in a dumpster (Mul. 117; B-625).

Creedon went to great lengths to prepare As-Built drawings, so it could determine what wiring was completed and what needed to be done. BOBC representatives threw them in the

18

trash, and Creedon incurred significant expense to recreate them. (Doble 154; B-626). After 21 years in the construction industry, Creedon's foreman testified he had never seen anything like this.

Creedon went to great lengths to color-code its conduit, in order to identify and locate the path of specific wires. Painters were directed to paint these color-coded conduits black, so it was impossible to determine where Creedon's wires were going. (Brain. 103; B-583). Creedon was constantly moved, when other trades were not. All of the other trades were given a specific space for storage and safety; but not Creedon. Creedon lost $50,000.00 in stolen conduits; because, unlike every other contactor, it was not given a specific, locked room for its materials. Creedon was forced to move around like gypsies, and they were the only ones treated this way. (Mul. 100-102; B-599-600). Creedon was "the dogs on the project." (Mul. 66; B-593); and everyone else was treated better.

## II.    LEGAL ARGUMENT

### A.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that the moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any show there is no genuine issue as to any material fact and the moving party is entitled to judgments as a matter of law." FED. R.CIV.P. 56.

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. Of Educ.*, 25 F.3d 194, 197 (3d Cir. 1994). "Summary judgment will not lie if the dispute about a material fact is

19

'genuine', that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When presented with a motion for summary judgment, a court must "review the record as a whole, drawing all reasonable inferences in favor of the non-moving party, which refraining from weighing the evidence or making credibility determinations." *Price v. Chaffinch*, D. Del., No. 04-956-GMS, 2006 WL 1313178 *1 (May 12, 2006) (slip op.) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). A court should enter summary judgment only if upon all the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Material facts are those which could alter the outcome of the case, while a genuine dispute exists if rational person could find that "the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting FED.R.CIV.P. 56(e)). The court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Pennsylvania Coal Ass'n v. Babitt*, 63 F.3d 231, 236 (3d Cir.1995). The non-moving party then must demonstrate that there is enough evidence that would permit a jury to rule in its favor on the very issue. *See Anderson*, 477 U.S. at 249.

## B.  FOREST ENTERED INTO THE SINGLE PROJECT CONSTRUCTION SERVICES AGREEMENT WITH CREEDON ON BEHALF OF BOBC.

### 1.  Forest Was BOBC's Agent.

Forest admits that it was BOBC's agent and Trade Manager for the purpose of contracting with Creedon and other electrical contractors at the Project and that it submitted both the Sample Form Contract and Single Project Construction Services Agreement to Creedon on BOBC's behalf. See Forest Brief at p. 12. Creedon agrees with Forest's recitation of these facts and concurs that it entered into a contract (the Single Construction Project Services Agreement) with BOBC and that Forest was to act as BOBC's construction manager for electrical trades on the Project.

However, Forest also alleges that the Sample Form Contract is binding as between Forest and Creedon. See Forest Brief at 6. Either Forest was BOBC's agent, in which case it bound Creedon to the Sample Form Contract with BOBC, or it was not, in which case it bound itself to a contract with Creedon. Both cannot be true and this factual contradiction alone precludes summary judgment in Forest's favor.

For the reasons set forth below, Forest, as BOBC's agent, bound BOBC to the Single Construction Project Services Agreement, as amended by Creedon.

### 2.  The October 2, 2003 Letter of Intent Was An "Agreement to Agree" Upon Material Terms at a Later Date and is Not Enforceable.

Under Delaware law, purported contracts are to be "construed as a whole, to give the effect of the intentions of the parties." *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996). If the language is clear and unambiguous, then the parties' intent is ascertained by "a reasonable reading of the plain language of the policy." *E.I. du Pont de Nemours & Co. v.*

21

*Allstate Ins. Co.*, 686 A.2d 152, 156 (Del. 1996). Extrinsic evidence is only used if the parties' intent cannot be derived from the plain language of the agreement. *See Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991).

The plain language of the October 2, 2003 letter from Forest to Creedon created a letter of intent to make a contract at a later date. Parties may make an agreement to make a contract an agreement is enforceable when the agreement specifies all of the material and essential terms including those to be incorporated into the future contract. *Vale v. Atlantic Coast & Inland Corp.*, 99 A.2d 396 (Del. Ch. 1953); *accord Gillenardo v. Connor Broadcasting*, Del. Super., No. C.A. 98C-06-015-WLW, 2002 WL 991110 * 6 (April 30, 2002); *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156, n.6 (Del. 1998) ("[W]hether [an] enforceable contract arises from preliminary negotiations and letter of intent or must await formal agreement depends on the intent of the parties.").

