IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CREEDON CONTROLS, INC., a Delaware corporation, | ) <br> ) <br> ) C. A. No. 05CV300 (JJF) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| BANC ONE BUILDING CORPORATION, an Illinois corporation; and FOREST ELECTRIC CORPORATION, a New York corporation, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

## DUAL APPENDIX
### SUBMITTED IN SUPPORT OF
### PLAINTIFF CREEDON CONTROLS, INC.'S
### OPPOSITION TO
### MOTION FOR SUMMARY JUDGMENT
### FILED BY BANC ONE BUILDING CORPORATION
### AND
### MOTION FOR PARTIAL SUMMARY JUDGMENT
### FILED BY FOREST ELECTRIC CORPORATION

# VOLUME THREE

Edward Seglias, Esq. (I. D. No. 2822)
Robert K. Beste, Jr., Esq. (I. D. No. 154)
Cohen, Seglias, Pallas, Greenhall & Furman, P.C.
1007 Orange Street, Nemours Bldg., Suite 1130
Wilmington, DE 19801
(302) 425-5089
Attorneys for Plaintiff, Creedon Controls, Inc.

# INDEX TO EXHIBITS

| 1 | Complaint | 1 |
|---|---|---|
| 2 | Answer to Complaint by Banc One Building Corporation | 15 |
| 3 | Affidavit of Scott A. Capaldi, dated June 8, 2005 | 23 |
| 4 | Affidavit of Paul Angerame, dated May 24, 2005 | 26 |
| 5 | Tishman - Forest – Single Project Construction Services Agreement – Contract #2 Trade Manager | 30 |
| 6 | October 2, 2003 Letter of Intent | 95 |
| 7 | October 2, 2003 Letter of Intent (Revised 10/31/03) | 106 |
| 8 | Series of E-mails 10/01/03 – 10/15/03, with attached draft contracts | 107 |
| 9 | E-mail of Donna Lucas to Paul Angerame, dated 2/18/04, with attached contract form | 215 |
| 10 | E-mail series, dated 3/29/04 through 4/12/04, Forest-Tishman personnel & attached draft agreement for electrical contractors | 270 |
| 11 | Letter of Charles Doble to Paul Angerame, dated April 6, 2004 | 325 |
| 12 | Letter of Donna Lucas to Pat Creedon, dated May 4, 2004, with attached draft contract | 327 |
| 13 | E-mail of Pat Creedon to Paul Angerame, dated 6/14/04, with comments re: Single Project Construction Services Agreement | 387 |
| 14 | E-mail series, 6/14/04 to 8/4/04, Paul Angerame to Donna Lucas | 405 |
| 15 | Change Order Documents with Forest as agent for Banc One | 419 |
| 16 | Single Project Construction Services Agreement – other electrical contractors | 474 |
| 17 | Letters of Paul Welsing to Forest, dated February 12, 2004, with attached Tishman-Forest contract | 483 |

i

18    Portions of Transcript of Deposition of Philip Altheim                    492

19    Portions of Transcript of Deposition of Donna Lucas                       503

20    Portions of Transcript of Deposition of Paul Angerame                     516

21    Portions of Transcript of Deposition of Patricia Creedon                  528

22    Portions of Transcript of Deposition of Dennis Link                       551

23    Portions of Transcript of Deposition of Paul Brainard                     571

24    Portions of Transcript of Deposition of John Mulrooney                    587

25    Portions of Transcript of Charles Doble                                   606

26    Portions of Transcript of Fred Street                                     628

27    Portions of Transcript of Deposition of Banc One Building
      Corporation's Rule 30(b)(6) representative, Richard Warner                644

28    Report of Mark I. Anderson, Warner Construction Consultants, Inc.,
      dated July 12, 2006                                                       653

29    Application and Certificate for Payment (Nos. 1-15)                       708

30    Affidavit of Patricia Creedon                                             723

31    Report of Dennis Link, Karden Construction Services,
      dated August 7, 2006                                                      742

RKB/msj
06894-0001
Doc. #363

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Philip Altheim                    C.A. # 05-CV-300-JJF                    June 28, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a          )
Delaware corporation,              )
                                   )
          Plaintiff,               )
                                   ) Civil Action
     v.                            ) No. 05-CV-300-JJF
                                   )
BANC ONE BUILDING                  )
CORPORATION, an Illinois           )
corporation, and FOREST            )
ELECTRIC CORPORATION, a New        )
York corporation,                  )
                                   )
          Defendants.              )

          Deposition of PHILIP ALTHEIM, taken
pursuant to notice at the law offices of Cohen,
Seglias, Pallas, Greenhall & Furman, PC, 1007 Orange
Street, Suite 1130, Wilmington, Delaware, beginning at
10:07 a.m., on Wednesday, June 28, 2006, before Julie
H. Parrack, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public.

APPEARANCES:

          ROBERT K. BESTE, JR., ESQUIRE
          COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
            1007 Orange Street, Suite 1130
            Wilmington, Delaware  19801
            On behalf of Plaintiff

          PAUL L. McDONALD, ESQUIRE
          PAUL, HASTINGS, JANOFSKY & WALKER LLP
            875 15th Street, NW
            Washington, D.C.  20005
            On behalf of Defendant Banc One Building
            Corporation
                    WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477
                      www.wilfet.com

Creedon Controls, Inc.                    v.           Banc One Building Corporation
Philip Altheim                    C.A. # 05-CV-300-JJF              June 28, 2006

Page 2

1  APPEARANCES CONT'D:
2         PAUL A. BRADLEY, ESQUIRE
          McCARTER & ENGLISH, LLP
3         919 North Market Street, Suite 1800
          Wilmington, Delaware 19899
4         On behalf of Defendant Forest Electric
          Corporation
5
          - - - - -
6
7              PHILIP ALTHEIM,
8         the deponent herein, having first been duly
9         sworn on oath, was examined and testified as
10        follows:
11 BY MR. BESTE:
12    Q.  All right, and if I could ask you to state your
13 name and address?
14    A.  Which address?
15    Q.  Your home address.
16    A.  Okay.  Philip, P-h-i-l-i-p, Altheim,
17 A-l-t-h-e-i-m, 799 Park Avenue.
18    Q.  All right, sir, and what's your position with
19 Forest?
20    A.  Chairman and CEO.
21    Q.  And how long have you held those positions?
22    A.  Since 1986.
23    Q.  Sounds like you are the boss.
24    A.  I am.

Page 3

1     Q.  Okay.  And how long have you been with Forest?
2     A.  Since 1978.
3     Q.  And what is your formal training or education?
4     A.  I was an electrician, I graduated as a
5  journalist student, I worked in the family electrical
6  contracting business.  And I've been in that, in this
7  industry since 1963.
8     Q.  And does Forest do electrical construction
9  nationwide?
10    A.  No.  Forest does electrical work in New York
11 City and New Jersey and in partnerships in West
12 Chester and/or other places.
13    Q.  All right.  Were the Banc One Data Centers in
14 Wilmington your first endeavor into the Delaware
15 field?
16    A.  Yes, yes.
17    Q.  How is it that you or Forest got together with
18 Banc One for the two data center projects in Delaware?
19    A.  Forest Electric, myself, had been a long -- had
20 a long-time standing with Mike Weinberg, Jamie Dimon
21 when he was at Salomon Smith Barney.  We had been, we
22 have been the contractor for Mike Weinberg
23 particularly and Salomon Smith Barney and Sandy Weill
24 for almost every bit of 20 years.

Page 4

1     Q.  Was Mike Weinberg at the Banc One at the time
2  this project was conceived?
3     A.  Yes, sir.  Yes.
4     Q.  What's his position at Banc One, or was it at
5  the time, should I say?
6     A.  I believe at the time, head of real estate
7  facility.  That's the best I know.
8     Q.  And was this the first data center project that
9  you did for Banc One?
10    A.  Yes, sir, that I did, Forest did for Banc One.
11    Q.  Okay.  You or Forest, this was your first data
12 center project for Banc One?
13    A.  Forest's first project, yes, first data center
14 for Banc One.
15    Q.  Have you done data centers, you or Forest done
16 data centers for other --
17    A.  Yes, sir.
18    Q.  And just give me some concept of the last 10
19 years.
20    A.  Data centers for AboveNet, data centers for
21 Level Three, data centers for, boy, oh, boy,
22 Bloomberg, data centers for, work and data centers for
23 Morgan Stanley, data centers and work for Lehman
24 Brothers, data center work in, with Metro Media

Page 5

1  Fibernet, data centers for Pershing, data centers for
2  numerous financial companies.  I can't recollect all
3  of them.
4     Q.  Were those projects where Forest acted as an
5  electrical contractor for those projects?
6     A.  Yes, sir.
7     Q.  Were they in any of those projects electrical
8  trade managers?
9     A.  No, sir.
10    Q.  Was the Delaware Banc One Data Center the first
11 where Forest acted as an electrical trade manager for
12 a data center?
13    A.  For a data center, yes.
14    Q.  Yes.  I take from your answer the way you
15 answered that that they acted as electrical trade
16 manager for other projects?
17    A.  Yes, sir.
18    Q.  What sort of projects would Forest --
19    A.  Healthcare.
20    Q.  Pardon me?
21    A.  Healthcare, hospitals, primarily those kind of
22 projects.
23    Q.  Is there some distinction as to why Forest
24 would, on those types of projects, work as an

**B-0493**

Creedon Controls, Inc.                                                                      Banc One Building Corporation
Philip Altheim                          v.          C.A. # 05-CV-300-JJF          June 28, 2006

Page 6

1  electrical trade manager versus the actual electrical
2  contractor?
3     A.  Yes.  There is a lot of different disciplines
4  in healthcare to build a project.  And we, we took the
5  position that the risk is out of the jobs being the
6  electrical subcontractor, and we would best serve as
7  electrical trade managers, meaning that there could be
8  as many as five to seven electrical trade --
9  electrical trades on the job that had to be
10  supervised.
11         And there's a specialty in healthcare, as
12  there is in data centers, in healthcare going from
13  fire alarm systems, smoke detection systems, recall
14  bell systems, oxygen systems, lighting,
15  communications, a lot of different disciplines, all of
16  which we could do.
17         But in terms of the jobs that we did,
18  which was Roosevelt, St. Luke's Hospital, which was a
19  monster, at that time, several million dollars, I
20  would say $45 million worth of electrical, there were
21  requirements for minority participation, there were
22  requirements for WBEs, MBEs, and we didn't have those
23  requirements.  So therefore it was, we sold and
24  marketed ourselves as a trade manager because we knew

Page 7

1  all those disciplines and we could manage those
2  processes without risk.
3     Q.  Getting back to your company being initially
4  contacted for this project by Mr. Weinberg, did you
5  say?
6     A.  Yes, sir.
7     Q.  Was it that he actually physically contacted
8  you?
9     A.  Um-hum, yes.
10     Q.  How did that develop as to what role you were
11  going to play in this particular data center project?
12     A.  Having this relationship with Mr. Weinberg and
13  doing work with him on a regular competitive basis,
14  Banc One was doing work in Chicago on data centers in
15  Elk Grove and maybe another area.  EMCOR had a
16  subsidiary company in Elk Grove -- in Chicago, and
17  Mike reached out for me to put those people together
18  with him because he has a great trust in our knowledge
19  and our capability.  And he -- and we brought to him
20  the contracting company that ultimately ended up
21  building those Banc One facilities.
22         So that was my first blush in the Banc One
23  world of data centers, having Mike and his people,
24  Fahrenbach, associate with our Chicago affiliate.

Page 8

1     Q.  Which is EMCOR?
2     A.  EMCOR, yes.
3     Q.  When you say affiliate --
4     A.  It's subsidiaries, all wholly owned
5  subsidiaries of EMCOR.  EMCOR has 45 subsidiaries
6  around the country and they have one in Chicago, which
7  is Gibson Electric.
8     Q.  And the formal name of the parent company is
9  what?
10     A.  EMCOR, E-M-C-O-R.
11     Q.  And what positions do you hold with EMCOR?
12     A.  None, none.
13     Q.  Okay.  Again, getting back to the
14  conceptualization of this Delaware project --
15     A.  Sure.
16     Q.  -- as I understand, Mr. Weinberg came to you
17  and wanted you to put the project together, general?
18     A.  Mr. Weinberg came to me and they were having
19  selections of places that Banc One was -- in a
20  selection process of finding where they could put data
21  centers, where they want to put data centers.  Data
22  centers, they were choosing places.  It could have
23  been New Jersey, it could have been Pennsylvania, it
24  could have been a various amount of places.

Page 9

1         It seems that from whatever I knew about
2  Maryland -- I'm sorry, Delaware, that there was a
3  corridor in Delaware that made sense for two buildings
4  to be put up in an approximately 20-mile radius, a
5  20-mile distance that would be helpful for whatever
6  fiber communications needed in that area.  And they
7  chose Delaware, given I guess some good-will and some
8  good consideration from the State of Delaware.  Did I
9  say Maryland again?  Delaware, where the governor was
10  open-armed, and so they chose Delaware.
11         Having said that, Mr. Weinberg and his
12  team reached out for us, obviously they were East Coast,
13  do you have an affiliate, do you have a subsidiary
14  company that works in the Washington, Delaware,
15  Baltimore area that could be of some service to us?
16  We have a company in Washington, Dynalectric, but they
17  were not coming up to Delaware.  They had worked in
18  Delaware but they chose not to work in Delaware.  For
19  what reasons I have no idea.
20         Found it to be a nice place to work.
21  Maryland you get crab cakes, which are delicious,
22  Delaware you don't get crab cakes.
23         In any event, Mr. Weinberg contacted me,
24  said, "What could you do for us there?"  I said,

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Philip Altheim                    C.A. # 05-CV-300-JJF                    June 28, 2006

Page 10

1 "Mike, this is a huge project." I said, "But it's
2 nothing we can't handle." And my take is that we want
3 to take this job on as an electrical trade manager,
4 fully understanding that we could be of big assistance
5 to you, number one, as a trade manager -- electrical
6 trade manager, working with an outstanding
7 construction company, that we could be of help, one,
8 we have a very big network of union relationships
9 through our National Electrical Contractors
10 Association, being, having a great reputation in New
11 York with Local 3, having all our affiliates, union
12 affiliates throughout the country all of top grade.
13      I also believe that we can come down here
14 and manage the contractors through the help of the
15 local unions' agreements, the local unions' -- the
16 word I'm trying to -- concern, local unions wanting to
17 get up and running on doing the right job.
18      We also felt -- we've had a lot of
19 experience in the data center business, strong
20 engineering, strong project managing, strong
21 purchasing capabilities. And we could work
22 hand-in-hand with whomever is chosen to be the
23 contractor.
24      Did I answer the question?

Page 11

1 Q. I believe so.
2 A. Okay.
3 Q. And you certainly tried, I'm sure.
4 A. Well, is there something more you want to know?
5 Q. There's going to be plenty that I need to know,
6 but --
7 A. I got to get home today.
8 Q. We're going to get you home today, sir. Your
9 answers are very full and complete, I think.
10 Sometimes by the time you get done, I sometimes forget
11 the questions. That's my fault, not yours.
12      All right, you understand, of course, that
13 one of the issues in this litigation is whether or not
14 Creedon Controls, Inc., was under contract with Banc
15 One through Forest as agent for Banc One, or direct
16 between Creedon and Forest itself. You understand
17 that essentially is an issue, do you not?
18 A. Yes.
19 Q. Okay, and in the interest of time, as you
20 suggest, were those issues, any part of those initial
21 discussions which you had with Mr. Weinberg per se as
22 to the difference in the legal role, if you will, that
23 Forest would be playing in these projects?
24 A. No.

Page 12

1 Q. Okay. Did you have any discussions with any
2 other members of the Banc One team regarding the
3 essence of the contracts or what specific legal role
4 that Forest would play vis-a-vis Creedon, Banc One and
5 other electrical contractors?
6 A. No.
7 Q. Who, other than Mr. Weinberg, did you deal with
8 in putting together the data center in the Brandywine
9 project? In that I'm talking about you personally,
10 not just Forest Electric.
11 A. Me personally.
12 Q. Yes.
13 A. My role was to assemble a team of people as
14 feet on the ground representing Forest Electric from
15 engineering, project managing, cost surveillance,
16 project -- I said project managing. Assembling a team
17 of people that would be here on a full-time basis that
18 would help aid this job. And the relationship grew
19 with Tishman after they were selected to be the
20 construction manager.
21      So we viewed ourselves, or I at least
22 viewed us as a partner, I don't know if that's the
23 right word, but running the same train tracks with
24 Tishman as construction manager. We twisted it as a

Page 13

1 trade electrical, we used our name as an electrical
2 trade manager.
3 Q. You had indicated that you had not done
4 projects with Banc One as an electrical trade manager
5 before.
6 A. Correct, yes.
7 Q. Am I correct?
8 A. Right.
9 Q. Okay. But that you had done other prior jobs
10 where you were the electrical trade manager.
11 A. True.
12 Q. Were any of them done on a similar side-by-side
13 track, as you mentioned just now?
14 A. Yes.
15 Q. And how were those relationships set up?
16 A. They were -- that happened to be Bovis, you
17 might have heard, Lehrer McGovern Bovis, New York
18 construction manager, all construction managers, and
19 we had worked this detail with Lehrer McGovern Bovis
20 on three projects, St. Luke's, Roosevelt and two at
21 Long Island Jewish.
22 Q. Is that a fairly common type of arrangement,
23 for lack of a better word, in the business?
24 A. No, no.

**B-0495**

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

Creedon Controls, Inc.          v.          Banc One Building Corporation
Philip Altheim        C.A. # 05-CV-300-JJF        June 28, 2006

Page 14

1   Q. I understood you to testify a moment ago that
2 you didn't have any specific conversations with Banc
3 One representatives about the specific legal nature of
4 Forest's role, correct?
5   **A. Yes, sir.**
6   Q. Did you, however, speak with others within your
7 organization about what specific legal role Forest was
8 going to play with respect to the other electrical
9 subcontractors and Banc One in this data center
10 project?
11   **A. The only things that took place between me and**
12 **my people down here, and Paul Angerame was the real**
13 **head of the organization down here, was that we**
14 **explicitly had made it clear, or I had made it clear**
15 **to Banc One people, whether it be Mike Weinberg,**
16 **whether it be Karl Auwarter, or whether it be**
17 **Fahrenbach, we were not taking this job at risk.**
18   Q. What do you mean by that?
19   **A. In other words, we were acting as agents,**
20 **similar to the way a construction manager acts. Now**
21 **my knowledge of that is only known through the**
22 **relationships of construction managers and how they**
23 **acted, because as you pointed out, we haven't done a**
24 **lot of these electrical trade management contracts.**

Page 15

1       **So any time we did, I think maybe, this**
2 **was 10 to 12 years ago with the L — with LMB, we were**
3 **not at risk and I don't know if the form was an agent**
4 **contract. But we certainly went in line with the way**
5 **the construction managers worked their contracts.**
6       **Let me explain something else to you.**
7   Q. Please.
8   **A. If Mike Weinberg, Fahrenbach, if Banc One asked**
9 **us to put a price together on this job and said, "We**
10 **want you to be the electrical contractor," that takes**
11 **on a whole different animal. We would then be**
12 **subcontract, we would then go out for prices, we would**
13 **then subcontract to them, and we would, if there was**
14 **overruns, if there were financial problems, that**
15 **becomes my whole problem. That's not the way I came**
16 **down here.**
17   Q. Is the essence of the deal that you thought you
18 structured down here that you would take a percentage
19 as a profit and overhead of the electrical
20 subcontractors under you?
21   **A. No. I didn't — I was on a fee basis to the**
22 **bank.**
23   Q. A flat fee?
24   **A. Yes. I think it's someplace contractually.**

Page 16

1   Q. It's not a percentage?
2   **A. It was a percentage.**
3   Q. Okay.
4   **A. Yes, it's a percentage of the total value of**
5 **the subcontracts, plus general conditions at no**
6 **markup.**
7   Q. Okay. Maybe I asked the question a little bit
8 wrong before. But you mentioned just now that you
9 understood that it was a not at-risk arrangement --
10   **A. Oh, yeah.**
11   Q. -- for the projects here in Delaware.
12   **A. Right.**
13   Q. Do I understand we're talking about the
14 Brandywine and the Bear data centers in Delaware?
15   **A. Yes, yes, sir.**
16   Q. And do I understand that you had that specific
17 discussion about a no-risk or a not-at-risk project
18 with Mr. Weinberg?
19   **A. At times, yes.**
20   Q. Okay. What other individuals that are Banc One
21 representatives that you might have had those
22 discussions with?
23   **A. I, I'm not sure if Karl was part of it or**
24 **Fahrenbach was part of it.**

Page 17

1   Q. Is Karl Mr. Fahrenbach?
2   **A. No, Fahrenbach is one person, I forgot his**
3 **first name. And Karl Auwarter, A-u-t-e-r, maybe, used**
4 **to be the representative right here, he was the, he**
5 **was the man on the ground for Banc One.**
6   Q. Auwarter?
7       MR. BRADLEY: A-u-w-a-r-t-e-r.
8   **A. A-u-w-a-t-e-r, Auwarter. He was very much**
9 **involved.**
10   Q. Okay.
11   **A. So, and then it wasn't a matter of -- I mean I**
12 **knew what we were heading toward, and I just laid it**
13 **out to my people and whatever contractual agreement**
14 **was going to take place they were going to execute it.**
15       **And let me tell you something else. We**
16 **started this job without anything. We worked for six**
17 **months on sort of handshakes and letter of intents**
18 **with people. And the only good news was that money**
19 **flowed to pay these people, or else my good-will and**
20 **my good name and my handshake meant nothing. So we**
21 **worked six months in a problem here with no design, no**
22 **drawings, having to put this together in order to**
23 **build a building in a record time of 11 months.**
24       **So we didn't see contractual agreements --**

B-0496

5 (Pages 14 to 17)

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Philip Altheim                     C.A. # 05-CV-300-JJF                        June 28, 2006

