Creedon Controls, Inc.                                      Banc One Building Corporation
Patricia Creedon, Volume 1          C.A. # 05-CV-300-JJF              May 22, 2006

Page 134

1  for this job?
2  **A. No, they did not.**
3  Q.  When you went to Wilmington Trust, did you give
4  Wilmington Trust a copy of either Creedon 11, 12, 15
5  or 16, that is, the letters from Mr. Angarame that are
6  countersigned by you on the bottom?
7  **A. I believe I gave him a letter of, a copy of the**
8  **letter of intent or Wilmington Trust a copy of a**
9  **letter of intent, yes.**
10  Q.  Do you know which one of those you gave to
11  Wilmington Trust?
12  **A. No, I do not.**
13  Q.  Do you know whether anyone from Forest Electric
14  ever told you that they had authority to negotiate the
15  terms of the contract document which is attached to
16  Creedon 16?
17  **A. It was my understanding that all the**
18  **contractors on the site got this contract. So yes, I**
19  **believe they had authority to negotiate a contract.**
20  Q.  Prior to the time of your sending the
21  communication which is Creedon 17, did you have any
22  other communication with Forest Electric as to the
23  basis of the contract document which was attached to
24  Creedon 16?

Page 135

1  **A. Yes.**
2  Q.  And what communication did you have?
3  **A. I had a telephone conversation with Paul**
4  **Angarame of Forest Electric.**
5  Q.  And what was the substance of that
6  conversation, please?
7  **A. That it was going to take me a little longer**
8  **than 14 days to turn around the contract with any**
9  **revisions or points for negotiations.**
10  Q.  And why was that?
11  **A. Because I allowed myself 14 days on an**
12  **eight-page sample subcontract, and I received a**
13  **60-page prime contract. I knew it was going to take**
14  **me longer than 14 days.**
15  Q.  When you say it was a 60-page prime contract --
16  **A. Pardon me?**
17       MR. PATRIZIA: Would you read that
18  question back to the witness, please?
19       (The requested portion was read.)
20  Q.  What do you mean?
21  **A. To me it looked like a prime contract.**
22  Q.  Did you understand, did you have any
23  understanding whether the owner was a party to this
24  contract?

Page 136

1  **A. I saw signature lines for people as**
2  **representatives of the owner, yes.**
3  Q.  Did you look at the first page of the document
4  which is 6114 at the bottom, the last two lines which
5  says, "Electrical trade manager and construction
6  contractor agree to the terms and conditions"?
7  **A. And my modification in addendum 1 was to change**
8  **between electrical trade manager and construction**
9  **contractor to between Banc One Building Corporation,**
10  **electrical trade manager agent, and construction**
11  **contractor.**
12  Q.  That was your proposal?
13  **A. That's my proposal.**
14  Q.  The form as presented to you was between the
15  electrical trade manager and contractor; is that
16  right?
17  **A. Correct.**
18  Q.  Why did you want the contract to be inclusive
19  of Banc One in your comments?
20  **A. My understanding was that Forest was working**
21  **on, as an agent for representing Banc One.**
22  Q.  What was the basis of your information that
23  Forest was working as an agent?
24  **A. I don't recall off the top of my head.**

Page 137

1       MR. SEGLIAS: Well review the document,
2  see if that --
3       THE WITNESS: Okay, okay.
4  **A. I suppose the term "electrical trade manager."**
5  Q.  Did anybody from Forest Electric ever show you
6  a contract in which Forest Electric was appointed an
7  agent?
8  **A. Paul Angarame told me they signed, he said they**
9  **signed a contract very similar to this, yes.**
10  Q.  Did he show you such a contract?
11  **A. No, he did not.**
12  Q.  Did he show you any contract in which Forest
13  was appointed an agent of the Banc One Building
14  Corporation?
15  **A. No, he did not.**
16  Q.  Did you ever see any document in which Forest
17  or Tishman sought approval from Banc One Building
18  Corporation to enter into a contract with Creedon
19  Controls?
20  **A. No, I did not.**
21  Q.  Did you ever see a document in which Forest or
22  Tishman represented that the contract that they were
23  entering into or that Forest was entering into was a
24  subcontract with Creedon Controls?

35 (Pages 134 to 137)

Creedon Controls, Inc.                                            v.                   Banc One Building Corporation
Patricia Creedon, Volume 1                          C.A. # 05-CV-300-JJF                              May 22, 2006

Page 138

1    A.  No, I did not.
2    Q.  At the time that you submitted the comments
3  which are in Creedon 17, is it the case that Creedon
4  Controls had already made the claims which are at
5  issue in this litigation for additional payment?
6    A.  I'm not sure if we had quantified what those
7  were at that time, but we had gone to the Banc One
8  management team and told them that there were some
9  circumstances beyond our control and that there would
10  be some change orders coming.  We didn't -- we did --
11  at that point I'm not sure when we knew what the, what
12  the value of that was going to be at that time.
13    Q.  Was one of your purposes in submitting the
14  comments which are in Creedon 17 to assure that you
15  were not waiving any claims for those change orders
16  that you were going to submit?
17    A.  Yes.
18    Q.  Would you look back at Creedon No. 15, please?
19  And look at page 684.
20    A.  Yes.
21    Q.  The second paragraph of Roman XIV.
22    A.  Yes.
23    Q.  What is your understanding of that paragraph?
24        MR. SEGLIAS:  Object to the question to

Page 139

1  the extent it calls for legal conclusion or a legal
2  answer.  However, you can describe your layman's
3  understanding of what you think that means.
4        MR. PATRIZIA:  I agree, Miss Creedon is
5  not counsel and I'm only asking for her layperson's
6  understanding.
7        MR. SEGLIAS:  Right.
8    A.  Well, I knew I didn't -- I knew I had questions
9  about it.  I wasn't going to spend a lot of time
10  worrying what those questions were.  That's why I put
11  a little notation on it, and if it had presented
12  itself in an executable contract form, I would have
13  sought more guidance on it.
14    Q.  When you say you would have sought more
15  guidance, from whom would you have sought guidance?
16    A.  Somebody knowledgeable in construction
17  contracts.
18    Q.  Would that have included counsel, or was there
19  someone else you had in mind as knowledgeable?
20    A.  Most likely would have, at that time, would
21  have been counsel.
22    Q.  At the time that Creedon Controls began work on
23  the project in October of 2003, was it your
24  understanding that the work was under contract to

Page 140

1  Forest Electric?
2    A.  Would you repeat that?
3    Q.  Yes.  At the time Creedon Controls began work
4  on this project in October of 2003, was it your
5  understanding that there was a contract with Forest
6  Electric for this work?
7    A.  It was my understanding there was a pending
8  contract.
9    Q.  Well, let's go back a step, Miss Creedon.  Was
10  it your understanding that you were beginning work
11  without any agreement at all?
12    A.  It was my understanding I was proceeding with a
13  letter of intent.
14    Q.  And that letter of intent was with Forest
15  Electric?
16    A.  Correct.
17    Q.  And it was your understanding that there would
18  be some written documentation of that agreement at
19  some point?
20    A.  Correct.
21    Q.  When did you expect to receive that written
22  documentation?
23    A.  I expected to receive it shortly after I had
24  started the project.

Page 141

1    Q.  And was it your understanding that Creedon
2  Controls in commencing work in October of 2003 had
3  commenced work based on at least an oral contract?
4        MR. SEGLIAS:  Objection.  Calls for a
5  legal conclusion.
6        MR. PATRIZIA:  Will you permit the witness
7  to answer to her layperson's understanding?
8        MR. SEGLIAS:  I will.
9        MR. PATRIZIA:  Thank you.
10    A.  In my layperson's -- I'm not quite sure what an
11  oral contract is, so --
12    Q.  Did you feel like you had an agreement?
13    A.  I'm not sure how to answer that, because if
14  they had present -- if they had presented a contract
15  that we could not negotiate terms on, I was not -- I
16  was unclear of how that would resolve itself.
17    Q.  Would you have stopped work if you couldn't get
18  a written agreement that met your requirements?
19    A.  That would be supposition.  I don't know.
20    Q.  At the time that you first became aware
21  sometime in early 2004 that the work was going to take
22  longer and cost more to complete than was in your
23  original proposal, did you believe that you had a
24  contract?

36 (Pages 138 to 141)

Creedon Controls, Inc.                          v.                   Banc One Building Corporation
Patricia Creedon, Volume 1              C.A. # 05-CV-300-JJF                          May 22, 2006

Page 186

1  gotten this e-mail and this without writing on it, as
2  well as this without any writing on it. They would --
3    Q.  "This" is the third page, the general release?
4    A.  Yes, sorry. Yes, the general release and the
5  final waiver of liens and release of claims. There
6  would have been no notations on it when we received
7  it.
8    Q.  And then you believe Mr. Link at some point may
9  have marked it up?
10    A.  Yes.
11    Q.  At the time that Mr. Link marked it up, did you
12  make a request to him to mark it up?
13    A.  Not that I recall. I may have.
14    Q.  Do you know whether Mr. Doble, in the course of
15  his role as project manager and preparing
16  work-in-process forms for you, would have been
17  tracking the actual extent of completion of the
18  project month by month?
19    A.  Do you mean estimating completion to the end by
20  month by month, because it is an estimation, a work in
21  process is an estimation of your cost to complete.
22    Q.  Well, I guess I would understand that to do an
23  estimate of the cost to complete, you would have to
24  know how much work had been completed to date at what

Page 187

1  cost. Right?
2    A.  Yes.
3    Q.  And from that you would then try to make an
4  estimate of how much additional work remained.
5    A.  Correct.
6    Q.  And how many dollars it was going to take --
7    A.  Correct.
8    Q.  -- to do that work.
9    A.  Correct.
10    Q.  So I guess my question was did Mr. Doble track
11  the work actually completed to date as part of his
12  effort to fill out the work-in-process forms and make
13  an estimate of the work to be completed?
14    A.  That would be -- yes, that would be my --
15    Q.  Did he ever show those documents to you?
16    A.  Yes.
17    Q.  Do you have copies of those documents somewhere
18  in your files?
19    A.  They have been presented.
20    Q.  In what form are those documents kept?
21    A.  Schedules; the -- we did a delta graph of how
22  many hours we estimated to complete. We did a daily
23  schedule of how many hours we thought we had left to
24  complete. We -- there were several formats in which

Page 188

1  we estimated the cost to complete.
2    Q.  When did, when did Creedon Controls begin to
3  keep the delta graph or the daily form of work left to
4  complete?
5    A.  That I recall?
6    Q.  Yes.
7    A.  Somewhere April. That doesn't mean it wasn't
8  done before that.
9    Q.  I understand that. But I don't know --
10    A.  Yeah, okay.
11    Q.  -- whether it means it was or it wasn't done.
12  But my next question was going to be whether you
13  recall seeing those kinds of documents prior to April
14  of 2004?
15    A.  Not typically from my project managers.
16    Q.  You indicated to me earlier that you recall
17  Mr. Doble coming to you in March of '04 to indicate as
18  you were going over the February numbers that the work
19  was going to take more resources than was available
20  remaining on the contract billing amount. Is that
21  right?
22    A.  That's correct.
23    Q.  Do you recall when in March that occurred?
24    A.  No.

