Page 82

1    Q.  And No. 9?
2    A.  Not this way.
3    Q.  Okay.  And when you say "not this way," what
4  are you concerned about?
5    A.  It should be -- you can prepare it, but it
6  should really be presented in a meeting that involves
7  all of the trades that are actively doing work on the
8  project at that time, and that your submission gets
9  merged with other people's and discussions, so that we
10  can come up with a final one that considers all the
11  activities rather than just your activity. It's very
12  difficult for you to do anything effective if you're
13  sitting in a room by yourself and saying "This is what
14  I want."
15    Q.  I want to move on to page 4036.  It's the same
16  exhibit.  This is under "General conditions."  It's a
17  rider A to the bid package.  Want to direct your
18  attention to No. 11, where it says, "It may be
19  necessary for this Contractor to leave openings in its
20  work or omit portions of work temporarily in order
21  that other trades can perform their work.  It is
22  understood that the work of filling in openings or
23  completing such unfinished portions of the work may be
24  required to be performed at different times and

Page 83

1  intervals including those after the Contractor
2  has completed its primary work.  All of the foregoing
3  shall be included in the Contract Price."  Do you
4  consider that provision to be a reasonable
5  expectation?
6    A.  If it's coordinated, if it's organized, and if
7  there's sufficient notice provided to the contractors
8  that it affects, it would be a reasonable provision.
9    Q.  And what would be sufficient notice, in your
10  opinion?
11    A.  It depends on what activities are taking place
12  and what the sequence is.  If we start at one corner
13  of the building and we work out from there so that
14  everybody can see what's coming days and weeks ahead,
15  less notice is necessary.  If we're working here and
16  unexpectedly two weeks later we're working in this
17  area, and then a day later we're working in that area
18  where no one can anticipate anything because the job
19  isn't moving along in a normal sequence, then this
20  becomes very difficult to do to diminish the
21  inefficiency and the delay.
22    Q.  Regarding this particular project, 2357, what's
23  your understanding as to the reasons for the
24  sequencing of the work?

Page 84

1    A.  That's a good question, because the project
2  wasn't sequenced in a manner that I would have
3  considered reasonable at bid time.  I think, I think
4  that's responsive to your question.
5    Q.  As it was sequenced in actuality, and this is,
6  I think you just said as you saw it as being sequenced
7  at bid time, in the way it actually proceeded, would
8  that have been -- was that more reasonable in your
9  opinion than the way it was presented at bid time?
10    A.  No.  It was, it was, it was entirely
11  unreasonable and unexpected, the manner in which the,
12  the project actually unfolded.
13    Q.  I guess what I'm trying to get at is I think
14  you testified that as it was presented at bid time,
15  that you thought that there were problems with the
16  sequence at that time too.
17    A.  I don't remember --
18        MR. McDONALD:  Maybe we can have it read
19  back, I think a couple, maybe a couple of questions
20  back.
21        (The requested portion was read.)
22    Q.  That's what I'm trying to get at in your prior
23  response when you said you didn't consider it
24  reasonable at bid time, I'm trying to see if I can

Page 85

1  understand if there's a distinction between the
2  sequencing at bid time, if you consider that to be
3  unreasonable versus the way it actually progressed
4  once the project started.
5    A.  Well, I think what I just heard the court
6  reporter read was basically what unfolded was
7  different than what was anticipated at bid time.
8  That's, that was my understanding of what was just
9  read.
10    Q.  Okay, I --
11        MR. SEGLIAS:  Well, it was your answer
12  that she read back.
13        THE WITNESS:  Yes.
14        MR. SEGLIAS:  Okay, so in response to what
15  Paul is asking --
16        THE WITNESS:  Yes.
17        MR. SEGLIAS:  -- did you consider -- I
18  don't want to ask the deposition questions here.  But
19  did you consider what happened at bid time reasonable
20  and then contrast that to what happened later?  What
21  was reflected at bid?
22        THE WITNESS:  What Creedon had anticipated
23  at bid time based upon the documents I considered to
24  be reasonable.

Creedon Controls, Inc.                    v.              Banc One Building Corporation
Dennis Link                        C.A. # 05-CV-300-JJF                 May 31, 2006

Page 106

1  shall include, in addition to other terms and
2  conditions, customary representations, warranties,
3  bonding, indemnities, and insurance from Subcontract
4  Agreement executed, Subcontractor agrees to be bound
5  to the terms and conditions of the Subcontract
6  Agreement as attached hereto as Exhibit 1." Do you
7  see that?
8    A.  I see that.
9    Q.  Is it a fair interpretation of that paragraph
10  that, in your opinion, that the subcontract agreement
11  that is attached will be included in any future
12  contractual arrangement?
13       MR. SEGLIAS:  I'm going to object to the
14  question, because I think it calls for a legal
15  conclusion.  I don't think also that there is a
16  foundation to ask this witness that question.  It
17  almost sounds as though you're asking his opinion.
18  He's here as a fact witness, and therefore, I don't
19  think that it's appropriate for him to speculate about
20  what he thinks it means.  I don't know if it's even
21  worth anything, but I know you've asked the question.
22       So if you want to rephrase that, Paul, or,
23  you know, start with a foundation whether he discussed
24  it with anybody, I don't have a problem with that.

Page 107

1  But otherwise, I think it's not an appropriate
2  question for this witness.
3    Q.  Okay.  You're familiar with your curriculum
4  vitae; is that correct?
5    A.  My curriculum --
6    Q.  Yes, because you prepared it, right?
7    A.  I think so, yes.
8    Q.  And are you familiar on your curriculum vitae
9  it's listed, and I'm sorry I don't have an additional
10  copy here, I don't think I do, but you just indicated
11  that you're familiar with it, that there is a mention
12  of -- here is actually an additional copy, Counsel, if
13  you want to take a look at it.  I'm sorry, I don't
14  know if I have an additional for you.
15       There's indicated there, Mr. Link's legal
16  experience, 1977 to present.  It says, "Covers many
17  aspects of the litigation process, having many years
18  of experience with settlement negotiations and
19  litigation in construction.  He has participated in
20  many cases as a (i) a litigation and alternate dispute
21  resolution support consultant, (ii) an expert witness
22  and (iii) a sole arbitrator and as part of an
23  arbitration panel for the American Arbitration
24  Association."  That's correct, right?

Page 108

1    A.  That is correct.
2    Q.  Okay.  And as part of that legal experience
3  that you indicate on your curriculum vitae, have you
4  looked at documents similar to this, to this, what is
5  now Link C, contractual documents?
6    A.  Yes.
7    Q.  Okay.  And have you been asked to provide your
8  opinion of what they mean in terms of in the
9  construction industry or in particular to electric
10  contracting?
11    A.  Specifically to this project or in general?
12    Q.  In general, have you been asked before to do
13  that?
14    A.  Yes.
15    Q.  Okay.  And how many times have you done that
16  before, if you, if you know?
17    A.  Frequently.
18    Q.  Frequently, okay.  So -- okay.  Well --
19       MR. SEGLIAS:  I still, same objection.
20       MR. McDONALD:  Same objection.
21       MR. SEGLIAS:  He is not a lawyer.
22       MR. McDONALD:  Right.
23       MR. SEGLIAS:  Even though he may have had
24  that experience.

Page 109

1       MR. McDONALD:  Understood, understood.
2       MR. SEGLIAS:  And with regard to the
3  interpretation of this particular language, what he
4  may have done in the past with regard to other
5  documents or other letters of intent I don't think
6  have any relevance to what the words here mean.  That
7  really is appropriately directed either to
8  Mr. Angerame, who authored the letter, or Miss
9  Creedon, who, who also signed the document.
10    Q.  Well, let me ask you this.  Reading that
11  paragraph, what would your interpretation be of that
12  paragraph if you were presented with it?
13    A.  I think that the fact that the prime contract
14  document has not been finalized says that everything
15  is up in the air.  And we can't rely upon anything
16  because any subcontract would have to be conditioned
17  upon whatever is in the prime contract document.  So
18  that there's nothing here that you can rely upon until
19  the prime contract documents are completed and the,
20  the, someone such as Forest Electric, for example,
21  knows the terms and conditions which they have to
22  introduce into their, their blank contract document,
23  what changes they have to make and, and usually in
24  those contracts they make reference to the prime

28 (Pages 106 to 109)

Creedon Controls, Inc.                           v.                    Banc One Building Corporation
Dennis Link                                C.A. # 05-CV-300-JJF                        May 31, 2006

Page 110

1  contract, which you really need to know what the terms
2  and conditions are overall for your participation in
3  the project.
4         It's pretty well -- as far as I'm
5  concerned, that paragraph means it's open-ended.
6  Q.  And in regards to the part of that paragraph
7  that says that it shall include, what do you, what do
8  you understand the "shall include" to be referencing?
9  A.  I'm sorry, you have to -- can you give me a
10  line number?
11  Q.  Sure, it's the third line in the second
12  paragraph.
13  A.  "Which shall include." Okay.
14  Q.  Right. What do you understand that to be
15  referring to?
16  A.  They're just general issues that are present in
17  every contract, and they're just generally throwing
18  these things out and saying the kinds of things you
19  normally see in a contract are going to be present in
20  this contract when it gets finalized.
21  Q.  Okay. And at the end of that, of that list --
22  that's, you're referring to the terms and conditions,
23  customary representations, warranties, bonding,
24  indemnities and insurance from subcontract agreement.

Page 111

1  That's what you're referring to?
2  A.  All of those issues, yes.
3  Q.  Okay. And at the end of that particular
4  section, doesn't it also say, "Subcontractor agrees to
5  be bound to the terms and conditions of the
6  subcontract agreement as attached hereto as Exhibit
7  1"?
8  A.  Yeah, it's saying that, you know, at some point
9  in time when we can finalize that based upon us having
10  a prime contract document. You know, you have to
11  expect to be bound by that. And largely, it's, I
12  think it's referring to the prime contract document
13  and what the conditions and all of these other things
14  that are surrounding that, you know, will happen to
15  impose upon the subcontractor.
16         But in itself, I don't think it -- I think
17  it's open-ended, as I said earlier.
18  Q.  There is an Exhibit 1 attached to that
19  document, though, isn't that correct?
20  A.  I don't know. Should I --
21  Q.  If you'd turn to the next page, CL 1144.
22  A.  There is a subcontract agreement, a document
23  identified as a subcontract agreement attached.
24  Q.  And is it your understanding that that's the

Page 112

1  Exhibit 1 referred to in paragraph 2 on the first
2  page, CL 1143?
3  A.  Yes, that would be my, my opinion.
4  Q.  Okay. Now, at the bottom of that first page,
5  1143, Patricia Creedon, there is a Patricia Creedon
6  signature there; is that correct?
7  A.  There are two signatures at the bottom of that
8  form.
9  Q.  Okay.
10  A.  One includes Patricia Creedon.
11  Q.  Okay. And above that there is a portion that
12  says, "This letter of intent is accepted and will be
13  considered executed after the required substantive
14  review, modification, negotiations and implementation
15  of the advice from Creedon Control Incorporated's
16  legal counsel, allowing 14 days for response to
17  address terms, conditions, scope of work and any and
18  all other items requiring additional considerations."
19  Do you see that?
20  A.  Yes, I do.
21  Q.  Okay. And is it your understanding that that
22  additional language was added, added by Miss Creedon?
23  A.  It's below the original letter and Paul
24  Angerame's signature, so that would be my assumption.

Page 113

1  Q.  Okay. And to your knowledge, did Miss Creedon
2  or anyone from Creedon Controls in any way respond or
3  object to the content of this October 2nd, 2003 letter
4  within 14 days?
5  A.  Well, the current date is May of 2006. I have
6  yet to see a complete set of documents that anyone can
7  review with respect to this contract. They never
8  delivered them, so I don't know how anything can be
9  done in 14 days to review documents that don't exist.
10  Q.  Okay. But this particular, I won't say
11  proviso, but this particular I think she referred to
12  it as a codicil before, saying this is the letter of
13  intent is accepted, is that not just related to this
14  particular information?
15         MR. SEGLIAS:  I'm going to object to the
16  extent that you're, you're asking him to speculate
17  again, because that's -- Miss Creedon answered
18  questions about this. And so the only thing that
19  Mr. Link could testify to is either a conversation
20  that he had with her about this particular
21  understanding, or if he was provided some other
22  information about what this meant from some
23  independent basis.
24         MR. McDONALD:  Understood.

