Creedon Controls, Inc.                              v.                    Banc One Building Corporation
Paul Brainard                              C.A. # 05-CV-300-JJF                              June 6, 2006

Page 126

1   A.  It was, it was more time consuming than going,
2   you know, straight down the hallway.  You'd have to go
3   around, yes.
4   Q.  And that was the same with other contractors?
5   A.  Yes.
6   Q.  So if anything, you would say the trench
7   somewhat hindered your ability to move around the job?
8   A.  I would say ours more than a lot of people
9   because all of our work was up in the air and we had
10  to do everything off of a high reach.
11  Q.  Okay, and so is that correct that it hindered
12  your ability to get around the job?
13  A.  Correct.
14  Q.  Do you recall any delays in getting certain
15  lighting fixtures in for Creedon to use?
16  A.  No, not that I remember.
17  Q.  Was it your understanding that it was Creedon's
18  job to order the lighting fixtures?
19  A.  Yes.
20  Q.  And it was their job to have the different
21  fixtures released for production to the job?
22  A.  Yes.
23  Q.  Did you review any documents today before your
24  deposition?

Page 127

1   A.  No.
2   Q.  Did you review anything to prepare for today's
3   deposition?
4   A.  No.
5   Q.  Did you meet with anyone in preparation for
6   today's deposition?
7   A.  Bob.
8   Q.  Okay, you're indicating Mr., met with
9   Mr. Beste?
10  A.  Yes, Mr. Beste.
11  Q.  What discussions did you have with Mr. Beste?
12  A.  Just what to expect here.
13  Q.  Anything else?
14  A.  If I wanted something to drink.
15  Q.  On the daily meetings, other than the note that
16  we saw in your logbook for that one meeting, did you
17  keep any notes of those meetings?
18  A.  I had a book that I kept in my pocket and when
19  I left that job I took it with me to the next one, and
20  when that one, when the calendar year ran out, I threw
21  it out.
22  Q.  So you would -- kind of a small calendar book,
23  a one-year calendar book?
24  A.  Correct.

Page 128

1   Q.  And in that you would keep notes from the daily
2   coordination meetings?
3   A.  Not necessarily from the meeting, just from the
4   course of the day and I would try to write anything
5   important in the log.  I didn't carry my log -- I
6   didn't carry this big book around with me all day.
7   Q.  Okay, so you would write into your calendar
8   book and then record some of the items into your log?
9   A.  Yes.
10  Q.  But from the daily meetings, did you keep
11  notes?
12  A.  That was mostly verbal.
13  Q.  Do you know if any, anybody from Creedon kept
14  notes from those daily meetings?
15  A.  I was the only one that went most of the time;
16  occasionally Charlie Doble would go.  And prior to
17  that, Rob Sharp, I don't know if he kept notes or not.
18  Q.  Let me look through the logbook and see if I
19  have any additional questions.
20      Did you also work on the cable tray
21  conveyance job?
22  A.  Yes.
23  Q.  And you were the foreman for that job?
24  A.  General foreman.

Page 129

1   Q.  General foreman.  Was there also a foreman that
2   worked on that job?
3   A.  Yes.
4   Q.  Who was that?
5   A.  Jimmy King.
6   Q.  Did he work also on the general lighting job?
7   A.  Some.  He was a journeyman on the lighting job.
8   Q.  Did journeymen from the cable tray conveyance
9   job also work on the lighting job?
10  A.  Some.
11  Q.  Now you talked about the floor painting and the
12  need to cover the floor if it had been painted before
13  you got into that particular room.  Do you know if any
14  other contractors had already covered certain floors
15  that had been painted?
16  A.  I don't remember.
17  Q.  Are you aware that, of other contractors or
18  someone else would cover the floor before Creedon
19  would go in, as opposed to your journeymen doing that
20  work?
21  A.  We were responsible for it if we didn't get our
22  work done before they painted the floor.
23  Q.  Do you know who actually covered the floors,
24  though?

33 (Pages 126 to 129)



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Creedon Controls, Inc.

## v.

# Banc One Building Corporation

## C.A. # 05-CV-300-JJF

---

## Transcript of:

## John B. Mulrooney

## June 26, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0587

Creedon Controls, Inc.                                    Banc One Building Corporation
John B. Mulrooney          C.A. # 05-CV-300-JJF                June 26, 2006

Page 42

1  respect to this project or generally?
2     Q.  Generally, is that what you do?
3     A.  For the most part, yes.  When a -- when time
4  allows, I will do it.  Most every -- everything you
5  see, if you want to peruse the logbook, you'll see the
6  major incidents that cost us the most money.
7     Q.  And so you did that on this job also?
8     A.  Yes.  For the most part.  There's some -- I
9  mean there were some days I actually didn't even have
10  a chance to sit down, that's how bad it was.  We had
11  people that were throwing our material in the
12  Dumpster.  I had a guy that was pulling a string into
13  a pipe and the man from Tishman picked up the bucket
14  of string and threw it in the trash can as the string
15  was reeling out.  That's when I requested that the
16  apprentice go get me a camera so I could take a
17  picture of it.
18     Q.  Do you know who the person from Tishman was
19  that did that?
20     A.  Bob Alloca.
21     Q.  I take it from that that you liked him or --
22     A.  Oh, he was a real friend of mine.
23     Q.  And how often did Tishman have Creedon material
24  thrown out?

Page 43

1     A.  Everything is noted in the logbook.  I say at
2  least four occasions.  Lights, strut, $25,000 worth of
3  strut was disbanded and thrown in the trash can.
4  That's all logged into the logbook if you care to
5  peruse it.
6     Q.  And that was at the direction of Mr. Alloca?
7     A.  I have no idea.  I have no idea.  All I know is
8  it transpired, the events transpired and they were
9  beyond our control.  Some transpired on overtime.
10  Some transpired at lunchtime.  All I can do is
11  conjecture at this point.
12     Q.  How often was Pat Creedon on the project?
13     A.  Frequently.  At least once a week if not twice
14  a week.
15     Q.  And would she come visit you on the project
16  or --
17     A.  She's the owner, sir.  She walked the project.
18  She was looking after her -- she was just seeing the
19  progress of the project.  There was no personal
20  visitations.  There was no personal conversations.
21  She was there casually to observe what was going on.
22     Q.  Would she meet with you when she came to the
23  project?
24     A.  No, sir.  No, sir.  I have work to do.

Page 44

1     Q.  And how is it you would know that she was on
2  the job once or twice a week?
3     A.  Her car would be parked in front of my trailer.
4     Q.  How about Mr. Doble, how often was he on the
5  site?
6     A.  Mr. Doble was there almost every day.
7     Q.  Now are we talking --
8     A.  He eventually took over my office.
9     Q.  Are we talking when you were the foreman
10  starting in January 29 of 2004?
11     A.  Um-hum.
12     Q.  Is that yes or no?  You've got to --
13     A.  Yes, sir.  Yes, I'm sorry.
14     Q.  And your testimony is Mr. Doble was on the site
15  almost every day?
16     A.  Almost every day.
17     Q.  And was he in the trailer?
18     A.  I have no idea, sir.  All I knew, he drives a
19  red pickup truck and his red pickup truck was parked
20  there.  It's a two-mile walk from our trailer to the
21  job site.  So do the math.
22     Q.  Where was your trailer located?
23     A.  Our trailer was located just outside the
24  Goodwill, right down next to the gas station.  And it

Page 45

1  was only two -- two avenues to get there.  It was
2  completely fenced off.  This job was nothing like the
3  south job, nothing.  Nothing.  Obstacles --
4     Q.  I'm trying to get a picture of this.  The
5  Goodwill store is, and there is a parking lot with the
6  Goodwill store; is that right?
7     A.  That's where our original parking center was.
8     Q.  And that's on Lea Boulevard?
9     A.  Yes.
10     Q.  And your trailer was in that location or --
11     A.  No.  I was telling you, that is the other
12  location, that's the only other way to get up to the
13  site.  You either had to walk around that way, past
14  the Goodwill or walked around the other way, past the
15  gas station up to the main gates which is on Governor
16  Printz Boulevard and then sashay up the boulevard into
17  the front doors.
18     Q.  And the trailer you were in was two miles from
19  the site?
20     A.  I'm just approximating.  I mean you're
21  splitting hairs here.  It was a long way.  I couldn't
22  throw a rock that far.  I can barely see that far.
23     Q.  Where was the Tishman trailer?
24     A.  Within 100 feet of us.

12 (Pages 42 to 45)

Creedon Controls, Inc.                    v.              Banc One Building Corporation
John B. Mulrooney              C.A. # 05-CV-300-JJF                      June 26, 2006

Page 50

1  Q.  And when you say "every night," who was there?
2  A.  The foreman and Charlie Doble.
3  Q.  Did anybody keep any notes of those kind of
4  meetings?
5  A.  No, sir.
6  Q.  How about meetings with other, with Forest or
7  other electrical trades on the job, did you attend any
8  of them?
9  A.  No, I was not invited.
10  Q.  Okay.
11  A.  That was specifically for superintendents.
12  Q.  Okay.  Do you know how often those meetings
13  occurred?
14  A.  No, sir, I don't.
15  Q.  And when you say superintendents, you mean
16  someone at Mr. Doble's level?
17  A.  Charlie Doble.
18  Q.  Did you attend any meetings with -- daily
19  meetings while on the project?
20  A.  Only safety meetings.  We had a safety meeting
21  every day.
22  Q.  And what time did that meeting occur?
23  A.  First thing in the morning.  I went over the
24  safety parameters with the men.  It was strictly

Page 51

1  safety.  Any current issues, anything that cropped up,
2  safety hazards.  We had 100 percent non-injury rate on
3  this job.  That's our goal every job.
4  Q.  During the course of the project, did you
5  attend any daily meetings at all with other
6  contractors?
7  A.  No, sir.
8  Q.  Did you attend any kind of meetings at all with
9  other contractors during the course of the job?
10  A.  I can't recall specifically at this time.
11  Q.  Did you have any meetings with Pat Creedon?
12  A.  Nothing concerning this job whatsoever.  Just
13  specifically, "Hi, how you doing?"  She's a very
14  hands-off owner.
15  Q.  Did you meet with Len Beck at all?
16  A.  Many, many, many times.
17  Q.  All right.  Is there any -- you mean during the
18  course of working on the project you would meet with
19  Mr. Beck?
20  A.  Yes.
21  Q.  And do you know of any notes or things --
22  strike that.
23      Do you know if any notes were made with
24  meetings you had with Mr. Beck?

Page 52

1  A.  I submitted numerous RFIs, which is a request
2  for information, which were never answered by Mr. Beck
3  or Forest Electric.  Ever.  I'm still waiting for
4  answers.
5  Q.  And those requests for information on how to,
6  are on how to perform certain work in the field?
7  A.  No.  It's on gray areas that were involved in
8  the project, specifically the administration building,
9  which we were under the gun to complete.  They were
10  pouring the concrete and we still didn't have
11  up-to-date prints or a stamped print from an
12  architect.
13  Q.  And you were seeking answers so that you would
14  know how to perform your job in the administration
15  building?
16  A.  Exactly.
17  Q.  And you never got those answers?
18  A.  Never.  I'm still waiting for them.  It's three
19  years later.
20  Q.  But you performed your work in the
21  administration building?
22  A.  Yes, sir.  It's tough to run conduit when you
23  don't know where you're going.
24  Q.  Do you have any -- do you have any writings

Page 53

1  relating to those requests for information?
2  A.  We have requests for information forms and you
3  should have a copy of all my requests for informations
4  from Forest Electric.  There was at least 50 or plus
5  RFIs that were faxed, which is a legal document in a
6  court of law.
7  Q.  And did you get verbal answers to those
8  requests for information?
9  A.  I very -- I didn't get very, any answers,
10  period.  I got nothing but smoke.  I got nothing
11  but --
12  Q.  So you got no verbal answers to any requests
13  for information?
14  A.  I got nothing, sir, nothing.  Absolutely
15  nothing.
16  Q.  And you still did your work in the
17  administration building?
18  A.  Yes, sir.  I traveled personally at the cost of
19  Creedon Controls with another person and went down and
20  looked at their site and laid everything out and did
21  it to duplicate that, since these were supposed to be
22  identical sites.  We researched the project and got,
23  gleaned the information ourselves without the help of
24  Forest Electric.

