Creedon Controls, Inc.                    v.              Banc One Building Corporation
Charles Doble                     C.A. # 05-CV-300-JJF                      May 26, 2006

Page 42

1  Q. Did you use the same trade people?
2  A. Yes. And we basically bounced them from one
3  project to the other as we needed manpower. So there
4  were several, several guys that went off for short
5  periods of time as foremen, I just can't remember
6  their names off the top of my head. Particularly when
7  the two cable trade jobs were going on, we kind of
8  expanded up, and so there was a few more foremen at
9  that point in time. I can't believe I can't remember
10 their names, I worked with them for 30 years. But I'm
11 a little nervous here this morning. Five minutes from
12 now it will pop in.
13 Q. That's all right.
14     If you used the same foremen and general
15 foremen, how would you account for their time at
16 different intervals at Creedon?
17 A. Each three projects were, were set up
18 separately. So they would have been given a project
19 number -- excuse me -- and material would have been
20 purchased and labor would have been assigned to
21 whatever particular project they were working on. For
22 Creedon was 2357, 67 and 77 were the three projects.
23 Q. Right. But if you have the general foremen and
24 foremen working all those projects at different

Page 43

1  periods of time, how did you account for their time?
2  A. Well, the foremen wouldn't have been working --
3  the foremen would have bounced back and forth but they
4  wouldn't have -- wouldn't have been working both
5  at the same time.
6      For example, John Mulrooney was a foreman
7  on the lighting job, and I don't think he worked at
8  all on the cable trade job. The -- so the only ones
9  that would have been working on both simultaneously
10 would have been the, would have been the general
11 foremen. And they would have allocated their time.
12 Q. How did they do that?
13 A. They would do it when their, on their daily
14 time sheets based on whichever one of the projects
15 they spent the most time on that day.
16 Q. So they wouldn't separate their day by
17 different projects?
18 A. Yeah, they would.
19 Q. Okay. So if you look at their daily time, they
20 would write in different project numbers for the
21 amount of time they spent on that project that day?
22 A. Correct.
23 Q. And did Creedon have any other contracts at
24 Banc One?

Page 44

1  A. No.
2  Q. Did you have any contracts at, at the other
3  data center being built in Bear?
4  A. Yes.
5  Q. What did you have?
6  A. You know what, I'm mistaken. We had -- it was
7  at both sites. It was, Mark Buckson was the project
8  manager on it. He was a subcontractor to, I think he
9  was doing energy management cabling for some -- to
10 tell you, I don't remember. I know that he had a
11 small package on both sites as a subcontractor.
12 Q. And did they use different general foremen for
13 that or the same?
14 A. It wasn't even big enough to have a general
15 foreman. I think it was, he came in with one of his
16 foreman and one or two men and he was -- I'm -- as
17 best I can remember, he was on site for a couple weeks
18 and out. It wasn't a large amount of work. Other
19 than, you know, general awareness that he had a couple
20 guys on my site for a short period of time, didn't
21 know a whole lot about it.
22 Q. How was -- I'm trying to get a sense of the
23 meetings that were held while the job was in progress.
24 Were there meetings with Forest, Tishman? Were they

Page 45

1  weekly, daily? Do you recall any of that?
2  A. Yeah. My recollection is I had almost no
3  meeting contact with Tishman until late in the project
4  when they started to do punch list meetings. I'm
5  going to guess that would have been maybe late April
6  of '04 or early May they started. But up until that
7  point in time, the meetings that, were basically with
8  Forest. And then I had the impression that Forest had
9  meetings with their subs and they were meeting with
10 Tishman. So I wasn't aware of any of the
11 subcontractors that were going to meetings with, with
12 Tishman.
13 Q. Okay, so you're saying that Forest -- your
14 understanding was Forest would meet with Tishman, and
15 then Forest would meet with the --
16 A. Subs.
17 Q. -- other contractors?
18 A. Yeah.
19 Q. Okay, and how often did those meetings take
20 place during the course of the job?
21 A. The meetings with the subs?
22 Q. Yeah. Between Forest and the subs.
23 A. There were daily meetings every morning that
24 were about a half hour, 45 minutes that would include

**B-0611**

Creedon Controls, Inc.                v.                Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                May 26, 2006

Page 46

1  the mechanical and electrical subs. There were times
2  when there would be a Tishman representative at those
3  meetings; sometimes they were, sometimes they weren't.
4       There was, in the beginning of the
5  project, there was weekly coordination meetings with
6  just the, just the electrical contractors. And my
7  recollection is that they ran maybe through March.
8     Q.  And that's the weekly meetings?
9     A.  That was the weekly meetings. And then my
10 recollection is there was about a month -- Lenny Beck
11 was running those meetings, and my recollection is
12 there was about a month when he got real involved in
13 the startup for those meetings, kind of fell apart and
14 didn't happen for about a month, and then the Tishman
15 meetings with the punch list meetings kind of kicked
16 in.
17    Q.  Okay, let me back up for a minute.
18       First you had daily meetings with Forest
19 and the other subcontractors on the job; is that --
20    A.  Correct.
21    Q.  -- correct? And who attended those meetings
22 for Creedon?
23    A.  It would either be me or the general foreman or
24 both of us, depending on what was happening on site on

Page 47

1  a given day.
2     Q.  Did you keep any notes or meeting minutes from
3  them?
4     A.  I didn't keep like a log and keep minutes from
5  them, no. For the most part, it was -- those meetings
6  were covering what was happening today. So there
7  really wasn't a need to do that.
8     Q.  So they were meetings to tell everyone what was
9  going to happen on the project that particular day,
10 and you had them every day?
11    A.  Telling would be a, a generous way of putting
12 it.
13    Q.  Okay, tell me what the meetings were about.
14    A.  Well, most of the project managers would laugh
15 about the meetings after we got outside and then
16 would -- they were pretty helter-skelter. Usually you
17 found out what Forest wanted that morning. So it
18 involved, you know, a lot of scrambling after the
19 meeting was over to try and respond to what their,
20 their requests were.
21       My general perception was, and my
22 discussions with most of the other project managers on
23 site, was that there was somehow a breakdown. And it
24 never seemed like information that came from Tishman

Page 48

1  down got disseminated. I would get, you know, "You've
2  got to be done in 213 by tomorrow" at this morning's
3  meeting, you know, this was Wednesday's meeting. You
4  know, "You've got to be done by Friday." It's like
5  did you just find out this room was going to be done
6  today? You didn't know it last week or -- it always
7  seemed like whatever was -- whatever was transpiring,
8  there was like this level from subcontractor to Forest
9  to Tishman, and there was this kind of vacuum that
10 went on with a lot of information.
11    Q.  And you weren't, you weren't involved in the
12 meetings between Tishman and Forest?
13    A.  Correct.
14    Q.  Who, who ran the daily meetings from Forest?
15    A.  Usually Len Beck.
16    Q.  And did you -- neither you or your general
17 foreman kept any notes or meeting minutes, things like
18 that from the daily meetings?
19    A.  Not that, not that I saw when we went through
20 it, no.
21    Q.  And you talked about weekly meetings, and they
22 were for coordination purposes?
23    A.  Um-hum.
24    Q.  And did Mr. Beck also handle those meetings for

Page 49

1  Forest?
2     A.  Yes.
3     Q.  And who went to those meetings from Creedon?
4     A.  Again, it depended on who was on site, who was
5  available. It would either be the general foreman or
6  myself.
7     Q.  And those meetings were -- was that the
8  meetings just with the other electrical contractors?
9     A.  Yes.
10    Q.  And who were the other electrical contractors?
11    A.  It would have been Furness, Conti. Furness,
12 Conti was doing fire alarm, Creedon, Preferred at some
13 point in time would have shown up at them. I'm trying
14 to think, there was another contractor on site. I
15 can't remember who the other one was. Seems like me
16 there was usually -- there was five -- four in the
17 beginning and then five when Preferred starting
18 coming. I forget who the other one was, Superior
19 maybe? Superior Electric.
20    Q.  Have you, have you ever worked other projects
21 with that number of electrical contractors on site?
22    A.  Yes.
23    Q.  What jobs?
24    A.  Usually when there's that many it's been like a

B-0612

13 (Pages 46 to 49)

Creedon Controls, Inc.                              v.                    Banc One Building Corporation
Charles Doble                              C.A. # 05-CV-300-JJF                              May 26, 2006

Page 50

1  General Motors shutdown, a Chrysler shutdown.
2  Q.  And there's a, lead electrical contractor or
3  something of that nature and others --
4  A.  Yeah.
5  Q.  -- did parts of the job, is that --
6  A.  Well either a lead electrical or a prime
7  contractor.  But yeah, they're very fast-tracked, high
8  manpower type of projects.
9  Q.  Similar to this one?
10  A.  Probably faster than this.
11  Q.  On the weekly meetings did you keep any notes
12  or minutes?
13  A.  I did.  Again, I saw, going through the
14  exhibits, a couple of them and didn't see the other
15  ones.
16  Q.  Did you keep them routinely, meaning every time
17  you attended you kept notes?
18  A.  Yeah.
19  Q.  Do you know if the general foreman also did?
20  A.  He probably would, yeah.  Either would have
21  kept a note or would have kept it in his, in his daily
22  log, one or the other.
23  Q.  At some point during the course of the job, did
24  you realize that Creedon was going to exceed its

Page 51

1  estimated man-hours?
2  A.  Yes.
3  Q.  When did you realize that?
4  A.  My recollection is late February.  Late
5  February, early March.
6  Q.  And what did you do?
7  A.  Well, I went to Pat and told her that we looked
8  like we were getting in, getting in trouble.  Hours
9  were, were piling up and there was still work to be
10  done.  We weren't going to make the estimate.
11  Q.  And I believe she testified she learned that
12  around March 24th or 25th.  Is that consistent with
13  your recollection?
14  A.  I -- yeah, I would say that's probably -- if
15  she testified to that, that's probably accurate.
16  Q.  And what was her reaction?  What discussion did
17  you have with her about that?
18  A.  She wanted to know how bad was it, what was,
19  you know, what was involved, how did we get here, you
20  know, how much -- I think, my recollection is she was
21  more concerned about what was needed to, you know, how
22  many hours over, what was required to complete, more
23  than how we got there at that point in time.
24  Q.  Did you keep any notes from that meeting?

Page 52

1  A.  No, not that I -- that would have been a kind
2  of an informal -- no, I don't remember keeping any
3  notes of that.
4  Q.  Prior to that discussion with Pat Creedon, had
5  you spoken with anyone at Forest about that issue?
6  A.  No.
7  Q.  Anyone at Tishman, I assume not?
8  A.  No.
9  Q.  And at some point a Dennis Link became
10  involved?
11  A.  Yeah, I believe shortly after that Dennis
12  became involved.
13  Q.  And what's your understanding of what he was
14  supposed to do?  What was his function?
15  A.  Well, at that point in time we were at peak
16  manpower.  I had been working extended hours for
17  several months, and one of the things that we
18  discussed with Pat was that I needed some help up
19  there on the, on the site.  And she got Dennis
20  involved in coming up to give me a hand on site.
21          My recollection is in the beginning he was
22  there for maybe a day a week or two days a week and
23  ended up probably being there three or four days a
24  week.

