Creedon Controls, Inc.                    v.                    Banc One Building Corporation
Fred Street                        C.A. # 05-CV-300-JJF                        May 30, 2006

Page 74

1  down how many man-hours and supervision, how did you
2  go about kind of reconstructing that?
3    A.  At that point in time it was still very fresh
4  in my mind, the problems and what it took to move each
5  one of these rooms. I went back and reviewed where on
6  the daily, we have a daily report that was given to
7  Forest, manpower report and the areas that we were
8  working in. I used those along with these notations
9  to come up with a reasonable amount of man-hours to
10  complete those tasks.
11    Q.  Now, at the time that these, these tasks or
12  you're dealing with them on that day, what --
13  withdrawn.
14        Actually, this is a good stopping point,
15  you have five minutes left?
16        THE VIDEOGRAPHER: We're going off the
17  record at approximately 11:23 a.m.
18        (A brief recess was taken.)
19        THE VIDEOGRAPHER: We're going back on the
20  record at approximately 11:28 a.m.
21  BY MR. McDONALD:
22    Q.  All right, Mr. Street, based upon what you just
23  told me, I wanted to turn back the pages a couple,
24  couple of pages, actually maybe more than a couple.

Page 75

1  Maybe start from the very beginning. Sounds like a
2  Sound of Music reference. And look at the situations
3  where you went back when you had your discussion with
4  Mr. Link and noted the supervision plus man-hours. So
5  starting at the first page, which I believe the first
6  page where you have your written text, 005491, okay,
7  you're on that page?
8    A.  Yes.
9    Q.  Am I correct in saying that there are no such
10  notations? And again, when I say notations, I'm
11  talking about the supervision plus man-hours that you
12  went back and did with Mr. Link, are there no such
13  notations on that page? Is that correct?
14    A.  There are -- yeah, there is a notation on that
15  page.
16    Q.  There is?
17    A.  Yes.
18    Q.  There is or is not?
19    A.  There is.
20    Q.  Okay, where would that be? I'm sorry if I
21  didn't see it.
22    A.  It's right up here under Thursday the 13th.
23        MR. BESTE: I think he's on the wrong
24  page. He is on the next page.

Page 76

1        THE WITNESS: The first -- oh. On this
2  page. Wait a minute. Well that looks like a 1 there
3  too. Okay.
4        That's correct, there are no notations on
5  this page.
6    Q.  Okay, that's 005491?
7    A.  1.
8    Q.  Okay, moving to 005492, I see the notation I
9  think you were referring to a second ago, that's the
10  Thursday the 13th?
11    A.  Yes.
12    Q.  Okay. And that's supervision plus 40, is that
13  40 man-hour?
14    A.  Yes.
15    Q.  And what was that in relation to?
16    A.  This was delay of approved drawings.
17    Q.  And when you say delay of approved drawings,
18  what do you mean by that?
19    A.  We were not supposed to start the installation
20  of the Unistrut support structure for the lighting
21  until it was approved. This was a delay because we
22  thought it took an extremely long time to approve the
23  drawing.
24    Q.  When you say extremely long time, what would be

Page 77

1  the normal period of time for approving the drawings,
2  in your experience?
3    A.  Normally five to seven days.
4    Q.  Okay. And how long did this take?
5    A.  My recollection was in excess of two weeks.
6    Q.  So it doubled the time it normally would take?
7    A.  Yes.
8    Q.  And who was the person that had to approve the
9  drawings?
10    A.  Our approval would have come from Forest
11  Electric.
12    Q.  Do you know from whom in Forest Electric?
13    A.  No, sir.
14    Q.  And were you able to do any work in the interim
15  while you were waiting for these drawings?
16    A.  Not for the actual structure of the Unistrut,
17  no.
18    Q.  But you were able to do other work?
19    A.  Very, very little. The majority of our work
20  consisted of the lighting in the data areas. They --
21  at this point in time, that was the only area that had
22  any floor poured. So there was not a lot of other
23  area, the walls weren't installed, there was not a lot
24  of areas to work in.

**B-0636**

20 (Pages 74 to 77)

Creedon Controls, Inc.                          v.                          Banc One Building Corporation
Fred Street                              C.A. # 05-CV-300-JJF                            May 30, 2006

Page 86

1  previous to that.  **Now we would start fresh with the**
2  **slate being wiped clean.**
3   Q.  Okay.  So then, for instance, the problems that
4  are described on -- bear with me for a second.  The
5  problem that you describe on, for instance, 005498,
6  which is the "all material in building now," and you
7  gave that I think 10 man-hours is what we, you said
8  you assigned to it, is that separate from what you
9  previously had written on 005494 from November 25th,
10  "still moving a lot of materials to do our job" and
11  you have that as supervision plus 40 man-hours?
12   A.  **Yes, that is separate.**
13   Q.  Okay.  And for instance, on 005499 at the
14  bottom for December 20th when you talk about "problem
15  with all crafts taking control, box off lifts," so on
16  and so forth, that's a different problem from the one
17  we just discussed on 005503 regarding moving a lot of
18  other crafts' material?
19   A.  **That is correct.**
20   Q.  Okay.  All right.  I believe we were at, before
21  we went back, we were at, I think I covered 005505,
22  but just for the sake of, to make sure, there's
23  nothing on that page, 005505 that fits supervision
24  plus man-hours; is that correct?

Page 87

1   A.  **Unfortunately, my number's incomplete, is that**
2  **January --**
3   Q.  That's January 2004 is at the top, that's
4  correct.
5   A.  **Okay, that's Thursday the 15th?**
6   Q.  Through the 20th.
7   A.  **There is no notations on that, that's correct.**
8   Q.  Okay, the next page, 005506, that's January
9  21st through the 24th.  Anything on that page?
10   A.  **No.**
11   Q.  Okay.  The next page, 005507, which is January
12  26 through I believe the 29th, anything on that page?
13   A.  **No.**
14   Q.  Next page, 005508, January 30th through
15  February 3rd, I do see I think one notation that says
16  supervision plus, is that 280 man-hours?
17   A.  **Yes.**
18   Q.  And what's that in relation to?
19   A.  **This was the impact caused by them painting the**
20  **battery room floors before giving us any time to get**
21  **into those rooms and install the lighting.  They put**
22  **epoxy coating on the floor and then told us we had to**
23  **protect the floor in order to run our reaches in there**
24  **to install the lighting.**

Page 88

1   Q.  When you say they told you you had to protect
2  the floor, what was the means for doing that?
3   A.  **Basically had to cover it with plywood.**
4   Q.  And how large a room are we talking about?
5   A.  **Approximately 30 foot by 40, and there was more**
6  **than one.**
7   Q.  How many rooms did that apply to?
8   A.  **Three rooms.**
9   Q.  So is that three rooms that are 30-by-40 each?
10   A.  **That is correct.**
11   Q.  And the plywood, where did you get the plywood
12  from?
13   A.  **I'm not sure about that.**
14   Q.  Was it something that you provided or that you
15  put down or was it something that was done for you?
16   A.  **Some, some was provided for us and installed.**
17   Q.  When you say installed, by Creedon or installed
18  by someone else?
19   A.  **Someone else.**
20   Q.  Okay.  So what's the 280 man-hours related to
21  in that, in regards to those three rooms?
22   A.  **They also, as soon as the floor was painted,**
23  **they installed the battery racks and started**
24  **installing all the batteries.  Plus they wanted the**

Page 89

1  **lights done.  So we're working in an area that's very**
2  **congested with other people in there trying to work,**
3  **install these large batteries that are hazardous at**
4  **best, and they're working over their head installing**
5  **Unistrut.  Considerably slowed this project down in**
6  **these rooms.**
7   Q.  And this is still the night shift we're talking
8  about?
9   A.  **Yes.**
10   Q.  And when you say it slowed it down, was there
11  any other work that was available to be done during
12  this time period?
13   A.  **We were instructed to get these rooms**
14  **completed.  They had a completion date that they**
15  **wanted.**
16   Q.  And what was that completion date for those
17  rooms?
18   A.  **I do not remember at this time.**
19   Q.  Okay.  I want to make sure I understand
20  something.  You said that it slowed the project down,
21  but that there was a completion date that they were
22  trying to meet.  Did they meet the completion date for
23  these three rooms?
24   A.  **I don't know.**

**B-0637**

Page 102

1  that were available to us with the manpower we kept.
2  Q.  In your calculation of man-hours, do you feel
3  that there could have been a reduction in that
4  calculation based upon having additional men
5  available?
6  A.  No, I think the additional people available
7  would have increased the amount of lost time.
8  Q.  Okay.  And that's because?
9  A.  More people to shuffle around, more people to
10  have stuff in their way.
11  Q.  That's the congestion issue again?
12  A.  Yes.
13  Q.  When you say "back to one gang" on 005517, what
14  does one gang mean?  How many people is that?
15  A.  That's 10 men.
16  Q.  So you have a total of 10 men working for you
17  at that point?
18  A.  Yes.
19  Q.  And at the, I guess the height of it, so to
20  speak, how many people did you have working for you at
21  the peak?
22  A.  Thirty some, I remember.  I can go back here
23  and be specific.
24  Q.  Okay.

Page 103

1  A.  Thirty-three or -- yeah, it looks like we
2  peaked at 33 for this particular project.
3  Q.  And what was, what was your thought about
4  having one gang working on the work that you had in
5  front of you in terms of how you could complete that
6  work?
7  MR. BESTE:  You mean in front of him that
8  day or --
9  MR. McDONALD:  In front of him --
10  MR. BESTE:  -- in front of him in the
11  months?
12  MR. McDONALD:  It's a fair question.
13  Q.  In front of you in terms of the months to come.
14  Like what was yet to be completed?  Did you think you
15  could get that done with 10 men in a reasonable time
16  period?
17  A.  For what my assignment on night shift, I would
18  say yes, I felt confident with the number of men I had
19  at that point.
20  Q.  Now moving on to 005518, are there any
21  notations on that page indicating supervision with
22  need of additional man-hours?
23  A.  No.
24  Q.  Next page is 005519, I do see something for

Page 104

1  March 17th.  I think it says eight man-hours.  What's
2  that in relation to?
3  A.  Okay, now this was the two rooms that they
4  painted the floors.
5  Q.  Okay.
6  A.  We had to protect the floors again in order to
7  go in and finish the lighting and receptacle wiring.
8  Q.  Are these two rooms the same size as the other
9  three you mentioned before?
10  A.  These two rooms are approximately, they're
11  approximately the same size.
12  Q.  Okay.
13  A.  Twenty-by-30.
14  Q.  Now, do you have fewer men working on that
15  project this time around as opposed to before?
16  A.  Yes.  As we said before, we're down to one
17  crew.
18  Q.  Bear with me for a second.  I'm trying to go
19  back to their other incident.
20  Back on 005508, you estimated for three
21  rooms that it would be 280 man-hours.  I'll wait till
22  you get there.  And it's under January 2nd.  And then
23  on this particular date, 005519 on March 17th, I think
24  I see eight man-hours.