In ascertaining the intent of the parties, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions that control. *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986) (the question whether a contract has been formed turns on whether the parties intended to be bound); *Gillenardo*, 2002 WL 991110 at * 6 (citations omitted); *Diamond Electric, Inc. v. Delaware Solid Waste Authority*, Del. Ch. Ct., No. 1395-K, 1999 WL 160161, *3 (Mar. 15, 1999) (after a contract has been awarded, contracting parties are bound to enter into final subcontract). Until it is reasonable to conclude, in light of all surrounding circumstances, that all of the terms that negotiating parties regard as essential have been expressly or (through prior practice or commercial custom) implicitly agreed upon, the parties have not finished their negotiations and have not formed a contract (emphasis added). *Leeds*, 521 A.2d at 1101.

Delaware courts will not enforce a contract that is indefinite in any of its material and

essential provisions. *Hindes v. Wilmington Poetry Soc.*, 138 A.2d 501, 502 (Del. Ch. 1958). An offer cannot form the basis on an enforceable contract unless its terms are sufficiently certain and provide a basis for determining the existence of a breach and for giving an appropriate remedy. *Middle States Drywall, Inc. v. DMS Properties-First, Inc.*, Del. Super. Ct., No. C.V. 95L-01-041-SCD, 1996 WL 453418 *8 (May 28, 1996) (citing RESTATEMENT (SECOND) OF CONTRACTS §33 (1981)). The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance. *Id.* In a construction contract, a contractor's scope of work is an essential and material term because it provides the basis whereby the Court can determine the existence of a breach. *Id.*

Forest's October 2, 2003 letter to Creedon, (which included the Sample Form Contract), confirms that Forest contemplated that a subsequent contract would be forthcoming that specified the services that Creedon was to perform and would include additional terms and conditions, customary representations, warranties, bonding, indemnities, and insurance. The letter also confirms that Creedon was expected to begin work immediately at the Project and that the parties would "endeavor to enter into and execute a definite Subcontract Agreement" at a later date.

After receiving the October 2, 2003 letter, Creedon added language confirming its understanding that it was entering into a "Letter of Intent," to be followed by a completed contract that it would be expected to sign. For this reason, Creedon did not execute the enclosed Sample Form Contract or return it to Forest. Instead, Creedon began working at the Project as directed, believing simply that it was bound by the letter of intent, which would be replaced with a complete contract after the prime contract documents had been finalized.

23

Creedon's receipt of Forest's May, 2004 letter and Single Project Construction Services Agreement conformed to Forest's expectations in two important ways. First, Single Project Construction Services Agreement identified Creedon as a signatory and appeared to be a complete agreement. The Single Project Construction Services Agreement contained numerous provisions not included in the Sample Form Contract including a detailed scope of work, references to Project drawings, general conditions, schedule, form of change order, form of payment application and form of certificate of substantial completion. Secondly, the Single Project Construction Services Agreement identified Forest at the Electrical Trade Manager and agent for BOBC. This was consistent with Forest's prior representations. To Creedon, the Single Project Construction Services Agreement was the complete agreement it had expected to receive when it signed the Letter of Intent in October, 2003.

Prior to May, 2004, Creedon and Forest (as BOBC's agent) had agreed that they would contract, but had not come to a meeting of the minds as to what the material terms of the contract would be including issues of scope, payment and remedies for breach. Indeed, Exhibit "A" to the Sample Form Contract purporting to describe the Project scope of work, contains the notation [DETAIL SCOPE OF WORK/LIST DRAWINGS] but does not identify any drawings or detail of what work Creedon was to perform. Accordingly, the Sample Form Contract is unenforceable because the scope of work, an essential and material term, was omitted.

Forest's October 2, 2003 letter clearly demonstrates that the negotiations were to continue and that a "definite Subcontract Agreement" would be forthcoming. The Single Project Construction Services Agreement identifying Creedon's scope of work followed.

24

Accordingly, October 2, 2003 Sample Form Contract is not enforceable and Forest's Motion for Summary Judgment must be denied.

### 3. The Single Project Construction Services Agreement, As Amended by Creedon, is Enforceable Because Forest Accepted the Creedon's Counteroffer by Failing to Respond.

Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation. *Hornberger Management Co. v. Hawes & Tingle General Contractors*, 768 A.2d 983, 991 (Del. Super. 2000) (citing Restatement (Second) of Contracts §69 (1981)). Indeed, where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept and his failure to do so can be considered acceptance of the offer. *Brittingham v. Board of Adjustment of City of Rehoboth*, Del. Super. Ct., No. C.A. 03A-08-002, 2002 WL 170690 *5 (Jan. 5, 2005).

When Forest sent Creedon the Single Project Construction Services Agreement in May, 2004, Creedon responded and made a counteroffer by letter dated June 14, 2004 that included proposed modifications to the Single Project Construction Services Agreement marked as "Addendum 1" to the agreement. Neither Forest nor BOBC rejected Creedon's proposed modifications and Creedon continued its performance at the Project.

Creedon's proposed modifications constituted a counteroffer to Forest's "offer" of the Single Project Construction Services Agreement. Because Creedon continued to work at the Project (and Forest knew Creedon was expecting a response to its counteroffer), Forest, as BOBC's agent, had the duty to Creedon to accept or reject

25

Creedon's proposed modifications. *Hornberger Management Co.*, 768 A.2d at 991.

Under these circumstances, it is reasonable that Forest or BOBC would respond to

Creedon's counteroffer and their failure to do so constitutes acceptance of Creedon's

modifications to the Single Project Construction Services Agreement on behalf of BOBC.

Accordingly, the Single Project Construction Services Agreement, as modified by

Creedon's "Addendum 1," created an enforceable contract between Creedon and BOBC

facilitated by Forest, BOCC's agent.

## C.    THE NO DAMAGE FOR DELAY CLAUSE
         IS NOT ENFORCEABLE

### 1.    The No Damage For Delay Clause Does Not Bar Creedon's
          Damages Caused By Forest's And Tishman's Mismanagement
          Of the Project.

No matter which contract applies, the "no damage for delay" clause is not enforceable.

When Delaware courts have enforced such clauses, they are strictly construed to avoid harsh

results. *Wilson Contracting, Inc. v. Justice*, Del. Super. Ct., No. 508 CIV.A. 1974, 1981 WL

377680 *1 Del. Super. 1981). Delaware courts have held that summary judgment is

inappropriate when the enforceability of a "no damage for delay" clause is at issue. *See J. A.*

*Jones Construction Co. v. City of Dover*, 372 A.2d 540 (Del. Super. 1977).

Although generally enforceable, Delaware courts recognize certain exceptions to "no

damage for delay" clauses, and have refused to enforce such clauses where there is evidence that:

1) the delay was of a kind not contemplated by the parties, 2) the delay amounted to an

abandonment of the contract; and 3) the delay was caused by bad faith. *Anthony P. Miller, Inc.*

*v. Wilmington Housing Authority*, 165 F.Supp. 275 (D. Del. 1958).

Legal commentators have examined the meaning of "bad faith" as it relates to

26

enforcement of a "no damage for delay" clause, and have concluded that the clause remains subject to overarching implied obligations read into every express contract; namely, (1) the implied obligation of good faith and fair dealing, (2) the implied obligation of cooperation and (3) the implied obligation of noninterference. Bruner & O'Conner, CONSTRUCTION LAW § 15:75. These implied obligations constitute the fundamental bedrock principles upon which judicial exceptions to the enforcement of the "no damage for delay" clause are founded. *Id.*

In *J.A. Jones Construction*, The Delaware Superior Court applied the common exceptions to the enforcement of a "no damage for delay" clause and denied summary judgment to an owner seeking to enforce the clause where the contractor had alleged that the owner's conduct had caused the delays. *J.A. Jones Construction*, 372 A.2d at 547. The court based its holding, in part, on *Peter Kiewit & Sons' Co. v. Iowa Southern Utilities Co.*, 355 F.Supp. 376 (S.D. Iowa 1973)[4] which defined "active interference" as: "Some affirmative, willful act, in bad faith, to unreasonably interfere with the contractor's compliance with the terms of [the] construction contract," as distinguished from mere "simple mistake, error in judgment, lack of total effort or lack of complete diligence" on the part of the owner. *Id.* at 397. *See also F.D. Rich v. Wilmington Housing Authority*, 392 F.2d 841 (3d Cir. 1968).