Page 18

1    MR. BRADLEY: Let him ask you the
2  questions and then you answer them.
3    THE WITNESS:  Okay, I'm sorry, I got
4  carried away.
5    MR. BESTE:  I thought he was, Mr. Bradley.
6    MR. BRADLEY:  Next question.
7  BY MR. BESTE:
8    Q.  In any event, in addition to Mr. Auwarter and
9  Mr. Fahrenbach and Mr. Weinberg, were there other
10 people that you discussed this no, not-at-risk
11 arrangement at Banc One?
12   **A.  Yes.**
13   Q.  Can you give me any other names that would be?
14   **A.  Paul Angerame.**
15   Q.  I'm thinking at Banc One.
16   **A.  Oh, no, no.**
17   Q.  Not Forest.
18   **A.  No.**
19   Q.  How about at your --
20   **A.  Paul Angerame.**
21   Q.  Anyone else at Forest or its subsidiaries?
22   **A.  Paul Angerame.**
23   Q.  Anyone else at Tishman?
24   **A.  Maybe Joe Ryan.**

Page 19

1    Q.  Joe Ryan?
2    **A.  Um-hum.**
3    Q.  Do you know his position at Tishman?
4    **A.  I think executive vice president.**
5    Q.  Are there any other individuals who are not in
6  those named entities with whom you might have had
7  conversations about this project, these two projects
8  in Delaware being not-at-risk projects?
9    **A.  No.**
10   Q.  Did you have any discussions with the
11 individuals that you named about the specific legal
12 nature of a not-at-risk project and what that meant?
13   **A.  No.**
14   Q.  Did you consult, you or your entity, your
15 company, consult with any attorneys prior to the
16 formulation of any agreements for these projects?
17   **A.  Not I.**
18   Q.  Okay.  Are there other members of your
19 organization who have consulted, who consulted with an
20 attorney?
21   **A.  The only one that probably would have consulted**
22 **was Donna Lucas.**
23   Q.  Were there in-house attorneys that reviewed the
24 contracts and the legal nature of this, these

Page 20

1  projects?
2    **A.  I don't remember.**
3    Q.  Do you have in-house attorneys?
4    **A.  Yes.**
5    Q.  That would generally review that?
6    **A.  Yes.**
7    Q.  And who would that have been in 2003 and 2004?
8    **A.  Donna is not -- Donna's title is not -- can we**
9  **hold on that for a minute?**
10     THE WITNESS:  I have a question to ask
11 you.
12     MR. BRADLEY:  Answer his questions.
13   Q.  If you don't know, just tell me, sir.
14   **A.  I don't know.**
15   Q.  As I understand it, Donna Lucas is not an
16 attorney.
17   **A.  That's what I was getting at.**
18   Q.  Now, let me ask it this way.  Does there become
19 a time when your involvement in these Delaware
20 projects essentially stops, or were you involved
21 throughout it?
22   **A.  I was, I was involved throughout.**
23   Q.  Okay.  Were you in any way in receipt of
24 varying e-mails, documents or contracts that were the

Page 21

1  initial contracts between Creedon Controls, for
2  example, and Banc One?
3    **A.  Not to my knowledge.**
4    Q.  So if I give you a whole series of e-mails or
5  contracts or correspondence relating to them, have you
6  seen them in the course of your normal course of
7  working on this project?
8    **A.  I really don't remember.**
9    Q.  You don't remember ever getting involved in the
10 review of specific contracts between --
11   **A.  I never got, I never got involved in the review**
12 **of contracts.**
13   Q.  Other than specifically review them, would you
14 even have them pass your desk?
15   **A.  If there was a signature needed, I would sign**
16 **it based -- yes.**
17   Q.  And for the Delaware data centers, did you sign
18 contracts?
19   **A.  Yes.**
20   Q.  And did you review them before signing, or did
21 you simply take advice of someone else and sign them,
22 or some other --
23   **A.  I took the advice.**
24   Q.  So would it be worthless for me to give you a

**B-0497**

6 (Pages 18 to 21)

Creedon Controls, Inc.                      v.                Banc One Building Corporation
Philip Altheim                      C.A. # 05-CV-300-JJF                      June 28, 2006

Page 22

1 parade of correspondence and contracts in this matter?
2 **A. Yes.**
3         MR. BRADLEY: I object to form.
4 Q. Did you have any specific conversations with
5 any of the electrical subcontractors on the job as to
6 the Forest role as a not-at-risk entity?
7 **A. No.**
8 Q. Do you know if other members of the Forest
9 group had any conversations with its electrical
10 contractors?
11 **A. No, no.**
12 Q. You mentioned that you had conversations with
13 Mr. Auwarter regarding the not at risk. Can you give
14 me an idea as to the timing of it or the circumstances
15 under which those conversations occurred?
16         MR. BRADLEY: Going to object to form.
17 You can answer if you know.
18 Q. You can answer.
19         THE WITNESS: I didn't hear what you said.
20         MR. BRADLEY: I just objected to the form
21 for the purposes of the record. But if you know, you
22 can answer the question.
23 **A. I think it was just in general discussion**
24 **because we were awaiting contracts, we had not**

Page 23

1 **received contracts for several months. So we didn't**
2 **know which way we were going, and it was always**
3 **brought up that we were never at risk.**
4 Q. When you met with Mr. Auwarter, was
5 Mr. Angerame with you or was it the two of you?
6 **A. Oh, I believe Paul was with me.**
7 Q. Any other persons with you?
8 **A. I don't remember.**
9 Q. What about with Mr. Fahrenbach? And who is he
10 again, first, please?
11 **A. Fahrenbach worked under Mike Weinberg in**
12 **Chicago. I don't recall any kind of really**
13 **conversations with him.**
14 Q. I thought you had told me earlier that you
15 thought you had a conversation with him.
16 **A. Again, it could have been in a room, it could**
17 **have been at Delaware, I just, I can't specifically**
18 **say that this was something with Fahrenbach, he and I.**
19 **He could have been part of a general meeting.**
20 Q. All right. Have you to this point in time seen
21 or reviewed the original subcontract agreement that
22 was forwarded to Creedon Controls in October of 2003
23 for the Brandywine data center project?
24 **A. No.**

Page 24

1 Q. You haven't seen it to this day?
2 **A. No.**
3 Q. Have you to this day seen the proposed form of
4 contract sent from Forest to Creedon with Forest
5 acting as agent for Banc One in May of 2004?
6 **A. No.**
7 Q. So even to this day you have not seen any of
8 those two proposed forms of contract?
9 **A. No, no, sir.**
10 Q. Have you had discussions regarding those two
11 proposed forms of contracts for, with Creedon other
12 than with your counsel?
13 **A. You said with Creedon?**
14 Q. Not with Creedon. Have you had discussions
15 with any persons regarding the Creedon two forms of
16 contract at issue in this matter, other than your
17 counsel?
18 **A. No.**
19 Q. You haven't spoken to Mr. Angerame about it?
20 **A. Angerame? Yes, I have.**
21 Q. And when did you speak to Mr. Angerame about
22 it?
23 **A. I would say several months ago, when this,**
24 **whenever this thing hit the, when it hit the ground.**

Page 25

1 Q. What was the nature of that conversation?
2 **A. How did we deal with Creedon, was there a**
3 **letter of intent like everybody else? Yes, there was.**
4 **After we developed her pricing, did we send them a**
5 **letter of, a contract which was a normal contract sent**
6 **to every other electrical contractor? Yes, it was.**
7 **And then I was told it wasn't signed.**
8 Q. Were you informed that there were other
9 proposed revisions --
10 **A. No.**
11 Q. -- made by Creedon?
12 **A. No.**
13 Q. And have you to this date seen the proposed
14 form of revision suggested by Creedon?
15 **A. No.**
16 Q. What is your understanding of the nature, legal
17 nature of Forest's role in the Brandywine data center
18 project vis-a-vis Creedon Controls?
19 **A. Acting as electrical trade manager or**
20 **construction manager, and managing that process with**
21 **Creedon.**
22 Q. On behalf of yourself or on behalf of some
23 other entity?
24 **A. On behalf of the bank.**

**B-0498**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Creedon Controls, Inc.                              v.                         Banc One Building Corporation
Philip Altheim                              C.A. # 05-CV-300-JJF                              June 28, 2006

Page 26

1    Q.  As agent for the bank?
2    **A.  As agent for the bank.**
3    Q.  It is asserted, at least by Banc One in this
4    litigation, that Banc One has paid Forest all sums due
5    or claimed to be due by Creedon and that Forest is
6    holding those funds pending a resolution. Is that
7    your understanding?
8            MR. BRADLEY:  Object to form.
9            MR. McDONALD:  Objection to --
10           MR. BRADLEY:  Are you referring to the
11   retainage?
12           MR. BESTE:  Yes.
13           MR. BRADLEY:  If you know you can answer.
14   **A.  We have not been paid by Banc One.**
15   Q.  Okay.  Is Forest holding funds due Creedon for
16   the Brandywine data center project for the general
17   power and lighting contract?
18           MR. McDONALD:  Objection.
19           MR. BRADLEY:  Object to form, and if you
20   know, you can answer.
21   **A.  I don't know.**
22   Q.  Does Forest believe it owes Creedon any further
23   sums for the general power and light contract for the
24   Brandywine data center?

Page 27

1    **A.  I don't know.**
2            MR. BRADLEY:  Object to form.
3    Q.  Do you know how much Banc One has paid Forest
4    for the data center project at Brandywine?
5    **A.  Tishman paid us, not Banc One.**
6    Q.  Have you received funds from Tishman for
7    Creedon's work that has not been paid to Creedon for
8    the general power and lighting contract?
9            MR. McDONALD:  Objection.
10           MR. BRADLEY:  Objection.
11   **A.  I don't know.  I don't know.**
12   Q.  Are you aware that Creedon also was involved in
13   two other IT cable conveyance projects also at the
14   data one center?
15   **A.  Yes, I do.**
16   Q.  And do you know whether Forest is holding funds
17   received from Tishman for the Creedon work on those
18   projects?
19   **A.  I don't know.**
20   Q.  Who would be the person that would know the
21   nature and flow of the funds?
22   **A.  We had a project financial person associated**
23   **with the job.  I believe it would be Steve Martinez.**
24   Q.  And is he still with your company?

Page 28

1    **A.  He was yesterday.**
2    Q.  Today is a new day, right?
3    **A.  Take one day at a time.**
4    Q.  You're the boss.  Have you done anything to
5    change that status?
6    **A.  No, I haven't.**
7    Q.  And where is Mr. Martinez?
8    **A.  Two Penn Plaza.**
9    Q.  All right, what's his position?
10   **A.  He's an account project executive.  I think**
11   **that's what we call him.  He's, he's assigned certain**
12   **projects and is responsible for the billing,**
13   **requisitions, and for the approval of moneys -- well,**
14   **not for the approvals, but getting the checks out to**
15   **the appropriate contractors.**
16   Q.  Does Tishman owe Forest any money for the
17   Brandywine data center project?
18           MR. BRADLEY:  Objection.
19   **A.  Yes.**
20   Q.  What do you claim they owe Forest for?
21   **A.  For fees.**
22   Q.  Relating to what?
23   **A.  To Forest Electric's management fees.**
24   Q.  I'm sorry?

Page 29

1    **A.  Forest Electric's management fees.**
2    Q.  Is there a claims process currently --
3    **A.  No.**
4    Q.  -- between Forest and Tishman --
5    **A.  No.**
6    Q.  -- Banc One?
7    **A.  No.**
8    Q.  How much does Forest claim Tishman owes it for
9    the Brandywine data center project?
10   **A.  It wasn't a claim.  It's a bill.**
11   Q.  Okay.  Is there a currently outstanding bill of
12   Forest to Tishman for the Brandywine project?
13   **A.  I don't know if it's specific to Brandywine.**
14   Q.  Why is Tishman telling you they're not paying?
15           MR. BRADLEY:  Objection.  What relevance
16   does that have to the claims being made by Creedon
17   here?
18           MR. BESTE:  Trying to find out where
19   Creedon's money is.
20           MR. BRADLEY:  I don't think there's any
21   dispute that the retainage money you're talking about,
22   been asking about is held by Forest subject to getting
23   a proper lien waiver and dealing with the back charge
24   that you got a letter from --

**B-0499**

8 (Pages 26 to 29)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Philip Altheim                          C.A. # 05-CV-300-JJF                          June 28, 2006

Page 38

1    tried to come to resolutions with Creedon and, you
2    know, I had heard that this is an issue. She's an
3    issue.
4    Q.  You mean after they sued you?
5    A.  I guess so.
6    Q.  Is after the suits were filed the first time
7    that you personally saw the proposed changes that --
8    A.  No, I didn't.
9    Q.  Okay, was it before suit was filed that you saw
10   the proposed changes with Creedon?
11   A.  No.
12        MR. BRADLEY:  Let him finish the whole
13   question, then answer, okay?
14        THE WITNESS:  Okay.
15   Q.  Okay.  If it wasn't before or after suit was
16   filed, is the answer that you've never seen them?
17   A.  I've never seen it.
18   Q.  But you're aware that there were some
19   proposed changes that were suggested?
20   A.  Yes, sir.
21   Q.  And did you become aware of those proposed
22   changes after suit was filed?
23   A.  Yes.
24   Q.  Not before?

Page 39

1    A.  No.
2    Q.  And how did you become aware of that?
3    A.  The discussion took place at our office that
4    after having done the successful project, one person
5    has caused a lawsuit.  And I inquired what's this all
6    about?  And Angerame and Rosenberg and people, Donna
7    told me this is, this is what's happening.
8    Q.  And was there a discussion then as to the
9    nature of Forest's role as agent for Banc One or as a
10   not-at-risk party?  Was that discussed at that
11   particular time?
12   A.  No.
13   Q.  When did you first learn that Banc One denied
14   that Forest was acting as agent for Banc One with
15   respect to the data center project?
16   A.  I'm not understanding that question.
17   Q.  All right.  I'll try it again.  What I want to
18   know is when you personally first learned that Banc
19   One was denying that your company acted as its agent,
20   vis-a-vis Creedon Controls, Inc., for the Brandywine
21   data center project?
22   A.  I would say just recently.
23   Q.  How recently?
24   A.  The last few months.

Page 40

1    Q.  And how did you so learn?  How did you learn
2    that?
3    A.  Talked to counsel.
4    Q.  Did you talk to anyone else other than your
5    counsel?
6    A.  No.
7    Q.  Have you talked to anyone at Tishman about
8    that?
9    A.  No.
10   Q.  Have you talked to anyone at Banc One about
11   their denial that you were acting as agent?
12   A.  There was nobody to talk to at Banc One.
13   Q.  Their successor?
14   A.  No.
15   Q.  Are you aware that there is a back charge of
16   approximately $15,000 made against Creedon with
17   respect to the Brandywine data center project?
18   A.  No, sir.
19   Q.  So you don't know, you don't know or are not
20   aware of any of the specifics about that?
21   A.  No, sir.
22   Q.  My telling you today, is that the first that
23   you've ever heard that there's a back charge asserted?
24   A.  Yes, sir.

Page 41

1        MR. BESTE:  I think those are my
2    questions.  Thank you, sir.
3        THE WITNESS:  Good.
4        MR. BRADLEY:  He's next.  Let's take a
5    five-minute break.  Do you have any questions, Paul?
6        MR. McDONALD:  Um-hum.
7        (A brief recess was taken.)
8        (Altheim Exhibits No. 1 through 7 were
9    marked for identification.)
10   BY MR. McDONALD:
11   Q.  Good morning, Mr. Altheim.  As we met earlier
12   this morning, my name is Paul McDonald for Banc One
13   Building Corporation, with the law firm of Paul
14   Hastings Janofsky & Walker.  I have some questions for
15   you regarding some of the testimony this morning.
16        The first thing I want to do is talk about
17   your understanding that Forest Electric was an agent
18   of the bank.  Is it correct to say that you base that
19   understanding on your communications with
20   Mr. Weinberg, Mr. Auwarter and Mr. Fahrenbach about
21   the no-risk --
22   A.  Yes.
23   Q.  Okay.  And is that the only thing you base your
24   belief that Forest Electric is, was an agent of the

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

Creedon Controls, Inc.                    v.               Banc One Building Corporation
Philip Altheim                      C.A. # 05-CV-300-JJF                June 28, 2006

Page 42

1  Banc One Building Corporation on?
2          MR. BRADLEY: Object to form.
3    A.  Yes.
4    Q.  And regarding these communications you had
5  with -- now, first of all, did you have that
6  communication with all three or just one of those
7  individuals, if you recall, about the no-risk aspect
8  of the contract?
9    A.  I know I had the conversation with Mike, and I
10  believe that certainly Karl and, and I forget his --
11  Gary Fahrenbach, were part of discussions. It wasn't
12  the most important thing in the world, all right?
13  We're there to build a building.
14    Q.  Now, and by the way, when I say no risk, it was
15  your position that you were to be at no risk; is that
16  correct?
17    A.  As an electrical trade manager, we would be at
18  no risk.
19    Q.  Okay. Now, is it fair to say that means that
20  Forest Electric would not be bound to the
21  subcontractors?
22    A.  Yes, sir.
23    Q.  And who would be bound to subcontractors if
24  Forest Electric was not at risk?

Page 43

1    A.  Banc One.
2    Q.  And when you say that it was not the most
3  important thing, why not? You I guess just said now
4  in your conversations with Mr. Weinberg, Mr. Auwarter
5  and Mr. Fahrenbach.
6    A.  Because we didn't spend days and days like
7  we're sitting here talking about it. It was just
8  something that we knew would be part of contractual
9  agreements and part of what we're supposed to be
10  doing.
11    Q.  At any time did you memorialize your
12  understanding with Mr. Weinberg, Mr. Auwarter,
13  Mr. Fahrenbach regarding Forest Electric being at no
14  risk?
15    A.  No.
16    Q.  Is this the type of thing you would have
17  memorialized in the normal course of business?
18    A.  Depending on the client.
19    Q.  Is there any particular reason why you didn't
20  do it in this particular instance?
21    A.  Because of the client.
22    Q.  When you say "the client," are you referring to
23  Mr. Weinberg?
24    A.  Banc One.

Page 44

1    Q.  Was there anything that you felt about Banc One
2  that did not require such a term or condition to be
3  memorialized in writing?
4    A.  Long-standing relationships.
5    Q.  And those long-standing relationships are with
6  Mr. Weinberg, correct?
7    A.  Yes, sir.
8    Q.  But not with Banc One Building Corporation
9  itself?
10    A.  No.
11    Q.  And you also I think indicated that it was your
12  belief or understanding that Forest Electric was to
13  act as a construction manager, almost a partner with
14  Tishman on this project.
15    A.  Yes.
16    Q.  I'm going to show you what is going to be
17  marked as Altheim 1. Give this to counsel. Altheim 1
18  is single project construction services agreement
19  contract No. 2, which if you go to page 03934, has
20  your signature on it. And it says --
21    A.  Hold on, I got to find my glasses.
22    Q.  I'm sorry.
23    A.  66 years old, you don't exactly have good eyes.
24  Page 3, page 3, sir?

Page 45

1    Q.  And the format used here is you'll see there's
2  Bates numbers at the bottom.
3    A.  I see.
4    Q.  So what I'll do is refer to the last numbers of
5  the Bates, 3934 is I believe where your signature is
6  indicated on this particular contract. And if you go
7  back to the first page, which is 3932, and you look at
8  the first full paragraph after the various signature
9  areas are indicated in the front, it says, "This
10  single project construction services agreement is made
11  as of the 12th day of September 2003 between
12  construction manager and electrical trade manager."
13  Do you see that?
14    A.  Single project -- yes.
15    Q.  Okay. And this identifies the construction
16  manager, just above that, the construction manager is
17  identified as Tishman Construction Corporation of
18  Maryland. Is that fair?
19    A.  Um-hum, yes.
20    Q.  And electrical trade manager is identified as
21  Forest Electric Corporation?
22    A.  Yes.
23    Q.  Is there anywhere in this contract that you're
24  aware of that Forest Electric Corporation is

**B-0501**

12 (Pages 42 to 45)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Philip Altheim                          C.A. # 05-CV-300-JJF                        June 28, 2006

Page 46

1    identified as a construction manager?
2            MR. BRADLEY: By that term, "construction
3    manager"?
4            MR. McDONALD: Yes.
5    A. No.
6    Q. And if we go to, again, going to the page we
7    were at before, 3934, on the signature block where you
8    have signed for Forest Electric Corporation, next to
9    that -- and it's under electrical trade manager; is
10   that correct?
11   A. Yes, sir.
12   Q. Next to that it has, it says agent Tishman
13   Construction Corporation of Maryland as Banc One
14   Building Corporation's agent and construction manager,
15   signed by William Stanton. Do you see that?
16   A. Yes.
17   Q. Is there anywhere in this contract that you are
18   aware of that Forest Electric is identified, as
19   Tishman is in this contract, as an agent of Banc One
20   Building Corporation?
21   A. I'm not aware.
22   Q. And if we go to page 3959, it's a little ways
23   into the contract, want to direct your attention to
24   Section 4.04. Let me know when you're there.