Page 189

1    Q.  Do you recall Mr. Doble ever having that
2  discussion with you earlier than March of '04?
3    A.  My recollection is no, no. I would not have
4  recollected that.
5    Q.  Do you recall any indications in the
6  November/December time frame that either the pace of
7  the work had shifted or the amount of effort involved
8  was greater than Mr. Doble anticipated when he did his
9  original estimate for the bid?
10    A.  In November and December?
11    Q.  November and December of '03.
12    A.  No, I was tracking hours and we had not -- it
13  did not look out of range, no.
14    Q.  Do you recall whether there were more hours in
15  the December time frame than appeared to be consistent
16  with the estimate as it had originally been submitted?
17    A.  No, I don't recall that.
18    Q.  At any point in the November/December time
19  frame as you got to year end, did you ask Forest where
20  the executable contract was?
21    A.  I believe I had a conversation with Paul
22  Angarame asking for the executable contract, yes.
23    Q.  Do you recall when that conversation occurred?
24    A.  I believe it was the November, the November

48 (Pages 186 to 189)

Creedon Controls, Inc.                                                  Banc One Building Corporation
Patricia Creedon, Volume 1                  v.                          May 22, 2006
                                    C.A. # 05-CV-300-JJF

Page 190

1   time period.
2   Q.  What did Mr. Angarame say to you in response?
3   A.  That they hadn't gotten any of the contracts
4   together yet.
5   Q.  Did he tell you why they hadn't gotten the
6   contracts together yet?
7   A.  They said they hadn't executed a contract yet.
8   Therefore, they weren't going to issue contracts.
9   Q.  Do you know when Forest ever executed a
10  contract with Banc One Building Corporation or
11  Tishman?
12  A.  No.
13  Q.  Did you ever see such an agreement?
14  A.  No.
15  Q.  Would it surprise you that there was a contract
16  in place as early as October of 2003 between Tishman
17  Construction of Maryland and Forest Electric?
18  A.  No.
19  Q.  If such a contract were in place, why would
20  Mr. Angarame have told you that there was no contract
21  in place?
22  MR. SEGLIAS:  Objection.  Unless
23  Mr. Angarame made such a statement to you, there's no
24  need to speculate about what was in his mind.

Page 191

1   MR. PATRIZIA:  I certainly don't want
2   speculation, quite correct, Counsel.
3   MR. SEGLIAS:  So if he said something to
4   you, you can testify to that.
5   THE WITNESS:  Okay.
6   MR. SEGLIAS:  About why Forest --
7   THE WITNESS:  Okay.  There was a lot of
8   rumor and speculation going on on the job site.
9   Q.  What was the rumor and speculation?
10  A.  Oh, with electricians, it's hard to tell.  They
11  had all manner of -- all of the contractors that I
12  knew of were complaining they did not have contracts,
13  that they had expended millions of dollars and still
14  hadn't got a contract.  They were working under
15  letters of intent and it was causing concern.  And
16  couldn't get through to anyone to find out why they
17  weren't getting contracts.
18  Q.  Did Mr. Doble, in the course of his activity as
19  project manager, indicate to you in the November 2003
20  time frame that he was having any difficulties in
21  terms of scheduling work or other implementation of
22  the 6B contract?
23  A.  Not that I recall.
24  Q.  Did he give you any indication that there were

Page 192

1   problems in scheduling the work or in accomplishing
2   the work in the December 2003 time frame?
3   A.  Not in the first part.  There was a minor
4   glitch in December.
5   Q.  What was the minor glitch in December?
6   A.  I can't recall off the top of my head.
7   Something happened in December.  We had a blip in
8   the -- we had a spike in the costs and I was asking
9   him about it.
10  Q.  Did that spike in cost cause you any concern in
11  terms of being able to complete the work for the bid
12  amount?
13  A.  No, because we were generally ahead of schedule
14  at that time.
15  Q.  In January of '04 did Mr. Doble indicate to you
16  that there were problems in accomplishing the work on
17  the site in that month?
18  A.  No.
19  Q.  Did Mr. Doble indicate to you in February of
20  '04 that there were problems in accomplishing the work
21  on the site?
22  A.  When we were reviewing the numbers from
23  February, we had a conversation about we're not going
24  to be able to finish this project.

Page 193

1   Q.  And that's the same conversation that we
2   discussed a little bit ago as your first understanding
3   from Mr. Doble that the contract completion was going
4   to cost more than was in the original amount?
5   A.  Correct, correct.
6   Q.  And this occurs sometime in March of '04 as
7   you're looking at the February numbers?
8   A.  Correct.
9   Q.  Was there something about that conversation in
10  which he indicated that there had been delays on site,
11  or simply that it was going to cost more to complete
12  the work?
13  A.  It was more that the, the contract was spread
14  so far over so many areas that it was hard to get a
15  read on how much was being done at any one time in any
16  one room in any one area.  So it was -- it was not as
17  anticipated on bid day where they, he could work crews
18  and it could be contiguous or within a certain area at
19  a certain time.  So there was -- when he came and
20  talked to me, it was a number of reasons why he felt
21  that we weren't going to be -- it wasn't just one
22  reason.  There were several reasons why he didn't
23  think, based on the February numbers, that we were
24  going to be able to complete for the contract amount.

49 (Pages 190 to 193)

Page 214

1    Q.  That's why I asked whether you know.
2    **A.  I do not know.**
3    Q.  You do not know.  You were the apparent
4    successful bidder.
5    **A.  In my mind, I was the successful low bidder on**
6    **that project.**
7    Q.  Okay.  Then there is a reference in item 4 to a
8    package for the second IT cable conveyance job for pod
9    B.
10   **A.  Yes.**
11   Q.  It says, "Charlie to estimate and negotiate pod
12   B including an additional 250K to mitigate the cost
13   overruns for job 2357."  Do you see that?
14   **A.  I do.**
15   Q.  What's your understanding of what that
16   discussion was?
17   **A.  That they were trying to mitigate the cost**
18   **overruns of $250,000.**
19   Q.  So there was going to be included in whatever
20   estimate Charlie made -- and Charlie's Mr. Doble?
21   **A.  That is correct.**
22   Q.  Mr. Doble was to include an extra $250,000 in
23   that estimate, and that amount was to count against
24   the putative cost overruns on the 6B job?

Page 215

1    **A.  Correct.**
2    Q.  And that was your understanding going into this
3    discussion, was that if they awarded you that
4    additional contract, that was going to include the
5    extra money?
6    **A.  No, not going into this contract, no.**
7    Q.  I'm sorry, going into --
8    **A.  Not into this meeting, no, it was not.**
9    Q.  It was your understanding coming out of the
10   meeting?
11   **A.  Yes.**
12   Q.  Okay.  Item 11 says, "Creedon was asked to cut
13   night-shift manpower even though second shift was most
14   productive."
15   **A.  Yes.**
16   Q.  Would you tell me your understanding of that
17   portion of the conversation in the meeting?
18   **A.  Well, Tishman and Forest were saying, "You**
19   **don't need night shift.  Night shift costs money, cut**
20   **your night shift."  And we kept saying don't -- you**
21   **know, "You're saving pennies and wasting dollars.**
22   **We're more productive at night shift.  We can get more**
23   **work done.  We're not, you know, we don't have the**
24   **constraints on us at night shift as we do at day**

Page 216

1    **shift."  So, you know, we kind of fought them and**
2    **asked them, "Please don't let us, make us cut the**
3    **night shift."  And they said, "Cut the night shift."**
4    **So we cut the night shift.**
5    Q.  So your understanding is that Creedon was
6    directed to cut the night shift?
7    **A.  Yes, um-hum.**
8    Q.  Item 12 says, "Charlie was asked to create a
9    detailed schedule based on 6,000 hours versus
10   Creedon's 12,000."  Can you tell me what that relates
11   to?
12   **A.  There was a set of documents that had preceded**
13   **this meeting, and it probably generated this meeting.**
14   Q.  Do you recall ever seeing the letter that
15   Mr. Angarame was to generate recapping the meeting --
16   **A.  No.**
17   Q.  -- that's marked in item 14?
18   **A.  No, I didn't see much from them at all,**
19   **anything.**
20        MR. PATRIZIA:  Let's mark this as 39,
21   please.
22        (Creedon Exhibit No. 39 was marked for
23   identification.)
24   Q.  Have you seen this document before, Miss

Page 217

1    Creedon?
2    **A.  I have.**
3    Q.  Would this be Mr. Doble's notes from that same
4    meeting?
5    **A.  It appears to be.**
6    Q.  Did you and Mr. Doble coordinate on your notes?
7    **A.  No.**
8    Q.  Why did Mr. Doble also take notes?
9    **A.  We're both prone to take notes.  And his are**
10   **definitely more, more detailed and more getting the**
11   **job done, more -- you can see his are definitely hours**
12   **and what's left to complete and those types of things.**
13   **So his is from a different vantage point than, say,**
14   **mine would be.**
15   Q.  The first bullet point in Mr. Doble's say that,
16   "Paul and Tom stated that they had reviewed our letter
17   of 4-20, we should have notified them earlier than our
18   4-06 letter about the impact of our change order
19   request."  Do you see that?
20   **A.  I do.**
21   Q.  Do you recall that discussion in the meeting?
22   **A.  Not really, no.**
23   Q.  Do you have any reason to believe that
24   Mr. Doble would have put this item in here if he had

55 (Pages 214 to 217)

Creedon Controls, Inc.
Patricia Creedon, Volume 1

v.
C.A. # 05-CV-300-JJF

Banc One Building Corporation
May 22, 2006

Page 218

1 not heard that discussion?
2 **A.  No, absolutely not.**
3    Q.   And then Mr. Doble states, "I stated we
4 notified as soon as we realized and quantified
5 impact."  Do you see that?
6 **A.  I do.**
7    Q.   Was it your understanding that based on your
8 phone call with Mr. Angarame at the end of March, that
9 you had notified earlier and just had not been able to
10 quantify impact at that point?
11 **A.  That was my understanding.**
12    Q.   Did you indicate that understanding at the
13 meeting?
14 **A.  Excuse me?**
15    Q.   Did you indicate that understanding at the
16 meeting in response to the discussion of this issue?
17 **A.  No, but it looks like Charlie did.**
18    Q.   Item 3, "Additional hours, 13,300 to date plus
19 12,000 to finish."  What do you understand that to
20 mean?
21 **A.  Well, I would understand that to mean that we**
22 **had expended 13,300 over what we had anticipated to**
23 **date, and we had another 12,000 to finish.**
24    Q.   So the 13,300 is 13,300 over what the original

Page 219

1 estimate was?
2 **A.  That was -- that's what I believe.  I could be**
3 **wrong.**
4    Q.   Do you know how many hours had been included in
5 the original estimate?
6 **A.  I believe 20 -- somewhere in the neighborhood**
7 **of -- it's back in there somewhere.**
8    Q.   It is.  I'm just asking you if you remember.
9 The documents are --
10 **A.  I think it's 29,000, somewhere in the**
11 **neighborhood of 29,000 and then there was an allowance**
12 **for an additional thousand hours.**
13    Q.   So let's say in rough terms 30,000, and this
14 was going to be another 25,000 hours.
15 **A.  Correct.**
16    Q.   Almost double --
17 **A.  Yes.**
18    Q.   -- the original estimate.
19 **A.  Yes.**
20    Q.   Were you surprised to understand that the
21 estimate now was almost double the original estimate
22 that Mr. Doble had prepared?
23 **A.  Yes.**
24    Q.   Did you have any conversation with Mr. Doble

Page 220

1 about that?
2 **A.  I'm sure I did.  I also talked to the**
3 **contractor on the other site and he said join the**
4 **club.**
5    Q.   When you say you talked with the other
6 contractor on the other site, I'm sorry, what do you
7 mean?
8 **A.  Yes.  I talked to the other contractor who was**
9 **performing work on the Bear site.**
10    Q.   And who was that?
11 **A.  Well, at the time it was Kevin Dare at Hatzel &**
12 **Buehler.**
13    Q.   And what conversation did you have with
14 Mr. Dare?
15 **A.  I said, "I'm not going to go into specifics,**
16 **but I'm wondering how close to your bid you are and**
17 **how much more you think you have to complete."  And he**
18 **said, I believe he said we've -- "We're going to**
19 **double our hours."  At that point --**
20    Q.   When did you have that conversation with
21 Mr. Dare, do you recall?
22 **A.  No, I do not.**
23    Q.   Item (I) under 3 on the second page, Mr. Doble
24 seems to say that Tom and Paul both stated Creedon

Page 221

1 needs to cut manpower.  Is there any reference there
2 to cutting the night shift specifically as opposed to
3 cutting manpower generally?
4 **A.  Doesn't look like he's made reference to a**
5 **night-shift cut.**
6          MR. PATRIZIA:  Would you mark this one as
7 40, please.
8          (Creedon Exhibit No. 40 was marked for
9 identification.)
10    Q.   I'm showing you what's been marked as Creedon
11 40, and that's a document which is titled "Critical
12 events."  It's dated April 19.  Have you seen that
13 document before?
14 **A.  I have.**
15    Q.   Do you know who prepared that document?
16 **A.  It was Charlie Doble, Dennis Link, and**
17 **interviews and reviews with the, Paul Brainard, Fred**
18 **Street, John Mulrooney, and a few more site**
19 **supervisors on the project.**
20    Q.   Okay.  Well we've been through site
21 supervisors, Mr. Brainard, Mr. Street, I thought
22 Mr. Sharp?
23 **A.  Yes.**
24    Q.   And Mr. Mulrooney?