29 (Pages 110 to 113)

Page 114

1  BY MR. McDONALD:
2  Q.  Have you seen any, any documentation or
3  correspondence from Creedon to Forest Electric
4  referencing this particular document that occurred
5  within 14 days of the date of this document?
6  A.  I, I don't recall seeing any.
7  Q.  Now, turning to what I think the attachment
8  Exhibit 1 to this document starting at page --
9  A.  Excuse me, Paul.
10  Q.  Yes.
11  A.  Let me, let me go back to that again.
12  Q.  Okay.
13  A.  While you were planning your next question.
14  Yeah, there was documentation that I do recall seeing
15  relative to this original agreement.
16  Q.  Okay.
17  A.  And I think it was related to where is it, when
18  are we going to get it, something of that sort. But
19  I -- that's just a vague recollection.
20  Q.  Okay. And do you recall when that, that
21  documentation?
22  A.  I would have seen it sometime subsequent to my
23  arrival on the project in March, April.
24  Q.  Okay.

Page 115

1  A.  So I really can't tell you at this point when
2  these documents were generated.
3  Q.  Understood. Appreciate that.
4          Looking at CL 1144, it's the first page of
5  the subcontract agreement that's attached as Exhibit
6  1. I want to direct your attention -- well, first of
7  all, there seems to be handwriting on this document.
8  Do you recognize that handwriting at all?
9  A.  It looks very similar to the handwriting that I
10  see, Pat Creedon's signature and also her printing
11  below, so I would suspect it's Pat Creedon's, but I,
12  I'm just guessing based upon what I'm seeing on the,
13  on 1143.
14  Q.  Have you had a conversation with Miss Creedon
15  as to whether or not that's her handwriting on this
16  particular document?
17  A.  I think, I think I have had such a
18  conversation. My, my guess is that it is her
19  handwriting.
20  Q.  And now looking at -- we'll finish up with this
21  document and then we'll call a break for lunch.
22  Looking at, I want to call it I guess I, I guess
23  paragraph I which starts off "Subcontractor
24  represents." Do you see that?

Page 116

1  A.  Okay, Roman numeral I?
2  Q.  Right, Roman numeral I, that's a better way of
3  putting it. Towards the end of that paragraph there's
4  a section that starts off, it's five sentences down,
5  "Subcontractor agrees to be bound and obligated to FEC
6  as FEC is bound and obligated to Construction Manager
7  and/or Owner under its Contract as to the Work
8  provided hereunder." Do you see that?
9  A.  Yes.
10  Q.  What's your, what's your understanding of that
11  clause?
12  A.  Well, I think that in my earlier testimony I
13  referred to the prime construction contract. And I
14  think it's, it's related to that prime construction
15  contract.
16  Q.  But in terms of, in your experience, you
17  testified that you've had some experience interpreting
18  contracts, have you seen something like this before?
19  A.  That the subcontract agreement is, is subject
20  to terms and conditions that might exist in a prime
21  contract?
22  Q.  Yes.
23  A.  Is that what you're referring to?
24  Q.  Right.

Page 117

1  A.  Yes, I have.
2  Q.  And is this -- does this clause mean that the
3  subcontractor is contracting with, in this case, FEC?
4  A.  Yes.
5  Q.  And FEC has a separate contract with, with
6  another entity that does not involve a subcontractor?
7  A.  If I were to see this set of documents and not
8  know what I know about the project, I would say that
9  it looks like there's a subcontract agreement
10  anticipated between Creedon Controls and Forest
11  Electric Corporation.
12  Q.  Okay, you say not what you know about the
13  project, what is it that you know about the project
14  that would cause you not to believe that to be the
15  case?
16  A.  Because in May a 60-page contract was issued by
17  Banc One that was dated as to the beginning of the
18  project back in October of '03, which suggests to me
19  that Banc One, for some reason, wanted the terms and
20  conditions of their contract to be binding upon the
21  subcontractor on a prime contract basis.
22  Q.  Okay, and we'll get to that. It's, obviously
23  it will be after lunch at this point. But I want to
24  ask a couple of quick questions about that first.

30 (Pages 114 to 117)

Page 194

1  A. That is correct.
2  Q. Okay.
3  A. Well, the first document is the, I think would
4  be -- yes, I mean it would be appropriate to say Paul
5  Angerame.
6  Q. Right. Now, if you look at Link R, the May 4,
7  2004 document, the single project construction
8  services agreement, if you look on page 6114, it's the
9  first page, it identifies as a construction contractor
10 Creedon Controls Incorporated. Is that correct?
11 A. Yes.
12 Q. And identifies as the electrical trade manager
13 Forest Electric Corporation; is that correct?
14 A. Yes.
15 Q. And the first sentence of the document says,
16 "This Single Project Construction Services Agreement
17 is made as of the 2nd day of October 2003." And we
18 understand that's backdated. Is that a fair
19 statement?
20 A. We're reading the bottom now?
21 Q. Yes, I'm sorry, the first sentence at the
22 bottom, "This Single Project Construction Services
23 Agreement is made as of the 2nd day of October 2003."
24 And again, that's backdated?

Page 195

1  A. Yes, given this is May, then that would be
2  backdated.
3  Q. Okay, and it says, "(Agreement) between
4  Electrical Trade Manager," that's Forest Electric,
5  correct?
6  A. Um-hum.
7  Q. "And Construction Contractor," and that's
8  Creedon Controls, correct?
9  A. That is correct.
10 Q. Now, on Link S, the proposed revisions to Link
11 R, that document, if you look on page FE 003547. Let
12 me know when you're there.
13 A. Yes.
14 Q. Item No. 1, it says, "Contract location. First
15 page, last paragraph, first sentence." Proposed
16 change is between, to change "between Electrical Trade
17 Manager and Construction Contractor," to read "between
18 Banc One Building Corporation, Electrical Trade
19 Manager, Agent, and Construction Contractor." Do you
20 see that?
21 A. Yes, I do.
22 Q. Okay. Who, who is the person that proposed
23 that change, you or Miss Creedon or Mr. Doble?
24 A. I did.

Page 196

1  Q. Okay. And why did you propose that change?
2  A. Because on page 3, 006116, it's clearly
3  identifying the signator as exactly what, all we did
4  was create consistency between what they wanted, who
5  they wanted to sign it and in what role they wanted it
6  signed, and what was previously presented.
7  Q. And what are you referring to in particular on
8  006116?
9  A. "Owner: Banc One Building Corporation, an
10 Illinois corporation, By: Forest Electric Corp. as
11 Banc One Building Corporation's agent and Electrical
12 Trade Manager, by," whoever the respective party would
13 have been.
14 Q. And did you know who Philip Altheim was?
15 A. Yes.
16 Q. Okay, and who did -- who was Philip Altheim?
17 A. Well, I knew him as one of the people on the
18 project. I'm not sure who he worked for.
19 Q. Okay. And did anyone at Banc One Building
20 Corporation tell you that Forest Electric Corporation,
21 you or anyone at Creedon to your knowledge, that
22 Forest Electric Corporation was their agent?
23 A. Only to the degree that -- the answer to your
24 question is no, no one from Banc One came to me and

Page 197

1  said that Forest Electric was the agent.
2  Q. Is this particular, the section you just read
3  off on page 006116, is that the only written example
4  where you, that you point to indicating your --
5  supporting your belief that Forest Electric
6  Corporation was acting as an agent for Banc One
7  Building?
8  A. I can't say that. I would have to review the
9  documents that surrounded this and, you know, the
10 documents that were exchanged at this time. But as I
11 answered previously, clearly it's being asked that
12 this -- I just noticed this as we were discussing it.
13 Clearly it's indicated here that Forest is the agent,
14 and there was a disagreement between what you
15 originally read and the manner in which the document
16 is supposed to be executed.
17 Q. Now, is it fair to say that, we've talked about
18 this earlier today, you've made reference to Banc One
19 and agency, when you make that reference, is this the
20 specific item that you are thinking of when you made
21 that statement earlier?
22 A. Not alone. This was one of the things -- I was
23 thinking about this document, not specifically that
24 particular section of it. But there were discussions

Creedon Controls, Inc.
Dennis Link

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
May 31, 2006

Page 202

1  A. Yes.
2  Q. When it talks about, "The foregoing shall not
3  relieve Construction Contractor of Construction
4  Contractor's responsibility to advise Owner of any
5  inconsistencies in any of the plans and specifications
6  which a fully competent first class contractor could
7  reasonably be expected to discover upon review of the
8  plans and specifications." Do you see that?
9  A. Yes.
10  Q. Now, in fact, to the extent that Creedon
11  recognized or reported any such inconsistencies, it
12  reported them to Forest Electric, not Banc One
13  Building Corporation. Isn't that correct?
14  A. Yes, I think fundamentally Creedon's contact on
15  this project was primarily with Forest and sometimes
16  with Tishman.
17  Q. Now given that answer, maybe I can skip forward
18  a bit. And that would be true of -- withdrawn.
19    MR. BRADLEY: Pardon me, what was the last
20  question?
21    (The requested portion was read.)
22  BY MR. McDONALD:
23  Q. Okay, I want to go to, we're still in Link R,
24  the document that was presented to Creedon. I want to

Page 203

1  go now to page 006133 to Article 2 entitled "Owner."
2  Let me know when you're there.
3  A. Yes, I'm sorry.
4  Q. Now, in that particular article, I want to talk
5  about 2.01, the first one. If you go to the end of
6  the first sentence, it says, "Owner shall furnish
7  descriptions of all surveys describing the physical
8  characteristics, legal limitations and utility
9  locations for the area within which" --
10  A. Excuse me, I'm going to interrupt you. I can't
11  find where that is.
12  Q. 2.01 under Article 2.
13  A. Yes, yes.
14  Q. At the end of the very first sentence.
15  A. Oh, at the end of the first sentence.
16  Q. Right, I'm sorry. Right after the, I guess the
17  introductory clause, if you will. "To the extent
18  required by Construction Contractor to perform the
19  Work, Owner shall furnish descriptions of all surveys
20  describing the physical characteristics" --
21  A. I'm sorry, I still don't know where you are.
22  Could you just point to it on your document?
23  Q. I will, it's 2.01.
24  A. Just point on your document.

Page 204

1  Q. Here, right there.
2  A. "To the extent required"?
3  Q. Right, I was going to start off at the end of
4  the sentence, but I'll just do the whole thing.
5  A. Thank you.
6  Q. "To the extent required by Construction
7  Contractor to perform the Work, Owner shall furnish
8  descriptions of all surveys describing the physical
9  characteristics, legal limitations and utility
10  locations for the area within which the Work is to be
11  performed and where materials are to be stored, which
12  Work areas within the Site are limited to the areas
13  designated such on Exhibit D to the Agreement (Work
14  Area)."
15    My question is, in fact, is it true to say
16  that when Creedon communicated regarding, or the
17  communication it received regarding descriptions and
18  surveys on this project that it received them from
19  Forest and not from Banc One Building Corporation?
20  A. I can't say that I was privy to the exchange of
21  such information. It probably occurred early in the
22  project, so I really can't answer that question.
23  Q. Okay, if we go to No. 2.03, first sentence
24  says, "If Construction Contractor is in default of any

Page 205

1  of its obligations under the Contract Documents, and
2  such failure or default continues for seven days after
3  written notice from Owner, Owner may order
4  Construction Contractor immediately to stop the Work,
5  or any portion thereof, until the cause for such order
6  has been eliminated." Do you see that?
7  A. Yes.
8  Q. In fact, when -- in fact, Creedon communicated
9  with Forest and not Banc One Building Corporation when
10  it received noncompliance notices that either came
11  from or were made by Forest. Isn't that true?
12  A. To answer that question, my understanding of an
13  agency arrangement is I'm dealing with the owner when
14  I'm dealing with the owner's agent. So I -- you know,
15  when you say we're dealing with Forest, who is the
16  agent of the owner, as far as I'm concerned we're
17  dealing with the owner.
18  Q. But I guess so then, your understanding is that
19  communications went through either Forest or Tishman,
20  and that based upon what you believe to be the case,
21  they were then agents of Banc One Building. Is that
22  what you're saying?
23  A. Well certainly with respect to this agreement,
24  it was clear to me, either correctly or incorrectly,