14 (Pages 50 to 53)

Creedon Controls, Inc.                    v.            Banc One Building Corporation
John B. Mulrooney              C.A. # 05-CV-300-JJF                   June 26, 2006

Page 54

1   Q.  And so you visited the Bear site?
2   A.  Yes, we did, sir, numerous occasions.
3   Q.  And how many times did you visit the Bear site?
4   A.  At least a dozen times.
5   Q.  Pardon?
6   A.  At least a dozen times.
7   Q.  And are all those visits noted in your logbook?
8   A.  No, sir.  There's only one or two noted in my
9   logbook.
10  Q.  Why is that?
11  A.  Why?
12  Q.  Yes.
13  A.  No reason, it wasn't -- specific -- we were
14  going there to do a job.  We didn't get help on your
15  end, so we went there and gleaned the information
16  ourselves.  They were telling us they had to pour the
17  concrete and get the concrete done.  Our conduit had
18  to be in the concrete.  We have never, I don't think
19  we've ever even officially got a stamped set of
20  blueprints for the administration building, which has
21  currently been done for two years.  That's the
22  auspices we were working under.
23  Q.  Now, my question was why you didn't note in the
24  logbook on each occasion that you visited the Bear

Page 55

1   site?
2   A.  Because I lived in that area.  I took off from
3   work early, and I cruised, I cruised past the site and
4   stopped by on my way home.  That was an excuse for me
5   to go, leave early, basically.
6   Q.  And you did note several, or at least I recall
7   one visit to the Bear site in your logbook.
8   A.  That was when we spent a whole day there.  I
9   knew everybody that was working there, all the
10  contractors that were involved.  I have a specific
11  relationship with many of the men that were running
12  the job for other contractors, and they helped us out.
13  Brother-to-brother thing.
14  Q.  Did you ever meet with Mike Rocca?
15  A.  Yes.
16  Q.  When did you meet with him?
17  A.  On a daily basis.  He became the project
18  superintendent.  They transferred him up from the
19  south site to the north site.  He was a ray of
20  sunshine.  He tried to do his job.  But I still never
21  received anything in writing regarding my RFIs, never
22  did I ever receive a written reply to a request for
23  information ever, the whole job, ever.
24  Q.  Did you get a verbal reply?

Page 56

1   A.  Some.  But it was always gray areas.  There was
2   never a hard, fast answer.  It was work it out for
3   yourself.
4   Q.  And then whatever --
5   A.  It was engineering on the fly, basically.  It
6   was engineering on the fly.
7   Q.  And then whatever it was, you went ahead and
8   did the work?
9   A.  We had to.  I've never seen a project that was
10  run on a verbal in my life, not like this, not a $300
11  million project.
12  Q.  Did you ever meet with Paul Angerame?
13  A.  Who?
14  Q.  Paul Angerame?
15  A.  I'd say no.  I don't even recognize that name.
16  I might be mistaken, but...  Who is he?
17  Q.  Did you meet with anybody from Tishman?
18  A.  As far as a formal meeting?
19  Q.  Yes.  Did you have any --
20  A.  No.
21  Q.  -- meetings during the course of the job with
22  people from Tishman?
23  A.  No, no formal meetings, they were just
24  basically there.

Page 57

1   Q.  Did you have any interaction at all with Banc
2   One employees?
3   A.  As far as?
4   Q.  Anything.
5   A.  No.  Banc One employees when I was there, I was
6   there the next time I was there for Furness when they
7   started manning their job up.  I had no interaction
8   whatsoever with any of their employees.
9   Q.  Did you prepare any schedules for Creedon's
10  work relating to the project?
11  A.  No, sir.  I'm not the project manager.  I'm
12  just a general foreman.
13  Q.  Do you know if Mr. Doble did?
14  A.  Yes, sir, he did.
15  Q.  And did he give you copies of those --
16  A.  No, sir.
17  Q.  -- sketches?
18  A.  I'm not privy to that information.
19  Q.  And how do you know Mr. Doble prepared
20  schedules for Creedon work?
21  A.  Because that's what he did, sir.  He sat in his
22  office and gave them bar graphs.  He alerted them to
23  every time that there was a problem.  We were being
24  held up constantly.  Constantly.

**B-0590**

15 (Pages 54 to 57)

Creedon Controls, Inc.
John B. Mulrooney

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
June 26, 2006

Page 58

1  Q.  Did Mr. Doble, to your knowledge, prepare
2  one-week look-ahead schedules?
3  A.  Sir, I have no idea. I'm not privy to that
4  information. I am not in Mr. Doble's head. I have no
5  idea what Mr. Doble did on a daily basis. But I know
6  one thing, he was there and he was dealing directly
7  with Tishman and Forest and I was pushing the men.
8  That's my job.
9  Q.  So he didn't provide to you any, any type of
10  look-ahead schedules for Creedon work?
11  A.  We went from one hot job to another. We put
12  fires out. We got it done is what we did. That's
13  what I do.
14  Q.  Good.
15  A.  I'm not privy to that. That's management.
16  You're talking the difference between management and
17  blue collar people. I'm blue collar.
18  Q.  So you look at the look-ahead schedule as a
19  management thing, as opposed to getting the work done?
20  A.  Yes, sir.
21  Q.  Looking at Exhibit 1, your logbook, did you
22  complete this on a daily basis while at the job?
23  A.  Most often, yes, but there is some glitches.
24  Q.  Did you --

Page 59

1  A.  That's when I was totally overwhelmed.
2  Q.  Did you ever --
3  A.  I didn't even have the time to sit down and do
4  it.
5  Q.  Did you ever go back at any time and write
6  additional information to your logbook?
7  A.  Never, never.
8  Q.  So anything that's written in here was written
9  on the day that it occurred?
10  A.  Yes, sir.
11  Q.  For instance, if we look at February 5th, 2004,
12  at page 5350 --
13  A.  "Held up until 3:30 when digging actually
14  started on trenches." This is all doing with the
15  administration building.
16  Q.  Okay. But everything that you wrote on that
17  day on that page was written on February 5th?
18  A.  Yes, except for that eight men delayed eight
19  hours, I wrote that at the end of the night with a
20  different pen. I carry five pens in my wallet.
21  Q.  So that darker --
22  A.  It was wrote that day but with a different pen.
23  I have -- I carry multiple pens on me. I give -- you
24  know, things happen. Usually I have three

Page 60

1  highlighters, two pens, a tic-tac tracer. This was at
2  the end when I finally got to the point where this is
3  what happened. That was at the end of the day. This
4  was started in the morning, this was at the end of the
5  day.
6  Q.  When you say "this was started," what are you
7  referring to "this"?
8  A.  The original, everything up to that point,
9  "Eight men delayed eight hours" was written at the
10  same time. Okay? Then at the end of the day after 10
11  hours, I finally put that down, they were delayed
12  eight hours. Because we had to finish it. The
13  concrete was coming. Okay? They were push, push,
14  push, push, push. No information. No help.
15  Q.  Did anyone ask you to go back in your logbook
16  and write down a number of men and how long a delay
17  was?
18  A.  No, sir, no, never. Everything here is --
19  everything here is documented from the day I did it.
20  I told you that before. My father taught me exactly
21  how to keep a logbook.
22  Q.  So that's how you typically keep your logbook?
23  A.  Yes. I mean there's a lot, I mean believe me,
24  there's -- I would have a dictionary. It would look

Page 61

1  like Mein Kampf if I put every detail in here.
2  Q.  I want you to look at February 5th, 2004 first.
3  A.  Got it.
4  Q.  That last paragraph there, what are you telling
5  us? What's that mean?
6  A.  This had to do -- I always put down things that
7  jog my memory, okay. This had to do about with the
8  administration building, okay. I told you we were
9  under the gun as far as they were pushing us to put
10  our conduit in. They had -- they have never given us
11  any specific locations. So they're telling us they're
12  going to pour concrete. That would have cost us an
13  additional hundreds of thousand dollars to run that
14  pipe overhead. We had to get in this ditch and get
15  the pipes there. Okay?
16      So here I say, "Held up until 3:30 p.m.
17  when digging actually started." So they fooled around
18  until 3:30. Now we're on overtime now, till they
19  actually started. So the impact on me is I had eight
20  men standing around, picking their nose, at $30 an
21  hour waiting for these guys to start digging. Okay?
22  Q.  Okay.
23  A.  That gives you that clue. "Had to wait till
24  Furness piping was slurried." The slurry mix is a

**B-0591**

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
John B. Mulrooney              C.A. # 05-CV-300-JJF                        June 26, 2006

Page 62

1 non-concrete, it's more of a softer base that they put
2 in there instead of putting concrete in, so if
3 anything happened they could still dig it up and get
4 back in it. Furness and us were working side by side.
5   Q. Okay.
6   A. They were giving -- they were given the point,
7 they had two little pipes to put in there, but they
8 were deeper than our pipes. So we had to wait till
9 they got their pipes in deeper that we could run our
10 thousand pipes past their two pipes. And they still
11 missed it. That was -- that's later in the logbook.
12 But those two pipes never hit the right location.
13   Q. So you're putting your conduit in the ground as
14 opposed to overhead, right?
15   A. Yes.
16   Q. And that's cheaper. That's less expensive to
17 do.
18   A. There is not -- yes. But there's no room in
19 that administration building. We had multiple pipes
20 already that had to go in there for the lighting and
21 stuff. They had to be in the ceiling. Okay, I'll
22 take you in there right now and show you, we got
23 thousands of foot of pipe up in that ceiling. And
24 there's five or six or seven other contractors that

Page 63

1 also had to be in the same airspace. So what you have
2 to do is get what you can into the deck, and that's
3 all, it was in the bid. It was in the -- this was an
4 extra, this was an extra. This wasn't even bid, this
5 was an extra.
6   Q. So are you saying that you had eight men
7 standing around the job for eight hours that day
8 waiting for this to happen?
9   A. Well, what I had them do, I had them do what
10 they could do, make up the, make up the hangers, I
11 mean the underground things. All those things had to
12 have strut made out. Do what they could do. Lay the
13 stuff out. But basically they were nonproductive.
14 They were the least amount of productive as they could
15 have been. They were not as productive as they could
16 have been. This job could have been done in that
17 eight-hour period. We were held up by one person
18 running two pipes, period.
19   Q. Looks like somebody had to dig the trench
20 first. Is that wrong?
21   A. They dug a trench to install their conduit.
22 Their conduit was deeper than ours. Their conduit,
23 they were in charge of providing us with a raceway to our
24 two panels that came out there. And eventually they

Page 64

1 got them crisscrossed, which is, it will be dealt with
2 later in that book. They hit the wrong one. 50-50
3 shot, it was in the wrong spot. But they were deeper
4 than us. We had to allow them to get in there. And
5 the concrete truck had to run in there, so we couldn't
6 put our pipe out on the ground because an 80-ton
7 concrete truck driving over the conduit smashes it.
8 Simple as that.
9   Q. And so your guys performed some work to lay
10 this out and get it ready and had to wait for the
11 other people?
12   A. You know, maybe they got an hour of productive
13 work, okay. But the thing was, they were barking at
14 my butt, they were gnawing my butt trying to push me
15 to get this done. I could not abandon that site. The
16 concrete was coming but they had no care or worry
17 whatsoever that I had the proper information or I had
18 the time to do my job like I should have been.
19 Everyone else it took the point, everyone else was
20 more important than Creedon Controls. And this is a
21 big deal.
22   Q. So you're saying -- you're claiming that delay
23 was 64 hours.
24   A. Oh, yeah.