Page 53

1  Q.  And how do you -- do you know how Miss Creedon
2  knew Dennis Link?
3  A.  I believe he was already working with her on
4  other related matters.  I had seen him in the office
5  and I knew that he had been around for, on occasion
6  for, I really don't know, six months, a year, I'd seen
7  him in, you know.  So I was familiar with him and she
8  was familiar with him.
9  Q.  Was he working on other projects for Creedon?
10  A.  I believe, I believe he was working on a
11  project assisting Danny Creedon.
12  Q.  Do you know what project that was?
13  A.  I believe it was Commerce Bank, but I'm not
14  sure.  I would -- I'm pretty sure it was.
15  Q.  What issue did Creedon have with the Commerce
16  Bank job?
17  A.  I believe there were overruns on the job and
18  they were trying to document what the costs were on
19  the, on the project.
20  Q.  And was that to present a claim against the
21  general contractor or the owner?
22  A.  I believe, I don't think they -- you know, I
23  wasn't real involved in that job.  But I don't think
24  they put a claim together.  I think they were trying

Wilcox & Fetzer, Ltd.                              P                              (302)655-0477

Creedon Controls, Inc.
Charles Doble

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
May 26, 2006

Page 54

1  to go back to the general contractor and negotiate
2  some assistance with the overrun.
3     Q.  What, in terms of a change order or --
4     A.  Yeah.
5     Q.  And did you at some point meet with Mr. Link?
6     A.  I had several meetings with Mr. Link, yes.
7  Like I said, he ended up being in the trailer for
8  several months.
9     Q.  Did you keep any notes from those meetings?
10    A.  Yes, I would say yes.
11       (Creedon Exhibit No. 80 was marked for
12  identification.)
13    Q.  Did you review those notes before today's
14  deposition?
15    A.  I went through the stuff that was in the
16  exhibits.  I saw some of them, yes.
17    Q.  Exhibit 80 is a March 31, 2004 letter from
18  Mr. Link to Pat Creedon.  It references a meeting in
19  Creedon's office with you on March 30th, 2004.  Is
20  that correct?
21    A.  I don't think I've ever seen this.  Can I look
22  at it for a minute?
23    Q.  Absolutely.
24       THE VIDEOGRAPHER:  Going off the record at

Page 55

1  approximately 11:25 a.m.
2       (Discussion held off the record.)
3     A.  Yes, I would say based on this letter, I met
4  with Dennis Link on March 30th.
5       THE VIDEOGRAPHER:  Back on the record
6  approximately 11:25 a.m.
7     A.  After reviewing this, I would say yes, that I
8  met with Dennis Link on March 30th.
9     Q.  Did you discuss with Mr. Link the subcontract
10  agreement?
11       MR. BESTE:  Could you tell us what
12  subcontract agreement you're referring to?
13       MR. BRADLEY:  I think you have it in front
14  of you, sir.
15    A.  This is Creedon 11?
16    Q.  Yes.  Did you discuss that subcontract
17  agreement with Mr. Link?
18       MR. BESTE:  On March 30th?  Is that your
19  question?
20       MR. BRADLEY:  Let's start with March 30th.
21       MR. BESTE:  Okay.
22    A.  I don't remember discussing the contract with
23  Dennis Link on March 30th.  I think, my recollection
24  is that we spent a fair amount of time discussing the

Page 56

1  project and bringing him up to speed with the project.
2  The reference to the contract, my guess is would have
3  been his, his discussions with Pat.  And I, and I
4  think I have seen this letter, now that I've read it,
5  but I just didn't remember it when you first handed it
6  to me.
7     Q.  All right.  And you don't recall any
8  discussions at all with Mr. Link about the subcontract
9  agreement.  Is that fair to say?
10    A.  At that time, no.  I've had conversations with
11  him since then.
12    Q.  Okay.  What conversations have you had with
13  Mr. Link since then about the subcontract agreement?
14    A.  Just conversations about what contract we were
15  working under, whether we were working under a
16  subcontract to Forest or we were working under a
17  subcontract to Banc One, or if we were -- my
18  understanding is that Pat had asked for a copy of
19  the -- there was reference in the, in the Forest
20  letter to language that wasn't included or something
21  and she had asked for that.  And then the whole thing
22  of Banc One, whether we have a contract with Banc One
23  or, or Forest, you know, has been discussed over and
24  over and over again.

Page 57

1     Q.  Do you have any notes from any of those
2  meetings?
3     A.  No.
4     Q.  Did Mr. -- did you have any discussions with
5  Mr. Link about what particular terms of the
6  subcontract agreement might affect any claim you would
7  later make?
8     A.  I'm not sure I even understand what you're
9  talking about there.  Can you kind of rephrase that
10  for me or find a --
11    Q.  Sure.  Did you have any discussion with
12  Mr. Link about the effect of the subcontract agreement
13  in any way?
14    A.  The effect of the subcontract -- not that I can
15  recall, no.
16    Q.  Did you have any discussion with him about
17  particular terms of the subcontract agreement?
18    A.  Not really, no.  Not that I recall.
19    Q.  Okay, could you turn to page 6549, please.
20  Mr. Link lists 16 items here.  Do these items appear
21  accurate to you?
22    A.  Yes.
23    Q.  And can you tell me -- let's look at item No.
24  1.  That talks about the sequence in which the areas

**B-0614**

15 (Pages 54 to 57)

Wilcox & Fetzer, Ltd.

(302)655-0477

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                    May 26, 2006

Page 58

1  were to become available for work versus the plan at
2  bid time.  What was the plan at bid time?
3    A.  There was a sequence where the project was
4  going to proceed, decks being poured, walls being
5  poured and that kind of stuff.  It was, I think it was
6  going by drawing areas, C, B, A, D, E, F -- no.  C, B,
7  A, G, F, D, A, and there were -- they ended up doing
8  the back half of the building in, in reverse.  They
9  ran into problems with the generator pads, for
10  example, were poured late, which slowed down areas.
11  The area B, when the equipment arrived for area B,
12  everything kind of stopped in area A, and that became
13  a priority that was not anticipated in the original
14  schedule, if I remember correctly.
15    Q.  What in the bid are you citing here to suggest
16  what the sequence was?  Is there a particular document
17  in the bid that says "Here is our sequence"?
18    A.  Yeah, there was scheduling and stuff that was
19  in the, in the general conditions.  I'd have to -- I
20  don't remember off the top of my head.  I have to go
21  back through the information to find them, but yes,
22  there was a general sequence that was discussed in
23  the -- during the bidding process.
24    Q.  Was that contained in exhibit, do you still

Page 59

1  have that in front of you?
2    A.  No, it wouldn't be contained, I don't think it
3  was -- well, I would say that Exhibit FE 004034 is
4  some of the information that I was talking about,
5  which is the schedule in the areas that they would be
6  working that was furnished by Forest.
7        But my recollection is that there was a, a
8  more, a more detailed schedule that was involved
9  besides this.  This was kind of -- in the general
10  conditions you got to remember, there was a couple set
11  of specifications and stuff too.
12        MR. BRADLEY:  Okay, we can go off the
13  record.
14        THE VIDEOGRAPHER:  Going off the record at
15  approximately 11:31 a.m.
16        (A brief recess was taken.)
17        THE VIDEOGRAPHER:  Back on the record at
18  approximately 11:41 a.m.
19  BY MR. BRADLEY:
20    Q.  Mr. Doble, you, before we broke, you referenced
21  some other parts of the general conditions, things
22  like that, and I wanted to make sure I was clear.  Are
23  you saying that there's another schedule other than
24  the one-page schedule you were looking at in Exhibit 2

Page 60

1  that was used as part of your bid?
2    A.  My recollection is that there was an entire
3  Primavera schedule that was part of the documents, and
4  that these general conditions were just showing the
5  portion of work that was part of this package.  But my
6  recollection is that there was a full schedule in the
7  documents.
8    Q.  In Exhibit No. -- what number are we on? -- 80,
9  it suggests that you have to go out and meet with
10  certain field project supervision and document all
11  these events that supposedly impacted the job.  Did
12  you do that?
13    A.  No, I did not do it.
14    Q.  Why not?
15    A.  In subsequent conversations, I said there was
16  no way that I had time to do that while I was still
17  trying to run the, run the project.
18    Q.  Okay.  So who did that --
19    A.  Dennis Link did that.
20    Q.  -- if anybody?  Mr. Link did that?
21    A.  Yes.
22    Q.  So Mr. Link is the one that went out and met
23  with the field project supervision and documented the
24  events that resulted in your critical events

Page 61

1  summaries?
2    A.  Correct.
3    Q.  Did you, did you take some part in preparation
4  of those materials?
5    A.  Yes.
6    Q.  But he took the lead?
7    A.  Yes.
8    Q.  Okay.  And now I want to show you Exhibit 37,
9  which was previously marked.  And that's a letter from
10  you to Mr. Angerame dated April 6, 2004; is that
11  correct?
12    A.  Correct.
13    Q.  And is this the first notification that you
14  gave Forest in writing of your belief that there is an
15  impact on the project, on your estimates and man-hours
16  because of impacts at the job?
17    A.  To the best of my recollection, yes, this is
18  when we gave them written notice.
19    Q.  And who prepared this letter?
20    A.  My recollection is that Dennis Link and I
21  prepared it together.
22    Q.  There's discussion in the first couple
23  paragraphs about the contract.  Did you prepare those
24  parts of it?

B-0615                                    16 (Pages 58 to 61)

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                    May 26, 2006

Page 62

1    A.  I don't believe -- I believe Dennis did that.
2    Q.  Okay, why don't you look at it and tell me what
3    parts you prepared.
4    A.  You may have to go off the record for a second
5    while I read this.
6        MR. BRADLEY:  Okay.
7        THE VIDEOGRAPHER:  Going off the record at
8    approximately 11:45 a.m.  Back on the record at
9    approximately 11:47 a.m.
10    A.  I guess my answer to your question is I don't
11    think there's like line item 1 I did and line item 2
12    Dennis did.  It would have been a compilation of me
13    kind of explaining what had been transpiring and then
14    the two of us kind of drafting it together, is my
15    recollection.
16    Q.  Okay.  In paragraph, the third paragraph it
17    starts "We conditionally acknowledged."  It references
18    that arrangement was contingent upon sufficient time
19    for our review of the documents, including the prime
20    contract, the subcontract, and a detailed schedule
21    among others.  Did you write that?
22    A.  I got to tell you the truth, I don't, I don't
23    remember.  I'm sure I'm the one that typed it.  It
24    doesn't look like my wording, so...

Page 63

1    Q.  Are you aware, can you show me, are you aware
2    of any documents that say that you conditionally
3    entered into the letter of intent pending a detailed
4    schedule, among other things?
5    A.  Can you repeat that one?
6    Q.  Sure.  Are you aware of any contingency for
7    Creedon to perform based upon receipt of a detailed
8    schedule, as this letter seems to suggest?
9    A.  I'm not sure I know the answer to that
10    question.  I would have expected a, you know, a
11    Primavera type of schedule that was in the original
12    documents to be continually upgraded.  So that may be
13    what that reference is to.
14    Q.  But my question is that here it says that
15    Creedon conditionally acknowledged its intent to enter
16    into an arrangement with Forest contingent upon
17    receiving a detailed schedule.  Is that, is that true,
18    according to what you know?
19    A.  I would say, I would say yes, it is.
20    Q.  And can you show me where that is stated
21    anywhere?
22    A.  I would have to go back through documentation
23    to see if I could find it.  But yeah, I think it's in
24    the documentation that there would be schedules

Page 64

1    submitted.
2    Q.  What, what documentation are you talking about?
3    A.  In the specifications and general conditions of
4    the bid package.
5    Q.  But that's not part of the letter of intent
6    that's dated October 2, 2003, is it, that you've
7    reviewed and have in front of you?
8    A.  Well, I would say that the second paragraph
9    where it says "Although the prime contract documents
10    have not been finalized," would be an indication that
11    Forest had not finished all the documentation,
12    including the scheduling that would have been with it.
13    Q.  Does it say anything about a schedule in the
14    letter of intent?
15    A.  The schedule would be part of the final
16    documents.
17    Q.  And you think there -- a minute ago I think,
18    thought you testified that you believed there was a
19    Primavera schedule that was a part of the general
20    conditions.
21    A.  Correct.
22    Q.  If you look at Exhibit 37, you have items 1
23    through 12.  Are those things that you told Mr. Link
24    or that you actually wrote yourself?  Or you don't

Page 65

1    know?
2    A.  They would have, they would have been things
3    that I discussed with Mr. Link, yes.
4    Q.  And did you, did you go out after this letter
5    and follow-up with any of your foremen to prepare any
6    other details relating to the impact that Creedon
7    claims occurred on the job?  Or did Mr. Link do it?
8    A.  Mr., Mr. Link did almost all of the
9    interviewing of all of the foremen.  There were,
10    depending on when a foreman was available, sometimes
11    it was after work.  There were, there was an occasion
12    when we brought the foremen into the shop so that he
13    could interview them.  And there were times when I was
14    available and would, and would sit in and listen.  But
15    he did most of that interviewing, and with the idea of
16    being that I would not -- what he was looking for was
17    to get, to capture information from them without input
18    from me.  I then reviewed it with him afterwards, but
19    he did most of that interviewing.  And the largest
20    portion of it I don't think I was there for.
21    Q.  Okay.  And you say he didn't want you,
22    necessarily want you around when he did that type of
23    work.  Why is that?
24    A.  I think what he was trying to do is glean as