Page 105

1  A.  Right.
2  Q.  What's the, what's the difference other than --
3  well, obviously there is a difference in one is three
4  rooms, the other is two.  But in terms of the
5  disparity between 280 man-hours versus eight
6  man-hours, what's your recollection as to why that's,
7  the difference is that much?
8  A.  Okay.  The earlier one on the 2nd, February the
9  2nd, these three rooms that we're speaking of hadn't
10  even been started.  There's -- as far as the support
11  system for the lighting, it's not there at all.  So
12  the rods have to be hung, the Unistrut installed, the
13  wire, the lighting, everything associated with it.  So
14  there's three rooms --
15  Q.  Okay.
16  A.  -- that you're limited in where you can get in
17  there and the floor protection.  Okay?  The second one
18  where it's just the eight hours, these rooms were
19  basically completed just before they painted the
20  floor.  So much less work to be done, much less floor
21  to protect because we only had to run in the door and
22  make a, you know, couple of moves and we were done.
23  Because the back side was done.  That's why there's a
24  large disparity, much less work being done here than

27 (Pages 102 to 105)

Creedon Controls, Inc.                          v.                   Banc One Building Corporation
Fred Street                              C.A. # 05-CV-300-JJF                      May 30, 2006

Page 106

1  in the previous incident.
2     Q.  Now, in the previous incident, I think you
3  testified that the plywood was laid down by someone
4  other than Creedon; is that correct?
5     A.  That is correct.
6     Q.  Okay.
7     A.  In some cases.  Then we had to move the plywood
8  to some other areas.  They only did -- they actually
9  put the plywood down so that Furness could bring the
10  batteries in.  They didn't really protect the floors
11  for us.
12     Q.  Okay.
13     A.  A lot of this is just coming back to me as
14  we're talking about this.  But some -- the floors were
15  protected for them to bring the batteries in, and then
16  we used that same protection as they got done
17  installing the batteries to cover the floor to do the
18  rest of our work.
19     Q.  And just so, we're actually probably about to
20  break for lunch here in a second, I have five minutes
21  left on the tape.  Before I do that, though, just to
22  be clear, you did mention the one instance so far
23  we've had, I think we've had one supervision plus
24  man-hours incident on 005516 that was in relation to

Page 107

1  2377 as opposed to 2357.
2     A.  Yes.
3     Q.  Are the other ones we've discussed so far, have
4  they all been related to 2357, other than that one
5  instance?
6     A.  That is correct.
7     Q.  Okay, and let me just finish off this page and
8  then we can break for lunch.  On 005519, there's I
9  think one other notation, it says something to the
10  effect "delayed start," supervision plus 200
11  man-hours?  What's that in relation to?
12     A.  That's the generator rooms.  We tried to get in
13  there early to try and get the strut up before the
14  generators were installed before the, some of the
15  block walls were put up.  We could not get in that
16  area.  I'm not sure of all the reasons, but we were
17  denied access to that area.  So now you're installing
18  Unistrut in lighting fixtures around a generator
19  that's the size of a locomotive.
20        MR. McDONALD:  Okay, I think we'll go
21  ahead and just break for lunch.
22        THE VIDEOGRAPHER:  We're going off the
23  record approximately 12:22 p.m.
24        (A lunch recess was taken.)

Page 108

1        THE VIDEOGRAPHER:  We're going back on the
2  record at approximately 1:19 p.m.
3  BY MR. McDONALD:
4     Q.  Good afternoon, Mr. Street.
5     A.  Afternoon.
6     Q.  I want to start off kind of where we left off,
7  and I think it's going to be page number 005520, March
8  2004, 22nd through the 25th.  The same thing we've
9  been doing before, is there anything on that page that
10  was noted as being required supervision or additional
11  man-hours?
12     A.  No.
13     Q.  Okay.  005521 is the next page, March 26
14  through the 30th.  I think there is something I see in
15  the middle of the page.  That's supervision plus four
16  man-hours; is that correct?
17     A.  Yes.
18     Q.  Okay, and what's that all about?
19     A.  This was moving material in the air handler
20  room B, this particular material belonged to the sheet
21  metal workers, so that we could install lighting in
22  that area.
23     Q.  Okay.  And this is again we're talking about
24  2357, right?

Page 109

1     A.  That is correct.
2     Q.  Is there anything else on that page that
3  required supervision or additional man-hours?
4     A.  No.
5     Q.  Moving on to page 005522, this is March 2004,
6  March 31st through April, looks like April 3rd.  I see
7  two items, the first one I see supervision plus eight
8  man-hours on March 31st.  Do you see that?
9     A.  Yes.
10     Q.  What was that in relation to?
11     A.  That again was in the other generator room, the
12  opposite side of the building, additional time and
13  labor needed to get our lifts into the area so we
14  could work.
15     Q.  Is this the same generator issue we talked
16  about earlier?
17     A.  Yes, same issue, different room.
18     Q.  And at the bottom of the page there is a
19  supervision plus 16 man-hours, do you see that?
20     A.  Yes.
21     Q.  And what's that in relation to?
22     A.  This is pertaining to the floors being painted
23  out of sequence.  We were given a schedule, tentative
24  schedule for the painting of the floors, and then they

28 (Pages 106 to 109)

Creedon Controls, Inc.
Fred Street

v.

C.A. # 05-CV-300-JJF

Banc One Building Corporation
May 30, 2006

Page 110

1  decided to change that schedule for their own use.
2  And when I say "they," I'm speaking of Tishman.
3  Q.  Tishman?
4  A.  Yes.
5  Q.  And how do you know that Tishman was involved
6  in that particular incident?
7  A.  Because the painter worked for Tishman.
8  Q.  All right, moving on to the next page, 005523,
9  April 5th through April 8th, I see I think two items
10  there.  One is supervision and two additional
11  man-hours on April 6th.  Do you see that?
12  A.  Yes.
13  Q.  Okay, what is that in relation to?
14  A.  That's moving material again in the air
15  handling room A.
16  Q.  Okay.  And below that, the next day, April 7th,
17  supervision plus eight man-hours for what activity?
18  A.  That's for corridor 146, moving material to
19  gain access.
20  Q.  And when you say material, what material are
21  you referring to?
22  A.  At this point I can't identify the owner of the
23  material from the notes I took.
24  Q.  Okay.  And is there anything else on page

Page 111

1  005523?
2  A.  No, there's not.
3  Q.  Okay.  Moving on to 005524, April 8th through
4  the 10th, I see two items on my, on the sheet.  First
5  one on April 8th, supervision plus six man-hours.  Do
6  you see that?
7  A.  Yes.
8  Q.  What was that about?
9  A.  This is to complete the strut lighting in the
10  area where the walls were not completed.  This was in
11  data center A.  We talked about this earlier, what
12  happened in data center B.  These walls were not
13  completed due to the temporary roof drain that had
14  been installed.
15  Q.  When you say data center A, is this still 2357
16  or is this --
17  A.  Yes, still 2357.
18  Q.  Okay.
19  A.  This is, there are two separate data centers
20  there.
21  Q.  Right.  Just wanted to make sure.  I think I
22  maybe misunderstood you earlier.
23      Further down the page on April 9th, there
24  is a delay and supervision plus 150 man-hours.  What's

Page 112

1  that in relation to?
2  A.  That's the chiller room.  Chiller room B, in
3  particular here.  We had started installation of a
4  bolt rod in that area to hang our strut on.  We were
5  instructed to stop because those rods were interfering
6  with the installation of the piping, the chilled water
7  piping.
8  Q.  And what was your understanding regarding the
9  priority or the -- I should say the priority of
10  installing the chilled water piping versus what you
11  were doing?
12  A.  They said that the chilled water piping was
13  more important, wanted us to stay out of the way.  And
14  this reflects what it took to go back once the chilled
15  water piping was installed to go over, under and
16  around that piping to install our lighting.
17  Q.  Okay.  And when you say "they," who do you mean
18  when you say they told you?
19  A.  Tishman.
20  Q.  Tishman.
21  A.  We were actually directed through Forest, but
22  Tishman was involved in this.
23  Q.  Anything else on page 005524?
24  A.  No.

Page 113

1  Q.  Okay.  Moving on to page 005525, this April
2  12th through the 13th, is there any item on that page
3  that required additional supervision or man-hours?
4  A.  No.
5  Q.  And by the way, I note that along the
6  right-hand border it seems like you have numbers along
7  the side.  Is that, are those numbers reflecting the
8  men who were working on different projects?
9  A.  Yes, that's, that's just a reminder to me when
10  I did my daily labor report to Forest how many men
11  were on each project.
12  Q.  And did you believe at that time in early April
13  that you had enough men on your, on your crew to get
14  things done?
15  A.  Yes.
16  Q.  Next page is 005526.  This is April 14th
17  through the 15th.  Is there anything on this page that
18  required additional supervision or man-hours?
19  A.  No.
20  Q.  Now, I note towards the end of the write-up on
21  April 14th there's a notation that says, "Called C.
22  Doble, may go back to eight hours next week and no
23  Saturday or part crew.  Reeder leaving after Saturday.
24  May lose my" -- is that trailers?

Creedon Controls, Inc.                                        Banc One Building Corporation
Fred Street                         v.                                    May 30, 2006
                          C.A. # 05-CV-300-JJF

Page 114

1  A.  "Travelers."
2  Q.  "Travelers," excuse me, "and get day shift men.
3  This will not work and I told C. Doble this." When
4  you said that wasn't going to work, what did you mean
5  by that?
6  A.  That I thought was not going to be conducive to
7  the job continuing smoothly. The travelers were
8  workers that were out of our jurisdiction, had come
9  from another local working for us. And there was a
10  possibility that they would be replaced by other
11  people, lay them off and other -- this did not happen.
12  This was --
13  Q.  Okay.
14  A.  This did not happen. This was merely a, it was
15  a possibility.
16  Q.  Okay. And what's your understanding as to why
17  it didn't happen?
18  A.  Don't know. I really don't know the answer to
19  that. It just didn't happen.
20  Q.  Okay.
21  A.  False alarm.
22  Q.  Moving on to page 005527, April 15th through
23  the 17th, is there anything noted on this page that
24  required additional supervision or man-hours?

Page 115

1  A.  No.
2  Q.  Okay. Moving on to the next page, 005528,
3  April 19th through the 23rd, I think I note one thing
4  I think on Wednesday April 21st, that indicates
5  additional supervision and man-hours. Do you see
6  that?
7  A.  Yes.
8  Q.  Okay. And that is, was it 50 additional
9  man-hours?
10  A.  Yes.
11  Q.  And what's that in relation to?
12  A.  That goes back to the other chiller room.
13  There's two chiller rooms in each, in this building.
14  That was the late start, again due to we were asked to
15  wait till the, or the chilled water piping was
16  installed.
17  Q.  And do you know what function the chilled water
18  has in this particular context?
19  A.  Yes.
20  Q.  Okay, and what is that?
21  A.  That's what gives you your air conditioning.
22  The CRAC units we talked about earlier really just use
23  chilled water as a medium to take the heat out of the
24  room, as opposed to Freon.