When Creedon submitted its bid for the Project, it expected that Tishman would competently manage the Project and that Forest would competently manage the electrical work. Specifically, Creedon expected that:

- The Project would be constructed substantially as designed and described in the initial Bid Package and subsequent contract to be developed;

---

[4]    This case expressing the applicable exceptions has been into numerous judicial decisions throughout the United States. See Bruner & O'Conner, CONSTRUCTION LAW §§ 15:75-76.

27

- Forest and/or BOBC would manage the Project in the manner and sequence contemplated by the Bid Documents, and that the Project would be completed in the specified time;

- The Project would progress on time, and in an orderly, coordinated, and expeditious manner, without undue delay, disruption and/or interference;

- The Project would be completed in accordance with the time provided in the contract;

- The Project would be constructed in accordance with the drawings and specifications contained in the initial Bid Package;

- CCI would not be required to perform work specifically excluded from the contract;

- CCI would not be required to perform work not described in the initial Bid Package without a Change Order;

- Forest and/or BOBC would timely and completely perform all work prerequisite to CCI's performance; and

- Forest and/or BOBC would not hinder CCI's performance.

Forest and Tishman had a duty to Creedon to properly manage work at the Project and coordinate work among subcontractors. Many courts have held an owner liable for delays suffered by a contractor when its agents have failed to coordinate work at a Project. *See Hoffman v. U.S.*, 340 F.2d 645 (U.S. Ct. Cl. 1964)(owner liable for failure to secure cooperation of multiple prime contractors); *Tippets-Abbett-McCarthey-Stratton v. New York St. Thruway Authority*, 212 N.Y.S.2d 275 (N.Y. Ct. Cl. 1966) (owner responsible to coordinate interrelated work among contractors); *Buchman Plumbing, Co. Inc. v. Regents of the University of Minnesota*, 215 N.W.2d 479 (Minn. 1974) (owner has nondelagable duty to coordinate to cooperate and coordinate multiple contracts); *L.L. Hall Constr. Co. v. U.S.*, 379 379 F.2d 559 (U.S. Ct. Cl. 1966) (owner obligated to prevent interference of ordinary and necessary progress

28

of a contractor's work by other contractors over which owner has control); *Pebble Bldg. Co. v.*
*G.J. Hopkins, Inc.*, 288 S.E.2d 437 (Va. 1982) (finding prime contractor delayed the progress of
electrical subcontractor progress was retarded by contractor's failure to properly coordinate the
work of the various subcontractors); *See also* Bruner & O'Conner, CONSTRUCTION LAW §§
15:55-56.

Although Creedon's bid was deemed reasonable by Forest after a meeting with Creedon
representatives, Forest and Tishman failed to properly manage the Project to Creedon's detriment
and caused Creedon to incur substantial costs directly attributable to their mismanagement. The
circumstances causing Creedon's cost overruns are detailed in the Anderson Report and through
other documents included in the Appendix to Creedon's brief. Ironically, Forest seeks to enforce
the "no damage for delay" clause in the BOBC Sample Form Contract to deny Creedon payment
for the adverse impacts and additional expenses caused by the actions of Forest even though it
claims to be BOBC's agent for the purposes of entering into contracts with Creedon and the other
electrical contractors.[5]

In addition to its lack of standing, Forest cannot enforce the "no damage for delay" clause
because there are substantial facts showing that Forest acted in bad faith with respect to Creedon,
which resulted in the increased expenses for which Creedon now seeks compensation. Forest's
conduct takes two basic forms: 1) mismanagement of the Project that resulted in interference
with Creedon's performance of its scope of work; and 2) intentional, vindictive conduct designed

---

[5]     Because Forest admits that it is BOBC's agent, it follows that for the purposes of summary
judgment, Forest has no standing to enforce the terms of any contract between Creedon and BOBC. *See Heller v.*
*Kiernan*, 2002 Del. Ct. Ch., No. C.A. 1484-K, 2002 WL 385545 *4 (Feb. 27 2002) (citing Mechem, *Outline of the*
*Law of Agency* (4th ed. 1952) §§12A, 19) (an agent is vested with the authority to bind its principal to a contract
with a third party and normally binds its principal, not itself, to the contracts that it makes. *See also Guardian*
*Construction Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378 (Del. Super. 1990) (a stranger to a contract has no
right to enforce its terms.)

29

to cause Creedon additional expense. Tishman also mismanaged the Project and interfered with

Creedon's work.