Page 47

1    A. I'm here.
2    Q. The first line of that section says, "By
3    appropriate agreement, electrical trade manager shall
4    require each subcontractor, to the extent of the work
5    to be performed by such subcontractor," then it says,
6    "(i) to be bound to electrical trade manager by the
7    terms of the contract documents." Do you see that?
8    A. Yes.
9    Q. And in this particular contract, Forest
10   Electric is identified as the electrical trade
11   manager; is that correct?
12   A. Yes.
13   Q. And if you go further down in that same
14   paragraph, it says, starting at, "Nothing contained in
15   the contract documents shall create any contractual
16   obligation between any subcontractor and owner." Do
17   you see that?
18   A. Yes, I do.
19   Q. And if you go back to page 1, which is 3932,
20   the owner is identified as Banc One Building
21   Corporation. Correct?
22   A. Yes.
23   Q. Now, given what we have just talked about in
24   regards to this single project contract that you

Page 48

1    signed on page 3934, is it fair to say that you signed
2    a document that contradicted whatever understanding
3    you say you had with Mr. Weinberg regarding no risk?
4            MR. BRADLEY: Object to form.
5    A. I signed this contract given to me by other
6    persons.
7    Q. But is it fair to say, based upon what we've
8    just discussed, that those provisions that we have
9    just discussed contradict the representation that you
10   made regarding your conversations with Mr. Weinberg?
11   A. If per the letter of the law, then I don't have
12   a -- I don't have enough knowledge to know if that
13   contradicts.
14   Q. Well, let me ask you this. I think you just
15   testified that your understanding of no risk for
16   Forest Electric would mean that Forest Electric would
17   not be bound to the subs.
18   A. Correct.
19   Q. And in Section 4.04 on page 3959, does it not
20   say that subcontractors are to be bound to electrical
21   trade manager, which is Forest Electric in this
22   particular contract?
23   A. It does say that, yes.
24   Q. And also I think you testified that a no-risk

Page 49

1    contract for Forest Electric, that Banc One Building
2    Corporation would be bound to the subs instead, yes?
3    A. Yes.
4    Q. It also says in 4.04 that nothing contained in
5    the contract documents shall create any contractual
6    obligation between any subcontractor and owner. Is
7    that fair to say?
8    A. Yes.
9    Q. Now, want to move on to what will be marked as
10   Altheim 2. And this is a document dated October 2nd,
11   2003 to Creedon Controls from Paul Angerame of Forest
12   Electric Corporation. First paragraph says, "This
13   letter is to acknowledge our mutual desire to enter
14   into a subcontract agreement with Creedon Controls
15   electrical contractors." Do you see that?
16   A. Yes.
17   Q. And if we go to the attachment to this
18   document, which is referred to on page 1 as Exhibit 1,
19   and it's on page CL 0624 styled the "Subcontract
20   Agreement," let me know when you're there.
21   A. I am.
22   Q. And you see that, does that appear to be a form
23   subcontract agreement utilized by Forest Electric
24   Corporation, to your knowledge?

**B-0502**

13 (Pages 46 to 49)