56 (Pages 218 to 221)

Creedon Controls, Inc.                                    Banc One Building Corporation
Patricia Creedon, Volume 1          v.                               May 22, 2006
                              C.A. # 05-CV-300-JJF

Page 222

1    A.  Yes.
2    Q.  What other, quote unquote, supervisors are you
3    referencing in terms of the interview process that
4    supported this document?
5    A.  Okay, there were possibly, I know there was at
6    least one, there maybe had been another site
7    supervisor who had kept a daily log.
8    Q.  Do you know who that supervisor was?
9    A.  I wish I could remember their names, but no, I
10   don't.
11   Q.  You mentioned daily logs.  What do you mean by
12   a daily log?
13   A.  Daily logs would be what a foreman or general
14   foreman would do on a daily basis on a job.
15   Q.  In what form are these kept?
16   A.  In bound marbled copy books, copyright books.
17   Q.  Are they always bound or are they sometimes a
18   spiral bound?
19   A.  Most times they're bound.
20   Q.  When the general foreman keeps that log, what
21   does he do with the log at the end of the project?
22   A.  He should turn them over to me.
23   Q.  Do you have all of the logs, the daily logs
24   from this project?

Page 223

1    A.  I believe I do.
2    Q.  Do you keep those in Creedon's files
3    ordinarily?
4    A.  Yes, I would.
5    Q.  Is it in the ordinary and usual course of
6    business for you to keep those logs in the file?
7    A.  Yes, it would be.
8    Q.  And when you say you keep them, are you talking
9    about you personally or someone on your staff?
10   A.  Someone on my staff.
11   Q.  Who on your staff would keep them?
12   A.  It would be the general or the, with all the
13   documentations regarding the job.  So it wouldn't --
14   it would be in the same place you would find the
15   contract, where you'd find the general conditions,
16   where you would find the plans and specs, where you'd
17   find the submittals.  So it would just be -- there's
18   no special place for just job logs.
19   Q.  Okay.  So in the file for the project, there
20   would be the contract documents, the daily logs and
21   other related documents related to that project?
22   A.  Correct.
23   Q.  Copies of the requisition submittals?
24   A.  Yes.

Page 224

1    Q.  Okay.  And you said that Mr. Doble and Mr. Link
2    worked on this based on Mr. Doble's information and
3    the interviews.  Did anybody else participate in the
4    preparation of this list?
5    A.  The preparation, yes.
6    Q.  Who?
7    A.  I believe Kristin did some of the typing and
8    the formatting.
9    Q.  Okay.  Kristin being Kristin Cerase?
10   A.  Yes, sorry, yes, Kristin Cerase.
11   Q.  Was there anyone other than Mr. Link,
12   Mr. Doble, the people who were interviewed, and Miss
13   Cerase?
14   A.  Not that I can recall.
15   Q.  This version is dated April 19, 2004.
16   A.  Yes.
17   Q.  Do you know whether there were earlier drafts
18   of this document?
19   A.  Possibly.
20   Q.  Is this the document that is referenced in the
21   meeting notes as to the critical events list?
22   A.  I can't be sure, but I would -- we sent a
23   similar document to Forest, and this looks like what
24   we sent them.

Page 225

1    Q.  At the back of this document, Creedon 5693,
2    there's an estimate to complete as of 4-16, which
3    totals 11,990 hours.  Do you see that?
4    A.  Yes, I do.
5    Q.  Is that the basis of the 12,000 hours that was
6    in the earlier notes?
7    A.  I believe so.
8        MR. PATRIZIA:  This is 41.
9        (Creedon Exhibit No. 41 was marked for
10   identification.)
11   Q.  Showing you a document which has been marked as
12   Creedon 41.  Well the good news, Miss Creedon, is
13   we've got 20 minutes and we're going to get through
14   it.
15   A.  Okay.
16   Q.  So don't worry about rippling the pages, okay?
17   A.  Okay.
18   Q.  First of all, do you recognize that document?
19   A.  I do.
20   Q.  Who prepared this document?
21   A.  Some of it was prepared by me, some was
22   prepared by Kristin, some was prepared by Charlie
23   Doble, some was prepared by Dennis Link.  See if I can
24   see anybody else's handiwork in here.  Some was

57 (Pages 222 to 225)

Creedon Controls, Inc.                                     Banc One Building Corporation
Patricia Creedon, Volume 1          C.A. # 05-CV-300-JJF                   May 22, 2006

Page 226

1  prepared by Banc One. Some was prepared by Forest. I
2  believe I -- well, I believe I covered all that may
3  have had a hand in the preparation.
4     Q. This is obviously a rather formal compilation.
5  There is a table of contents, there are tabs.
6     A. Yes.
7     Q. For whom was this compiled?
8     A. For my banker.
9     Q. And when you say your banker, this is someone
10 at Wilmington Trust?
11    A. Yes.
12    Q. What was the purpose of preparing this
13 document?
14    A. We were -- the line of credit had an
15 anniversary date of sometime in August. And I knew
16 that in August I would not be able to repay them.
17    Q. You knew as of June that come the end of the --
18    A. Yes.
19    Q. -- line of credit in August, you would not be
20 capable of repayment in August.
21    A. Correct.
22    Q. Now if we look at the second page of this
23 document, which is CL 0523 --
24    A. Yes.

Page 227

1     Q. -- there are two bar charts.
2     A. Yes.
3     Q. And they indicate that the original estimate
4  was 22,620 hours, plus an allowance of 1,000 hours?
5     A. Okay.
6     Q. Invoiced change orders of 6,610 and a half
7  hours.
8     A. Okay, that's where the 29 or 30,000 -- okay,
9  yes.
10    Q. And then the projected difference of 34,819?
11    A. Yes, but this is out of sequence. I am kind of
12 puzzled why this says 9-12-04 and this says June 30th
13 of 2004.
14    Q. I don't know. All I can tell you is that they
15 were given to us in this sequence.
16    A. Okay.
17    Q. If you look at the Bates numbers, it's 522 and
18 then 523.
19    A. Okay.
20    Q. So I was going to ask you the same question,
21 which is we've got a June 30, 2004 date on the front
22 and a September --
23    A. I'm not sure why --
24    Q. -- '04.

Page 228

1     A. I don't remember ever opening up this and
2  finding anything other than the table of contents
3  first. So these, I don't know why they would be in
4  here as they are. But they are.
5     Q. Well, let me ask you this, because it may
6  refresh your recollection. If you'd turn to 721, CL
7  721, it's further in the back of the document.
8     A. Okay.
9     Q. Okay. There is what appears to be a new cover
10 sheet.
11    A. CL 721.
12    Q. And then 722 is "Follow-Up Banc One documents."
13    A. Yes, okay.
14    Q. And there is a new table of contents.
15    A. Yes, okay.
16    Q. Which is events post August 2.
17    A. Okay.
18    Q. Is it possible that there was an updated
19 version of this that went later than the original date
20 of June 30 and this got put in?
21    A. Possible, yes.
22    Q. Is that possible?
23    A. That is possible.
24    Q. Do you recall that?

Page 229

1     A. Yes, I do, yes.
2     Q. If you look at the third page of the document,
3  CL 0524?
4     A. Yes.
5     Q. This is marked as attachment 3.B in the upper
6  right-hand corner?
7     A. Yes, um-hum.
8     Q. Do you know what this was an attachment to?
9     A. It created this.
10    Q. Okay. We need to go through this so we can see
11 "this."
12    A. Here we go.
13    Q. CL 524 was the data that was used to support
14 the graph?
15    A. The graph, yes.
16    Q. Which is on the next page, CL 525?
17    A. I don't have a Bates stamp on mine, so I don't
18 know.
19    Q. But it is a graph titled "Creedon Controls
20 Actual and Projected"?
21    A. Correct.
22    Q. Okay. Now let's look at the table, okay, which
23 is CL 524.
24    A. Okay.

58 (Pages 226 to 229)

Creedon Controls, Inc.                                    Banc One Building Corporation
Patricia Creedon, Volume 1          C.A. # 05-CV-300-JJF                May 22, 2006

Page 230

1  Q.  Now at the table, not the chart. 524. We're
2  not looking at the same thing.
3  A.  Oh, sorry, yes.
4  Q.  Okay.  There is a column in about the middle of
5  the page titled "Percentage complete." Do you see
6  that?
7  A.  Yes.
8  Q.  Do you know what that percentage complete is
9  based on?
10  A.  No, I don't.
11  Q.  Do you know who prepared this table?
12  A.  No, I don't.  Well, I know Kristin did a
13  portion of it.
14  Q.  Do you know what data she relied on?
15  A.  I believe she relied on the total hours from
16  payroll records.
17  Q.  So this is based on hours rather than dollars
18  billed or on a record from Mr. Doble or any of the
19  general foremen as to work actually accomplished?
20  A.  Correct.
21  Q.  Okay.  The column immediately to the left of
22  the percentage complete is "S curve percentage," do
23  you see that?
24  A.  I do.

Page 231

1  Q.  Do you know what S curve is?
2  A.  I do know there is another graph called the "S
3  curve," and that these would have fed the S curve
4  graph.
5  Q.  Do you know what the S curve is supposed to
6  represent?
7  A.  The variation of the variant.
8  Q.  Do you know under whose direction Miss Cerase
9  worked in preparing this table and gathering this
10  data?
11  A.  That would have been Mr. Link.
12  Q.  Mr. Link, okay.
13  A.  Yes.
14  Q.  Given that the total in the third column under
15  "total hours" matches to the "project to date" hours
16  on CL 523 --
17  A.  Yes.
18  Q.  -- would it be reasonable to say that this
19  table and the bar chart are contemporaneous?
20  A.  It would be reasonable, yes.
21  Q.  Okay.  Now, the next page that doesn't have a
22  Bates on it is the graph?
23  A.  Yes.
24  Q.  You talked a little bit ago about doing graphs

Page 232

1  that compared daily hours.  Is this the graph you had
2  in mind or did you have other graphs in mind?
3  A.  I did not have -- this is -- yes, this is the
4  graph that I was talking about.
5  Q.  Was this graph prepared several times or was
6  this a one-time preparation?
7  A.  This was several times.
8  Q.  Do you know when you gave this document to
9  Wilmington Trust?
10  A.  No, I do not.
11  Q.  If you look --
12  A.  I can probably check out, but I don't know off
13  the top of my head.
14  Q.  Well, I understand.  But I just, I want to know
15  what you know now.
16  A.  Okay.
17  Q.  Okay.  Would you look at the narrative portion
18  of this CO 0530.  Do you know who prepared this
19  narrative?
20  A.  Yes, Dennis Link.
21  Q.  Dennis Link prepared this?
22  A.  Yes.
23  Q.  Do you know what documents or other information
24  Mr. Link worked from?