52 (Pages 202 to 205)

Creedon Controls, Inc.                          v.                 Banc One Building Corporation
Dennis Link                              C.A. # 05-CV-300-JJF                      May 31, 2006

Page 206

1  that the, that Banc One was represented by Forest as
2  agent. And when we were dealing with Banc One, if
3  this particular agreement is the agreement that
4  controls, then we were dealing with Banc One, the
5  owner, if we were dealing with Forest.
6      Q.  But again, you didn't deal with anyone from
7  Banc One Building Corporation to your knowledge
8  regarding any of the issues we just discussed in the
9  contract?
10     A.  Again, I wasn't privy to all of those contacts,
11 but I did -- I don't recall the issue, other than
12 those which I testified to this morning, that involved
13 Banc One employees or -- employees.
14     Q.  Understood.
15         MR. McDONALD:  We can take a break since
16 we have I think five minutes left on this tape.
17         THE VIDEOGRAPHER:  We're going off the
18 record at approximately 3:37 p.m.
19         (A brief recess was taken.)
20         THE VIDEOGRAPHER:  We're going back on the
21 record at approximately 3:42 p.m.
22 BY MR. McDONALD:
23     Q.  Now, I want to go to, and still might be best
24 if you kept R and S kind of off to the side because

Page 207

1  we're probably going to go back to them a couple of
2  times and it might be easier to flip that way.  But in
3  the notebook I want to go to, excuse me, to Link T,
4  which is funny considering our conversation about tee
5  off records a second ago.
6         (Link Exhibit No. T was marked for
7  identification.)
8      Q.  Link T on its face appears to be a July 23rd,
9  2004 letter from Miss Creedon addressed to CEO of Banc
10 One Building Corporation and CEO of Tishman
11 Construction Corporation and the CEO of Forest
12 Electric Corporation, Philip Altheim, so I guess that
13 tells us who he is from a prior document when we
14 discussed it.
15         My first question is, to your knowledge is
16 this the first, the first correspondence or
17 communication that Creedon Controls had directly with
18 Banc One Building Corporation on the matter of the
19 critical events summary that we discussed earlier, the
20 order of magnitude?
21     A.  I can't say that this is one of the original
22 documents, but I don't know.  There were several of
23 these that I, that I recall that were sent.  And I
24 don't know, you know, I don't have the time line in

Page 208

1  front of me.
2      Q.  Okay.  Actually, what might be helpful is I
3  think there is a time line inside the document itself
4  if we turn the next page, 005734.  Miss Creedon seems
5  to, to give an accounting of communications or formal
6  notification that apparently was attached to the
7  original of this document.  And if you go down that
8  list, you can tell me if I read something incorrectly.
9  There is a Creedon letter to Forest dated April 6,
10 2004; there is a Creedon letter to Forest dated April
11 20th, 2004; a Creedon meeting with Tishman and Forest
12 of April 21st, 2004; a Creedon e-mail to Forest dated
13 May 7th, 2004; Creedon e-mail to Forest dated May
14 13th, 2004; Creedon transmittal to Forest dated May
15 24th, 2004; Creedon letter dated May 28th, 2004 to
16 Forest; a Creedon letter dated June 17, 2004 to
17 Forest; a Creedon letter to Forest dated June 22nd,
18 2004; a Creedon e-mail to Forest dated July 12th,
19 2004; a Creedon e-mail to Forest dated July 13th,
20 2004; and a Creedon letter dated July 19th, 2004 to
21 Forest.  Did I miss anything?
22     A.  You read everything that was on 005734.
23     Q.  Okay.  Is there anything else --
24     A.  -- at the bottom of the page.

Page 209

1      Q.  Is there anything else mentioned in the letter
2  as a communication, a formal notification,
3  communication?
4      A.  Would you like me to read the three pages to
5  determine whether --
6      Q.  You can certainly do that if you'd like to.
7      A.  Well, it's up to you.  Are you going to ask
8  me -- if you want an answer to that question, that
9  would be helpful to me.
10     Q.  I'm sure it will take you maybe a minute to do
11 that if you'd like to.
12     A.  A cursory review indicates that, that there may
13 have been an additional document prior to this.  It
14 says this letter, this is on 005733, the last sentence
15 of -- let me call it the preamble, it says, "This
16 letter is one last attempt to open a meaningful
17 dialogue to discuss and settle a change order."  And I
18 don't know if there was any prior letters that were
19 sent, I do know there was more than one sent.
20     Q.  Okay, but at least on the face of the document,
21 other than that possible reference, there is no other
22 indication that there was any prior communication with
23 Banc One Building Corporation regarding the order of
24 magnitude.  When I say order of magnitude, I'm talking

53 (Pages 206 to 209)

Page 258

1  at your office?
2  A.  At Creedon's office.
3  Q.  And in essence, this is a summary of the
4  project as you saw it, correct?
5  A.  It's a summary of the project as seen from the
6  perspective of the people who were working on the
7  project at a supervisory level.  And I may have
8  organized it, may have put it together, but it isn't
9  my sole product.
10  Q.  Okay.  And did you write it or did someone else
11  write it?
12  A.  I did a significant amount of writing with
13  respect to this, but it was a, it was a joint effort.
14  Q.  Okay.
15  A.  There may have been parts of it that were
16  written by others.  I may have changed some of those
17  sections, someone may have taken the sections I've
18  written and changed them.  It was a collective effort.
19  Q.  Do you have any of the drafts that were done?
20  A.  Well, I just work directly on the computer.  I
21  don't, you know, most times.  The only time that I
22  would have a handwritten draft, if that's what you're
23  referring to, would be if I didn't have my laptop with
24  me.  And I believe that I provided Mr. Beste all the

Page 259

1  documents that I had or that I could locate at the
2  time that he asked for production of documents.
3  Q.  Okay.  And in the pages you're looking at that
4  constitute basically a summary of the job through June
5  30th, are they accurate?
6  A.  I don't think that I would have produced
7  something that I thought was inaccurate to Wilmington
8  Trust.  So the answer is yes, I believe it's accurate.
9  Page 2 is missing, but other than that.
10  Q.  And part of it is, on page 530 you have a
11  section called "Project conduct"?
12  A.  There is a section project, "Project conduct"
13  on the document you gave me.
14  Q.  And does that section outline some of the major
15  obstacles that you believed occurred on this job?
16  A.  I think what it says is that there are many
17  areas where the low priority of this package to the
18  construction manager, engineer and owner became
19  evident.  So it's talking about areas that we believe
20  were low priorities with the Banc One team.
21  Q.  And the second part it talks about pouring the
22  concrete decks in alphabetical order, second bullet
23  point?
24  A.  Yes.

Page 260

1  Q.  And then it says "TCC."  That's a reference to
2  Tishman?
3  A.  I believe Tishman Construction Corporation, I
4  think is their name.
5  Q.  Okay, and Tishman was the construction manager?
6  A.  That's a good question.  It really depends upon
7  what the relationship was.  I have not had the
8  opportunity, as I testified earlier, to see contracts
9  that existed between Forest and Tishman, Tishman and
10  Banc One.  So I'm not really sure exactly what, you
11  know, what status Tishman had.
12  Q.  Was it, was it your understanding while you
13  were working at the job that Tishman was the
14  construction manager?
15  A.  It was my impression working on the job that
16  Forest reported to Tishman and Tishman reported to
17  Banc One.
18  Q.  Okay.
19  A.  What the arrangement was, I don't have
20  impression.
21  Q.  What, what are you citing to that would require
22  the concrete decks to have been poured in alphabetical
23  order?
24  A.  They wouldn't necessarily have to be poured in

Page 261

1  alphabetical order, but they should have been poured
2  in a contiguous order.  And as it turns out, the, the
3  drawings were pretty much A, B, C, right across the
4  plan.  And then D, E, F and G at the top of the site
5  plan, with H, the administration building, being at
6  the bottom.  So that normally there's some
7  consistency.  They could have started in the far
8  corner and poured out from there and it wouldn't
9  necessarily be in alphabetical order.  Maybe that was
10  a poor choice of words.  But really we're talking
11  about in some contiguous order, so that the job flows
12  from point A to point B, as opposed to someone working
13  here and tomorrow working in a very large building at
14  the far corner of that building.
15  Q.  And is there anything in the specifications or
16  drawings that say the concrete was to be poured in
17  alphabetical order?
18  A.  I can't say whether it is, it is or isn't
19  indicated in there.  But I'm telling you what industry
20  standard is and the way the job would normally be done
21  and what would normally be expected by me with, you
22  know, 36 years' experience.
23  Q.  Understood.  My question is limited to what was
24  in this bid that said the concrete was to be poured in

Page 262

1  alphabetical order?
2  **A.  I would have to refer to the documents.**
3  Q.  And I, because of Mr. Beste, I've got to hurry
4  up.  So let's try to speak the same language and get
5  through this.
6       The next page, 531, the first bullet point
7  at the top, is that the issue regarding the closing of
8  the storage trailers and the movement of materials
9  inside that you discussed earlier?
10  **A.  I'm not reading the whole thing, but just the**
11  **first couple of sentences, and it seems to apply to**
12  **the movement of materials, equipment and tools inside,**
13  **yes.**
14  Q.  And is it your belief that that was one of the
15  biggest problems or one of the -- withdraw that.
16       Is it your belief that that was one of the
17  biggest problems on the job in terms of materials
18  being in the way of people trying to get work done?
19  **A.  Yes, I believe that.**
20  Q.  And then you say there's another major obstacle
21  relating to the L&M corridor?
22  **A.  Yes.**
23  Q.  And could you tell me where that corridor was
24  located?

Page 263

1  **A.  Well, without a floor plan, I can tell you that**
2  **it was above the battery and UPS rooms in pod A and**
3  **pod B, if the administration building is at the bottom**
4  **of the drawing.**
5  Q.  Okay.  And the problem with that was there was
6  a trench that ran the length of that corridor?
7  **A.  Not the entire length.  It was towards the**
8  **center and it was a couple of sections of the center**
9  **area.  In effect, it made it impossible, very**
10  **difficult to use that corridor for access, which was a**
11  **main corridor.  There was a chiller pipe that was**
12  **supposed to be in that trench, 16-inch chiller pipe,**
13  **so there were very large trenches.**
14  Q.  Okay.  And the, I assume the trench was shown
15  on the drawings?
16  **A.  No, I don't think so.  Now when you're saying**
17  **drawings, I guess I should say this.  If we're talking**
18  **about someone's as-builts at some point in time, say,**
19  **for example, the mechanical contractor actually has to**
20  **record exactly where his pipe is, then it would appear**
21  **on his drawings.  What I'm referring to is I don't**
22  **recall seeing it on the original drawings that I saw.**
23  Q.  Okay.  Your next major obstacle was the UPS
24  switch gear was too large to fit in a room and they

Page 264

1  only could build three walls?
2  **A.  Could you direct me?**
3  Q.  Sure, the third bullet point.
4  **A.  Yes, that was a major obstacle.**
5  Q.  All right, and they had to come back and, after
6  the fourth wall was up and connect the strut to the
7  wall?
8  **A.  More than once.  No, actually, the strut was**
9  **hanging from the ceiling.  What we're talking about**
10  **here is the conduit and wiring that would be within**
11  **the wall itself.  If the wall is not there, they**
12  **obviously can't run the conduit and wire.**
13  Q.  Down through the wall because it didn't exist?
14  **A.  Yes, exactly right.**
15  Q.  Next bullet point on the next page, it says
16  that the block walls for the generator room started to
17  go up and the construction manager instructed masons
18  where to unload their material, do you see that?
19  **A.  Yes.**
20  Q.  And I assume your reference to construction
21  manager, it means Tishman?
22  **A.  I suspect that means Tishman, yes.**
23  Q.  Okay.  You came on the project in early April
24  2004?