Page 65

1   Q. And --
2   A. That's not counting the apprentices.
3   Q. And those eight guys had nothing else to do on
4 the project?
5   A. We could not physically pull them off the
6 project. They were making me man that job. They were
7 saying, "This is going to be poured that day." I kept
8 them as productive as possible, prepping before them
9 two got the other pipe in there, Furness.
10   Q. What time did your men start in the morning?
11   A. 7:00. We were on 10-hour days.
12   Q. And did they finish this particular part of the
13 job --
14   A. Yes.
15   Q. -- that day?
16   A. Yes, sir, they poured concrete that day. Look
17 at the logbook. In two hours we did what could have
18 been done in the morning because of my foresight, my
19 planning, and they did what they could do to be
20 productive. I had -- everything was laid out.
21        But the fact that their two pipes crossed
22 our ditch when we had multitudes, I mean we're talking
23 100, 200 pipes that I had to run through there. And
24 they had two pipes.

Creedon Controls, Inc.                                          Banc One Building Corporation
John B. Mulrooney                   C.A. # 05-CV-300-JJF                        June 26, 2006

Page 66

1      Everyone was, everyone was treated better
2  than we were. We were the dogs on the project.
3    Q. So if you go to this site at 7 in the morning
4  to see what's going on, you can tell that it's not
5  ready for your men to do the work. Is that fair to
6  say?
7    A. No. It was ready to go. We were, we were, we
8  were held up by another contractor who had to put his
9  conduits underneath of our conduits. That's simply --
10  that's the basic facts.
11   Q. So --
12   A. He had to get his conduits in. The truck had
13  to come in and pour the slurry mix and cover his
14  conduits before we could finish our conduits and
15  extend them and stub them up.
16   Q. But if you went there at 7:00 you would see
17  that the trench, you would see the Furness's
18  conduit --
19   A. There was no trench. There was no trench, sir.
20   Q. Let me finish. You would go there at 7:00,
21  then you would see there was no trench there that was
22  ready to put your conduit in. Is that fair to say?
23   A. No, sir, you're mistaken.
24   Q. Would you also --

Page 67

1    A. "Held up till 3:30 when digging actually
2  started on trench."
3    Q. So the digging for the trench didn't start till
4  3:30 that day. Is that correct?
5    A. Yes.
6    Q. Based on your logbook.
7    A. Yes.
8    Q. So if you went there at 7 in the morning, you
9  would see that there was no trench yet dug; is that
10  fair to say?
11   A. At that point in time, I had no knowledge
12  whatsoever that they were going to hold me up. My men
13  were there to do our job. There was no communication
14  between Forest Electric and ourselves. They were
15  shooting from the hip the whole job. They would just
16  come out and say, "Boom, you got to move your stuff.
17  Boom, we're doing this today, we're doing that today,
18  you're going to move." Boom, it was over.
19   Q. Did you go to this -- this was in the
20  administration building?
21   A. Yes.
22   Q. Did you go there at 7:00 in the morning to see
23  what the status was?
24   A. Yes, sir.

Page 68

1    Q. So when you went there, you would see there was
2  no trench there; is that correct?
3    A. Sir, I had no knowledge that there was supposed
4  to be a trench there. I, I was given the information
5  that I was going to run all my pipes out. There would
6  be no, no other contractors on the site. I had
7  already waited, at this point, I already waited for
8  the plumbers to get done putting the bathroom pipe in,
9  and now they came at the last minute and they said
10  this. And my pipes, my boys had my pipes all the way
11  up to that point. I can draw you a map. Okay? I
12  have two main -- I had two main trunk ways that came
13  through that building, okay.
14   Q. Well, wait, don't draw on the exhibits.
15   A. Okay.
16   Q. What I'm asking you is if the trench wasn't dug
17  yet, did you, did you know that your conduit was going
18  into the trench --
19   A. No.
20   Q. -- above somebody else's pipe?
21   A. My conduit was -- we had no knowledge that they
22  hadn't finished their pipes yet. You're not getting
23  what I'm saying. We had -- we were supposed to be
24  running on a flat surface. They had graded this for

Page 69

1  us. Our work was supposed to be top, top, top secret.
2  We were supposed to be the number one dog. But then
3  they came in afterwards and said oh, we had to wait.
4  We had four or 500 conduits come in. Every one of the
5  boxes, we had conduits going out for lighting, we had
6  conduits going out to floor boxes, we had conduits
7  going out to feed the individual cubicles, everything.
8    Q. So did you go to this particular part of the
9  administration building at 7 in the morning?
10   A. Yes, sir. I've already told you that.
11   Q. And eight guys, you went out there with eight
12  guys and they stayed there for eight hours?
13   A. Yes, sir.
14   Q. And they did what?
15   A. I already told you. They were as productive as
16  they possibly could. They glued 90s on, got ready,
17  they put up, they made up some underground hangers we
18  had to put strut, they had to cut some strut. But
19  basically we were held up for eight hours waiting for
20  this.
21   Q. And how long did the work that they performed
22  that day take?
23   A. Sir, I can't, I can't tell you that. I was --
24  I'm running 50 men. I was there numerous times in the

**B-0593**

18 (Pages 66 to 69)

Wilcox & Fetzer, Ltd.                              s                          (302)655-0477

Creedon Controls, Inc.                     v.              Banc One Building Corporation
John B. Mulrooney              C.A. # 05-CV-300-JJF                    June 26, 2006

Page 78

1  says "lost time." What was the lost time for?
2      A.  Waiting for them to stone.  Need to have man
3  watch as heavy equipment drops stone and spread it and
4  run over our conduit.  Okay, you're talking about an
5  80,000 pound truck running over, we were running
6  schedule 40 PVC pipe.  So once we got it in there,
7  they just ran right over it.  We lost three or four
8  conduits, we had to replace them.  They didn't care.
9  They had to stone overtop of the conduit before they
10 could put in the concrete.
11     Q.  Would that be the normal progress of the job,
12 putting the stone over the conduit and then concrete?
13     A.  Well, they were taking a shortcut.  Instead of
14 dropping it in an outside location and having a
15 backhoe wheel it over bucket by bucket, which it only
16 weighs a couple tons, no, no, no.  They had the 80,000
17 pound dump trucks roll it right across our conduits,
18 dump it right where it was so it would be easier for
19 them to spread it.  They took a shortcut.
20     Q.  Okay, take the dump truck out of it.  Do you
21 put the conduit in, then the stone, then the concrete?
22     A.  Right.
23     Q.  That's the normal course of a job?
24     A.  Yes.  You can't put it --

Page 79

1      Q.  What do you mean by "lost time two hours for
2  eight men, 16 hours total," what's that for?
3      A.  They stopped us in the middle of what we were
4  doing so that these guys could run them trucks
5  through.
6      Q.  And put the stone down?
7      A.  You got it.
8      Q.  All right.  Page 5357.  At the bottom there you
9  talk about lights missing end lenses.  Can you tell us
10 what you mean by those last two lines?
11     A.  "Twenty lights missing end lenses."  You guys
12 ordered the material, or we ordered the material, they
13 came in, end lenses on a fixture.  Okay, I know you're
14 not very familiar with this trade, but these are
15 called high hats.  What they're talking about is a
16 strip light.  Okay, the end lenses are the ends of the
17 fixture which guard the fixture from the, shall we
18 call them tombstones.  Tombstone is what holds in a
19 bulb.  That's what keeps them in, the end lenses.
20     Q.  All right.  And they were missing when they
21 were shipped to the site?
22     A.  Yes.
23     Q.  I've got to ask you again, please don't write
24 on the exhibits.

Page 80

1      A.  I'm having a good time.
2      Q.  I know.  I can give you some other paper to
3  write on.
4          MR. BESTE:  May I make a suggestion?  Off
5  the record a second.
6          (Discussion held off the record.)
7          (A substituted copy of Exhibit No. 1 was
8  marked.)
9          MR. BESTE:  Now you can scribble to your
10 heart's content.
11         THE WITNESS:  Good.  Just dredging up
12 three years ago.
13 BY MR. BRADLEY:
14     Q.  Page 5363.
15     A.  Hot damn, I'm on you now, I'm on it.
16     Q.  You have there something on the side about T&M.
17 Can you tell me what you're talking about?
18     A.  Yes.  "Finish admin rough-in on deck for
19 Tishman."  This was what I was explaining to you, and
20 if you go down to the third line, and "T&M fix floor
21 box Interstate smashed."
22     Q.  So then Creedon charged time and material to
23 fix that.  That's what that means?
24     A.  Yes.  Well at this point is when the plumbers

Page 81

1  or someone had cut a piece of strut, which is holding
2  our conduits, our conduits had to be in a four-inch
3  wall the stub ups on one end and the other end they
4  were going into the panel.  Well they cut a piece of
5  strut off and those conduits drifted out of the wall.
6  So it was no saving them.  I tried to get them to make
7  the wall bigger.  I talked to -- there was many
8  options they could have pursued.  But they decided to
9  take all those conduits overhead.  And that was just
10 the start of it.
11         This job, this job here, that extra right
12 there probably cost them 50 or 100,000 bucks, because
13 that was a whole wall and it was very, very important
14 wall.  Very important wall.
15     Q.  Where was that located?
16     A.  In the administration building.  It was one of
17 the last things that was poured.
18     Q.  Now when you -- does someone take your note in
19 the logbook that says time and material and complete
20 something to charge the time and material?
21     A.  I wrote up sheets and billed Forest Electric
22 every day, every day.  You should have sheets and RFIs
23 for every day, every entry that's in this logbook you
24 have them.

**B-0594**

21 (Pages 78 to 81)

Wilcox & Fetzer, Ltd.                                (302)655-0477

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
John B. Mulrooney              C.A. # 05-CV-300-JJF                        June 26, 2006

Page 82

1    Q.  So if you make an entry in your logbook for
2  time and material, you also --
3    **A.  You have a bill for it.**
4    Q.  -- completed the bill and --
5    **A.  You have a bill for it. I can't believe you**
6  **don't have them here with you.**
7    Q.  And did Mr. Doble make the decision whether to
8  send those bills or what to do with them?
9    **A.  I took them personally over and had them. And**
10 **the funny thing about that was they stamped every one**
11 **for time, for verification for hours only. Whether we**
12 **ever got signed copies back, I have no idea. But I**
13 **have never seen anybody stamp it like that.**
14   Q.  Well what does that mean to you?  Verified time
15 only.
16   **A.  That means all they're doing is verifying the**
17 **time. It's going someplace else to get paid. I**
18 **usually turn the bill in, they sign a copy and give me**
19 **one back. It wasn't like that with these people.**
20 **Nothing like it. I never seen, 21 years never seen**
21 **nothing like it.**
22   Q.  Page 5364. Did you on this job have any
23 problems with any of the men that worked for Creedon,
24 the journeymen?