**B-0616**

17 (Pages 62 to 65)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Charles Doble                        C.A. # 05-CV-300-JJF                          May 26, 2006

Page 66

1  much information from the foremen as accurately as
2  possible that they remembered without, without me
3  having an impact on it.
4      Q.  Can you look at item No. 4?  And in there you
5  say, for example, open trenches for chiller piping.
6  Do you see that line?
7      A.  Um-hum.
8      Q.  Was that, those trenches, were they on the
9  drawings for the job?
10     A.  They were on the drawing, yes.
11     Q.  Item No. 7, can you tell me what you mean
12 there, materials storage and lay-down areas were
13 changed during the project?
14     A.  December 16th is a date that I do remember.
15 That is when we were informed that all of the material
16 trailers that were surrounding the project at that
17 time had to be moved.  And not the office trailers,
18 but the material storage trailers.  And everything had
19 to be moved into the building.
20     Q.  And who, who required that?
21     A.  Tishman.
22     Q.  And what was the purpose for requiring that?
23     A.  They were starting to move forward with the
24 foundations for the admin building, and they also

Page 67

1  wanted to start excavation of the parking lot and
2  driveway.
3      Q.  And --
4      A.  And that was --
5      Q.  And that date sticks in your mind, and why is
6  that?
7      A.  Because I -- although I didn't realize it at
8  the time, it was an inconvenience at the time, I think
9  that that was a major reason why this, why the hours
10 of this job went through the roof.  All of that --
11 there was not only material trailers, but there were
12 like change trailers and gang boxes and that kind of
13 stuff out there.  All of that material, when it moved
14 into the building, went into the areas that we had to
15 work.  All of our work was -- or not all of it, but
16 most of our work was 27 to 30 feet in the air.
17     So all of a sudden, areas that had been
18 fairly accessible to work in were just clogged with
19 stored materials, gang boxes, tools, lunch tables, you
20 name it.  The rooms just were covered from wall to
21 wall, which made it impossible to get to 27 feet into
22 the, into the ceiling to run conduit wire.
23     Q.  Did you use lifts to get to 27 feet?
24     A.  Yes.

Page 68

1      Q.  So you're saying you couldn't move the lifts --
2      A.  Yeah.
3      Q.  -- without moving the other materials that were
4  in the way?
5      A.  Yeah.  And it was as, as the job progressed,
6  there were many occasions when I was down at the Bear
7  site which didn't have that problem, and it
8  probably -- I mean I think it's the difference between
9  the projects.  It was really a terrible situation.
10 Probably impacted Creedon and I would guess Conti the
11 most, because we were the ones that had most of the,
12 most of the piping up in the air.  So that was a --
13 that was really, in my opinion, a major contributing
14 factor to the overrun in the hours.
15     Q.  In item No. 9 -- let's cover No. 8 first.  You
16 talk about inability to work in area B.  Do you recall
17 why you could not work in area B?
18     A.  Yes.  Area B was the UPS area of the building,
19 and it -- the major portion of it was 16 rooms.  When
20 the equipment started to come in for area B, the
21 switch gear wouldn't fit through the doors that they
22 had made for the rooms.  So they were only able to
23 build three walls in each room, and they had to leave
24 the last wall out so that they could get the switch

Page 69

1  gear in, which wasn't there yet, or was starting to
2  progress.
3      And again, that had another major impact
4  because we weren't able to finish any of the piping
5  that -- you would bring feeders over the ceiling and
6  then they went down into the walls and you weren't
7  able to finish those walls because you, 25 percent of
8  it was missing.
9      Q.  Okay, because the fourth wall wasn't up yet you
10 couldn't finish in that area?
11     A.  Correct.
12     Q.  No. 9 you talk about material equipment
13 purchases, and that hindered your performance?
14     A.  Oh, yeah.
15     Q.  And can you give me one or two examples of what
16 you're talking about in terms of material and
17 equipment?
18     A.  The, on the lighting job, there were, there
19 were three major packages that were prenegotiated by
20 Forest and then allocated to the contract.  One was
21 for lighting, one was for gear, and the third was for
22 transfer switches.  And in the -- during the bid
23 review process we were told to allow so much for
24 lighting, so much for gear and so on.

**B-0617**

18 (Pages 66 to 69)

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Charles Doble                          C.A. # 05-CV-300-JJF                              May 26, 2006

Page 70

1    The lighting ended up being awarded to
2    Wesco, and I can remember having conversations with
3    both Paul and Len trying to get them to change
4    vendors. My experience had been that Wesco was the
5    weakest vendor in the area in lighting packages, and
6    they assured me that it would be handled out of New
7    York where, you know, their lighting people were very
8    good. And it was, it was a nightmare.
9        Number one, it was almost impossible -- I
10   had to handle everything through Wesco locally and
11   then they would contact Wesco in New York. I
12   couldn't -- submittals were very hard to get, were
13   poorly presented when they came to me.
14   Q.   Who were the submittals from?
15   A.   The submittals were prepared by Wesco,
16   Westinghouse Supply, would then be shipped to
17   Westinghouse in Wilmington, and then would be shipped
18   to me, and from me to Forest to Tishman to the
19   engineering and architect.
20       So there was a multi-step phase that it
21   went through. The vendor in New York just was
22   completely unresponsive to us. They had negotiated
23   everything with Forest. They knew that it was a
24   one-time purchase from Creedon, and they were, they

Page 71

1    were extremely unresponsive. When the fixtures came,
2    they came disassembled. They came with parts missing,
3    which required us to go back and make changes to
4    fixtures. So it was a major, major headache. Instead
5    of installing a fixture once, you basically had to go
6    back twice. And you got to remember, everything is up
7    into the air. So it's lifts back in and stuff.
8        The switch gear and the ATS packages again
9    were prenegotiated by Forest. And they had
10   prenegotiated all of the gear that was going to go
11   onto the job. But all of the gear weren't -- wasn't
12   in any one package that was broken out. So although
13   the vendors, again which were New York vendors, got
14   specific bills of material that were from Creedon or
15   were from Furness, everything that came to the site
16   was addressed to Forest.
17       So there was gear that was misplaced --
18   when a truck would arrive, there was no way of knowing
19   whether it was Creedon's material or some other
20   contractor's material. And usually Len would grab the
21   first electrical contractor that he saw and say, "You
22   have a, you know, a load here." It would get
23   unloaded. Whoever unloaded it would try to find
24   whatever material in there was theirs, try to figure

Page 72

1    out what was theirs, and the rest of it would, would
2    go wherever.
3        So there were panels and transfer switches
4    that were missing for weeks because it was unloaded by
5    the wrong contractor, take it off the truck, "Oh, it's
6    not mine." So that was another major, major problem.
7        We -- the -- as the job progressed with
8    the gear and stuff that the local contractors started
9    working together, and in the beginning we didn't
10   realize what was happening either. That eventually
11   got a little bit better as the job went on, because we
12   would kind of notify each other, "Some gear came in,
13   it's not mine, you may want to go down the loading
14   dock and see if it's yours."
15   Q.   So you start to coordinate with each other?
16   A.   Eventually, yeah. But it was, it was a mess.
17   And there was stuff that -- there was panels and
18   transfer switches that were on site that nobody could
19   find for a month. Well that stops the work associated
20   with, you know, associated with that panel. You can't
21   install the panel, you can't finish the feeders, you
22   can't finish the branch wiring. So it was a mess.
23   Q.   But you had other work to do?
24   A.   Well, there was -- the job was big enough,

Page 73

1    there was always other work to do.
2        It's important to realize, though, that
3    when you're saying there's other work to do, that you
4    were in a building that was loaded with a lot of
5    different contractors, and the work that we had to do
6    involved a lot of material, lifts and stuff, so that
7    if you went to another area, there was -- it was a
8    parade of material and then the tools and then the
9    manpower and then the lifts to get to somewhere else
10   to work.
11       And there were days when it was better and
12   there were days when it was worse. But there were
13   some days when it was just crazy. Or you'd say all
14   right, well I can work in this area, and you'd go down
15   and the room was filled with material. You couldn't
16   get in. You'd have to, you know, go try to find
17   somewhere else to move your manpower.
18       (Creedon Exhibit No. 81 was marked for
19   identification.)
20   Q.   And I assume you would find somewhere else to
21   work?
22   A.   You would eventually find somewhere else to
23   work, yes.
24   Q.   Can you look at Exhibit 81?

**B-0618**

Wilcox & Fetzer, Ltd.                                                              (302)655-0477

Creedon Controls, Inc.                                    v.                          Banc One Building Corporation
Charles Doble                                    C.A. # 05-CV-300-JJF                                    May 26, 2006

Page 74

1    MR. BESTE: Do you have another?
2    MR. BRADLEY: Oh, sorry. Yeah.
3 A. Okay.
4 Q. I'm trying to find out exactly what they mean
5 here. Wesco, that's who you were just talking about
6 earlier, correct?
7 A. Yeah.
8 Q. And does this involve the lighting that was
9 ordered through Wesco?
10 A. Yes.
11 Q. And in here they indicate that Wesco never
12 received a release on certain items from Creedon. Is
13 that correct?
14 A. Correct.
15 Q. What do you recall about that, if anything?
16 A. The, the Pittcon cover was a bone of contention
17 between Wesco and myself and Forest. There -- they
18 said that they did not include the Pittcon covers in
19 their, in their price. I felt that it was very clear
20 on the drawings that they should have. And it was --
21 I don't remember off the top of my head, but it was a
22 substantial amount of money. This went around and
23 around for quite a while. And I believe there are
24 other e-mails and letters and stuff associated with

Page 75

1 this where it went back and forth between Paul and
2 myself and back to Wesco. And my recollection is that
3 Paul ended up making some kind of an arrangement with
4 Wesco and that they were furnished without Creedon
5 having additional cost. But they were items that were
6 tied up for a while with that dispute.
7 Q. Okay, what does it mean that Wesco never
8 received a release on the items from Creedon, though?
9 A. I would have to go back in my notes. It looks
10 like to me that these fixtures were probably fixtures
11 that were in the last area of the building. And I was
12 releasing -- I was trying not to release fixtures that
13 I was going to need last and have them sit on the job
14 and be damaged or lost or something. So --
15 Q. And down bottom there it says, it's a four to
16 six week lead time for fixtures?
17 A. Um-hum.
18 Q. So once you release them, it takes four to six
19 weeks to get the fixture on site; is that correct?
20 A. Correct.
21 Q. Was that a, was that a problem that you recall?
22 A. This message I think was, he was probably
23 getting concerned that it was getting close. But like
24 I said, they were areas that were in the -- my

Page 76

1 recollection is these fixtures were fixtures that were
2 in the back of the building that were going to be the
3 last ones. And I believe that they ended up getting
4 released shortly after this.
5 Q. All right. Can you look at, back at Exhibit
6 37?
7 A. Hold on one second here. It looks like my
8 response is on the back of that, and some of them were
9 released.
10 Q. Okay, that's your letter that's attached to
11 that also?
12 A. Yeah.
13 Q. Was that a recurring issue or problem?
14 A. Yeah, yeah, it was.
15 Q. And if you don't release them, then it takes
16 another month before, at least a month before you get
17 the product in order to install it, right?
18 A. Correct. And I'm looking, he's saying -- M, O,
19 R, I, J. It looks like he's saying in February 24th
20 that we had not released them, and I'm two days later
21 sending him a letter saying yes, they were released
22 and here are the dates.
23 Q. All right. I see what you mean. And what date
24 would you have released them?