Page 116

1  Q.  Okay. And what's the consequence, if any, and
2  if you know, of not having chilled water installed at
3  this particular point in the, in the project?
4  A.  You basically need the chilled water up and
5  running and tested so if you have any leaks or any
6  problems, you can take care of them before they, you
7  have anything else installed and have damage done to
8  them.
9  Q.  Okay. And in relation to -- what exactly were
10  you doing, your crew? What were you doing at this
11  time that was interrupted by the chilled water issue?
12  A.  Basically on the nights at that time, we were
13  installing lighting which included the rods and the
14  Unistrut and the wire and the fixtures. And that's
15  what particularly they stopped us from doing. And
16  that was our primary task on second shift, was
17  lighting.
18  Q.  Now, is there anything else on page 005528 that
19  required additional supervision or man-hours?
20  A.  No.
21  Q.  Okay. Next page is 005529, couple items I'd
22  like to talk to you about on this page.
23  A.  Okay.
24  Q.  Let's start off with the supervision and

Page 117

1  man-hours. I see that on April 26 there is a notation
2  of eight additional man-hours. What's that in
3  relation to?
4  A.  This, again, is where we were redirected to
5  work in a specific room, 118, at the last minute.
6  This was where the mechanical contractor, pipefitters,
7  had for a storage area. And I've just reflected here
8  that it should have been better planning by Forest
9  Electric not to spring it on me at the last minute. I
10  already had my men out and working and now all of a
11  sudden you want me to move to room 118. And the eight
12  hours just reflects what I thought it actually took to
13  move my manpower from one room to another.
14  Q.  Okay. I also note on that same date you had a
15  meeting with Dennis Link.
16  A.  That's correct.
17  Q.  Do you see that?
18  A.  Yes.
19  Q.  Okay. Had you met with Dennis Link prior to
20  April 26th?
21  A.  Yes.
22  Q.  Okay. When was the first time you met with
23  Dennis Link?
24  A.  I believe it was approximately a week, maybe

30 (Pages 114 to 117)

Page 162

1  you a better answer here. Distancewise, probably in
2  the neighborhood of 100 yards.
3      Q. So are you saying it took 16 man-hours to move
4  100 yards?
5      A. No.
6      Q. Okay, so explain it to me then.
7      A. Okay. It takes two high reaches to do this
8  operation. You can't reach with one, you have to have
9  two. You have to get two men to go find two high
10  reaches. You have to have another man, a spotter to
11  bring them around these corners so you don't run into
12  the walls and don't run into the pipe trench, and
13  maneuver them into this area. Then you have to have
14  additional manpower to bring the Unistrut, the cutting
15  tools, all the hardware, all the other paraphernalia,
16  you need the cover that goes on the Unistrut,
17  transport it into that area. And then you have to
18  transport everything back to where it was when you
19  started for your next project.
20      That's all included in this, the
21  transportation and movement into the area, back to the
22  area to start where I was before I went in.
23      Q. So you're saying, how many men in particular
24  are you talking about here, five?

Page 163

1      A. Four.
2      Q. Four people. And it took them four hours each
3  to move from, move 100 yards back and forth?
4      A. Basically two hours to move everything in and
5  two hours to move everything back out.
6      Q. And is that how you calculated each of these
7  man-hours that you've included in your logbook?
8      A. I would say yes.
9      Q. How did you account for your time spent on the
10  general power job versus the cable tray job when that
11  began? Is there any way you did that?
12      A. Yes, that would, that would reflect back to the
13  time sheets, which would have split my time between
14  those projects.
15      Q. Okay. And is that a time sheet that you
16  prepared?
17      A. Yes.
18      Q. So you would write on a daily basis how many
19  hours you spent on one job versus the other?
20      A. For everybody that worked for me, I made out a
21  daily time report that went to Creedon's office for
22  every day for every man that worked for me.
23      Q. Okay. So that daily time report, you made it
24  out for all your journeymen under you and you assigned

Page 164

1  hours to different jobs?
2      A. That is correct.
3      Q. Did you use the same journeymen for the cable
4  tray conveyance job?
5      A. Yes.
6      Q. And -- withdraw that.
7      Now, you ended up with a second part of
8  this cable tray conveyance job; is that correct?
9      A. Yes.
10      Q. Can you look at your logbook and tell me when
11  that started?
12      A. Okay. I'm going to say that was going to be,
13  that's May the 12th. That's page 005533.
14      Q. Okay, and what tells you that the second cable
15  job began?
16      A. Because we received the strut for that project
17  and started unloading it.
18      Q. Okay. And can you tell me when that completed
19  it?
20      A. I'm not sure that that's correct.
21      Q. If you can't find it, can you just give us your
22  best estimate?
23      A. I'd really not, rather not guess. The reason
24  why the logbook changes and only reflects pertinent

Page 165

1  information and not everyday data like I was doing
2  before, if you look in the daily reports to Forest,
3  there's a book of daily reports for work that we
4  performed. Each area we worked in is detailed with
5  the number of men, and that will surely tell us
6  exactly when this project was completed.
7      Q. Okay. As you sit here today, do you have any
8  estimate of when that was?
9      A. I'm, I'm thinking it was around the end of
10  June.
11      Q. Okay. Again, did you use the same journeymen
12  for that cable tray project?
13      A. To some extent, not, not man for man, but the
14  nucleus of that crew, yes.
15      Q. Okay. And again, you were the general foreman?
16      A. Yes.
17      Q. You talked a little bit about your -- I'm
18  jumping around so --
19      A. Sure.
20      Q. You talked a little bit about your meeting with
21  Mr. Link on April 26th. Is there any recording made
22  of that interview?
23      A. Not to my knowledge.
24      Q. Did you take any notes relating to that

**B-0642**

42 (Pages 162 to 165)

Creedon Controls, Inc.                              v.                    Banc One Building Corporation
Fred Street                                  C.A. # 05-CV-300-JJF                            May 30, 2006

Page 166

1  interview?
2  A.  No, I did not.
3  Q.  Do you know if he did?
4  A.  I'm not sure.  He may have.  I'm not sure.
5  Q.  How often was Mr. Link on site?
6  A.  Fairly infrequently.
7  Q.  What was your understanding of Mr. Link's
8  function?
9  A.  Originally he was there to help us get back
10 together on as-built drawings, change orders that had
11 either been processed or not processed yet, and that
12 was his field of expertise.  And I was asked to assist
13 him in any way I could.
14 Q.  Did his function change, as far as you
15 understood it?
16 A.  Not really.
17 Q.  You talked about the L&M corridor.
18 A.  Um-hum, yes.
19 Q.  And an issue relating to that corridor and your
20 ability to get your work done.  Correct?
21 A.  Yes.
22 Q.  Can you tell me what that issue was?
23 A.  Originally when the walls were put up for the
24 data centers in the area B, which was the UPS rooms

Page 167

1  and switch gear rooms, the trench cover was not yet
2  installed, so that left a very narrow access area
3  across the back side of that building and open trench.
4  Consequent to that they installed the trench covers,
5  and we were told we could not run any kind of a lift
6  on them because they were of insufficient strength to
7  hold the weight.
8  Q.  Now, was the trench, that's where they ran
9  the --
10 A.  Chilled water lines.
11 Q.  Okay.  And that trench was shown on the
12 drawings, I assume?
13 A.  Yes.
14 Q.  So all the, any contractor with those drawings
15 would understand that there was going to be a trench
16 in that corridor?
17 A.  Yes.
18 Q.  It looks like you want to say something else.
19 What is it?
20 A.  It's also reasonable to think there's going to
21 be a lid on that trench that you're going to be able
22 to work around and use.
23 Q.  Was there -- in the drawings was there a lid on
24 the trench?

Page 168

1  A.  Yes.
2  Q.  And did it state when that lid would be placed?
3  A.  Of course not.
4  Q.  And did anyone -- well, you weren't involved in
5  the bid process, correct?
6  A.  No.
7  Q.  And so you would, you're saying that you would
8  have to run lifts, but there was basically a trench
9  down the middle of the corridor?
10 A.  It basically became a one-way street.  If
11 anybody was working in that particular area or coming
12 towards you, you could not get through.  It literally
13 sometimes would take you, you were talking about 100
14 yards, sometimes it would take you in excess of an
15 hour to get your lift 100 yards to where you wanted to
16 work.
17 Q.  And that's because you had a small area to
18 move?
19 A.  And several people trying to move.
20 Q.  So there are -- okay, there were other
21 contractors that would be working in the same area and
22 that would hinder or obstruct your ability to move?
23 A.  Correct.
24 Q.  Let's go through some of your logbook.  On page

Page 169

1  5492, I'm going to try not to repeat anything, but I
2  have a few questions for you.
3  A.  Okay.
4  Q.  This relates to drawings that you believe were
5  delayed for some period of time, correct?
6  A.  Yes.
7  Q.  And is it also correct that you and your men
8  continued to perform other work while the drawings
9  were apparently being processed?
10 A.  Yes.
11 Q.  And I think you said that you would get the
12 approved drawings from Forest, correct?
13 A.  No, Creedon Controls would get the approved
14 drawings.
15 Q.  Okay.  And Creedon -- and they would get them,
16 your understanding was they would get them from
17 Forest?
18 A.  Yes.
19 Q.  And do you know who Forest would have to get
20 the approved drawings from in order to give them to
21 Creedon?
22 A.  I don't know, no.
23     MR. BRADLEY:  Let's go off the record.
24     THE VIDEOGRAPHER:  We're going off the

43 (Pages 166 to 169)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a           )
Delaware corporation,               )
                                    )
            Plaintiff,              )
                                    ) Civil Action
        v.                          ) No. 05-CV-300-JJF
                                    )
BANC ONE BUILDING                   )
CORPORATION, an Illinois            )
corporation, and FOREST             )
ELECTRIC CORPORATION, a New         )
York corporation,                   )
                                    )
            Defendants.             )

        Rule 30(b)(6) deposition of BANC ONE
BUILDING CORPORATION, by and through its corporate
designee, RICHARD WERNER, taken pursuant to notice at
the law offices of Cohen, Seglias, Pallas, Greenhall &
Furman, PC, 1007 Orange Street, Suite 1130,
Wilmington, Delaware, beginning at 3:16 p.m., on
Monday, June 26, 2006, before Julie H. Parrack,
Registered Merit Reporter, Certified Realtime Reporter
and Notary Public.

APPEARANCES:

        EDWARD SEGLIAS, ESQUIRE
        COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN PC
          1007 Orange Street, Suite 1130
          Wilmington, Delaware  19801
          On behalf of Plaintiff

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Creedon Controls, Inc.                                                    Banc One Building Corporation
Richard Werner                                v.                          June 26, 2006
                                       C.A. # 05-CV-300-JJF

Page 46

1  litigation?
2     **A. It was grapevine talk.**
3     Q. When did you know, aside from rumor, when it
4  actually occurred, when was it confirmed to you that
5  there was litigation?
6     **A. When I was contacted by outside counsel.**
7     Q. And when was that?
8     **A. I can't put an exact date on that.**
9     Q. More than a month ago?
10    **A. Yes.**
11    Q. Two months ago?
12    **A. No.**
13        **Let me retract. It may have been two**
14    **months ago. I would need to --**
15    Q. It's somewhere in that neighborhood, I got you.
16    **A. Yes.**
17    Q. Somewhere in the April time frame maybe, it's
18 fair to say?
19    **A. It may have even been earlier than that, but it**
20    **was this year.**
21    Q. All right, let me show you what we will mark as
22 Exhibit 2.
23        (Werner Exhibit No. 2 was marked for
24 identification.)