Forest and Tishman interfered with Creedon's performance at the Project by:

- Failing to provide updated Project schedules that reflected actual conditions at the Project;

- Failing to coordinate work among contractors so that Creedon could efficiently and profitably perform its scope of work;

- Changing the Project schedule and sequencing so that Creedon was required to work in numerous areas simultaneously, even though many areas were not prepared for Creedon's performance;

- Failing to timely respond to Creedon's requests for information;

- Failing to timely respond to Creedon's requests for change orders;

- Obstructing Creedon's work area with batteries and other equipment; and

- Interfering with Creedon's means and methods by forcing Creedon to terminate its more efficient night-shift work.

Forest and Tishman engaged in intentional, bad faith conduct by:

- Directing laborers to dispose of $30,000 worth of Creedon's strut materials that were to be returned to the manufacturer;

- Reducing the amount of space for Creedon to store materials;

- Placing Creedon's 27' high reach in a dumpster;

- Throwing out Creedon's as-built drawings that Creedon had to re-create at its own expense; and

- Directing painters to paint Creedon's color coded conduit installed at the Project black so that the paths of the wires could not be identified.

In his expert report, Dennis C. Link concluded that management of the Project was poor

and that Forest's non-responsiveness to Creedon created more problems and led to more delays.

30

Forest's conduct, in particular, created a ripple effecting all contractors by directing work to be performed out of the scheduled sequence and resulting in cost overruns accelerations and stacking of trades.

Creedon had the right to expect that the Project would be performed in accordance with the scheduling and sequencing set forth in the bid documents as well as prompt turnaround of requests for information and change order requests. Creedon could also reasonably expect that access to its working areas would not be obstructed and that it could perform work at the Project at night. Accordingly, Creedon could not anticipate that its performance would be delayed by Forest and Tishman's failure to meet the minimum requirements for Creedon to timely perform its work. *See J.A. Jones Construction Co.*, 372 A.2d at 546-547.

Forest and Tishman's other conduct simply demonstrates bad faith. Indeed, only after Creedon requested that BOBC process change orders for additional work was its storage space reduced and its materials thrown in the trash. These acts are not mistakes or errors in judgment, they are affirmative, willful acts designed to unreasonably interfere with Creedon's performance at the Project.

Further, Creedon consistently notified Forest that its progress was being delayed and that it was incurring costs due attributable to the interference with its work and was facing serious financial problems. In June, 2004, Creedon even prepared a presentation detailing the delays and costs incurred up to that time. Despite Creedon's notice, neither Forest nor Tishman made any effort to mitigate the mismanagement or correct the coordination problems at the Project.

Creedon has offered evidence that the parties did not anticipate the delays encountered and that Forest engaged in bad faith conduct during the Project an interfered with Creedon's performance. Under the circumstances, a jury could find that Creedon's delay claim meets the

31

exceptions to the "no damage for delay" clause recognized by Delaware courts. Accordingly, even if Forest had standing to assert the "no damage for delay" clause against Creedon, its Motion for Summary Judgment must be denied.

## 2.    The No Damage For Delay Clause Was Deleted From the Single Project Construction Services Agreement.

In its June 14, 2004 "Amendment 1" to the Single Project Construction Services Agreement, Creedon specifically deleted Section 7.02 of the General Conditions containing the "no damage for delay" clause. Forest failed to respond to this deletion and is deemed to have accepted this modification on behalf of BOBC. *See* section D *infra*. At the time of Amendment 1, Creedon had been working at the Project for ten months and had experienced the actual conditions and Forest's and Tishman's mismanagement. Creedon had incurred significant costs over and above its bid price to perform the Project and expressly refused to be bound by any clause in the Single Project Construction Services Agreement that would compromise its right to recover these costs. For these additional reasons, the "no damage for delay" clause is not enforceable.

## CONCLUSION

For each and every one of the foregoing reasons, material questions of material fact exist,

32

and the Motion for Summary Judgment filed on behalf of Forest Electric Corporation should be denied.

**Cohen, Seglias, Pallas, Greenhall & Furman, P.C.**

Edward Seglias, Esq. (I. D. No. 2822)
Robert K. Beste, Jr., Esq. (I. D. No. 154)
1007 Orange Street, Nemours Bldg., Ste. 1130
Wilmington, DE 19801
(302) 425-5089
Attorneys for Plaintiff, Creedon Controls, Inc.

Date: August 8, 2006

33