Creedon Controls, Inc.
Donna Lucas

v.
C.A. # 05-CV-300-JJF

Banc One Building Corporation
June 23, 2006

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
CREEDON CONTROLS, INC., a      )
Delaware corporation,         )
                              )
             Plaintiff,       )
                              ) Civil Action
      v.                      ) No. 05-CV-300-JJF
                              )
BANC ONE BUILDING             )
CORPORATION, an Illinois      )
corporation, and FOREST       )
ELECTRIC CORPORATION, a New   )
York corporation,             )
                              )
             Defendants.      )
```

        Videotape deposition of DONNA LUCAS, taken
pursuant to notice at the law offices of Ashby &
Geddes, P.A., 222 Delaware Avenue, 17th Floor,
Wilmington, Delaware, beginning at 9:10 a.m., on
Friday, June 23, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

        ROBERT K. BESTE, JR., ESQUIRE
        COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
          1007 Orange Street, Suite 1130
          Wilmington, Delaware  19801
          On behalf of Plaintiff

        MELISSA G. WARREN, ESQUIRE
        PAUL, HASTINGS, JANOFSKY & WALKER LLP
          875 15th Street, NW
          Washington, D.C.  20005
          On behalf of Defendant Banc One Building
          Corporation

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Creedon Controls, Inc.                              v.                      Banc One Building Corporation
Donna Lucas                              C.A. # 05-CV-300-JJF                              June 23, 2006

Page 2

1   APPEARANCES CONT'D:
2       PAUL A. BRADLEY, ESQUIRE
        MARON & MARVEL, P.A.
3       1201 North Market Street, Suite 900
        Wilmington, Delaware 19899
4       On behalf of Defendant Forest Electric
        Corporation
5
    ALSO PRESENT: MARK BUCKMASTER, VIDEOGRAPHER
6
            - - - - -
7
8           THE VIDEOGRAPHER: This is the videotape
9   deposition of Donna Lucas taken by the defendant in
10  the matter of Creedon Controls, Inc., vs. Banc One
11  Building Corporation and Forest Electric Corporation,
12  Civil Action No. 05-C5-300-JJF, held in the offices of
13  Ashby & Geddes, Wilmington, Delaware, on June 23rd,
14  2006 at approximately 9:10 a.m.
15          The court reporter is Julie Parrack from
16  the firm of Wilcox & Fetzer. My name is Mark
17  Buckmaster, a video specialist from Discovery Video
18  Services, Inc., in association with Wilcox & Fetzer.
19          Counsel will now introduce themselves and
20  the reporter will swear in the witness.
21          MS. WARREN: Melissa Warren, Paul Hastings
22  Janofsky & Walker for Banc One Building Corporation.
23          MR. BESTE: Robert Beste, Cohen Seglias
24  Pallas Greenhall & Furman for Plaintiff Creedon

Page 3

1   Controls.
2           MR. BRADLEY: Paul Bradley, Maron & Marvel
3   for Forest Electric.
4           DONNA LUCAS,
5       the deponent herein, having first been duly
6       sworn on oath, was examined and testified as
7       follows:
8   BY MS. WARREN:
9   Q.  Good morning, Miss Lucas. My name is Melissa
10  Warren. I represent Banc One Building Corporation and
11  I'm going to be asking you some questions this
12  morning.
13          Have you had your deposition taken before?
14  A.  Very, very long ago.
15  Q.  Okay, under what circumstances?
16  A.  Personal injury insurance litigation.
17  Q.  Okay, and were you a plaintiff or a defendant
18  or in some other capacity?
19  A.  Representing the company, Forest Electric.
20  Q.  Okay. Do you remember approximately how long
21  ago that would have been?
22  A.  No, I don't.
23  Q.  So since you've been through this before,
24  although it was a while ago, you understand that

Page 4

1   everything that you say today is going to be recorded
2   by the court reporter and the videographer, and so
3   we're going to need verbal responses, yes, no, or some
4   other verbal response rather than any nodding of the
5   head or um-hums or uh-uhs, because the court reporter
6   won't be able to take those down.
7   A.  I understand.
8   Q.  Thank you. Now I understand that you are a
9   legal assistant; is that correct?
10  A.  My title is Senior Legal Assistant.
11  Q.  Okay. In that capacity, have you participated
12  in any depositions before?
13  A.  No.
14  Q.  Okay, well then let me give you a little bit
15  more instruction here at the beginning.
16          Let me just say that we want you to tell
17  us the truth today, not any speculation, no guesses,
18  just what you actually remember about the issues and
19  the questions that I'm going to ask you. Do you think
20  you're able to do that today?
21  A.  To the best of my ability, yes.
22  Q.  And this is kind of an odd question, but do you
23  think that there are any reasons that you would be
24  unable to answer the questions truthfully and

Page 5

1   completely today?
2   A.  No.
3   Q.  Thank you. What did you do to prepare for your
4   deposition today?
5   A.  Spoke to counsel.
6   Q.  Is that Mr. Bradley?
7   A.  That is Mr. Bradley, yes. Yes.
8   Q.  When did you speak with him?
9   A.  About two, three days ago.
10  Q.  Okay, for how long?
11  A.  I would say it was about maybe a half-hour
12  conversation.
13  Q.  Was that the only conversation you had had with
14  Mr. Bradley?
15  A.  As legal assistant with Forest Electric, part
16  of my duties are to monitor litigation. So I might
17  have had conversations prior to my appearing for the
18  deposition with Paul Bradley.
19  Q.  Did you review any documents in preparation for
20  this deposition?
21  A.  I received some documents from Mr. Bradley, and
22  I did review them.
23  Q.  Do you recall what documents those were?
24  A.  There were several documents, e-mails, a couple

Wilcox & Fetzer, Ltd.           Professional Court Reporters           (302)655-0477

Creedon Controls, Inc.                                    Banc One Building Corporation
Donna Lucas                   C.A. # 05-CV-300-JJF              June 23, 2006

Page 6

1  pages of a contract, contract, letter of intent.
2    Q.  Anything else that you can remember?
3    A.  Not at this time.
4    Q.  Did you bring any documents with you today?
5    A.  I only brought the documents that Mr. Bradley
6  had provided me for my review on the train in
7  preparation for this deposition.
8    Q.  Okay.  And are they here in this office --
9    A.  Yes.
10   Q.  -- with you?
11      MS. WARREN:  Okay, Mr. Bradley, if you
12  wouldn't mind, I'd like to take a look at those at a
13  break.
14      MR. BRADLEY:  Sure.
15      MS. WARREN:  Thanks.
16  BY MS. WARREN:
17   Q.  Okay, let's talk a little bit about your
18  educational background.  Could you tell me where you
19  went to college?
20   A.  Actually --
21   Q.  If you went.
22   A.  -- I did not attend college.  I started to
23  attend college and due to a personal situation never
24  returned.  I had graduated high school with honors.  I

Page 7

1  have been employed with Forest for approximately 19
2  years.  That's the extent of my education.
3    Q.  Have you had any education specifically in
4  paralegal, legal assistant or other legal training?
5    A.  I did take two courses, two separate courses
6  where I was awarded certificates, one honor degree and
7  one for litigation corporation that were taken some
8  time probably mid '80s.
9    Q.  Was your position with Forest, was that one of
10  your first jobs that you held?
11   A.  Yes, I would actually say it was one of the
12  first.  Prior to that I worked at Wells Fargo Alarm
13  Services for four years, and obtained the position at
14  Forest Electric, and I have been there since.
15   Q.  Okay.  And so 19 years would mean about 1985?
16   A.  I came to Forest --
17   Q.  I'm sorry, 1987.
18   A.  -- 1987.
19   Q.  I can do math.  I became a lawyer because I
20  really can't do math so well.
21      1987 you came to Forest, and what was your
22  position at that time?
23   A.  I came in as Assistant to the Director of
24  Contracts.  That was my title.  In essence, a

Page 8

1  paralegal.
2    Q.  Was the director of contracts an attorney?
3    A.  Yes, he was.
4    Q.  And can you tell me a little bit about your
5  advancement while at Forest?
6    A.  Excuse me.  Advancement at Forest, particularly
7  there is not necessarily an advancement where you can
8  obtain, like in a law firm, a partnership run.
9  Basically I had a position, I maintained a position.
10  I ended up in a sense growing within the position but
11  not able to move up to a vice president, nor did I
12  seek to obtain a vice president in a construction
13  firm.
14   Q.  Okay.  I guess what I'm asking is how you moved
15  from your original title, which was assistant to the
16  director of contracts, to eventually senior legal
17  assistant?
18   A.  Actually --
19   Q.  Were there any other job titles or different
20  types of positions in between?
21   A.  Actually, it was due to downsizing.  The direct
22  report, the director of contracts, he ended up going
23  up to our corporate offices, thus moving on
24  afterwards.

Page 9

1    Q.  Do you recall approximately when that happened?
2    A.  That was probably '91, 1991.
3    Q.  And I'm sorry, was 1991 when the director of
4  contracts went to corporate?
5    A.  Correct.
6    Q.  Or when --
7    A.  Correct.
8    Q.  Okay, and then he, after -- afterwards left the
9  company?
10   A.  And he thus -- yes.  And my title was changed
11  to Senior Legal Assistant.
12   Q.  Okay.  Was -- would you say that the director
13  of contracts left the company also in '91 or was it
14  shortly thereafter?
15   A.  Probably shortly thereafter.
16   Q.  Okay.  To whom do you report now?
17   A.  My report is to the chief financial officer of
18  Forest Electric Corp.
19   Q.  And has that changed since 1991?
20   A.  No.
21   Q.  Is the CFO an attorney?
22   A.  No, he is not.
23   Q.  Does Forest have a legal department?
24   A.  Per se, no.

**B-0505**

3 (Pages 6 to 9)

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Donna Lucas                       C.A. # 05-CV-300-JJF                      June 23, 2006

Page 18

1  files?
2  **A.  I would have to check.**
3  Q.  Have you reviewed your files and produced
4  documents to Mr. Bradley for this --
5  **A.  I have --**
6  Q.  -- lawsuit?
7  **A.  -- during the litigation process.**
8  Q.  Okay, I'm going to ask you to take a look at
9  your file and see if that document still exists in
10 your files.  And if it does, to please turn it over to
11 Mr. Bradley.
12 **A.  Okay.**
13         MR. WARREN:  Because I don't believe, and
14 you can correct me if I'm wrong, Mr. Bradley, I don't
15 believe that we've seen that document.
16         MR. BRADLEY:  I couldn't possibly tell you
17 if you have or haven't.  But we will look.
18         MS. WARREN:  Thank you.
19         MR. BRADLEY:  And if it's there, we'll
20 produce it.
21         MS. WARREN:  Thank you.
22         THE WITNESS:  However, as I indicated to
23 you, that would be just our initial review of the
24 agreement.

Page 19

1  Q.  Do you have any recollection as you sit here
2  today about what any of your comments to the agreement
3  might have been?
4  **A.  I don't recall.**
5  Q.  Do you recall any verbal comments that you made
6  to Mr. Angerame regarding that contract?
7  **A.  I'm sorry, I don't recall.**
8  Q.  Do you remember what happened next in the
9  evolution of this document?  Do you recall the next
10 time that you might have seen it?
11 **A.  Evolution of the document.**
12 Q.  Well, the reason that I use that terminology is
13 because the signature line doesn't have a date, so I
14 can't tell when it was actually executed.
15 **A.  Is that your question?**
16 Q.  Well, I'm giving you just a little background.
17 I guess I do want to know, do you know when the
18 document was executed?
19 **A.  That was executed, I believe, very late**
20 **January, early February because obviously it would**
21 **then be basically off my desk, in essence, of 2004.  I**
22 **believe it was very early February maybe that it went**
23 **back to Tishman Construction signed by Philip Altheim.**
24 Q.  Had there been a revision to the document prior

Page 20

1  to signing?
2  **A.  In October of 2003, I'm not quite sure of the**
3  **date, Paul Angerame and myself went to Tishman's**
4  **offices with a proposed contract.  In attendance there**
5  **was Tom Keene and Paul Welsing, and we discussed what**
6  **Forest requested as modifications on the contract.**
7  Q.  Do you recall what any of those modifications
8  were?
9  **A.  It could have been regarding liquidated**
10 **damages, I believe was an issue.  I don't know any**
11 **other specific, at this time, revisions on the**
12 **contract.**
13 Q.  Did you take a proposed revised contract with
14 you to Tishman?
15 **A.  I believe, yes, yes, we did.**
16 Q.  And did you keep a copy of that in your files?
17 **A.  I believe at that time we might have obtained**
18 **the Tishman trade management agreement electronically,**
19 **and I believe I was able to mark it up, red line an**
20 **obviously nicer copy.  After the meeting with Tishman,**
21 **if I recall correctly, I probably presented it back to**
22 **Tishman with what we had agreed on that day of yes,**
23 **no, no, no, yes, no, whatever the modifications were.**
24 **And I believe I presented it back to Tishman for their**

Page 21

1  **final review.**
2  Q.  Okay.  Would you have e-mailed that document
3  back to them or did you have another meeting with
4  them?
5  **A.  At that time I might have e-mailed it back to**
6  **them.  Probably to Tom Keene of Tishman.**
7  Q.  Do you recall any specifics regarding the
8  outcome of that initial meeting with Tishman?  Did
9  they -- do you recall any provisions they may have
10 accepted that you were trying to revise, anything that
11 you didn't get that you wanted, anything like that?
12 **A.  I really couldn't specifically tell you.  I**
13 **don't recall at this time.**
14 Q.  In your review of this trade manager agreement,
15 did you understand whether or not Forest was meant to
16 be Banc One's agent?
17 **A.  At the time this was being reviewed?**
18 Q.  Yes, any time between your receipt of the
19 initial version and the signing of the document, the
20 execution of it, of the contract.
21 **A.  Between the obtaining and signing of this, it**
22 **was my conversations with Philip Altheim that Forest**
23 **would be acting as electrical trade manager,**
24 **construction manager as agent for Banc One.**

Creedon Controls, Inc.                                          Banc One Building Corporation
Donna Lucas                          C.A. # 05-CV-300-JJF                    June 23, 2006

Page 22

1    Q.  Do you recall the specifics of any of those
2    conversations with Mr. Altheim?
3    A.  I was told that this was a large project.  We
4    would be working in conjunction with Tishman but
5    monitoring and managing the electrical contractors
6    that were on site, and that this would be a no-risk
7    agreement project contract.
8    Q.  During the time period we're talking about,
9    which I guess is mid-September through early February,
10   mid-September 2003 through early February 2004, did
11   you have any conversations with anyone at Banc One
12   regarding whether Forest would be an agent for Banc
13   One?
14   A.  Never spoke with any representative from Banc
15   One.
16   Q.  Okay.  Did you have any conversations with a
17   representative from Tishman about the agency issue?
18   A.  It probably most likely was discussed with Tom
19   Keene when we were going over the contract.  Receiving
20   this contract we didn't know what our agreement was
21   going to look like.  We were at the same time of
22   discussing this also discussing how were we going to
23   handle the contractors that are already on the job
24   site to get an agreement.

Page 23

1    Q.  Okay, when you say probably likely discussed,
2    do you have any actual recollection of discussing with
3    Tom Keene or anyone at Tishman your understanding that
4    Forest was to be Banc One's agent?
5    A.  Not an actual conversation about Forest being
6    the bank's agent, but that in getting subcontract
7    agreements, if they are representing the bank, that
8    does the bank want us to use their form of subcontract
9    for the contractors that we're going to be managing.
10   Q.  Okay.  I think I might have gotten a little
11   confused in your answer.  You said, "But then in
12   getting subcontract agreements, if they are
13   representing a bank," who is the "they"?
14   A.  Tishman.
15   Q.  Tishman, okay.  In your review of the trade
16   manager agreement, did you see anything in that
17   document that indicated that Forest was going to be
18   Banc One's agent?
19        MR. BRADLEY:  Object to form.
20   A.  This agreement -- excuse me -- when I was
21   looking at it, I was looking at it purely the trade
22   management agreement, not focusing on that Forest was
23   going to be agent for Banc One.  My focus was on this.
24   Q.  Okay.  Well, I want you to focus on this as

Page 24

1    well today and tell me whether or not when you
2    reviewed this document, which is the contract document
3    between Forest and the bank through Tishman as the
4    bank's agent, whether there was anything in this
5    document that indicated to you that Forest was going
6    to be the bank's agent?
7        MR. BRADLEY:  Objection.
8    Q.  You can answer.
9    A.  I don't recall honestly seeing a provision in
10   this agreement that would state that Forest would be
11   Banc One's agent, in the trade management agreement.
12   Q.  Would you turn with me to the page that's Bates
13   labeled Banc One 03959?
14        MR. BESTE:  Would you say it again?
15        MS. WARREN:  3959.
16        MR. BESTE:  Thank you.
17   A.  Would that be marked G-10 on the bottom?
18   Q.  Yes.
19   A.  Okay.
20   Q.  And please read to yourself the Section 4.04.
21   A.  Okay.
22   Q.  Okay.  The first sentence says, "By appropriate
23   agreement, Electrical Trade Manager shall require each
24   subcontractor, to the extent of the Work to be

Page 25

1    performed by such subcontractor, (i) to be bound to
2    Electrical Trade Manager by the terms of the contract
3    documents."  Did you review that provision during your
4    review of the contract in the September '03 to
5    February '04 time period?
6    A.  I would have to say yes.
7    Q.  What did you understand that provision to be
8    saying?
9    A.  Excuse me.  That we, meaning Forest as
10   electrical trade manager -- I apologize.  That the
11   subcontractor would be bound to the electrical trade
12   manager, Forest, by the terms of the contract
13   documents, whatever the contract documents consisted
14   of.
15   Q.  Okay.  Let's look at the sixth line down, the
16   sentence beginning "Electrical trade manager."  I
17   apologize, one more line, seventh line, sentence
18   beginning "Nothing contained."  Do you see where I am?
19   A.  Yes, I do.
20   Q.  That sentence reads, "Nothing contained in the
21   Contract Documents shall create any contractual
22   obligation between any subcontractor and owner."  What
23   do you understand that sentence to mean?
24   A.  As I stand here today, correct?

**B-0507**

7 (Pages 22 to 25)

Creedon Controls, Inc.                v.                 Banc One Building Corporation
Donna Lucas                    C.A. # 05-CV-300-JJF                    June 23, 2006

Page 26

1  Q.  Well, I guess we can start with, do you recall
2  having any understanding of that sentence during the
3  time frame September '03 to February '04?
4  A.  It was a provision in the agreement. Quite
5  frankly, it might be a provision that may be in many
6  agreements. I don't understand exactly your question.
7  Q.  Well, I guess since you said as you sit here
8  today, I do want to know what you understand that
9  provision to mean as you sit here today. But I just
10  want to check and see if you have any recollection of
11  what your understanding may have been at the earlier
12  time period, if that understanding is different today
13  than it was then.
14  A.  Well, as I said previously, we were looking for
15  a contract, and my focus was reviewing this contract
16  and trying to get this resolved, signed and returned
17  so that we can then move on to the electrical trades
18  that were down there that were being managed and
19  putting a focus on contract documents there.
20  Q.  Okay. If you were concerned about trying to
21  determine what kinds of contract documents to use with
22  your subcontractors, wouldn't this provision regarding
23  contractual obligations between subcontractors and the
24  owner have been important to that consideration?

Page 27

1  A.  It may have been important, sure.
2  Q.  And why would that have been important?
3  A.  It may have been important depending on how
4  Forest was going to subcontract. Reviewing this
5  agreement during the time frame, my understanding is
6  Tishman is the agent for the bank, conversations with
7  our own internal people, we weren't sure how we were
8  going to subcontract -- I use the word "subcontract"
9  loosely, meaning to get an agreement with the
10  contractors that we were managing on the project.
11  Then conversations develop further,
12  understanding of the project develops further for me.
13  I hear from the chairman that Forest will be agent,
14  just like Tishman, that were conversations. I do not
15  necessarily go back and re-review, hindsight 20/20.
16  This is what's nice about reading contracts and
17  getting other people's point of view. You have
18  basically given me a different insight now on
19  something. I did not go back and say well, if Forest
20  is going to be agent for the bank, I got to see if
21  there's any sort of provisions in this agreement. I'm
22  reviewing this, I understand it, we were working on
23  our contract with Tishman, then the focus was then to
24  get paper for what I call the subcontractors, the

Page 28

1  trades down there.
2  Q.  Okay. So when you say that based on these
3  conversations that you've described with the chairman,
4  Mr. Altheim, had you gone back and looked at this
5  contract specifically regarding the issue of how the
6  subcontract was meant to be entered into by Forest? I
7  think this is going to be a very long question, and I
8  think I'm going to start over, I apologize.
9  What is your understanding of that
10  sentence, "Nothing contained in the contract documents
11  shall create any contractual obligation between any
12  subcontractor and owner," as we sit here today?
13  A.  As we sit here today, I would have questions
14  over it myself. This is obviously an agreement
15  between the owner, and the owner being defined -- I'm
16  trying to recall.
17  Q.  I'll represent to you the owner is Banc One
18  Building Corporation.
19  A.  Right, correct. That there are certain
20  obligations: contractor, subcontractor, subcontractor
21  to sub-subcontractor. However, there were
22  conversations that were still developing when I was
23  told and had clearer understanding that we would be
24  agent for the bank. Thus, would we have entered into

Page 29

1  an agreement that would obligate the bank as agent for
2  owner? You know, again, I would have to go back. I
3  don't think that would have a problem here, but
4  obviously if we were to subcontract out as a
5  contractor-subcontractor, that would concern me, then
6  the owner would not have that obligation.
7  Q.  Okay, I think I'm a little confused.
8  A.  So my understanding was that we were agent for
9  owner, so this would not necessarily, to me, have any
10  great significance.
11  Q.  Well, would you agree with me that if this
12  sentence indicates that there shouldn't be any
13  contractual obligation between a subcontractor and the
14  owner, then if Forest enters into agreements that
15  create an obligation, that that may be in breach
16  of this provision?
17  MR. BRADLEY: Object to form and calls for
18  a legal conclusion.
19  Q.  But you can answer.
20  A.  I'm not an attorney. I don't know the answer.
21  Q.  Can you describe for me what authority you
22  understood Forest to have related to the CDC II
23  project?
24  MR. BRADLEY: Object to form.

B-0508

8 (Pages 26 to 29)

Creedon Controls, Inc.                     v.            Banc One Building Corporation
Donna Lucas                        C.A. # 05-CV-300-JJF                    June 23, 2006

Page 30

1   Q.  You can answer.
2   A.  Authority to, to whom?  As trade manager?
3   Q.  Yes.
4   A.  My understanding is that we were going to and
5   did manage the electrical trades for the Banc One
6   project on CDC I and CDC II.  Being as a trade
7   manager, it was my understanding that we were also
8   agent for owner, which is customary when you do
9   construction management, electrical trade manager,
10  what have you.
11  Q.  Well, let me just ask a quick question about
12  that.  You understood that Tishman was the
13  construction manager for this project, correct?
14  A.  By term, sure, yes.
15  Q.  What do you mean "by term"?
16  A.  Construction manager.  Separately Forest deals
17  with Tishman Construction, and we know them as a
18  construction manager.  What duties and obligations
19  they had, I do not know.
20  Q.  Okay.  I guess the reason for my question is
21  you seem to sort of be using "construction manager"
22  and "trade manager" interchangeably.  Have you
23  understood that there were two separate entities, one
24  of whom had the title and the duties and obligations

Page 31

1   of construction manager, while the other, Forest, was
2   the electrical trade manager?  Did you understand that
3   distinction at the time of contracting?
4   A.  Yes.  Yes, and I apologize if those terms for
5   me can be interchangeable for this, yes, Tishman was
6   construction manager with certain obligations and
7   duties.  And Forest was termed the electrical trade
8   manager, and my understanding broadly was to manage
9   the electrical trades performing the work on the
10  project site.
11  Q.  And to distinguish between Tishman and Forest
12  and their rights and obligations, we could look to the
13  contracts that each party had with the bank to
14  determine those rights and obligations.  Is that
15  correct?
16      MR. BRADLEY:  Object to form.  Calls for a
17  legal conclusion.
18  A.  You, you could.
19  Q.  Okay.  Did you understand that Forest had the
20  authority to make decisions regarding the project
21  without the bank's approval?
22  A.  Yes, my understanding, we were agent for the
23  bank, so yes.
24  Q.  Why don't you tell me a little bit about what

Page 32

1   your understanding is of what an agent in general has
2   the right to do.
3   A.  In general, act on behalf of the party that
4   they're representing.
5   Q.  And do they have any obligations back to the
6   party that they're representing?
7   A.  They may, primarily a fiduciary duty to act
8   appropriately in their shoes.
9   Q.  And depending on the particular circumstances,
10  would you expect that there would be some obligation
11  to run things by the principal, the party to whom you
12  are the agent?
13  A.  Not necessarily, because if you're acting as
14  agent, there is certain responsibility that that party