Page 233

1  A.  He worked from the project documents, he worked
2  extensively with Charlie Doble, he worked with project
3  manager -- the site supervision, the manpower
4  supervision, and he worked from -- well let me see how
5  far it goes.  And of course I reviewed it.
6  Q.  Did you review it for the accuracy of the
7  statements?
8  A.  For the reasonableness and accuracy, yes.
9  Q.  Okay.  If you go back to the table with me on
10  CL 0524, there's a column headed "total hours."
11  A.  Yes.
12  Q.  Is it your understanding that those are the
13  total hours actually spent in that particular week?
14  A.  Except for a formatting problem, yes.
15  Q.  When you say "a formatting problem," what do
16  you mean?
17  A.  Well, there was some time period in here where
18  the total number at the bottom wasn't all the cells in
19  the, in the Excel spreadsheet.  So, but I believe that
20  these numbers by week were --
21  Q.  Were correct?
22  A.  Were correct, yes.
23  Q.  Okay.  And on the right-hand side of the table,
24  there's a set of columns labeled "projected."  And

59 (Pages 230 to 233)

Creedon Controls, Inc.                    v.                Banc One Building Corporation
Patricia Creedon, Volume 2        C.A. # 05-CV-300-JJF                         May 23, 2006

Page 244

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a        )
Delaware corporation,            )
                                 )
          Plaintiff,             )
                                 ) Civil Action
     v.                          ) No. 05-CV-300-JJF
                                 )
BANC ONE BUILDING                )
CORPORATION, an Illinois         )
corporation, and FOREST          ) Volume Two
ELECTRIC CORPORATION, a New      ) Pages 244 - 397
York corporation,                )
                                 )
          Defendant.             )


          Videotape Rule 30(b)(6) deposition of
CREEDON CONTROLS, by and through PATRICIA CREEDON,
taken pursuant to notice at the law offices of Ashby &
Geddes, P.A., 222 Delaware Avenue, 17th Floor,
Wilmington, Delaware, beginning at 9:33 a.m., on
Tuesday, May 23, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:
          EDWARD SEGLIAS, ESQUIRE
          COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
             1007 Orange Street, Suite 1130
             Wilmington, Delaware  19801
             On behalf of Plaintiff


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Creedon Controls, Inc.                                          v.                              Banc One Building Corporation
Patricia Creedon, Volume 2                        C.A. # 05-CV-300-JJF                                    May 23, 2006

Page 269

1    A. We had made four contacts prior -- after the
2    July 8th meeting, and at the fourth one it was, "Do
3    what you have to do."
4        Q. Did you, you personally on behalf of Creedon
5    Controls subsequently write, for example, to
6    Mr. Diamond at Banc One or to Mr. Tishman at Tishman
7    Construction --
8        A. Correct.
9        Q. -- seeking to get a meeting?
10       A. Correct.
11       Q. As a result of those letters did you have a
12   subsequent meeting?
13       A. We did.
14           MR. PATRIZIA: Counsel, I would like to
15   ask you whether you regard those conversations as
16   within the settlement privilege, that is, the ones
17   that occur subsequently that Mr. Hennessey and Miss
18   Creedon and others attended?
19           MR. SEGLIAS: I think you're -- at this
20   point, we'll reserve our right. I mean at -- if we
21   believe that -- I'll allow you to explore it. If we
22   believe that it may violate the Federal Rules for
23   purposes of trial, that's probably a different story
24   and I'll reserve my right to object to any sort of

Page 270

1    settlement discussions, if you will, that may have
2    occurred.
3            But for purposes of this deposition, I'm
4    going to allow you to go ahead and explore that.
5            MR. PATRIZIA: I think I understand the
6    line you're drawing.
7    BY MR. PATRIZIA:
8        Q. With that in mind, Ms. Creedon, were there
9    subsequent meetings by Creedon Controls with
10   representatives of Forest Electric and/or Tishman
11   Construction and/or Banc One Building Corporation?
12       A. Everyone but Tishman, yes.
13       Q. Did you ever have a meeting at which Tishman
14   Construction was separately represented?
15       A. Following the July 8th meeting?
16       Q. Yes.
17       A. No.
18           THE WITNESS: May I take a break now?
19           MR. PATRIZIA: Yeah, of course.
20           THE WITNESS: Thank you.
21           THE VIDEOGRAPHER: We're going off the
22   record at approximately 10:09 a.m.
23           (A brief recess was taken.)
24           THE VIDEOGRAPHER: We're going back on the

Page 271

1    record at approximately 10:16 a.m.
2    BY MR. PATRIZIA:
3        Q. Looking still at Exhibit 41, Miss Creedon,
4    would you turn to the page which is Bates stamped CL
5    0620? Do you know who prepared this portion of
6    Exhibit 41, the Section IV, contract summary text?
7        A. It would have been Dennis Link with input from
8    Charlie Doble, myself.
9        Q. Did you review it prior to its inclusion in
10   Exhibit 41 and its being sent to the bank?
11       A. Yes.
12       Q. In the bottom third of that page, there is a
13   reference to a letter of intent for the IT cable
14   conveyance system dated February 6th, 2004. Do you
15   see that?
16       A. I do.
17       Q. If you look further back in the document at
18   page CL 0638, there's a copy of what I believe to be
19   that letter. Is that correct?
20       A. It looks like it, yes. Um-hum.
21       Q. And would you agree with me that the form and
22   the text of that letter is substantially the same as
23   the letters that you received in October and November
24   of '03 with regard to the 6B project?

Page 272

1        A. I would.
2        Q. There is no Exhibit 1 attached to this copy of
3    the letter. Do you know whether Exhibit 1 on this
4    letter was the same form of subcontract agreement that
5    you had received in October and November?
6        A. My recollection was that it was.
7        Q. When you received this letter with the same
8    form of agreement, did you raise again with Forest
9    Electric the issue of obtaining a written contract in
10   executable form for the 6B work as well as the 21B
11   work?
12       A. I don't recall.
13       Q. Two pages after that letter at 0640 there is a
14   document titled "Purchase order agreement." Do you
15   see that?
16       A. I do.
17       Q. Is this the purchase order that you received
18   from Forest with regard to the 21B work?
19       A. This would be a purchase order for my job 2377.
20       Q. Well, if you look at the total amount at the
21   bottom --
22       A. Oh, sorry.
23       Q. -- and compare it to the February 6 letter, the
24   amounts seem to match and the text is "add IT cable

8 (Pages 269 to 272)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Patricia Creedon, Volume 2          C.A. # 05-CV-300-JJF                              May 23, 2006

Page 273

1   conveyance system" --
2      A.  You're right, yes.
3      Q.  -- "pod A per RFP 21B"?
4      A.  Yes.
5      Q.  So this is the purchase order from Forest for
6   the 21B work?
7      A.  Yes.
8      Q.  Did you receive a similar purchase order for
9   the 6, project 6B work?
10     A.  Not that I recall.
11     Q.  Did you find it unusual that there was a
12  purchase order for this work and not for the 6B work?
13     A.  No, I did not.  Didn't give it much thought.
14     Q.  Turning back to page CL 0620.
15     A.  Yes.
16     Q.  There is a reference at the bottom of that page
17  to the May exchange with, which included a different
18  form of contract.  Do you see that?
19     A.  I do.
20     Q.  The last sentence says, "This action by FEC,
21  Tishman and Banc One created confusion with whom we
22  have even an oral contract."  Do you see that?
23     A.  I do.
24     Q.  In the transmission of the contract form in

Page 274

1   May, did you receive any correspondence directly from
2   Tishman Construction?
3      A.  No, we did not.
4      Q.  Did you receive any correspondence in that time
5   frame directly from Banc One Building Corporation?
6      A.  Other than the contract, no.
7      Q.  Well, did the contract come to you from Banc
8   One Building Corporation or from Forest Electric?
9      A.  My assumption was that it came from Banc One to
10  Forest to me; thereby it did come from Banc One.
11     Q.  What was the basis of your assumption that it
12  came from Banc One to Forest?
13     A.  It was -- I believed it to be a contract
14  prepared by Banc One.
15     Q.  But you only received it from Forest Electric?
16     A.  That would not have surprised me.
17     Q.  I didn't ask you whether you were surprised,
18  Miss Creedon.  But you only received it from Forest
19  Electric?
20     A.  And where would they have gotten it from?
21     Q.  Miss Creedon, regardless of where you think
22  they got it from, did you receive it from Forest
23  Electric?
24     A.  I received it from Forest Electric.

Page 275

1      Q.  And not from anyone else?
2      A.  No, I did not.
3      Q.  And you say in this sentence at the bottom of
4   0620 that it "created confusion regarding with whom we
5   have even an oral contract."  Do you see that?
6      A.  I did not say that, but I can read it, yes.
7      Q.  When you say you did not see it, this was
8   something that Creedon Controls submitted?
9      A.  I did not say that, right.  I'm just saying
10  that's not my terminology.
11     Q.  Whose terminology is that?
12     A.  I believe that's Dennis Link's terminology.
13     Q.  Was it Creedon Controls' understanding in
14  embarking on the work in October of 2003 that they
15  were undertaking, Creedon Controls was undertaking
16  that work pursuant to a contract?
17     A.  Yes.
18     Q.  Is it Creedon Controls' understanding that the
19  contract was not reduced to an executed written
20  contract?
21     A.  No, I was waiting for an executed contract.  At
22  no time did I think I wouldn't get a contract.
23     Q.  Indeed, Creedon Controls commenced the work
24  believing that it was working pursuant to a contract,

Page 276

1   isn't that right?
2      A.  I anticipated a contract.
3      Q.  Well, when you say you anticipated a contract,
4   you anticipated a written contract --
5      A.  I did.
6      Q.  -- in fully executable form?
7      A.  Yes, an executable contract.
8      Q.  But you wouldn't have undertaken the work
9   unless you believed that you had a contract under
10  which you would be paid to perform that work; isn't
11  that right?
12     A.  Correct.
13     Q.  At the time that Creedon Controls began the
14  process of submitting its change orders for the claim
15  which is involved in this proceeding, were you told
16  that there was a combined overhead and profit limit to
17  which Creedon Controls should adhere in making its
18  submission?
19     A.  There were varying tellings or papers exchanged
20  about what would or would not be the overhead and
21  project profit on the project.
22     Q.  What was, what was your understanding of what
23  Forest believed was the appropriate limit?
24     A.  I cannot recall which one they finally decided

9 (Pages 273 to 276)

Creedon Controls, Inc.                                      Banc One Building Corporation
Patricia Creedon, Volume 2          C.A. # 05-CV-300-JJF                    May 23, 2006

Page 277

1  upon.
2          MR. PATRIZIA:  Would you mark this as 42,
3  please?
4          (Creedon Exhibit No. 42 was marked for
5  identification.)
6     Q.  Showing you Creedon 42, which is Forest
7  Electric's 3457, this appears to be an e-mail from a
8  Juliane Lynch to Mr. Doble.  Have you seen this e-mail
9  before, Miss Creedon?
10    A.  I can't answer with any certainty.
11    Q.  Did Mr. Doble ever have a discussion with you
12  that payroll processing fees are an overhead to be
13  included in the labor rate?
14    A.  I believe we resolved this issue, and it was
15  allowed.
16    Q.  Do you see where the combined overhead and
17  profit should be limited to an agreed guideline of 15
18  percent?
19    A.  I do see that.
20    Q.  Was that your understanding as to what Forest
21  expected in any submission?
22    A.  I can't answer that with any certainty.
23          MR. PATRIZIA:  Would you mark this as 43,
24  please?

Page 278

1          (Creedon Exhibit No. 43 was marked for
2  identification.)
3     Q.  Creedon 43 is an e-mail from you, Ms. Creedon,
4  to Mr. Angarame in April -- I'm sorry, in May?
5     A.  Yes, I do.
6     Q.  Would you tell me what you recall about the
7  circumstances that caused you to send that e-mail?
8     A.  I think I was giving Paul a heads-up that the
9  critical events summary as presented would be included
10  on the May's application for payment.
11    Q.  When you say "the critical events summary would
12  be included on the May application for payment," what
13  does that mean?
14    A.  That we had been pricing the critical events
15  summary, that we had finally gotten the total hours
16  projected or estimated, and that we would then put it
17  on the May's application for payment.
18    Q.  Okay, when you say "put it on the May
19  application for payment," was the intent to include
20  the critical events summary in the May requisition or
21  was it to include the pricing that Mr. Link and
22  Mr. Doble had estimated based on the critical events
23  summary and put that dollar figure on to the pay
24  application?