Page 265

1  **A.  End of March.**
2  Q.  End of March?
3  **A.  Yes.**
4       MR. BRADLEY:  I guess this would be Link
5  LL.
6       MR. BESTE:  Have an extra?
7       (Link Exhibit No. LL was marked for
8  identification.)
9       MR. BRADLEY:  Yeah, I do, but not for you.
10  Here, you can have the actual exhibit.
11  Q.  The question is whether this is, LL are your
12  notes from your first meeting with Pat Creedon,
13  Charlie Doble on March 30th, 2004?
14  **A.  Yes, it does appear that these eight pages**
15  **represent notes on the same day that that meeting**
16  **occurred.**
17  Q.  Okay.  If you could look at page 533.
18  **A.  Yes.**
19  Q.  Would you agree in the first main paragraph
20  there that the general power and lighting job was 95
21  percent complete as of June 30th?
22  **A.  Yes.**
23  Q.  Okay, on the, you talked a little bit about the
24  conveyance, cable conveyance job, would you agree that

67 (Pages 262 to 265)

Creedon Controls, Inc.                                    Banc One Building Corporation
Dennis Link                    v.                              May 31, 2006
                        C.A. # 05-CV-300-JJF

Page 290

1  Q. And you never reviewed any records relating to
2  Hatzel & Buehler's work at Bear?
3  A. I may have.
4  Q. As you sit here now, you don't recall doing it?
5  A. No, I mean it's possible. But as I sit here, I
6  couldn't identify or describe to you something that I
7  reviewed.
8      (Link Exhibit No. PP was marked for
9  identification.)
10  Q. Exhibit PP appears to be a note made by you May
11  6, 2004. At the top you have "Banc One" and there's
12  some percentages there. Do you know what they mean?
13  A. No, I do not.
14  Q. Do you know what the rest of this note means?
15  A. I looked at it. It's out of context. I'd have
16  to go back to 5-6-04, look at what I was doing, and
17  then kind of put it together.
18  Q. Okay, what would you look at to figure out what
19  you were doing on 5-6-04?
20  A. I'd probably look at documents, days before and
21  days after, correspondence and things like that. In
22  other words, some of the things that are noted here,
23  remember I indicated that what we do is we sit down,
24  we go over some issues, then I may generate some

Page 291

1  language and then give that to people to review and
2  get back to me. This is the format, this is the way
3  that that would have occurred. So it's possible that
4  5-7 or 5-8 there may have been a correspondence
5  generated which might specifically refer to some of
6  these numbers.
7  Q. Without that, you can't tell?
8  A. That's correct.
9      (Link Exhibit No. QQ was marked for
10  identification.)
11  Q. And look at Exhibit QQ, please. I'm interested
12  in the first page. There's an e-mail from Richard
13  Anderson to Pat Creedon. Are you aware that two
14  other, or two jobs where Creedon appeared to be losing
15  money referred to in his e-mail?
16  A. Apparently this was sent to me, copied in the
17  e-mail, but unless I spend some time reading it, I
18  can't tell you what they're saying.
19  Q. Are you -- let me just ask you, are you aware
20  of any other jobs that Creedon was losing money on?
21  A. No, I don't have any awareness of that.
22      (Link Exhibit No. RR was marked for
23  identification.)
24  Q. Let me show you what's been marked as Link RR.

Page 292

1  Could you -- I know it says 7-19-04. Is this, this is
2  your handwriting, obviously?
3  A. Yes.
4  Q. And it says, "Tishman," could you read that to
5  us?
6  A. "Tishman was observed" -- oh, "moving our
7  material, plywood from Data Center B. Bob Alloca,
8  Tishman, asked that we leave the plywood on the floor.
9  Tishman superintendent demobilize area with no proper
10  document. Need a letter to Forest."
11  Q. Okay, so the point is that Tishman told you to
12  leave the particular area?
13  A. It looks like Tishman was removing plywood and
14  was observed moving our material, plywood from Data
15  Center B. But then Bob Alloca was saying that he
16  wants us to leave it there. So it seems like Tishman
17  is a little confused about what they want.
18  Q. Did you eventually meet with anyone from Banc
19  One --
20  A. Yes.
21  Q. -- when you were attempting to resolve the
22  order -- the critical events summary and the numbers
23  assigned to that?
24  A. Yes.

Page 293

1  Q. Who did you meet with?
2  A. Hennessey and others. He was present with
3  many others at a meeting.
4  Q. Did Banc One have a representative on the
5  project?
6  A. Yes.
7  Q. Do you recall who that was?
8  A. I think it was Auwarter.
9      (Link Exhibit No. SS was marked for
10  identification.)
11  Q. Show you SS. I think you referred to this
12  earlier too. And my question is that there's a -- you
13  had recommended someone for project management
14  assistance to Creedon. Why was that done?
15  A. I'm sorry, where does it refer to that?
16  Q. In the last sentence of the e-mail from you.
17  A. Yes. Why was that?
18  Q. Yeah.
19  A. Because Tishman arranged for laborers to clean
20  the site, and in that process they threw away our
21  as-built drawings, the drawings that we were
22  maintaining during the entire course of the project.
23  And what we needed to do was hire somebody to take a
24  new set of plans and to survey the entire project and

74 (Pages 290 to 293)



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Creedon Controls, Inc.

## v.

# Banc One Building Corporation

### C.A. # 05-CV-300-JJF

---

### Transcript of:

### Paul Brainard

### June 6, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0571

Page 18

1  you would have these conversations with foremen from
2  other trades, other than the informal conversations?
3  **A. No.**
4  Q.  Did anyone set up any meetings or anything
5  during those other four jobs, other foremen?
6  **A. Not usually.  We would have meetings amongst**
7  **ourselves.**
8  Q.  And what you just described, did that happen on
9  2357?
10  **A. Excuse me?**
11  Q.  What you just described in terms of these
12  informal meetings that you've had on these other four
13  jobs, did the same type of thing happen on 2357?
14  **A. Yes.**
15  Q.  Okay.  And with whom did you have informal
16  conversations about I guess coordinating work on 2357?
17  **A. With Forest.**
18  Q.  Anyone else?
19  **A. Forest would hold a meeting and other**
20  **contractors would be there.**
21  Q.  How many other contractors, if you know?
22  **A. Six or eight.**
23  Q.  Six or eight.  And are these all contractors
24  that are working on day shift the same as you?

Page 19

1  **A. Yes.**
2  Q.  Do you recall any specific names of the
3  contractors, not the -- not necessarily the individual
4  foremen, but the contractors they're working for?
5  **A. Yeah.**
6  Q.  And who do you recall?
7  **A. Furness, Superior, Conti, Tangent, Tishman was**
8  **there, American Testing.  There was a mechanical**
9  **contractor, they were there, I don't remember, F&G**
10  **maybe.**
11  Q.  Okay.
12  **A. I.D. Griffith.  It was everybody that was on**
13  **the -- sometimes the painters would be there.  It was**
14  **everybody that was on the job, for the most part.**
15  Q.  And how often did these meetings occur?
16  **A. Daily.**
17  Q.  And could you kind of give me a general
18  description of what occurred during the meetings, how
19  they were -- what was discussed, if you will?
20  **A. Well, we would stand here and there was, they**
21  **would have a guy standing up there and just asking**
22  **everybody how it's going.**
23  Q.  When you say "they," who are you referring to?
24  **A. Forest.**

Page 20

1  Q.  Forest would.  And was there an opportunity to
2  give feedback to Forest?
3  **A. Yes.**
4  Q.  And did you ever give any feedback to Forest in
5  response to that question, "How is it going?"
6  **A. Yeah, I mean it was, it was informal.  It was,**
7  **they would ask, "How are you making out?  Good or**
8  **bad."**
9  Q.  And in your mind, are there any circumstances
10  that stand out where you told them that things were
11  bad?
12  **A. Yes.**
13  Q.  And let's talk about those, if we can.  How
14  many times, if you can estimate or maybe if you know,
15  did you tell them that things were going badly?
16  **A. I couldn't guess that number.  A lot.**
17  Q.  A lot?
18  **A. Yes.**
19  Q.  And when did you first tell someone from Forest
20  that things were going badly?
21  **A. I don't know the date.**
22  Q.  Do you have an idea in terms of the month or
23  how far into the project?
24  **A. I would say once we started hanging light**

Page 21

1  **fixtures and -- or the hangers for the lights, when**
2  **they would start to get damaged.**
3  Q.  And do you have an idea as to when that was
4  when you started hanging the lights?
5  **A. No.**
6  Q.  And you say they were getting damaged.  Was
7  that the reason why you reported something to Forest?
8  **A. There was -- you know, we had lots of things**
9  **getting damaged.  That's, that's when I was reporting**
10  **it to them.**
11  Q.  And do you know or have a belief as to why
12  things were getting damaged?
13  **A. Poor planning.**
14  Q.  And what do you mean by that, when you say poor
15  planning?
16  **A. We had a, we had to try to do our job the best**
17  **we could without -- once they put a wall up, they**
18  **would leave -- they would put a room up, they would**
19  **leave one wall out.  So we would have to leave our**
20  **conduits outside of the wall to connect them once they**
21  **finished that wall.  And the pipes were getting**
22  **smashed and pulled apart.  And that's just poor**
23  **planning to have to come back -- we were -- we, over**
24  **and over we would have to come back to finish things**

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Paul Brainard                        C.A. # 05-CV-300-JJF                          June 6, 2006

Page 22

1  we've already started.
2  Q.  And do you know who was causing the damage?
3  A.  No.
4  Q.  Did you ever find out who was causing the
5  damage?
6  A.  No.
7  Q.  And when you say damage, I think you said
8  damage to various items.  What other items are we
9  talking about, other than the conduit and the hangers,
10  I think you also said?
11  A.  Yeah, the hangers for the lights and the
12  conduit, that was our bread and butter, if you will.
13  You know, and we would have to go back to fix that
14  constantly.
15  Q.  And how long did you experience that kind of
16  damage to your materials on the job?
17  A.  As long as I can remember.
18  Q.  Did it ever get resolved at all?
19  A.  No.
20  Q.  What did anyone say in response, if anything,
21  to your complaints about the damage?
22  A.  I don't remember.
23  Q.  Do you recall if anything was done about the
24  damage at all by anyone other than Creedon?

Page 23

1  A.  I don't understand what you're asking.
2  Q.  Did anyone do anything to try to, I guess to
3  rectify or to deal with the problem that you brought
4  to their attention?
5  A.  Not that I remember.
6  Q.  Are there any other things that you recall
7  reporting during these daily meetings that you thought
8  were going badly on the job?
9  A.  Our material.
10  Q.  When you say your material, what are you
11  referring to in terms of --
12  A.  Our material to do the job.
13  Q.  And is this the same issue of damage or it's
14  something different?
15  A.  It was getting stolen.
16  Q.  And did you ever determine who was taking the
17  materials?
18  A.  No.
19  Q.  When you -- same basic question, when you
20  reported that, did anyone respond to it or try to
21  address the issue?
22  A.  I reported it to Forest and they said we'll
23  take care of it, and never did.
24  Q.  And do you recall when you first mentioned to

Page 24

1  Forest that things were being taken?
2  A.  No.
3  Q.  Did it ever end or was there ever a resolution
4  to the issue?
5  A.  Not that I remember.
6  Q.  Anything else you recall reporting during those
7  daily meetings, other than the damage and the
8  materials theft that you've talked about?
9  A.  No.
10  Q.  Now, you said earlier, and before I got into
11  it, about you were comparing the I think the four jobs
12  we talked about, the Creedon University of Delaware
13  job, the FATA, the Nitro and the Conti jobs, to 2357,
14  and I think you made a comment that nothing like that
15  in regards to 2357.  What were you referring to when
16  you made that comment earlier?
17  A.  Those, those other jobs, you know, storage was
18  a problem on the 2357 job.  You never had that problem
19  on other jobs.  The theft, the poor planning,
20  constantly having to go back to finish jobs you've
21  already started.
22  Q.  Okay, let me start off, with we've talked
23  about, so -- let me back up.  Withdrawn.
24      Did you have any problems with damage of