Page 83

1    **A.  Sure. You're always going to have problems.**
2    Q.  What kind of problems did you have?
3    **A.  This guy here, Dave Jones, they got his money.**
4  **Had to get rid of a couple guys. Big jobs you have**
5  **people. We had travelers coming from all over the**
6  **country. You got a job, you got people that just**
7  **don't want to work and they want to hide. So I get**
8  **rid of him. Simple as that. I got his money and got**
9  **rid of him.**
10   Q.  And how many guys did you have like that on
11 this job?
12   **A.  Two.**
13   Q.  Who were they?
14   **A.  This guy, Dave Jones was one of them. I'd have**
15 **to go back through all my notes to find out the other**
16 **dude. He was the worst. Late again, late again. He**
17 **was late every day.**
18   Q.  So if you had a problem with a guy, you would
19 note it in your logbook?
20   **A.  Yeah, if I thought I was going to have to --**
21 **you have to. There he goes, late again, late again.**
22   Q.  How about 5372. Up top can you tell me what
23 this, it looks like Jerry somebody?
24   **A.  He was on probation.**

Page 84

1    Q.  Probation for what?
2    **A.  I have no clue. He had to go to probation,**
3  **probation officer.**
4    Q.  All right.
5    **A.  I mean that's --**
6    Q.  I didn't know what you meant.
7    **A.  That's pretty self-explanatory.**
8    Q.  Page 5374.
9    **A.  Here we go. This is when it really started.**
10   Q.  What really started?
11   **A.  "Drywall studs, doors, carpenter unloaded and**
12 **store in administration area." This is when they**
13 **completely shut me down. They covered every square**
14 **inch, 90 percent of the floor space. We couldn't even**
15 **put up a ladder. We were six weeks ahead of the other**
16 **site and almost finished our job, and they stopped us**
17 **dead in the water. You couldn't even put up a ladder,**
18 **let alone drive a lift around in there. Covered up**
19 **every floor box. Every place we could put a ladder,**
20 **we were stopped dead in the water.**
21   Q.  Okay. And the date on this is March 4th, '04?
22   **A.  Um-hum.**
23   Q.  And you're saying that the -- are you saying
24 material came into the administration building for

Page 85

1  storage?
2    **A.  They used it as a storage area.**
3    Q.  On top of the floor, right?
4    **A.  Every, every available square inch except for**
5  **the part where they could take a pallet jack and move**
6  **the stuff out was covered. They completely shut me**
7  **down, eight men. We were so close to being finished,**
8  **we would have been way ahead of the other site.**
9    Q.  You were close to being finished what?
10   **A.  Running the overhead piping and getting**
11 **ready -- we were just starting to pull wire in the**
12 **underground boxes. There's floor boxes that feed all**
13 **the cubicles.**
14   Q.  So you were close to being finished the
15 administration building?
16   **A.  I was close to getting all the pipe and**
17 **everything in and start pulling wire. I mean that's**
18 **the big crux of the whole job.**
19   Q.  Well, what's the big crux of the whole job?
20   **A.  Establishing the raceway, getting the raceway**
21 **from point A to point B.**
22   Q.  All right. And that was almost finished by
23 March 4th?
24   **A.  Well, I won't -- put it this way. I can't give**

**B-0595**

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
John B. Mulrooney                  C.A. # 05-CV-300-JJF                    June 26, 2006

Page 86

1  you a percentage number, but the home runs were within
2  30 or 40 feet, but we're talking about I had another
3  hundred or 150 home runs in the air.
4  Q.  And the home runs are what?
5  A.  That's the pipes that go out and feed the
6  individual lines.  You know, we had multiple, you had
7  multiple circuits for emergency lighting, regular
8  lighting, backup lighting, power, data.  Everything
9  has to have its own individual raceway.
10  Q.  And on this March 4th date, you say the
11  carpenters unloaded and stored their materials in the
12  area?
13  A.  Right.  It became an unloading area.  It was
14  more advantageous to them.  They didn't have a loading
15  dock finished.  And it was simply a point that they
16  didn't care.  They just moved the stuff in.  We had to
17  stop everything.  They were coming right through the
18  front door, right through, right through -- the only
19  thing they left open was that doorway.
20       You obviously haven't visited the site.
21  There is a front door comes, there is a main hallway
22  comes down, goes left and right around to the
23  individual quads.  That's the only thing left open.
24  Everything else was storage space.  All my electrical

Page 87

1  work was in those areas.
2  Q.  And you have a loss of six man-hours per man.
3  A.  Right.  This --
4  Q.  Times four?
5  A.  This didn't happen occasionally.  We're talking
6  thousands of tractor trailers coming in there,
7  thousands.  Thousands.  Thousands.  It's
8  incomprehensible.  It was every five minutes we had to
9  stop.
10  Q.  And what, during this, that would be four men
11  times six hours.  So what work did they perform that
12  day?  I mean did they do nothing?  I'm not sure what
13  you're saying.
14  A.  What I'm saying is, in the course of their
15  workday, they had to stop what they were doing, drop
16  everything, and get the heck out of the way.
17  Q.  So, okay, so they could come in and unload
18  something?
19  A.  You got it.  You're getting the picture now.
20  Q.  I get it.  And that was the -- you too, you
21  stayed there for six hours while they did that or did
22  you go to other areas and do your work?
23  A.  I stayed there because I was so mad, I couldn't
24  see straight.  I have never been on a job like this

Page 88

1  that was so poorly run in my life, never.  Never
2  mismanaged, never in 21 years, never.
3  Q.  So on March 4th you stayed in that same area
4  for six hours?
5  A.  I stayed there the whole time and witnessed the
6  whole debacle.  Witnessed the whole thing.
7  Q.  And you didn't finish your sentence on that
8  page.  Can you tell us what that was?  It says "we
9  are" --
10  A.  I was probably so pissed off I couldn't see
11  straight.
12  Q.  -- something.
13  A.  I had to run out of there.  Okay.  What page is
14  that?  5376?
15  Q.  74.
16  A.  Okay.  Let's keep going back.  There we are.
17  "Cannot pull strings or wire, almost impossible to
18  work in area.  And we are," should be stopped dead in
19  the water.
20  Q.  So when you were stopped dead in the water,
21  what did you do?
22  A.  I ran down to Forest's trailer and asked them
23  what the heck was going on.  They're the ones that are
24  pushing my buttons telling me this is the most

Page 89

1  important thing since sliced bread, and here they are
2  now making it into a storage area for building
3  materials that shouldn't even be there, that had no
4  place to be there, doors, doors locks, the doors for
5  the whole building were there, stored there.
6  Q.  Who did you meet with?
7  A.  Len Beck.
8  Q.  And --
9  A.  I got nothing but smoke.  I got nothing but
10  smoke and rhetoric.  Smoke and rhetoric.
11  Q.  And what did he tell you?  What did he tell
12  you?  Do you recall anything in particular?
13  A.  Smoke and rhetoric.  That's all.  Just smoke
14  and rhetoric.
15  Q.  And after, after you met with Mr. Beck on March
16  4th, what did you do, just go back to the site and
17  hang out there or what?
18  A.  Okay.  If you look at the next page, that will
19  answer your question.  5375, "Took picture of all
20  areas blocked by others' materials."  You seem to be
21  ignoring all the places that I had something about Len
22  Beck in them.  "Furness has battery, reels of wire,
23  gear, almost entire area blocked for workers.  Told
24  Tishman and Len and Forest," Bob Alloca, whatever the

**B-0596**

Creedon Controls, Inc.                                    Banc One Building Corporation
John B. Mulrooney                v.    C.A. # 05-CV-300-JJF    June 26, 2006

Page 90

1 heck his name, "and Len from Forest, no response.
2 Don't even move lifts around to hang hangers for." I
3 couldn't even put lifts in. "Rough-in walls. Took
4 pick pictures of all areas by others' blocked
5 material."
6     5375, that pretty much answers all the
7 questions you just asked me.
8   Q.  Well, I'm asking you what you did on March 4th.
9 Did you talk to Mr. Beck on that day and then just
10 stay at that site where no work, where you write "no
11 work can be done"?
12   A.  No.
13   Q.  Or did you move men and work elsewhere?
14   A.  At that point the day was shot. The day was
15 shot.
16   Q.  Well, but you're saying you hung around for six
17 hours, if I understand your note on the 4th.
18   A.  I didn't say it was a continuous six hours. I
19 told you that the trucks were coming in and out. Only
20 one truck can back up and unload at a time. That's
21 it. You can't have two trucks in, one whole truck.
22   Q.  So a truck backed up and took up the whole
23 space where your men could work in the administration
24 building?

Page 91

1   A.  You got it.
2   Q.  That's --
3   A.  You got it.
4   Q.  Okay. How big was the administration building?
5   A.  I haven't a clue. Look at a print. I mean
6 you're asking me for dimensions, 50,000, 100,000
7 square feet, who knows.
8   Q.  When you took pictures, who did you give the
9 pictures to? Is that something you left with Creedon
10 or what?
11   A.  Yes, sir. Took pictures of things that were in
12 there blocking our way, that's all. The big piles of
13 drywall, the big piles of doors, the whole area
14 blocked off and the ends of our conduits which were 30
15 or 40 feet from termination points that stopped us
16 from pulling wire.
17   Q.  5376.
18   A.  Still haven't fixed the floor, still haven't
19 fixed the ceiling. Four inches of water on the floor.
20 Reassign men to other locations after the move. Four
21 man-hours lost for 14 men. That was getting, moving
22 tools and material out of flood area. They actually
23 pulled my floor box covers up and drained the water
24 into my underground conduit system in order to

Page 92

1 evacuate the water from the site. So then I had to,
2 at a later point in time, evacuate that water from my
3 conduit system.
4   Q.  And when you say four man-hours times 14 men,
5 is that what you mean there?
6   A.  Oh, yeah. That's my whole crew. I had all my
7 material there. I had seven toolboxes there. Their
8 personal tools, everything was there. Everything.
9   Q.  So Creedon had all their materials in the
10 administration building too?
11   A.  I had all my stuff on wheels. Everything we
12 had was on wheels. It was being able to move. I had
13 to move it around constantly. I had one little room
14 in there, that was my room.
15   Q.  And that was in the administration building?
16   A.  Yes.
17   Q.  Page 5378, sir.
18   A.  Yep.
19   Q.  At the top, this is March 9th. Material is
20 being moved through the area by Furness and Superior.
21   A.  Yep.
22   Q.  And lost man-hours eight a day at least? What
23 does that mean, you lost eight hours?
24   A.  "Continue rough-in of admin area. Constantly

Page 93

1 being stopped by material being moved through area."
2     As I explained to you before, there was
3 one main hallway. We were trying to run our pipes
4 through that hallway. Whenever a truck came in, we
5 had to stop, drop, and move out of the way.
6   Q.  Did you ever go to Forest or Tishman, give
7 notice saying that you --
8   A.  On a daily basis.
9   Q.  Please let me finish the question. Did you
10 ever give Forest or Tishman written notice at any time
11 and tell them that you would stop work on this part of
12 the job until the material was moved and you could do
13 your work?
14   A.  Charlie Doble did that.
15   Q.  He wrote to Tishman and Forest and --
16   A.  Oh, yeah.
17   Q.  -- made that statement?
18   A.  Oh, yes. And I did it verbally, they did
19 everything verbal. I did it verbally on a daily
20 basis.
21   Q.  My question is, did you write to Tishman or
22 Forest and tell them you would stop work in this area
23 until they got the material out of your way so you
24 could do your work?

24 (Pages 90 to 93)

Creedon Controls, Inc.                                          Banc One Building Corporation
John B. Mulrooney                    C.A. # 05-CV-300-JJF                    June 26, 2006

Page 94

1    A.  No.
2    Q.  And your statement is --
3    A.  I did it verbally and Charlie Doble did it
4    written.  And it's in your records.
5    Q.  Did you see that writing by Mr. Doble?
6    A.  Excuse me?
7    Q.  Did you see the writing by Mr. Doble saying --
8    A.  No, sir.  That's his job.  I have my job.
9    Q.  And did Creedon stop work during this period of
10   time in March in the administration building because
11   of the problems it was experiencing?
12   A.  Yes.
13   Q.  When was that?
14   A.  Sir, we are -- this is a redundant point.  We
15   covered that 10 or 20 pages ago, okay?  Let me go
16   back.  Let's look it up.  "Reassigned men to other
17   location after move."  5376, 6th of March.  We've
18   already touched on this, sir.  You're getting
19   redundant.
20   Q.  On March 6th you reassigned men to other
21   places?
22   A.  Yes, sir.
23   Q.  And then on March 9th you have another
24   statement that you're delayed again or lost man-hours,

Page 95

1    eight hours a day.  That's the following --
2    A.  Three days later.
3    Q.  -- Monday.
4    A.  Right.  After the flood waters receded, we went
5    again and tried to reenter the location, as we were
6    being pushed by Forest Electric to complete this on a
7    timely basis.
8    Q.  So you had this problem March 4th, 5th and
9    again on the 6th, and then on the 6th you finally
10   reassigned people.  Is that what you're saying?
11   A.  At that point there was nothing we could do
12   constructively once they had blocked all avenues of
13   approach.  We had everything covered to a point where
14   we were locked out of putting our home runs into the
15   panels.
16   Q.  Okay.  Then why did you go back on the 9th and
17   face the same problem?
18   A.  We didn't face the same problem.  The flood
19   waters had receded and we were in there.  At that
20   point the underground boxes, all those had been done.
21   And we could pull our strings into the underground
22   boxes and suck all the water which had been drained
23   into our underground conduit system by Forest Electric
24   to drain their administration building, and we were

Page 96

1    trying to pull our strings in so we could pull wires
2    in.  They had to be vacuumed out, the water evacuated
3    from the conduit system, and then a string line pulled
4    in in order to facilitate us pulling the wires into
5    the conduit system.
6    Q.  Now, turn to page 5379, sir.  This is March
7    10th, and this still addresses the administration
8    building, correct?
9    A.  Um-hum.
10   Q.  Still addresses the problem of material in your
11   way?
12   A.  No.
13   Q.  Is that not?
14   A.  You are -- can't you read?  "Furness Electric
15   used administration all day for unloading.  Tons of
16   wire reels in the way.  Also doors and studs stacked
17   all over the floor."  It was a continuous unloading
18   process.  It's simple.  It's in black and white.
19   Q.  So on March 10th, sir, based on your note,
20   there was material in your way in terms of performing
21   your job.  Yes or no?
22   A.  Sir, yes.  It wasn't in our way.  They were
23   unloading it.
24   Q.  And when they unloaded it, are you claiming

Page 97

1    they put it in your way so you couldn't perform your
2    job?
3    A.  Sir, the whole floor space was already taken
4    up.  We -- this is a moot point.  You can't picture
5    what's going on here.  We're talking about a little
6    avenue, the main hallway, okay?  The tractor trailer
7    pulls up to the front door and they just keep
8    unloading nonstop all day.  Everything else is already
9    covered.  It's already there.  There's no place to put
10   anything else.  I mean I don't know how many times we
11   have to go through this, but you're not grasping what
12   I'm saying here.
13   Q.  Well, some people have suggested I don't grasp
14   well.
15   A.  Believe me, you're thick.
16   Q.  So what you're saying is that Creedon's work
17   was interfered with by that, correct?
18   A.  Well, yes, sir.
19   Q.  And that's the same --
20   A.  Yeah.
21   Q.  -- in essence the same issue you described as
22   beginning on March 4th?
23   A.  Thousands of tractor trailers.
24   Q.  Is that correct?