Page 77

1 A. Well, each fixture type had a different date.
2 The M was on 2-16, the Os were on October 22nd of '03.
3 Q. So you're saying Wesco had it wrong and you had
4 released them?
5 A. That's what, that's what it looks like to me,
6 yes.
7 Q. All right. Can we go back to 37, please?
8 That's the April 6 letter from you to Mr. Angerame.
9 By the way, do you know why Mr. Link didn't sign the
10 letter?
11 A. I would say since I was the project manager
12 they felt it should be coming from me.
13 Q. Did he serve as project manager with you?
14 A. He ended up helping me with project management
15 duties. I don't know whether he enjoyed that -- you
16 know, I'm not sure if "enjoy" is the right word to use
17 or not. Avoided that title is probably a better way
18 of putting it. But yeah, he did, as the job
19 progressed, help me with project management duties.
20 Q. All right. What would you have considered his
21 title?
22 A. I don't know. I think both of us have been
23 doing this long enough we're not real concerned about
24 it. He's, was a pretty good worker and --

20 (Pages 74 to 77)

Wilcox & Fetzer, Ltd.                          I                          (302)655-0477

Page 86

```
 1   Q.  All right.  Now were there other attempts to
 2   offset what Creedon claimed as losses discussed during
 3   the terms of the meeting?
 4   A.  Yes.
 5   Q.  And were other, were other things done to
 6   offset their claimed losses by Forest and/or Tishman?
 7   A.  I don't remember any other dollars being added,
 8   other than the second IT conveyance project.  But I
 9   believe that they expedited some payment drafts, and I
10   think they allowed us to reduce retainage in order to
11   assist with cash flow at that point in time.  But
12   I'm -- I don't remember them making any other dollars
13   available.
14   Q.  Could you look at page 4854, item L?
15        MR. BESTE:  I'm sorry, what exhibit are we
16   on?  Or you're back to 39?
17        MR. BRADLEY:  39.
18        MR. BESTE:  39, sorry.
19   A.  Item L.
20   Q.  Do you recall that conversation about cutting
21   manpower?
22   A.  Yes.
23   Q.  Do you recall anything else about that
24   conversation beyond what you placed in your memo?
```

Page 87

```
 1   A.  I remember that they felt that my estimate of
 2   hours to complete was high and that they were, they
 3   were, you know, pushing for the, you know, the 6,000
 4   to 3,000 hour range in order to finish the job.
 5   Q.  And you were claiming it would take 12,000, or
 6   estimated 12,000?
 7   A.  I estimated 12,000, yeah.
 8   Q.  And they, Tom Keene, that's Tom Keene of
 9   Tishman?
10   A.  Correct.
11   Q.  And Mr. Angerame said that you needed to cut
12   manpower?
13   A.  Yeah.
14   Q.  And I'm trying to understand what that means.
15   And they're saying the completion doesn't need to be
16   until the end of May so you can cut back on hours and
17   still get completed by May.  Is that what they're
18   saying?
19   A.  That's what they were saying.  I --
20   Q.  And then they told you not to pay attention to
21   Len Beck?
22   A.  Yeah.  Because they, I guess they realized he
23   was not going to be happy with, with seeing me cut
24   manpower.
```

Page 88

```
 1        I think it might be important to, to state
 2   that I didn't agree with -- I thought that my estimate
 3   to complete, which I think ended up being low, you
 4   know, was, was as good as I could do at that point in
 5   time.  But when you're sitting in a meeting with
 6   somebody saying, "Well, I'm looking for a way to give
 7   you $500,000 to help you with your, your offsets,"
 8   it's, it's, becomes very difficult to say, you know,
 9   "No, but by the way, I think it's going to be 12,000."
10   I was going to do everything in my power to shoot for
11   that 6 to $3,000 -- or 6 to 3,000 hour, hour range.
12   Q.  Did you, after that meeting, cut the manpower?
13   A.  Yes.
14   Q.  What did you do?
15   A.  I cut the -- you got to remember, I'm going
16   back three years so I'm not exactly sure if it was
17   like the next day or something.  But shortly after
18   that we got rid of the night shift.  There was a,
19   there was a second meeting that I believe was after
20   this with Terry Peng, Len Beck, Paul and myself, where
21   they felt that the night shift should be cut.  So that
22   was cut and then the day shift was reduced, I really
23   don't remember off the top of my head.  You go back to
24   payroll records and see, but it was, it was reduced.
```

Page 89

```
 1   I think some -- I think also at about that time some
 2   of the, some of that manpower was, was, instead of
 3   being laid off was swung over to the start of the
 4   second cable tray job also.
 5   Q.  Did you keep any notes of that other meeting
 6   you're talking about with Terry Peng, Len Beck and
 7   Paul Angerame?
 8   A.  I really don't remember.  It was, that was not
 9   a real harmonious meeting.  And Terry Peng and I were
10   not getting along -- I didn't have a whole lot of time
11   to be writing down at that meeting.  I was not real
12   happy with Mr. Peng.  And eventually, either Paul or
13   Lenny, I think it was Paul, stepped in and said, you
14   know, Lenny -- or "Terry, we'll handle the meeting
15   from here on," kind of throttled him back a little
16   bit.
17        I forget the exact thing that he was
18   saying, but he was like repeating it over and over and
19   over again.  You know, "You've got to cut this
20   manpower, you've got to do this or that."  And Paul
21   eventually said, "I think he understands what you're
22   saying, you don't have to say it again."  So my
23   recollection is I didn't, I probably didn't take them.
24   Q.  Was it your discretion to cut the night shift?
```

**B-0620**

Creedon Controls, Inc.                                    v.                     Banc One Building Corporation
Charles Doble                              C.A. # 05-CV-300-JJF                                    May 26, 2006

---

Page 90

1   A.  I didn't -- at that point in time I didn't feel
2   it was.  If it had been up to me, I would have, I
3   would have cut heavier into the day shift and left the
4   night shift.  I felt like my, my interferences were
5   less and my production was higher on nights.  I think
6   generally speaking, most people, most project managers
7   don't necessarily share that, that philosophy and they
8   would rather have people working days where they can
9   see them and so on and so forth.
10          But I had a high degree of confidence in
11  the general foreman I had at nights, and I could see
12  the work that they were able to get to, you know, I
13  thought they were being, there were -- you know,
14  generally speaking, they were able to be more
15  productive than the day shift was.
16  Q.  So you're -- I want to understand what you're
17  saying.  Are you saying that it wasn't your discretion
18  to decide, you know, get rid of the night shift or cut
19  back in the day or how to handle reducing the
20  manpower?
21  A.  I didn't feel it was.  When you're sitting
22  across the table from a guy that's got all this money
23  who's saying, "I'm going to help you but I want you to
24  cut that," I felt like it was prudent to do what they

Page 91

1   were asking me to do.
2   Q.  But you still have control of the manpower as
3   the project manager for Creedon and --
4   A.  Correct.
5   Q.  -- could decide what to do?
6   A.  Yeah.
7          MR. BRADLEY:  Why don't we break now and
8   go off the record.
9          THE VIDEOGRAPHER:  Going off the record at
10  approximately 12:36 p.m.
11         (A lunch recess was taken.)
12         THE VIDEOGRAPHER:  We're back on the
13  record at approximately 1:09 p.m.
14  BY MR. BRADLEY:
15  Q.  Mr. Doble, how often did Pat Creedon visit the
16  job site?
17  A.  Monthly.
18  Q.  She -- you say monthly, you mean she would come
19  out there once a month?
20  A.  I would, I would guess about that, yeah.
21  Q.  Do you recall what month she first came out to
22  the site?
23  A.  Not really.
24  Q.  You testified earlier about a conversation with

Page 92

1   Mr. Angerame relating to the bid amount.  Do you have
2   any notes of that conversation?
3   A.  On the -- you're talking about the 23 -- the
4   lighting job?
5   Q.  Yes.
6   A.  No, I don't think so.
7   Q.  Do you recall any conversations with Mr. Peng
8   relating to the bid amount on the lighting job?
9   A.  No.
10  Q.  Do you know if Miss Creedon had any
11  conversations with Mr. Peng regarding the bid amount
12  on the lighting job?
13  A.  Not that I am aware of.
14  Q.  Did Miss Creedon have any involvement in the
15  bid that you put together for the lighting job?
16  A.  No, she had no involvement in the bid.  She --
17  I did review it with her before the numbers were
18  submitted.
19  Q.  And --
20  A.  But she wasn't involved in the preparation of
21  it.
22  Q.  When you say you've reviewed it with her, how
23  long did you spend with her reviewing it?
24  A.  I would say that it transpired on and off the

Page 93

1   morning of the bid, so there was probably a series of
2   conversations.  In total, it might have transpired
3   over two or three hours where we were reviewing it at
4   different, at different points.  It wasn't like three
5   hours continuous.  But...
6   Q.  So you had a couple conversations with her
7   during the morning of the bid over the period of time
8   that you were submitting or finalizing the bid?
9   A.  Yes.
10  Q.  Do you recall any questions she had regarding
11  the bid?
12  A.  Not off the top of my head.
13  Q.  Could you look at Creedon 77, please.  Near the
14  back you have your pricing sheets.  I guess we could
15  try page 3549.  And I just want to read across a line
16  with you, see if I can understand where you got the
17  information that you put in this bid.
18         First of all, this deals with branch
19  lighting conduit; is that right?
20  A.  Correct.
21  Q.  And on the first line you have a quantity of
22  2,000?
23  A.  Correct.
24  Q.  And then you have a material price that you

Wilcox & Fetzer, Ltd.                                                              (302)655-0477

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Charles Doble                       C.A. # 05-CV-300-JJF                              May 26, 2006

Page 94

1   developed with a vendor.
2   **A.  Correct.**
3   Q.  And per C, what does that mean?
4   **A.  Per hundred feet.**
5   Q.  Okay.  And what does the material extension
6   mean?
7   **A.  If you take 2,000 feet and multiply it times**
8   **$58 per hundred feet, the extension would be 1,160, I**
9   **guess it is.**
10  Q.  All right.  And then the labor unit, what's
11  that?
12  **A.  That would be nine hours per hundred feet.**
13  Q.  And where did you develop that labor unit, or
14  get that labor unit?
15  **A.  That labor unit would have come from any**
16  **adjustments that I made to the labor units used in the**
17  **NECA Labor Manual.**
18  Q.  Did you say any adjustments you would have made
19  to the labor units in the manual?
20  **A.  Yes.**
21  Q.  I couldn't --
22  **A.  Yes.**
23  Q.  And how do you determine what adjustments to
24  make?

Page 95

1   **A.  I do that based on my experience of using the**
2   **manual, the type of job that's, that I'm bidding, the**
3   **working height of the installation, the depth of the**
4   **installation, that type of stuff.**
5   Q.  Do you take into consideration project notes
6   and general conditions when you determine what labor
7   unit to use?
8   **A.  Yes, generally.**
9   Q.  And do you adjust the labor unit up or down,
10  depending on the, what your experience tells you?
11  **A.  Yes.**
12  Q.  Now if I went to the -- do you actually get the
13  manual out and look this information up?
14  **A.  Yes.**
15  Q.  And this manual would have been the one in
16  effect in September 2003?
17  **A.  Yes.**
18  Q.  And is that the same process you used as you go
19  throughout your pricing sheet?
20  **A.  Yes.**
21  Q.  Does the manual tell you any way to adjust
22  those labor units based on project notes and
23  conditions that might be particular to a project?
24  **A.  That's kind of a broad question.  There are**

Page 96

1   **instructions in the manual on how to adjust those**
2   **labor rates, and it could be affected by a lot of**
3   **different things, some of which would be included in**
4   **the, in the general condition notes.**
5   Q.  I'm going to show you Exhibit 44.  And this is,
6   for the record, Creedon Controls' letter of
7   transmittal -- transmittal to Forest dated May 24,
8   2004 attaching a critical events summary.  Is that
9   correct?
10  **A.  Correct.**
11  Q.  Like you to look obviously at the critical
12  events summary that starts on the next page.  I think
13  you told us that Mr. Link is the one who went out and
14  interviewed people and developed the critical events
15  themselves.  Is that fair to say?
16  **A.  Correct.**
17  Q.  Is he the one that, as opposed to you, the one
18  that actually wrote what we're looking at in this
19  exhibit?
20  **A.  Yes.**
21  Q.  Do you know who actually typed it?
22  **A.  He did.**
23  Q.  He did.  And did he do that at Creedon's office
24  or in his own office?