Page 47

1     Q. Take a moment to scan that document.
2        Mr. Werner, have you ever seen that
3  document before today?
4     **A. No. Let me rephrase that. Yes, it's the**
5     **policies and procedures that the bank used at one**
6     **point in time.**
7     Q. Okay. When is the first time you've seen that
8  document?
9     **A. This I'm going to say in '04, early, probably**
10    **February of '04.**
11    Q. And was that at the time that you were hired by
12 Banc One?
13    **A. It was in that general area, yes, because I**
14    **became a employee of the bank.**
15    Q. If you go to the bottom of that first page,
16 you'll see something called single project
17 construction service agreement.
18    **A. Yes.**
19    Q. Do you know what that is?
20    **A. Yes.**
21    Q. What is it?
22    **A. Single project construction services agreement?**
23    Q. Yes.
24    **A. It was one of the forms that we would use in**

Page 48

1  project tracking system where this came out of at the
2  time.
3     Q. And that form, who were the parties to that
4  agreement?
5        MS. KLEINICK: Objection.
6     **A. Depends.**
7     Q. On what?
8     **A. Well, the short form contract construction**
9     **services agreement is a general form that's part of**
10    **project tracking system.**
11    Q. Who are the parties to it?
12        MS. KLEINICK: Objection.
13    **A. The party -- the parties can be a member of the**
14    **bank and another party.**
15    Q. When you say "a member of the bank," what does
16 that mean?
17    **A. Well, the facility manager, in my case.**
18    Q. One of the other bank entities under the whole
19 bank umbrella?
20        MS. KLEINICK: Objection.
21    **A. Yes, yes.**
22    Q. And how about the form above this reference,
23 construction services agreement. Is there a
24 difference between that and the single project

Page 49

1  construction services agreement?
2        MS. KLEINICK: Mr. Seglias, where are you
3  referring to?
4        MR. SEGLIAS: Well, if you go right above
5  there --
6        MS. KLEINICK: Above where?
7        MR. SEGLIAS: Middle of the page from
8  where I was referencing previously, there's something
9  called a construction services agreement, long form.
10 I'm asking him what's the difference.
11       MS. KLEINICK: Between the long form and
12 the short form?
13       MR. SEGLIAS: Um-hum.
14       MS. KLEINICK: If you know.
15    **A. No.**
16    Q. What's the difference between a construction
17 services agreement and a single project construction
18 services agreement?
19    **A. Could you repeat that again, please?**
20    Q. Yeah. These two entries here on this document,
21 one refers in the middle of the page to a construction
22 services agreement, and then at the bottom of the page
23 there is a reference to a single project construction
24 services agreement. I want to know what the

13 (Pages 46 to 49)

Creedon Controls, Inc.                                          Banc One Building Corporation
Richard Werner                    v.                            June 26, 2006
                            C.A. # 05-CV-300-JJF

Page 90

1   A.  No. I took -- I recanted that.
2   Q.  So based on his signature, the bid to Creedon
3   was approved by the bank; is that fair to say?
4   A.  Yes.
5   Q.  And it was also approved by Tishman.
6   A.  Yes.
7   Q.  What was your understanding of Forest Electric
8   acting as electrical trade manager?
9   A.  The bank's understanding is Forest acting as
10  electrical trade manager is Forest would have entered
11  into agreements with subcontractors to install or
12  have, implement the different electrical divisions of
13  the contract to build the data center.  So Forest
14  would manage the subcontractors, enter into those
15  agreements, and manage those subcontractors that were
16  working on those particular divisions of the, of the
17  electrical.
18  Q.  And Tishman, as construction manager, had
19  overall responsibility for the project?
20  A.  Yes.
21  Q.  And your understanding, which you just
22  expressed, is based on what?
23  A.  The executed agreements between Tishman
24  Corporation and the bank.

Page 91

1   Q.  And that's what you told us before.
2   A.  Yes.
3   Q.  Did you review any documents between Tishman
4   and Forest relating to how Forest was to contract with
5   the electrical contractors?
6   A.  Yes.
7   Q.  And what -- do you recall who those e-mails
8   were between?
9       MS. KLEINICK: Objection.
10  A.  Oh, no.
11  Q.  When did you review them?
12  A.  Last week.
13  Q.  And did you review an e-mail which stated that
14  Tom Keene of Tishman reviewed and approved the form of
15  contract to be used by Forest as electrical
16  contractors?
17  A.  No.
18  Q.  Can you tell me the substance of an e-mail that
19  you reviewed last Thursday between Forest and Tishman
20  relating to the contracts to be entered into with the
21  electrical contractors?
22  A.  If you have a copy of that e-mail, I could tell
23  you whether I have reviewed it or not.
24  Q.  And do you know how many e-mails you reviewed?

Page 92

1   A.  No.
2   Q.  And you can't tell us today the substance of
3   any of the e-mails that you reviewed last Thursday?
4   A.  No.
5   Q.  Is it the bank's position that Tishman, as
6   agent of the bank, did not have the authority to tell
7   Forest the type of contract entered into with the
8   electrical contractors?
9   A.  No, it is my belief that the, that Tishman
10  would have told Forest exactly the type of contracts
11  to use.
12  Q.  And if Forest told -- or I'm sorry, if Tishman
13  told Forest to use the form of contract that you see
14  as Exhibit 6, then it would have had the authority to
15  do so; is that correct?
16  A.  Acting as an agent for the bank, yes.
17  Q.  And who was at the meeting you had last
18  Thursday in order to formulate your testimony for
19  today?
20      MS. KLEINICK: Objection.
21  A.  Counsel and Jonathan Choa.
22  Q.  Anyone else present at that meeting?
23  A.  No. Jodi and Jonathan.
24  Q.  And did you have one meeting in order to do

Page 93

1   that?
2   A.  No, I had two.
3   Q.  When was the other meeting?
4   A.  Friday.
5   Q.  And who was present at that meeting?
6   A.  Jonathan and Jodi.
7   Q.  Anyone else present?
8   A.  No.
9   Q.  Did you converse with anyone else during the
10  course of the meeting to get information, or either of
11  those meetings?
12  A.  I did not.
13  Q.  Do you know if they did?
14  A.  I can't say if it was in relation to this.
15  Q.  And during the course of the construction
16  itself, you had no, as I understand it, you had no
17  responsibility with regard to the contracts or
18  contract form that would have been entered into by any
19  electrical contractor.  Is that correct?
20  A.  Personally?
21  Q.  Yes.
22  A.  Yes, that's correct.
23  Q.  Are you aware of any discussions between anyone
24  at the bank and Forest Electric regarding the form of

24 (Pages 90 to 93)

Page 94

1 contract to be used with the electrical contractors?
2 **A. That would have been the project management**
3 **team that was on site.**
4 Q. And that's Mr. Auwarter?
5 **A. Yes.**
6 Q. Who else was on site for the bank?
7 **A. Mr. Capaldi.**
8 Q. Was he at the Brandywine site or Bear?
9 **A. He was located at the Brandywine site.**
10 Q. And what was Mr. Capaldi's title?
11 **A. He was assistant to Mr. Auwarter as project**
12 **lead. Mr. Auwarter being lead.**
13 Q. And do you know when Mr. Auwarter left the
14 bank?
15 **A. I don't have the date.**
16 Q. Was it during the course of the construction
17 project itself?
18 **A. No.**
19 Q. Are you aware of any discussions between anyone
20 else at the bank, other than those two gentlemen, and
21 Forest Electric regarding the contract that was to be
22 entered into by Forest with electrical contractors?
23 **A. No.**
24 Q. Can you relate to us any conversations between

Page 95

1 anyone at Forest and Mr. Capaldi about the contract to
2 be entered into by Forest with electrical contractors?
3 **A. Mr. Capaldi would have had no negotiations on**
4 **contracts. That was not within his title.**
5 Q. How about Mr. Auwarter?
6 **A. No. Again, contracts was at Mr. Fahrenbach's**
7 **level.**
8 Q. Can you relate to us any conversations between
9 Mr. Fahrenbach and anyone at Forest relating to
10 contracts?
11 **A. No, I cannot.**
12 Q. Do you know where he's located now?
13 **A. I believe we have a last known address.**
14 Q. Was he based in New York?
15 **A. No. He was out in the Chicago, Chicago area.**
16 Q. Were there other trade, other trade managers on
17 the, that worked on the project?
18 **A. Yes.**
19 Q. What other ones?
20 **A. That would have been F&G Mechanical acting as**
21 **the mechanical trade contractor.**
22 Q. Anybody else? Any other entities?
23 **A. Not that I can -- no, not that I am aware of.**
24 Q. Have you reviewed any contract entered into by

Page 96

1 F&G with Tishman or the bank?
2 **A. No.**
3 Q. Are you aware of any instance in which the bank
4 or Tishman -- strike that.
5 Did you review any files of Tishman, the
6 bank's agent, relating to the formation of contracts
7 between Forest and electrical contractors?
8 **A. No.**
9 Q. Are you aware of any instance in which Tishman
10 as agent to the bank or the bank told Forest not to
11 use the form of contract that's been marked as Exhibit
12 6?
13 **A. I am not aware.**
14 Q. Did the bank receive copies of contracts
15 entered into by the electrical contractors?
16 **A. The bank would have received those.**
17 Q. And kind of the flow of paper?
18 **A. Could we, could we retract it, is that the**
19 **subcontractors or with Forest?**
20 Q. With the, any electrical contractor.
21 **A. Yes.**
22 Q. The bank would have received a copy of
23 whatever --
24 **A. Copy.**

Page 97

1 Q. Okay. And kind of the flow of the paperwork
2 would have been from Forest to Tishman, Tishman to the
3 bank, as you understand it?
4 **A. Yes.**
5 MS. KLEINICK: Objection.
6 Q. Do your obligations now and in the course of
7 your employment entail entering into contracts with
8 anyone?
9 **A. Yes.**
10 Q. And is there some type of contracts that you
11 would enter into?
12 **A. Yes. There are, there are different types of**
13 **contracts.**
14 Q. And are those types of contracts -- strike
15 that.
16 Did you at any time use the form of
17 contracts that are identified in Exhibit 2 in the
18 course of your job?
19 **A. Not in this form.**
20 Q. Okay, what do you mean "not in this form"?
21 **A. The policies and procedures have since changed**
22 **since this was -- we're no longer Banc One, we're JP**
23 **Morgan Chase.**
24 Q. Okay, so as a result of that change, the form

25 (Pages 94 to 97)



**Paul,Hastings, Janofsky & Walker** LLP
75 East 55th Street • New York, NY 10022
telephone 212 318 6000 • facsimile 212 319 4090 • www.paulhastings.com

## *FACSIMILE TRANSMISSION*

| to: | company/office: | facsimile: | telephone: |
|---|---|---|---|
| Edward Seglias, Esq. | Cohen Seglias et al. | (302) 425-5097 | (302) 425-5089 |
| Paul Bradley, Esq. | Maron & Marvel, P.A. | (302) 425-0180 | (302) 425-5177 |

| from: | facsimile: | telephone: | initials: |
|---|---|---|---|
| Jonathan A. Choa | (212) 319-4090 | (212) 318-6451 | JC9 |

| | | client matter number: | 57364.00013 |
|---|---|---|---|
| date: | July 26, 2006 | pages (with cover): *5* | |

comments:

*If you do not receive all pages, please call immediately Facsimile Center: (212) 318-6821*

*This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.*

B-0648

# Paul Hastings
**ATTORNEYS**

Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street • New York, NY 10022
telephone 212 318 6000 • facsimile 212 319 4090 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(212) 318-6451
jonathanchoa@paulhastings.com

July 26, 2006                                                                57364.00013

**VIA UPS**

Wilcox and Fetzer, Ltd.
1330 King Street
Wilmington, DE 19801

Re:    Creedon Controls, Inc. v. Banc One Building Corp. and Forest Electric
Corporation
Deponent: Richard Werner
Deposition Date: June 26, 2006

Dear Sir/Madam:

Enclosed is the executed Errata Sheet of Richard Werner regarding the above-
captioned matter.