15  wants you to take on on their behalf.
16  Q.  And how does one determine where that line is,
17  where you have to go back up the chain and where you
18  have the authority to do basically whatever you in
19  your judgment deem proper?
20      MR. BRADLEY:  Object to form and calls for
21  legal conclusion.
22  Q.  You can answer.
23  A.  Some of it may be common sense, some of it may
24  be written in agreement.  I don't know.  It can vary.

Page 33

1   I would make that assumption, it can vary.  I can't
2   give you definite this is what it is, 1, 2, 3, 4, 5,
3   maybe there is a sixth.
4   Q.  Did you understand whether or not Forest had
5   authority to enter into contracts in the bank's name
6   without the bank's approval?
7   A.  My understanding is that we were acting as
8   agent, electrical trade manager, and we did have that
9   authority.  Tishman Construction was well aware of it.
10  Q.  I'm sorry, when you say "Tishman was well aware
11  of it," what do you mean?
12  A.  That we were agent, we gave them copies of
13  various documents.  They knew we were holding
14  ourselves out as agent.  They -- I'll be speculating,
15  but I would assume that they told us to be agent and
16  knew that we were agent.
17  Q.  But as you said, you'd be speculating that they
18  said anything to that effect.
19  A.  If they said anything, because I might not have
20  been in those conversations.  I'm talking about
21  conversations at a higher level of Paul Angerame, of
22  Philip Altheim.
23  Q.  But to the best of your knowledge, your
24  knowledge as you sit here today, Tishman did not tell

**B-0509**

9 (Pages 30 to 33)

Creedon Controls, Inc.                v.                Banc One Building Corporation
Donna Lucas                    C.A. # 05-CV-300-JJF                June 23, 2006

Page 34

1  Forest Electric that they were the bank's agent?
2        MR. BRADLEY: I'm going to object to form.
3  I don't think that's what she's testified to.
4    Q.  You can answer.
5    A.  Could you repeat the question again, please?
6  I'm sorry.
7    Q.  Sure. I'll break it down a little bit.
8  Tishman did not tell you that Forest was acting --
9  that Forest was the bank's agent. Is that correct?
10   A.  To me?
11   Q.  Correct.
12   A.  I don't recall having a conversation with that
13  specific: You are going to be an agent for the bank.
14   Q.  And you weren't involved in any conversations
15  where Tishman told anyone else at Forest that Forest
16  was to be the bank's agent?
17   A.  That's correct, I was not involved in those
18  conversations.
19   Q.  And when you said earlier that Tishman knew
20  that Forest was holding itself out as the bank's
21  agent, what did you mean?
22   A.  Part of it, I apologize, is speculation of
23  conversation with Paul Angerame and Tishman. But
24  there was at a point where -- excuse me, I'm sorry,

Page 35

1  this agreement called a single project construction
2  services agreement was given to the electrical trades
3  that were working, transmitted to them, executed by
4  them. Once they were obtained, part of my duties were
5  to ensure that the subcontractors, the electrical
6  trade people signed it. Once they did, I transmitted
7  it back down to our office, which we had down here in
8  Wilmington, so that Tishman would obtain a copy of
9  this.
10   Q.  When you say "so that Tishman would obtain a
11  copy of it," did you send it to Tishman?
12   A.  Not directly, no, I never did. It was done
13  through our offices.
14   Q.  Do you have actual knowledge that it was sent,
15  that those contract documents were sent to Tishman?
16   A.  I don't have knowledge of that. The intent was
17  there. I believe there probably was at one point,
18  because five copies were asked to be signed by the
19  electrical trades.
20   Q.  We've established that you don't know that it
21  actually happened.
22   A.  The intent was that copies would get
23  transmitted to Tishman. I personally did not do it.
24  They were sent down to our Wilmington office for the

Page 36

1  people there to give to Tishman.
2    Q.  Right. But you don't know whether that
3  actually happened, whether the document was actually
4  sent to Tishman?
5    A.  No, I don't.
6    Q.  Was there anything else to which you're
7  referring, were referring when you said that Tishman
8  knew that you were holding yourself out, Forest was
9  holding itself out as agent of the bank?
10   A.  Tishman was aware of the single project
11  construction agreement that we were going to ask those
12  electrical trade contractors to sign. They were aware
13  they were given a draft of it, if you want to say. I
14  don't think they -- initially they were given a draft
15  saying, "This is what we're going to use, okay?"
16   Q.  And do you recall when that happened?
17   A.  Not, not off the top of my head. I'm sorry,
18  no, I don't.
19   Q.  And do you recall getting any sort of response
20  from Tishman?
21   A.  I do recall an e-mail that I received that Paul
22  Angerame confirmed a discussion with, I think it was
23  Tom Keene, that these were the agreements we're going
24  to use, fully knowing that we were acting as agent for

Page 37

1  Banc One.
2    Q.  Now when you say "fully knowing they were
3  acting as agent for Banc One," what do you mean?
4    A.  They received what we intended to give to the
5  electrical trade contractors as an agreement. I
6  believe the e-mail might have mentioned that we were
7  going to be agent for owner. I believe it was an
8  e-mail to Tom Keene from Paul Angerame.
9    Q.  Okay, let's come back to that. Let's shift
10  gears a little bit. Let me ask you, were you at all
11  involved in the drafting or review of the invitation
12  to bid for the general lighting and power package?
13   A.  No.
14   Q.  So you did not review any of the provisions of
15  that invitation to bid?
16   A.  No.
17   Q.  General conditions, anything like that?
18   A.  No.
19   Q.  Were you involved in the drafting of the
20  letter of intent sent to Creedon Controls regarding
21  the award of the contract for general power and
22  lighting?
23   A.  The letter of intent that went to Creedon, yes.
24   O.  That went to Creedon.

B-0510

10 (Pages 34 to 37)

Creedon Controls, Inc.                    v.         Banc One Building Corporation
Donna Lucas                        C.A. # 05-CV-300-JJF            June 23, 2006

Page 42

1  from Katherine Valdes at Tishman in October, October
2  1st of 2003, to Terry Peng at Forest, attaching what
3  are described as the contract forms for both CDC I and
4  CDC II. Have I accurately represented what that first
5  e-mail --
6     **A. Yes.**
7     Q. -- in the string is? Then it looks like Terry
8  forwarded along without comment to Paul Angerame. Is
9  that correct?
10    **A. Yes.**
11    Q. And then Paul forwarded it to you and stated
12  "Per your request." Is that correct?
13    **A. Yes.**
14    Q. And is it correct that you had requested that
15  Paul obtain the contract form from Tishman?
16    **A. There was a request made to Paul, yes.**
17    Q. Did you make that request?
18    **A. Yes.**
19    Q. And then you say, still on October 1st of 2003,
20  "Paul, please clarify if this is the agreement the
21  bank wants us to give to our subcontractors. If so,
22  we will have to rework the contract document. The
23  attached copies will bind our subcontractors to Banc
24  One (Tishman being Agent and Construction Manager for

Page 43

1  Owner."
2       What did you mean when you said "we will
3  have to rework the contract document"?
4     **A. My recollection of this is still reviewing our**
5  **agreement with Tishman, trying to figure out what**
6  **we're going to do with the electrical contractors down**
7  **there, I recall probably asking Paul if Tishman has an**
8  **agreement, if we're going to use one, give us a copy of**
9  **it. This is where the e-mail comes in.**
10      **I take a look at it. The reworking of the**
11  **contract document means the inserting of "Forest" to**
12  **whomever, not, you know, "Tishman" to whomever.**
13  **That's what that is meant, as it applies to the**
14  **electrical trade contractors that are working down**
15  **there. "The attached copies will bind our**
16  **subcontractors to Banc One," meaning how are we going**
17  **to contract or get an agreement to the electrical**
18  **contractors down there? Are we going to be acting as**
19  **agent for the bank? Is this the agreement that we**
20  **should be using, i.e., their form of agreement? At the**
21  **time there was no**
22  **necessarily clear direction.**
23    Q. When you say "there was no necessarily clear
24  

Page 44

1  direction," do you mean clear direction as to which
2  form of subcontract to use? Or whether at this point,
3  and this is quite early in October of, beginning of
4  October of 2003, whether Forest was meant to
5  subcontract directly or as the bank's agent?
6     **A. At this time, again, it's just, just to rehash,**
7  **and I apologize if I'm going over this myself but,**
8  **repeatedly, but we were still trying to review our own**
9  **agreement. We were in communication with Tishman,**
10  **obviously. We wanted to do it the way the bank wanted**
11  **it to do, the right way.**
12      **I was probably at this point, knowing me**
13  **obviously, trying to say to Paul, if this is the**
14  **agreement, we'll rework it, excuse me. At that time**
15  **were we agent for Banc One? I can't tell you exactly**
16  **when I knew that we were representing ourselves as**
17  **agent for Banc One, but it could have been around that**
18  **time, maybe beforehand. I'm not sure. It was just a**
19  **matter of going back to a VP, saying we could use this**
20  **agreement for the electrical contractors, if this is**
21  **what we are to use through Tishman.**
22    Q. Okay. The next and final e-mail in this string
23  dated October 15th, 2003, is from you to Paul
24  Angerame, and it says, "Please advise on the

Page 45

1  following. If we are to have no exposure, we could
2  use Banc One's form of agreement and place us as Agent
3  for Owner. With the sample subcontracts being used,
4  we have exposure." Do you recall why you sent that
5  e-mail and what you meant by it?
6     **A. Going back to Paul, are we going to be Banc**
7  **One's agent, or are we going to subcontract out in a**
8  **contractor/subcontractor relationship, not as agent?**
9    Q. And you state that the sample subcontractors
10  being used, would that include the document we just
11  looked at, the subcontract agreement sent to Creedon,
12  along with the letter of intent, is that the --
13    **A. I was speaking about this attached document.**
14    Q. When you say "this attached document," you're
15  talking about the single project construction services
16  agreement?
17    **A. Yes.**
18    Q. But in the final sentence of that e-mail, it
19  says, "With the sample subcontractors being used, we
20  have exposure." Which sample subcontract are you
21  referring to in that sentence?
22    **A. This one here, most likely this one.**
23    Q. The single project construction services
24  agreement?

12 (Pages 42 to 45)

Creedon Controls, Inc.                                                                    Banc One Building Corporation
Donna Lucas                              v.                                                                  June 23, 2006
                                 C.A. # 05-CV-300-JJF

Page 46

1   A. Correct. Correct.
2   Q. Okay. Did you get a response from Paul?
3   A. I don't recall.
4        MS. WARREN: Will you please mark that as
5   the next.
6        (Lucas Exhibit No. 4 was marked for
7   identification.)
8   Q. If you'll take a look at what the court
9   reporter has marked as Lucas 4, it appears to me to be
10  a revision to the letter of intent that was initially
11  sent to Creedon revised on October 31st of 2003. Is
12  that correct?
13  A. Revised on October 31st? Oh, I see. That is
14  correct.
15  Q. Do you have a recollection of why that was, the
16  letter of intent was revised?
17  A. The price was revised.
18  Q. Do you recall receiving a signed copy of this
19  document back?
20  A. Yes.
21  Q. Do you recall taking any note of the fact that
22  the language that had been inserted by Miss Creedon on
23  the previous signed copy did not occur or appear on
24  this signed copy of the document?

Page 47

1   A. I don't necessarily recall not noticing it
2   wasn't there.
3   Q. And do you recall whether you attached the same
4   subcontract agreement to this revision as had been
5   attached to the initial letter of intent?
6   A. I'm sorry, could you repeat the question again?
7   Q. Do you recall whether you attached the same
8   subcontract agreement to this letter of intent as was
9   attached to the initial October 2nd letter of intent?
10  A. The subcontract agreement in the prior one
11  would have been attached to this.
12       (Lucas Exhibit No. 5 was marked for
13  identification.)
14  Q. Please take a look at what the court reporter
15  has marked as Lucas 5. Does that look familiar to
16  you?
17  A. Yeah. Yes, it does.
18  Q. Do you agree with me that the first page is an
19  e-mail from you to Paul Angerame dated February 18th,
20  2004?
21  A. Yes.
22  Q. And it says, "I have taken the Banc One
23  Agreement and tried to modify it into a (Draft)
24  subcontract agreement. Take a look and call me after

Page 48

1   your review. I'm sure Tishman Construction will have
2   to bless this before we do anything." Have I read
3   that correctly?
4   A. Yes.
5   Q. Do you recall talking to Mr. Angerame about
6   this after the e-mail was sent?
7   A. I can't say for sure we had a conversation. We
8   may have, I don't know.
9   Q. On the page that's Bates numbered FE 014445, it
10  appears that Forest is representing itself as Banc
11  One's agent and electrical trade manager. Do you
12  recall if you inserted that language into this
13  contract?
14  A. Just for clarity, it's page 3, correct, on the
15  bottom?
16  Q. Yes.
17  A. Yes. And yes.
18  Q. And when did you do that? Would it have been
19  around the time of the e-mail or —
20  A. I don't know.
21  Q. Okay. What made you decide to do that, to
22  insert that language?
23  A. I did an insertion of the language stating that
24  Forest, agent and electrical trade manager, because it

Page 49

1   was my understanding that's what we were.
2   Q. So while you might not have been sure in
3   October of whether Forest was meant to be an agent of
4   Banc One, by this February time period you felt
5   confident that Forest was Banc One's agent; is that
6   correct?
7   A. Yes.
8   Q. On the second page of the document that I've
9   handed you, which is page 1 of the single project
10  construction services agreement, in the last
11  paragraph, I guess the only real paragraph on that
12  page, it says that the agreement is made between
13  electrical trade manager and construction contractor.
14  And yet, when we looked at page FE 014445, number page
15  3 of the contract, it's executed and you have listed
16  construction contractor and owner as the contracting
17  parties. Is that correct?
18  A. On the signature page, this is not executed.
19  Q. On the signature page.
20  A. Yes.
21  Q. So while the contract is textually written as
22  between the electrical trade manager, Forest, and a
23  construction contractor, the signatories of the
24  document would be the construction contractor and the

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Donna Lucas                    C.A. # 05-CV-300-JJF                    June 23, 2006

Page 62

1  forward that e-mail to you until August 4th of 2004,
2  correct?
3    A. Yes.
4    Q. Do you recall having any conversations with him
5  between those dates, June 14th and August 4th,
6  regarding the Creedon contract issues?
7    A. I probably spoke to him saying Creedon had not
8  signed their contract, just to make sure that he was
9  aware of it.
10   Q. And Paul writes to you, "These are the Creedon
11 contract issues for the record and for any comments
12 you may have. At the time I informed Creedon that no
13 changes would be accepted." Do you recall reviewing
14 the attachments to this e-mail?
15   A. I probably read the attachments.
16   Q. Do you have any reaction?
17   A. A reaction in what form?
18   Q. Well, did you make any comments back to Paul?
19   A. Regarding the comments themselves?
20   Q. Regarding the attachments.
21   A. No.
22   Q. Were you at all surprised to see 12 pages of
23 suggested revisions to the contract?
24   A. Personally, when I see 12 pages, it made me

Page 63

1  laugh. But that was --
2    Q. When you say it made you laugh, because?
3    A. You know, sometimes you don't take things too
4  seriously. But it was a document they prepared with
5  their comments, Paul made it clear that no changes
6  would be accepted. Maybe I should retract my
7  statement, say I have no comments, I had no reaction.
8    Q. Did you have any communications regarding the,
9  what Paul describes as the Creedon contract issues
10 with Paul Angerame after the August e-mail?
11   A. No.
12   Q. Do you recall having any conversations with
13 anyone at Forest about the Creedon contract issues?
14   A. No.
15   Q. Do you recall having any conversations with
16 anyone at Tishman regarding the Creedon contract
17 issues?
18   A. No.
19   Q. Do you recall having any conversations with
20 anyone at Creedon regarding the Creedon contract
21 issues?
22   A. Absolutely not, no.
23   Q. And any conversations with Banc One regarding
24 the Creedon contract issues?

Page 64

1    A. I never spoke to Banc One, no.
2       MS. WARREN: Let's just take two minutes
3  off the record, please.
4       THE VIDEOGRAPHER: Going off the record at
5  approximately 11:00 a.m.
6       (A brief recess was taken.)
7       THE VIDEOGRAPHER: Going back on the
8  record at approximately 11:15 a.m.
9  BY MS. WARREN:
10   Q. Miss Lucas, before we left for the break, we
11 were talking about some of these contract issues, and
12 I just wanted to know, was anybody else giving you
13 input into the revisions that were made to the project
14 services construction agreement, single project
15 construction services agreement -- I apologize -- that
16 was sent to Forest's subcontractors in approximately
17 May of 2004?
18   A. From what I recall, that single project
19 services agreement was really unchanged, except for
20 the insertion of "electrical trade manager" into it.
21 And as you pointed out before, the agent, the form was
22 what was received from Tishman through the prior
23 e-mails and explanations and questioning. If you're
24 trying to allude to if there was any additional

Page 65

1  modifications to the language?
2    Q. I'm just trying to find out if there was anyone
3  else giving you input into the revision. Did Paul --
4  did you and Paul talk about it, did you and
5  Mr. Altheim talk about it?
6    A. Again, the only revisions were, you know,
7  electrical trade manager, insertion of that name. No.
8  No. The insertion of the -- no.
9    Q. No, you didn't talk to Mr. Angerame or
10 Mr. Altheim about those changes?
11   A. We were -- you know, I might have had one
12 conversation with Paul, saying, "Paul, this is, you
13 know, this is electrical trade manager." But nothing,
14 from what I'm trying to grab from you --
15   Q. I think it might be a simpler question than you
16 want it to be. Yeah, I just want to know if you
17 talked to them about the changes that you were making
18 to the contract?
19   A. Paul knew that we were going to be placing the
20 signature as is, Forest Electric as agent for Banc
21 One, but there was no other changes.
22   Q. When you say "Paul knew," how did he know?
23   A. Well, by giving him a draft form of the
24 agreement.

B-0512

17 (Pages 62 to 65)

Page 66

1  Q.  Okay.  So I understand that you're saying that
2  there were very minimal changes to the contract.
3  A.  Right.
4  Q.  Basically tailoring the contract to Forest.
5  Would that be an okay way to say it?  We'll leave it
6  at minimal changes to the contract.
7  A.  Fine.
8  Q.  Would it be fair to say that you made the
9  changes to the contract, sent the revision to Paul and
10 said, "Is this okay?"
11 A.  Yes.
12 Q.  And the changes came from you, not initially
13 from Paul?
14 A.  Yes.
15 Q.  Okay.  Have you reviewed Creedon's claim in
16 this case?
17 A.  What do you mean by "claim"?
18 Q.  Well, let's start with, were you aware of when
19 Creedon first made a claim for anything having to do
20 with the general lighting and power project?
21 A.  To be quite honest, I might have heard about
22 it, but I was not involved.
23 Q.  And have you reviewed the complaint that's in
24 this lawsuit?

Page 67

1  A.  When it first came in, yes.
2  Q.  Were you ever involved in any of the
3  negotiations of Creedon's claim before or after the
4  complaint?
5  A.  No.
6         MS. WARREN:  Those are all of my
7  questions.
8         THE WITNESS:  All righty.
9         MS. WARREN:  So I appreciate you taking
10 the time today.
11        THE WITNESS:  Thank you.
12        THE VIDEOGRAPHER:  Going off the record at
13 approximately 11:18 a.m.
14        (Discussion held off the record.)
15        THE VIDEOGRAPHER:  Going back on the
16 record at approximately 11:18 a.m.
17 BY MR. BESTE:
18 Q.  Well, good morning again.  I've already
19 introduced myself, but again, I'm Bob Beste.  I
20 represent Creedon Controls, Inc., plaintiff in this
21 case.  We appreciate your time in coming down to speak
22 with us here today.
23        As I ask you some questions I may
24 generically refer to Forest, but by that I mean any of

Page 68

1  its subsidiaries, including but not limited to EMCOR,
2  is it, or its parent, I guess?  Yes?
3  A.  EMCOR --
4  Q.  Is the parent?
5  A.  Is the ultimate parent, yes.
6  Q.  I'm using Forest as generic, so please, I don't
7  want to have to ask you all their parents,
8  subsidiaries, if any.  Forest is the whole
9  organization, okay?
10 A.  Okay.
11        MR. BRADLEY:  Well, I object to that.  She
12 is an employee of Forest Electric and performed work
13 for Forest in what we've been talking about here, not
14 EMCOR.  I'm not sure -- I don't know your question.
15        MR. BESTE:  Well, your objection is noted,
16 and I don't know if it's going to make any difference.
17 So let's move on.  If it's a specific area, then maybe
18 we'll get into it.
19 BY MR. BESTE:
20 Q.  Let's see.  With respect to that signed letter
21 of intent by Mrs. Creedon, for example, Exhibit 2 to
22 your deposition, did you understand that there was to
23 be further documentation to come with respect to
24 actual contract terms?

Page 69

1  A.  In what respect, to Creedon Controls?
2  Q.  Pardon?
3  A.  To Creedon Controls?
4  Q.  Yes.
5  A.  Yes.
6  Q.  Okay.  Did you at any time receive or review
7  any Banc One manuals, documents that described their
8  contract forms, terms, norms or anything for their
9  contract?
10 A.  No.
11 Q.  Do you know if Tishman or their representative
12 had any such manuals or forms that established Banc
13 One's pattern contract forms?
14 A.  I wouldn't know.
15 Q.  All right.  With respect to the other
16 electrical contractors, do you understand that the
17 same forms that were furnished to Creedon Controls
18 were also furnished to them?
19 A.  Yes.
20 Q.  Obviously different names and different
21 numbers, but it's the same basic format?
22 A.  Yes.
23 Q.  And did any of the other electrical contractors
24 object to Forest's representation that they were

Creedon Controls, Inc.                                   Banc One Building Corporation
Donna Lucas                    C.A. # 05-CV-300-JJF              June 23, 2006

Page 70

1   acting as agent for Banc One?
2   **A. No.**
3   Q.  Do you know if any of the other subcontractors
4   on the job under -- strike that.
5        Do you know if any of the other electrical
6   subcontractors' contracts were furnished to Tishman?
7   **A.  Could you clarify that a little more?  Are you**
8   **talking the single project services agreement?**
9   Q.  Yes.
10  **A.  When those went out to those electrical**
11  **subcontractors and returned back to me signed, they**
12  **did go down to our office in Wilmington, Delaware,**
13  **with the intent to give it to Tishman.**
14  Q.  Would that have been at or about the same time
15  that they were sent to Creedon?
16  **A.  I would be speculating, but assuming around the**
17  **same time, yes.**
18  Q.  Is it your understanding that all of the other
19  electrical subcontractors signed that single project
20  contract?
21  **A.  Yes.**
22  Q.  And is it the Forest practice to then forward
23  it on to a construction manager on the job?
24  **A.  Yes.**

Page 71

1   Q.  You mentioned at some point during your
2   testimony that, as I took it, that Forest does not
3   normally have subcontractors on a job.  Did you say
4   that?  Or is that accurate?
5   **A.  Yes, in our normal course of business, yes.**
6   Q.  Normally what role does Forest take in these
7   sorts of projects of some size and magnitude?
8   **A.  Normally, our normal work is as electrical**
9   **contractor.  We are able to do a job completely with**
10  **very minimal, if not at all, no subcontracting.**
11  Q.  With respect to Exhibit 5 for your deposition
12  today, it says in the e-mail, "I'm sure that Tishman
13  will have to bless this before we do anything."  Do
14  you know if Tishman, in fact, blessed it?
15  **A.  Based upon subsequent e-mails from, that I**
16  **received from Paul Angerame, I believe Paul had a**
17  **conversation with them that gave me the indication**
18  **that they had no objection, they made no objection to**
19  **it that I was aware of.**
20  Q.  And certainly you didn't get any documents or
21  information that indicated that there was any
22  objection by Tishman?
23  **A.  I'm not aware of any, no.**
24  Q.  Exhibit 5 attaches an agreement that

Page 72

1   specifically refers to the CDC I project in Bear, but
2   were you intending this to more or less be generic and
3   regard Bear and Brandywine projects for the data
4   centers at those respective locations?
5   **A.  There was -- yes, they were intended for either**
6   **site.  If an entity was working on CDC II, it would**
7   **say CDC II.  If they happened to be working on both,**
8   **there would be a separate one for CDC I, separate one**
9   **for CDC II.**
10  Q.  So the fact that there is no specific
11  attachment for CDC II here on Exhibit 5 really is
12  meaningless; it would be wasting more paper?
13  **A.  That's correct.**
14  Q.  Referring to your Exhibit 3, the initial e-mail
15  comes from Ms. Valdes at Tishman Technologies
16  Corporation.  Do you know what relationship that has
17  to Tishman of Maryland?
18  **A.  I do not know the entity relationship.**
19  Q.  Do you ever recall dealing with Tishman
20  Technology before?
21  **A.  I am aware that Tishman operates under Tishman**
22  **Technologies Corporation, as well as Tishman**
23  **Construction Corporation of New York.**
24  Q.  In what sense would you have Tishman

Page 73

1   Construction of New York versus Tishman Technologies,
2   do you know?
3   **A.  I would not know.**
4   Q.  Referring to Exhibit 3, the statement at the
5   end of your e-mail at the very top of the page, "With