Page 279

1     A.  The critical events summary were change orders,
2  87 individual price change orders.  And for expedience
3  sake, we referred to them as critical events or change
4  orders.  And I believe there were 87 through April
5  8th, and we priced each one separately and billed the
6  total on the May billing.
7     Q.  Okay.  So --
8     A.  Or included it in the pencil copy on the May
9  billing.
10    Q.  So when the initial pencil requisition was
11  submitted by Creedon to Forest for the May
12  requisition, included on the pencil copy of the
13  requisition was an amount for 87 separate proposed
14  change orders, and each of those events was an event
15  listed on the critical event summary; is that correct?
16    A.  That sounds right.
17    Q.  Okay.  Let me show you a document which we'll
18  mark as 44.
19          (Creedon Exhibit No. 44 was marked for
20  identification.)
21    A.  I might add that it was without profit and
22  overhead, only at cost.
23    Q.  Showing you Creedon 44, which is a document
24  Bates stamped beginning with Banc One 0048.  Is that

Page 280

1  the critical events summary as of May 24, 2004 that
2  was referenced in the e-mail that we just looked at at
3  Creedon 43 and which Mr. Doble supplied to Forest
4  Electric?
5     A.  I believe it is.
6     Q.  Did you review that document before it was
7  submitted to Forest Electric?
8     A.  I did look at it, yes.
9     Q.  Do you know whether it was prepared on the same
10  basis that you and I discussed with regard to the
11  large table, Exhibit II.F, in Exhibit 41?
12    A.  I believe it's, II.F may be reduced in size.
13    Q.  So as far as you know, once the critical events
14  summary was priced as of May 24, those prices did not
15  change in any subsequent iteration?
16    A.  No, I believe that they did change in
17  subsequent iterations.
18    Q.  So let me go back.  As far as you know, the
19  methodology used by Mr. Link and Mr. Doble in creating
20  the pricing on the critical events summary which is in
21  Creedon 44 is the same methodology that you described
22  earlier?
23    A.  I believe so.
24          MR. PATRIZIA:  Would you mark that as 45,

10 (Pages 277 to 280)

Creedon Controls, Inc.                              v.                Banc One Building Corporation
Patricia Creedon, Volume 2                C.A. # 05-CV-300-JJF                        May 23, 2006

Page 281

1  please.
2          (Creedon Exhibit No. 45 was marked for
3  identification.)
4    Q.  Showing you a document which has been marked as
5  Creedon 45.  This is apparently a letter from you to
6  Mr. Angarame dated May 28th, Bates stamped CL 1134 to
7  1137.  Do you recall that letter?
8    A.  I do.
9    Q.  There's a reference in that letter to a meeting
10 or a telephone call, I'm sorry, between you and
11 Mr. Angarame?
12   A.  Yes.
13   Q.  What occurred in that telephone call?
14   A.  We talked about the change orders submitted to
15 be included on the May payment.  We talked about
16 trying to resolve the events of the change orders and
17 to mitigate further damages going forward.  We -- of
18 particular note was that Forest was threatening to
19 withhold payments from March unless I signed the
20 document and return it immediately.  That's --
21   Q.  You say signed what document, I'm sorry?
22   A.  Sign the Banc One contract and return it.  I
23 believe it was that phone conversation where I had
24 said that it -- it may have been that phone

Page 282

1  conversation where I asked that I have more time in
2  order to review the contract, and that pretty much
3  sums up, sums it up.
4    Q.  Did you receive a reply from Mr. Angarame with
5  regard to that letter?
6    A.  I believe I received a phone conversation.
7    Q.  What did Mr. Angarame say in the phone
8  conversation?
9    A.  That he had signed the same contract that I was
10 presented with, and that I should go ahead and just
11 sign it.  That they would give me more time to
12 negotiate or review the contract, and that they would
13 not withhold the payment from March.  That's all I can
14 recall at that time -- at this time.
15   Q.  Did you subsequently sign the contract?
16   A.  I believe I made an addendum to the contract
17 and accompanied it with a letter saying that I was
18 prepared to sign the contract at some time after the
19 addendum had been reviewed and negotiated.
20   Q.  Did you subsequently receive the payment for
21 March?
22   A.  Yes, I did, for March, yes.
23   Q.  And when was that received?
24   A.  Sometime in June.

Page 283

1    Q.  If you look at page CL 1136 in Exhibit 44.
2    A.  Yes.
3    Q.  At the first full paragraph in that document it
4  says, "As you know at bid time we indicated in writing
5  that we took exception to the sample contract
6  presented and would need to negotiate changes."  Do
7  you see that?
8    A.  Yes.
9    Q.  What is the reference that you have to
10 indicating in writing that you took exception to the
11 sample contract presented?
12   A.  I believe I was referring to the annotation on
13 the letter of intent.
14   Q.  The two lines that says that this will be
15 effective 14 days after whatever the text is?
16         MR. SEGLIAS:  Well, object to that
17 characterization.
18         MR. PATRIZIA:  It's a fair objection,
19 Counsel, I understand.  I'm just trying to get the
20 reference to the lines.
21         MR. SEGLIAS:  Yeah, sure.  I know what
22 you're referring to.
23         MR. PATRIZIA:  Well, I just want the
24 witness to be sure that we're referring to the same

Page 284

1  thing.
2  BY MR. PATRIZIA:
3    Q.  Is that correct, it's that two-line reference
4  above your signature on at least some copies of the
5  October letter?
6    A.  I believe that's what the reference is to.
7    Q.  And then the May 28 letter at 1136 goes on and
8  says, "Let me say that for reasons we may attribute to
9  the subject project, we never had our meetings to
10 finalize our written agreement and have mutually
11 agreed to proceed under essentially an oral
12 agreement."  Do you see that?
13   A.  I do.
14   Q.  Was it your understanding at least as of May
15 28th, 2004 that Creedon Controls was proceeding under
16 an oral agreement?
17   A.  No.  I think I should have said "and had
18 mutually agreed to proceed under essentially an oral
19 agreement."
20   Q.  Well, I'm going to have to parse that.  You
21 think you should have said "and had mutually agreed to
22 proceed under essentially an oral agreement."  Does
23 that mean that it was your understanding as of May 28
24 that Creedon Controls and Forest Electric had agreed

11 (Pages 281 to 284)

Creedon Controls, Inc.                                      Banc One Building Corporation
Patricia Creedon, Volume 2        C.A. # 05-CV-300-JJF                        May 23, 2006

Page 353

1  two.  That would not have been unusual.
2     Q.  And beyond that, did you have any involvement
3  in that change order process?
4     A.  Not to my recollection, no.
5     Q.  Could you look at Exhibit 16, please.
6     A.  I may have to get up to do that.  I have
7  Exhibit 16.
8     Q.  Okay, thank you.  The -- it's first a letter
9  from Donald Lucas at Forest to you dated May 4, 2004,
10 and encloses the single project construction service
11 agreement.  Is that correct?
12    A.  That is correct, yes.
13    Q.  And that's for contract No. 6B?
14    A.  Correct.
15    Q.  And this is the contract that you received
16 obviously sometime in May 2004 for your review?
17    A.  Correct.
18    Q.  Is it your understanding that other contractors
19 on the Banc One project signed this agreement?
20    A.  That is my understanding, yes.
21    Q.  Is it your understanding that other electrical
22 contractors executed this agreement?
23    A.  That was my understanding, yes.
24    Q.  Now you were asked some questions about when

Page 354

1  Forest Electric entered into a contract with Banc One
2  or Tishman.  Do you have any personal knowledge as to
3  when that occurred?
4     A.  No, I do not.
5     Q.  Do you know if any of the other contractors who
6  executed this agreement attached as Exhibit 16 made
7  any or proposed any changes that were made to the
8  contract?
9     A.  No, none at all.
10    Q.  And on page 006116, that's the signature page,
11 and does that identify Forest Electric as Banc One's
12 agent?
13    A.  It does.
14    Q.  And as the electrical trade manager?
15    A.  It does.
16    Q.  Okay, you can put that aside.
17        Now, did you receive a similar agreement
18 to -- agreement, single project agreement for the 21B
19 project?
20    A.  Yes, I believe I did.
21    Q.  Could you please get Exhibit 11 for me?
22    A.  I have Exhibit 11.
23    Q.  Thank you.  The -- this is the Forest Electric
24 letter to you dated October 2, 2003 called the letter

Page 355

1  of intent; is that correct?
2     A.  That is correct.
3     Q.  And it attaches a subcontract agreement.  Is
4  that correct?
5     A.  Yes, it does, yes.
6     Q.  And in the letter at page CL 1143, it states in
7  the second paragraph that subcontractor agrees to be
8  bound to the terms and conditions of the subcontract
9  agreement as attached hereto as Exhibit 1.  Is that
10 correct?
11    A.  That does, yes.
12    Q.  And obviously you signed that agreement?
13    A.  Obviously.
14    Q.  And you signed a later agreement which changed
15 the amount of this 6B contract?
16    A.  I did.
17    Q.  And that enclosed the same subcontract
18 agreement?
19    A.  Same sample subcontract agreement.
20    Q.  And in addition, on the 21B project you signed
21 a similar letter of intent with a subcontract
22 agreement?
23    A.  A sample subcontract agreement, yes.
24    Q.  You say sample.  Does it say sample on the

Page 356

1  subcontract agreement that you have?
2     A.  I believe at some point there was "sample" on
3  this.  I'm not sure if my copy doesn't have "sample"
4  on it.  I'm not sure.
5     Q.  And whether it says sample or not, the letter
6  clearly states that you agreed to be bound to the
7  terms and conditions of the subcontract agreement; is
8  that correct?
9         MR. SEGLIAS:  I'll object to the form of
10 the question.  The cover letter states what it states.
11 And Miss Creedon has already testified to this, and
12 she's already testified to the additional information
13 that she's included on the letter and what she
14 believes it all means.
15    Q.  Now, Miss Creedon, I want to give you Creedon
16 Exhibit No. 68.
17        MR. BRADLEY:  Now for the record, I'll
18 accept counsel's representation that she testified to
19 the precise question I asked.  If she hasn't, after
20 reviewing a day and a half of the transcript, then
21 I'll ask her to come back.
22    Q.  Ma'am, I've handed you Exhibit No. 68.  Is this
23 the bid form agreement that was completed for the 21A
24 contract cable conveyance system?

29 (Pages 353 to 356)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Creedon Controls, Inc.

# v.

# Banc One Building Corporation

C.A. # 05-CV-300-JJF

---

Transcript of:

**Dennis Link**

**May 31, 2006**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0551

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Dennis Link                          C.A. # 05-CV-300-JJF                    May 31, 2006

Page 14

1  tradesmen, there are laborers.
2  Q.  All right, well let's exclude the laborers and
3  let's do it from the standpoint of starting with the
4  field supervision on up and different levels that I
5  think you just explained in terms of different
6  management levels. Are you familiar with the numbers
7  in those particular, I guess the definitions or the
8  defined kind of categories we've just talked about?
9  **A.  Well, it varies over time. But I would say**
10  **that in the March period of '04, and this is pretty**
11  **much a guess but I think an intelligent guess, there**
12  **was two general foremen that I recall, and I would say**
13  **there were three or four foremen. And I think there**
14  **may have been a material person and myself and Charlie**
15  **Doble.**
16  Q.  Is this the largest job or project to your
17  knowledge that Creedon Controls has undertaken?
18  **A.  I really don't know all the projects that**
19  **Creedon Control has done. I would say as far as**
20  **Charlie Doble was concerned, he's done projects much**
21  **larger than this.**
22  Q.  If Mr. Doble's done projects much larger than
23  this, to your knowledge has he had similar issues on
24  the larger projects?