Page 25

1  any items or materials you worked with on the other
2  four jobs that you can recall?
3  A.  Not that I remember.
4  Q.  Did you have any problems with material theft
5  that you can recall on any of the other four jobs?
6  A.  No.
7  Q.  And you mentioned storage issue.  What's, can
8  you explain to me what you mean by the storage issue?
9  A.  Well, when we first started the job, we had
10  trailers and C-vans --
11  Q.  You're talking about 2357 now, right?
12  A.  Correct.  Outside and that's where we kept our
13  stuff.  And then they wanted to get rid of all that
14  stuff to do site work, and we had to bring everything
15  that was outside inside, or find another place
16  outside.
17  Q.  And which, which one did you end up doing?
18  A.  Both.
19  Q.  And the other place outside, where was that?
20  A.  Just laying in the mud, right there on the job.
21  Q.  And in terms of inside, where did you put the
22  materials inside?
23  A.  Any floor space that wasn't occupied.
24  Q.  And did you have any I guess storage or lockers

**B-0573**

7 (Pages 22 to 25)

Creedon Controls, Inc.                    v.            Banc One Building Corporation
Paul Brainard                    C.A. # 05-CV-300-JJF                        June 6, 2006

Page 26

1  that Creedon had that you could use for that purpose?
2    **A. Minimal.**
3    Q.  When you say minimal, why is that?
4    **A. Well, you have a gang box, that's where men**
5  **keep their personal tools. And the material is spread**
6  **out in a room that we had. We had to put a guy in the**
7  **room to try to keep track of our material.**
8    Q.  When you say put a guy in the room --
9    **A. A tool man is what they call it.**
10   Q.  And is there anything else this tool man did,
11 other than keep track of your material?
12   **A. Try to keep people from taking it.**
13   Q.  Were there any other things or other I guess
14 tasks the tool man did on a daily basis other than
15 what you just described?
16   **A. Would hand out tools. And when we got**
17 **deliveries, he would put the stuff away in there.**
18   Q.  And on these other four jobs, what was the
19 storage situation on those?
20   **A. There was plenty of storage.**
21   Q.  You never had any storage problems on the other
22 four jobs?
23   **A. No.**
24   Q.  Now you talked about going back and having to

Page 27

1  complete work. Is that fair to characterize that as a
2  sequence issue?
3    **A. Meaning?**
4    Q.  In terms of doing things out of sequence or
5  coming back?
6    **A. Correct, yes.**
7    Q.  And is that something in your experience that
8  you've had on other jobs, having to come back and do
9  work out of sequence?
10   **A. No.**
11   Q.  So are you saying then that the other, the
12 other -- specifically I'm talking about the other four
13 jobs now, the other four jobs that they, to your
14 understanding, proceeded in sequence?
15   **A. Yes.**
16   Q.  And what's that understanding based on?
17   **A. When you start one job, you finish it before**
18 **you move on to another one.**
19   Q.  So on the other four jobs, are you saying that
20 you never had to go back and complete something that
21 you had previously started?
22   **A. I'm sorry, say that again.**
23   Q.  On the other four jobs that we've been talking
24 about, are you saying that you never had to go back

Page 28

1  and complete --
2    **A. No, I'm not saying that.**
3    Q.  Okay. So when have you had to go back and
4  complete something that you had started?
5    **A. Very few times, very few times you have to do**
6  **that.**
7    Q.  And when you've had to do that on the other
8  four jobs, what did you attribute that to?
9    **A. Maybe -- I don't know. Let me think. Say it**
10 **again real quick.**
11   Q.  When you, I think you said -- again, if I'm
12 incorrect, if I ever say something that you disagree
13 with, let me know. I think you said that on the other
14 four jobs that there have been situations where you
15 had to go back and do work that you had previously
16 started, hadn't had a chance to complete. And so what
17 I was trying to get at is what you understood to be
18 the reasons for having to go back and do the work.
19 And again we're talking about, the only universe we're
20 talking about is the other four jobs that we've been
21 talking about.
22   **A. Yes. Yes, I mean it very, very few times.**
23 **And sometimes that's, you know, because you're waiting**
24 **on material or -- a rare occasion do you have to go**

Page 29

1  **back after you've started something to finish it.**
2  **Typically we finish our job before we move on to**
3  **another one.**
4    Q.  And what's your understanding as to why you had
5  to work in some situations out of sequence on 2357?
6    **A. I don't know. I wasn't the one in charge of**
7  **that.**
8    Q.  And how often would you say that you had to go
9  back and complete work you had previously started on
10 2357?
11   **A. A majority of the time.**
12   Q.  And were you privy to any scheduling or other
13 materials for 2357?
14   **A. From, from who?**
15   Q.  Well, from anyone.
16   **A. Well we would have meetings and they would give**
17 **you a schedule.**
18   Q.  And when you say that you had to go back and
19 complete things, were you informed of that during
20 those meetings where you had to have the conversations
21 about the schedule?
22   **A. You never -- they would start rooms and you'd**
23 **get to a certain spot and then have to stop because**
24 **they still had to build the wall. So you knew you had**

8 (Pages 26 to 29)

Creedon Controls, Inc.                                    Banc One Building Corporation
Paul Brainard                    C.A. # 05-CV-300-JJF                    June 6, 2006

Page 70

1   A.  Yes.
2   Q.  Were you told anything as to why, after
3   disagreeing with your, Mr. Sharp's request for men and
4   reaches, that two men were provided and four high
5   reaches were provided on December 3rd?
6   A.  Once different areas open up, then you need
7   more men to -- at this point a lot of the job was
8   dirt. And once they poured the floor then we had more
9   room to work so we needed more guys.
10  Q.  And before December 3rd, what was your
11  understanding or the basis of your belief that you
12  could have used more men or more reaches?
13  A.  You always think you need more guys.
14  Q.  Did you believe prior to December 3rd that you
15  were completing your work on schedule?
16  A.  Yes.
17  Q.  Was there ever a time that you felt like you
18  were not completing your work on schedule?
19  A.  At the end.
20  Q.  When you say "at the end," what, what months
21  are you referring to?
22  A.  The last couple months of the job when we had
23  to keep going back and doing things. You can -- you
24  get a feel for a job when you're doing it and you know

Page 71

1   if things are going right or wrong.
2   Q.  And in terms of why you believed you maybe
3   weren't on schedule towards the end, is that solely
4   because of the repair, going back and doing the
5   repairs and that kind of thing?
6   A.  Well they give you a schedule that you -- they
7   give you a schedule.
8   Q.  When you say "they," who are you referring to?
9   A.  On a job, you get -- on a job you get a
10  schedule and it shows you where you should be at each
11  point, and the whole job was not up to schedule.
12  Q.  And when you say "they" give you a schedule,
13  who was the person that you receive the schedule from?
14  A.  The general contractor. On every job you get a
15  schedule. This job was no different than any other,
16  you got a schedule.
17  Q.  But I guess my question is do you know like
18  what entity it was? Was it, you know, was it Tishman,
19  was it Forest, was it Creedon? Who was it that, if
20  you know, who provided you with a schedule that you,
21  or provided the schedule that you saw?
22  A.  I don't know who provided the schedule that I
23  saw. I don't know where that came from.
24  Q.  And the schedule that you saw, do you remember

Page 72

1   when it indicated the completion date was to be?
2   A.  No, I don't remember that. I just know that we
3   were past it and it wasn't done yet.
4   Q.  And when you say you were past it, that
5   impression was towards the end of the job, you said?
6   A.  For me.
7   Q.  For you.
8   A.  Yes.
9   Q.  And for instance, through -- I think we've
10  already talked about through December 3rd. Through,
11  through the end of December did you feel as though you
12  were on schedule based upon --
13  A.  Yes.
14  Q.  -- your review? Through January of '04 did you
15  feel as though you were on schedule based upon your
16  review of the scheduling document?
17  A.  I don't remember when I started to feel that we
18  were behind. I just -- the, I just remember knowing,
19  looking at a date saying it should be done by this
20  point and we were past that. The whole job was past
21  that.
22  Q.  And what reasons do you attribute to being
23  behind schedule?
24  A.  I don't know that. I don't know why.

Page 73

1   Q.  When you for yourself looking at your crew and
2   the work that you still had to do, what, when you felt
3   like you were behind schedule, what was it that you
4   still had to do or what was left for you to do?
5   A.  I don't remember. I don't remember.
6   Q.  Now, going back to your logbook, I want to go
7   to page 5577. It's a little ways up, about five more
8   pages up from where we were. I'm looking at December
9   18th, Thursday, and again, there's a notation in the
10  margin, "Supervision plus manpower/man-hours, 120
11  hours." Do you have a recollection as to why you made
12  that notation on that date?
13  A.  No.
14  Q.  Moving on to page 5579, and this might be just
15  an issue of similar to -- well, not similar to what we
16  were talking about before with Mr. Flanagan, but it
17  might be an issue of personnel. On January 5th of
18  '04, Monday, it says, "B.H. standing around too much."
19  What is that in relation to?
20  A.  Bill Holland.
21  Q.  Okay, so a personnel issue.
22  A.  I thought he was -- not my gang, I made a note
23  just for myself. He didn't work for me.
24  Q.  Down on Tuesday, January 6th of '04, there's a

19 (Pages 70 to 73)

Page 74

1  notation that says that something needs to be dug up
2  on January 7th, '04. Something is -- I can't really
3  make that out.
4     A.  "Two one-inch PVCs."
5     Q.  "Are broken"?
6     A.  "At N.2/26."
7     Q.  What's in reference to?
8     A.  Pipes that we put in the ground and they, I
9  didn't want to put them in the ground and they said
10  no, put them in the ground, Forest, and they got ran
11  over by trucks. And we had to repeatedly go back and
12  fix them.
13    Q.  When you say repeatedly go back and fix them,
14  how many times did you have to?
15    A.  I don't remember exactly. It was at least four
16  or five times.
17    Q.  Is this a repair issue again?
18    A.  Correct.
19    Q.  If you go to page 5580, and we're looking at --
20  I'm looking at the bottom of the page, Friday, January
21  9th, it says, "Laborers got laid off except Ray
22  Howard." What's that in relation to?
23    A.  We had, Creedon had laborers on their payroll
24  to clean the job, the whole job. And they all got

Page 75

1  laid off except for Ray Howard.
2     Q.  And do you know why they got laid off?
3     A.  Wasn't my -- no, I don't.
4     Q.  And were there other laborers other than the
5  ones working for Creedon there on the job?
6     A.  Yes.
7     Q.  And were they also responsible for cleaning up,
8  the ones, other than Creedon, cleaning up parts of the
9  job site?
10    A.  Yes.
11    Q.  And were the other laborers who weren't Creedon
12  laborers, were they cleaning up areas where Creedon
13  was working in prior to Friday, January 9th?
14    A.  Yes.
15    Q.  And were they coordinating with the laborers
16  that Creedon had or --
17    A.  I don't --
18    Q.  Would they do things separately, if you know?
19    A.  I don't know.
20    Q.  You don't know. Are you aware of any time
21  period when any blueprints or any other items that
22  Creedon maintained were misplaced or otherwise lost,
23  stolen or anything?
24    A.  Yes.

Page 76

1     Q.  And do you know when -- well, what are you
2  aware of in that regard?
3     A.  Eddie, who is another foreman, the laborers
4  threw his prints away.
5     Q.  And what makes you say that?
6     A.  He told me.
7     Q.  And do you know when this would have been?
8     A.  No.
9     Q.  And do you, when you say laborers, are you
10  talking about Creedon laborers or other laborers, if
11  you know?
12    A.  I don't know.
13    Q.  So Eddie didn't tell you which laborers he's
14  referring to?
15    A.  I heard him talking about it in the trailer and
16  that was it.
17    Q.  It says, "Trying to get an area for all of our
18  material, using battery rooms 3A and 3B right now."
19  What's that in relation to?
20    A.  Trying to have a place to centralize all of our
21  material.
22    Q.  Is that the storage issue?
23    A.  Yes.
24    Q.  And how did battery rooms 3A and 3B work?