25 (Pages 94 to 97)

Creedon Controls, Inc.                                    Banc One Building Corporation
John B. Mulrooney                    C.A. # 05-CV-300-JJF              June 26, 2006

Page 98

1   A.  Hundreds of wire reels, thousands of batteries,
2   thousands of cabinets.  Have you ever walked through
3   the site yet?
4   Q.  And all that material was in your -- you're
5   claiming was in your way to perform your work,
6   correct?
7   A.  It was being unloaded through our work area.
8   Q.  And they were in your way so you could --
9   A.  It was already, the floor was already covered.
10  They were just using it as an avenue to unload, for
11  the tenth time.
12  Q.  And so that the material that was already on
13  the floor and the material they were unloading and
14  tractor trailer they were taking it out of was all in
15  the way of you performing your work; is that correct?
16  A.  Yes, sir.
17  Q.  And you had that same problem dating back to
18  March 4th?
19  A.  It was a daily problem.  And they were pushing
20  us.
21  Q.  How long did that problem continue?
22  A.  Until the end of my notes, when it tells you
23  they moved the stuff out.  I mean peruse the notes.
24  Q.  So every day that that was an issue it's in

Page 99

1   your notes somewhere?
2   A.  Yes.
3   Q.  Okay.
4       (Cell phone ringing.)
5       THE WITNESS:  Go away.  That's my wife.
6   Q.  Do you need to call her?  We can take a break.
7   A.  No, I don't want to break.  I just want to get
8   through this.  I don't know how much more you have,
9   but hopefully we've got to the end of this point,
10  okay.
11      The administration building was totally
12  jammed up.  There was thousands -- there's a record of
13  how many tractor trailers came in here, and everything
14  was unloaded through that administration building
15  until they got the loading dock finished, and you have
16  that in your records also.  It was totally different
17  than the south side, totally different.
18  Q.  Go to page 5387, please.
19  A.  Damn.
20  Q.  And on that, that's March 17th.  And one line
21  says, "Floor boxes covered administration building
22  still held up."  Is that correct, down near the
23  bottom, it's about seven lines off the bottom?
24  A.  Yep.

Page 100

1   Q.  That's still the same problem, in essence,
2   material in your way.  Is that fair to say?
3   A.  Yes, sir.
4   Q.  Now, down the bottom you reference lost, "six
5   hours lost moving material per Tishman."  What was
6   that about, do you know?
7   A.  We were forced to move like gypsies
8   periodically.  They would tell us we had a place.  We
9   were the only ones on the site that were treated this
10  way.  We were told on a moment's notice to move
11  everything you got, get the hell out of here.  Simple
12  as that.  That was two apprentices for six hours
13  moving everything lock, stock and barrel out of one
14  location.  We have no lay-down area at all.  They just
15  took away what little space we had.
16  Q.  Did Creedon have a storage room?
17  A.  One dedicated storage room like the other
18  people had?  Oh, no.  No, we didn't.  Oh, no, we
19  didn't.  We were the only contractor on the site that
20  didn't have a dedicated area and did not have a locked
21  door.
22  Q.  You never had -- well, if you didn't have
23  one --
24  A.  No.

Page 101

1   Q.  -- what would you lock?
2   A.  They moved us from gypsies from one space to
3   another.  It's all in the notes.
4   Q.  Did Creedon have a --
5   A.  There was an orchestrated attempt to keep us
6   moving around the whole site.  We were the only ones
7   treated that way.
8   Q.  What do you mean an "orchestrated attempt,"
9   sir?
10  A.  You glean what you want from it.  I'm just
11  telling you what happened.  Furness had a locked room.
12  Superior had a locked room.  Conti had a locked room.
13  That's three contractors.  Tangent had a locked room.
14  We were denied a locked room.  We were moved from one
15  location to the next.  We had no place to store your
16  lights.  We had no place to store anything.  We were
17  moved like gypsies and our stuff was stolen on a daily
18  basis.  I lost $50,000 of stolen conduit.  They stole
19  a 10,000-foot bundle.  It's in my notes.
20  Q.  And did you, did Creedon have a room to store
21  materials or not, whether it was --
22  A.  No.
23  Q.  No room at all during the course of the job?
24  A.  No.  Never.  Never did we have one dedicated

**B-0599**

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
John B. Mulrooney                    C.A. # 05-CV-300-JJF                        June 26, 2006

Page 102

1  space where we could call our own.  We were moved like
2  gypsies, I will reiterate.  We were moved like gypsies
3  from space to space to space at our own cost and our
4  labor, and we ate it.
5      Q.  And you're telling me that Creedon never had
6  any room in that, on that project to store its
7  materials, whether it was locked or not?
8      A.  For a temporary period of time?  Or are you
9  talking about for the whole site for the time?  Are
10 you talking about a temporary or a full term?
11     Q.  I'm talking about any room at any time to store
12 materials, whether locked or not.
13     A.  We always had some space, but we were
14 constantly moved like gypsies.  Furness had their
15 space the whole time.  One location they were there
16 indefinitely.  Everyone else had a definite place
17 where they stayed.  The fitters, everyone had their
18 little house.  We had no house.  That's what I'm
19 saying.  Permanent?  No.  Temporary?  Yes.
20     Q.  Could you turn to page 5391 I think it is.
21     MS. WARREN:  5391 is a blank page.  I
22 don't think it's that one.
23     A.  It's a blank page.
24     Q.  Yeah.  I'm wondering between there and page

Page 103

1  5400, they're all blank.  Is that because you were
2  off?
3      A.  Yes.
4      MR. BRADLEY:  Let's take a short break,
5  come back.
6      (A brief recess was taken.)
7      MR. BRADLEY:  Sir, we have some time
8  constraints because of another deposition that starts
9  shortly.  So I'm going to today cut short my
10 questioning, but there's a possibility that you'll be
11 called back again.  And I'd be happy to travel down to
12 Dagsboro or wherever to meet you down there.  I happen
13 to like it down there too.  So --
14     THE WITNESS:  Well, that's fine.
15     MR. BRADLEY:  -- just that you know that.
16     THE WITNESS:  I'm worried about my
17 financial remuneration, $40 doesn't even cover my gas
18 or my tolls.  My total loss for the day is $592.80.
19     MR. BESTE:  For the record, our position
20 is that we would like to proceed today, finish that
21 up.
22     THE WITNESS:  Yep.
23     MR. BRADLEY:  I hate to lengthen this
24 record but it was noticed for 9:00, and obviously

Page 104

1  because of reasons Mr. Mulrooney can't control, we
2  didn't start till 11:30 or somewhere around there.
3  Obviously we would have been done had we started on
4  time.
5      THE WITNESS:  Well, I'm sure depositions
6  can be done over the phone also.  We don't have to
7  have a face-to-face, we can have a deposition.
8      MR. BRADLEY:  They certainly can be, but I
9  think I would come down and see you.  Anyway, let's
10 get moving.
11 BY MR. BRADLEY:
12     Q.  Could you turn to page 5453.
13     A.  Got it.
14     Q.  Okay.  My question is between, the page before
15 that, 5452 is May, looks like May 20th, '04, and then
16 next page is June 15th, '04.  And I'm wondering why
17 there is a gap between those two dates?  Were you not
18 the foreman at that point or what?  I don't know.
19     A.  Well, this might be the point in the time that
20 I surrendered my log initially so they could make a
21 copy.  I have another log that I kept at that point,
22 but it's inadmissible as evidence since it wasn't in a
23 hard-bound book.
24     Q.  First of all, who did you surrender your log

Page 105

1  to?
2      A.  Previously stated, Patty Creedon.  She had to
3  make copies of it.
4      Q.  And do you have another log that would cover
5  the period between June -- I'm sorry, May 21st and
6  June 14th?
7      A.  Nothing that would be admissible in court.  It
8  was on looseleaf and it's not admissible.  I mean you
9  have to have hard bound and it can't be a page torn
10 out of it to be admissible in court.
11     Q.  Sir, regardless of its admissibility, do you
12 have that paper somewhere?
13     A.  I'm sure I do somewhere.
14     Q.  You say you think you have it at your home?
15     A.  I tell you what, I will look, when I get home
16 today I will look for it.  It was just -- basically
17 everything is going in the same direction.  If it
18 was -- if it was a cataclysmic event, I would have
19 noted it.  I would have brought it to their attention.
20     Q.  But then your logbook picks up, this logbook
21 that we were given in the case, picks up on June 15th.
22 Why would that be?
23     A.  I just explained to you, I had to surrender my
24 logbook so they could make copies and begin this,

Creedon Controls, Inc.                      v.                      Banc One Building Corporation
John B. Mulrooney                    C.A. # 05-CV-300-JJF                      June 26, 2006

Page 106

1  because at this point they knew what was going on and
2  they knew there was no end in sight and they were
3  preparing for this very occasion.
4  Q.  You mean they were preparing for the lawsuit?
5  A.  They were getting their guns in order as far as
6  documents, everything.  At this point I told them what
7  was going on.  It looked like orchestrated mayhem and
8  chaos, okay.  No other person on that site, no other
9  contractor on that site was treated as vilely as we
10  were.  No other one.  There was 100 contractors
11  on that site.  We were the only one that were treated
12  in this manner, in this fashion.
13  Q.  So do you think it was a conspiracy to get
14  Creedon or --
15  A.  I have no idea.  I can't conjecture in that, I
16  can't conjecture whatsoever.  All I can tell you is
17  that's the reason why we're here right now, simple as
18  that.
19  Q.  Okay.  Now, are you saying that you then picked
20  up in the same logbook that Miss Creedon had taken
21  from you on June 15th?
22  A.  No.  She did not take it.  She asked me for it.
23  I gave it to her, and she gave it back.  And I picked
24  up where I left off.