Page 97

1   **A.  I would say Creedon's office.**
2   Q.  Now, he also lists, as you look across, he
3   lists the particular shift, and then there's a number
4   of hours that I assume he means this event No. 1
5   impacted and caused these number of hours.  Correct?
6   **A.  Correct.**
7   Q.  And then at the end he has a total, he has
8   proposed change order total, that's the last line.
9   **A.  Correct.**
10  Q.  And the hours that are projected here or
11  estimated here, were they developed by Mr. Link or by
12  you?
13  **A.  They were developed by Mr. Link and then**
14  **reviewed with me.**
15  Q.  And do you know what Mr. Link used to estimate
16  the hours?  Let's take No. 1 for an example.
17  **A.  I believe Mr. Link went through his interviews**
18  **with each foreman and the general foremen with their**
19  **logs to generate the hours that are used there.**
20  Q.  And those hours are hours that Mr. Link
21  generated, correct?
22  **A.  They were hours that the foremen would have**
23  **told him were worked, and then he would have compiled**
24  **them.**

**B-0622**

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                    May 26, 2006

Page 98

1  Q.  Okay, I want to make sure I understand. Let's
2  take No. 1 as an example. It says "Foreman hours, 80
3  hours." Is it your testimony that the foreman said,
4  "Yeah, this impacted me by 80 hours," and therefore
5  Mr. Link wrote it down and accepted it?
6  A.  No. It's my understanding that he may have
7  talked to several foremen that worked in that area,
8  and they may have said, "I think it affected me by 16
9  hours," and another guy by 24 hours, and he would have
10  then compiled that for a total cost for that.
11  Q.  And do you know if Mr. Link kept notes or
12  estimating sheets, pricing sheets that relate to these
13  items?
14  A.  I don't know whether he did or not, no.
15  Q.  Other than the interviews of the general
16  foremen and foremen, are you aware of any other
17  information that Mr. Link used to arrive at what is
18  marked as Exhibit 44? And the logbooks.
19  A.  Yes, he would have used information from me
20  also.
21  Q.  Did you provide him that information in writing
22  or simply verbal?
23  A.  It was verbal.
24  Q.  And how much time did you spend with Mr. Link

Page 99

1  in giving him information relating to Exhibit 44?
2  A.  It was extensive. I don't know. It happened
3  over several meetings where we would, you know, I
4  would have four hours available on an afternoon and we
5  would start with item 1 and work our way through and
6  get as far as we could, and maybe a couple days later
7  it would meet again. I really don't know, I would say
8  extensive, but I don't know how many hours it was per
9  se.
10  Q.  Are you required to keep any kind of time
11  sheets or log to record your time?
12  A.  No.
13  Q.  You have to answer yes or no.
14  A.  I'm sorry, no.
15  Q.  Okay. And when you've reviewed it with
16  Mr. Link, was your focus on the event itself or in
17  developing the hours that appear on the exhibit?
18  A.  I would say both. We would review the item and
19  then review the hours. So there were -- there are
20  items on here that based on my experience I felt were,
21  foremen may have allowed hours to stuff that I felt
22  was, should have been allowed, allocated to contract
23  work, or they may have allocated hours that I thought
24  were low and therefore adjusted some of these hours

Page 100

1  after he was finished his review of them.
2  Q.  Okay. And if we go through item by item, can
3  you tell us what hours you added or subtracted? Or do
4  you have a writing somewhere that would tell us that?
5  A.  No, I don't think I could.
6  Q.  Are there any -- in the description of events,
7  are there any events that you added that the foremen
8  or general foremen had not told Mr. Link about?
9  A.  Not that I have a recollection of at this time,
10  no. I think they were generated by them. I think
11  there's like 84 items from, so...
12  Q.  So the description of events basically was done
13  by Mr. Link and you've reviewed them with him, but
14  it's his language and writing. Is that fair to say?
15  A.  Well, it was reviewed by me and I mean there's
16  been changes to the, to the language that were made by
17  me. But he was the one that generated it originally,
18  yes.
19  Q.  Can you look at the last page of that exhibit,
20  and number, on the legend it has 1, 2 and 3. On No. 3
21  it identifies the people that were interviewed. Is
22  that correct?
23  A.  Yes.
24  Q.  And there's only two people listed as having

Page 101

1  been interviewed?
2  A.  That looks correct, yes.
3  Q.  Do you know if any recording was made of those
4  interviews?
5  A.  I do not believe so.
6  Q.  Now, do you know if there were any handwritten
7  notes made regarding those interviews?
8  A.  I don't know.
9  Q.  Would you say that Mr. Link is in a better
10  position to give us testimony regarding these
11  description of events than you are?
12  A.  I would -- as far as discussing a particular
13  item or, or the preparation of it?
14  Q.  Discussing a particular item, since he's the
15  one who performed the interviews.
16  A.  I would say I should be able to discuss an item
17  if it's there.
18  Q.  Now, did you review the logs of the general
19  foremen or foremen at the time this was prepared?
20  A.  I don't think I read like straight through, but
21  if we were looking at a date, we would go back, I
22  would go back to the log or he would go back to the
23  log. So I am familiar with them and have been through
24  them.

**B-0623**

Wilcox & Fetzer, Ltd.                                        (302)655-0477

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Charles Doble                        C.A. # 05-CV-300-JJF                              May 26, 2006

Page 110

1  completely different. In, in one item doors were
2  moved, and in another item we were blocked because of
3  material. So it's a completely different item that
4  happened in the same room.
5      Q.   If those two items occurred at the same time,
6  then you wouldn't have a double claim. Is that fair
7  to say?
8      A.   No, I don't think that is fair to say.
9      Q.   In other words, if you were -- let me ask you
10 this question.
11     A.   Okay.
12     Q.   If your access to a room was denied for two
13 different reasons, you don't have two different
14 claims. Do you agree with that?
15     A.   If they happened at the same time, I would
16 agree with that.
17     Q.   All right.
18     A.   However, if they happened at different times,
19 then I would say no, I would disagree with it.
20     Q.   And here as we look at 15, 10 or some of these
21 others, we don't have time frames on the exhibit to
22 tell us when those events occurred. Is that correct?
23     A.   That is correct.
24     Q.   And Creedon did not -- there are no accounting

Page 111

1  or payroll records that would tell you when Creedon
2  was working in a particular room or the number of
3  hours spent by particular people in particular rooms.
4  Is that correct?
5      A.   That is correct.
6      Q.   Can you look at item No. 20, please. That item
7  concerns Tishman not permitting Creedon to lock your
8  material room?
9      A.   Correct.
10     Q.   And you hired someone to protect your material;
11 is that correct?
12     A.   That is correct.
13     Q.   Did you address that issue with Tishman at any
14 time?
15     A.   In writing, no. Verbally, yes.
16     Q.   And who did you speak with at Tishman?
17     A.   Don Blankenship I think his name was. There
18 was another super and I can't remember his name.
19     Q.   Would you agree that the project notes or the
20 general conditions require you to protect your own
21 materials?
22     A.   Yes. Which is very hard to do when the general
23 for -- or the general contract -- prime contractor
24 tells you you can't lock the door.

Page 112

1      Q.   And by prime contractor, you mean Tishman?
2      A.   Yeah.
3      Q.   If you look at page 7, No. 80, request for
4  information not answered or, it appears to be number,
5  No. 80. Is that correct?
6      A.   Correct.
7      Q.   Do you know what requests for information were
8  never answered?
9      A.   I would have to go back and look. I can't tell
10 you off the top of my head.
11     Q.   And is your claim there that you were -- I
12 don't understand your claim. Why don't you tell me
13 what you mean, rather than me telling you. They were
14 never answered and you went ahead and installed
15 whatever the materials were; is that correct?
16     A.   That is correct. I think you'll also notice
17 that there's no cost against them.
18     Q.   Maybe I'm reading wrong. I thought it was the
19 24,000. I might be --
20     A.   Well, I'm looking 1, 2, 3, 4, 5, 6, 7, 8, 9; 1,
21 2, 3, 4, 5, 6, 7, 8, 9, when I look down here, it
22 looks like that's zero. It looks like the 24,000 is
23 against item No. 79 to me.
24     Q.   Oh, okay. All right.

Page 113

1      A.   And that, that may -- if you look on some of
2  these, there are zeros and stuff, that may be -- I
3  just don't remember exactly, but that could be an
4  example where I went no, I think that's in the...
5      Q.   All right. How about No. 75. Now is the
6  amount for No. 75 50,270, is that how you read this?
7      A.   Yes.
8      Q.   And that relates to, again, protecting your own
9  material?
10     A.   Correct.
11     Q.   And is that the cost of a person to protect it,
12 is that what you mean?
13     A.   Yes.
14     Q.   And we have charges for the general foreman,
15 foreman and journeymen, if I'm reading this correct.
16 Why would there be charges for them relating to that
17 issue?
18     A.   I believe you would have to go back to, to
19 check with Dennis on that. But I believe that when we
20 were working this up we took a percentage of the 800
21 hours, which would have covered the time preparation,
22 supervision of that person. So I think that those
23 were done as a percentage. If a foreman had 10 men
24 working for him and one of them was this, they would

**B-0624**

Creedon Controls, Inc.                          v.                     Banc One Building Corporation
Charles Doble                        C.A. # 05-CV-300-JJF                            May 26, 2006

Page 114

1  have taken a percentage. But you have to check with
2  Dennis to make sure on that.
3    Q.  So you're saying that a journeyman was the
4  person who was protecting the material?
5    A.  Correct.
6    Q.  I thought you hired an outside -- maybe I
7  misunderstood what I read in some of the documents.
8  But I thought you hired an outside firm to protect the
9  material.
10    A.  No, we hired -- we had a journeyman do it.
11    Q.  And then you took some of the foreman hours and
12  general foreman hours and assigned them to watching
13  the, or supervising the person who was watching the
14  material.
15    A.  Correct.
16    Q.  I get it. And then you, let's see, completed a
17  second critical events summary. Is that correct?
18    A.  Yes.
19    Q.  Let me see if I can find that one. Give you
20  No. 74. Okay now, Exhibit 74 is your critical events
21  summary after February 7th, 2004; is that correct?
22    A.  Say that again?
23    Q.  That exhibit is your, is Creedon's critical
24  events summary for events that occurred after

Page 115

1  February -- April 7, 2004?
2    A.  Correct.
3    Q.  And was that prepared in the same manner as the
4  previous one we've already talked about?
5    A.  Yes.
6    Q.  And so Mr. Link took the lead and performed the
7  work to get that done?
8    A.  Correct.
9    Q.  And that was submitted -- well the date on the
10  proposed change order is March 31, 2005 on that
11  exhibit; is that correct?
12    A.  Yeah, the date is March 31st.
13    Q.  And is that about the time this was completed?
14    A.  I don't see how it could have been. Oh, of
15  '05.
16    Q.  Yes.
17    A.  I would say yes.
18    Q.  And by that time you had obviously moved on to
19  another job; is that correct?
20    A.  Correct.
21    Q.  Did you have any input into the critical events
22  summary from April 8th, '04 through the end of the
23  job?
24    A.  I would have had basically the same -- what's

Page 116

1  the word I'm looking for? The same as on the first
2  one.
3    Q.  Okay.
4    A.  First involvement, same involvement.
5    Q.  Would you look at page 6078. That's an item
6  where Mr. Keene of Tishman threw material away that
7  belonged to Creedon?
8    A.  Yep.
9    Q.  Did you address that with Mr. Keene?
10    A.  No.
11        MR. BESTE:  I'm sorry, what item number
12  are you?
13        THE WITNESS:  28.
14        MR. BRADLEY:  28.
15  BY MR. BRADLEY:
16    Q.  Was there an event where someone threw away
17  drawings prepared by Creedon or marked up by Creedon?
18    A.  Yes.
19    Q.  And who did that?
20    A.  The laborers were directed by Tishman to clean
21  up the site and they just went through and threw
22  everything away. The laborers were actually working
23  for us.
24    Q.  So your Creedon laborers --

Page 117

1    A.  Gets funny, doesn't it?
2    Q.  -- threw away materials at the direction of --
3    A.  No, Forest gave us a change order to hire
4  laborers that we had absolutely no control over, that
5  we then turned over to Tishman, and they directed and
6  all we did was pick up the payroll for them. So
7  technically they were working for us when they threw
8  our drawings away, but they weren't under our
9  direction.
10    Q.  And they did that at the direction of Tishman?
11    A.  Yeah. Bob --
12    Q.  What was the reason they would do that?
13    A.  Every once in a while some upper management
14  would be coming down from Banc One to tour the site,
15  and they would just go through and, you know, in an
16  effort to make the site look I guess presentable for
17  the upper management, they would throw away anything
18  that wasn't, wasn't nailed down.
19    Q.  Did you -- did Creedon --
20    A.  We literally went out one day and our
21  high-reach was put in the Dumpster.
22    Q.  And what do you mean by "high-reach"?
23    A.  The lift that gets you 27 feet in the air that
24  you have to rent. Not ours, everybody's, they had