Sincerely,

Jonathan A. Choa
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosure

cc:    Edward Seglias, Esq. (via fax)
Paul A. Bradley  (via fax)

**B-0649**

LEGAL_US_E # 71488020.1

**ERRATA SHEET- Creedon Controls, Inc. v. Banc One Building Corporation and Forest Electric Corp.**

Transcript of Richard Werner

June 26, 2006

| Page | Line | Per Transcript | Should Be | Reason |
|------|------|----------------|-----------|--------|
| 31 | 12 | No. | Creedon was also awarded the 21B Package, which is IT conveyance work. | correction |
| 34 | 5-6 | Could you – no. Tishman was the construction manager acting as agent for Banc One. | Yes. Tishman signed that contract as agent for Banc One. | correction |
| 34 | 13-15 | The contract that I have seen is with Tishman, Forest, and Banc One has a line, a signature line on it | Yes. | correction |
| 46 | 12 | No. | It was in December 2005. | correction |
| 46 | 19-20 | It may have been earlier than that, but it was this year. | It was in December 2005. | correction |
| 55 | 8 | Mr. Auwarter did not have that authority. | Mr. Auwarter had the authority to approve Tishman's recommendation of award. | correction |

**B-0650**

| Page | Line | Per Transcript | Should Be | Reason |
|------|------|----------------|-----------|--------|
| 58 | 11-12 | I believe they may have, yes. I believe the bank did pay Forest direct. | No. It would not. | correction |
| 67 | 17 | I'm not aware. | Yes. | correction |
| 90 | 4 | Yes. | No. Based on his signature, the recommendation to enter into a contract with Forest, and for Forest to subcontract the work to Creedon was approved. | correction |
| 92 | 9-11 | No, it is my belief that the, that Tishman would have told Forest exactly the type of contracts to use. | Yes. | correction |
| 92 | 16 | Acting as an agent for the bank, yes. | No. Tishman had no authority under its contract with Banc One to approve a form of contract that identified Forest as an agent of Banc One. | correction |
| 93 | 12 | I did not. | Yes. Robert Sharp. | correction |

B-0651

2

| Page | Line | Per Transcript | Should Be | Reason |
|------|------|----------------|-----------|--------|
| 96 | 16 | The bank would have received those. | The bank would have received those at the close of the project from Tishman. | correction |
| 97 | 4 | Yes. | Yes.  At the close of the project. | correction |

I have read the foregoing transcript
of my deposition and, except for any
corrections or changes noted above,
I hereby subscribe to the transcript as an
accurate record of the statements made
by me.

_____
Richard Werner

B-0652

3



# BRANDYWINE SITE CORE DATA CENTER II

**Expert Report**

**In the Matter of
Creedon Controls, Inc.
v.
Bank One Corporation
and Forest Electric Corporation**

**July 12, 2006**

Prepared by

Warner Construction Consultants, Inc.
2275 Research Blvd. Suite 100
Rockville, MD 20850
301-670-9020
Fax 301-670-7977
ww.warnercon.com

**WARNER**

# I.    Introduction

Warner Construction Consultants, Inc. ("Warner") was retained by Cohen Seglias Pallas Greenhall & Furman PC ("Counsel") to review project documents, plans and specifications in order to provide expert opinion relating to a dispute between Creedon Controls, Inc. ("Creedon") and jointly Forest Electric Corporation ("Forest") and the project owner, Banc One Building Corporation[1] ("Bank One"). The dispute is over nonpayment of monies due for work performed, increased costs and overruns in labor costs, as well as other costs and damages resulting from sequencing and management issues that are the responsibility of the construction management team for Banc One Building Corporation. These issues occurred during the construction of the Bank One Brandywine Site Core Data Center II located at 4001 Governor Printz Blvd., Wilmington, Delaware ("the Project"). Creedon claims that the substantial delays that occurred on the Project were due to mismanagement and events beyond Creedon's control.

The Project is a one-story data center used primarily for housing electronic equipment that performs processing of Bank One's electronic transactions. The building contains two computer data center spaces, supporting electronic equipment spaces, and administrative office space for Bank One employees. The building was divided into eight areas on the plans labeled A through H. Creedon's scope of work outlined in the General Power and Lighting (CCI Project #2357) contract included electrical work for all areas of the Project. Specifically, the Contract included providing lighting for areas A through G of the Data Center, general power receptacles in areas A through G, all electrical requirements in the Administration building area (with a few exceptions), feeders, power and lighting panels, automatic transfer switches, inverter systems, lighting control system, and empty voice and data conduits in areas A through G and the Administration Building (area H).

As demonstrated in Exhibit 1, the building was divided into letters A through H on the drawings. These letters were renamed and consolidated as A through D on the AIA payment application's schedule of values (AIA G701 form). Warner understands that these letters were the source of some confusion on the jobsite as A became C, C became A, D through G became D, and

---

[1] Banc One Building Corporation is the named owner on the project and is based in Illinois. Bank One is the name given to the local office located in Wilmington, DE, to which project correspondence was to be sent.

H became E. In this report, Warner will generally refer to the AIA payment application labels and will distinguish from the area letters shown on the drawings.

In analyzing the dispute, Warner reviewed files supplied by Counsel which included: job site log notes, payment applications, budgeted (bid estimate) and actual cost reporting, payroll logs, correspondence, and time allocation documents (supporting documents for PCO 51 and 52). Warner also has reviewed additional project files and interviewed Patricia Creedon, President of Creedon, Charles K. Doble, III, Project Manager for Creedon on the Project, and Dennis Link of Karden Construction Services, Inc. Through these interviews and analysis of the documentation, Warner has obtained a thorough understanding of the conditions of the jobsite during construction and the impacting events that caused extended durations and additional costs to the performance of Creedon's work.

The focus of Warner's analysis was to review and examine Creedon's claims as reflected in its submitted PCO and render an opinion as to the reasonableness of Creedon's claims reflecting the impacts experienced on the project. As will be presented herein, it is Warner's opinion that Creedon's estimates of additional labor man-hours expended on the project as presented to Forest in the PCOs #51 and #52, and in subsequently issued PCOs #53 and #54, prepared by Creedon, are reasonable and resulted from the Forest-caused impact events.

## II.    Analysis

### A.    Creedon's Subcontract and Bid Estimate

1.    In late 2003 a sample subcontract was given to Creedon that was twelve (12) pages in length, and the parties agreed to begin working in October 2003, before the contract was duly signed. However, a proposed subcontract agreement was delivered by Forest, some six (6) months later, via a letter dated May 4, 2004 and was sixty (60) pages in length. Following the delivery of this proposed subcontract agreement by Forest, Addendum I (12 pages) was prepared by Creedon and submitted to Forest by letter dated June 14, 2004. Addendum I lists 171 modifications to Forest's proposed original agreement, some of which are changes while others are corrections. There is no formal response from Forest regarding Addendum I, and both parties continued working toward project completion with these terms being the last exchange of terms.

Creedon's bid was competitively bid, detailed, reasonable, and in accordance with the project specifications. Accordingly, Creedon should have been able to complete the project in the budgeted time and for the budgeted cost of $3,152,000. Creedon's bid estimated the cost of the work by the lettered areas on the plans, the time required to perform such work, as well as the manpower that would be committed to completing these areas. Creedon's forces were to work ten (10) hours a day, six (6) days a week. The estimate also included sequencing of the areas in a logical manner and within the timeframes established by Forest for Creedon's work in Forest's project schedule.

The contract made reference to a project schedule, which was given at the time of bidding the project. This schedule was at a very summary level and provided for five-and-one-half (5.5) months of work from the Request for Proposal ("RFP") award (the date the RFP would be awarded) to the completion of the power and lighting in the last work area. Regular updates of this schedule were not provided by Forest. Additionally, the logical sequencing of the work that was anticipated by Creedon was not progressed on the Project as bid due to no fault of Creedon.

Creedon gave input as to the Project schedule early in the project, but Creedon's input did not affect the way the progress of the work was managed.

A subcontractor on a construction project of this size and complexity can expect, as is typical in the industry, certain basic management practices to be implemented unless otherwise informed.  Among these are that the work will be performed in a sequential manner, the work will be scheduled and tradesmen will be informed of changes to the scheduling sequence, various trades will be coordinated so that congestion of the work areas can be minimized, the physical location of the work to be installed is coordinated between trades so that design errors, omissions, and expected construction detailing do not conflict, and in the instance where conflicts exist they are minimized or questions are managed with timely responses.  These basic management functions were not performed as expected by Forest, as will be further detailed herein.

**B.    Issues Impacting Creedon's Progress**

The nine (9) issues outlined below are a categorization of the impacting events by Creedon that it encountered during the performance of its work.  These impact events were presented to Forest in PCO #51 and PCO #52.  PCO #51 was presented to Forest in April 2004 in an attempt to capture the impacts experienced by Creedon up to that point in time, listing eighty (80) such events.  PCO #52 captures the impacts from these events through the end of August 2004, listing twenty-six (26) such events. The critical impacting events listed in the PCOs represent the discrete impacting events that Creedon identified as having an impact over a defined period of time.  The critical impacting events are categorized as follows:

1. Rescheduling and Altered Sequencing of the Work
2. Failure to Timely Respond to Requests for Information (RFI)
3. Failure to Timely Respond to Potential Change Orders (PCO)
4. Elimination of the Night Shift
5. Restricted Access
6. Obstructed Work
7. Limited Secure Storage

Expert Report for Brandywine Site Core Data Center II
Creedon Controls, Inc. v. Banc One Building Corporation and Forest Electric Corporation

8. Rate of Manpower Consumption-Acceleration
9. Stacking of Trades

1.    Rescheduling and Altered Sequencing of the Work

The sequencing of Creedon's work was not able to be progressed as anticipated, nor did it proceed in a logical sequence that was in conformance with the original schedule. Creedon's bid estimate sequenced the work to begin in areas A and C (Data Centers B and A respectively), then proceed to the center area B two weeks later. When these initial areas were completed, area D (drawing areas D, E, F, and G) would begin with drawing area G's start date lagging one (1) week behind the others. Area E (Administrative area) would be installed during the last month of Creedon's performance period. In this way Creedon would work from one adjacent building area to the next until finally returning to the front of the building to complete the Administrative area. The project schedule provided in the RFP showed A and C first, then B, D, E, F, G, all at the same time, followed by H after all others were complete but was very schematic, no logic ties provided, nor dates, and only Creedon's work was shown.