6   the sample subcontracts being used," I assume that
7   means, "we have exposure."  I would think that would
8   refer to the October subcontract agreement rather than
9   the attachment, and I'm a little bit confused.
10       MR. BRADLEY:  Object to form.
11  **A.  Based upon this e-mail, as I look at it, it**
12  **should refer to the attachment that is placed at the**
13  **end of this string.**
14  Q.  But at the beginning it says, "If we are to
15  have no exposure, we would use Banc One's form," which
16  I understand to be an attachment to this exhibit.
17  Correct?
18  **A.  Yes.  Placing us as agent.**
19  Q.  Pardon me?
20  **A.  Placing us as agent.**
21  Q.  Understood.  That's why I, that's why I would
22  read the next sentence to be referring to the
23  subcontract agreement as perhaps --
24  **A.  At this time I was unsure whether we were going**

**B-0514**

19 (Pages 70 to 73)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Donna Lucas                          C.A. # 05-CV-300-JJF                          June 23, 2006

Page 74

1  to be acting as agent or whether the subcontracts, if
2  you want to call them subcontracts, were going to be
3  between Forest and the electrical entity. So I was
4  just probably trying to differentiate.
5      MR. BESTE: How much time do we have on
6  the tape?
7      THE VIDEOGRAPHER: Three minutes. Switch
8  it if you'd like.
9      MR. BESTE: Why don't you switch it just
10  to be certain so that --
11      THE VIDEOGRAPHER: Going off the record at
12  11:27 a.m.
13      Going on the record at 11:30 a.m.
14  BY MR. BESTE:
15  Q.  Referring to Exhibit 2 for your deposition here
16  today, you constructed that letter, I think you
17  indicated to us?
18  A.  Yes.
19  Q.  First, is that a form letter that's been met
20  here or did you start from scratch in dictating that
21  letter?
22  A.  Started from scratch.
23  Q.  All right. Is the -- does the attachment, is
24  that a form that's in Forest's files?

Page 75

1  A.  Yes.
2  Q.  With blanks in it?
3  A.  Yes.
4  Q.  And when you sent this letter or caused it to
5  be created and sent from this by Mr. Angerame, was it
6  your understanding that Forest was acting as agent for
7  Banc One?
8  A.  At that time I might not have been sure.
9  Q.  Okay. You had testified earlier that you
10  understood that Forest was essentially acting in a
11  no-risk capacity with respect to this contract. Did I
12  take your words down correctly when I made that note,
13  no risk?
14  A.  That was my understanding of what I was told.
15  Q.  And I believe you told us that you had a
16  meeting with Mr. Angerame and Tishman representatives
17  regarding contract forms?
18  A.  Yes, that was in October.
19  Q.  And was the no-risk language used or discussed
20  at that meeting?
21  A.  I don't believe so.
22  Q.  Have you ever used the no-risk language, "no
23  risk" with Tishman representatives?
24  A.  No.

Page 76

1  Q.  Are you aware of any other signature lines on
2  the data center projects, Wilmington and Bear, where
3  the signature lines were changed?
4      MR. BRADLEY: Object to form.
5  A.  No.
6  Q.  Where Forest's signature line was changed for a
7  contract with regard to the data center?
8      MR. BRADLEY: Object to form.
9  Q.  No?
10  A.  No.
11  Q.  Okay.
12      MR. BESTE: That's it. That's all I have.
13  Thank you.
14      THE WITNESS: Okay.
15      THE VIDEOGRAPHER: Going off the record
16  11:33 a.m.
17          I N D E X
    Deponent: DONNA LUCAS                          Page
18  By Ms. Warren.....................................  3
    By Mr. Beste...................................... 67
19      E X H I B I T S
    Lucas:                                          Page
20  1    Single Project Construction Services      14
         Agreement; Bates Nos. Banc One 03932-03996
21  2    October 2, 2003 RFP 6B; CL 0623-0636       38
    3    E-mail string, Contract; FE 014334-014441  41
22  4    10/31/03 Revised RFP 6B; FE 003284-003289  46
    5    E-mail, Contract No. 1; FE 014442-014496   47
23  6    E-mail, Subcontract; FE 014497-014551      52
    7    5/4/04 RFP 6B, RFP 21B; 006113-006173      55
24  8    6/14/04 Letter; FE 014206                  60

Page 77

1
2
3
4          Replace this page
5          with the Errata Sheet
6          after it has been
7          completed and signed
8          by the Deponent
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**B-0515**

20 (Pages 74 to 77)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Creedon Controls, Inc.
## v.
# Banc One Building Corporation

---

Transcript of:

# Paul Angerame
## Volume # 1
## June 1, 2006

---

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Creedon Controls, Inc.                                    Banc One Building Corporation
Paul Angerame, Volume 1                                              June 1, 2006

Page 30

1  know, after probably 20-some years of experience. I
2  know you know what to do, but --
3     A.  I appreciate that.  No, the -- there was
4  definitely an understanding of how the job had to be
5  built, which was that we were going to procure local
6  contractors for various packages of work and that work
7  has to be installed in the field.  I mean it's a --
8  beyond the fact that, you know, we're the trade
9  manager, electrical trade manager, it's, you know,
10 like any other construction project.
11         And certainly there was, you know, a lot
12 of involvement from the design team, a lot of input
13 from the design team, from the owner, from Tishman
14 along the way.  And, you know, weekly meetings, weekly
15 formal meetings and certainly daily contact to make
16 sure that we were meeting the expectation of the bank.
17    Q.  How was Forest to be compensated for its
18 effort?
19    A.  They were compensated for their effort through
20 a fee, a reimbursement of general conditions and a
21 fee.
22    Q.  Something like you might get under a CM
23 contract?
24    A.  Yes.

Page 31

1     Q.  Okay.  Where you were acting more as the agent
2  of the owner as opposed to a constructor.  Do you
3  understand the difference?
4     A.  Yes.
5     Q.  So would it be more as like the agent of the
6  owner as opposed to the constructor?
7     A.  I believe so.
8     Q.  So the general conditions costs were based on
9  essentially what your costs were out in the field?
10    A.  Yes.
11    Q.  Between labor, equipment, you know.
12    A.  Right.
13    Q.  When I say labor, I really mean personnel.
14    A.  Yes, personnel and expenses.
15    Q.  Okay.  So those would be, the roughly the three
16 major component parts, personnel, equipment, which I
17 mean is like your trailer, your phone, you know, paper
18 clips and everything in between?
19    A.  Yes.
20    Q.  And then ultimately also expenses which might
21 be your living expenses or your food allowance, things
22 of that sort?
23    A.  Yes.
24    Q.  Any other component parts, or is that pretty

Page 32

1  much, given the overview, pretty much what it would
2  include?
3     A.  I'm sure there's other parts.  Actually, when
4  we ultimately did develop the contract, there was a
5  list of all the agreed upon general conditions,
6  expenses that would be paid.
7     Q.  They would be reimbursable?
8     A.  Yes.
9     Q.  And then you got a fee on top of that?
10    A.  Yes.
11    Q.  And what was the fee?
12    A.  I'm sure I should know that, but I'd really
13 have to look at the contract again.
14    Q.  Was it a percentage of something or was it just
15 a flat dollar amount?
16    A.  No, it was a percentage of the total cost of
17 construction.
18    Q.  Of the electrical construction?
19    A.  Electrical construction.
20    Q.  Of the trade work that you were managing?
21    A.  Correct.
22    Q.  Did you fill out monthly applications, complete
23 monthly applications to submit to somebody?
24    A.  Yes.

Page 33

1     Q.  And what did they look like?  Let's start with
2  that.  Were they AIA-type applications?
3     A.  They weren't AIA, but they were actually a
4  standard Tishman form, but it's similar to AIA in that
5  it lists all the subcontractors, percentage of
6  completion, and the, you know, the dollar amount that
7  we're seeking for that particular subcontractor and
8  then as well our general conditions and fee.  And the
9  general conditions would be backed up with receipts
10 and payroll records; pretty large document every
11 month.
12    Q.  Were you -- did you have some responsibility in
13 assembling that information?
14    A.  We had an on-site project accountant.
15    Q.  And that was their job to pull all that
16 together?
17    A.  Yes.
18    Q.  So it sounds like not only was it your general
19 conditions, costs and fee that were recorded on this
20 document, but also costs related to certain of the
21 electrical trade contractors on the project.
22    A.  Yes.
23    Q.  Did you -- and so when you made an application,
24 you asked for the money not only for yourself, but for

**B-0517**

9 (Pages 30 to 33)

Creedon Controls, Inc.                                 v.                              Banc One Building Corporation
Paul Angerame, Volume 1                                                                                  June 1, 2006

Page 74

1  document, though, than what we're looking at here if
2  we look at what was previously marked as Creedon
3  Exhibit 11, isn't it, Paul? I want to just stick with
4  that. I want to stick with purely -- we'll get into
5  the whole Banc One scenario and the second document
6  that I think everybody is familiar with. But with
7  regard in that October/November time frame, you'll
8  agree with me, won't you, that there was no
9  subcontract agreement, which is what that document is
10  titled, or other contract form that was simply
11  executed only between Forest Electric and Creedon?
12       MR. BRADLEY: Object to form and
13  substance.
14       MR. SEGLIAS: Well, we know what the
15  letter of intent says. I know what it says, I'm not
16  arguing about that. I'm flipping the page, I'm asking
17  about a subcontract agreement.
18       MR. BRADLEY: Okay, if the question is was
19  this, was this document attached to the letter of
20  intent actually signed by anybody, I can understand
21  that question.
22       MR. SEGLIAS: Yeah, that's right. That's
23  the question.
24       MR. BRADLEY: But the letter of intent was

Page 75

1  signed by both parties.
2       MR. SEGLIAS: I understand that. And the
3  legal import of that is not what I'm asking him about.
4  We'll argue that another day.
5       MR. BRADLEY: All right, I'm just -- I
6  just want to make sure what we're dealing with.
7       MR. SEGLIAS: All I'm looking for is
8  whether he knows of any document that was ever
9  presented to Creedon for execution like that one,
10  which was signed by the parties, either one.
11     **A. It was not signed, to the best of my knowledge.**
12     Q. And after that November time --
13  October/November time frame, did you, Paul, or anyone
14  on your behalf at Forest, send another version of a
15  subcontract to Creedon asking them to sign it? Of
16  your contract form, only you, not the other one, not
17  that other 60-page Banc One thing. I'm not talking
18  about that.
19     **A. This is the only version.**
20     Q. So you didn't send another subcontract
21  agreement that was just between Forest and Creedon,
22  right?
23     **A. Until that other agreement --**
24     Q. Yeah, forget the other one.

Page 76

1     **A. This is the only document that existed.**
2     Q. Okay, all right. All right, if you jump down
3  on your exhibit to item (h), Forest, you state on
4  behalf of Forest, "Forest owes nothing to CCI since it
5  acted as agent of Banc One only." Do you see that?
6     **A. Yes.**
7     Q. Is that still Forest's position today?
8     **A. Yes.**
9     Q. All right. I want to direct your attention
10  back to this invitation to bid, which was previously
11  marked as Creedon Exhibit 2. And specifically, Paul,
12  I'm going to ask you some questions about some of
13  these general conditions items. I have circled the
14  two that I want to ask you about. There may be a
15  third one, but these are the primary ones.
16       The first one here, please read it before
17  we talk about it, is identified as No. 11.
18     **A. Okay, I read No. 11.**
19     Q. Did Forest prepare that or was that something
20  that Tishman had offered to be included in rider A?
21     **A. That was part of some, the items that Tishman**
22  **wanted to have us include.**
23     Q. And when you had your scope review with Creedon
24  prior to the letter that you wrote recommending them

Page 77

1  as the best value to Tishman, did you discuss that
2  provision at all or the substance of what's contained
3  in that provision?
4     **A. To some extent.**
5     Q. And tell me -- if you could hand that back to
6  me, please. If you need it I'll give it back to you.
7  It's my only copy here. We'll just have to share.
8  What exactly did you discuss with Creedon with regard
9  to openings in the work or the omission of portions of
10  the work temporarily in order to allow other trades to
11  perform their work? What did you say in that regard
12  during the meeting?
13     **A. I just believe it's -- during the course of the**
14  **meeting we described the project as a fast-track**
15  **project. And I think, I believe a responsible**
16  **contractor would recognize that a fast-track project**
17  **may entail leave-outs.**
18     Q. Yeah, and my question is, did you discuss that
19  with Creedon?
20     **A. That it's a fast-track project, absolutely.**
21     Q. Yeah, and with regard to the openings in the
22  work or the omissions of portions of the work, did you
23  describe in any detail what you thought the quantity
24  or the volume of that might be or the impact of what

**B-0518**

20 (Pages 74 to 77)

Creedon Controls, Inc.                              v.                Banc One Building Corporation
Paul Angerame, Volume 1                                                              June 1, 2006

Page 86

1  speculation on your part?
2  **A. Did I see them in the meetings? I guess it's**
3  **somewhat based on the fact that every other trades'**
4  **project manager was in those meetings.**
5  Q. Did you always attend those, the meetings with
6  Tishman, the bank's representatives, that level of
7  meeting?
8  **A. Just in the couple of statements you made**
9  **you're talking about three different or four different**
10  **meetings. But yes, I always attended the ones with**
11  **the bank and Tishman.**
12  Q. And were there -- so there were meetings with
13  just bank representatives, Tishman and people from
14  Forest, right?
15  **A. And the design team.**
16  Q. And the design team. And then were there
17  meetings, then I'm going like a level down, where you
18  have Banc One, Tishman and maybe, and Forest, and then
19  all of the various different trade people?
20  **A. Yes.**
21  Q. Concrete, electrical, mechanical, roofing,
22  plumbing?
23  **A. Yes.**
24  Q. All right. And at those meetings was there

Page 87

1  scheduling information discussed?
2  **A. Yes, I mean there was sequencing and scheduling**
3  **information discussed. I can say that I didn't, I**
4  **didn't attend a lot of those meetings, the ones you're**
5  **describing.**
6  Q. Coordination issues?
7  **A. Yes.**
8  Q. Were they discussed?
9  **A. Yes.**
10  Q. You didn't attend a lot of those meetings. Who
11  did on behalf of Forest?
12  **A. Leonard Beck. And they were run by Tishman's**
13  **superintendent.**
14  Q. Okay. And on behalf of the other trade
15  contractors, was that superintendents, foremen,
16  project managers?
17  **A. That was project managers and superintendents**
18  **from other trades.**
19  Q. The next document I want to show you is what we
20  will mark as Exhibit E.
21          (Angerame Exhibit No. E was marked for
22  identification.)
23  Q. Have you had a chance to look at that?
24  **A. Yes.**

Page 88

1  Q. Okay, I'm not -- I think the direction of this
2  e-mail thread is probably from the second page going
3  forward.
4  **A. I agree with that.**
5  Q. I always assume that, but not always right.
6  But it looks like Tishman had forwarded to Terry, I
7  think that's Terry Peng, a contract document for CDC I
8  and CDC II. Do you see that?
9  **A. Yes.**
10  Q. What document are they talking about? If you
11  know. I'm not asking you to guess.
12  **A. Yeah, I'd be guessing, honestly. If I had the**
13  **attachments, might know.**
14  Q. All right. If we move up, it looks like, and
15  it says, "Forwarded by Terry Peng." Katherine Valdes
16  I think is the Tishman person.
17  **A. Yes.**
18  Q. And it looks like he then -- does he send it to
19  you?
20  **A. Terry sends it to me, yeah.**
21  Q. It says, "Per your request."
22  **A. Well, the way I read it, Katherine sends it to**
23  **Terry, Terry sends it to me with no comment really,**
24  **and then I forward it to Donna Lucas, and it says "Per**

Page 89

1  **your request." So that's per Donna's request I**
2  **forwarded it to her.**
3  Q. All right. And it says then, Donna Lucas
4  writes to you, "Paul, please clarify if this
5  agreement -- if this is the agreement the Bank wants
6  us to give our subcontractors. If so, we will have to
7  re-work the contract document. The attached copies
8  will bind our subcontractors to Banc One (Tishman
9  being Agent and Construction Manager for Owner)." Do
10  you see that?
11  **A. Yes.**
12  Q. All right. Do you know if that -- was that
13  this document that you had, was that the same thing as
14  the document that you had forwarded to Creedon on May
15  4th?
16          MR. BRADLEY: Is what the same document?
17          MR. SEGLIAS: The agreement that they keep
18  referring to in here, in the e-mails, in the e-mails.
19  **A. I have to see the attachment to tell you that.**
20  Q. Do you know if that attachment still exists?
21  **A. I mean I'm sure it exists somewhere, I don't, I**
22  **don't know.**
23          MR. SEGLIAS: All right, I may be making a
24  request for the attachment, Paul. What I'll do,

**B-0519**

23 (Pages 86 to 89)

Creedon Controls, Inc.                     v.                 Banc One Building Corporation
Paul Angerame, Volume 1                                                      June 1, 2006

Page 90

1  though, is whatever documents that we need that we
2  haven't gotten out of this I'll just summarize in a
3  letter, kind of like Chuck did to us the other day.
4       MR. BRADLEY:  Okay.
5       MR. SEGLIAS:  Okay, that's the best way to
6  handle it.
7  BY MR. SEGLIAS:
8    Q.  All right, and if we finally get to the top
9  here, it says "Donna Lucas," looks like this was from
10 her also to you.
11   A.  Yes.
12   Q.  "Please advise," I think she meant "on the
13 following.  If we are to have no exposure, we could
14 use Banc One's form of agreement and place us as Agent
15 for Owner.  With the sample subcontracts being used,
16 we have exposure."  Do you see that?
17   A.  Yes.
18   Q.  All right, tell me what's going on at this
19 point, Paul.  I mean you're obviously talking about
20 two forms, are you not?
21   A.  It seems so, yeah.
22   Q.  One is probably the subcontract agreement that
23 we saw under your cover letter of October 2nd, and the
24 other one might be this form that we're looking at

Page 91

1  that's under your cover letter of May 4th, which is
2  identified as Creedon Exhibit 16.
3       MR. BRADLEY:  Object to form.
4    Q.  Is that right?
5    A.  I don't know that.
6    Q.  All right.  Was there a discussion going on
7  about whether Tishman -- I'm sorry, whether Forest
8  would contract directly with the electrical trade
9  contractors or whether that would be done with Banc
10 One?
11   A.  I'm sorry, could you repeat that?
12       MR. SEGLIAS:  Could you read it back,
13 please?
14       (The requested portion was read.)
15   A.  There was discussion as to the form of our
16 agreement with the bank, certainly.
17   Q.  Well, let's go back.  If we -- it says here,
18 please -- this is to you from Donna Lucas, top, very
19 top.
20   A.  Yes.
21   Q.  "Please advise on the following.  If we are to
22 have no exposure," I assume that's Forest Electric, is
23 that fair to say?
24   A.  Yes.

Page 92

1    Q.  "We could use Banc One's form of agreement and
2  place us as Agent for Owner."  Do you see that?
3    A.  Yes.
4    Q.  So there was a discussion about a Banc One form
5  of agreement, and Forest Electric being only
6  identified as an agent, so that essentially the
7  contractual relationship would be between Creedon and
8  Banc One.  Right?
9    A.  Yes.
10   Q.  And then you say, "With the sample subcontracts
11 being used, we have exposure."  Right?
12   A.  That's what Donna is saying to me, yes.
13   Q.  Right.  So there was a discussion going on
14 about whom exactly the trade contractors would be
15 contracting with, whether it would be directly with
16 Forest or whether it would be directly with Banc One.
17 Isn't that fair to say?
18   A.  Yes, it's fair to say it was being discussed.
19   Q.  Okay.  Well, tell me about that.  Tell me about
20 why Forest was having an issue with that at that time.
21   A.  I'd say just based on what I can remember,
22 it's, the fact was we had no contract in place at that
23 point.  So --
24   Q.  With Banc One?

Page 93

1    A.  Right.
2    Q.  Okay.
3    A.  So the discussion was how to, or how the
4  subcontractors were being contracted.
5    Q.  You didn't know how you were going -- how you
6  should proceed, is that because you didn't have a
7  contract with Banc One?
8    A.  Yes, I think that's a good assessment.
9    Q.  Did you have discussions with Banc One about
10 this situation, that is, Forest?
11   A.  I didn't have any discussions.
12   Q.  Who was having discussions with Forest about
13 this contractual situation?  Who was in charge of that
14 for Forest Electric?
15   A.  I think at this point we were still waiting for
16 Tishman to have, you know, finalize their agreement.
17 And I think that was the, you know, that was going to
18 be the next step.
19   Q.  Who did you report to on this job?
20   A.  Well, on the job, from a project standpoint --
21   Q.  For the job, yeah.
22   A.  For the job.
23   Q.  Yeah.
24   A.  Tishman was the overall construction manager,

**B-0520**

24 (Pages 90 to 93)

# In The Matter Of:

## *Creedon Controls, Inc., et al   v. Banc One Building Corp., et al*

---

### *Paul Angerame*
### *Vol. 2, June 14, 2006*

---

*brusilow + associates*
*135 South 19th Street*
*Suite 350*
*Philadelphia, PA  19103-4912*
*(215) 564-1717    FAX: (215) 564-1217*

*Original File ANGERAME.TXT, 169 Pages*
*Min-U-Script® File ID: 1349666213*

**Word Index included with this Min-U-Script®**

[1] subcontracts on the Banc One CDC I and CDC II

[2] projects."

[3]     Can you describe that conversation?

[4]     A: I mean, I don't remember it

[5] specifically, but what it looks like to me is that

[6] this document was transmitted to Tom Keane by Juliane

[7] Lynch.

[8]     I had a conversation with Tom at some

[9] point between these two dates, March 29th and July —

[10] excuse me, April 12th, and at that point I was

[11] directed by Tishman to use this document and this is

[12] a confirming e-mail.

[13]     Q: And what were the details of that

[14] conversation with Tom?

[15]     A: It's the question, "Is the document

[16] that we sent to you okay to use for the trade

[17] contractors?"

[18]     Q: So, you don't recall any substantive

[19] comments with Tom about the terms of the contract?

[20]     A: No.

[21]     Q: Do you ever remember Tom authorizing

[22] Forest Electric to act as an agent for Banc One?

[23]     A: I mean, a conversation surrounding it

[24] or just a statement? There was a statement: "You are

[1] acting as an agent for the bank."

[2]     Q: There was a statement?

[3]     A: Yes.

[4]     Q: Who made that statement?

[5]     A: You know, it may have come up in — it

[6] would have been made by Tom Keane. I don't know the

[7] exact time it was stated, but it would have been in

[8] the context of perhaps signing a document or

[9] confirming a change order.

[10]     Q: Was this statement in writing?

[11]     A: No.

[12]     Q: Is there any statement in writing from

[13] Tishman to Forest stating Forest should act as agent

[14] for the bank?

[15]     A: Other than acceptance of the agreement

[16] that we ultimately signed, the master agreement that

[17] we signed, that I believe states that.

[18]     Q: And the master agreement, what do you

[19] mean by that?

[20]     A: I mean the agreement that engages

[21] Forest as the trade manager for the bank, for the

[22] electrical trades on the Banc One CDC projects.

[23]     Q: So, to your knowledge, if Forest

[24] contracts with the bank, it gives Forest permission

[1] to act as agent for the bank?

[2]     A: Yes.

[3]     Q: And did any representative of Banc One

[4] Building Corporation ever authorize Forest to act as

[5] an agent?

[6]     MR. BRADLEY: Objection to the

[7] form.

[8]     THE WITNESS: That's my

[9] understanding based on the agreement.

[10]     BY MR. CHOA:

[11]     Q: Based on which agreement?

[12]     A: On the agreement authorizing Forest to

[13] proceed as the trade manager for the electrical

[14] trades.

[15]     Q: Besides that document, you never saw

[16] anything else in writing from the bank to Forest

[17] authorizing Forest to act as agent?

[18]     MR. BRADLEY: Objection. You mean

[19] other than what's in these exhibits we've

[20] already marked?

[21]     MR. CHOA: Well, actually Paul is

[22] saying that he thinks that's contained in

[23] the agreement between Forest and Tishman.

[24]     We haven't marked any of those —

[1] these agreements have all been proposed

[2] subcontracts between Forest and its sub

[3] trades.

[4]     MR. BRADLEY: I know — well, but

[5] some of these e-mails are writings that

[6] go to Tishman, is my point.

[7]     MR. CHOA: Oh, okay, I see what

[8] you're saying.

[9]     BY MR. CHOA:

[10]     Q: Besides the exhibits we've — and I'm

[11] actually talking about from the bank now, and I

[12] haven't seen any e-mails to or from the bank

[13] introduced here today.

[14]     Is there any writing from the bank,

[15] other than this agreement that we've discussed,

[16] authorizing Forest to act as the bank's agent?

[17]     A: Not that I'm aware of.

[18]     Q: Did you have any discussions with any

[19] representatives of the bank regarding the agency of

[20] Forest?

[21]     MR. BRADLEY: You mean anyone

[22] other than he's already talked about.

[23]     MR. CHOA: Right.

[24]     MR. BRADLEY: The problem is,

**B-0522**

Creedon Controls, Inc. et al v. Document 131-13 Filed 08/08/2006 Page 36 of 50 Paul Angerame
Banc One Building Corp., et al
Vol. 2, June 14, 2006

Page 287

[1] Q: I'm not asking you, but any
[2] conversations with her where she said something along
[3] those lines.
[4] A: No conversations, just this e-mail
[5] that details, I guess, her concerns about the
[6] contract.
[7] Q: Now, in your affidavit to Forest's
[8] answer, which was discussed at day one your
[9] deposition and was introduced as exhibit B, in that
[10] affidavit you said that the 6B form of contract was
[11] the controlling contract; is that correct?