Page 15

1                  MR. SEGLIAS: I'd just caution the
2  witness. You don't have to speculate or guess. If
3  Charlie has specifically told you something, then that
4  would be fair game and appropriate to respond to. But
5  you're not, not required here to guess at whether he
6  may or may not have.
7  Q.  Which is why I said to your knowledge.
8  **A.  Yes, I do have knowledge. This particular**
9  **project, I have 36 years of experience in**
10  **construction, and I've never seen anything like the way**
11  **this project was run and managed in my whole career.**
12  **And, and Charlie's experience was similar. This was**
13  **not a very well-managed project.**
14  Q.  But to your knowledge, has Mr. Doble
15  experienced similar problems on other projects?
16  **A.  Nothing like this to my knowledge and my**
17  **discussions with Charlie Doble.**
18  Q.  When you say "nothing like this," are you
19  saying that you're not familiar with any problems he's
20  had on other projects, or are you just saying compared
21  to this project?
22  **A.  I think your question was compared to this**
23  **project did he experience the same kind of problems.**
24  **And the answer is we discussed a lot of projects**

Page 16

1  **during the course of working together. Many, many**
2  **hours we spent together. And he, he did not**
3  **experience the kind of problems on a project of this**
4  **size on any other projects, and neither did I.**
5  Q.  Now, to your knowledge has Mr. Doble ever had
6  anyone I guess else other than yourself on a project
7  fill in or provide assistance as you were going to do
8  or were talking to him about doing in March of 2004 on
9  this project?
10  **A.  I can't remember specifically whether he did or**
11  **he didn't.**
12  Q.  Okay.  To your knowledge, did any other
13  contractors on the site of this project have I guess
14  somebody who would be considered your peer or someone
15  who was also providing assistance to the other
16  contractors?
17  **A.  I don't recall.**
18  Q.  Did you at any time have an impression that
19  there were parts of this job that were too big for
20  Creedon?
21  **A.  Fundamentally, a project, the definition of too**
22  **large or too small is a function of the project**
23  **management that you have on the project. It's not**
24  **really a function of the company that you're working**

Page 17

1  **for, largely.**
2                  **And in this particular case, Charlie**
3  **Doble, his experience was more than what was necessary**
4  **for this project. So the project was well managed,**
5  **and Charlie Doble's experience was, he's, he is one of**
6  **the best project managers that I've ever experienced**
7  **in my career.**
8  Q.  But in terms of the administrative tasks you're
9  talking about, what aspect of that, if any, was
10  impacted by what you're describing as the overall
11  management beyond Creedon?
12  **A.  Paul, can you try that again?**
13  Q.  Okay.  I guess what I'm trying to get at is, is
14  it seems that you're saying, and again if I'm
15  incorrect, let me know.  It seems that you're saying
16  that there -- that the issues were exterior to
17  Creedon.  Is that what you're saying?
18  **A.  Yes.  In terms of the problems that were**
19  **experienced on the project, they were exterior to**
20  **Creedon.**
21  Q.  But the reason why you were brought in, at
22  least what you've told me so far, is to help with the
23  administrative aspects within Creedon.  Is that fair
24  to say?

5 (Pages 14 to 17)

Page 18

1   A. That's fair.
2   Q. Okay. And so what I'm trying to get at is what
3   is it about the administrative aspects within Creedon,
4   why is it that Charlie Doble needed assistance on
5   those aspects and how does that -- that's one
6   question, and then the second one will be how does
7   that relate to the problems you say are exterior to
8   Creedon? So I just gave you a preview where I'm
9   going.
10   A. Before you do a project, you have the
11   opportunity to review bid documents. And based on
12   those bid documents, you present -- you build yourself
13   your estimate and you anticipate that the project will
14   be conducted in a manner which is reflected by those
15   bid documents.
16        Had the project been conducted in the
17   manner that was reflected by the bid documents and the
18   basis of Creedon's bid, it is my opinion that Charlie
19   Doble would have had no problem at all, and I would
20   not have been required.
21        However, during the course of the project,
22   the project unfolded much, much differently than what
23   was presented in the bid documents and was pretty much
24   represented at the time that Creedon put together

Page 19

1   their bid.
2        Now, that has many, many implications, but
3   I think it's a good answer to your question.
4   Q. Now, in terms of the things I think you
5   mentioned, the administrative tasks, and again, I'm
6   going to, if I'm incorrect let me know, but I believe
7   you mentioned things like daily reports, interacting
8   with, interfacing with Forest, other management on
9   site, communicating with other contractors. How is it
10   that any problems, the problems you just described
11   regarding the bid process, how is it that that impacts
12   those types of tasks?
13   A. The, the tasks have to -- the tasks that you
14   describe there have to be performed in either project.
15   The question is what's the volume that has to be, in
16   other words, how many pages of notes and so forth have
17   to be prepared. The activities that are taking place
18   on the project which, which are different than what
19   was represented at bid time escalates the amount of
20   activity that's necessary in the areas that you just
21   described.
22   Q. And when you say escalates, so are we talking
23   about more meetings or are we talking about more notes
24   or how does it escalate?

Page 20

1   A. The more difficulties you're experiencing on
2   the site itself, the more activity, the, the greater
3   number of memos that have to be written, the greater
4   number of letters that have to be written, more notes
5   that have to be taken, more time the project manager
6   has to spend in the field resolving difficulties, and
7   then documenting those difficulties, the more time he
8   has to spend interfacing with other trades, the amount
9   of time that he has to interface with, say, Forest or
10   Tishman people. That is where the escalation is.
11   It's tremendously time-consuming.
12   Q. So how would you compare the time that
13   Mr. Doble was spending on those tasks prior to your,
14   let me use I guess the term joining their team to the
15   time that you spent on it after you started in that
16   role for Creedon?
17   A. It became more and more difficult. In other
18   words, when, when I arrived on the project in, say,
19   March, the level of Charlie's activity and these
20   time-consuming activities that we just discussed
21   escalated even more. And so that even with the two of
22   us on the project, we frequently stayed till 1, 2:00
23   in the morning when initially it wasn't necessary for
24   us to do that.

Page 21

1   Q. And just to be clear, what I really want to get
2   at is the issues of, the administrative issues of
3   communicating, interfacing, daily reports. What I
4   really want to get at is the amount of time that
5   Mr. Doble was spending doing those tasks prior to your
6   joining the team, versus the amount of time that you
7   were doing on those tasks after you joined the team.
8        MR. SEGLIAS: In terms of hours, Paul, or
9   in terms of percentage of his overall activity?
10        MR. McDONALD: Hours is a place -- that's
11   what I had in mind. But we can talk about percentage
12   of overall activity after we talk about hours.
13        MR. SEGLIAS: And that would be based on
14   your own personal knowledge then, Dennis. Do you know
15   how many hours he spent on a weekly basis or a daily
16   basis typically handling administrative issues?
17        THE WITNESS: I can guess based on the
18   general discussions that we had, but I can't give you
19   what I consider to be a reliable, accurate estimate of
20   his activities prior to March.
21   Q. Well how much time were you spending on those
22   tasks after you started working on the team?
23   A. I was spending, I was there two to three days a
24   week, and, and arriving maybe 8 or 9 in the morning

Creedon Controls, Inc.                                                    Banc One Building Corporation
Dennis Link                          C.A. # 05-CV-300-JJF                              May 31, 2006

Page 22

1  and continuing frequently to 10, 11, 12, 1, 2:00 in
2  the morning.
3      Q.  And could you give me I guess a general
4  description?  I know it might take a little while to
5  do this, but a general description of what a typical
6  day for you would be like from 8 to 11 or 1, as it is?
7  What was your -- what was a typical day for you on
8  site like?
9      A.  I don't know that I could describe a typical
10 day.  I could describe something, but every day was
11 completely different.  I was impacted by things that
12 were going on on the job site.  And depending upon
13 what was going on on a particular day, it could affect
14 what I was doing.
15         But I can tell you that I was involved in
16 the activities surrounding the daily logs.  I had
17 numerous discussions with foremen and general foremen.
18 I was involved with the scheduling.  I was involved
19 with e-mail responses, reviewing e-mails from Forest,
20 Tishman, whoever might be generating those.  It's,
21 it's difficult to describe a typical day, but all of
22 those things would be involved.
23     Q.  To your knowledge, prior to your joining the
24 team, were those things being done?

Page 23

1      A.  Yes.
2      Q.  And who were they being done by?
3      A.  Largely Charlie Doble.
4      Q.  You say largely, who else was involved?
5      A.  Well, Pat Creedon would be helping, Kristin
6  Cerase, who was a person in the office, she would help
7  Charlie with administrative activities.  There were
8  people such as the warehousemen and the truck drivers
9  that would also assist to the extent they could on
10 purchases and things like that.
11     Q.  And did you ever have a discussion with either
12 Miss Creedon or Mr. Doble about why they didn't bring
13 someone on sooner than bringing you on in March 2004?
14     A.  Yes.  My recollection is that the problems
15 didn't really begin to escalate until late, maybe
16 around Christmas of 2003, when it was decided to work
17 on the parking lot area, the foundations for building,
18 I want to call it drawing H, which was the
19 administration building, and other activities related
20 in that particular area.  What they, what -- at that
21 time, what's typical on projects such as this is you
22 have off location -- well let me say it this way.
23         The building site itself, say within the
24 foundation of the building, normally there was storage

Page 24

1  outside of that area so that those areas could be kept
2  wide open.  And the only activity that you would
3  normally have is the material, tools, equipment, and
4  the various trade personnel that were working in
5  various areas within, let me call it the four walls of
6  the building.
7          What happened in late December was it was
8  decided that all of the material that was being stored
9  in trailers outside the four walls would be removed
10 from the site, and all of the material, equipment and
11 the logistical items necessary to run the project for
12 all trades was moved in within the four walls.  And so
13 at that point what happened was there was a lot more
14 problems that were experienced that weren't
15 experienced prior to that time.
16         Now, to respond to your question as to
17 when they should have known or what discussions we had
18 relative to when they did know, fundamentally it's my
19 recollection that activities post Christmas of
20 December 2003 were the problem areas.  And although
21 there may have been some recognition in January, it
22 wasn't until the dates that the union reports were due
23 and the total payrolls were put together for the month
24 of January reporting that, so like mid-February to the

Page 25

1  end of February would have been the first time that
2  they could actually see in a very analytic way what
3  the impact of moving all of the tools and equipment
4  and the personnel changing areas and lunch areas and
5  things like that inside the building.
6          So my recollection is that middle, the end
7  of February that they, they pretty much began to
8  recognize they had a problem, and they called me in a
9  couple weeks after that.
10     Q.  Okay.  Now, is it your understanding that prior
11 to that parking lot project and the moving of
12 materials inside that they didn't have any problems
13 that were unusual or that they felt like were of note?
14     A.  My recollection is, is that RFIs, requests for
15 information, which are needed for you to continue to
16 proceed with your work, were being generated by
17 Creedon and not being responded to by Forest, Tishman,
18 the related engineers and architects on the project.
19         And in addition to that, proposed change
20 orders were not being acknowledged on a timely basis.
21 And these are paperwork-type items that Creedon was
22 generating routinely, and they were getting very poor
23 turnaround with respect to responses there, which was
24 delaying their activities even early in the project in

7 (Pages 22 to 25)

Creedon Controls, Inc.                                    Banc One Building Corporation
Dennis Link                         v.                                        May 31, 2006
                            C.A. # 05-CV-300-JJF