Page 77

1     A.  It was the best thing we had at the time.
2     Q.  Did you ever have another solution that you
3  found to be better than that one?
4     A.  Yes.
5     Q.  And what was that?
6     A.  We moved it to another room and tried to keep
7  everything inside there.
8     Q.  And I think you mentioned earlier the theft
9  issue. Was there a time period when you were able to
10  abate or otherwise kind of end the theft issue?
11    A.  I don't remember it ever stopping.
12    Q.  If you go to the next page, 5581, at the
13  bottom, Tuesday, January 13th, there's notation of a
14  "layoff today. Six out-of-towners days, one
15  out-of-towner nights." What's that in relation to?
16    A.  Guys got laid off, and I don't know why they
17  got laid off.
18    Q.  Was there any discussion at all as to -- well,
19  withdrawn.
20       Were any of these people who were laid off
21  on your crew or working day shift with you?
22    A.  Yes.
23    Q.  And was there any discussion at all as to what
24  the day shift's needs were in terms of manpower during

20 (Pages 74 to 77)

Creedon Controls, Inc.                                v.                    Banc One Building Corporation
Paul Brainard                                C.A. # 05-CV-300-JJF                           June 6, 2006

Page 78

1  that time period?
2  A. That would have been between Rob and Charlie.
3  Q. And we're still not up to the time period when
4  you become general foreman?
5  A. Not yet.
6  Q. And you'll let me know when we get there?
7  A. I don't remember the exact date, to be honest
8  with you. And I thought I marked it in here. But if
9  I get past it, then I'm sorry.
10  Q. All right, understood. Now I want to move on
11  to page 5583. Looking at Tuesday, January 20th, it
12  says, "Carpenters burying us in walls, area D,
13  corridor 212." What's that in relation to?
14  A. They don't give us a chance to finish our work
15  in the wall, in the wall. They would put drywall on
16  both sides.
17  Q. And what would you do in response to that?
18  A. Ask them to take it down.
19  Q. And did they take it down or was there some
20  other solution that had to be worked out?
21  A. I think they took it down.
22  Q. And it seems like this was a --
23  A. Or they would, they would stop so we could
24  finish.

Page 79

1  Q. It seemed like this was a problem that
2  continued for some time period. I'm looking now, and
3  I think I see a notation similar to that, "Problem
4  with carpenters," and you tell me if it's different,
5  if it's a different issue, but "Problem with
6  carpenters and drywall" also listed on Wednesday,
7  January 21st. That's the same page, 5583, is that the
8  same issue?
9  A. Yes.
10  Q. And then on page 5584, the next page, for
11  Thursday, January 22nd, it says, "Carpenters taking
12  drywall down in spots that were covered too quickly."
13  Is that in relation to the same issue?
14  A. Yes, I mean once we do our work, it has to be
15  inspected before they can cover it. And they would --
16  you know, somebody from, somebody would direct them to
17  put the drywall up there regardless. So then they
18  would have to take it down to get it inspected.
19  Q. Did you ever know of anyone from Creedon ever
20  having to, I don't want to say punch the drywall, but
21  somehow break or whatever the drywall to get to
22  materials to work on them?
23  A. Not that I remember.
24  Q. In your experience, if you had to get to them,

Page 80

1  the carpenters would come and take the drywall down?
2  A. As long as you have a good relationship, yes,
3  they would do that for you.
4  Q. And did you have a good relationship with the
5  carpenters?
6  A. Yes.
7  Q. And still looking at 5584, it looks like the
8  same page that, that taking down drywall continues
9  through Friday, January 23rd. Is that correct?
10  A. Um-hum.
11  Q. All right, I want to go back to 5583. That's
12  where we first started talking about the carpenter
13  issue. And this was Tuesday, January 20th. There's a
14  note there, "Took a trip to Bear site. H&B," which I
15  assume is Hatzel & Buehler, "mounting lights on strut
16  not very nicely." What's that in relation to?
17  A. I just thought that their work didn't look as
18  good as ours.
19  Q. Fair enough. Any particular reason why you
20  thought their work was not the same as yours or not as
21  good as yours, as you say?
22  A. Just craftsmanship I guess you could say.
23  Q. Now, moving to the next page, 5584, and this is
24  Friday, January 23rd, there's a notation on that page,

Page 81

1  "Supervision plus manpower of 136 hours." Do you have
2  a recollection as to why you made that notation on, on
3  that date?
4  A. No.
5  Q. On the next page, 5585, there is mention on
6  Saturday, January 24th that material is becoming an
7  issue. What's that in relation to?
8  A. Things stolen.
9  Q. That's a theft issue?
10  A. Yes.
11  Q. It also says, "Need to condense everything into
12  one area." What does that mean?
13  A. Just to consolidate everything into, to one,
14  try to find one room.
15  Q. Is that in relation to the theft issue or --
16  A. Theft, yes.
17  Q. That's the solution that you came up with at
18  that time?
19  A. Yes.
20  Q. Now I think we get to where you become general
21  foreman.
22  A. Rob quit.
23  Q. Right, Rob quit. This is 5586, page 5586,
24  Tuesday, January 27th. Do you have an understanding

21 (Pages 78 to 81)

Page 82

1    as to why Rob quit?
2    A.  I never asked him.
3    Q.  Did you have a good relationship with him?
4    A.  Yeah, I mean we were good friends, and never
5    asked.
6    Q.  Was this at all expected or was it kind of a
7    sudden thing or --
8    A.  When you have full employment in our local,
9    it's not uncommon.
10   Q.  Do you know what job that Mr. Sharp went on to
11   after this job?
12   A.  He came back there with another company.
13   Q.  Did he?
14   A.  Yes.
15   Q.  Which company did he come back with?
16   A.  Preferred.
17   Q.  And was Preferred, what type of work were they
18   doing?
19   A.  I don't remember.  A low voltage -- nothing
20   similar to what we were.  It was a different package.
21   Q.  And when he came back, do you know what time
22   period he came back in, what the month or --
23   A.  Not -- it was not long after that.
24   Q.  And do you know if he was still acting as a

Page 83

1    general foreman for Preferred?
2    A.  He was the foreman for Preferred, yes.
3    Q.  And did you have any dealings with him while he
4    was with Preferred?
5    A.  Yeah, I mean we're, we're cordial.
6    Q.  But did you have any professional dealings or
7    was it just more --
8    A.  Oh --
9    Q.  Did you have to coordinate anything with him or
10   anything like that?
11   A.  Coordinate our work with his work?
12   Q.  Right.
13   A.  No.  But he would help, if I had any questions,
14   he helped me in the transition.
15   Q.  So now we know -- so Tuesday, January 27 is
16   when you were asked to take over and so you took over
17   sometime around that time period?
18   A.  Correct.
19        MR. BRADLEY:  Paul, before you move on,
20   can I ask him one question?
21        MR. McDONALD:  Sure.
22        MR. BRADLEY:  Do you know where Mr. Sharp
23   works now or lives?
24        THE WITNESS:  Preferred.

Page 84

1        MR. BRADLEY:  Okay, do you know where he
2    lives?
3        THE WITNESS:  I know where he lived a year
4    ago.  I haven't talked to him in a while.  He lives in
5    Thomas Cove in Middletown, Odessa.
6        MR. BRADLEY:  Okay, thank you.
7    BY MR. McDONALD:
8    Q.  Next page is 5587.  That's, I'm looking at
9    Thursday, January 29th, and again it's another
10   notation, "Supervision plus manpowers equal 80 hours."
11   Do you have recollection as to what that notation
12   means on that date?
13   A.  No.
14   Q.  Moving on to page 5588, there's a notation on
15   Wednesday, February 4th for 9:30.  It says, "Len Beck
16   said order the floor boxes."  And then it says
17   underneath there, "They are going to pour
18   administration" it looks like Tuesday, February 10th.
19   "We have a lot of work in administration."  Is that
20   what that, that notation means?
21   A.  Yes.
22   Q.  And what's that in reference to?  What's that
23   all about?
24   A.  We had to do the underground in there before

Page 85

1    they poured.
2    Q.  And was this, to your understanding, was this
3    according to the schedule?
4    A.  I don't know.  That, that was something that
5    Charlie hashed out with those guys.
6    Q.  And were you able to get the work done that
7    you, that you had to get done in administration before
8    they poured?
9    A.  Yes.
10   Q.  That was what, about a week later --
11   A.  Excuse me.
12   Q.  -- that they poured?
13   A.  Six days.
14   Q.  Was there any work that you had to, I guess to
15   put off or do in a different manner because of having
16   to complete that work in the administration area?
17   A.  I think we hired guys to do that.
18   Q.  You hired guys?
19   A.  Yes.
20   Q.  So is it fair to say that it didn't have an
21   impact in terms of what the other work you were also
22   doing?
23   A.  Correct.
24   Q.  Now, if you move on to page 5590, which is

**B-0578**

22 (Pages 82 to 85)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Paul Brainard                        C.A. # 05-CV-300-JJF                               June 6, 2006

Page 86

1  Monday, February 2nd, a couple notations. The first
2  one I'll ask you about is the "Supervision plus
3  manpower equals 500 hours" and ask you if you recall
4  what that's in relation to?
5  **A. No, I don't.**
6  Q. And in terms of the notation next to it,
7  "Battery rooms blocked," what was that about?
8  **A. They -- there was batteries for the UPS. UPS**
9  **is a backup. And they had batteries everywhere that**
10 **were going in the battery rooms, they had them down**
11 **the corridors.**
12 Q. And who, if you have an understanding as to
13 that, who was supposed to be installing those
14 batteries?
15 **A. Furness.**
16 Q. And did you have a conversation with anyone at
17 Furness about the batteries being, I guess, I don't
18 want to use the word strewn, but kind of all over the
19 place on the floor?
20 **A. No. There was nowhere else to put them.**
21 Q. Did you have a good relationship with the
22 people at Furness?
23 **A. Me personally?**
24 Q. Yes.

Page 87

1  **A. Yes.**
2  Q. And did they tell you anything in -- or
3  actually, maybe I should back up. Did you, did you
4  have a conversation with the people at Furness about
5  the battery issue?
6  **A. Yes.**
7  Q. And what did they -- what did you tell them and
8  then what did they tell you? That's two questions.
9  **A. "We need to get into the battery rooms," and**
10 **they said, "Yes, we know." And we have to put -- and**
11 **they said they have to put the batteries in there.**
12 **They have nowhere else to put them. They'll get them**
13 **in there as soon as they can. I said, "All right,**
14 **thanks."**
15 Q. And how did that impact your work, if at all?
16 **A. Couldn't get in there. You know, we needed to**
17 **get into those rooms to work.**
18 Q. Were you able to work in other rooms or other
19 areas while you were waiting to get into those rooms?
20 **A. We had to, you know, redirect our, our focus, I**
21 **guess.**
22 Q. And, but were you able to do that?
23 **A. Yes.**
24 Q. And do you think that you were able to stay on

Page 88

1  schedule after redirecting your focus?
2  **A. I don't know.**
3  Q. Next page is 5591. And there's another
4  notation, "Supervision plus manpower equals 270
5  hours." Do you have a recollection -- this is for
6  Tuesday, February 3rd. Do you have a recollection as
7  to what that's in reference to?
8  **A. No, I don't.**
9  Q. If you move on to page 5593, that's Thursday,
10 February 5th. A couple things, actually, maybe more
11 than a couple, there are a few notations here. The
12 first one, "Supervision plus manpower equals 265
13 hours," do you have any recollection as to what that
14 means on that day? Is that a no?
15 **A. No, I'm sorry.**
16 Q. Next thing I want to ask you about is it says,
17 "Finally able to start moving around trench." What's
18 that in relation to?
19 **A. There was a trench in the L&M corridor, which**
20 **is like the back, about two-thirds of the way back of**
21 **the building, was an open trench and it was, it was**
22 **open. So in order to get from here to here, the**
23 **trench was there, you'd have to go all the way around**
24 **and fight traffic. And they, they were trying to**

Page 89

1  **get -- they were trying to cover it so you could**
2  **drive, you know, instead of -- to go from here to here**
3  **you could drive straight to it instead of having to go**
4  **around.**
5  Q. And what happened with the covering issue? Did
6  that work?
7  **A. Yes.**
8  Q. And how long did this trench I guess -- well,
9  actually, withdrawn.
10       Was it a problem for you?
11 **A. Yes.**
12 Q. And what kind of problem did it present?
13 **A. Just access.**
14 Q. And it says "Finally able to start moving
15 around the trench." How long was this problem in
16 place?
17 **A. A couple months. I don't know exactly.**
18 Q. How long did you personally have to deal with
19 it in terms of coordinating your work?
20 **A. A couple months.**
21 Q. And during that time period that you had to, I
22 guess, navigate or coordinate working around this
23 trench, what effect if any did it have on your
24 progress in terms of the schedule?