Page 107

1  Q.  Are you saying that she gave it back to you and
2  you started in the same logbook on June 15th?
3  A.  Yes.
4  Q.  And did you give her the pages between May 21st
5  and June 14th at any time?
6  A.  No.  At that point I had stepped down from
7  being general foreman, and Freddy Street had assumed
8  the role of general foreman.  So I was only
9  responsible for my personal notes.  At that point I
10  was just the foreman again.  He had taken over the
11  reins.  He had come from night shift to day shift.  He
12  had taken over the reins, so I wasn't responsible for
13  the whole job anymore.
14  Q.  But you kept a logbook as foreman?
15  A.  Yes.
16  Q.  And also as general foreman, correct?
17  A.  Yes.  Except for those dates you had previously
18  mentioned.
19  Q.  And come June 14th, '04, you were foreman or
20  general foreman?
21  A.  I can't answer that question right at the
22  present time, but I'm pretty sure I was just the
23  foreman at that point.
24  Q.  All right.  So then --

Page 108

1  A.  But shortly thereafter I left the job, so I
2  mean this was it.  The writing was on the wall, the
3  job was almost over.  I had stepped down, let him
4  assume the duties of being the top dog.  And I was
5  moving on.
6  Q.  And then if you turn to the next page, 5454, it
7  looks like we have no, we have no information from
8  June 16th to June, through June 19th in the logbook.
9  Do you know, do you think --
10  A.  On vacation.
11  Q.  Okay.
12  A.  That's when I knew I was --
13  Q.  Or do you keep separate pages that outline
14  those dates also?
15  A.  Excuse me?
16  Q.  Do you think you have separate pages that
17  address those dates?
18  A.  No, at this point, as I will reiterate, at this
19  point I had already given over my duties as being the
20  head dog.  At this point I was not responsible for
21  reporting everything that went on in the whole job.  I
22  was simply responsible for myself and my men.  I did
23  not write that down.  When I go on vacation, I'm on
24  vacation, simple as that.

Page 109

1  Q.  How do you remember now that you were on
2  vacation those days?
3  A.  Well, because I have only taken a few vacations
4  in my whole life.  I can count them on one hand, and
5  I'm 46 years old.
6  Q.  Page 5456, there's a reference to Charlie's
7  book.  What do you mean Charlie's book?
8  A.  Charlie's book, Charlie is the foreman that I
9  put in charge of the administration building.  Charlie
10  has all pertinent information also to deal with the
11  fiasco that went on in the administration building.
12  Q.  And who; Charlie who?
13  A.  Charlie Oliver.  His name is Charlie Oliver.
14  He will be added to the, he will be added to the list.
15  Q.  To what list?
16  A.  Your witness list.
17  Q.  And Mr. Oliver has a, like a logbook like you?
18  A.  Oh, yeah.  We all keep logbooks.  I taught him
19  well.
20  Q.  And what's underneath that, two something
21  refill?
22  A.  That's for two pallet, the pallets, a portable
23  printer machine for printing up, printing up letters
24  and numbers that identify wires.

28 (Pages 106 to 109)

**B-0601**

Creedon Controls, Inc.                                    Banc One Building Corporation
John B. Mulrooney                   v.                    June 26, 2006
                              C.A. # 05-CV-300-JJF

Page 110

1    Q.  All right.  So if you made him foreman of the
2    administration building at that time, then you were
3    still general foreman; is that correct?
4    A.  Well, he was, he was foreman before then.  At
5    this point I was on my way out the door.
6    Q.  Is there any reason --
7    A.  I had made him a foreman way before this.
8    Q.  Is there any reason you made a note about his
9    book?
10   A.  Sir, you're grasping at straws.  I have no
11   idea.  It's three years ago, two years ago.  I have,
12   you know.  It was pertinent at the time.
13   Q.  Okay.
14   A.  I was getting all my documentation together.
15   Q.  For what?
16   A.  For this very reason.
17   Q.  For the lawsuit?
18   A.  I didn't say that, sir.  I said for this very
19   reason, why we're sitting here right now, you always
20   have to cover your bases.
21   Q.  Could you turn to page 5465.  That's June 29th,
22   and that notes you as the general foreman; is that
23   correct?  Up top?
24   A.  There's no indication up top here.  5404?

Page 111

1    Q.  5465.
2    A.  My pages are jumbled because they went from
3    63 -- there we go.  Got one stuffed in there.  Oh,
4    yeah, I'm still general foreman.
5    Q.  And could you explain what you mean, you have
6    something about two hours lost?
7    A.  Well, let's read down through here.  Oh, here
8    we go.  Pipe in VAVs.  Couldn't pull wire, painters
9    painted floor in that room, so we got throwed out of
10   that room.  Damaged by lift.  Another wire pull,
11   somebody hit it with a lift.  Wire shorted, blew out
12   the circuit.
13   Q.  So that's work that was damaged by somebody,
14   somebody else and you had to go back --
15   A.  That's the second entry.  The first entry where
16   the first time was involved was they painted the floor
17   in the area we were working after our lunch or
18   whatever and we had to move everybody out of there.
19   Pretty tough to work on a wet painted floor.
20   Q.  And they painted it, you were in there the same
21   day, and then they painted it at lunchtime?
22   A.  I have no -- I'm just conjecturing, sir.  I'm
23   telling you what's on the paper.  They -- it was like
24   gypsies.  No rhyme or reason.  No advance notice.

Page 112

1    Nothing done professionally.  This was the biggest
2    fiasco I've ever been involved in in 21 years.  And
3    you're representing the client.  Who orchestrated the
4    whole mess?
5    Q.  Okay, could you look at 5468.
6    A.  Got it.
7    Q.  Now there you have a note, "eight straight
8    time, two overtime," is this just a note of how many
9    hours were spent on the job that day?
10   A.  Yes.
11   Q.  Okay.
12   A.  And these are lifts.  This is a list of the
13   lifts that were left on site.  We had a problem with
14   people stealing each other's lifts.  So I had to use
15   the serial numbers and verify the lifts that we were
16   actually renting at the time.
17   Q.  All right.  Page 5476.  This is July 8th.  It's
18   a rather long note that goes over to the next page.
19   A.  5474?
20   Q.  76 and 77.
21   A.  Okay.  Oh, yeah.  This is the good one.  This
22   is when the stuff really hit the fan.
23   Q.  And this Tom Keene, he's with Tishman; is that
24   correct?

Page 113

1    A.  Um-hum.
2    Q.  And according to your note, he instructed a
3    laborer to throw out 7,000 feet of your --
4    A.  Um-hum.
5    Q.  -- strut materials?
6    A.  That is correct.  On overtime, no less.  That
7    was banded up sitting next to the loading dock waiting
8    for Strut Services to pick it up.  He cut the bands
9    and threw it into the trash.  That was 20 or $30,000
10   worth of uni-strut.  Thrown in the garbage just for a
11   spiteful vindictiveness.
12   Q.  Do you know who did that?
13   A.  It's right in the book.
14   Q.  Is Mr. Keene actually the one who did it?
15   A.  He is the one that directed the laborers to do
16   it.  They worked for him directly.  They did it on
17   overtime.  Overtime.
18   Q.  And somebody retrieve that material?
19   A.  My men.  If you look three or four pages later,
20   my men had to go in there and pull it out.  I almost
21   lost my job that day because I wanted to beat the piss
22   out of the guy that threw it in the Dumpster.  But I
23   kept myself from losing my cool, went out there, had
24   my men retrieve it, and most -- a lot of it was bent,

Creedon Controls, Inc.                                                    Banc One Building Corporation
John B. Mulrooney                        C.A. # 05-CV-300-JJF                              June 26, 2006

Page 114

1  warped and destroyed so it could not be returned to
2  the manufacturer so we ate that also. We ate it and
3  steel, as I informed you earlier, steel had went
4  through the roof.
5        China is building the biggest dam on the
6  face of the earth and they have bought up all the
7  scrap steel in the world. The price of steel has
8  jumped 10 times its normal rate. Ten times in the
9  last year, or last, since 2004. And it's currently
10  holding that same value.
11    Q. Well, do you know if Creedon presented a claim
12  to Tishman to pay for the material that --
13    A. I have no knowledge of that, sir. My job is
14  specifically to push the men and to run the job. I am
15  not involved any way, shape or form in billing or
16  anything to do with billing.
17    Q. Okay. And then you, on that same day, July
18  8th, you wrote a second note a short time later. It
19  says "8:53 a.m." Do you see that on page 5477?
20    A. Yes.
21    Q. What led you to write a second note? Did you
22  talk with somebody about the issue or what --
23    A. By that time I had calmed down. As I said, I
24  was getting ready to get physical with this guy that

Page 115

1  did it. After further thought I realized that the job
2  impact goes much further than two or three levels of
3  scope. These transgressions have cost Creedon Control
4  at least $10,000. This is a casual observation. I'm
5  sure it will create a domino effect snowballing into
6  50 or so grand.
7        Strut Services was contracted to pick up
8  the material the very next business day. This gives
9  the appearance of a conspiracy to defraud.
10    Q. Okay.
11    A. Rambles of a pissed-off man.
12    Q. Let me make sure I understand this. Somebody
13  was coming to pick up the material because it was
14  extra material?
15    A. Yes, sir.
16    Q. All right. And who's involved in this
17  conspiracy to defraud? What do you mean by that?
18    A. That was the rambles of a man that was so mad,
19  I was thinking about getting physical. But I can tell
20  you right now, this has been a tirade, this has been a
21  natural progression as you have seen as we have gone
22  over these documents, systematically one after
23  another, mostly on a daily basis, of placing hurdles
24  and undermining our effort to complete our job in a

Page 116

1  timely fashion.
2    Q. And did Strut Services ever pick up any of the
3  material?
4    A. Yes, what was left that wasn't destroyed. Once
5  it was -- once they broke that seal, it was, it could
6  have been picked up in two seconds. It was out away
7  from everything by the loading dock carrier. This was
8  strictly a spiteful, vindictive act. And it was
9  typical of what transpired on this job from beginning
10  to end.
11    Q. Did these acts occur against other contractors?
12    A. No. Only Creedon Controls seemed to be singled
13  out for the special treatment that we got.
14    Q. Okay, could you turn to page 5488, 5489. Now
15  toward the bottom -- I'll wait till you get there,
16  sorry. Toward the bottom you have a note that at
17  approximately 11:55 a.m. --
18    A. The lunchtime fiasco. This is when -- the
19  first one they mugged us on overtime. This time they
20  mugged us right after lunch to eat lunch.
21    Q. And here you're saying that Bob --
22    A. Alloca, whatever his name, I have no idea.
23    Q. Okay. And he was with Tishman, instructed
24  somebody to do what, throw material out?

Page 117

1    A. Laborers. All of our stuff.
2    Q. Okay. Did they actually throw it out?
3    A. Oh, yeah.
4    Q. Okay. Did Creedon get any of that material
5  back?
6    A. Oh, yeah, we went Dumpster diving on our time.
7    Q. The next page, 5489 -- well, strike that. Let
8  me go back to the prior page.
9        At the bottom it says, "Tishman never
10  contacted Creedon Controls verbally or in writing to
11  request," can you read that?
12    A. "To request this move. I, John B. Mulrooney,
13  was forced to stop all electric work in order to start
14  the process of moving all tools, material,
15  workbenches, lights, et cetera, out of building. This
16  has caused a severe shortage of manpower, forcing me
17  to stop all work on contract No. 2357. The job is 95
18  percent complete and I estimate this will -- this
19  unforeseen hurdle placed in our way was premeditated.
20  This is the third such occurrence within the past five
21  weeks. Other contractors are working in the data
22  center B and were not disturbed in any way, shape or
23  form, Superior Electric Service and Furness Electric
24  to name two. A foreman and three journeymen wiremen

30 (Pages 114 to 117)

Creedon Controls, Inc.                                         Banc One Building Corporation
John B. Mulrooney                  v.                                        June 26, 2006
                            C.A. # 05-CV-300-JJF

Page 118

1  had to stay overtime to continue the move. Charlie
2  Oliver, Jeff Prague, Bobby Harris, and Paul Lochner."
3    Q.  Now on that page, what you just read, are you
4  saying that Creedon had to move its material again?
5  Is that the point of this?
6    A.  Yeah.
7    Q.  All right.
8    A.  Everything, not just material, everything, out
9  of a location where there were other companies in the
10  same location. Singled out for persecution, is what
11  I'm saying, and that's on the paper. Singled out for
12  persecution, period.
13    Q.  And they were told to move the material by
14  Mr. Alloca?
15    A.  Lock, stock and barrel. Five minutes' notice.
16    Q.  Who gave you the notice?
17    A.  Is it written on the paper? Let's look. That
18  was Tishman. I didn't write down. Tishman ordered
19  the laborers specifically. The laborers were
20  specifically contracted directly through Tishman.
21  They were the ones that perpetrated the misdeed, they
22  were under orders.
23    Q.  All right. After July 19th did you go back to
24  work at all at the Banc One facility on Governor

Page 119

1  Printz?
2    A.  Not for Creedon Controls.
3    Q.  For anybody else?
4    A.  I went back there I believe for two weeks
5  before Christmas for Furness Electric. It might have
6  been -- for a few months, as a matter of fact, it was.
7  I think it was in October or something. I made it
8  till Christmas.
9    Q.  And that's October through December 2004?
10    A.  Um-hum.
11    Q.  And what type of work were you doing then?
12    A.  At that point we were installing the batteries
13  in the battery room and mopping up the details as far
14  as the UPS service and everything.
15    Q.  Did you have any involvement for Creedon in the
16  cable tray or cable conveyance contracts that they
17  got?
18    A.  Yes.
19    Q.  Did you have involvement in both cable tray
20  contracts or just one?
21    A.  At that point in time, I believe I was general
22  foreman.
23    Q.  So as general foreman you would oversee any
24  contract that Creedon had on the site. Is that right?