**B-0625**

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Charles Doble                          C.A. # 05-CV-300-JJF                              May 26, 2006

Page 154

1  estimate to keep a running count of what was left and
2  what I had left to do.
3      Q.  Did you measure the number of hours worked
4  against actual completion of tasks in the project?
5      A.  No.
6      Q.  For example, how did you have any idea how many
7  rooms, how many, how many particular tasks on the
8  project schedule had been completed to know --
9      A.  It was easy.
10     Q.  -- what was left?
11     A.  None of them got completed.  I had open,
12  openings everywhere.
13     Q.  How did you keep track of how far along you
14  were?
15     A.  We had, for the longest period of time we had
16  drawings that as we installed conduit we would
17  highlight so that we knew, you know, this is done,
18  this isn't done.  And then they got thrown in the
19  Dumpster, and we pretty much guessed after that.
20     Q.  Now, when did the destruction of the drawings
21  happen?
22     A.  Might have been early January.
23     Q.  And before that time had you been reviewing the
24  drawings to do a rough calculation of percentage of

Page 155

1  work remaining based on the highlighting?
2      A.  Did I sit down and do calculations, no.  It
3  was, it was, you know, this area is 60 percent
4  finished, this area is 20 percent finished, this area
5  is 5 percent finished.  The conduit, you know, for
6  example, would be installed.
7      Q.  Did you ever add those percentages up to say
8  okay, well it looks like we're about 24 percent of the
9  way there?
10     A.  Usually monthly when I did the billing I was --
11  when I was trying to come up with percent completes,
12  you try to use that information to do that.
13     Q.  Okay.  So I'm trying to I guess figure out,
14  did -- I mean it sounds to me like you're saying after
15  January you were just guessing about how far along you
16  were percent complete since you didn't have the
17  drawings anymore.
18     A.  Well, it was probably later in, later into
19  January.  Because when they were gone, I still felt
20  like I had a pretty good handle on it.  So it was, you
21  know, but you get into February is when you, you're
22  starting to --
23     Q.  Lose a little control over that?
24     A.  -- lose a little control.

Page 156

1      Q.  Okay.
2      A.  And it's becoming more of a --
3      Q.  More of a guessing game.
4      A.  -- best guess, yeah.
5      Q.  But before that point, did you feel reasonably
6  comfortable that your percent complete and the
7  percentage of hours used were --
8      A.  I thought it was --
9      Q.  -- reasonably close?
10     A.  Probably end of January I thought I was on
11  schedule or maybe just a little bit ahead.
12     Q.  Okay.  Well let's take a look at 0524.  Now
13  this has weekly actual and projected hours.  And I
14  don't know if you might want to use another piece of
15  paper to kind of make sure that we're looking at the
16  same row all the way across because it's kind of
17  small.  But if we go down to December 28th of '03, I
18  believe if you add those numbers in the total hours
19  columns, I'll represent to you that the total hours
20  actual is 9,709, and the total hours projected is
21  9,120, which would mean that you were already over
22  your hours at the end of December by 600.
23     A.  What were the numbers you just gave me?
24     Q.  9,709 and 9,120.  Do you recall being ahead of

Page 157

1  your hours already by the end of December, ahead of
2  your projected hours?
3      A.  To tell you the truth, I really don't.  I mean
4  part of that would be if I had an area that was
5  available to me, I may have felt like I was -- I just
6  don't remember.  I really don't.  I might have been
7  further completed then, my projected hours also, if my
8  actual hours were, were higher than my projected.
9      Q.  Okay.  Can you explain to me the columns that
10  read "S curve percent" and "percent complete"?
11     A.  No.
12     Q.  Can you explain to me what those mean?
13     A.  I cannot.
14     Q.  Okay.  Go back up to November 30th.  I'll
15  represent to you that your projected hours were 4,200,
16  but you had only actually used 2,804.  Does that sound
17  at all familiar, that you were pretty far behind in
18  hours used by the end of November, something of a slow
19  start on this project?
20     A.  We had problems getting submittals approved for
21  the supports of the lighting in data centers A and B,
22  and so that probably delayed us a little bit in those,
23  in those two areas getting started.  So the hours
24  weren't expended yet to do them, and that was a large

Creedon Controls, Inc.                    v.                 Banc One Building Corporation
Charles Doble                    C.A. # 05-CV-300-JJF                      May 26, 2006

Page 178

1  Q.  Do you recall there being an issue related to
2  the markup, the overhead and profit that CCI was
3  charging on this project?
4  A.  On several occasions, yes.
5  Q.  What do you recall about that issue?
6  A.  On the very first -- early on in the job, I got
7  a letter from Forest saying that all change orders
8  would go to the guy that was Lenny Beck's equivalent
9  on CDC I. I can't -- his name escapes me right now.
10  It will probably come back to me in a minute. And so
11  I went to him and said, "Do you have a form of how you
12  would like change orders presented and what are the
13  markups, how you want to, you know, how do you want to
14  see them calculated," so on and so forth.
15       There was -- I was kind of surprised
16  because I wasn't the first contractor that had been on
17  site. There had been contractors working for a while,
18  and I was kind of surprised that somebody wouldn't
19  have been able to go, Yes, this is how we want change
20  orders presented." But that was not the case. There
21  was discussions about how markup would be calculated,
22  how the OCIP would be deducted. And I can't think of
23  that guy's name. I said, "It doesn't really matter to
24  me, just show me the form you want so that I can

Page 179

1  follow it for the whole project."
2       And I ended up getting -- and he said,
3  "Well, how do you want to present it?" So I put
4  together a change order and I went, "Will this be
5  acceptable? Is this how you want it?" And that was
6  acceptable until the next month. And then I think I
7  got another letter and they said, "No, we want to see
8  it this way."
9       And so the rules kind of changed again.
10  And that happened probably for the first maybe three
11  months or so. There was confusion about how Forest
12  wanted to -- do you want me to stop?
13  Q.  No, keep going.
14  A.  How Forest wanted to see the change orders
15  presented, how they were to be calculated. It
16  surprised me that a large New York contractor was
17  having this much, you know, it was like just show me
18  how you want it and I'll present them that way. And
19  they just -- it took a while to get that straightened
20  out.
21       And at some point in time I remember Terry
22  Peng coming back and we had to recalculate change
23  orders that had already been done. It was like two
24  hours' worth of work for me and I'd get finished and

Page 180

1  it would be a dollar 30. You know, I offered to give
2  Terry 20 bucks out of my pocket and just let him, let
3  him go.
4       So yeah, there was some confusion about
5  markups and how Forest wanted to see them presented
6  and what markup would be acceptable on material and
7  stuff. And my recollection is that took maybe three
8  months to kind of work through. And after we found a
9  way that they accepted it, it didn't seem like it was
10  a problem after that.
11       MS. WARREN: Okay, why don't we go off the
12  record to change the tape. And I don't think I have
13  much more.
14       THE VIDEOGRAPHER: Off the record at
15  approximately 4:16 p.m.
16       (A brief recess was taken.)
17       THE VIDEOGRAPHER: We're back on the
18  record at approximately 4:21 p.m.
19  BY MS. WARREN:
20  Q.  Mr. Doble, what type of communications did you
21  have with contractors at CDC I, the Bear site?
22  A.  Basically I had contact with Hatzel & Buehler,
23  number one because of my past experience with them, I
24  knew quite a few of them. Paul Angerame had

Page 181

1  encouraged Hatzel & Buehler and Creedon to have open
2  discussions in how we were going to do lighting
3  support systems and that kind of stuff, so that both
4  sites would mirror each other as closely as possible.
5  So we had ongoing conversations early in the job
6  trying to come up with a design for supports for
7  fixtures and that kind of stuff.
8       As the project went along, what we found
9  was that we were both submitting on very -- on either
10  the same stuff or very similar stuff on the two sites.
11  And sometimes one contractor would get an approval or
12  find out information about something was happening.
13  So we had communications that way where if you got an
14  answer to an RFI, you would, you know, they would call
15  me or I would call them and say, "Hey, it's okay to,
16  you know, run the lighting on the cooling tower or,
17  you know, on the outside of the rail instead of the
18  inside of the rail" or whatever, so there was
19  communications that went on that way also.
20  Q.  Okay. Did you have any communications with
21  Hatzel & Buehler regarding the delays you were
22  experiencing, you claim you were experiencing?
23  A.  No.
24       MS. WARREN: I think that's all I have.

Page 1

                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a        )
Delaware corporation,            )
                                 )
              Plaintiff,          )
                                 ) Civil Action
       v.                        ) No. 05-CV-300-JJF
                                 )
BANC ONE BUILDING                )
CORPORATION, an Illinois         )
corporation, and FOREST          )
ELECTRIC CORPORATION, a New      )
York corporation,                )
                                 )
              Defendant.          )


          Videotape deposition of FRED STREET, taken
pursuant to notice at the law offices of Ashby &
Geddes, P.A., 222 Delaware Avenue, 17th Floor,
Wilmington, Delaware, beginning at 9:32 a.m., on
Tuesday, May 30, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

          ROBERT K. BESTE, JR., ESQUIRE
          COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
            1007 Orange Street, Suite 1130
            Wilmington, Delaware  19801
            On behalf of Plaintiff

          PAUL L. McDONALD, ESQUIRE
          PAUL, HASTINGS, JANOFSKY & WALKER LLP
            875 15th Street, NW
            Washington, D.C.  20005
            On behalf of Defendant Banc One Building
            Corporation

                    WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
                     www.wilfet.com

**B-0628**

Creedon Controls, Inc.    v.    Banc One Building Corporation
Fred Street    C.A. # 05-CV-300-JJF    May 30, 2006

Page 18

1    Q.  Now, in terms of coordinating work with other
2    subcontractors, has that been part of your
3    responsibility?
4    A.  Yes.
5    Q.  And have you had any problems doing that?
6    A.  No.
7    Q.  And when you've had -- going back to the gap
8    issue, when you've had gaps in work, how have you
9    responded to that?  What's been the, I guess the
10   remedy to that?
11   A.  The remedy usually is to move into other areas
12   that are available.
13   Q.  So the work is still continuous.  Is that a
14   fair thing to say?
15   A.  My work would be continuous, yes.
16   Q.  Okay.
17   A.  Of course it's at additional cost.
18   Q.  And what's the additional cost attributed to?
19   A.  You now have to move from one area to another,
20   move your equipment, move your manpower.  And then
21   bring all your foremens and journeymen up to speed on
22   the new area they're going to work in, as opposed to
23   where you've had them set up to work.
24   Q.  And what process have you been involved in to

Page 19

1    address the issue of the additional cost?  Or how is
2    it addressed, I should say?
3          MR. BESTE:  If I may inquire, are you
4    talking broadly?
5          MR. McDONALD:  Just a general, still
6    broadly, yes.
7    A.  How it -- the question is how is it usually --
8    Q.  Addressed.
9    A.  -- addressed?  By myself.  This, again, I would
10   have to say would depend on the size of the project.
11   Certainly if it's a two- or three-man job, it would be
12   handled much differently as opposed to a 40- or 60-man
13   project.  But basically, I would bring, keep track of
14   the time it would take for me to remove my people from
15   one area to another, make the owner or the project
16   manager of the company aware of that time.  It would
17   then become their responsibility as to how they would
18   handle that.
19   Q.  And is your understanding that that would
20   depend upon the type of contract that you had?
21   A.  I'm really not usually brought up to speed on
22   the contract.
23   Q.  Do you review the contracts?
24   A.  No, sir.

Page 20

1    Q.  Okay, have you reviewed a contract in any of
2    these jobs?
3    A.  No, sir.
4    Q.  Okay.  Now, as a result of any of these prior
5    projects you've been on, has there been a dispute
6    between your employer and either the general
7    contractor or the owner?
8    A.  Not that I am aware of.
9    Q.  Not including this particular matter we're
10   talking about here today?
11   A.  That's correct.
12   Q.  Now, within Creedon, who do you report to?
13         MR. BESTE:  Are you talking now or --
14         MR. McDONALD:  Yes.
15         MR. BESTE:  -- at the time of this
16   project?  Both?
17   Q.  Let's start at the time of the project, 6B.
18   A.  The -- I would have -- my first contact would
19   have been Charles Doble.
20   Q.  And after Mr. Doble?
21   A.  Mrs. Creedon.
22   Q.  How did you come to work on what I'll refer to
23   as project 6B?  Is that okay?
24   A.  Okay.