The first update of the project schedule provided to Creedon by Forest, which had a data date of August 12, 2003 and a run date of August 27, 2003, showed the structural steel erection in the same order that Creedon had bid the job with drawing areas A through H proceeding in alphabetical sequence, thus verifying the general construction sequence for the building. This update also showed five-and-one-half (5.5) months from the Request for Proposal (RFP) award of Utility Power and Lighting to the last of Creedon's work activities. However, this update indicated that Creedon's work was scheduled in all areas simultaneously during a fifteen-day (15) time period, with the exception of drawing area H proceeding thereafter. Thus, even the first full update given to Creedon contained problems with the sequencing of the work.

The only other Forest update provided to Creedon had a data date of December 4, 2003 and a run date of December 22, 2003, four months later than the first schedule provided. This update is labeled BW20 as opposed to the previous schedule labeled

BW09.  Only one of Creedon's work activities appears on BW20, utility power at area A, and its name was changed from the BW09 schedule.  In fact, many of the activity descriptions on BW20 did not match the previous BW09 update, and the copy given to Creedon of BW20 contained only selected activities.  No further update was provided to Creedon, and no clear, decisive, and permanent direction was given to Creedon regarding the sequencing of their work throughout the completion of the Project.  To the extent that Forest held weekly planning meetings, the forward looking planning on a weekly basis was not provided.  The daily jobsite meeting did not have any forward looking planning, nor did the plan-of-the-day given by Forest remain consistent through a given day.

Creedon produced a detailed manpower completion schedule in May 2004 after raising concerns about the labor overruns it was experiencing on the project and its inability to complete the work due to Forest-caused impacts.  This schedule, which showed an anticipated completion by June 30, 2004, was based on Forest providing access to work areas in a timely and predictable manner.  However, Forest was unable to meet its obligations to Creedon in this completion schedule (to provide access for Creedon to perform its work), causing further delay and impact throughout Creedon's continued performance until completion in late September 2004.  Forest's failure to provide and maintain a project schedule and to communicate and coordinate the work, as well as its failure to provide Creedon with access to its required work areas resulted in significant additional costs and delay to Creedon.

The actual installation of other subcontractor work varied from the planned sequencing and timing in such a way that prevented Creedon from performing its work as planned.  The installation of the slabs, for example, was from drawing area C, to A, G, B, F, E, D, and then H.  Additionally, these areas were only partially completed before the next slab was being placed.  In altering the completion sequencing for the slabs, the superstructure (walls, roofing, etc.) that followed the slab installation would also follow a varied sequence.  Creedon's progress was hindered by other subcontractor's failure to fully complete work before beginning a

new area and forced Creedon to return to an area multiple times in order to complete its work. This phenomenon occurred with other subcontractor trades as well, such as the exterior wall construction, the drywall installation, and others. An example of delay impact events stemming from poor sequencing occurred along a 120 foot wall at column line R, where drywall was installed covering uninspected electrical work and had to be removed. This is not the only instance of this type of impact. These impacting events, and others relating to this category, are outlined in PCO#51 and #52 in more detail.

2.    Failure to Timely Respond to Requests for Information (RFI)

Creedon's work was hindered by the late, and lack of, responses to RFI. In order for Creedon to receive a response to an RFI, the request had to go through many channels. First, Creedon would submit it to Forest who would submit it to the Prime Contractor, Tishman. Tishman would then submit it to the design team, who would either copy Bank One or request their approval. The document would then have to return down this chain of command to Creedon. This process was significant and had to be diligently maintained in order to ensure timely responses, yet it was not.

There are many examples of the RFI response process not being managed properly which are detailed in PCO #51 and #52. The extended delay in awaiting approval of the strut layout, the layout of underground conduits in the electrical closets, and RFIs clarifying the proper area letters were all RFI approval issues that contributed to the delay of Creedon's work. Often RFIs would also require a resubmission because of the confusing or conflicting responses that were given; yet, the delays associated with these resubmissions were not able to be discretely quantified in PCO #51 (reference item 74 on PCO #51).

3.    Failure to Timely Respond to Potential Change Orders (PCO)

Similarly, the lack of timely responses to PCOs hindered Creedon's progress. The process to receive approval of a PCO was similarly burdensome, yet was not

diligently managed. The lackluster approval process of change orders created confusion and hindered progress. There are also several instances where the work of the preceding subcontractor was not installed as planned, or Creedon's work was damaged, and the delay in responding to those changed conditions created a delay to Creedon's work. Some of these events were able to be discretely captured in PCO #51.

4.     Elimination of the Night Shift

Creedon agreed to begin a night shift in November 2004 in order to provide additional labor to the job. This additional labor was, presumably, to expedite the slow start of the work due to delays experienced by others in their completion of the slabs, roofing, and interior masonry walls (See Exhibit 9). Experience would reveal that typically the night shift is not as productive as the day shift; however, this did not appear to be the case on the Brandywine site. The reason for this is that the night shift had fewer encumbrances from other trades, as there were much fewer trades working at night. The stacking of trades (more on trade stacking in issue #9 below) was less of an impact at night, but the night crew was eliminated at the end of April 2004 per Forest's direction. Creedon did not have any night shift work after May 9, 2004.

5.     Restricted Access

Often Creedon would at first be directed by Forest to work in an area, yet upon arriving to that area Creedon would not be able to work there due to another subcontractor restricting Creedon's access. A recurring example of this type of delay event was with the floor painting subcontractor. This subcontractor would require all trades to be removed from an area in order to perform its work, so that regardless of whether Creedon had been working in that areas the previous day, Creedon could not work while the floors were being painted. Other rooms contained stored materials for other subcontractor's that blocked the entrance to or the work within the room. In other instances, Creedon found too many subcontractors in a room for Creedon to perform their work and thus had to seek out another location to work or

wait for the other subcontractors to complete their work. The congestion issue was an acute problem in the Administration area (E) toward the actual completion of the Project (in July 2004 through September 2004) where the majority of rooms and halls were smaller, leaving less room for multiple trades.

6.    Obstructed Work

Creedon was hindered from performing their work as planned, in any given area of the building, due to obstructions. Because of the limited secured storage issue (detailed in category 7 below), there were materials and equipment stored in the building which obstructed Creedon's progress. The building also had limited access, with few exterior doors, particularly on the North side of the building. The North end of the building (drawing areas D, E, F, and G) was generally accessible by two (2) means, either an overhead rolling door, or through the main East/West corridor (referred to on site as the L&M Corridor). The area where the overhead rolling door was located was generally blocked with the mason subcontractor's and other subcontractor's stored materials, leaving only the L&M corridor.

In mid-January, two, approximately five-foot wide by three-foot deep, trenches were dug through the middle of the L&M corridor. This severely hampered access between the North and South areas of the building, as well as restricting the East/West flow of workers and materials. The movement of materials and equipment became very difficult. This problem was accentuated by the additional movement of materials and equipment required due to the lack of available work areas issues mentioned above.

7.    <u>Limited Secure Storage</u>

In mid-December 2003, all subcontractor trades were required to remove their storage trailers from the jobsite and store all their materials, tools, equipment, and lockable equipment/material storage boxes within the footprint of the building (Creedon was designated space in area B). It is Warner's understanding that this was done in order for rough-grading and other site work to be performed. Yet, all of the building slabs had not yet been completed, nor had the structural steel and/or roofing been completed for the areas where the slabs were finished at this time. The coordination and/or planning done for this effort was not effective, and the move was not anticipated by Creedon. This, combined with the nonlinear, unplanned sequencing of the work, created an inefficient and congested work area for all subcontractors. Due, in part, to the nonlinear manner in which the building areas were being completed, the material and equipment storage was also done in a nonlinear manner. What resulted was a lack of coordination of storage space, so that materials were left wherever it was most convenient for that particular tradesman, at that particular moment in time, but not necessarily in an area that was convenient to, or functional for, the flow of the Work for all tradesmen. Further, Creedon's materials and equipment, would often need to be relocated in order for other subcontractor's work to be completed. This material movement would not have had to be done if the storage trailers were available.

Once the walls began to be installed, it became even more difficult, if not impossible, to store all of the trades equipment and materials in the building and not impair some aspect of the work. Creedon often was unable to work in areas they needed to because they could not access them due to the storage of other trades equipment or materials. Further, much of Creedon's work for the lighting and branch power was being installed off of scissor lifts because this work was attached to the roof support steel approximately twenty-five (25) feet or more above the concrete slabs. This work was impeded from progressing because the floor was full of equipment and materials from the other trades. As such, the lifts were unable to maneuver to the appropriate locations to install the work. This impeded work condition forced

Expert Report for Brandywine Site Core Data Center II
Creedon Controls, Inc. v. Banc One Building Corporation and Forest Electric Corporation

Creedon to return to all areas multiple times. Without a plan in place as to what areas would next be available to work, Creedon would very often begin work as Forest directed that morning in one area, but would soon have to leave that area and search out another available work area when impediments to their work were encountered.

As perhaps a response to the congestion, Forest would discard the materials and equipment rather than either inquiring as to their ownership or managing the flow of work and storage of materials. Creedon often had to retrieve materials from the dumpsters or order new materials that had been either stolen or discarded by the project management staff of the Project. Moreover, the materials discarded by Forest and others were often packaged or bundled so as not to be confused with used or leftover over materials.

8.    Rate of Manpower Consumption-Acceleration

Due to the congested work areas, the stacking of trades and lack of clear sequencing of the work, there was an increase in man-power on the jobsite in order to ensure that any available work areas could be worked by Creedon. Working in multiple areas required multiple foremen due to the Union agreement with the electrical tradesmen. This increase in nonproductive supervision adds additional man-hours not otherwise required. The impact events designated under this category contain hours associated with such unanticipated nonproductive supervisory hours.

An event of particular note was item number 54 on PCO #51, regarding the painting of the Creedon's ceiling conduits which began in January 2004. Creedon had color-coded its conduit so that power and light, emergency power and light, data, and receptacle conduits of each system could all be distinguished. In this way, Creedon had mapped which conduits were for which fixtures, receptacles, etc. The mapping of the conduits was particularly important on this project due to the dual-redundant power system on the Project. The redundancy was not only in the power supply but also in the UPS back-up power, complicating the number, location, and paths of conduits in the building. Yet, in January of 2004, the construction management team

began to paint all of the conduits on the ceiling black. Thus, Creedon's intelligent identification system of conduit was lost, hampering the completion of the rough-in electrical work. Creedon's work was further hampered when laborers, working for others and assigned to cleaning the jobsite, discarded Creedon's as-built record drawings. With its intelligent ID system eliminated, and no map as to where the conduits terminated, Creedon had to then determine the conduit's termination points one at a time.

9.    <u>Stacking of Trades</u>

The Project suffered from a delay impact issue often referred to in the industry as a "Stacking of Trades." Stacking of Trades occurs when there are multiple subcontractors working in a single area at the same time, such that none of the subcontractors can perform their work effectively. The Brandywine Project lacked coordinated movement of manpower and materials as indicated above. Because of the lack of coordination, lack of available storage areas, and constant unanticipated movement of materials, the Project suffered from trade congestion or Stacking of Trades. Where Creedon could find discrete examples of this issue, they have categorized these impact areas as such.