[12] A: I'm not sure if I understand the
[13] question.
[14] Q: Let me actually get the exact
[15] language. I'll just read from the transcript the
[16] question, which I believe Ed was reading to you,
[17] number five of your affidavit. Actually, Paul has
[18] it.
[19] MR. BRADLEY: Yes.
[20] MR. CHOA: Can you show him?
[21] BY MR. CHOA:
[22] Q: It's number five.
[23] A: Okay.
[24] Q: Now, in number five you say, "One of

Page 288

[1] the defenses is that the construction agreement
[2] contract number 6B was between CCI and Banc One, only
[3] with Forest acting as agent for Banc One, the owner."
[4] Now, is contract number 6B the same
[5] contract as the back form of agreement that we were
[6] just discussing?
[7] A: Yes, I think it is.
[8] Q: And what is the basis of your
[9] knowledge for saying that "the construction agreement
[10] contract number 6B was between CCI and Banc One, only
[11] with Forest acting agent for Banc One, the owner?
[12] A: That's my understanding of the nature
[13] of that contract — that agreement, rather.
[14] Q: What is your understanding based on?
[15] A: It's based on my understanding of the
[16] agreement.
[17] Q: Did you see any documents that helped
[18] you form this understanding?
[19] MR. BRADLEY: Objection. You mean
[20] other than the. . .
[21] BY MR. CHOA:
[22] Q: Other than the unsigned bank form of
[23] agreement, yes, did you review any other documents
[24] that led you to that understanding?

Page 289

[1] A: Well, I signed documents as agent that
[2] were cosigned by the bank.
[3] Q: I'm sorry, but can you repeat that?
[4] A: Another instance where it would be
[5] confirmed is that I signed documents as agent for the
[6] bank, and those documents were cosigned by bank
[7] personnel.
[8] Q: That's the agency issue. Let's put
[9] that aside. We'll come back to that in a minute.
[10] Right now I'm just talking about the
[11] fact that you said the construction agreement
[12] contract number 6B was between CCI and Banc One.
[13] Now, to me that implies that there was
[14] some sort of agreement between CCI and Forest, acting
[15] as agent for Banc One, that the 6B contract was
[16] agreed to by both parties; is that correct?
[17] MR. BRADLEY: You mean that it was
[18] actually executed.
[19] MR. CHOA: Right — well,
[20] "executed" is a little bit of a legal
[21] term. I'm trying to get a layman's
[22] understanding.
[23] THE WITNESS: I'm sorry, can you
[24] repeat the question?

Page 290

[1] MR. CHOA: Sure.
[2] BY MR. CHOA:
[3] Q: You say that "the construction
[4] agreement number 6B was between CCI and Banc One,
[5] only with Forest acting as agent for Banc One, the
[6] owner."
[7] Was it your understanding that CCI had
[8] agreed to enter into the 6B contract, which is the
[9] bank form of agreement?
[10] A: It's my understanding that there was
[11] an agreement between Creedon and Forest acting as
[12] agent.
[13] Q: And what was the basis of that
[14] agreement? Was it the bank form of subcontract?
[15] A: I think that's a legal — that calls
[16] for a legal. . .
[17] Q: Well, what is the basis of your
[18] understanding that there was an agreement between
[19] Creedon and Forest?
[20] A: Well, that we were agent for the bank
[21] and that Creedon was performing the 6B scope of work
[22] as our trade contractor and requisitioning dollars
[23] throughout the contract and acting as an engaged
[24] contractor.

Page 291

[1]    Q: Now, you say it was requesting money
[2] and acting as an engaged contractor.
[3]    A: Right.
[4]    Q: Did those events occur before Creedon
[5] was ever sent the bank form of agreement?
[6]    A: Yes.
[7]    Q: So, those events occurred prior to
[8] Creedon ever getting the bank form — strike that.
[9]    Is there anything else that forms the
[10] basis of your understanding that there was an
[11] agreement between Creedon and Forest?
[12]    A: I think that's about it, just that
[13] they were performing as the trade contractor.
[14]    Q: Whatever happened to the bank form of
[15] agreement, to your recollection?
[16]    A: It was sent to Creedon, and they
[17] responded with their comments.
[18]    Q: And then what happened — did anything
[19] else happen after that?
[20]    A: As far as it being signed? No, it was
[21] never signed by Creedon.
[22]    MR. CHOA: I'm going to introduce
[23] HH.
[24]

Page 292

[1]    (Exhibit HH was marked for
[2] identification)
[3]              BY MR. SEGLIAS:
[4]    Q: Do you recognize this document, Paul?
[5]    A: I guess it appears to be a change
[6] order.
[7]    Q: Now, if you notice down at the bottom,
[8] in handwritten pen is written "Agent for Banc One
[9] Building Corp." above the Forest Electric signature
[10] block." Do you see that?
[11]    A: I see that.
[12]    Q: Whose handwriting is that?
[13]    A: I believe that's Rick Flemingloss.
[14]    Q: And when would Rick have written that
[15] on this document?
[16]    A: Prior to having it signed.
[17]    Q: Signed by whom?
[18]    A: By either myself or Tom Keane.
[19]    Q: Okay, let me just unpack that. When
[20] you signed this change order, was that handwritten
[21] language "Agent for Banc One Building Corp." on the
[22] document"?
[23]    A: Yes, I believe it was.
[24]    Q: Where did you get the document from?

Page 293

[1] — strike that. Who did you get the document from?
[2]    A: This would be produced by our project
[3] accountant, Rick Flemingloss.
[4]    Q: Now, if Rick Flemingloss is creating
[5] this document, why is it handwritten and not typed?
[6]    A: This document is produced in a
[7] software package. It's called Expedition. It's not
[8] the easiest thing to edit text, so I think he was —
[9] I think at some point he does correct it, but some of
[10] these change orders have to be handwritten in.
[11]    Q: And what is the order of signature on
[12] this change order? Who signs first?
[13]    A: This is initiated by Forest. I would
[14] have signed it first.
[15]    Q: And then who would you send it to?
[16]    A: It would be sent to Tishman and the
[17] bank, but it would — the flow or the process would
[18] go to Tishman next.
[19]    Q: And then Tishman would send it on to
[20] the bank?
[21]    A: Yes.
[22]    Q: Do you know if the handwritten
[23] notation above "Tishman Construction Corp." which
[24] reads "Agent for Banc One Building Corp.," was that

Page 294

[1] also written by Rick Flemingloss?
[2]    A: I believe it was.
[3]    Q: At whose instruction did Rick
[4] Flemingloss write that language?
[5]    MR. BRADLEY: If you know.
[6]    Q: Well, as a representative of Forest
[7] Electric, not to your personal knowledge, but to
[8] Forest Electric's knowledge.
[9]    MR. BRADLEY: Still, if you know.
[10] I don't know if he knows that or not.
[11]    THE WITNESS: Again, I referred to
[12] it earlier, I believe. It was imparted
[13] on us from Tishman, and I guess it was
[14] the basis or included in other documents,
[15] so. . .
[16]              BY MR. CHOA:
[17]    Q: Did anyone from Forest tell Rick to
[18] write that language in or — strike that. I'll start
[19] over.
[20]    Did anyone from Forest tell Rick to
[21] write that language in?
[22]    A: I'm sure he came to know that he had
[23] to do it in some manner. I don't exactly remember
[24] how.

**B-0524**

Page 295

[1] Q: Did Rick do it on his own initiative?

[2] A: No.

[3] MR. CHOA: I'm going to introduce

[4] II.

[5] (Exhibit II was marked for

[6] identification)

[7] BY MR. SEGLIAS:

[8] Q: Have you seen this document before,

[9] Paul?

[10] A: It's a change order as well.

[11] Q: And is this change order the same date

[12] as the prior one we were just looking at?

[13] A: Yes, it appears to be.

[14] Q: So, it's the same date, but — the

[15] change order covers different items or different

[16] amounts — I'm sorry.

[17] They're the same date, but it's a

[18] different change order; isn't that right?

[19] A: Yes, it's a different designation.

[20] Q: The first one that we looked at was

[21] RFP-6B, and this one is for RFP-21B?

[22] A: Yes.

[23] Q: Now, at the bottom there is no "Agent

[24] for Banc One Building Corp." language, right?

Page 296

[1] A: That's right.

[2] Q: Why is that missing?

[3] A: I would just be speculating, but he

[4] just missed it.

[5] Q: When you signed it, did you notice it

[6] was missing?

[7] A: Probably not.

[8] Q: Was that something you routinely

[9] looked for when signing documents for Forest

[10] Electric?

[11] MR. BRADLEY: Objection to the

[12] form.

[13] THE WITNESS: I looked for it

[14] during the course of this contract, yes.

[15] BY MR. CHOA:

[16] Q: Did you ever handwrite it in yourself

[17] on any documents?

[18] A: I believe I have, yes.

[19] Q: And did you do that on your own

[20] initiative, or were you instructed to do that?

[21] A: It was my understanding that that was

[22] our relationship and needed to be noted on the

[23] documents.

[24] Q: So, no one from Forest specifically

Page 297

[1] told you, "Make sure you have that language written

[2] in on all your Forest Electric documents"?

[3] A: Not that I recall.

[4] Q: Do you remember telling anybody at

[5] Forest that they should include that language on all

[6] Forest Electric documents?

[7] A: Not that I recall.

[8] Q: Just a few other questions, kind of

[9] following up on some other stuff.

[10] The April 4 letter that was introduced

[11] earlier today from Patricia Creedon to you, after

[12] receiving that letter did you ever tell anyone at

[13] Creedon Controls, "You shouldn't have put it in

[14] writing"?

[15] A: I'm sorry, which letter was that?

[16] Q: The April 4 letter from Pat Creedon.

[17] MR. BRADLEY: I think it's April

[18] 6th.

[19] MR. CHOA: April 6th, I'm sorry.

[20] BY MR. CHOA:

[21] Q: After receiving that letter, did you

[22] ever tell anybody at Creedon "You shouldn't have put

[23] it in writing," it being your claim?

[24] A: I never said they shouldn't put it in

Page 298

[1] writing.

[2] Q: Did you ever say anything similar to

[3] that?

[4] A: I may have said, "I wish you hadn't

[5] put it in writing."

[6] Q: What did you mean by that?

[7] A: I just hoped that we would reach an

[8] agreement without litigation ultimately.

[9] Q: Was that your typical practice at

[10] Forest, to request that the subcontractors not put

[11] their change orders in writing?

[12] MR. BRADLEY: I'm going to object

[13] to the form. The April 6th letter is not

[14] a change order.

[15] MR. CHOA: Okay, strike that.

[16] BY MR. CHOA:

[17] Q: Did you ever tell any other

[18] subcontractors they shouldn't put their claims in

[19] writing?

[20] A: There were no other claims.

[21] Q: So, when you said "I wish you hadn't

[22] put it in writing," can you explain a little bit more

[23] what you meant by that?

[24] MR. BRADLEY: Objection.

**B-0525**

Page 299

[1] THE WITNESS: Just that they had
[2] represented that there is an issue, and I
[3] hoped that we could resolve the issue
[4] without going down this path.
[5]      BY MR. CHOA:
[6] Q: How would you have liked to resolve
[7] the issue?
[8] MR. BRADLEY: Objection to the
[9] form.
[10] THE WITNESS: Well, we were having
[11] discussions with Creedon, and we had
[12] hoped that there was some course of
[13] action that could have resolved —
[14] satisfied their concerns and not had to
[15] become a legal claim.
[16] MR. CHOA: Okay.
[17]      BY MR. CHOA:
[18] Q: What kind of course of action did you
[19] contemplate at the time?
[20] A: Well, in discussions with the bank
[21] over this issue, one of the courses of action was to
[22] give Creedon some additional work and an opportunity
[23] to help their financial status.
[24] Q: Did Forest Electric ever do that?

Page 300

[1] A: We did.
[2] Q: I just want to back for a little bit
[3] and then we'll be done.
[4]      You testified earlier that your
[5] understanding that Forest was authorized to act as
[6] agent for Banc One came from Forest's contract giving
[7] it the responsibility to be the electrical trade
[8] manager; is that correct?
[9] MR. BRADLEY: I'm going to object
[10] to form. I don't think that's what his
[11] testimony was.
[12] MR. CHOA: Okay, we can —
[13] MR. BRADLEY: Well, whatever it
[14] was, it stands, but you can answer the
[15] question, if you can.
[16] THE WITNESS: I think that
[17] formalized it. That formalized it.
[18]      BY MR. CHOA:
[19] Q: And did your understanding come from
[20] your own reading of the contract, or were you told
[21] that?
[22] MR. BRADLEY: I'm going to object
[23] to the form.
[24] THE WITNESS: (No response)

Page 301

[1] MR. CHOA: Do you understand the
[2] question?
[3] THE WITNESS: Yes.
[4] THE WITNESS: It's hard to say
[5] that I was told, but yes, I believe that
[6] I was told.
[7]      Can I point to a point in time
[8] where someone said "You're agent for the
[9] bank," no, but it was — it became clear.
[10] MR. CHOA: Okay.
[11] THE WITNESS: And ultimately
[12] formalized by the agreement that was
[13] signed.
[14]      BY MR. CHOA:
[15] Q: Do you know who would have told you?
[16] A: Again, it just became apparent during
[17] the course of the job.
[18] Q: And when you say it became apparent
[19] during the course of the job, is that from your
[20] interactions with Forest people?
[21] A: No, it was interaction between the
[22] bank, Tishman and Forest —
[23] Q: And these were — I'm sorry, go ahead.
[24] A: Onsite.

Page 302

[1] Q: And these were interactions that you
[2] personally witnessed?
[3] A: Yes.
[4] Q: So, while the express authorization
[5] might never have happened, from observing their
[6] behavior is how you came to the understanding that
[7] Forest was able to act as agent for the bank?
[8] MR. BRADLEY: Objection to the
[9] form.
[10] THE WITNESS: Again, I don't know
[11] that it's a specific point in time, but
[12] you're us.
[13]      In other words, the bank is
[14] saying, "You are us. You're acting as
[15] agent for us," and of course that was how
[16] I acted, with the bank's interests.
[17]      BY MR. CHOA:
[18] Q: And the bank was saying this to you?
[19] A: Yes.
[20] Q: Is it possible the bank was saying
[21] those type of things because the bank was the
[22] ultimate owner of the building and whatever was built
[23] would belong to the bank?
[24] A: No, it was clearly a direction as far

**B-0526**

Case 1:05-cv-00300-JJF v. Document 131-13   Filed 08/08/2006   Page 40 of 50 Paul Angeramo
Creedon Controls, Inc., et al
Banc One Building Corp., et al                                              Vol. 2, June 14, 2006

Page 303

[1] as how we were to relate to the trade contractors on
[2] the job.
[3] **Q:** And who from the bank told that to
[4] you?
[5] **A:** Karl Auwarter would be the person that
[6] I would get that information from.
[7] **Q:** Do you remember any specific
[8] conversations with Karl Auwarter?
[9] **A:** And of course it would be reinforced
[10] by discussions with Tom Keane of Tishman. Specific
[11] conversations, no.
[12] **Q:** So, you don't remember any specific
[13] point in time where Karl Auwarter said to you Forest
[14] Electric should act as the bank's agent?
[15] **A:** No.
[16] **Q:** And did you ever see any specific
[17] documents from Karl Auwarter to you saying that?
[18] **A:** No.
[19] **Q:** Was there anyone else at the bank that
[20] you had these conversations with?
[21] **A:** He was the principal person I would
[22] interact with on the site from the bank.
[23] **Q:** Did you ever ask to see documentation
[24] to support his position?

Page 304

[1] **A:** Well, there was no documentation. We
[2] were six months into the project by the time the
[3] agreement was formalized in writing.
[4] **Q:** And at that point did you ask to see
[5] the formal agreement?
[6] **A:** Yes, I've seen it.
[7] **Q:** And to your knowledge, in that
[8] agreement the bank authorizes Forest to act as agent?
[9] **A:** To my understanding.
[10] **Q:** And that's from your own reading of
[11] the contract?
[12] **A:** Among the other things we've discussed
[13] and my understanding and reading of the contract,
[14] yes.
[15] **Q:** I just want to get — nobody said,
[16] "Hey, Paul, this provision right here in this
[17] contract, this means that Forest can act as agent for
[18] the bank"?
[19] **A:** No, no one said that.
[20] **Q:** Sorry to skip around. I have a
[21] follow-up.
[22] You had said earlier, on day one of
[23] your deposition, that Creedon kept its picnic tables
[24] in the administration area?

Page 305

[1] **A:** Yes.
[2] **Q:** And that that was just symbolic of
[3] their overall problems on the job. What did you mean
[4] by that?
[5] **A:** I just think it shows a lack of
[6] control and discipline.
[7] **Q:** Was that an ongoing problem for
[8] Creedon?
[9] **A:** Like I said, I think it was symbolic
[10] of the way that they were running the job, and
[11] perhaps indicative of their lack of control over the
[12] workforce.
[13] **Q:** Was this something that you observed
[14] directly, lack of control?
[15] **A:** No, I am inferring it from the
[16] information that they have given us after the fact.
[17] **MR. CHOA:** That's everything I
[18] have.
[19] **MR. BRADLEY:** We'll read and sign.
[20] (The deposition was concluded at
[21] 7:20 p.m.)
[22]
[23]
[24]

**B-0527**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Creedon Controls, Inc.

## v.

# Banc One Building Corporation

### C.A. # 05-CV-300-JJF

---

Transcript of:

# Patricia Creedon
### Volume # 1
### May 22, 2006

---

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Creedon Controls, Inc.                                           Banc One Building Corporation
Patricia Creedon, Volume 1        C.A. # 05-CV-300-JJF                        May 22, 2006

Page 34

1  recently completed projects and the three largest
2  completed projects in the last three years.  Do you
3  see that?
4      A.  Yes.
5      Q.  Were any of the jobs which you've described on
6  those pages greenfield construction?
7      A.  No.
8      Q.  And the largest single job in that group is the
9  Deerfield wings at MBNA; is that right?
10     A.  Correct.
11     Q.  What sort of facility was that?  I mean I know
12  MBNA is a bank, but other than that, what sort of
13  facility was it?
14     A.  A single standing building for offices.
15     Q.  Okay.  And then if you look at 3143, there's
16  the William Penn High School, electrical upgrades with
17  a total value of construction of 2.9 million.  Do you
18  see that?
19     A.  Correct.
20     Q.  Was that the total value of your work on that
21  job?
22     A.  Yes.
23     Q.  And when you say electrical upgrades to the
24  entire school, I take it that was an existing school

Page 35

1  building?
2      A.  Correct.
3      Q.  What work was involved in the electrical
4  upgrade?
5      A.  I don't know that.
6      Q.  If you turn now to the invitation to bid, which
7  was Creedon No. 2, is it the case that you received,
8  that Creedon Controls, I'm sorry, received the
9  invitation to bid sometime after you had submitted the
10  prequalification document which is Creedon 4?
11     A.  To the best of my knowledge, yes.
12     Q.  When you received, or when Creedon Controls
13  received the invitation to bid, which is Creedon No.
14  2, what was your process at Creedon Controls for
15  reviewing these documents and making a determination
16  whether or not Creedon Controls would submit a bid?
17     A.  It would be reviewed by the estimator to make
18  sure that it was within his capabilities.
19     Q.  When you say it was reviewed by the estimator,
20  I believe you told me about 10 minutes ago that the
21  project managers also did the estimation.  Is that
22  correct?
23     A.  Yes.  One in the same.
24     Q.  Would you or would someone at Creedon Controls

Page 36

1  assign an RFP of this sort to a particular project
2  manager?
3      A.  Yes.
4      Q.  What was the basis on which it would be
5  assigned to a particular project manager initially?
6      A.  The type of the project, the sophistication of
7  the project, the, who the customer was.
8      Q.  Do you recall in the instance of this
9  particular RFP from Forest Electric to whom it was
10  assigned?
11     A.  Yes.
12     Q.  To whom was it assigned?
13     A.  Charlie Doble.
14     Q.  What was the basis on which Mr. Doble was
15  assigned the initial review of this RFP?
16     A.  Who the customer was, what the work was, and
17  the scope.
18     Q.  When you say who the customer was, who do you
19  have in mind?
20     A.  A large national sophisticated customer.
21     Q.  Well, I guess what I'm asking is did you have
22  in mind Forest Electric or did you have in mind Banc
23  One?
24     A.  The ultimate customer would be Banc One, yes.

Page 37

1      Q.  Banc One.
2      A.  Um-hum.
3      Q.  Knowing Mr. Doble's experience and the
4  experience of the other two project managers that you
5  had on staff, was it your view that Mr. Doble had
6  particular qualifications for reviewing a job of this
7  scope?
8      A.  Yes.
9      Q.  Do you know whether Mr. Doble had had
10  particular training in estimation of jobs?
11     A.  Yes.
12     Q.  What training did Mr. Doble have, do you know?
13     A.  He had training through his prior employer.
14     Q.  Who was his prior employer?
15     A.  Hatzel & Buehler.
16     Q.  How long had Mr. Doble been working with
17  Creedon Controls at this point, which is September
18  2003?
19     A.  He's been with me since 1995.
20     Q.  Once Mr. Doble had initially reviewed the RFP,
21  did he have any discussions with you about whether or
22  not to submit a bid?
23     A.  No.
24     Q.  Did you review his proposed bid prior to its

B-0529

Wilcox & Fetzer, Ltd.                                              (302)655-0477

Creedon Controls, Inc.                                              Banc One Building Corporation
Patricia Creedon, Volume 1          C.A. # 05-CV-300-JJF                           May 22, 2006

Page 86

1  Q. Did Creedon Controls have a standard form of
2  contract that you preferred to use?
3  A. No.
4  Q. Did Creedon Controls have counsel look at
5  contract forms when they were received from general
6  contractors or trade managers?
7  A. From time to time.
8  Q. Did you do that in most instances or only in a
9  few instances?
10 A. In a few instances, yes.
11 Q. What would be the basis on which you would ask
12 counsel to review?
13     MR. PATRIZIA: I'm being very careful,
14 Mr. Seglias.
15     MR. SEGLIAS: I'm listening carefully.
16 A. When, when there were terms that I did not
17 recognize, when there were provisions in there that I
18 thought were one-sided, when it would have been at my
19 detriment to have signed a contract which I thought
20 was one-sided.
21 Q. Did you personally review the contract terms as
22 they were proposed as part of an acceptance of an RFP?
23     MR. SEGLIAS: On this project or
24 generally?

Page 87

1  Q. Generally. Talking generally first.
2  A. Generally, yes.
3  Q. Would you also expect the project manager to
4  have done that?
5  A. I would expect -- yes.
6  Q. Would you expect the project manager to raise
7  with you issues that the project manager might have
8  seen in the contract form?
9  A. Yes.
10 Q. Would he do that orally or in writing or both?
11 A. Orally.
12 Q. As a matter of corporate policy, before
13 entering into such an agreement, did you have a board
14 resolution or board authority to enter into these
15 agreements or was that part of your general authority
16 as CEO?
17 A. So long ago. I believe --
18     MR. SEGLIAS: I think he's speaking
19 generally still.
20     THE WITNESS: Generally.
21     MR. SEGLIAS: I don't think it's related
22 to this project necessarily. Is that correct?
23     MR. PATRIZIA: That's right.
24 A. The latter.

Page 88

1  Q. Was within your authority?
2  A. Within my authority.
3  Q. Who is on the board of Creedon Controls, Inc.,
4  currently?
5  A. Me.
6  Q. So single-person board?
7  A. Correct.
8  Q. Okay. Was that also true in 2003?
9  A. Yes.
10 Q. All right. Maybe I can do this in two minutes.
11     At the time that you became aware that
12 Creedon Controls was the apparent successful offeror
13 on Brandywine, did you receive a form of contract?
14 A. A sample subcontract.
15 Q. Did you review that sample?
16 A. Yes, yes, I did.
17 Q. Did you, do you know whether Mr. Doble reviewed
18 it?
19 A. I'm not sure.
20 Q. Did you ask counsel to review it?
21 A. No.
22 Q. When you say a sample form of contract, what do
23 you mean?
24 A. It was stamped "sample." There was nothing

Page 89

1  filled in, and it was not executable.
2  Q. Okay. Back at the very beginning of the day,
3  you mentioned that one of the things that you wanted
4  to do in Creedon Controls was commercial industrial
5  general electrical contracting, and you mentioned the
6  term fast-track projects. Do you recall that?
7  A. Yes.
8  Q. What do you understand to be a fast-track
9  project? What does that mean to you?
10 A. One with -- that doesn't take three years to
11 complete, that has a short duration period.
12 Q. Was the Passaic Valley wastewater treatment
13 plant a fast-track project, at least initially until
14 the --
15 A. Yes.
16 Q. -- contamination was discovered?
17 A. Yes.
18 Q. And the discovery of contamination changed it
19 from a fast track to something else?
20 A. Yes.
21 Q. Did you understand the Brandywine project to be
22 a fast-track project?
23 A. Yes.
24     MR. PATRIZIA: Why don't we break. It's

**B-0530**

23 (Pages 86 to 89)

Page 90

1  noon.  I expect my call will take half an hour, 45
2  minutes.  I'm happy to restart at 1:00 if that's
3  convenient.
4          MR. SEGLIAS:  That's fine.
5          THE VIDEOGRAPHER:  We're going off the
6  record at approximately 12:00 p.m.
7          (A luncheon recess was taken.)
8          THE VIDEOGRAPHER:  We're going back on the
9  record at approximately 1:08 p.m.
10 BY MR. PATRIZIA:
11 Q.  Haven't even started yet, Mr. Seglias.  Didn't
12 know I was that boring on this part of it.
13         MR. SEGLIAS:  No, it's not you, Chuck,
14 it's the after lunch, you know Tlan.
15 Q.  Now, Miss Creedon, did there come a time when
16 you did in fact receive more formal notification from
17 Forest Electric that Creedon Controls was the apparent
18 successful offeror?
19 A.  Yes.
20 Q.  In what form did that come to you?
21 A.  A letter of intent.
22         MR. PATRIZIA:  Let me have 3282.
23 Q.  Let me show you a document which has been
24 marked as Creedon No. 11.

Page 91

1          (Creedon Exhibit No. 11 was marked for
2  identification.)
3  Q.  Ask if you recognize that document, Miss
4  Creedon?
5  A.  Yes, I do.
6  Q.  Is this the document that you referred to?
7  A.  Yes.
8  Q.  Looking at this document, below Mr. Angarame's
9  signature, there is another signature line which says
10 "Agreed to and accepted by."  Do you see that?
11 A.  Yes, I do.
12 Q.  Is that your signature?
13 A.  Yes, it is.
14 Q.  Above the "agreed to and accepted by," there is
15 a set of two lines of small type that begin "This
16 letter of intent is accepted and will be considered
17 executed."  Do you see that?
18 A.  Yes.
19 Q.  Whose language was that?  Did you insert that
20 language?
21 A.  Yes.
22 Q.  Where did that language come from; that is, is
23 that standard language for Creedon Controls or did you
24 develop it specifically for this or --

Page 92

1  A.  It's an amalgamation, but on letters of intent,