Page 26

1  the October, November and early December period of
2  '03.
3     Q.  Now, I'll get to that, get back to that in a
4  second.  But I guess my question is prior to the
5  parking lot issue in December and the moving of the
6  materials then, was it your understanding that
7  Mr. Doble or Miss Creedon, that they felt like that
8  they didn't need assistance in the form that they
9  later requested of you?
10    A.  If it were I, based upon what I knew then and
11 know now, I typically would have staffed the job
12 administratively, and as far as the trades are
13 concerned, pretty much in accordance with the estimate
14 that I had put together in order to get the job based
15 on what was represented by the bid documents.  And at
16 that time my experience is, and my knowledge of what
17 took place, I don't think I'd be looking for help.  I
18 would be hoping that the turnaround on the request for
19 information, the PCOs would improve, and I would be
20 able to conduct the project in accordance with the
21 original schedule.
22        And at some point subsequently, when you
23 have a major change, like you really crowd the work
24 areas within the four walls of the building, when that

Page 27

1  begins to happen, and as I said earlier, when, from an
2  analytic standpoint it's not a feel anymore, you
3  actually get to see the numbers mid-February to end of
4  February and you can start analyzing them and say we
5  have a problem, I don't know, based on my experience,
6  how they could have done -- they would have or could
7  have or I would have even done anything sooner than
8  the, the end of February, beginning of March.
9     Q.  Now, you mentioned that they were having delays
10 in responses to RFIs and proposed change orders.  Who
11 at Creedon was preparing RFIs and proposed change
12 orders?
13    A.  Those that I looked at, and based on my
14 recollection currently without getting involved in
15 reviewing them again, was largely Charlie Doble.
16    Q.  Okay.  And do you have I guess a ball park or
17 maybe exact number of how many of those had been
18 prepared prior to December, or actually through the
19 end of December 2003?
20    A.  I don't recall right now.
21    Q.  You said you did review them, though, at some
22 point?
23    A.  Oh, yes.
24    Q.  And, and what were -- what's your recollection

Page 28

1  of the nature of the RFIs to the proposed change
2  orders?
3     A.  Typically it had to do with drawings, and there
4  may have been reasons why certain things could not be
5  done in accordance with those drawings, or there was
6  some question as to specifically what was intended
7  when you got to the point of planning the installation
8  of what was described in these drawings.  And so
9  largely the request for information was related to the
10 drawings themselves or some physical aspects of the
11 work area that may have been in conflict or unclear
12 with respect to the drawings.  So that would be the
13 nature of the information on the PCIs -- I mean on the
14 RFIs.
15        And with respect to the PCOs, did you ask
16 that question?
17    Q.  The change orders?
18    A.  Yes.  With respect to the PCOs, when there were
19 deviations that were recognized, then you would
20 acknowledge those with a proposed change order, which
21 you would expect them to get back to you with so that
22 you could then move forward conducting the work in the
23 manner described in the PCOs.
24    Q.  And to what extent, if any, did this, you say

Page 29

1  the delay in the response to the RFIs or the PCOs
2  affect Creedon's work towards, towards the completion
3  date through December 2003?
4     A.  Well, not recalling what the number was, it
5  would be hard for me to even estimate what the impact
6  may have been at that time in the project.
7     Q.  Was it your understanding at that time through
8  December 2003 that Creedon believed -- I say believe
9  itself, that Miss Creedon or Mr. Doble believed that
10 Creedon was on schedule to complete the project?
11    A.  Prior to December of 2003, the Christmas
12 period?
13    Q.  Yes.
14        MR. SEGLIAS:  If you know.
15    A.  Yeah, I have a faint recollection that they
16 were somewhat optimistic, that they were slipping a
17 little bit and in terms of, you know, what do we do?
18 We don't have response to request for information.  We
19 have a schedule that says we should be proceeding.  We
20 have proposed change orders that are not being
21 responded to, what do we do?  Do we continue to move
22 people around, try to pick up work so we don't have to
23 lay off people?  Or do we go ahead and we do some of
24 these things at our risk perhaps to remain on

8 (Pages 26 to 29)

Page 34

1  request for information in, "How do you want this
2  done, Mr. Engineer?"  And Mr. Engineer doesn't get
3  back, and I may only have two more days in that
4  particular room before I've been asked to move out so
5  somebody else can come in and do some work there.  And
6  so it's, I'm forced into a situation that I have to
7  make a decision in order to continue to stay on
8  schedule and move ahead.
9      So that again, I don't know if -- I'm
10  making things up just to be responsive to your
11  question to give you examples of how you could get
12  forced into a situation that you had to do something,
13  even though you're not getting the responses from the
14  people who should be providing those responses.
15     Q.  Understood.  Now, taking that from I guess the
16  general that we've been talking about for the last
17  couple minutes to the specific, what's your
18  understanding of how many instances where, and this
19  again is through the December 2003 period, through the
20  time period we've talked about before where there's
21  the parking lot issue and the moving of the materials,
22  what's your understanding of how many RFIs that were
23  not responded to that involved kind of a circumstance
24  where Creedon had to make a decision to do additional

Page 35

1  work?
2     A.  Okay, you asked me a question earlier in terms
3  of how many RFIs there were and PCOs, and I told you
4  that I couldn't, I couldn't estimate that and what the
5  implications of it are.  That hasn't changed.  There's
6  really -- I can't be -- other than guessing, there's
7  no way I can be responsive to that question at this
8  time.
9     Q.  You say you reviewed them at some point,
10  correct?
11     A.  That is correct, absolutely.
12     Q.  And do you have copies of those still?
13     A.  I doubt that I have copies in my files.  They
14  were, they were part of the files that were on site in
15  the construction office while I was there.
16     Q.  Now, in December 2003, now I'm talking about
17  after, or the period after Christmas --
18     A.  Yes.
19     Q.  -- after this issue arises, what's your
20  understanding of the, the things that changed that
21  made the job more difficult after that?
22     A.  As I described earlier, we went from a
23  situation where each of the contractors, each of the
24  trades had storage trailers and C-boxes on site

Page 36

1  outside the four walls, the perimeter of the building.
2  And they could safely store their materials, they
3  could, they could secure them, their tools, they had
4  lunch areas and changing areas and things like that
5  outside.
6      And then what happened, as I indicated
7  earlier, was those trailers, the contractors, all the
8  contractors were told you have to get those off site,
9  we want to work in the areas where those storage and
10  secure areas -- trailers and C-boxes were stored, and
11  everything has to move inside the building.
12      So we have a situation where the area was
13  largely open and accessible to do work, to a situation
14  where that was no longer the case.
15     Q.  And what's your understanding as to why that
16  decision was made to do work on the parking lot and
17  move things inside, if you have one?
18     A.  Yes.  The reason that that happened was that
19  the management of the project, which would include
20  Banc One, Tishman and Forest, decided for some reason
21  that they wanted to work in that area at that time.
22  And as I mentioned earlier in the deposition, that the
23  administration -- the office area, the administration
24  office area, drawing H area, and the parking lot

Page 37

1  around there was the area that they wanted to work in.
2     Q.  A couple things I'd like to ask regarding what
3  you just said.  The first is to your knowledge, was
4  this, the work that was going to be done in the
5  parking lot, was that included in the bid materials
6  that Creedon received?
7      MR. SEGLIAS:  I'm sorry, could you, could
8  you read back the question, please?
9      (The requested portion was read.)
10     A.  I can't remember specifically without reviewing
11  the documents at this time.  But largely that was
12  controlled by a schedule which was presented at bid
13  time.  And those activities were not in accordance
14  with the schedule and what was anticipated by Creedon
15  based upon what was represented at bid time.
16     Q.  Do you have a recollection, since you mentioned
17  schedule, of when this particular project, the parking
18  lot project or the -- I'll refer to it as that, that
19  incident as the parking lot issue, when it was
20  scheduled in terms of month?
21     A.  As I sit here now, I don't, I don't recall.
22     Q.  Did you ever have a discussion with anyone at
23  Creedon regarding what, if they had any plans to, to
24  do work during the time period that this parking lot

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Dennis Link                    C.A. # 05-CV-300-JJF                    May 31, 2006

Page 50

1   how we were to proceed on a given issue. And so it
2   would take that form largely.
3      Q.   And in any of those six or 12 meetings, did you
4   ever, polite way of putting it, raise any complaint or
5   make any complaint to Banc One regarding the
6   management of this project?
7      A.   No. These, these meetings were usually very
8   task oriented, you know, specifically, you know, ad
9   hoc to a particular problem. And there would be no
10  reason to get into a discussion which was not related
11  to the task at hand.
12     Q.   Do you recall ever disagreeing with a
13  resolution to any problem coming out of those meetings
14  with Banc One?
15     A.   No. I largely listened, and it was more
16  Charlie's role to agree or disagree or to offer an
17  alternative. Charlie and I may have conferred briefly
18  on a particular issue and then Charlie would then
19  present it, but largely my role was not to really
20  participate, other than with the people of our team,
21  the Creedon team.
22     Q.   Do you recall any instance where Mr. Doble
23  registered a complaint or a certain degree of
24  disagreement with any decision being made by Banc One

Page 51

1   at any of these meetings?
2      A.   He frequently would have alternative
3   recommendations that I considered to be improvements
4   over those that were being discussed.
5      Q.   And today do you recall any specific example of
6   one or more of those recommendations?
7      A.   Not related to 2357, or project 6B.
8      Q.   Let me ask you that, actually. When you --
9   these meetings that you're having with, where Banc One
10  is present, were any of them related to 2357?
11     A.   They may have been. That's what I'm saying,
12  you asked me if I could come up with any examples of
13  discussion. As I sit here, I can't think of anything
14  specifically related to 2357. But, you know, such
15  things existed. I just don't have a recollection now
16  of an example in response to your question.
17     Q.   Now, going back to the December, the post
18  Christmas time period with the parking lot issue, do
19  you have any knowledge or understanding of how other
20  contractors responded to what I think I can
21  characterize as a congestion issue, is that fair to
22  say, a congestion issue within the, within the
23  building?
24     A.   Congestion begins to describe the problem, yes.

Page 52

1      Q.   If you want to fill it out more, feel free to
2   do so.
3      A.   Well, let's, let's stay with congestion.
4      Q.   Okay. Was there anything else that in addition
5   to congestion that you feel would better characterize
6   the problem as you've described it after the December
7   Christmas time period in the building when materials
8   were brought in?  Is there another way you would
9   describe it or add things, for that matter?
10     A.   Yeah, the way that, what I would say is
11  congestion is an issue. But being unable to do your
12  work is probably, you know, maybe putting some
13  additional meaning into what congestion means. You
14  know, we're describing the results of what, of what I
15  think you're describing congestion to mean.
16     Q.   Okay. And do you have any knowledge or
17  understanding of how other contractors responded to
18  both the congestion and any issues of doing work?
19     A.   It's a pretty general question. What
20  specifically are you looking for?
21     Q.   Well, I mean if you know of any, you know,
22  obviously there's a response and then we'll get to
23  that, that Creedon had one way or another to deal with
24  this issue. And what I'm trying to get at is whether

Page 53

1   or not you have any knowledge of what other
2   contractors may have done, or I mean not may have
3   done, were doing, I should say, to address whatever
4   issues that flowed from the parking lot issue?
5      A.   It really depends upon the work that those
6   contractors were doing, what their trade is. And I
7   can tell you that there was things that Creedon,
8   problems that Creedon had were unique to Creedon
9   because of the nature of Creedon's work. And I'm
10  sure, and I do have recollections of discussions of
11  other contractors that had problems with respect to
12  their trades.
13     Q.   And what were the discussions you had with
14  those other contractors?  What type of problems were
15  they telling you?
16     A.   As you describe it, congestion. The inability
17  to work in given areas because other people's tools,
18  equipment, and materials were in an area that they
19  needed access to.
20     Q.   What if any response or work around or other
21  type of fix, if you will, or attempt to fix did
22  Creedon engage in in response to this?  And when I say
23  "this," again I'm talking about the congestion
24  resulting from the parking lot issue in December.