23 (Pages 86 to 89)

**B-0579**

Creedon Controls, Inc.                                    Banc One Building Corporation
Paul Brainard                    v.                                        June 6, 2006
                        C.A. # 05-CV-300-JJF

Page 90

1  A.  That slowed you down because you had to go a
2  round-and-about way to move.
3  Q.  Were you able to make up for whatever time or
4  other issues regarding going around this trench?
5  A.  No.
6  Q.  So, and let me see if I can go back for a
7  second.  Now, in December, and again tell me if I'm
8  incorrect, I believe you said that you felt like you
9  were on schedule?
10  A.  Yes.
11  Q.  Okay.  End of January did you still think you
12  were on schedule?
13  A.  I, I don't know.  I don't remember -- I don't
14  remember not feeling like we were on schedule.
15  Q.  And your feeling that -- and that feeling that
16  you had of not feeling like you were, you were not on
17  schedule, is that the right way to put it?
18  A.  Yeah.
19  Q.  Okay, double negative.  What, if any, impact
20  did the trench issue have on that feeling?
21  A.  It didn't have any.  I just remember everybody
22  feeling like you had easier movement around the job
23  then.
24  Q.  And so this trench issue, is it resolved for

Page 91

1  you as of Thursday, February 5th?
2  A.  It was resolved for everybody, yes.
3  Q.  It says, "Having problem with material from,"
4  is that Graybar?
5  A.  Yes.
6  Q.  What's that in relation to?
7  A.  Graybar is a supplier.
8  Q.  And were they a supplier that Creedon worked
9  with directly or --
10  A.  Yes, yes.
11  Q.  And what was the problem?
12  A.  I think that problem there was for some of the
13  stuff we ordered to do the underground and the
14  administration building.  But we got that hashed out
15  and, you know, it wasn't a problem at the time.
16  Q.  Was that just a matter of delivery, was that
17  the issue?
18  A.  Correct.
19  Q.  Then it also says, "Went with Charlie to look
20  at floor boxes at Bear site."  That's the Hatzel &
21  Buehler job?
22  A.  Yes.
23  Q.  And what was the occasion?  Why did you go to
24  look at the floor boxes at the Bear site?

Page 92

1  A.  Because we were put -- we were doing the
2  underground on our job, and the underground down at
3  this job was done as part of the original underground
4  package.
5  Q.  So you were comparing basically, is that --
6  A.  Yes, just trying to see what they did before.
7  Q.  How did their work measure up this time?
8  A.  No, no, that was -- this was not H&B, this was
9  Battaglia did this stuff.
10  Q.  All right.  Now, if I go to page 5596, which is
11  Monday, February 9th, it says, "Getting answers from
12  Walt a problem.  He is more worried about" -- what is
13  that, do you see that?  What is that exactly?  Is
14  that --
15  A.  I probably didn't finish writing what I was
16  going to write.
17  Q.  Okay.  What were you going to write?
18  A.  Who knows with -- I'm trying to remember
19  exactly.  I was trying to get the layout from the Bear
20  job for the phone room, and at that same time -- you
21  know what, I don't know what I was going to write
22  there.  "Getting answers from Walt a problem.  He is
23  more worried about getting on" --
24  Q.  Now -- I'm sorry, go ahead.

Page 93

1  A.  Walt was kind of a liaison between Forest and
2  the contractors.
3  Q.  And this was -- but you do recall this being in
4  relation to the phone room I think you said something?
5  A.  Yes.
6  Q.  You were trying to get layouts for the phone
7  room from the Bear site?
8  A.  Yes.
9  Q.  Did you have a layout for the site you were
10  working on as part of the blueprints?
11  A.  Yes.
12  Q.  So why did you want to compare with the Bear
13  site?
14  A.  They wanted to make ours the same as -- they're
15  supposed to be mirror images of each other.  Theirs
16  was already poured, ours was not.  I was told to make
17  ours the same as the Bear.
18  Q.  Now, if you turn the next page, 5597, this is
19  Tuesday, February 10th.  It's another note regarding
20  Walt.  It says, "Walt Husar asked what was taking so
21  long in admin.  I told him you can only have so many
22  guys in an area.  Also waiting for layout of phone
23  room."  What's that in relation to?
24  A.  Still waiting for him to get the layout of the

24 (Pages 90 to 93)

Creedon Controls, Inc.                                v.                    Banc One Building Corporation
Paul Brainard                              C.A. # 05-CV-300-JJF                              June 6, 2006

Page 94

1  phone room.
2  Q.  And this is the Bear site phone layout, right?
3  A.  Yes.  Again, they wanted us to mirror that,
4  that site.
5  Q.  And what's the part about "I told him you can
6  only have so many guys in an area"?
7  A.  Oh, you have a ditch there and he -- we had
8  guys passing materials down to guys in the ditch and
9  he thought we should have them all in the ditch.  This
10  is a guy that's never been on a job in his life, he's
11  always been in the office.
12  Q.  And what gives you that impression?
13  A.  He told me that.
14  Q.  He told you that?
15  A.  Yes.  He, he was -- he was the guy was supposed
16  to be getting us our answers, and he was just giving
17  me his opinion.
18  Q.  Now, in terms of the other folks from Forest,
19  Len Beck and I think you mentioned Paul Angerame, did
20  you have the same impression of them or a different
21  one?
22  A.  I think Len was a guy that worked with his
23  tools, and he told me Paul was the same.
24  Q.  Did you ever talk to them about these issues

Page 95

1  with Mr. Husar in terms of Mr. Husar not having the
2  experience or --
3  A.  Walt was an office guy.  He was what we call a
4  bean counter.  And he'll tell you that.  I mean
5  he's -- it's just one of them things.
6  Q.  And did you ever talk to Mr. Beck or
7  Mr. Angerame about Mr. Husar's I guess being a bean
8  counter or anything?
9  A.  He was a, one of our local brothers and I
10  wouldn't want to bad-mouth him in front of a guy from
11  another state.
12  Q.  All right.
13  A.  Try to have a little respect for the guy.
14  Q.  Understood.
15  MR. McDONALD:  We're going to take a break
16  now, we have five minutes left on the tape.
17  THE VIDEOGRAPHER:  Going off the record at
18  approximately 11:30 a.m.
19  (A brief recess was taken.)
20  THE VIDEOGRAPHER:  Going back on the
21  record at approximately 11:37 a.m.
22  BY MR. McDONALD:
23  Q.  All right, Mr. Brainard, I want you to turn
24  with me to page 5599.  It's Thursday, February 12th.

Page 96

1  Again, there's a notation there, "Supervision plus
2  manpower," I think it says "24 hours."  Do you have
3  any recollection of what that's in reference to on
4  that date?
5  A.  No.
6  Q.  Turning the page to page 5600, that looks like
7  Friday, February 13th.  There's a notation there for
8  "Supervision plus manpower equals 125 hours."  Do you
9  have a recollection as to what that's in reference to?
10  A.  No.
11  Q.  It says, "No schedule on floor painting.  Going
12  by word of mouth on that same page."  What is that in
13  reference to?
14  A.  They would tell us, "Okay, we need you to hang
15  the lights in room 1, 2 and 3.  We're going to paint
16  the floor in there."  And once they paint the floor,
17  you either are responsible for protecting it or not
18  taking a high reach in there.  So you wanted to get in
19  there before they did the floor.
20  Q.  And did that pose any problems for you?
21  A.  You had to, you know, if we were working down
22  in room 4, 5 and 6 if they came and said, "Oh, we're
23  going to do room 1, 2, and 3," all right, stop the
24  work here, relocate.

Page 97

1  Q.  And was that relocation significant in terms of
2  your schedule or delay or anything?
3  A.  As a delay.  I mean you had to stop everything,
4  all the work you were doing, gather your tools, all
5  the material, move the high reaches and then start
6  over.
7  Q.  About how far apart — I mean or how large was
8  this area that you're working in in terms of, you
9  know, how many different rooms, how far apart were
10  they?
11  A.  It's hard to explain.  It would be better to
12  look at.
13  Q.  Was it a — like, for instance, the example you
14  just gave, going from say you're working on 4, 5 and
15  6, and again I understand it might be a hypothetical,
16  but 4, 5 and 6 to 1, 2 and 3, about how far
17  distancewise would that be?
18  A.  It could have been a few hundred feet.
19  Q.  And how long does it take to move a reach and
20  those types of items?
21  A.  Hard to say.  You know, you don't know who's --
22  if nobody is in the way, you know, 15, 20 minutes.  If
23  you have people in the way, people that are there
24  working, you have to jockey your way through the

25 (Pages 94 to 97)

**B-0581**

Page 98

1  **hallway, plus move the material.**
2     Q.   It also says on that page, "Big push for
3  lighting in data centers." Why did you take note of
4  that on that date?
5     A.   **They wanted us to get lights up in the data**
6  **center and get them turned on.**
7     Q.   And was that an acceleration of the schedule
8  or --
9     A.   **The way I interpret it, yes.**
10    Q.   And how did that impact what you were doing at
11 that time?
12    A.   **We had to hire more guys to do that.**
13    Q.   And the additional people you hired, did they
14 work on that part of the project while the other guys
15 continued to work on the other part?
16    A.   **Correct.**
17    Q.   Do you know how many additional men you hired?
18    A.   **No. No, I don't.**
19    Q.   Now, moving on to the next page, which is 5601,
20 and then also if you flip over to 5602, maybe I want
21 to see if this is related to each other. On 5601 you
22 have Saturday, February 14th, "Lights missing covers
23 and end caps." Do you see that?
24    A.   **Yes.**

Page 99

1     Q.   What's that in relation to?
2     A.   **That's part of the light fixture that came in.**
3     Q.   So did it come in missing the caps?
4     A.   **Or, or damaged, but they sent replacements.**
5     Q.   And who, from whom did you get the lights?
6     A.   **I don't remember the name off the top of my**
7  **head. A supplier.**
8     Q.   So did they come from a supplier damaged, is
9  that the gist of this?
10    A.   **They were missing the covers and the end caps.**
11    Q.   And was this supplier that Creedon dealt with,
12 or was it someone else who was ordering the materials?
13    A.   **I don't remember. I didn't do that.**
14    Q.   Now, on the next page, which is 5602, Sunday,
15 February 15th, it says, "Lenses for lights broken and
16 missing. Lights getting damaged." Is that the same
17 issue or is it a different issue?
18    A.   **The lights getting damaged were lights that**
19 **were installed getting damaged.**
20    Q.   Okay, so "lights getting damaged" is a separate
21 issue?
22    A.   **Yes.**
23    Q.   But the "lenses for lights broken and missing,"
24 that's the same issue we just talked about?

Page 100

1     A.   **Correct.**
2     Q.   And the lights getting damaged seems that that
3  continues, if you flip through here, I think there's
4  notations on virtually every page from Sunday,
5  February 15th, through I believe the last one that I
6  saw was on March 23rd, which is page -- bear with me
7  for a second. 5635.
8        Now, why did that remain a problem for you
9  from -- well, again, what appears to be Sunday,
10 February 15th, which is page 5602, through March 23rd,
11 page 5635, and that's the lights getting damaged?
12    A.   **What did you ask?**
13    Q.   Why did that remain a problem or why was that
14 something that you continued to note?
15    A.   **Because while we were installing light**
16 **fixtures, nobody else cares about them, they would**
17 **just smash into them with a high reach or ladder,**
18 **whatever.**
19    Q.   And when you say other people --
20    A.   **Other crafts, I'm sorry.**
21    Q.   Other crafts?
22    A.   **Yeah.**
23    Q.   And do you know any of the contractors involved
24 in any of these incidents?