Page 120

1    A.  You got it.
2    Q.  And did -- if you made any notes regarding
3  those two contracts, they would be in your logbook?
4    A.  No. I assigned -- there was a specific foreman
5  assigned to that project. That was Jimmy King, and
6  the night shift foreman, Freddy Street, that was
7  basically their baby. That was a minor, minor project
8  compared to what I was doing. You only have so much
9  capacity.
10    Q.  Were you -- if you were general foreman, would
11  you have the obligation to oversee those projects
12  also?
13    A.  No, no, no, you delegate authority. You
14  delegate to people that are responsible and that can
15  handle the mission. That's what you do. If you think
16  that you could oversee a $300 million job and have,
17  touch every I and dot -- it's impossible. You have to
18  have people you trust in your chain of command that
19  you delegate that authority to and you wash your hands
20  of it. You check on them periodically, but other than
21  that, that's it.
22         And that's the way it was with that. That
23  conveyance was "pffft," that was a joke. That was a
24  baby little nibble in the whole big job. That was

Page 121

1  nothing.
2    Q.  And so as general foreman, though, for Creedon,
3  if they had projects relating --
4    A.  Got it.
5    Q.  As general foreman for Creedon, if they had
6  projects relating to general power and lighting and
7  cable tray conveyance work, you would be the person
8  responsible for all their project?
9    A.  No.
10    Q.  Would they have more than one general foreman
11  on the site?
12    A.  No.
13    Q.  Okay. So what you're saying is --
14    A.  You delegate authority. I will reiterate
15  again. You're not getting it. You delegate
16  authority. Project -- we had 1,000 projects going on
17  simultaneously. If you think that I could keep my
18  thumb on a thousand projects at a time, I'm not that
19  good. I'm good, but I'm not that good. I delegated
20  authority.
21    Q.  To a foreman?
22    A.  Jimmy King and Freddy Street.
23    Q.  And so as general foreman, you have no
24  responsibility for those things once you send a

B-0604

31 (Pages 118 to 121)

Page 122

1  foreman out to do it? Is that what you're saying?
2    A.  Exactly. It was cable tray. You don't -- you
3  don't understand this business, obviously. Cable tray
4  is a joke. It's a joke. You cut it, throw it up,
5  bam, boom. It's the easy way out.
6    Q.  How about the general power and lighting, would
7  it --
8    A.  That was my baby. That was the hard stuff.
9  And the wiring detail and making sure everything
10  worked. The UPS system, emergency lighting, things
11  that will shut a job down, that was my baby. That was
12  enough headaches for me to handle at that point in
13  time. The conveyance system of the cable tray was
14  baby work. Simply baby work.
15         MR. BRADLEY:  Unfortunately, we have to
16  end the deposition there, subject to what I said
17  before. Thank you, sir.
18         THE WITNESS:  Oh, no problem.
19         MS. WARREN:  Can I just ask a couple
20  questions?
21         MR. BESTE:  Yes.
22         MS. WARREN:  Just in case you don't choose
23  to call him back?
24         MR. BRADLEY:  Sure.

Page 123

1         MS. WARREN:  I'd like to.
2         MR. BRADLEY:  I've got to get to this bank
3  deposition.
4         MR. BESTE:  They'll wait for you.
5         MR. BRADLEY:  They are?
6         MR. BESTE:  I assume because you're going
7  to be there too, right?
8         THE REPORTER:  Yes.
9         MR. BRADLEY:  Go ahead, I didn't realize
10  it.
11         THE WITNESS:  Fire away. You've been so
12  quiet too.
13  BY MS. WARREN:
14    Q.  Well, my name is Melissa Warren, we introduced
15  ourselves earlier. Hopefully I'll be very brief
16  today.
17         I just have a couple questions for you
18  related to when you gave Miss Creedon your logbook for
19  photocopying. Were you involved in any other way in
20  helping to provide documentation for what you've
21  described as what we're here for today, the claim, the
22  lawsuit that --
23    A.  No.
24    Q.  -- the purported problems on site?

Page 124

1    A.  No. My, my job as a foreman and a general
2  foreman is to document everything that transpires in
3  the course of the workday and to document everything
4  to the best of my ability, whether -- I'd tell you,
5  looking back at this, there was many places where I
6  should have documented more. But I never knew that
7  this animal would grow to be this large and that this
8  problem would, you know, I've never encountered this
9  in 21 years of what we went through on this job,
10  never, ever. Never.
11    Q.  So there's no other documentation that you were
12  involved in preparing?
13    A.  No, none whatsoever. The only thing, I'll go
14  home and I'll see, I thought I had it where I filed
15  in, just some looseleaf, but it can't be important or
16  I'd have -- I already had it here. So those days must
17  have went by and when I went on vacation, you know, I
18  wasn't -- what, keep a logbook? Having fun in the
19  sun. You know.
20    Q.  Okay. So just to be completely clear, you were
21  not involved in, for example, trying to figure out
22  exactly how many hours were lost attributable to any
23  one particular problem on the site?
24    A.  Nope. The only thing I did was right here.

Page 125

1  Everything you see in this notebook is what I did. I
2  kept a running track. There was no going back, but my
3  problem was I had a bunch of thieving foremen that
4  stole my pens. So I had like five or six pens and
5  that's the way it was.
6    Q.  Okay. Did you discuss with Mr. Link at any
7  point approximately, you know, how many hours you
8  thought had been lost --
9    A.  No.
10    Q.  -- how much --
11    A.  No, never, never, I never have entered into any
12  discussion encompassing this whole affair. My little
13  part of it is right here in this book. I'm not privy
14  to that information. I don't want to be privy to that
15  information. That's not my job. My job is to run the
16  men and bring the job home and make money for the
17  contractor and make money for my men. That's my job.
18    Q.  Okay. Well earlier, very close to the
19  beginning of this deposition when you were talking
20  about having the conversation last night before the
21  deposition, you mentioned having found a couple of
22  things in your logs that had not already been, that
23  claims had not already been made for; is that correct?
24    A.  Right, well -- right. That's not the question

32 (Pages 122 to 125)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a     )
Delaware corporation,         )
                              )
            Plaintiff,        )
                              ) Civil Action
      v.                      ) No. 05-CV-300-JJF
                              )
BANC ONE BUILDING             )
CORPORATION, an Illinois      )
corporation, and FOREST       )
ELECTRIC CORPORATION, a New   )
York corporation,            )
                              )
            Defendant.        )

        Videotape deposition of CHARLES DOBLE,
taken pursuant to notice at the law offices of Ashby &
Geddes, P.A., 222 Delaware Avenue, 17th Floor,
Wilmington, Delaware, beginning at 9:36 a.m., on
Friday, May 26, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

        ROBERT K. BESTE, JR., ESQUIRE
        COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
          1007 Orange Street, Suite 1130
          Wilmington, Delaware  19801
          On behalf of Plaintiff

        MELISSA G. WARREN, ESQUIRE
        PAUL, HASTINGS, JANOFSKY & WALKER LLP
          875 15th Street, NW
          Washington, D.C.  20005
          On behalf of Defendant Banc One Building
          Corporation

        WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com

**B-0606**

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                    May 26, 2006

Page 22

1  Q. Okay, you can put that one aside for a minute.
2  And I'd like to show you what was marked as Creedon 6.
3  And does that constitute the bid that Creedon
4  eventually submitted?
5      MR. BESTE: Do you have another copy? I
6  don't believe I have that one.
7      (Creedon Exhibit No. 78 was marked for
8  identification.)
9  **A. It looks like the three pages of the bid form.**
10 **It would have had a cover letter with it.**
11 Q. All right. And the price on that is
12 approximately 3.152? I don't have it in front of me.
13 **A. Yes, 3 million 152.**
14 Q. And it was later changed to 3.184; is that
15 correct? Or you don't recall?
16 **A. Yeah, it went back and forth a couple times.**
17 Q. Okay. Do you know what caused that
18 back-and-forth?
19 **A. My recollection is it was about $30,000 in**
20 **bonding cost that was in and then out and then in and**
21 **then out again. It bounced in and out a couple times.**
22 Q. All right. And was that for payment or
23 performance bond?
24 **A. That was, that was cost that was for**

Page 23

1  **performance and payment bond, yeah.**
2  Q. And did Creedon ever get the payment or
3  performance bond?
4  **A. They did not, which is why that was going in**
5  **and out.**
6  Q. All right. I want to hand you Exhibit 78 so we
7  have a clear record. This is a letter from you to
8  Forest dated September 9, 2003 attaching an e-mail.
9  And I want to know if this, if this constitutes the
10 questions you asked in response to the initial bid?
11 **A. No, this would have been the cover letter that**
12 **went with the original bid before the scope review,**
13 **not the best and final.**
14 Q. Okay. And my question: Does that letter and
15 e-mail attached constitute the questions that you had
16 asked in response to the initial bid?
17 **A. Correct.**
18 Q. Can you go back to Exhibit 77, the bid file, on
19 page 3521 again, please. And at the -- I just want to
20 find out if I'm correct. Is the total estimated hours
21 the 24,365 hours you have on that page near the
22 bottom?
23 **A. It appears that it is, yes.**
24 Q. Just trying to get an understanding of this.

Page 24

1  Can you look at page 3517. Now, on that page in the
2  last column, you have labor hours and you have 25,392.
3  **A. Um-hum.**
4  Q. Is that the right number? I'm trying to find
5  out what number you actually used to estimate the job.
6  **A. No, it would have been the 23,620.**
7  Q. Okay.
8  **A. Would have been the final hours that I used.**
9  Q. All right. And what's the -- it references a 3
10 percent discount. What's that mean?
11 **A. That's -- I took a 3 percent discount on the**
12 **material cost.**
13 Q. Is that "linear foot"?
14 **A. "Labor factor."**
15 Q. "Labor factor." And what does that mean?
16 **A. That means that when I was, calculated the**
17 **final hours of 25,392, I used a labor factor of**
18 **point 93, which was a 7 percent discount on the total**
19 **number of hours required to do the job.**
20 Q. And that was a discount that Creedon decided to
21 put into its estimate?
22 **A. Correct.**
23 Q. That's not something that was required by
24 Forest?