Page 21

1    Q.  Okay.  How did you come to work on project 6B?
2    A.  I was asked to work on that project by
3    Mr. Charles Doble.
4    Q.  Were there other projects ongoing at the time
5    when you were asked to participate in 6B?
6    A.  Yes.
7    Q.  And had you been involved in any of the other
8    projects?
9    A.  Other, other projects for Creedon?
10   Q.  Yes.
11   A.  Yes, I was working on another project when he
12   asked me to leave there.
13   Q.  And did he give you any reason as to why he
14   wanted you to work on 6B?
15   A.  Just that he wanted someone with my experience
16   on that job.
17   Q.  And did he go into any details as to why he
18   thought someone of your experience was necessary for
19   the job?
20   A.  Not really.
21   Q.  Did you, did you have an understanding as to
22   why someone of your experience would be necessary for
23   this job?
24   A.  I wouldn't say necessary.  I would just say

6 (Pages 18 to 21)

Page 22

1 would probably be beneficial basically because I knew
2 most of the people that were there for the other
3 contractors.
4 Q. Okay. And when you say you knew most of the
5 people who were there for the other contractors, which
6 contractors are you referring to?
7 A. Furness Electric and Conti.
8 Q. Was Hatzel & Buehler involved in the 6B project
9 at all to your knowledge?
10 A. No.
11 Q. Okay. How many other contractors were involved
12 in the 6B project?
13 A. Electrical contractors?
14 Q. Yes.
15 A. I'm not sure, to be honest with you.
16 Q. How many other contractors, electrical or
17 otherwise, did you have to coordinate with your work
18 on a regular basis on the 6B project?
19 A. Approximately seven.
20 Q. And Furness -- Furness, excuse me, and Conti
21 were two of those seven, correct?
22 A. That's correct.
23 Q. And did you ever have any problems coordinating
24 work with any of the seven contractors, other

Page 23

1 contractors?
2 A. Yes.
3 Q. And who and when was that? Or who was that, I
4 should say, and then when was it?
5 MR. BESTE: Now you're referring to 6B?
6 MR. McDONALD: Yes, this questioning, this
7 line of questioning, I should say, is now referring to
8 6B. I just, we're past the point of the general kind
9 of introductory.
10 MR. BESTE: Okay, just so we're all sure.
11 MR. McDONALD: Yeah, we are, thanks.
12 A. Then 6B, I understand that that is the major
13 part of the data center contract.
14 Q. Well, it's the, I guess, I don't know if I want
15 to characterize it as the major part. But it's the
16 part that you worked on on the data center contract.
17 A. Okay.
18 Q. How many parts did you work on, I should ask,
19 on the data center contract?
20 A. Three.
21 Q. Okay. Let me maybe do it this way. You're
22 familiar with I guess the way Creedon has numbers for
23 its different projects?
24 A. Yes.

Page 24

1 Q. So 2357 means something to you?
2 A. Yes.
3 Q. 2367 means something to you as well?
4 A. Yes.
5 Q. And 2377?
6 A. Yes.
7 Q. Okay. Right now let's talk about 2357.
8 A. Okay.
9 Q. So on 2357, is that where you were dealing with
10 seven different contractors?
11 A. Yes.
12 Q. Okay. And with whom did you have the
13 scheduling difficulties?
14 A. The excavation contractor, which I'm not
15 exactly sure who that is.
16 Q. Any other contractor?
17 A. Drywall contractor.
18 Q. Okay, anyone else?
19 A. Not that I can remember right now.
20 Q. Okay. And there's only one excavation
21 contractor and one drywall contractor; is that right?
22 A. To my knowledge, yes.
23 Q. Okay. And what was the nature of your problem,
24 I guess scheduling problem with the excavation

Page 25

1 contractor?
2 A. Trying to gain access to the building.
3 Q. And when did that occur?
4 A. I'm going to say it started in October,
5 continued through November.
6 Q. Does that mean it ended in November, that
7 particular problem?
8 A. Yes.
9 Q. After November did you have any other problems
10 with the excavation contractor?
11 A. No.
12 Q. And what was the nature of that problem with
13 the excavation contractor? I mean -- actually,
14 withdrawn.
15 You said earlier that it was a problem
16 with access to the building. What was the access
17 issue?
18 A. As they moved dirt around the building, they
19 would isolate areas where you could not enter the
20 building.
21 Q. And what would you do in response to not being
22 able to enter the building at any particular area?
23 A. Really impacted because our material was stored
24 outside, and they would cut you off from your

**B-0630**

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Fred Street                        C.A. # 05-CV-300-JJF                      May 30, 2006

Page 26

1  material. You would have to transport it around to an
2  adjacent side of the building or to the back side of
3  the building to be able to gain access.
4   Q.  And what impact, if any, did that have on your
5  schedule for completing work?
6   A.  Certainly slowed us down.
7   Q.  And slowed you down during the period of
8  October, November?
9   A.  Yes.
10   Q.  Okay. And how much time do you think you lost
11  as a result of that issue in October and November?
12   A.  I really couldn't answer that without referring
13  back to documentation.
14   Q.  Okay, and we'll do that shortly.
15      Whatever time you may have lost, were you
16  able to, to make up for it after November?
17   A.  No.
18   Q.  Were you able to do work in other areas that
19  you had access to during the October to November time
20  period?
21   A.  No.
22   Q.  And why weren't you able to do work in other
23  areas that you had access to?
24   A.  Still needed materials that were stored out

Page 27

1  front.
2   Q.  Were there other areas where you could store
3  materials during that time period? And when I say
4  during that time period, again, October through
5  November.
6   A.  No.
7   Q.  And we're talking October to November of 2003,
8  to be clear.
9   A.  That is correct.
10   Q.  Okay. And did you report this issue to, to
11  anyone?
12   A.  Yes.
13   Q.  Okay, and to whom did you report this issue
14  with the excavation contractor?
15   A.  At that time that would have been to Mr. Rob
16  Sharp.
17   Q.  And who is Rob Sharp?
18   A.  He was the daytime general foreman.
19   Q.  Did you report to anyone else?
20   A.  No.
21   Q.  Why did you report it to Mr. Sharp?
22   A.  Because that was my immediate contact at that
23  point in time.
24   Q.  And at this time your role is general foreman

Page 28

1  for what shift?
2   A.  Night shift.
3   Q.  Okay. What other contractors were working
4  night shift during 2357?
5   A.  Furness Electric, the painting contractor. Is
6  this -- what time period, are we talking this time
7  period?
8   Q.  I guess at any time during 2357, we can break
9  up the time periods later when we go through your log,
10  which we'll do.
11   A.  Through that whole period, a lot of
12  contractors. Let me see.
13   Q.  If there a lot of contractors, tell you what,
14  we will then do it, just go through each individual
15  month if that's easier, if there are a lot of
16  contractors that were working night shift. Is that an
17  accurate statement, there were a lot of them working
18  night shift throughout the project?
19   A.  Throughout the project, in and out, yes.
20   Q.  Okay, we're still dealing with just the seven
21  other total contractors, though, correct?
22   A.  No, there was more, more contractors than that
23  total.
24   Q.  More -- okay, maybe I'm misunderstanding. You

Page 29

1  testified earlier there's seven total contractors you
2  had to coordinate with. Is that, on 2357, is that
3  correct, throughout the time period of that?
4   A.  That's correct.
5   Q.  Okay. Sorry, I misunderstood you there for a
6  second.
7      Now, the other contractor you said you had
8  a problem scheduling with was the drywall contractor?
9   A.  Yes.
10   Q.  Okay, and what was the nature of that problem?
11   A.  They would erect walls and not give us
12  sufficient time to install conduit before they would
13  drywall.
14   Q.  In what time period did you experience those
15  problems with the drywall contractor?
16   A.  That would have been November of '03.
17   Q.  And when you say November of '03, it starts in
18  November and ends in November; is that correct?
19   A.  My particular problem with them ends in
20  November, yes.
21   Q.  Okay. And how did you resolve that problem?
22   A.  We would cut holes in his drywall and install
23  the conduit where it needed.
24   Q.  That's the way to do it, I suppose.

Wilcox & Fetzer, Ltd.                                        (302)655-0477

Creedon Controls, Inc.                          v.                    Banc One Building Corporation
Fred Street                              C.A. # 05-CV-300-JJF                         May 30, 2006

Page 30

1    A.  I don't know any other way.
2    Q.  And what if any delay did this cause in your
3    work schedule?
4    A.  A lot easier to install conduit without the
5    drywall being on.
6    Q.  Do you have an estimate of how many, how much,
7    how many days or hours, weeks?
8    A.  No, not really.
9    Q.  Did it affect the overall completion of the
10   project?
11   A.  Yes.
12   Q.  And did you report that issue with the drywall
13   contractor to anyone?
14   A.  Mr. Rob Sharp.
15   Q.  To anyone else?
16   A.  No.
17   Q.  Were there any other problems during the 2357
18   project that you had with any other contractor, other
19   than the two that you've just talked about?
20   A.  Had continuing problems with the laborers in
21   the cleanup crew.
22   Q.  And are they different than a contractor?
23   A.  I don't know exactly who they work for.
24   Q.  And what was the nature of the problem you had

Page 31

1    with the continuing problem, as you describe it, with
2    the laborers in the cleanup crew?
3    A.  With no prior notice, they would move into an
4    area and clean it.  When I say clean it, they would
5    remove anything that wasn't attached to something or
6    nailed down and throw it in the trash.
7    Q.  And what effect did that have on your work?
8    A.  Considerable amount of impact.  They would take
9    drawings, prefabricated materials, boxes of materials
10   to be used and put them in the trash.
11   Q.  You said that was a continuing problem.  When
12   did it start?
13   A.  Right before Christmas 2003.
14   Q.  And how long did that problem remain a problem
15   for you?
16   A.  Till the end of the project.
17   Q.  When you're saying to the end of the project,
18   when was that, as your understanding?
19   A.  Have to refer to my logbook, but approximately
20   August of '04.
21   Q.  When were you originally scheduled to complete
22   your work on 2357?
23   A.  I don't know.
24   Q.  When you say you don't know, is that based

Page 32

1    upon -- or what is that based upon, I should ask?
2    A.  I heard so many dates that it came a point in
3    time where I just couldn't keep track of them all.
4    I'm really not sure anybody told me exactly the
5    completion date.  There was a lot of speculation, but
6    I don't ever remember an absolute completion date.
7    Q.  When was the earliest time that someone told
8    you would be a completion day?
9    A.  I believe originally I heard sometime in June.
10   Q.  And who did you hear that from?
11   A.  Mr. Len Beck, Forest Electric.
12   Q.  And you said you had more than one conversation
13   or you heard more than one person say something about
14   a completion date.  Who were the other people that
15   would say something to you about completion dates?
16   A.  Several of the people for Tishman.  I don't
17   remember explicit names anymore, several of their
18   people in the office that were out in the field.  In
19   general, speculation from all the contractors, from
20   all of the general foremens and foremens for the rest
21   of the contractors.  Rumors were everywhere.
22   Q.  Now these other general foremen for the other
23   contractors, what was the, I guess the occasion or the
24   reason for having conversations with them about

Page 33

1    completion dates?
2    A.  Just how unrealistic some of them were.
3    Q.  When you say unrealistic, what was your
4    understanding as to why, and again, now this is kind
5    of a general question as opposed to specific, some of
6    the reasons that were given as to why people thought
7    the completion dates were unrealistic?
8    A.  Well, some of the problems that we were having
9    all along with the delivery of materials and the lack
10   of information that we were getting about how they
11   were to be installed.
12   Q.  I'll get back to that in a second.  Was there
13   ever a time that you thought the completion date, as
14   you understood it to be a completion date, was
15   unrealistic?
16   A.  Not in the beginning.
17   Q.  And you say not in the beginning.  Was there a
18   time where you did think it was unrealistic?
19   A.  I would say probably in May.
20   Q.  And what was the basis for your belief that it
21   was unrealistic to complete it, I guess at that
22   point -- withdrawn.
23        What was your understanding in May as to
24   what the completion date would be?