**C.    Labor-Hours Analysis**

1.    According to the payroll accounting, Creedon's actual labor hours expended far exceeded the estimated labor hours for the Project. In order to determine the cause of this overrun, Warner examined the project documentation, in particular the claimed hours of additional time asserted in PCO #51 and #52. The critical events described in these PCOs, and as highlighted in the section above, account for much of the additional man-hours expended. To determine the degree to which Creedon's estimates of additional labor show a causal linkage to delays in the performance of Creedon's work and lowering of its labor productivity, and to determine the extent of the correlation, Warner performed a labor analysis described herein.

2.    Through its analysis, Warner determined that Creedon's estimates are supported by contemporaneous project records and other documents that identify impacts attributable to Forest and that there was a correlation between the actual hours expended and the hours attributable to the critical events described in PCO #51 and #52. The total hours budgeted, spent, and captured in PCO #51 and #52, as well as the change order hours and additional supervision due to critical events is charted by month in Exhibit 7. Particularly from the start of the Project through the end of April 2004, the critical events hours account for most of the additional hours spent beyond the budgeted hours (89.5% of the overrun).

In order to gain a better understanding of where the time on the project was being spent, Warner charted the hours budgeted by their AIA building area. This information was plotted by combining the actual man-hours logged in the payroll accounts with the daily man-power count sheets turned into Forest's field office. By distributing the hours spent each month to the appropriate building area according to the daily man-power sheets, an analysis on the trends of where the hours were spent may be obtained. This information was plotted in several forms as shown in Exhibits 2 through 6. Additionally, Warner charted each work impact type categorized in PCO #51 and #52 by area (see Exhibits 2 through 6).

The charts plotting man-hours by area contain a histogram demonstrating the planned work periods, the actual work periods, and when the critical events were impacting Creedon's work. They also graph the total actual hours against the critical events hours over time. The critical events hours are represented by the red hashed area below the total hours spent line-graph. These graphs brought forth several important points. The critical events hours are generally in conformance with the superintendent logs, thus the sorting of the hours into their respective areas (which was done by Creedon's project staff) is accurate and reliable. The critical events hours consume much of the additional hours expended. The impact event hours relating to the Stacking of Trades, increased rate of man-power consumption, and limited storage space issues may have been undervalued. These three impact event

hours are primarily in area B, although the effect of these impacts was throughout the Project, and not highly consolidated in one area.

3.      Another indicator of performance on a project is the earned value versus the expended man-hours. Warner charted the actual hours (minus the hours attributable to the critical events) and divided by the percent of billings earned over time (by month). The critical events were similarly charted in a stack graph with the remaining actual hours. Warner then compared that to the budgeted hours per percent complete. These graphs are found in Exhibits 2 through 7. By charting the hours per the percent of earned billings, the amount of additional hours needed to obtain the budgeted rate of completion which are attributable to the critical events can be demonstrated. The green line represents the budgeted rate. When the vertical bars are above the green line, Creedon was expending more man-hours to complete the work than budgeted. When the red bar, representing the critical events expenditure rate, accounts for the area above the line, then the loss in productivity has been captured by the critical events, and vice versa. Thus, although through April 2004 the majority of loss in productivity is captured by the critical events, later in the project less of the loss in productivity is being captured by the critical events listed in PCO #51 and #52. Also, area C, in particular, has not had the loss in productivity captured by the critical events throughout the project. Hence, all of the impacted labor overruns may not have been captured in the critical events estimates. Two later PCOs, PCO #53 and PCO #54, attempt to amass the additional labor overruns that are attributable to continued access issues and lack of direction affecting the progress of the work in area D and the remaining impacting delays and events occurring in the Administration area (Area E).

4.      On April 20, 2004, Creedon provided Forest with an estimate of the labor effort required to complete the remaining work from April 16, 2004. This estimate totaled 11,990 hours including time for an estimate of additional delays. As of mid-April 2004, Creedon's work was approximately 82% complete. Creedon's original estimate for the project was 23,620 hours. Thus, Creedon should have expected to expend approximately 4,252 of the original budget-hours to complete the remaining work.

Expert Report for Brandywine Site Core Data Center II
Creedon Controls, Inc. v. Banc One Building Corporation and Forest Electric Corporation

The difference between this original estimate and Creedon's April 20, 2004 estimate
(i.e. 11,990 less 4,252 or 7,738) reflected the anticipated labor-hour overrun caused
by ongoing impacts at that time attributable to Forest.

5.    In mid-May 2004, Creedon prepared a more detailed man-hour completion schedule
and estimate.  This schedule, which reflected promises from Forest to provide
coordinated access for the completion of the work, projected a required effort of
5,598 man-hours and a completion of the primary work by June, 30 2004.  However,
Creedon actually spent 16,964 hours after mid-May 2004 due to Forest's failure to
follow Creedon's revised plan, an overrun of 12,166 hours.  Of this amount,
Creedon has captured 4,585 hours in critical events and changes orders, leaving an
additional overrun of 6,781 hours in impacts from Forest's coordination failures.
The calculation of this overrun by area is presented in the table below.

For period mid-May 2004 through Dec. 2004

| Area | Revised Budget | Actual | Actual Budget | Critical Events | Remainder |
|---|---|---|---|---|---|
| A | 417 | 688.49 | 271.49 | 69.25 | 202.24 |
| B | 358 | 1990.54 | 1632.54 | 321.25 | 1311.29 |
| C | 459 | 854.95 | 395.95 | 0 | 395.95 |
| D | 2179 | 5080.57 | 2901.57 | 349.75 | 2551.82 |
| E | 1385 | 8349.70 | 6964.70 | 451.75 | 6512.95 |
| Undesignated | 800 | | -800.00 | | -800.00 |
| Subtotal | 5,598 | 16,964.30 | 12,166.30 | 1,192.00 | 10,174.30 |
| PCO #52 Supervision | | | | | 1,771.00 |
| Change Orders | | | | | 1,622.50 |
| Total Remaining | | | | | 6,780.80 |

6.    As can also be seen from the table above, the majority of the overrun after May 2004
occurred in Areas D and E.  These areas also experienced the highest levels of
coordination and congestion experienced on the project during the final months
leading to completion.  Several impacting events such as the storage of materials and
equipment in the narrow hallways and smaller rooms, and the flooding of Creedon's
underground conduits, are not adequately represented in the critical events listed in
PCO #51 and #52.  Forest's lack of coordination and the effects of trade congestion
were especially severe in this area.

B-0668

**D.    Damages**

1.    Due to the above detailed impact events, which are largely captured in PCO #51 and #52, Creedon has requested payment for the additional labor expenditures. Warner presents a chart that totals the man-hours per area as well as the man-hours per critical event impact type in Exhibit 8. Creedon's total actual man-hours spent on the Project were 65,408, an increase of 41,788 hours over the budgeted 23,620 hours. Of the increase in hours, 7,165 are attributable to approved change orders and 23,780 hours are attributable to the critical impact events outlined in PCO #51 and #52, leaving 10,842 hours unattributed. Of this remaining amount, PCO#52 designates 3,627 hours of additional supervision (General Forman and Forman) for the critical events identified in PCO #52 occurring throughout the project, leaving 7,215 hours.

Creedon requests payment for the overrun in hours specifically identified in PCO #51 and #52 through its critical event impacts lists. The labor analysis above has shown that Creedon's lost productivity and additional man-hours are reasonably attributable to the critical events caused by others. The impacts identified are consistent with the periods of overrun of man-hours, thus the additional costs incurred are also attributable to others.

2.    The total of the hours captured by PCO #51 and #52 is 27,407 hours, yet this does not account for the entire overrun experienced by Creedon. As noted above, 7,215 hours are not specifically traceable to a single event or period of time outlined in PCO #51 or PCO #52. These overrun hours are consistent with the projected overrun provided to Forest by Creedon in April, and the actual overrun incurred from mid-May 2004 through the completion of the project. As stated above, it is Warner's opinion that this overrun was caused by Forest's inability to coordinate and manage the completion of the work.

In order to quantify the costs of these additional hours and other completion costs, Creedon developed two PCOs; PCO #53 and PCO #54. The first, PCO #53, requests payment for 1,127 additional hours spent by Creedon as well as other time-

Expert Report for Brandywine Site Core Data Center II
Creedon Controls, Inc. v. Banc One Building Corporation and Forest Electric Corporation

related costs.  PCO #54 requests payment for another 6,091 hours for a total of 7,218 hours.  These hours yield an additional $70,620 and $381,381.79 for PCO #53 and PCO #54 respectively.

3.    The claim states, as of March 31, 2006, that $3,400,406 is owed to Creedon for contract amounts due and damages related to labor inefficiency.  The bill of particulars found in the Mechanics Lien that was filed on April 14, 2005 in the Superior Court of the State of Delaware was later revised to state in summary that the following costs are requested to be paid:

| | |
|---|---|
| Retainage Due: | $181,380 |
| Total Change Order Balance Due:<br>(almost all of which is comprised of<br>not approved PCO #51 $1,588,402<br>and not approved PCO #52 $531,066) | $2,266,152 |
| Other Damages - not approved PCO #53:<br>(components of the $538,226 are: Labor<br>productivity impact $70,620; Delayed purchase<br>of copper & steel $24,049; Extended overhead<br>$15,604; Interest & Extended Home Office<br>Overhead $427,954) | $538,226 |
| Adjustments to PCO #52: | $89,650.92 |
| Adjustments to PCO #53:<br>(reduction of mark-up on home office overhead, etc.) | ($56,384.96) |
| PCO #54 Residual Damages: | $381,381.79 |
| **TOTAL – (Project claim revised amount)** | **$3,400,405.75** |

Warner finds the above costs reasonable in light of the above analysis.

## III.   Conclusions:

Based on its objective and independent analysis, Warner has come to the following conclusions:

> The scheduled duration from RFP award (date the Request for Proposal was to be awarded) to the completion of the General Power and Light contract work was 5.5 months, per the documents given at the time of bidding the Project. Creedon provided Forest with an estimate, included with their bid, that reflected the planned sequence and timing of the schedule in the RFP. Creedon began its work in October 2003 and completed its work by the end of October 2004, only returning in December for a few minor outstanding items. Thus, the actual project duration was approximately thirteen (13) months.

> Forest and the project management staff for the Project (Tishman) did not provide Creedon with regular schedule updates. Only two schedules were given in the October 2003 to December 2003 time period. The updates given contained conflicting information. No other scheduling documentation was given to Creedon. Weekly coordination or scheduling meetings were not held regularly throughout the project, and the daily coordination meetings gave conflicting information as to what work areas were available. Thus, Creedon had no means of predicting what areas were available to work.

> Due to the multitude of issues caused by others that Creedon was experiencing on the Project, Creedon tracked and compiled a list of discrete critical impact events into PCO #51 in April 2004 and requested payment for the labor overruns Creedon was experiencing at that time. Creedon was not paid for PCO #51 and the impacting events did not stop, therefore Creedon produced an additional PCO #52 to capture additional impacts as the job progressed. These two PCOs cited to the following categories of impacting critical events:

  - Rescheduling and Altered Sequencing of the Work
    – Neither the timing nor the sequencing of the work was performed as planned.