2  I've only received a couple of letters of intent over
3  the course of being in business, so it's -- I can't
4  say it's verbatim to what I've used on the rare
5  occasion that I had a letter of intent, but basically
6  it's the same language.
7  Q.  And that was language that you physically had
8  inserted in this --
9  A.  Yes.
10 Q.  -- before you signed?
11 A.  Yes.
12 Q.  Okay.  And do you recall when you signed this?
13 A.  I believe it was in October.
14 Q.  Okay.  I notice at the top there is a fax line.
15 You see that?
16 A.  Yes.
17 Q.  October 7, 2003, 9:39 a.m., and I'm assuming
18 that where that hole punch is it was Forest Electric
19 CDC 2, do you see that?
20 A.  Yes.
21 Q.  Would that indicate that this was apparently in
22 Forest Electric hands not later than October 7th?
23 A.  No.  This, that may have been they faxed it to
24 me on that date, this could have been a fax.  I'm not

Page 93

1  sure.
2  Q.  Do you have any reason to believe that it would
3  have been faxed to you after its apparent date of
4  October 2?
5  A.  Would you say that again?
6  Q.  Yeah.  You'll notice the letter is dated
7  October 2.
8  A.  Okay.
9  Q.  Okay?  So what you're suggesting to me is it
10 might have been faxed to you five days after its
11 apparent date of October 2.  Do you have any reason to
12 think that that's true?
13 A.  I have reason to believe that might be true.
14 Q.  And what is the reason that you believe it
15 might be true?
16 A.  I believe there was one -- more than one letter
17 of intent.
18 Q.  Well, I would agree with that.  But is it your
19 recollection that there was a letter of intent that
20 came in November as opposed to early October?
21 A.  Not my recollection.
22 Q.  Okay.  We'll deal with that.
23        In the second paragraph of the letter, it
24 says, "Although prime contract documents have not been

24 (Pages 90 to 93)

Page 94

1 finalized, it is the intent of the parties to begin
2 work and will endeavor to enter into and execute a
3 definite subcontract agreement defining the
4 construction services." Do you see that language?
5 **A. I do, yes.**
6 Q. What do you understand to be a subcontract
7 agreement?
8 **A. A subcontract agreement would be one where I**
9 **would be a subcontractor.**
10 Q. To Forest?
11 **A. Yes.**
12 Q. So your contract would be with Forest, which
13 would be the prime contractor; is that right?
14 **A. No, not necessarily. It said they would**
15 **endeavor, so I'm not assuming that the subcontract at**
16 **that point would be the contract that was presented to**
17 **me. That's why I put the language down before my**
18 **signature line. I wanted to see an executable**
19 **contract before I made any attempt to negotiate or to**
20 **sign.**
21 Q. And you understand that the language at the end
22 of the second paragraph is that subcontractor agrees
23 to be bound to the terms and conditions of the
24 subcontract agreement attached as Exhibit 1?

Page 95

1 **A. But my codicil line says I wanted to be able to**
2 **address terms and conditions in scope upon receiving**
3 **an executable contract. So it's my practice that**
4 **after I have received an executable contract, to**
5 **negotiate terms and condition and sometimes scope.**
6 Q. All right, well let's look at your, I think you
7 called it a codicil. Anywhere in those two lines does
8 it say that you expect to receive an executable
9 contract?
10 **A. Not verbatim, no. It was my intention.**
11 Q. Within the 14-day period which is referenced in
12 your two lines of added language, 14 days from either
13 October 2 or October 7 of 2003, did you provide any
14 comments or other materials to Forest Electric on this
15 draft?
16 **A. Nor would I, no.**
17 Q. No. Did you have any outside counsel review
18 that?
19 **A. No.**
20 Q. If you turn to the next page in this document,
21 there are some handwritten notes on this form of the
22 subcontract, what's labeled the "subcontract
23 agreement." Is that your handwriting?
24 **A. It is, yes.**

Page 96

1 Q. Do you know when those notes were added to that
2 document?
3 **A. Do I know when. No, I do not know.**
4 Q. Do you know whether you sent those comments to
5 Forest Electric?
6 **A. I did not try to negotiate a sample**
7 **subcontract, so I would not have sent this sample**
8 **subcontract or any notes associated with it.**
9 Q. Okay. And you've called this a "sample
10 subcontract."
11 **A. Yes.**
12 Q. At the top it says "subcontract agreement."
13 **A. It's a sample subcontract -- I believed it to**
14 **be a sample subcontract, as there was no dates filled**
15 **in and I was -- at some point there may have been a**
16 **cover sheet on this saying "sample subcontract."**
17 **So...**
18 Q. Okay, it's not on this form of the document.
19 **A. May not be.**
20 Q. I'm not questioning whether there is or isn't.
21 We've got several different forms of this and I'm
22 trying to understand the sequence of them.
23 **A. Okay, but my belief when I signed this was this**
24 **was a sample subcontract.**

Page 97

1 Q. Okay, and you gestured there and I have to make
2 the record complete.
3 **A. Okay.**
4 Q. So when you say you signed the first page,
5 which is CL 1143, it was your understanding or your
6 intent that the document which was attached and which
7 is labeled "subcontract agreement" was a sample.
8 **A. Correct.**
9 Q. Is there any statement in the second paragraph
10 of the letter, which is CL 1143, that the document
11 which was attached as Exhibit 1 is a sample agreement?
12 **A. It says to, and execute a definite subcontract**
13 **agreement. So in that, that is, this is not a**
14 **definite subcontract agreement. I read that to be,**
15 **and clearly it's not.**
16 Q. Okay. So you read the, "It is the intent of
17 the parties to begin work and endeavor to enter into
18 and execute a definite subcontract" as indicating the
19 attached document was a sample?
20 **A. Correct.**
21 Q. You did not understand the phrase
22 "Subcontractor agrees to be bound to the terms and
23 conditions of the subcontract as attached hereto as
24 Exhibit 1" as indicating that when it says above your

25 (Pages 94 to 97)

Creedon Controls, Inc.                                      Banc One Building Corporation
Patricia Creedon, Volume 1          C.A. # 05-CV-300-JJF                   May 22, 2006

Page 98

1  signature "agreed to and accepted by" that you were
2  agreeing as stated in the second paragraph of the
3  letter?
4    **A.  I would not have spent the time -- expended the**
5    **time or the energy to review in detail a sample that**
6    **may or may not be presented to me in an executable**
7    **form.  It would have been only on an executable form**
8    **that I would have wasted any of my resources in order**
9    **to execute or modify terms and conditions.**
10      MR. PATRIZIA:  Okay.  Let me -- would you
11   mark that as No. 12, please, Creedon 12?
12      (Creedon Exhibit No. 12 was marked for
13   identification.)
14    Q.  Miss Creedon, I'm going to show you a document
15   which has been marked as Creedon No. 12.  And this
16   appears to be another copy of this same cover letter.
17   This one does not have the fax notation at the top.
18   Do you agree with me?  This is FE 3282?
19    **A.  I do.**
20    Q.  Would you also agree with me that this one
21   differs from CL 1143, in that on this one, there is a
22   date next to your name?
23    **A.  Yes.**
24    Q.  And on the earlier one there is not a date next

Page 99

1  to your name.
2    **A.  Correct.**
3    Q.  Do you know when the date was inserted?
4    **A.  No, I would only be assuming.**
5    Q.  You'd be guessing or making an assumption.
6    **A.  I'd be guessing, yes.**
7    Q.  We don't want you to guess or assume.  Is that
8  your handwriting?
9    **A.  It is.**
10    Q.  Is that date in your handwriting?
11    **A.  Yes, it is.**
12    Q.  Could you have signed two of these documents in
13   or about October of '03?
14    **A.  I could have.**
15    Q.  What would have been the purpose of signing two
16   of them?
17    **A.  I don't have any explanation why two would have**
18   **been signed.  Maybe -- no, I don't want to guess.**
19    Q.  You indicated, I believe, to me that you did
20   not send in to Forest the handwritten notes which are
21   on the copy attached to Creedon No. 11.  Is that
22   right?
23    **A.  Correct.**
24    Q.  Did there come a time when you and any

Page 100

1  representative of Forest discussed any of the terms
2  which are in the form of document attached to CL 1143?
3    **A.  Not that I recall.**
4    Q.  Nonetheless, it is the case that Creedon
5  Controls began work in the time frame of October 2003
6  on this project?
7    **A.  Correct.**
8    Q.  Do you know when you started work or when
9  Creedon Controls started work?
10    **A.  I believe it was the second week in October.**
11      MR. PATRIZIA:  Would you mark this one as
12   13, please.
13      (Creedon Exhibit No. 13 was marked for
14   identification.)
15    Q.  I'm going to show you another one which has
16   been marked as Creedon 13.  This is Bates stamped
17   00668.  This one appears to be another copy of this
18   cover letter.  This one has the fax legend at the top
19   and does not have the date at the bottom, so it's very
20   similar to CL 1143, right?
21    **A.  Yes.**
22    Q.  But it has underlining at two places.  Do you
23   see that?
24    **A.  Yes.**

Page 101

1    Q.  One is in the last line of the second paragraph
2  of the letter, the words "as attached hereto" are
3  underscored.
4    **A.  Yes.**
5    Q.  And in the language you added at the bottom of
6  the page, the "allowing 14 days for response to
7  address terms, conditions, scope of work" are
8  underlined.
9    **A.  Yes.**
10    Q.  Do you see that?
11    **A.  I do.**
12    Q.  Do you know who made that underlining?
13    **A.  No.**
14    Q.  Is that your mark?
15    **A.  No, it is not.**
16    Q.  Do you have any idea who might have made that
17   underlining?
18    **A.  No, I do not.**
19    Q.  Do you know when that underlining would have
20   been made?
21    **A.  No, I do not.**
22    Q.  Would you agree with me that in light of what
23   is on CL 1143 it was done sometime after your
24   signature was put on?

26 (Pages 98 to 101)

Creedon Controls, Inc.                                          v.                          Banc One Building Corporation
Patricia Creedon, Volume 1                        C.A. # 05-CV-300-JJF                                     May 22, 2006

Page 110

1    Q.  Or handwritten marginalia, I'm sorry, not
2    changes.
3    **A.  Correct.**
4    Q.  That were in Creedon 11.
5    **A.  Correct.**
6    Q.  Do you know whether or not you made those
7    changes subsequent to November 5th of '03?
8    **A.  What changes?**
9    Q.  I'm sorry, the comments which are on these form
10   of subcontract agreement at 00682.
11   **A.  No, I do not know that.**
12   Q.  You'll notice that in 00682 the third paragraph
13   has a contract amount of 3.152?
14   **A.  Yes.**
15   Q.  Which is the original contract value, not the
16   one on the revised version.
17   **A.  Correct.**
18   Q.  Subsequent to November 5 of 2003, did you have
19   any conversations with Forest Electric about the terms
20   of the form of subcontract agreement which is attached
21   to the letter which is dated October 2 but has a
22   revised date of 10-31-03 which is either 14 or 15?
23   **A.  Would you repeat that question?**
24   Q.  Yes.  Did you have any conversations with any

Page 111

1    representative of Forest Electric subsequent to
2    November 5, 2003, about the terms of the form of
3    subcontract agreement which are shown on 00682 in
4    Creedon 15?
5    **A.  Not that I recall.**
6    Q.  Did you, as the work progressed in October or
7    November, receive what you would regard as an
8    executable copy of the subcontract?
9    **A.  No, I did not.**
10   Q.  Do you know when, if ever, Forest executed
11   prime contract documents such as those that are
12   referenced in the second paragraph of Creedon 15?
13   **A.  No, I do not.**
14   Q.  Did you ever receive any such document?
15   **A.  No.  Wait, say that question again.  Ask that**
16   **question --**
17   Q.  Yes, did you ever receive such a document, that
18   is, prime contract documents executed by Forest?
19   **A.  No, I did not see any.**
20   Q.  Subsequent to your receipt of the cover letter
21   which is in Creedon 15, did you consult with counsel?
22   **A.  Again, no.  It was a sample.**
23   Q.  You believed it to be a sample agreement?
24   **A.  Yes.**

Page 112

1    Q.  Did you within the 14 days subsequent to
2    November 5 of 2003 give any indication to Forest
3    Electric that your signature on the document which is
4    Creedon 15 was not effective as it stood for whatever
5    purpose was indicated on the cover letter?
6    **A.  I was waiting for a prime -- I was waiting for**
7    **an executable contract.**
8    Q.  When you say you were waiting for an executable
9    contract, Creedon Controls had begun work already?
10   **A.  Correct.**
11   Q.  In fact, you were already preparing to submit
12   invoices to Forest Electric for payment?
13   **A.  Correct.**
14   Q.  Did you at any time in the course of submitting
15   those invoices give any indication that you did not
16   have an executed contract in your view?
17   **A.  I believe there were conversations that no**
18   **executable contract had been received yet.**
19   Q.  When did those conversations occur, Miss
20   Creedon?
21   **A.  During the billing, billing cycles, which were**
22   **generally about the 25th of the month.**
23   Q.  Who had those conversations?
24   **A.  It was my recollection that it was between the**

Page 113

1    **financial officer, Rick Flemingloss, and my staff.**
2    Q.  When you say Rich Flemingloss, the financial
3    officer, whose financial officer is Mr. Flemingloss?
4    **A.  Oh, from Forest, sorry.**
5    Q.  No, that's fine.  And who on your staff would
6    have talked to Mr. Flemingloss?
7    **A.  A couple of people would have talked to**
8    **Mr. Flemingloss.  It would have been Charlie Doble or**
9    **Kristin Cerase.**
10   Q.  Who is Kristin Cerase?
11   **A.  She does the billing.**
12   Q.  Once work began on the 6B project, if you can
13   call it that, is that useful?
14   **A.  That's fine.  I will recognize it.**
15   Q.  Okay.  Once work began on the 6B project, was
16   Mr. Doble at the job site most days?
17   **A.  No, he was project managing from the shop.**
18   Q.  When you say project managing from the shop, he
19   was at your offices --
20   **A.  Correct.**
21   Q.  -- Creedon Control offices?
22   **A.  Correct.**
23   Q.  Who would have been in charge for Creedon
24   Controls' at the site?

29 (Pages 110 to 113)

Creedon Controls, Inc.                                                          Banc One Building Corporation
Patricia Creedon, Volume 1              C.A. # 05-CV-300-JJF                     May 22, 2006

Page 122

1  sure that I understand the marginal notes, some of
2  which are either cut off or faded out. On the first
3  page, which is 682, the comment on the left side,
4  could you read that to me, please?
5    A.  Comment on the left side.
6    Q.  Just above the paragraph numbered Roman I on
7  the left-hand side, there is an arrow and I think it
8  says "payment schedule" p-y-m-t?
9    A.  Correct.
10   Q.  Payment schedule?
11   A.  Um-hum.
12   Q.  Is this your handwriting?
13   A.  It is.
14   Q.  What did you mean by that?
15   A.  Probably what was the payment schedule.
16   Q.  Did you have a payment schedule which was part
17 of the schedule of values that had been submitted?
18   A.  I don't recall.
19   Q.  If you would look at -- well, I'll skip over
20 that because I know where it is but I can't find it
21 right now.
22        The next line, there's reference to prime
23 contract?
24   A.  Um-hum.

Page 123

1    Q.  Do you see that?
2    A.  Yes.
3    Q.  What was your intent there?
4    A.  I would assume that all contractual
5  documentations associated here within would include
6  the contract between Banc One and the Banc One
7  management team.
8    Q.  Were you ever shown contracts between Banc One
9  Building Corporation and Tishman Construction of
10 Maryland?
11   A.  No.
12   Q.  Were you ever shown contracts between Banc One
13 Building Corporation and Forest Electric?
14   A.  No.
15   Q.  Were you aware of a designation of Forest
16 Electric as trade manager for the electric trades?
17   A.  Yes.
18   Q.  What was your understanding of what the trade
19 manager role was?
20   A.  They were not going to be performing any
21 electrical work. They were going to be managing the project,
22 the electrical portion of the project.
23   Q.  So all of the work would be performed by
24 subcontractors and Forest Electric would manage those

Page 124

1  subcontracts for the electrical portion of the work?
2    A.  My understanding of an electrical trade manager
3  isn't that they're a general or, and the people below
4  them would be subcontractors. My understanding of
5  that terminology is that they have very little skin in
6  the game and that they're working as the owner's rep.
7  So we're in actuality doing the work. We're doing the
8  risk work. So no, I don't, I don't -- my
9  understanding of trade manager is not, say, as a
10 general contractor.
11   Q.  If you look at the letter which is the first
12 page of Creedon 15, the first paragraph says that it's
13 the intent of the parties to enter into a subcontract
14 agreement. Do you see that?
15   A.  Yes.
16   Q.  Does that change your understanding as to the
17 role of Forest Electric and the form of the contract
18 agreement?
19        MR. SEGLIAS:  I'm going to object to the
20 characterization of the first paragraph because I
21 don't see the words "intent of the parties." So I'll
22 let the, I'll let the witness answer about what she
23 believes the intent of the first paragraph is.
24   Q.  Miss Creedon?

Page 125

1    A.  And would you ask that question again?
2    Q.  Yes. Do you see that in the first paragraph of
3  the first page of Creedon 15, which is 681, the first
4  paragraph says it's acknowledging our mutual desire to
5  enter into a subcontract agreement?
6    A.  And what about it?
7    Q.  Does that change your understanding as to the
8  role Forest played in the contracting process?
9    A.  Not really.
10   Q.  Was it your understanding that your contract to
11 perform the 6B work was going to be with Forest
12 Electric?
13   A.  Yes.
14   Q.  And Forest Electric was going to be, as we
15 discussed earlier, what I called the counter-party on
16 that contract?
17   A.  Yes.
18   Q.  Turn back to 683, which is the second page of
19 that form agreement. On the left-hand side of what is
20 Roman VII, there is some writing. Is that your
21 writing?
22   A.  Yes.
23   Q.  Can you tell me what that writing says?
24   A.  Looks like a question. I can't --

32 (Pages 122 to 125)

**B-0533**

Creedon Controls, Inc.
Patricia Creedon, Volume 1

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
May 22, 2006

Page 126

1  Q.  I think the first word, is the first word
2  "what"?  There's a W missing?
3  **A.  Yes, looks like "what."**
4  Q.  "What about"?
5  **A.  Um-hum.**
6  Q.  "EC pay how" can you read the remainder of
7  that?  It's quite faded out.
8  **A.  No, no, I'm sorry, I can't.**
9  Q.  And on the bottom left hand it's "what
10 notification"?
11 **A.  Yes.**
12        MR. PATRIZIA:  Counsel, if you've got a
13 better copy, I'd appreciate getting a better copy.
14        MR. SEGLIAS:  I don't know if we do.
15        MR. PATRIZIA:  I don't know whether you do
16 or not.  I'm just saying if there is one, I'd
17 appreciate it.
18 Q.  The next page --
19        MR. SEGLIAS:  That I guess you had asked
20 us to produce an original of Exhibit C 15, so as part
21 of doing that, I think it will answer that question as
22 well.
23        MR. PATRIZIA:  Good.  Let's hope that it
24 does.

Page 127

1  BY MR. PATRIZIA:
2  Q.  On the next page, which is 684, on the
3  left-hand side next to Roman XIV, "what about delays,"
4  and can you read the next two words?
5  **A.  "By other trades."**
6  Q.  Okay.  And then below that?
7  **A.  "What if new contract for labor exists?"**
8  Q.  Could you tell me what those two comments mean
9  to you?
10 **A.  It has something to do with the paragraph.
11 Those were just marginal notes that I would cursory
12 have made.  I guess it was talk -- I was wondering if
13 some of this might have slipped into a new contract or
14 a new -- yeah, a new contract time if, what about it,
15 what would happen in the event of.**
16 Q.  Do you have any additional recollection, now
17 that you've gone through these comments, as to when
18 you would have put these comments on this form of
19 agreement?
20 **A.  Not really.**
21 Q.  Okay.  Roman XIV, which is on the page we were
22 looking at, 684, says "Time of performance is of the
23 essence of this subcontract agreement."
24 **A.  Um-hum.**

Page 128

1  Q.  Do you have any understanding of what that term
2  means, "time is of the essence"?
3  **A.  No, I just know it's bad.**
4  Q.  Well, owners may have a different view of
5  what's good and bad.  But we'll leave that.  When you
6  say it's bad, what do you mean?
7  **A.  Well, when I see "time is of the essence," I
8  know it's something that I would want my attorney to
9  review.**
10 Q.  Okay.  At any point did you have attorneys
11 other than litigation counsel review this document?
12 **A.  I may have.  I don't recall.**
13 Q.  Do you know whether or not you received any
14 comments from an attorney other than litigation
15 counsel on this document?
16 **A.  I don't recall.**
17 Q.  If you had received such comments, would you
18 have kept a copy of them?
19 **A.  Yes.**
20 Q.  If you had received such comments, would you
21 have transmitted them to Forest Electric?
22 **A.  No.**
23 Q.  If you had received such comments, would you
24 have said anything to Forest Electric about a change

Page 129

1  in the terms of this form of document?
2  **A.  Absolutely not.**
3  Q.  Was it your understanding that the burden was
4  on Forest Electric to produce something to you which
5  they regarded as an executable contract?
6  **A.  Yes.**
7  Q.  In your view, did such an event ever occur?
8  **A.  I did receive an executable contract, yes.**
9  Q.  When was that?
10 **A.  May of 2004.**
11 Q.  Well, let's treat that.  I wasn't going to do
12 it now.
13        MR. PATRIZIA:  Let's go off the record
14 momentarily.
15        THE VIDEOGRAPHER:  We're going off the
16 record at approximately 2:04 p.m.
17        We're going back on the record at
18 approximately 2:05 p.m.
19        MR. PATRIZIA:  Why don't you give me 6113.
20        Let me show you a document that we'll mark
21 as Creedon 16, please.
22        (Creedon Exhibit No. 16 was marked for
23 identification.)
24 BY MR. PATRIZIA:

33 (Pages 126 to 129)

**B-0534**

Wilcox & Fetzer, Ltd.

(302)655-0477

Creedon Controls, Inc.                                          Banc One Building Corporation
Patricia Creedon, Volume 1              C.A. # 05-CV-300-JJF              May 22, 2006

Page 130

1   Q.  Showing you a document that's been marked as
2   Creedon 16, Miss Creedon.  This appears to be a cover
3   letter from Forest Electric addressed to you dated May
4   4 referring to both the 6B and the 21B projects; is
5   that right?
6      A.  Yes.
7      Q.  Is this the form of contract you had in mind as
8   an executable contract?
9      A.  Yes, it is.
10     Q.  Was this contract in fact ever executed?
11     A.  I believe I submitted an exhibit that I would
12  want to have had agreement on and then I would have
13  signed it, yes.
14     Q.  Okay.  You submitted an exhibit that you would
15  have wanted as additional terms to this contract or
16  changed terms?
17     A.  Negotiated -- yeah, they would have been
18  negotiable points to be considered.
19     Q.  Were those points ever negotiated, to your
20  knowledge?
21     A.  No, they were not.
22     Q.  Was this document ever executed in its existing
23  form, regardless of any proposed additions?
24     A.  No, it was not.

Page 131

1      Q.   Let me show you a document that we'll mark as
2   Creedon 17.
3          (Creedon Exhibit No. 17 was marked for
4   identification.)
5      Q.  You recognize that document?
6      A.  Yes, I do.
7      Q.  Okay, the first page is an e-mail from you to
8   Mr. Angarame?
9      A.  Yes.
10     Q.  And it's dated June 14th?
11     A.  Correct.
12     Q.  Which is approximately six weeks after the May
13  4 transmittal of the original form of document to you?
14     A.  Correct.
15     Q.  And it says there are proposed revisions; is
16  that right?
17     A.  Correct.
18     Q.  And the second page, which is FE 3546, is a
19  letter from you to Mr. Angarame also of the date June
20  14?
21     A.  Correct.
22     Q.  And then attached is addendum 1?
23     A.  Correct.
24     Q.  Who prepared addendum 1?

Page 132

1      A.  Dennis Link and myself.
2      Q.  Did you have counsel consult with you about
3   addendum 1?
4      A.  No, I did not.
5      Q.  What was your purpose in proposing addendum 1?
6      A.  To, to have the contract represent -- this
7   contract that was presented to me was postdated to
8   October 2nd.
9      Q.  Okay, "this contract" means the document
10  attached to Creedon 16?
11     A.  This, yes, the single project construction
12  service agreement contract No. 6B was dated October
13  3rd, October 2nd, 2003.
14         MR. SEGLIAS:  And that's part of Exhibit
15  16.
16         MR. PATRIZIA:  16, yes.
17         THE WITNESS:  Creedon 16.
18         MR. SEGLIAS:  Okay.
19     A.  The intent of this exhibit was to, or addendum
20  1 was to clarify what had actually happened on the
21  project instead of retroactively signing this, this
22  contract.
23     Q.  Okay.  And I'm sorry to do this, but we have to
24  keep the record a little straight.  What you've just

Page 133

1   said I believe is that your intent in submitting
2   addendum 1, which is attached to Creedon 17, was to
3   clarify what had happened on the project since the
4   October 2 time frame, which was the effective date of
5   the form attached to Exhibit Creedon 16.  Is that
6   correct?
7          MR. SEGLIAS:  I would object to the form
8   of the question to the extent that you say that the
9   effective date of the form.  But with that proviso,
10  you can answer the question.
11     A.  I thought it very unusual that I would have
12  gotten a contract with a date so stale.  It was highly
13  un -- irregular, highly irregular.  I set about going
14  through the contract and saying well, I would like
15  to -- I would like to negotiate these terms.
16     Q.  In your experience since 1989 and the formation
17  of Creedon Controls, was it unusual for you to have
18  commenced work and to have worked for some six or
19  eight months on a project without a written agreement?
20     A.  There have been instances where the contract
21  did not come until later, but it was unusual, yes.
22     Q.  When you went to Wilmington Trust to seek the
23  additional credit lines in relation to this project,
24  did Wilmington Trust ask you for an executed contract

34 (Pages 130 to 133)