14 (Pages 50 to 53)

Page 54

1   A. Frequently they complained about it in meetings
2   with Forest and asked for some kind of assistance in
3   facilitating their work; that is, enabling them to do
4   their work as was originally represented and
5   anticipated at bid time.
6       Q. And what response, if any, did they receive?
7       A. Sometimes the responses -- sometimes the
8   answers or the agreements were, seemed to be
9   responsive. And other times there may be a few
10  expletives that were delivered and you got no
11  responsive answer. And even when you got a responsive
12  answer, an agreement as to what you were going to do
13  tomorrow and the next day or what they were going to
14  do tomorrow and the next day, it never happened, or
15  virtually never happened, I guess I should say.
16      Q. When either a response did not come or it was a
17  response that Creedon disagreed with, is it your
18  understanding that -- let me ask -- well actually,
19  withdrawn.
20          Do you have an understanding as to why,
21  whenever a request that Creedon made was rejected, why
22  that rejection came?
23      A. Largely because of poor management from Forest
24  and Tishman.

Page 55

1   Q. Do you have any knowledge as to whether or not
2   it was related to accommodating another trade's work?
3   A. Yes.
4   Q. Is that yes, you have knowledge, or yes, you --
5   A. Yes, I have knowledge and recollection that
6   other trades were involved in some of the problems
7   that Creedon, Creedon experienced.
8   Q. Okay. And to your knowledge, I guess
9   conversely speaking, did Creedon in its work,
10  essentially were there accommodations made for Creedon
11  that impacted other contractors adversely?
12  A. Virtually never.
13  Q. When you say virtually never, I guess a couple
14  things. One is if you're saying virtually never, I
15  assume there is an instance or at least one that
16  you're thinking of where it did happen. That's the
17  first question I would have.
18  A. What I'm doing is I'm using that word to allow
19  for that possibility. Do I think it occurred? I
20  don't have recollection of any time that there were
21  adjustments. Now, remember, Charlie Doble was the
22  individual who was on the frontline. I would see
23  these things occasionally and of course would discuss
24  them frequently, so that Charlie Doble may be aware of

Page 56

1   some accommodation, but I can't think of an
2   accommodation, as I sit here now, reflecting upon
3   2004.
4   Q. Is there anything about the nature of the work
5   that Creedon was doing that I guess influences your
6   response of virtually never in terms of accommodation?
7   A. Well, that's a pretty general question. I mean
8   something as simple as we're going to be working in a
9   given room, it's scheduled, you know, you want us to
10  be there in two days, and can we have materials moved
11  out of there that belonged to other trades or
12  equipment of other trades? Yeah, we'll do it. Two
13  days later the room is more crowded than it was when
14  the agreement came through. And largely, and as I
15  said before, each trade had their own specific
16  characteristics of their work, but Creedon's work
17  involved 25 to 30 feet off the ground. So that if
18  they have to get up there and do some work, they need
19  lifts and things that are large to actually get into
20  that space and then reach up into the area where they
21  have to do their work. And it just can't be done if
22  the floor is totally occupied and the only aisle ways
23  are aisle ways just large enough for people to travel
24  through.

Page 57

1   Q. Now, I believe you testified that it was
2   February or March time period when Mr. Doble and Miss
3   Creedon -- well actually, withdrawn.
4       March is when they came to you; is that
5   correct?
6   A. March is when they came to me, yes.
7   Q. Okay. And up until that time period, is your
8   understanding that they felt that they could still
9   work given those conditions?
10  A. If you have a project to do, you're going to
11  continue to work, delayed, you know, delayed,
12  inefficiencies being created for you, productivity
13  being diminished considerably because of these
14  problems. You're going to continue to work, you're
15  going to continue to try to stay on schedule. So that
16  you know, you know, I'm just trying to suggest to you
17  that you just don't walk off the project and, you
18  know, you continue to suffer through the experiences
19  and you make every attempt you can to remedy the
20  problems.
21  Q. Okay, I guess what I'm trying to get at is, the
22  reason they came to you, I think you said, was because
23  of administrative issues. Is that correct? Or for
24  assistance for the administrative issues?

15 (Pages 54 to 57)

Page 74

1    Q.  And moving on to page -- I'm going to just
2  refer to these, these are all started off with FE, so
3  I'll just refer to these by their last four numbers
4  for the sake of brevity, so this is still Link A.
5  It's going to be page 4015.
6    A.  4015?
7    Q.  That's correct.  Actually, before I ask you a
8  question on that page, to follow-up on the last
9  question I asked, to your knowledge did Creedon at all
10  times during this project, 2357, did they maintain the
11  good practice you described?
12    A.  They tried.
13    Q.  When you say they tried, what does that mean?
14    A.  It means that the normal forum that would be
15  available for that to be done effectively, which
16  should be provided by the management on the project,
17  was not provided.
18    Q.  When you say the normal form, is there a
19  specific -- and this, maybe I'm saying something
20  that's not correct here.  But is there like a NECA,
21  R.S. Means form you're referring to, or is there a
22  place where you're getting a certain form from that
23  you're referring to?
24    A.  No.  There is a management practice, especially

Page 75

1  on large projects, to have meetings with the
2  subcontractors and to plan the project in short
3  intervals, a week, three weeks, a month.  And certain
4  events, for example, what's going to happen this week
5  are generally set in concrete.  And everybody knows
6  they're going to have their materials, their equipment
7  is going to be delivered, their, whatever inventory
8  they need, their personnel is going to be available
9  and so forth.  And that pretty much wouldn't change.
10      But at the same time in those meetings you
11  look ahead, maybe two, three weeks ahead, and this is
12  a heads-up for all the contractors as to this is what
13  we plan in conjunction with the global schedule for
14  the project.  And does anybody see any problems with
15  this?  And then as time goes on, the three-week look
16  ahead becomes this week.  And that's the time that the
17  contractors will say, "My suppliers didn't distribute
18  what I need to work in this area."  Anyone else that
19  is dependent upon those precedent activities maybe
20  should plan to be doing something else in a different
21  place.
22      And this is done largely by the
23  subcontractors in support of the general contractor.
24  This forum did not exist in any effective means during

Page 76

1  this project.
2    Q.  So you're saying "forum," not "form."  I
3  apologize.
4    A.  Forum, yeah, f-o-r-u-m.
5    Q.  I thought you said "form," I apologize for
6  that.
7    A.  All that, just to --
8    Q.  Well still, though, I appreciate the
9  explanation.
10    A.  You're welcome.
11    Q.  So then are you saying that there were no,
12  there were no meetings that were held on a regular
13  basis to your knowledge?
14    A.  There were meetings held on a regular basis at
15  different levels.  But those meetings were not
16  properly documented or effectively documented.  So
17  that you can have lots of meetings, and you can
18  discuss lots of things, and you can give lots of
19  orders, but if it's not written down and documented
20  with specific responsibilities assigned, you can't
21  later identify who's responsible for a delay or
22  damages to other contractors or to the overall
23  progress of the project.
24    Q.  Now, to your knowledge, did Creedon maintain

Page 77

1  any independent notes or memos regarding these
2  meetings?  And I'm talking about the meetings with the
3  subcontractors supporting the contractor that you just
4  described.
5    A.  I have seen some notes prepared by the, by
6  Charlie Doble or the general foremen.  But at this
7  time I can't -- I'm anticipating your next question,
8  perhaps.  But at this time I can't really remember the
9  details of the notes that I saw.
10    Q.  Would those notes be separate and apart from
11  daily logs?
12    A.  They could be, in some cases they were, in some
13  cases it would be recorded in the daily log.
14    Q.  Okay.  And the notes that you recall seeing,
15  they were, do you remember if they were dated before
16  you joined March '04 or were they going forward from
17  March '04?
18    A.  My recollection is both.
19    Q.  Now, looking at page 4015 under "Project notes
20  and specifications," looking at No. 5, "Maintain
21  on-site and update on a daily basis a record set of
22  drawings detailing progress."  And that's listed as a,
23  I guess a requirement.  If you disagree with that
24  characterization or at least putting someone on notice

20 (Pages 74 to 77)

Creedon Controls, Inc.                                                      Banc One Building Corporation
Dennis Link                              v.                                 May 31, 2006
                                C.A. # 05-CV-300-JJF

Page 78

1   that's going to be expected of them for this bid, to
2   your knowledge did Creedon do that?
3       A.  Yes, they did.
4       Q.  And do you know to whom they provided such
5   records detailing their progress?
6       A.  It -- the practice is for each of the
7   contractors to maintain those records, and that they
8   are available to anyone that would like to look at
9   them during normal business hours.
10      Q.  So are you saying then that to your knowledge
11  they did not affirmatively give it to anyone?
12      A.  The practice is that at the conclusion of the
13  project, these are finalized and presented as
14  as-builts, so that if any work has to be done later,
15  maintenance or whatever, they'll know exactly how you
16  did your work.
17      Q.  And to your knowledge, Creedon followed that
18  practice you described on this particular project?
19      A.  Yes, they did.
20      Q.  And No. 8 says, "Provide daily reports for
21  Forest Electric Corp., FEC," and then it indicates A,
22  B, C and D, certain things that are to be included in
23  those reports, D indicating "Scope of work completed."
24  Was that done by Creedon to your knowledge?

Page 79

1       A.  Yes, it was.
2       Q.  And same basic question:  To whom did Creedon
3   provide these daily reports, if you know?
4       A.  To Forest Electric.
5       Q.  And have you seen those daily reports?
6       A.  Yes, I have.
7       Q.  And is it your understanding that those daily
8   reports indicated, indicated the progress that they
9   were making on the project?
10      A.  The, the daily reports were generally
11  responsive to what's issued -- what's indicated there
12  in item 8A through D, various levels of details.  It
13  would vary how the responses were made to each of
14  those items on a daily basis.
15      Q.  Would they or did they, I should say, because
16  since you've seen them, did they indicate any
17  particular problems that Creedon had with the way the
18  work was being scheduled or managed?
19      A.  I don't recall.  It was a standard form, and
20  the standard form was filled out answering the
21  questions that were asked and then they were submitted
22  to Forest Electric.
23      Q.  Did Creedon have an opportunity to add
24  additional pages to those daily reports?

Page 80

1       A.  I guess.  I mean it could have been done, but
2   to be responsive, I think largely the ones that I've
3   seen, Forest Electric had binders of them, and the
4   ones that I've seen, you know, pretty much were using
5   their standard form and filling that out.
6           MR. McDONALD:  We'll actually take a break
7   right here.  I think we have five minutes left on the
8   tape.
9           THE VIDEOGRAPHER:  Okay, we're off the
10  record at 11:33.
11          (A brief recess was taken.)
12          THE VIDEOGRAPHER:  We're back on the
13  record at 11:43.
14  BY MR. McDONALD:
15      Q.  Okay, Mr. Link, before I leave No. 8, I just
16  want to make sure I have a clear understanding.  So to
17  your knowledge, is it fair to say that to your
18  knowledge you don't know if Creedon provided any
19  information regarding problems with the schedule or
20  the work to Forest Electric in daily reports?
21      A.  To respond to that question effectively, I
22  would have to look at them again.
23      Q.  Okay.  Moving on to No. 9 on that same page,
24  again this is 4015, it says on a weekly basis to

Page 81

1   provide a two-week look-ahead schedule for review and
2   coordination with FEC, of course meaning Forest
3   Electric Corp.  To your knowledge, did Creedon do
4   that?
5       A.  Yes.
6       Q.  And by the way, are any of the things we've
7   talked about so far, do you believe that they are
8   reasonable expectations or unreasonable, or do you
9   have an opinion of them?
10      A.  Well, did you want -- which ones?
11      Q.  We can, we can go back and start off I guess
12  with actually just No. 5 on this page, the maintain on
13  site --
14      A.  No. 5 on which page, 14?
15      Q.  4015.
16      A.  15.  Number 5.  Well, I testified that they did
17  maintain that.
18      Q.  Okay, and do you think that's a reasonable
19  expectation?
20      A.  Yes, it is.
21      Q.  Okay.  And No. 8, is there anything in No. 8
22  that you, that you consider to be a reasonable
23  expectation as well?
24      A.  Yes, that's reasonable.

21 (Pages 78 to 81)