Page 101

1     A.   **No.**
2     Q.   Did you ever report this issue to anyone?
3     A.   **Yeah, I would tell Len Beck about it.**
4     Q.   And what did Mr. Beck tell you in response?
5     A.   **I don't remember what he said.**
6     Q.   Okay. Now, assuming that I think March 23rd is
7  the last time I see it, does that mean that at some
8  point this issue was resolved? Again, that's page
9  5635.
10    A.   **I don't remember if that was the end of it or**
11 **whether I just stopped writing it.**
12    Q.   Okay. What would you do in response to the
13 lights being damaged? What was the remedy there?
14 What did you have to do to --
15    A.   **Try to fix it, as best we could.**
16    Q.   So is that a repair issue?
17    A.   **Yes.**
18    Q.   Is that fair to say?
19    A.   **Yes.**
20    Q.   And how long would it take, for instance, if
21 you have a light that's damaged, about how long would
22 it take to fix it?
23    A.   **Depends on what's wrong with it. If the lens**
24 **got cracked, you'd take the lens down and pop a new**

26 (Pages 98 to 101)

**B-0582**

Page 102

1  one up. If the strut that it was -- if the hanger got
2  damaged, then obviously that would take longer.
3           You asked earlier -- I mean I have one
4  note in there that Eddie's log got thrown out, I just
5  found that.
6  Q.  When was that?
7  A.  March 22nd.
8  Q.  March 22nd?
9  A.  5634.
10 Q.  Thank you very much for pointing that out.
11 Aha, I do see that.
12 A.  I don't know if that matters.
13 Q.  Thanks. Now, going back to where we were, want
14 to go to page 5604. That's Tuesday, February 17th.
15 It says, "Poured administration." Is that the pouring
16 that we referred to earlier?
17 A.  Yes.
18 Q.  So it actually took an additional week for them
19 to pour administration? Is that fair to say?
20 A.  Yes.
21 Q.  Then going to page 5606, which is Thursday,
22 February 19th, again has a notation for "lights
23 getting damaged," which we've been talking about. But
24 also says "material disappearing." What's that in

Page 103

1  relation to?
2  A.  Material disappearing.
3  Q.  That's either for theft or some other reason
4  you're not aware of?
5  A.  Yeah, I mean what other reason there is I don't
6  know, but yes, it could be that.
7  Q.  And there's a notation there for "Supervision
8  plus man-hours of 38 hours." Do you have a
9  recollection of what that refers to on that date?
10 A.  No.
11 Q.  Going to the next page, which is actually 5607,
12 which is Friday, February 20th, it has some notations
13 that are continued from the page before, the "material
14 disappearing" and also "lights getting damaged," but
15 it also mentions "having tough time finding conduits
16 in ceiling." What's that in reference to?
17 A.  We put our conduits in the ceiling, color coded
18 them, and then they came back and painted the whole
19 ceiling black.
20 Q.  And were you told any time prior to that being,
21 that happening that, painting the ceiling black that
22 that was going to take place?
23 A.  No, not that I remember.
24 Q.  And what was the -- how did that issue get

Page 104

1  addressed or how was it resolved?
2  A.  Once it's painted there's not a whole lot you
3  can do, and we just had to take time to go back and
4  find -- I mean everything had to be in pipe. There
5  was a lot of pipes in the ceiling, and it took a lot
6  of time to find them. You know, you would run one
7  pipe, which is called a trunk line, and then from
8  there you branch off. And it was very time-consuming.
9  Q.  And how many rooms or how many, I mean I guess
10 areas did this effect, the painting of the ceiling
11 black and having to find the conduits?
12 A.  The whole building.
13 Q.  About how long do you think it took to locate
14 the conduits for the entire building?
15 A.  I couldn't --
16 Q.  You don't --
17 A.  I couldn't begin to.
18 Q.  And was it something that was raised with
19 anyone, the issue?
20 A.  It was a done deal. I mean it was, our pipes
21 were color coded, you painted the ceiling. Okay. It
22 was already painted, there was nothing they could do.
23 Q.  Now, there's also a notation there for
24 "Supervision plus manpower 280 hours." Is that in

Page 105

1  relation to that?
2  A.  I don't know what that is.
3  Q.  Now, moving on to, again we're passing a couple
4  of pages where there seems to be a continuous notation
5  of material disappearing and lights getting damaged,
6  that's true of 5608, it's also true of 5609 and 5610
7  and 5611. Come to 5612 and there's still a notation
8  for "material disappearing" and "lights getting
9  damaged" but there's also a notation for "laid off
10 lighting gang." What's that in relation to, that
11 particular reference?
12 A.  We hired guys, a lot of guys to what we call
13 gang bang an area, and had them hang the lights and
14 they got done and got rid of them. Or laid them off,
15 I shouldn't say got rid of them.
16 Q.  And any particular reason why you got rid of
17 them at that time?
18 A.  Didn't need them. Their job was done.
19 Q.  Did you ever hire back any of these guys for
20 other parts of the job, or was it kind of a cyclical
21 thing? Well, not cyclical, but --
22 A.  It's, historically speaking that's how you
23 know, as the job winds down you get rid of guys.
24 Q.  So is it your understanding at this time around

27 (Pages 102 to 105)

B-0583

Creedon Controls, Inc.
Paul Brainard

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
June 6, 2006

Page 106

1  February 26th, Thursday, February 26th, that the job
2  was starting to wind down?
3  **A. No.**
4  Q. So how would you characterize the progress of
5  the job as of Thursday, February 26th?
6  **A. I don't remember.**
7  Q. Did you still feel like you were on schedule?
8  We talked about this earlier.
9  **A. No.**
10  Q. You did not feel like you were on schedule?
11  **A. I don't, I don't feel like -- let me see these**
12  **notes.**
13  Q. Take your time.
14  **A. I don't remember when I started to feel like we**
15  **were behind schedule. I don't remember exactly when**
16  **that was.**
17  Q. So in reference to this time period, do you
18  know if it was before or after, do you have that
19  recollection at all?
20  **A. No.**
21  Q. Okay, excuse me. Now, turning to page 5613,
22  there is notation there, there's some of the
23  notations are still continued, the material
24  disappearing, lights getting damaged. There is a new

Page 107

1  notation, "Having problems getting cable tray
2  materials." This is Friday, February 27th. What's
3  that in relation to?
4  **A. We were just starting the cable tray job and we**
5  **were just trying to get all our material there.**
6  Q. So this is another job, this is the 26 -- or
7  2367 or 2377?
8  **A. Correct.**
9  Q. The things we've been talking about so far have
10  been in relation to 2357; is that correct?
11  **A. Yes.**
12  Q. So looking at the references, I think if we go
13  to the reference to "having problems getting cable
14  tray materials" continues through February 29th, which
15  is 5615, that's all in relation to 2377 or 2367,
16  right?
17  **A. Yes.**
18  Q. Now I want to go to page 5619, which is
19  Thursday, March 4th. There there's a notation, again,
20  the "material disappearing" and "lights getting
21  damaged" is mentioned again. There's another notation
22  that says, "Trench covered." What's that in relation
23  to?
24  **A. The trench that was in that L&M corridor, they**

Page 108

1  **put the diamond plate on there.**
2  Q. Now, before they put the diamond plate on, on
3  Thursday March 4th, was it covered by anything?
4  **A. I don't think so.**
5  Q. And once it was covered by diamond plate, were
6  you able to cross over the trench?
7  **A. Yes.**
8  Q. Is that true of your equipment as well as just
9  men walking across it?
10  **A. I think you could take a small high reach over**
11  **that.**
12  Q. After it was covered, did it create any --
13  withdrawn.
14      Also there is a notation there for
15  "Supervision plus man-hours, 240 hours." Do you see
16  that?
17  **A. Yes.**
18  Q. Do you have any recollection as to what that's
19  in reference to?
20  **A. No.**
21  Q. Now going to page 5623, which is Tuesday, March
22  9th, again there's a reference to "lights getting
23  damaged," we talked about that before. There's also a
24  reference to "moving of material is slowing us down."

Page 109

1  And that reference is also continued, or something --
2  I should say it's not continued, but there's a
3  reference on the next page, 5624, which is March 10th,
4  it says, "Other people's material slowing us down."
5  Are those two references related to each other?
6  **A. We had to just keep moving stuff around,**
7  **lights, wire, and other companies had the same**
8  **problems. They had stuff -- a problem finding a good**
9  **place to put your stuff where it was out of the way.**
10  Q. And noting it here on March 9th and March 10th,
11  was it a problem prior to that at all, or it was
12  particularly notable on this particular occasion?
13  **A. Yeah, I guess it just stood out more than the**
14  **other days. It was a problem the whole time having a**
15  **place for the material.**
16  Q. Do you recall why it stood out more on those
17  particular days?
18  **A. No, no, I don't.**
19  Q. And on March, the March 10th notation for 5624,
20  there is a notation for "Supervision plus manpower
21  equals 24 hours." Do you have a recollection as to
22  what that's in reference to?
23  **A. No.**
24  Q. Moving ahead to 5628, which is March 15th, it's

28 (Pages 106 to 109)

**B-0584**

Creedon Controls, Inc.
Paul Brainard

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
June 6, 2006

Page 122

1    Q.   Is that correct?
2    A.   Yes.
3    Q.   And you don't recall what that's about?
4    A.   I don't remember exactly, no.
5    Q.   All right.
6    A.   It's hard to believe this was two years ago.
7    Q.   Understood. And then there's blanks for April
8    26th through April 28th. Do you know why that is?
9    A.   No, I don't.
10   Q.   Now were you working on the project at that
11   time?
12   A.   Yes, best I remember.
13   Q.   Who came in as general foreman after you left?
14   A.   I don't know if it was John Mulrooney or Fred
15   Street. I don't know.
16   Q.   Do you know where John Mulrooney currently
17   works?
18   A.   No.
19   Q.   Does he live in Wilmington or --
20   A.   He lives down at the -- he lives in Millsboro.
21   Q.   Is he retired?
22   A.   No, no. Oh, no, he lives at the beach.
23   Q.   Okay.
24   A.   He commutes.

Page 123

1    Q.   All right. So he lived at the beach at that
2    time and would commute up here to this job?
3    A.   Yes.
4    Q.   Do you have any -- or are you aware of any
5    letters or writings directed to Forest about stolen
6    material relating to Creedon?
7    A.   Not that I am aware of, no.
8    Q.   Are you aware of any written, or writings to
9    Forest about damaged material?
10   A.   Not that I know of.
11   Q.   Are you aware of any writings to Forest about
12   work being performed out of sequence?
13   A.   Not that I know of.
14   Q.   Are you aware of whether Creedon submitted
15   change orders for stolen material during the course of
16   the job?
17   A.   I don't know.
18   Q.   Are you aware of any change orders submitted by
19   Creedon during the course of the job, you know, when
20   the event occurred for material that you say was
21   damaged?
22   A.   For repair?
23   Q.   Correct.
24   A.   Yes, yes.

Page 124

1    Q.   Okay, so as you discovered damaged material,
2    you would submit a change order to Creedon -- or I'm
3    sorry, to Forest, to have that repair work performed?
4    A.   I would tell Charlie and he would submit the
5    change order paperwork.
6    Q.   And then you, you're aware that that happened
7    or because Creedon then performed the work to repair
8    the damaged goods?
9    A.   Yes.
10   Q.   Are you aware of any work that was done on a
11   time-and-material basis?
12   A.   Not that I remember.
13   Q.   You talked about the trench that was in the --
14   was it in the data center or --
15   A.   It was between the data -- the data centers
16   were on each end, there was battery rooms in the
17   middle with gear. Then there was the corridor, then
18   behind that was the generators and the mechanical
19   rooms. The trench -- that was the L&M corridor
20   which separated the mechanical from the data, that's
21   where it was.
22   Q.   And do you know what went into that trench?
23   A.   Mechanical piping.
24   Q.   And was that trench shown on the drawings, or

Page 125

1    you're not aware?
2    A.   Not that I remember.
3    Q.   Did you review the mechanical drawings?
4    A.   When I first got on the job, that was the
5    general foreman did that, that was Rob.
6    Q.   At any later point did you review the
7    mechanical drawings?
8    A.   For hanging our lighting in different places we
9    would have to do that.
10   Q.   And did you review them to determine if the
11   trench was present?
12   A.   Well, the trench was already there at that
13   point when I took over.
14   Q.   Do you have any reason to believe this trench
15   was not shown on the drawings?
16   A.   I really don't know.
17        MR. BESTE: Objection, speculation.
18   Q.   Were there at any time boards or other
19   materials over parts of the trench so men could walk
20   over the trench?
21   A.   I don't remember.
22   Q.   And were you -- even though it might be
23   difficult, was Creedon able to navigate around the
24   trench to get to different areas?

B-0585