Page 25

1  **A. Correct.**
2  Q. And did you have any meetings relating to the
3  bid, any prebid meetings?
4  **A. No.**
5  Q. No, okay. And the bid submitted was a lump sum
6  bid?
7  **A. Yes.**
8  Q. And what does that mean?
9  **A. It means that it's a, based on the drawings and**
10 **specifications, that this is the lump sum that it will**
11 **cost to install that work.**
12 Q. And does that mean Creedon takes some risk if
13 the job doesn't come within that number?
14 **A. Yes.**
15 Q. Let's see, can you go to Exhibit 2, please.
16 That's the invitation to bid best and final. Can you
17 turn to page 4014. Is one of the things you had to do
18 is become familiar with the site?
19 **A. Yes.**
20 Q. And what did you do to become familiar with the
21 site?
22 **A. I went to it.**
23 Q. And when did you go to the site?
24 **A. During the bidding process. I don't know what**

**B-0607**

Wilcox & Fetzer, Ltd.                    's                    (302)655-0477

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Charles Doble                          C.A. # 05-CV-300-JJF                          May 26, 2006

Page 26

1  day it was or, but I would have gone, my recollection
2  is probably twice during that time.
3      Q.   And after you went to the site, what
4  understanding did you have of the job itself?  Did
5  reviewing the site conditions cause you to come to any
6  conclusions regarding the job and the bid you should
7  submit?
8      A.   That it was -- I guess the conclusion is that
9  it was a, it was a smaller site than the Bear site,
10  that it was going to be more difficult than the Bear
11  site would be; that space, parking and that kind of
12  stuff was going to be limited.
13      Q.   And when you say it was going to be more
14  difficult than the Bear site, what do you mean?
15      A.   That storage was going to be, storage trailers
16  were going to be limited, office trailers were going
17  to be limited, parking for your manpower was going to
18  be limited.
19      Q.   Be fair to say access to the site was limited?
20      A.   Yeah.  I would say yes.
21      Q.   On page -- could you turn to page 4015, please,
22  item No. 8.  It talks about providing daily reports to
23  Forest Electric.  Did you provide those daily reports?
24      A.   I did not, no.

Page 27

1      Q.   And did someone from Creedon provide those
2  daily reports?
3      A.   Yeah, my general foremen would have.
4      Q.   And do you know what form they took?
5      A.   I'm not sure I remember.  I believe it was a
6  form that Forest had, but I'm not, I'm not positive.
7      Q.   Item No. 9, it says "On a weekly basis provided
8  two-week look-ahead schedule to Forest."  Did Creedon
9  perform that?
10      A.   Early on in the project we did.  As the project
11  progressed it became impossible to do.
12      Q.   Did you produce all look-ahead schedules that
13  you actually did prepare in your document production?
14      A.   When I was reviewing Ed's paperwork, I saw like
15  one of each, and I believe there was more than that.
16  But they -- I don't know where they are.  Without you,
17  you know, going back and seeing if I could find them, I
18  would assume they should have been in the paperwork
19  somewhere.
20      Q.   When you say reviewed, I think you said
21  reviewed Ed's paperwork, what do you mean?
22      A.   The -- what are those called, Ed?  The
23  exhibits?
24      Q.   Oh, okay.  And you thought there were more

Page 28

1  but --
2      A.   I didn't see -- I saw one of each and that was
3  it.
4      Q.   Who would have prepared them?
5      A.   The general foremen would have prepared them.
6      Q.   And did you get copies of them?
7      A.   My recollection is yes.
8      Q.   And did you retain copies in your files?
9      A.   I would have -- I would think I did, yes.
10      Q.   And would you have received them by e-mail or
11  in the hard copy?
12      A.   No, probably in hard copy.
13      Q.   And do you know where those documents are
14  today?
15      A.   I do not, no.
16      Q.   Item No. 17, you were aware of that condition?
17      A.   I was.
18      Q.   And what does that condition mean to you?
19      A.   Normally in a project there would be
20  coordination drawings, coordination meetings where
21  each layer of subcontractor marks up where their
22  installation is going to go, and the succeeding
23  contractor overlays so that every contractor knows
24  where, for example, ductwork or piping or that kind of

Page 29

1  stuff is going to go.
2      Q.   And that condition tells you to provide
3  sufficient time to coordinate the layout with the
4  other trades and other electrical contractors?
5      A.   Um-hum.
6      Q.   Is that correct?
7      A.   It is.
8      Q.   Could you turn to 4035.  And these are the
9  general conditions that were issued with this
10  invitation to bid, correct?
11      A.   It appears that they are, yes.
12      Q.   And under item No. 11, the condition advised
13  you that you might have to leave openings in work or
14  mid-portions of work in order for other trades to
15  perform their work; is that correct?
16      A.   I'm sorry, I was reading that.  I forget what
17  your question was.
18      Q.   That tells you that you may, Creedon might
19  begin work in one area and have to move to another
20  area so that another trade could perform work; is that
21  correct?
22      A.   Correct.
23      Q.   And it also tells you that you should include
24  in your contract price some allowance for that

**B-0608**

8 (Pages 26 to 29)

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                    May 26, 2006

Page 30

1  occurrence; is that correct?
2  A. That is correct. And I would, you know,
3  normally expect that that happens on, on every
4  project. Not to the degree that it happened on this
5  one, but that's not unusual to see that in
6  specifications.
7  Q. And by putting it in the general conditions,
8  they called that to your attention, didn't they?
9  A. Yes. And that would be pretty standard for a
10  project like this.
11  Q. Item No. 14. That provides that the contractor
12  has to provide protection necessary to safeguard its
13  own work from damage; is that correct?
14  A. From its own operations, yeah.
15  Q. And you understood that going into it?
16  A. Yes.
17  Q. No. 17 requires daily reports to Forest. Is
18  that -- are those the reports you referred to earlier
19  that you thought the general foremen did?
20  A. Yes.
21  Q. No. 19 advised contractors that there might be
22  areas of special coordination concerning dust control,
23  traffic congestion, building access, material
24  delivery, et cetera; is that correct?

Page 31

1  A. Yes, that would be correct. And that, again,
2  is pretty standard in most, most projects.
3  Q. And they called it to attention in the general
4  conditions here; is that correct?
5  A. Yeah, most, most general conditions will call
6  that, yes.
7  MR. BRADLEY: And we need to replace the
8  tape, so we'll break for a minute.
9  THE VIDEOGRAPHER: Going off the record at
10  approximately 10:31 a.m.
11  (A brief recess was taken.)
12  THE VIDEOGRAPHER: We're back on the
13  record at approximately 10:36 a.m.
14  BY MR. BRADLEY:
15  Q. Mr. Doble, could you look at page 4038, item
16  No. 6. That item advises the contractor that the work
17  may not be continuous and they may be required to work
18  out of sequence; is that correct?
19  A. That is correct.
20  Q. And it also says there shall be no charges for
21  comeback time or out-of-sequence work, correct?
22  A. That is correct.
23  (Creedon Exhibit No. 79 was marked for
24  identification.)

Page 32

1  Q. Mr. Doble, Exhibit 79 is part of the
2  specifications from the job; is that correct?
3  A. I would assume it is. It looks like it's the
4  right project number, so...
5  Q. And these were produced from Creedon's files,
6  and we have Bates Nos. 343, 344, 347 and 348. Can you
7  look at page 348. Section 1.8 talks about expediting
8  the work and Section B tells you that any
9  discrepancies or interferences shall be reported
10  immediately to the owner. Is that correct?
11  A. Correct.
12  Q. And did you understand that to mean that if
13  your work was interfered with, you had an obligation
14  to report to the owner?
15  A. Yes.
16  Q. And you were aware of that prior to the time
17  you started work?
18  A. I would have been aware of that when I read the
19  specifications during the bidding process, yes.
20  Q. And they were obviously available before you
21  submitted your bid, correct?
22  A. Yes.
23  Q. You can put that one aside.
24  Mr. Doble, once the job began, that was in

Page 33

1  early October 2003? Is that your recollection?
2  A. Correct, yes.
3  Q. What was your duties? Were you in Creedon's
4  offices or were you on site? Give me some idea.
5  A. In the beginning of the job I was working in
6  Creedon's office. Once we got a trailer on site, I
7  had three people on site doing layout and design. I
8  was going through submittals, preparation, negotiating
9  material pricing and that kind of stuff. So I found
10  it a lot easier to work out of the office than it was
11  to work in a small trailer with three people already
12  in it.
13  Q. Who were the three people that were on site?
14  A. Would have been Rob Sharp, Paul Brainard, and
15  Fred Street.
16  Q. At some point did you go on site on a daily
17  basis or stay on site for the duration of the project?
18  A. I went on site, my recollection is late
19  December, early January as the job started to gear up.
20  Q. And when you say you went on site, do you mean
21  you were there every day?
22  A. Yes.
23  Q. Did you -- were you there eight hours a day
24  or --

B-0609

9 (Pages 30 to 33)

Wilcox & Fetzer, Ltd.                                    (302)655-0477

Creedon Controls, Inc.                                          Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                        May 26, 2006

Page 34

```
 1   A. No.
 2   Q. -- did you just visit and --
 3   A. I would say generally I was there from 7 in the
 4   morning till 7 at night.
 5   Q. Five days a week?
 6   A. No. At least six. Usually I was in on Sundays
 7   trying to get ready for the next week.
 8   Q. And that started in late December, early
 9   January?
10   A. Yeah.
11   Q. Were you ever, ever told by Forest or someone
12   that you needed to be on site?
13   A. Not to my recollection, no.
14   Q. During the course of the Banc One job, say from
15   October '03 to October '04, just to use that one-year
16   period, were you project manager or estimator for any
17   other jobs for Creedon?
18   A. In October of '03, maybe for the first month as
19   I was transitioning into that project and divesting
20   myself of some of the projects I had, there was some
21   involvement on ongoing projects until the other
22   project managers took them over from me. By October
23   of '04 I -- as best I can remember, I would have been
24   wrapping up the Forest project and starting to bid
```

Page 35

```
 1   other projects.
 2        So in the beginning and the end I would
 3   have -- I was pretty much -- I had my hands full with
 4   Forest between change orders and the project and
 5   stuff. So I was pretty much, with the exception of
 6   divesting myself in the beginning and starting to look
 7   for additional work towards the end, I would have been
 8   only working on Forest.
 9   Q. Okay. Let me ask it this way. From, say,
10   December of '03 until about August of '03, was your,
11   were you responsible at Creedon for any other project
12   in any way, other than Banc One?
13   A. Not that I can recall, no.
14   Q. I'm going to hand you what was marked as
15   Creedon 11. I assume that you saw this document back
16   in October '03?
17   A. Yeah, I would say I -- yes.
18   Q. Did you have any discussions with Pat Creedon
19   about the October 2, 2003 letter and the enclosed
20   subcontract?
21   A. I would say we probably had discussions. I
22   don't remember a specific discussion or anything, but,
23   you know, I would assume we were pretty happy when the
24   letter of intent came in. So I would, you know, I
```

Page 36

```
 1   would say yeah, we probably had discussions about it.
 2   Q. Do you remember any discussions relating to the
 3   subcontract agreement that was enclosed with the
 4   letter of intent?
 5   A. Not really. I didn't get -- I rarely got
 6   involved in, in the language of the subcontracts. Pat
 7   reviewed them and did all that.
 8   Q. Did you have any conversations with her about
 9   the subcontract at that time?
10   A. Not that I recall right now. Nothing is
11   popping out in my mind, my memory.
12   Q. And you -- make sure I understand you
13   correctly. You don't recall reviewing the terms of
14   the subcontract agreement back in October 2003?
15   A. I don't remember reviewing it. I probably
16   would have. I just don't remember having done it.
17   Q. Do you recall any conversation with Ms. Creedon
18   prior to the time she signed the letter of intent
19   regarding her understanding of the letter of intent
20   and the subcontract agreement that was enclosed?
21   A. Can you repeat that one? I'm sorry, I was kind
22   of, I was kind of drifting.
23   Q. I'll bypass that question.
24        Looking on the letter itself, does the, in
```

Page 37

```
 1   the second paragraph, does the letter state that the
 2   subcontractor agrees to be bound to the terms and
 3   conditions of the subcontract agreement as attached
 4   hereto as Exhibit 1?
 5   A. Yes, it does say that.
 6   Q. And was it your understanding at the time that
 7   Creedon would be bound by the terms and conditions of
 8   the subcontract agreement that was enclosed?
 9        MR. BESTE: Let me object to that
10   question. You're asking him to interpret this letter,
11   which I think he's already testified that he wasn't
12   involved in. So if you're asking him to guess what it
13   means today, I would object to that. He said he
14   didn't have involvement in it.
15   Q. Mr. Doble, I'm not asking you to questions or
16   speculate.
17   A. Okay.
18   Q. We never do that. What I asked you was, was it
19   your understanding at the time that Creedon would be
20   bound to the terms and conditions of the subcontract
21   agreement that was enclosed with the letter of intent?
22   A. No. It has been my experience that Pat usually
23   will go through a contract and mark it up with areas
24   that she does not agree with legal language or
```

Wilcox & Fetzer, Ltd.                                              (302)655-0477