B-0632

9 (Pages 30 to 33)

Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Fred Street                        C.A. # 05-CV-300-JJF                    May 30, 2006

Page 34

1  A. At that time I thought it was still June.
2  Q. And at that point why did you believe it to be
3  unrealistic to complete by June?
4  A. My experience, it was just entirely too many
5  things, too many ends to be joined together to make
6  that date realistic.
7  Q. When you say too many ends to be joined
8  together, what do you mean by that?
9  A. All trades had things that needed to be
10 completed, and they were not completed and it seemed
11 like they were going much slower than anticipated.
12 Q. Now, for you on, in terms of your job and what
13 you were doing, what was it that you felt still needed
14 to be done in May?
15        MR. McDONALD: We're done with that tape?
16        THE VIDEOGRAPHER: No, go ahead.
17        MR. McDONALD: Okay, sorry.
18 A. I'd have to go back --
19 Q. Okay.
20 A. -- to the logbook to give you a specific
21 answer.
22 Q. And as -- withdrawn.
23        When was the next completion date that you
24 were told of after June '04?

Page 35

1  A. I really don't recall.
2  Q. Now, the laborers and cleanup crew that you
3  said you had issues with, who did you, did you report
4  that to anyone, that particular issue?
5  A. Forest Electric.
6  Q. And who at Forest Electric did you report that
7  to?
8  A. Mr. Len Beck.
9  Q. Did you report it to anyone else?
10 A. Michael Rocca.
11 Q. And Michael Rocca is?
12 A. He was an employee for Forest Electric.
13 Q. Anyone else?
14 A. Charlie Doble.
15 Q. And I know who Mr. Doble is.
16 A. I'm sure you do.
17 Q. Anyone else?
18 A. No, sir.
19 Q. And was that issue of cleaning up, was that
20 ever resolved in any form or fashion?
21 A. No.
22 Q. Okay. Was there a way that you tried to work
23 around it or deal with it, if that makes sense?
24 A. Yes, I, I approached Forest about written

Page 36

1  information to give me a reasonable amount of time if
2  they wanted an area cleaned up to let me take care of
3  it and have time to record; not to keep laborers
4  overtime after everyone's out of that area and then
5  cleaned it up.
6  Q. And what was the response to your suggestion?
7  A. None.
8  Q. When you say none, meaning that you never heard
9  back? Is that what you mean?
10 A. That's correct.
11 Q. Okay. And when did you make the suggestion or
12 first make it?
13 A. With -- without looking at my logbook, I'd have
14 to say January.
15 Q. Okay. Before I move on, I just want to make
16 sure, is there any other problem you had with any of
17 the ones you've talked about with the excavation
18 contractor, the drywall contractor, and the laborers
19 and cleanup crew that you considered to be notable?
20        MR. BESTE: Your question relates to other
21 trades and subcontractors?
22        MR. McDONALD: Yes. Well, to anyone on
23 the 23, on 2357.
24        MR. BESTE: Anyone on the job?

Page 37

1  Q. Well, contractors and other trades. I'm not
2  talking about what might have happened inside of, for
3  instance, your work crew. I'm not talking about those
4  types of things. We're talking about things external
5  to, to what was going on in Creedon, if you will.
6  A. The only other thing that I think is, that
7  impacted this job at that time, they closed the side
8  entrance to the building.
9  Q. And when did they do that?
10 A. Once again, I have to look in my logbook. But
11 the impact was great, because now you have to go all
12 the way out to the road and a pathway across the
13 project and in the front entrance, particularly bad at
14 night shift, no lighting.
15 Q. And when you say they closed it, who do you,
16 who do you mean when you say "they"?
17 A. Whether it be Tishman, Forest, I don't know.
18 All I know is come in one day and the gate is closed.
19 Q. And did you report that issue to anyone?
20 A. Yes.
21 Q. Okay, and who did you report that to?
22 A. To Mr. Doble and to Mr. Len Beck.
23 Q. Anyone else?
24 A. No.

B-0633

10 (Pages 34 to 37)

Creedon Controls, Inc.                                          Banc One Building Corporation
Fred Street                           C.A. # 05-CV-300-JJF                       May 30, 2006

---

Page 50

1  Q.  Did you ever get them from anyone else?
2  A.  I may have, but I would not respond.
3  Q.  Mr. Doble was the only person that had
4  authority in your understanding to authorize you to do
5  something?
6  A.  That's correct, unless it was an emergency.
7  Q.  Did you ever have any emergencies on 2357?
8  A.  No.
9  Q.  How many change orders did Mr. Doble instruct
10 you to perform?
11 A.  I don't recall.
12 Q.  Would it be less than five or more than?
13 A.  I would say more than.
14 Q.  Okay, less than 10 or more than?
15 A.  I would say less than 10.
16 Q.  Okay.  Now, as promised, we're going to get to
17 your daily log, which I will have marked as -- well I
18 say it's your daily log.  You have to identify it as
19 your daily log.  I believe it to be that.  Which we'll
20 have marked as Street B, which is in your materials.
21 Is that, in fact, your daily log?  Do you recognize
22 that to be, you can flip through it and let me know if
23 it is.  Purports to be on its cover, but since it's
24 your work, you should be able to tell us if it is or

---

Page 51

1  if it isn't.
2        (Street Exhibit B was marked for
3  identification.)
4  A.  Yes, this appears to be my daily log.
5  Q.  Okay, and for the record, the document is
6  titled "Daily Log:  Banc One CDC II, Fred Street,
7  dates:  October 17th, '03, through September 22nd of
8  '04," with a Bates range of 005490 through 005561.
9        Now let me ask you just a basic question
10 to start off.  What's your understanding as to why
11 daily logs were maintained for 2357?
12 A.  Basically as a way of tracking what we were
13 doing and any other problems or any incident that came
14 up.
15 Q.  And in terms of what you put in your daily log
16 for 2357, are those events that are in here, are those
17 the events that you considered notable?  Or maybe
18 another way to put it, if you didn't put anything in
19 here, is it because you didn't consider it to be
20 notable?
21 A.  I basically tried to give an outline what I was
22 performing that particular day, and would make note of
23 anything that I thought was peculiar or out of the
24 ordinary or may additional work or an impact to the

---

Page 52

1  schedule.
2  Q.  I want to start off at page 005494.  And I just
3  want to walk through some of these things just
4  briefly.  I want to try to get an understanding of
5  some things that when I went through and reviewed
6  this, I had questions about.
7  A.  Okay.
8  Q.  On that page, 005494, there's a notation for
9  November 25th that says, "Still moving a lot of
10 materials to do our job pipe CW" -- I can't read that
11 other part, I think "CRAC stands"; is that correct?
12 A.  Um-hum.
13 Q.  "Wire reels, et cetera"?
14 A.  Yes.
15 Q.  What does, what's that in reference to?
16 A.  Okay, the -- what this note says where it says
17 pipe, that's chilled water pipe, and the CRAC stands
18 are the stands that the air conditioning units for the
19 data center were going to be mounted on.  And of
20 course wire reels are self-explanatory.  These were
21 the materials that were covering the floor of the data
22 center.  We were trying to install Unistrut, conduit
23 and wire, stored on this floor.
24 Q.  Now when you say stored on the floor, stored by

---

Page 53

1  you or by --
2  A.  Other contractors.
3  Q.  -- other contractors.  And what if any impact
4  did that particular storage issue have for you?
5  A.  Instead of being able to -- everything that we
6  performed basically was off of a scissors lift.  If
7  you can't drive forward without moving material, it
8  takes extra time and manpower to move those materials
9  out of your way.  That's where the additional manpower
10 came in.  That's what this notation in the left-hand
11 margin.
12 Q.  When you say notation in the left-hand margin,
13 that's, can you maybe explain that one?
14 A.  What I estimated was the additional manpower
15 required to do that particular task.
16 Q.  Okay, and what was that estimate?
17 A.  Supervision plus 40 man-hours.
18 Q.  Okay, all right.  Moving to page 005495, that's
19 December 1st.  In that notation I see an area where
20 you say, "Area C cutting rods for lighting, new saw"?
21 is that "not right, not metal saw"?
22 A.  Yes.
23 Q.  What's that in relation to?
24 A.  I ordered a new saw and it came in incorrect.

---

**B-0634**

Creedon Controls, Inc.                           v.                Banc One Building Corporation
Fred Street                              C.A. # 05-CV-300-JJF                      May 30, 2006

Page 54

1    Q.  And who did you order it from?
2    A.  One of the tool suppliers. I'm not -- at this
3    time I do not remember exactly.
4    Q.  Okay, but it was something you ordered, though,
5    that came in incorrectly?
6    A.  Through our office, yes.
7    Q.  Okay. And did that have an effect on your work
8    at that time period?
9    A.  Yes.
10   Q.  Okay. And what was that impact, effect?
11   A.  It was very small. Just I was going to start
12   another crew cutting rods, and I just put them on
13   something else for that night till the problem
14   straightened out the next day.
15   Q.  Okay. Now, moving on to page 005496, which is
16   actually I think, yes, the next page, I see a notation
17   for December 6th that says "Could not find two
18   conduits -- could not find two conduits and pipe
19   tools." What's that in reference to?
20   A.  I was asked by the day shift to install some
21   conduits for telephone. I could not locate the two
22   conduits that they asked me to extend, and I needed,
23   also needed pipe tools that they -- we stubbed that up
24   in rigid conduit from PVC to rigid to come up. This

Page 55

1    was just a notation, they asked me to look into it, I
2    looked -- this is a notation to myself, really.
3    Q.  Okay, okay.
4    A.  Didn't impact anything.
5    Q.  Okay. And did you ever, in terms of not being
6    able to find the conduits, pipe tools, did you ever
7    determine why you couldn't find them?
8    A.  Just that my recollection of that is they said
9    they spray painted them with orange paint.
10   Unfortunately, everybody out there used orange paint.
11   I wasn't sure, so I just said I'm not going to waste
12   any more time on it.
13   Q.  Understood. Now, moving on to page 005497, I'm
14   looking at December 9th.
15   A.  Okay.
16   Q.  I see a notation there for "Connect outside
17   lighting with" --
18   A.  Romex?
19   Q.  -- "Romex," okay, "ran out, could not do."
20   A.  Right.
21   Q.  Is that a material issue? Running out of
22   material or --
23   A.  Yes. This, this was extra work that I actually
24   requested because we still didn't have outside

Page 56

1    lighting. We're working night shift, there's no
2    outside lighting. It was a safety issue that I had
3    been complaining about since I went on night shift.
4    Q.  And who had you made those complaints to?
5    A.  Mr. Len Beck.
6    Q.  Okay. And this is in December of 2003?
7    A.  Yes.
8    Q.  And how long did that problem last?
9    A.  We got the lights connected the next night.
10   That would be December the 10th.
11   Q.  When was the first time you made this complaint
12   to Mr. Beck?
13   A.  First night I was on night shift.
14   Q.  And when was that?
15   A.  I will tell you in just a second. November the
16   13th.
17   Q.  Now, in terms of this lighting issue, how did
18   it affect your work on night shift from November 13th
19   through December 10th?
20   A.  Basically everybody had to carry a flashlight
21   to go to work or to go to the bathroom.
22   Q.  And is there any delay that you attribute to
23   that?
24   A.  I would say not delay, but added expense. We

Page 57

1    had to supply flashlights for our whole crew.
2    Q.  And do you know what happened to that added
3    expense or added cost?
4    A.  No, sir.
5    Q.  Okay, moving to the next page, 005498, there's
6    a notation at December 16th, I believe, that says,
7    "All material and in building now, no trailer or boxes
8    on site." Is that referring back to the other issue
9    we discussed earlier, in terms of where the material
10   was?
11   A.  Yes, this, this is now, we were directed that
12   there be no more material outside. Everything had to
13   be moved inside. No more trailers, no more box
14   trailers or storage. Everything had to move inside.
15   Q.  Okay. And what effect did that have on your
16   work, if any?
17   A.  Just about brought everything to a halt.
18   Tremendous impact.
19   Q.  Okay. And when you say brought everything to a
20   halt, how long did that, I guess that impact or that
21   standstill or whatever you want to call it, how long
22   did that last?
23   A.  Basically it was ongoing.
24   Q.  Okay. Now, if it was ongoing, how did you

15 (Pages 54 to 57)