  - Failure to Timely Respond to Requests for Information (RFI)
    – The RFI process was cumbersome, resulting in delayed responses that impacted Creedon's progress.

- <u>Failure to Timely Respond to Potential Change Orders (PCO)</u>
  - The PCO process was cumbersome, resulting in delayed responses that impacted Creedon's progress.

- <u>Elimination of the Night Shift</u>
  - The night shift for Creedon was able to make better progress because the Stacking of Trades issue was less prevalent at night; however, this shift was eliminated by Forest.

- <u>Restricted Access</u>
  - Creedon was instructed to work in areas that they were not able to access due to the other trades working in those areas, or were instructed to leave areas they were working because of other trades.

- <u>Obstructed Work</u>
  - Creedon had to return to areas multiple times due to the work or stored materials of other trades that were obstructing their work.

- <u>Limited Secure Storage</u>
  - From December 2003 through the end of the project, all materials and equipment of all the trades were to be stored in the building. There was a limited amount of space for storage and the storage areas available were often altered, or Creedon's materials were thrown into the dumpsters.

- <u>Rate of Manpower Consumption-Acceleration</u>
  - Having to work in multiple areas and incur additional work crews required additional supervision per Union-mandated requirements.

- <u>Stacking of Trades</u>
  - Too many trades working in the same area was hindering progress and Creedon was forced to return to complete their work and/or work at a slower rate.

Each impact event was logged with the number and type of workers affected and the timing of the impact and areas where the impact occurred. Warner analyzed this information and found that it was reliable.

➢ The impacting events listed by Creedon account for the majority of the labor-hour overruns incurred on the project. Creedon's estimates were reasonably prepared by contemporaneous project records as to impacts experienced on the Project attributable to Forest. The types of impact categories above that have the most hours attributed to them are in the rescheduling and resequencing, restricted access and obstructed access; which total 12,480 hours (over half the hours categorized). Additionally, the single category with the most man-hours is the rate of manpower consumption – acceleration category at 6,166 hours. This category

captures time required to work in multiple areas with multiple supervisors not anticipated during much of the Project.

➢ The budgeted man-hours on the Project were 23,620, and the total actual man-hours were 65,408, a difference of 41,788 hours. Of this overrun, 7,165 hours were change-order hours, 23,780 were captured by the logging of the critical events in PCO #51 and #52, and 3,627 more for additional supervision described in PCO #52. Thus, Creedon incurred 41,788 additional labor-hours on the project of which 35,022 are attributable to change orders and/or discretely identifiable critical events.

➢ The remaining lost labor-hours, which are not captured by change orders or PCO #51 and #52, total 7,215. Creedon attempted to capture these lost hours in their PCO #53 and PCO#54, which ask for payment for additional labor hours of 1,127 and 6,091, attributable to Forest's failure to manage and coordinate the completion of the work, particularly in areas D and E. Creedon provided notice of and an estimate of the level of these damages in its letter of April 24, 2004 and its May completion schedule. Thus, the additional $70,620 and $381,381.79 for PCO #53 and PCO #54 respectively, are reasonable.

➢ Creedon's costs requested as listed below are therefore reasonable:

| | |
|---|---|
| Retainage Due: | $181,380 |
| Total Change Order Balance Due:<br>(almost all of which is comprised of<br>not approved PCO #51 $1,588,402<br>and not approved PCO #52 $531,066) | $2,266,152 |
| Other Damages - not approved PCO #53:<br>(components of the $538,226 are Labor<br>productivity impact $70,620; Delayed purchase<br>of copper & steel $24,049; Extended overhead<br>$15,604; Interest & Extended Home Office<br>Overhead $427,954) | $538,226 |
| Adjustments to PCO #52: | $89,650.92 |
| Adjustments to PCO #53<br>(reduction of mark-up on home office overhead, etc.) | ($56,384.96) |

Expert Report for Brandywine Site Core Data Center II
Creedon Controls, Inc. v. Banc One Building Corporation and Forest Electric Corporation

| | |
|---|---|
| PCO #54 Residual Damages: | $381,381.79 |
| TOTAL – (Project claim revised amount) | **$3,400,405.75** |

This report was prepared by Warner Construction Consultants, Inc. Warner reserves the right to supplement this report with information found during the discovery process.



Mark I. Anderson
Executive Vice President and COO

7/12/06

July 12, 2006

**EXHIBIT 1**
**Brandywine Site Core Data Center II**



**B-0675**

EXHIBIT 2
Brandywine Site Core Data Center II



Area A Manhours Analysis



Area A- Manhours/Percent Complete Analysis



WARNER

EXHIBIT 3
Brandywine Site Core Data Center II



Area B Manhours Analysis



Area B- Manhours/Percent Complete Analysis



WARNER

B-0677

EXHIBIT 4
Brandywine Site Core Data Center II



### Area C Manhours Analysis



### Area C- Manhours/Percent Complete Analysis



WARNER

EXHIBIT 5
Brandywine Site Core Data Center II



Area D Manhours Analysis





WARNER

EXHIBIT 6
Brandywine Site Core Data Center II





Area E Manhours Analysis



Area E- Manhours/Percent Complete Analysis



WARNER

**B-0680**

EXHIBIT 7
Brandywine Site Core Data Center II







B-0681

WARNER

**EXHIBIT 8**
**Brandywine Site Core Data Center II**
**Division of Hours By Area**

| Letter Designation Drwg. | Pay App. | Budget | Actual | (Act-Budget) Difference | Percent of Overrun Quant. |
|---|---|---|---|---|---|
| C | A | 3,620 | 6,110 | 2,490 | 77% |
| B | B | 2,360 | 14,241 | 11,881 | 79% |
| A | C | 3,620 | 11,441 | 7,921 | 13% |
| D,E,F,G | D | 12,000 | 22,513 | 10,513 | 71% |
| H | E | 1,920 | 11,102 | 9,182 | 36% |
| | Other | 100 | -100 | -100 | -866% |
| **TOTAL** | | 23,620 | 65,408 | 41,788 | 57% |

Change Orders    7,165
Budget    23,620
C.E.    23,780
PCO #52 add.Supervision    3,627

         58,192

Total Actual    65,408
   -58,192
         7,215

---

**Work Impact Analysis**

| Impact Type | Work Impact Type Description | C A | B B | AIA Area A | D | E | D | F | D | G | E H | General | TOTAL ** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Rescheduling & Resequencing | 970 | 1269 | 447 | 180 | 342 | 462 | | 431 | | 693 | 10 | 4804 |
| 2 | Failure to Timely Respond to RFIs | | 23 | 538 | | 10 | | | | | 316 | | 877 |
| 3 | Failure to Timely Respond to PCOs | | 23 | | | 15 | | | | | 179 | | 212 |
| 4 | Eliminate Night Shift | | | | 68 | | | | | | | | 83 |
| 5 | Restricted Access | 18 | 1821 | 47 | 92 | 292 | 112 | | 947 | | 146 | | 3474 |
| 6 | Obstructed work Area | 18 | 1641 | 362 | 92 | 292 | 306 | | 1068 | | 432 | | 4202 |
| 7 | Limited Secure Storage | | 1341 | 41 | 4 | 1 | | | | | 157 | 65 | 1609 |
| 8 | Rate of Manpower Consumption | | 1747 | 439 | 180 | 68 | 439 | | 1559 | | 1057 | 680 | 6166 |
| 9 | Stacking of Trades | | 1550 | 53 | 175 | 65 | 103 | | 135 | | 294 | | 2375 |
| | | | | | | | | | | | | | 23801 |

Note-    ** Rounding difference of 21 man-hours due to distribution by impact types (Total of 23801 man-hours vs. 23780 man-hours)

**WARNER**

EXHIBIT 9
Brandywine Site Core Data Center II

Projected dates per BW09 - August 2003 update from Forest Electric



Actual Manhours Expended By Area



# Creedon Controls Inc.
## Electrical Contractors

3424 Old Capitol Trail
Wilmington, Delaware 19808
Telephone (302) 892-2000
Fax (302) 892-2002

Ex C-75

### CREEDON CONTROLS CHANGE ORDER SUMMARY
### BANK ONE BRANDYWINE - CDC II - RFP6B

DATE:                3/31/2005
FOREST EWA #:
CREEDON - PCO# :     53

Description: Other Damages

|  | TOTALS: |
|---|---|
| LABOR VALUE       : | $          - |
| ACTUAL SUPERVISION COSTS: | $          - |
| (Gross Payroll to Employee) | |
| LESS: OCIP LABOR | $          - |
| LESS: OCIP NON-PRODUCTIVE SUPERVISION | $          - |
| | |
| LABOR SUBTOTAL: | $          - |
| | |
| MATERIAL: | $    419,179.00 |
| THIRD PARTY RENTAL: | $          - |
| DIRECT JOB EXPENSES @ 7% OF LABOR, MATERIAL COST AND RENTALS: | $     29,342.53 |
| (INCLUDES PROJECT MANAGEMENT) | $    448,521.53 |
| | |
| OVERHEAD AND PROFIT MARKUP @ 20% OF BARE COST: | $     89,704.31 |
| | |
| SUBTOTAL: | $    538,225.84 |
| | |
| SUBCONTRACT: | 0 |
| OCIP: | 0 |
| SUBCONTRACT BARE COST: | 0 |
| | |
| OVERHEAD AND PROFIT MARKUP @ 6% OF SUBCONTRACT COST: | 0 |
| | |
| SUBTOTAL: | 0 |
| | |
| TOTAL COST: | $    538,225.84 |

B-0684

006080

# Creedon Controls Inc.
### Electrical Contractors

3424 Old Capitol Trail
Wilmington, Delaware 19808
Telephone (302) 892-2000
Fax (302) 892-2002

**CREEDON CONTROLS CHANGE ORDER SUMMARY**
**BANK ONE BRANDYWINE - CDC II - RFP6B**

DATE:       3/31/2006
FOREST EWA #:
CREEDON - PCO# :    54

Description:  Hours over the course of the Project

|  | | TOTALS: |
|---|---|---|
| LABOR VALUE   : | $ | 310,534.57 |
| NON-PRODUCTIVE SUPERVISION @15% OF LABOR: | $ | - |
| LESS: OCIP LABOR : | $ | (13,508.25) |
| LESS: OCIP NON-PRODUCTIVE SUPERVISION : | $ | - |
| LABOR SUBTOTAL: | $ | 297,026.32 |
| MATERIAL: | $ | - |
| THIRD PARTY RENTAL: | $ | - |
| DIRECT JOB EXPENSES 7% OF LABOR, MATERIAL, RENTALS : | $ | 20,791.84 |
| (Including Project Management) | $ | 317,818.16 |
| OVERHEAD AND PROFIT MARKUP @ 20% OF COST: | $ | 63,563.63 |
| SUBTOTAL: | $ | 381,381.79 |
| SUBCONTRACT: | $ | - |
| OCIP: | $ | - |
| SUBCONTRACT BARE COST: | $ | - |
| OVERHEAD AND PROFIT MARKUP @ 6% OF SUBCONTRACT COST: | $ | - |
| SUBTOTAL: | $ | - |
| TOTAL COST: | $ | 381,381.79 |

B-0685