# EXHIBIT "A"

# BRUNER AND O'CONNOR ON CONSTRUCTION LAW

PHILIP L. BRUNER
PATRICK J. O'CONNOR, JR.

VOLUME 5
CHAPTERS 15 to 18




*For Customer Assistance Call 1-800-328-4880*

Mat #40038303

> Never was a sufficient amount of steel piling delivered to [the contractor] so as to permit construction completion without delay. Although [the government] well knew from the contract drawings and specifications that the special piles were needed for the commencement and continued progress of construction of the quay wall, [the government] failed to exercise reasonable diligence to provide the piles in the order in which they would be used for use on the project. . . . From all the evidence in this case we find that [the government] was negligent and lacking in reasonable diligence in fulfilling its obligation to furnish the steel sheet piles for the quay wall when reasonably needed in the performance of the contract, but as a result of such negligence and lack of diligence [the contractor] was delayed in its overall performance of the contract to the extent of 92 calendar days.[9]

Although the contract did not expressly state when and in what sequence steel pilings were to be delivered, the government was held to its implied duty to deliver the material timely and in the sequence reasonably dictated by the contractor's planned construction operations and schedule.[10]

### § 15:55 ——"Compensable" delay due to failure to coordinate multiple contractors

Delay to the critical path caused by an owner's failure to coordinate and manage the work of multiple prime contractors is "compensable."[1] Public and private owners on occasion engage multiple prime contractors to construct separate portions of a single project or separate projects on the same site. Public owners may be required by statutes aimed at preventing "bid shopping" to award separate prime contracts for general, electrical,

---

[9]Ben C Gerwick, Inc. v. U.S., 152 Ct. Cl. 69, 285 F.2d 432, 437 (1961).

[10]The same implied duty to timely provide contractor furnished materials and equipment is owed by a prime contractor to its subcontractors. See Blake Const. Co., Inc. v. C. J. Coakley Co., Inc., 431 A.2d 569 (D.C. 1981); J. J. Brown Co. v. J. L. Simmons Co., 2 Ill. App. 2d 132, 118 N.E.2d 781 (1st Dist. 1954); S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1020-1021 (S.D. N.Y. 1984), judgment aff'd, 762 F.2d 990 (2d Cir. 1985) (contractor failed to timely furnish layout drawings to subs) (same).

[Section 15:55]

[1]See Walter Kidde Constructors, Inc. v. State, 37 Conn. Supp. 50, 434 A.2d 962 (Super. Ct. 1981) (holding owner liable to one prime contractor for delay caused by another); U. S. Steel Corp. v. Missouri Pac. R. Co., 668 F.2d 435 (8th Cir. 1982) (same); J. A. Jones Const. Co. v. City of Dover, 372 A.2d 540, 22 U.C.C. Rep. Serv. 694 (Del. Super. Ct. 1977) (same); Paccon, Inc. v. U. S., 185 Ct. Cl. 24, 399 F.2d 162 (1968); L. L. Hall Const. Co. v. U. S., 177 Ct. Cl. 870, 379 F.2d 559 (1966) (same).

mechanical and other work on major building projects,[2] and for excavation and paving work on major highway projects. Although delay caused by one contractor to another without owner fault was viewed until well into the 20th century as mere "excusable" delay outside of the owner's "control,"[3] growing judicial recognition of the owner's implied obligations to cooperate and not to hinder or delay has led to findings of owner "fault," making such delay "compensable."[4]

Delay is a particular risk[5] of the modern multiple contractor project, which utilizes multiple bid packages, and the "fast track"[6] construction process to minimize completion time.[7] Owners have

---

[2]See N.Y. Gen. Mun. Law § 100(a) ("Wicks Law"); Ohio Rev. Code Ann. § 153.03.

[3]See U.S. v. Blair, 321 U.S. 730, 64 S. Ct. 820, 88 L. Ed. 1039 (1944), reh'g denied, 322 U.S. 768, 64 S. Ct. 1052, 88 L. Ed. 1594 (1944) (holding that the government had no affirmative duty to prevent one contractor from delaying another); Koppers/Clough, v. U. S., 201 Ct. Cl. 344, 1973 WL 21338 (1973) ("Since it would be a most unusual undertaking for the Government to shoulder full responsibility for the other contractor, we have looked, absent some express covenant to see if the Government is at fault in some way.").

[4]See L. L. Hall Const. Co. v. U. S., 177 Ct. Cl. 870, 379 F.2d 559 (1966). See also Liability Issues in Multi-Prime Contracting: The Duty to Coordinate and Direct Liability for Delay, 18 Constr. Law. 31 (Jan. 1998).

[5]See E.B. Jones Const. Co. v. City and County of Denver, 717 P.2d 1009 (Colo. Ct. App. 1986) (holding owner liable for delay caused by mismanagement of "fast track" project by the owner's designated construction manager, who had no experience in managing "fast track" projects).

[6]See Roberts & Schaefer Co. v. Hardaway Co., 152 F.3d 1283 (11th Cir. 1998), reh'g and suggestion for reh'g en banc denied, 162 F.3d 1179 (11th Cir. 1998) ("In the construction business, ['fast track'] means that construction commences under a schedule of simultaneous design, building and construction. In other words, . . . [the contractor] was to begin construction before it completed the design and finalized a set of fully coordinated plans."); Marriott Corp. v. Dasta Const. Co., 26 F.3d 1057 (11th Cir. 1994), reh'g and suggestion for reh'g en banc denied, 37 F.3d 639 (11th Cir. 1994), in which the "fast track" method is described as follows:

> Under the fast track method, construction on a building begins before a final set of fully coordinated plans is completed. Rather, the architectural plans and specifications are designed and modified as the building's actual construction progresses. The advantage of the fast track method, as opposed to building from plans completed at the outset, is that it enables construction to begin at a much earlier stage in the project. The method's disadvantage results from increased difficulty in scheduling and coordinating the project since the construction progress schedules must be modified to account for constant plan changes.

See also § 6:68.

[7]See Fehlhaber Corp. v. State, 65 A.D.2d 119, 410 N.Y.S.2d 920, 922 (3d Dep't 1978) (Noting the use of the "fast track" process for construction of a mall in 1966-1968 and describing "fast tracking" as "a procedure whereby the State would let certain contracts as soon as the design for them was completed without

sought to achieve cost savings inherent in accelerated project completion resulting from phased construction under which separate contracts are awarded to different trade contractors for sequential construction of work based on separate design document "bid packages" prepared for the work's various segments.[8] That process permits construction on phased work segments to proceed even though the design for the entire project is unfinished and results in construction being commenced and completed earlier than if work was held up until all project design documents were completed.[9] For example, a site grading contract can be awarded even though the follow-on foundation design has not been completed, and a foundation contract can be awarded when the foundation design is completed based on estimated structural loads even though the structural design of the superstructure is incomplete.

Where an owner, by itself or through a construction manager acting as the owner's agent, awards multiple prime contracts for the construction of a project, the owner retains responsibility to coordinate the work of all contractors and, unless otherwise clearly provided in the contract, is liable for delay caused by one contractor to another.[10] It is this risk of liability that commends

---

waiting for the design of the entire project to be completed. The state thereby hoped to economize and blunt the effects of inflation by the early performance of such contracts."); E. C. Ernst, Inc. v. Koppers Co., Inc., 476 F. Supp. 729, 734 (W.D. Pa. 1979), judgment aff'd in part, rev'd in part regarding proof of damages, 626 F.2d 324, 6 Fed. R. Evid. Serv. 763 (3d Cir. 1980), on remand to, 520 F. Supp. 830 (W.D. Pa. 1981) (noting that the "fast track method" was used under a 1973 "turnkey" contract for steel mill improvements, and that both parties "were familiar with, and had previously used, the fast track method").

[8]See AIA Document A201-1997, ¶ 6.1 under which the owner reserves the right to award separate contracts for different portions of the project and agrees to "provide for the coordination of the activities of the owner's own forces and of each separate contractor with the work of the contractor, who shall cooperate with them."

[9]See E. C. Ernst, Inc. v. Koppers Co., Inc., 476 F. Supp. 729, 734 (W.D. Pa. 1979), judgment aff'd in part, rev'd in part regarding proof of damages, 626 F.2d 324, 6 Fed. R. Evid. Serv. 763 (3d Cir. 1980), on remand to, 520 F. Supp. 830 (W.D. Pa. 1981) (Noting that after the contract was entered into, the contractor "immediately undertook the initial steps for demolition of existing facilities and relocation of utility lines. Concurrently, [the owner's] engineers commenced the design and engineering of the Project, while its Procurement Department began ordering equipment and materials as they were identified by the Engineering Department. This technique is known in the construction industry as the 'fast track' method . . . ").

[10]See Sherman R. Smoot Co. v. Ohio Dept. of Adm. Serv., 136 Ohio App. 3d 166, 736 N.E.2d 69 (10th Dist. Franklin County 2000) (holding that prime general contractor could recover delay damages from owner for delays of separate

to owners the "single source" advantage of contracting the entire project to a single contractor or design-builder.[11]

The owner's implied duties of cooperation and nonhindrance demand the owner's active and affirmative exercise of its contract rights under all of the prime contracts in order to coordinate and facilitate timely completion of the project.[12] These implied duties arise because the owner of a multi-prime project "controls":

1. The selection of the contractors and terms of their contracts;
2. Requirements for performance and bonding by individual contractors;
3. Project design and designation of phased "bid packages" for construction;
4. Overall project schedule and general progress of work; and
5. Right of recourse against each contractor for its unexcused delay of the critical path of the project.[13]

---

prime heating and cooling contractor); Walter Kidde Constructors, Inc. v. State, 37 Conn. Supp. 50, 434 A.2d 962 (Super. Ct. 1981) (owner liable for site access delay by another prime contractor); Department of Transp. v. APAC-Georgia, Inc., 217 Ga. App. 103, 456 S.E.2d 668, 1995 WL 113870 (1995), reconsideration denied, (Mar. 30, 1995) and cert. denied, (June 7, 1995); John E. Green Plumbing and Heating Co., Inc. v. Turner Const. Co., 742 F.2d 965 (6th Cir. 1984); North Harris County Junior College Dist. v. Fleetwood Const. Co., 604 S.W.2d 247 (Tex. Civ. App. Houston 14th Dist. 1980), writ refused n.r.e., (Dec. 10, 1980); Shea-S&M Ball v. Massman-Kiewit-Early, 606 F.2d 1245 (D.C. Cir. 1979); L. L. Hall Const. Co. v. U. S., 177 Ct. Cl. 870, 379 F.2d 559 (1966); Peter A. Camilli & Sons, Inc. v. State, 41 Misc. 2d 218, 245 N.Y.S.2d 521 (Ct. Cl. 1963). See also § 7:198.

[11]See Abdalla & Hudock, Liability Issues in Multi-Prime Contracting: The Duty to Coordinate and Direct Liability for Delay, 18 Constr. Law. 31 (Jan. 1998); Goldberg, The Owner's Duty to Coordinate Muti-Prime Construction Contractors, A Condition of Cooperation, 28 Emory L.J. 377 (1979).

[12]See Hoffman v. U. S., 166 Ct. Cl. 39, 340 F.2d 645 (1964) (government never even attempted to secure cooperation of multiple prime contractors; Forest Elec. Corp. v. State, 52 Misc. 2d 215, 275 N.Y.S.2d 917 (Ct. Cl. 1966), judgment aff'd, 30 A.D.2d 905, 292 N.Y.S.2d 589 (3d Dep't 1968); J. A. Jones Const. Co. v. City of Dover, 372 A.2d 540, 22 U.C.C. Rep. Serv. 694 (Del. Super. Ct. 1977); Paccon, Inc. v. U. S., 185 Ct. Cl. 24, 399 F.2d 162 (1968).

[13]For the same reasons a prime contractor owes the same implied duties to its subcontractors and suppliers. See U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539 (D.C. Cir. 1982); U. S. for Use and Benefit of Heller Elec. Co., Inc. v. William F. Klingensmith, Inc., 670 F.2d 1227 (D.C. Cir. 1982) (holding contractor failed properly to coordinate its subs and provide adequate supervision); Howard P. Foley Co. v. J. L. Williams & Co., Inc., 622 F.2d 402 (8th Cir. 1980) (holding contractor failed to coordinate its subs and to erect steel on a timely basis); Quaker-Empire Const. Co. v. D. A. Collins Const. Co., Inc., 88

Illustrative is *North Harris County Junior College Dist. v. Fleetwood Construction Co.*,[14] in which an owner chose to award multiple prime "fast-track" contracts for the construction of a junior college. The first contract was awarded to an earthwork contractor for site grading, construction of a permanent road and drainage system, and compaction of fill material at the building site. The second contract was awarded to a building contractor for the construction of buildings and paving of roads and a parking lot on the sub-grade completed by the earthwork contractor. The owner represented to the building contractor at the time of contracting that the compacted fill would be in place one month after the building contractor received its notice to proceed. Thereafter the earthwork contractor had trouble compacting the subgrade soils to the specified density, which delayed the building contractor for six months. Although the owner argued that it was not responsible for the earthwork contractor's untimely performance, the Court of Civil Appeals of Texas held the owner liable to the building contractor for its delayed completion.[15]

Because the owner's contractual recourse against any offending contractor for delay of a multiple prime contract project may not be perceived sufficient to protect the owner against the risk of liability for delay to all other damaged parties, owners frequently include in contracts a variety of express "no damage for delay" clauses[16] and other risk shifting provisions that seek to delegate

A.D.2d 1043, 452 N.Y.S.2d 692 (3d Dep't 1982) (same); Minmar Builders, Inc. v. Beltway Excavators, Inc., 246 A.2d 784 (D.C. 1968); Weyher Const. Co. v. Cox Const. Co., 22 Utah 2d 365, 453 P.2d 161 (1969); Bagwell Coatings, Inc. v. Middle South Energy, Inc., 797 F.2d 1298 (5th Cir. 1986); Hunter Bros. Systems, Inc. v. Brantley Const. Co., Inc., 286 S.C. 59, 332 S.E.2d 206 (1985); J. J. Brown Co. v. J. L. Simmons Co., 2 Ill. App. 2d 132, 118 N.E.2d 781 (1st Dist. 1954); Able Elec. Co. v. Vacanti & Randazzo Const. Co., 212 Neb. 619, 324 N.W.2d 667 (1982).

[14] North Harris County Junior College Dist. v. Fleetwood Const. Co., 604 S.W.2d 247 (Tex. Civ. App. Houston 14th Dist. 1980), writ refused n.r.e., (Dec. 10, 1980).

[15] But see Beltrone Const. Co. Inc. v. State, 256 A.D.2d 992, 682 N.Y.S.2d 299 (3d Dep't 1998) (where project involved four separate contractors, state was not liable to one contractor for delays caused by another contractor as the state made significant and meaningful efforts to expedite the construction process and therefore discharged its coordination obligations).

[16] See Holloway Const. Co. v. Department of Transp., 218 Ga. App. 243, 461 S.E.2d 257 (1995) (owner effectively disclaimed liability for delay and disruption caused by out-of-sequence work performed by separate contractors); Wells Bros. Co. of New York v. U.S., 254 U.S. 83, 41 S. Ct. 34, 65 L. Ed. 148 (1920); Marriott Corp. v. Dasta Const. Co., 26 F.3d 1057 (11th Cir. 1994), reh'g and suggestion for reh'g en banc denied, 37 F.3d 639 (11th Cir. 1994); Broadway Mainte-

direct mutual responsibility to multiple prime contractors[17] to (1) adhere to the owner's schedule, (2) coordinate their work between and among themselves, and (3) look only to each other and not to the owner for damages in the event of project delay.[18] Sometimes owners even make one contractor expressly responsible for scheduling and coordinating the work of the other prime contractors. An owner's express contractual delegation of its duty to coordinate to one or more of its prime contractors occasionally has been upheld.[19] Nevertheless, an owner's effort to exonerate itself from liability arising out of its implied duties to cooperate and to affirmatively coordinate its multiple contracts may be viewed as nondelagable.[20]

The primary legal theory relied upon to support the delegation of coordination risks and responsibilities is the doctrine of "third party beneficiary,"[21] which is applicable where each prime contractor accepts under common contractual documents third-party beneficiary rights against and obligations to the others[22]

---

nance Corp. v. Rutgers, State University, 90 N.J. 253, 447 A.2d 906 (1982); Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983); Gust K. Newberg, Inc. v. Illinois State Toll Highway Authority, 153 Ill. App. 3d 918, 106 Ill. Dec. 858, 506 N.E.2d 658 (2d Dist. 1987). But see VanKirk v. Green Const. Co., 195 W. Va. 714, 466 S.E.2d 782 (1995) (a liquidated damage provision in separate prime agreement did not limit the contractor's indemnity obligation to owner that arose when owner sued by another contractor claiming it was delayed due to the first contractor's actions). See also § 15:75.

[17]See Barth Elec. Co. v. Traylor Bros., Inc., 553 N.E.2d 504 (Ind. Ct. App. 1st Dist. 1990) Prime contractors seek to push the same responsibility down to their subcontractors. See High Point Sprinkler Co. of Atlanta v. George Hyman Const. Co., 164 Ga. App. 706, 297 S.E.2d 757 (1982). See also Restatement Second, Contracts § 318.

[18]See Smith & Leaderman, Dobson v. Rutgers: A Roll of the Dice for Multi-Prime Contractors, 5 The Constr. Law. 3 (Spring 1984); Schone, Delay Problems in Multi-Prime Contractor Construction Contracts: A Management Perspective, 5 Con. Law. 1 (1984).

[19]See CIG Contractors, Inc. v. Mississippi State Bldg. Com'n, 510 So. 2d 510 (Miss. 1987); Bolton Corp. v. State, 95 N.C. App. 596, 383 S.E.2d 671, 56 Ed. Law Rep. 324 (1989).

[20]See Buchman Plumbing Co., Inc. v. Regents of the University of Minnesota, 298 Minn. 328, 215 N.W.2d 479 (1974). See also § 7:198.

[21]See Burch, Third-Party Beneficiaries to the Construction Documents, 8 Constr. Law. 2 (April 1988); McGill, Construction Contract Third-Party Beneficiaries, Construction Briefings No. 88-4 (March 1988). See also Restatement Second, Contracts §§ 302 to 315.

[22]See Little Rock Wastewater Utility v. Larry Moyer Trucking, Inc., 321 Ark. 303, 902 S.W.2d 760 (1995); Barth Elec. Co. v. Traylor Bros., Inc., 553 N.E.2d 504 (Ind. Ct. App. 1st Dist. 1990); Tonn & Blank, Inc. v. Board of Com'rs of La-

without recourse against the owner.[23] Illustrative is *Moore Construction Co., Inc. v. Clarksville Department of Electricity*,[24] in which both the Court of Appeals of Tennessee and the Supreme Court of Tennessee upheld the right of one prime contractor to recover from a second prime contractor for delays it caused to the project. In that case, an owner undertook to have constructed an office building and warehouse project by awarding two prime contracts, one to an earthwork contractor for site preparation and utilities, and the other to a building contractor for construction of the building and warehouse. Portions of the earthwork contractor's exterior work were dependent upon completion of portions of the office building and warehouse. Subsequently, the building contractor was delayed by defective work of a subcontractor and by weather. The earthwork contractor complained of this delay as well as the building contractor's haphazard storage of materials and equipment and strewing of trash around the site, which interfered with performance of the site work. On several occasions, the building contractor gave erroneous assurances to the earthwork contractor as to when it would proceed. Following delayed completion, the earthwork contractor sued the building contractor and its surety for recovery of delay damages on the theory that it was a third-party beneficiary of the contract between the owner and the building contractor.

In considering whether to allow the earthwork contractor's claim to go forward on that theory, the Court of Appeals of Tennessee noted the complexity of the problem as follows:

> The application of the third party beneficiary theory to construction contracts has been particularly troublesome. This is because of the number of different parties that are routinely involved in a project's construction, the complex inter-relationships of the professional

---

Porte County, 554 N.E.2d 827 (Ind. Ct. App. 3d Dist. 1990), transfer denied, (Oct. 2, 1990); Broadway Maintenance Corp. v. Rutgers, State University, 90 N.J. 253, 447 A.2d 906 (1982); J. Louis Crum Corp. v. Alfred Lindgren, Inc., 564 S.W.2d 544 (Mo. Ct. App. 1978); M. T. Reed Const. Co. v. Virginia Metal Products Corp., 213 F.2d 337 (5th Cir. 1954), reh'g denied, 214 F.2d 127 (5th Cir. 1954). Compare Dynamic Const. Co. v. Barton Malow Co., 214 Mich. App. 425, 543 N.W.2d 31 (1995) (rejecting contractor's third-party beneficiary claim against a construction manager because the CM's contractual obligations ran only to the owner).

[23]See Bolton Corp. v. State, 95 N.C. App. 596, 383 S.E.2d 671, 56 Ed. Law Rep. 324 (1989) (rights against owner limited to owner changes or breach of contract, not breaches caused by other contractors).

[24]Moore Const. Co., Inc. v. Clarksville Dept. of Electricity, 707 S.W.2d 1 (Tenn. Ct. App. 1985).

disciplines involved, the amount of money at stake, and each party's mutual interdependence on the performance of the other.[25]

The court then proceeded to analyze the three types of third-party beneficiaries, the "donee" beneficiary, the "creditor" beneficiary and the "incidental" beneficiary, noting that only donee and creditor beneficiaries are "intended beneficiaries" with an independent right to enforce contracts made by others for their benefit. In ultimately concluding that the earthwork contractor was an "intended beneficiary" of the building contractor's contract with the owner, the court observed that the building contractor expressly had "agreed to undertake the [owner's] responsibility to [the earthwork contractor] to make sure that the work was coordinated." Because of this express assumption of the owner's duty to coordinate, the court concluded:

> These [cited] cases as well as others granting relief based on a third party beneficiary claim point to an emerging trend. Unless construction contracts involved clearly provide otherwise, prime contractors on construction projects involving multiple prime contractors will be considered to be intended or third party beneficiaries of the contracts between the project's owner and other prime contractors. They have been permitted to recover when the courts have found that their fellow prime contractor assumed an obligation of the owner to them (the "duty owed" test) or that their fellow contractor assumed an independent duty to them in their own contract with the owner (the "intent to benefit" test). The courts have generally relied upon the following factors to support a prime contractor's third party claim:
>
> (1) the construction contacts contain substantially the same language;
>
> (2) all contracts provide that time is of the essence;
>
> (3) all contracts provide for prompt performance and completion;
>
> (4) each contract recognizes the other contractor's rights to performance;
>
> (5) each contract contains a non-interference provision; and

[25]Moore Const. Co., Inc. v. Clarksville Dept. of Electricity, 707 S.W.2d 1, 7 (Tenn. Ct. App. 1985). The court also quotes Professor Corbin that "whenever a contract involves three or more parties instead of two, their legal relationships increase by geometrical progression. This is the chief reason for the complexity, conflict and uncertainty in the law of suretyship and in the law of third party beneficiaries." Corbin, Third Parties as Beneficiaries of Contractor Surety Bonds, 38 Yale L.J. 1, 2 (1928).

(6) each contract obligates the prime contractor to pay for the damage it may cause to the work, materials or equipment of other contractors working on the project.[26]

With respect to the building contractor's surety, however, the court concluded that the earthwork contractor had no third-party recourse against the building contractor's bond for the reason that the surety could only be liable to those who were expressly named as obligees under its payment and performance bonds and the statutes under which the bonds were provided.[27]

Except where the owner's duty to coordinate multiple contractors has been expressly and unequivocally assumed by the prime contractors themselves, the owner must perform its implied duty to coordinate its multiple partners or contractors. The owner must furnish a suitable work schedule and cannot satisfy this duty merely by encouraging the contractors to coordinate among themselves.[28] The delegation of responsibility to coordinate third-parties without providing the means to control or compel third-party behavior is a prescription for trouble. As a general rule, it is the owner's obligation to actively control and enforce compliance of each partner with the provisions of its contract and to exercise its supervisory rights to assure cooperation.[29] Failure to

[26]Moore Const. Co., Inc. v. Clarksville Dept. of Electricity, 707 S.W.2d 1, 10 (Tenn. Ct. App. 1985).

[27]Moore Const. Co., Inc. v. Clarksville Dept. of Electricity, 707 S.W.2d 1, 11-12 (Tenn. Ct. App. 1985). Compare Hanberry Corp. v. State Bldg. Commission, 390 So. 2d 277 (Miss. 1980), in which the Supreme Court of Mississippi allowed one prime contractor to recover from the surety of another prime based on a provision in each prime contract requiring each prime to coordinate with the others. Expressly rejecting the holding in this case, however, is M.G.M. Const. Corp. v. New Jersey Educational Facilities Authority, 220 N.J. Super. 483, 532 A.2d 764, 42 Ed. Law Rep. 606 (Law Div. 1987), in which the court ruled that the surety's liability cannot be expanded to add obligees other than those named in the bond and that *Hanberry* constituted a "minority view."

[28]See Peter A. Camilli & Sons, Inc. v. State, 41 Misc. 2d 218, 245 N.Y.S.2d 521 (Ct. Cl. 1963).

[29]See Hoffman v. U. S., 166 Ct. Cl. 39, 340 F.2d 645 (1964) (holding that "the government could not disavow responsibility for delay caused by one prime contractor to another when the government failed to exercise its own supervisory responsibilities and there is no evidence that [the government] ever attempted to secure this cooperation, other than arranging for one unsuccessful conference with [the contractor] who refused to make any changes 'because nobody offered to pay for it'"). See also Goldberg, The Owner's Duty to Coordinate Multi-Prime Construction Contractors, a Condition of Cooperation, 28 Amory L.J. 377 (1979).

exercise its supervisory rights over a party's prime contractors or partners constitutes a breach of the implied duty of cooperation.[30]

With the advent of construction management, owners frequently have delegated their implied duties to coordinate the work to a construction manager.[31] Where the construction manager is merely the agent of the owner, the owner remains liable for any breach of the implied duty to cooperate by its agent.[32] Where the construction manager truly is an "at risk" independent contractor rather than an agent and the duty to coordinate is clearly and unequivocally delegated,[33] or where the contract documents create third-party beneficiary rights in others,[34] the opposite result may be reached.

## § 15:56 ——"Compensable" delay due to failure to coordinate participating owners

Delay to the critical path caused by miscoordination of activities among participating owners is "compensable." An owner has an implied duty to coordinate the activities of other owners involved in the project. Delay caused by failure to coordinate the activities of other participating entities usually is "compensable."[1] One typical situation involves coordination with public and

[30]See Shea-S&M Ball v. Massman-Kiewit-Early, 606 F.2d 1245 (D.C. Cir. 1979).

[31]See Spangler III & Hill, The Evolving Liabilities of Construction Managers, 19 Constr. Law. 30 (Jan. 1999). See also Ginsburg & Eshelman, Implied Duty of Cooperation, Construction Briefings No. 87-12 (Nov. 1987), in which the authors observe: "Frequently, an owner will attempt to transfer responsibility for coordination to a Construction Manager (CM). The effectiveness of the CM will depend upon the degree to which the owner has delegated the powers of coordination (the ability to impose sanctions) to the CM."

[32]See Goldberg, The Owner's Duty to Coordinate Multi-Prime Construction Contractors, A Condition of Cooperation, 28 Emory L.J. 377 (1979).

[33]See Centex-Rooney Const. Co., Inc. v. Martin County, 706 So. 2d 20 (Fla. Dist. Ct. App. 4th Dist. 1997), reh'g and reh'g en banc denied, (Mar. 11, 1998) (holding an "at risk" CM liable to the owner for defects in building exterior wall system). See also Abdalla & Hudock, Liability Issues in Multi-Prime Contracting: The Duty to Coordinate and Direct Liability for Delay, 18 Constr. Law 31 (Jan. 1998).

[34]See Caldwell v. Bechtel, Inc., 631 F.2d 989, 1980 O.S.H. Dec. (CCH) ¶ 24716 (D.C. Cir. 1980) (holding construction manager liable to third parties because of CM's contractual assumption of "safety engineering services").

**[Section 15:56]**

[1]See John B. Pike & Son, Inc. v. State, 212 A.D.2d 963, 623 N.Y.S.2d 464 (4th Dep't 1995) (owner responsible for railroad's failure to cooperate in highway project by properly scheduling the running of its trains so as to allow contractors access to the site because owner had an agreement with the railroad and could control its cooperation).

private utilities and landowners over acquisition of easements and relocation of power lines and pipelines. Another type of multi-owner project are large "privatized" public use developments organized by public/private partnerships comprised of public agencies and private entities having some degree of financial and management participation and common interests in the design, construction and long-term use of the projects.[2] Private owners and developers routinely engage in joint development of projects under privatized development agreements with public agencies.[3] In such cases, joint approvals routinely are required for contract documents, contract awards, contract changes involving additional time or money, performance requirements that may affect one or more of the owners, and resolution of disputes.

Where a construction contract is entered into by one owner for the benefit of itself and others, that owner necessarily assumes as part of its implied duty of cooperation the responsibility to coordinate the activities of the other participants so as not to delay or hinder the contractor's performance. This implied duty to coordinate the activities of multiple participating interests arises out of the owner's "control" over the selection of its collaborators, extent of their involvement, and extent of recourse against them for project delay. A contractor may successfully pursue a claim directly against an owner for its failure to coordinate the activities of the other participating entities.[4] Illustrative is *John B.*

---

[2] See Union Pacific R. Co. v. Midland Equities Inc., 45 F. Supp. 2d 685 (E.D. Mo. 1999), aff'd in part, rev'd in part on other grounds, 212 F.3d 386 (8th Cir. 2000) (discussing the implications of a public/private partnership entered into by the City of St. Louis and private developers for the development of the St. Louis Marketplace project with funds acquired from a combination of public tax increment financing and private sources); Lane Const. Corp. v. Brown & Root, Inc., 29 F. Supp. 2d 707 (E.D. Va. 1998), order aff'd in part, rev'd in part on other grounds, 207 F.3d 717 (4th Cir. 2000) (involving Dulles Toll Road Extension Project in Northern Virginia under a public/private partnership); Norfolk Elec., Inc. v. Fall River Housing Authority, 417 Mass. 207, 629 N.E.2d 967 (1994) (involving a low income housing project developed by a local public housing authority with funding entirely from the United States Department of Housing and Urban Development).

[3] The largest public-private development to date is the Federal Triangle Project, which was funded jointly by the United States Government and private developers under special congressional legislation. See Saratoga Development Corp. v. U.S., 21 F.3d 445 (D.C. Cir. 1994) (addressing the validity of contracts awarded in connection with the private development of the Federal Triangle Project under congressional legislation).

[4] In those jurisdictions which treat the contractor as a third party beneficiary of project development agreements between multiple owners, the contractor may be able to pursue the offending owner directly. See Little Rock Wastewater

*Pike & Son, Inc. v. State*,[5] in which the State of New York, preparatory to reconstructing an interstate highway, entered into a separate agreement with a railroad to have its railroad bridge crossing the highway reconstructed at the same time under the same construction contract. In the state's agreement with the railroad, the railroad authorized the state and its contractors to enter upon the railroad's premises to make necessary changes to the railroad bridge and promised to coordinate and cooperate with the state's contractor. The state in turn agreed to reimburse the railroad for its costs incurred in coordinating with the contractor. The state then awarded a construction contract that provided that all work affecting the railroad would be "carried out under the joint supervision of the Department of Transportation and the railroad company." During construction, the contractor suffered significant delays due to the railroad's failure to cooperate. The New York Court of Claims denied relief to the contractor, but the Appellate Division of the Supreme Court reversed as follows:

> [T]he court erred in denying [the contractor's] claim for damages resulting from delays encountered in constructing the railroad overpass. The record establishes that the extraordinary and unanticipated delay was attributable to [the railroad's] unreasonable refusal to accommodate [the contractor's] schedule. We disagree with the court's conclusion that the State had no obligation to obtain [the railroad's] cooperation. . . . In our view, the State would not have entered into that contract with [the railroad] unless the construction contract required it to secure [the railroad's] cooperation. In any event, the second agreement granted the State the right to enforce [the railroad's] cooperation for the benefit of claimant, a third party beneficiary. We thus conclude that the State bore the contractual risk for the expense of delay in the event that [the railroad] failed to cooperate.[6]

## § 15:57 ——"Compensable" delay due to failure to provide contract "direction"

Delay caused by inexcusable failure of the owner or its agents to perform contract obligations to provide direction and informa-

Utility v. Larry Moyer Trucking, Inc., 321 Ark. 303, 902 S.W.2d 760 (1995). See also McGill, Construction Contract Third-Party Beneficiaries, Construction Briefings No. 88-4 (March 1988).

[5]John B. Pike & Son, Inc. v. State, 212 A.D.2d 963, 623 N.Y.S.2d 464 (4th Dep't 1995).

[6]John B. Pike & Son, Inc. v. State, 212 A.D.2d 963, 623 N.Y.S.2d 464, 465 (4th Dep't 1995).

This language was included on the formwork subcontractor's proposal, which was incorporated into the subcontract by reference. Numerous causes were alleged to account for the eight-month delay in completion, but the "most prominent cause" of delay was determined to be the unusually cold winter, which slowed the concrete placement work and severely aggravated problems of safety and morale. The United States District Court for the Eastern District of Pennsylvania nevertheless ruled that this otherwise "excusable delay" was compensable because the formwork subcontract simply provided for payment for any delays beyond the formwork subcontractor's "reasonable control."

### § 15:75 ——Contractual conversion of "compensable delay" into "excusable delay": "No damage for delay" clause

"Compensable delay" can be converted into "excusable delay" by a "no damage for delay" clause, which limits the remedy for "compensable delay" to an extension of time only and not damages.[1] No other type of contract clause used to allocate and apportion time delays and impacts has generated the controversy and litigation caused by the "no damage for delay" clause.[2] There is no "standard form" of "no damage for delay" clause. The common thread running through all such clauses is the conversion of "compensable delay" to "excusable delay" by limitation of the remedy for delay to an extension of time and not damages.

In its broadest sense, the "no damage for delay" clause constitutes an express waiver of monetary relief for the other party's breach of its implied duties of cooperation and nonhindrance. The clause sometimes is written as:

---

**[Section 15:75]**

[1] See Validity and construction of "no damage" clause with respect to delay in building or construction contract, 74 A.L.R. 3d 187; Kovars & Shuham, "No Damage for Delay" Clauses, Construction Briefings No. 87-11 (Oct. 1987); 5A Corbin on Contracts § 1087. The only standard form contract to include the clause is EJCDC Document No. 1910-8, ¶ 12.4 (1990), which purports to limit the owner's liability for delay due to "neglect by utility owners or other contractors." Subcontracts routinely include clauses by which contractors seek to limit their liability to subs for delay of any kind to sums recovered from the owner for the benefit of the subcontractor on the subcontractor's "pass through" claim. See Building and construction contracts: prime contractor's liability to subcontractor for delay in performance, 16 A.L.R. 3d 1252.

[2] See Fifty State Monograph on the Enforceability of "No Damage for Delay Clauses" (1998).

1. A general disclaimer of liability for delay damages;[3]
2. A waiver by one party to any right to relief beyond a mere extension of time caused by the other party;[4]
3. An indemnity of one party by the other against the consequence of delay;[5]
4. An accord and satisfaction of claim;[6] or
5. A limitation in the definition of events outside a party's "control."[7]

Most frequently, the clause is written to disclaim liability for delay likely to be caused by specific events foreseeable at the time of contracting, such as difficulties in acquisition of required right-of-way,[8] delay in obtaining owner-furnished materials,[9] potential delay that might be caused by other contractors work-

[3]See U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539 (D.C. Cir. 1982) ("contractor shall not be liable for any damages that may occur from delays . . .").

[4]See Wells Bros. Co. of New York v. U.S., 254 U.S. 83, 41 S. Ct. 34, 65 L. Ed. 148 (1920) (clause provided: "No claim shall be made or allowed to the contractor for any damages which may arise out of any delay caused by the United States.").

[5]See Holloway Const. Co. v. Department of Transp., 218 Ga. App. 243, 461 S.E.2d 257 (1995), reconsideration denied, (July 31, 1995) (clause provided:

> Contractors working on the same project shall assume all liability, financial or otherwise, in connection with his [sic] contract and shall protect and save harmless [the owner] from any and all damages or claims that may arise because of inconvenience, delay, or loss experienced by him [sic] because of the presence and operations of other contractors working within the limits of the same project.

This was held to be a valid "no damage for delay" clause that limited [the owner's] liability for damages due to a delay attributable to any breach of its implied duty to coordinate or sequence the work of the various contractors.).

[6]See E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas, 551 F.2d 1026, 21 U.C.C. Rep. Serv. 1061 (5th Cir. 1977), opinion modified on other grounds on reh'g, 559 F.2d 268 (5th Cir. 1977) (Clause provided: "An extension of time for completion of this contract is hereby granted to [subcontractor] for a period equal to any delay caused by [contractor]. Such extension shall be in lieu of and in full satisfaction of any and all claims whatsoever of [the subcontractor] against [the contractor].").

[7]See EJCDC Document No. 1910-8, ¶ 12.4 (1990) (disclaims owner liability for "delays beyond the control of both parties, including but not limited to . . . acts or neglect by utility owners or other contractors").

[8]See Rogers v. U.S., 99 Ct. Cl. 393, 1943 WL 4217 (1943).

[9]See Kent v. U. S., 228 F. Supp. 929 (S.D. N.Y. 1964), judgment aff'd, 343 F.2d 349 (2d Cir. 1965); W. C. James, Inc. v. Phillips Petroleum Co., 485 F.2d 22 (10th Cir. 1973), aff'g W. C. James, Inc. v. Phillips Petroleum Co., 347 F. Supp. 381 (D. Colo. 1972); George J. Grant Const. Co. v. U.S., 124 Ct. Cl. 202, 109 F. Supp. 245 (1953).

ing on the same project[10] or on nearby projects,[11] delay due to changes in scheduling or sequencing of work,[12] delay due to underground obstructions,[13] delay due to utility relocations,[14] and delay for which the contract otherwise affords a remedy.[15] Some clauses condition the right to a time extension upon timely notice of delay and request for an extension.[16] To the extent that such clauses authorize any damages, the recovery ordinarily is limited to sums recovered from others[17] or to defined costs.[18] The wide va-

[10]See Beltrone Const. Co. Inc. v. State, 256 A.D.2d 992, 682 N.Y.S.2d 299 (3d Dep't 1998) (contract provided that due to the award of multiple prime contracts for the construction of a prison, inherent delays were contemplated, the state could not guarantee unimpeded operations of any contractor and the state would not be liable for any such delay).

[11]See Cooke Contracting Co. v. State, 55 Mich. App. 479, 223 N.W.2d 15 (1974); P.T. & L. Const. Co., Inc. v. State of N.J., Dept. of Transp., 108 N.J. 539, 531 A.2d 1330 (1987) (clause provided: "the contractor shall and hereby does agree to make no claims against the state for additional payment due to delays or other conditions created by the operations of such other parties . . . .").

[12]See Port Chester Elec. Const. Corp. v. HBE Corp., 978 F.2d 820 (2d Cir. 1992) (clause provided: "contractor may, from time to time, modify or alter the work schedule, but, in such an event, no such modification or alteration shall entitle subcontractor to any increase in the consideration of the subcontract").

[13]See Davis Const. Corp. v. County of Suffolk, 149 A.D.2d 404, 539 N.Y.S.2d 757 (2d Dep't 1989) ("we find that the contract and related documents expressly imposed upon the [contractor] the burden to check for obstructions and foreclose damages for such delays . . .").

[14]See Little Rock Wastewater Utility v. Larry Moyer Trucking, Inc., 321 Ark. 303, 902 S.W.2d 760 (1995). The clause said:

> The contractor shall consider in the bid of the permanent and temporary utility facilities and appurtenances in their present, relocated, or proposed positions. No additional monetary compensation will be allowed for any delays, inconveniences, or damages sustained due to any interference from the utilities or appurtenances or from the operations of relocating them.

[15]See APAC-Carolina, Inc. v. Greensboro-High Point Airport Authority, 110 N.C. App. 664, 431 S.E.2d 508 (1993) (Clause stated: "No provision of this article shall be construed as entitling the contractor to compensation for delays due to inclement weather, for suspensions made at the request of the contractor, or for any other delay provided for in the contract, plans, or specifications.").

[16]See Holloway Const. Co. v. Department of Transp., 218 Ga. App. 243, 461 S.E.2d 257 (1995), reconsideration denied, (July 31, 1995).

[17]See Roy A. Elam Masonry, Inc. v. Fru-Con Const. Corp., 922 S.W.2d 783 (Mo. Ct. App. E.D. 1996), reh'g and/or transfer denied, (Apr. 30, 1996) and transfer denied, (June 25, 1996) ("no damage for delay" clause limited a subcontractor's recovery to sums recovered by the prime contractor from the owner on its behalf, although court upheld the clause on grounds it was not a "no damage for delay" clause because it was not a total bar to recovery). Contractors frequently utilize "no damage for delay" clauses to preclude recoveries against them by their subcontractors, except to the extent of recoveries that

riety of "no damage for delay" clauses that must be interpreted and construed in the context of complex factual situations surrounding the formation and performance of construction contracts only adds to the confusion that manifests itself in a bewildering array of divergent case law on the subject. The subject abounds with public policy considerations.[19]

It is a well accepted principle that judicial scrutiny begins with the "strict construction" of the language of the clause and enforcement only within its clear terms.[20] Where a "no damage for delay"

---

contractors can make on behalf of the subcontractors from owners. Not going quite that far is the standard subcontract of the Associated General Contractors of America (AGC Document 600, 1984 ed.) which provides:

> If the progress of the subcontractor's work is substantially delayed without the fault or responsibility of the subcontractor, then the time for the subcontractor's work shall be extended by change order to the extent obtained by the contractor under the contract documents and the schedule of work shall be revised accordingly. The contractor shall not be liable to the subcontractor for any damages or additional compensation as a consequence of delay caused by any person not a party to this agreement unless the contractor has first recovered the same on behalf of the subcontractor from said person, it being understood and agreed by the subcontractor that, apart from recovery from said person, the subcontractor's sole and exclusive remedy for delay shall be an extension in the time for performance of the subcontractor's work (emphasis added).

In essence, this clause does not preclude the subcontractor from recovering delay damages caused solely by the prime contractor, but precludes recovery against the prime contractor of delay damages caused by the owner, design professionals, or other subcontractors or material suppliers, except to the extent that the prime contractor obtains any recovery from them on behalf of the damaged subcontractor.

[18] See Underground Const. Co. v. Sanitary Dist. of Chicago, 11 N.E.2d 361, 115 A.L.R. 57 (Ill. 1937) (clause limited recovery for compensable delays to wages and thus precluded recovery for equipment costs); Herlihy Mid-Continent Co. v. Sanitary Dist. of Chicago, 60 N.E.2d 882 (Ill. 1945).

[19] See Grandoff and Davenport, "No Damage for Delay" Clauses: A Public Policy Issue, 25 Constr. Cont. L. Rev. 4 356 (Nov. 30, 2001). Public policy concerns have caused some state legislatures to act to restrict the application of these clauses. See Scoccolo Const., Inc. v. City of Renton, 102 Wash. App. 611, 9 P.3d 886 (Div. 1 2000) (summary judgment in favor of owner reversed where statute voided such clauses to the extent that they seek to insulate owner from its own breaches).

[20] See J. & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill. 2d 265, 205 Ill. Dec. 98, 642 N.E.2d 1215 (1994) ("such exculpatory clauses—commonly referred to as no-damage-for-delay clauses—are enforceable though they are construed strictly against those who seek their benefit"). Strict construction of the "no damage for delay" clause is said variously to be justified by (1) the law's abhorrence of harsh forfeiture terms in derogation of common law, (2) the time-honored practice of construing clauses against the drafter, and (3) the custom of strictly scrutinizing clauses that purport to shift risks to or require indemnification of guilty parties by innocent parties. But see Green Intern., Inc. v. Solis, 951 S.W.2d 384 (Tex. 1997), reversing Argee Corp. v. Solis, 934 S.W.2d 39 (Tex.

clause is found to be ambiguous, the ambiguity ordinarily will be construed under legal rules of interpretation[21] and, as a last resort, against the drafter.[22] Strict construction supports the recovery of delay damages not clearly and unequivocally barred by a "no damage for delay" clause.[23] Thus, delay in commencement of the work due to the owner's failure to acquire the right-of-way was held not to fall within the scope of a clause barring damages for delay from "any cause whatsoever in the progress of the work."[24] The words "any cause" have been construed to mean "any cause other than an act of the owner."[25] A clause precluding recovery of damages for "delay in delivery of pipes and other material" has been held not to cover delay caused by defects in timely delivered castings.[26] In essence, any apparent ambiguity or omission in the scope of the "no damage for delay" clause may serve

App. 1996) (unlike releases and indemnity provisions exculpating a party from its own negligence, a "no damage for delay" clause need not be so clear, unambiguous and "conspicuous" under the U.C.C. to be enforceable under Texas law).

[21]See §§ 3:1 to 3:57. See also Restatement Second, Contracts §§ 200 to 208.

[22]See Atlanta Economic Development Corp. v. Ruby-Collins, Inc., 206 Ga. App. 434, 425 S.E.2d 673 (1992); Western Engineers, Inc. v. State By and Through Road Commission, 20 Utah 2d 294, 437 P.2d 216 (1968); Algernon Blair, Inc. v. Norfolk Redevelopment and Housing Authority, 200 Va. 815, 108 S.E.2d 259 (1959).

[23]See U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539 (D.C. Cir. 1982); Giammetta Associates, Inc. v. J.J. White, Inc., 573 F. Supp. 112 (E.D. Pa. 1983).

[24]See City of Dallas v. Shortall, 87 S.W.2d 844 (Tex. Civ. App. Dallas 1935), judgment rev'd on other grounds, 131 Tex. 368, 114 S.W.2d 536 (Comm'n App. 1938). See also McGuire & Hester v. City and County of San Francisco, 113 Cal. App. 2d 186, 247 P.2d 934 (1st Dist. 1952); Cauldwell-Wingate Co. v. State, 276 N.Y. 365, 12 N.E.2d 443 (1938); Nelson v. City of Eau Claire, 175 Wis. 387, 185 N.W. 168 (1921).

[25]See Algernon Blair, Inc. v. Norfolk Redevelopment and Housing Authority, 200 Va. 815, 108 S.E.2d 259 (1959) (clause barring damages for "hindrance or delay from any cause" held ambiguous and not applicable to owner stop work order); McGuire & Hester v. City and County of San Francisco, 113 Cal. App. 2d 186, 247 P.2d 934 (1st Dist. 1952). But see to the contrary Freeman v. Department of Highways, 253 La. 105, 217 So. 2d 166 (1968) and Housing Authority of City of Dallas v. Hubbell, 325 S.W.2d 880 (Tex. Civ. App. Dallas 1959), writ refused n.r.e., (Oct. 28, 1959).

[26]See Wood v. City of Ft. Wayne, 119 U.S. 312, 7 S. Ct. 219, 30 L. Ed. 416 (1886). But see L & B Const. Co. v. Ragan Enterprises, Inc., 267 Ga. 809, 482 S.E.2d 279 (1997) (subcontractor's delay claim was barred by "no damage for delay clause" in contractor's agreement that was unambiguously flowed down into subcontract through an "incorporation by reference" or "flow down" clause in subcontract).

as a basis for nonenforcement.[27] To avoid entirely the reach of a "no damage for delay" clause, delay claims sometimes are characterized and labeled as claims for "acceleration"[28] or "disruption,"[29] and courts review carefully the substance of the claim before deciding whether or not the claim is covered by the clause.[30]

When clearly written to reallocate expressly to the contractor the time impact risk of owner-caused delay, which the contractor in turn is expected to factor into its contract price, the clause may be enforced under the doctrine of "freedom to contract."[31]

---

[27] Where there is no ambiguity the issue of enforceability is a matter for the court to decide, rather than the jury. See Morse/Diesel, Inc. v. Trinity Industries, Inc., 67 F.3d 435 (2d Cir. 1995).

[28] See Siefford v. Housing Authority of City of Humboldt, 192 Neb. 643, 223 N.W.2d 816, 74 A.L.R.3d 172 (1974) (acceleration claim was barred as within "no damage" clause).

[29] See Marriott Corp. v. Dasta Const. Co., 26 F.3d 1057 (11th Cir. 1994), reh'g and suggestion for reh'g en banc denied, 37 F.3d 639 (11th Cir. 1994) (delay claim relabeled as "disruption" claim not excepted from the "no damage" clause).

[30] See U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539 (D.C. Cir. 1982) ("disruption" claim proven to contain no delay damage cost was not barred by clause).

[31] See Wells Bros. Co. of New York v. U.S., 254 U.S. 83, 41 S. Ct. 34, 65 L. Ed. 148 (1920) (Upholding enforcement of a "no damage of delay" clause with this observation:

> Men who take $1 million contracts for governmental buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract . . . protected themselves against such delays as are complained of by the higher price extracted for the work.

See also Burt Welding & Automotive Repair Inc. v. U.W. Marx Inc., 272 A.D.2d 737, 707 N.Y.S.2d 548 (3d Dep't 2000); Roy A. Elam Masonry, Inc. v. Fru-Con Const. Corp., 922 S.W.2d 783 (Mo. Ct. App. E.D. 1996), reh'g and/or transfer denied, (Apr. 30, 1996) and transfer denied, (June 25, 1996); Marriott Corp. v. Dasta Const. Co., 26 F.3d 1057 (11th Cir. 1994), reh'g and suggestion for reh'g en banc denied, 37 F.3d 639 (11th Cir. 1994); APAC-Carolina, Inc. v. Greensboro-High Point Airport Authority, 110 N.C. App. 664, 431 S.E.2d 508 (1993); White Oak Corp. v. Department of Transp., 217 Conn. 281, 585 A.2d 1199 (1991); McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906 (E.D. Va. 1989), order aff'd in part, rev'd in part on other grounds, 911 F.2d 723 (4th Cir. 1990); Broadway Maintenance Corp. v. Rutgers, State University, 90 N.J. 253, 447 A.2d 906 (1982); Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983); Gust K. Newberg, Inc. v. Illinois State Toll Highway Authority, 153 Ill. App. 3d 918, 106 Ill. Dec. 858, 506 N.E.2d 658 (2d Dist. 1987); K & F Construction v. Los Angeles City Unified School Dist., 123 Cal. App. 3d 1063, 176 Cal. Rptr. 842 (2d Dist. 1981); Wes-Julian Const. Corp. v. Com., 351 Mass. 588, 223 N.E.2d 72 (1967); Western Engineers, Inc. v. State By and Through Road Commission, 20 Utah 2d 294, 437 P.2d 216 (1968); Cunningham Bros., Inc. v. City of Waterloo, 254 Iowa 659, 117 N.W.2d 46 (1962).

Because it precludes the right to recover damages for future events in derogation of traditional common-law risk allocation, however, the clause is often construed to avoid unintended waiver and forfeiture, and is enforced no farther than the clear import of its terms.[32] Illustrative of the application of this rule of strict construction to a "no damage for delay" clause is *U.S. Industries Inc. v. Blake Construction Co.*,[33] in which a contractor sought to bar delay claim under a "no damage for delay" clause that read:

> Contractor shall not be liable for any damages that may occur from delays or other causes on the part of other contractors or subcontractors involved in work, or the furnishing of materials, pertaining to this project.[34]

The primary delay for which the subcontractor sought compensation was caused by the structural steel supplier under a separate subcontract with the contractor. Noting that the "no damage for delay" clause mentioned only delay by "contractors or subcontractors," the subcontractor argued that the clause was inapplicable and unenforceable because it did not expressly reference delay caused by "suppliers." In accepting the subcontractor's interpretation of the clause, the United States Court of Appeals for the District of Columbia Circuit concluded:

> If the parties had intended to immunize [the contractor] from liability for delay caused by its suppliers and vendors, they easily could and presumably would have so provided by specifically so

[32] The "no damage for delay" clause constitutes a waiver of a right to damages for events that have not yet occurred and thus the intent of the parties and what was in their contemplation at the time of contracting is relevant to the question of extent of waiver. Waiver is the "intentional relinquishment of a known right." Waiver must be clearly proven. See JWP/Hyre Elec. Co. of Indiana v. Mentor Village School Dist., 968 F. Supp. 356, 119 Ed. Law Rep. 876 (N.D. Ohio 1996) (motion for summary judgment denied because of fact issue in dispute over whether delays due to construction manager's lack of coordination were reasonably contemplated at time of contracting); Clifford R. Gray Inc. v. City School Dist. of Albany, 277 A.D.2d 843, 716 N.Y.S.2d 795 (3d Dep't 2000) (delays caused by owner failing to obtain easements and construction manager to coordinate schedules fell within the "uncontemplated delays" and "fundamental breach" exceptions to "no damage for delay" clause); Hawley v. Orange County Flood Control Dist., 211 Cal. App. 2d 708, 27 Cal. Rptr. 478 (4th Dist. 1963); Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F. Supp. 376 (S.D. Iowa 1973); E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas, 551 F.2d 1026, 21 U.C.C. Rep. Serv. 1061 (5th Cir. 1977), opinion modified on other grounds on reh'g, 559 F.2d 268 (5th Cir. 1977); Southern Gulf Utilities, Inc. v. Boca Ciega Sanitary Dist., 238 So. 2d 458 (Fla. Dist. Ct. App. 2d Dist. 1970).

[33] U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539 (D.C. Cir. 1982).

[34] U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539, 543 (D.C. Cir. 1982).

stating. The provision, however, covers only "contractors and subcontractors . . . ." Since exculpatory clauses generally are not favored, they are strictly construed. *E.g.*, [E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas, 551 F.2d 1026, 1029, 21 U.C.C. Rep. Serv. 1061 (5th Cir. 1977), opinion modified on other grounds on reh'g, 559 F.2d 268 (5th Cir. 1977)]. The subcontract in this case was a printed form prepared by [the contractor], and it is appropriate to construe it against the drafter. *E.g.*, [John W. Johnson, Inc. v. Basic Const. Co., 429 F.2d 764, 771 n.11 (D.C. Cir. 1970)]. In the absence of any indication either in the contract itself or in the surrounding negotiations leading to its execution that the parties intended the words "contractors or subcontractors" also to cover suppliers and vendors, we interpret the contract to mean what it says.[35]

The principle of strict construction also will often take claims for acceleration[36] or disruption[37] beyond the scope of this exculpatory provision, if the "no damage for delay" clause clearly refers only to delay.

Given the common law's traditional aversion to harsh forfeiture provisions in contracts, courts have carved out significant exceptions to their enforceability,[38] and some state legislatures

---

[35] U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539, 544 (D.C. Cir. 1982).

[36] See Contracting & Material Co. v. City of Chicago, 20 Ill. App. 3d 684, 314 N.E.2d 598 (1st Dist. 1974), judgment rev'd on other grounds, 64 Ill. 2d 21, 349 N.E.2d 389 (1976) (an acceleration claim is different from a delay claim and is not barred by a no damage for delay clause); Watson Elec. Const. Co. v. City of Winston-Salem, 109 N.C. App. 194, 426 S.E.2d 420 (1993); Wallace Process Piping Co. v. Martin-Marietta Corp., 251 F. Supp. 411 (E.D. Va. 1965). One court, however, reasoned that acceleration is necessitated because of delay and thus is a type of delay claim that is barred by a "no damage for delay" clause. See Siefford v. Housing Authority of City of Humboldt, 192 Neb. 643, 223 N.W.2d 816, 74 A.L.R.3d 172 (1974).

[37] See U. S. Industries, Inc. v. Blake Const. Co., Inc., 671 F.2d 539 (D.C. Cir. 1982); John E. Green Plumbing and Heating Co., Inc. v. Turner Const. Co., 742 F.2d 965 (6th Cir. 1984) (disruption is a claim distinct from delay).

[38] Courts commonly recognize four exceptions to enforcement of these clauses, the only problem is that they are not always the same four bases. Often the courts do not even count the same way by combining and mixing various exceptions. See Green Intern., Inc. v. Solis, 951 S.W.2d 384 (Tex. 1997), reh'g of cause overruled, (Oct. 2, 1997) (Texas recognizes for exceptions to enforcement of a "no damage for delay" clause: (1) uncontemplated delay; (2) delay caused by fraud or bad faith; (3) unreasonably long delay amounting to abandonment and (4) delay not specifically enumerated in clause); U.S. for Use and Benefit of Williams Elec. Co., Inc. v. Metric Constructors, Inc., 325 S.C. 129, 480 S.E.2d 447 (1997) (South Carolina recognizes four exceptions: (1) fraud/bad faith; (2) delay caused by active interference of the party seeking protection of the clause; (3) unreasonable long delay and (4) delay caused by gross negligence); DiGioia

have gone farther to enact statutes that limit severely or bar entirely the enforceability of "no damage for delay" clauses.[39]

One approach is that a clear and unequivocal "no damage for delay" clause is valid and enforceable, is not contrary to public policy, and is justified on grounds of "freedom of contract" and the economic pricing of assumed contract risks. As the United States Supreme Court observed in *Wells Brothers Co. of New York v. United States*:[40]

> Men who make million-dollar contracts for government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts

---

Bros. Excavating, Inc. v. Cleveland Dept. of Pub. Util., Div. of Water, 135 Ohio App. 3d 436, 734 N.E.2d 438 (8th Dist. Cuyahoga County 1999) (same as Texas); PYCA Industries, Inc. v. Harrison County Waste Water Mgmt. Dist., 177 F.3d 351 (5th Cir. 1999) (clause enforceable subject to exceptions for bad faith, active interference, delay amounting to abandonment); U. S. for Use and Ben. of Evergreen Pipeline Const. Co., Inc. v. Merritt-Meridian Const. Corp., 890 F. Supp. 1213 (S.D. N.Y. 1995), judgment aff'd in part, vacated in part on other grounds, 95 F.3d 153, 45 Fed. R. Evid. Serv. 745 (2d Cir. 1996) (New York recognizes four exceptions: (1) uncontemplated delays; (2) bad faith, or willful, malicious or grossly negligent conduct; (3) unreasonable delay amounting to abandonment; and (4) delay which is the result of a fundamental breach of contract). See also Kovars & Shuham, "No Damage for Delay" Clauses, Construction Briefings No. 87-11 (Oct. 1987); Thomas & Wilshusen, How to Beat a "No Damage for Delay" Clause, 10 Constr. Law. (No. 4) 17 (1988).

[39]See Wash. Rev. Code Annotated § 4.24.360 (1979) (voids:

> any clause in a construction contract . . . which purports to waive, release, or extinguish the rights of a contractor, subcontractor, or supplier to damages or an equitable adjustment arising out of unreasonable delay in performance which delay is caused by the acts or omissions of the contractee or persons acting for the contractee . . .)

Cal. Pub. Cont. Code § 7102 (1984):

> contract provisions in construction contracts of public agencies and subcontracts thereunder which limit the contractee's liability to an extension of time for delay for which the contractee is responsible and which delay is unreasonable under the circumstances involved, and not within the contemplation of the parties, shall not be construed to preclude the recovery of damages by the contractor or subcontractor

Ariz. Rev. Stat. 41-2617 (1987) (similar); Colo. Rev. Stat. § 24-91-103.5(1)(a) (1989):

> any clause in a public works contract that purports to waive, release, or extinguish the rights of a contractor to recover costs or damage, or obtain an equitable adjustment, for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void and unenforceable

Vernon's Annotated Missouri Stat. § 34.058.2 (1990) (same); Louisiana Rev. Stat. § 38.2216 (1990) (same); North Carolina Gen. Stat. § 143-134.3 (1997) (similar).

[40]Wells Bros. Co. of New York v. U.S., 254 U.S. 83, 41 S. Ct. 34, 65 L. Ed. 148 (1920).

limit severely or bar
: delay" clauses.[39]



than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work.[41]

Under this theory, the "no damage for delay" clause is merely "part of the economic package upon which the parties agree."[42] Because a contractor may adjust its price to compensate for risks assumed, the propriety of the contractor's express assumption of risk is commercially supportable. As expressed by the United States Court of Appeals for the Eleventh Circuit in *Marriott Corporation v. Dasta Construction Co.*:[43]

> Although these terms may seem one-sided, [the contractor] was aware of these provisions at the time it bid the contracts, and had the opportunity to increase its proposed contract prices to account for the risks it would be assuming. [The contractor] failed to seize upon this opportunity, and, in hindsight, made a pair of improvident bargains from which we are powerless to grant relief. It is not the function of the courts to "rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain."[44]

Notwithstanding the general enforceability of a "no damage for delay" clause, the clause remains subject to overarching implied obligations read into every express contract; namely, (1) the implied obligation of good faith and fair dealing, (2) the implied obligation of cooperation and (3) the implied obligation of noninterference. These implied obligations constitute the fundamental bedrock principles upon which judicial exceptions to

---

[41] Wells Bros. Co. of New York v. U.S., 254 U.S. 83, 87, 41 S. Ct. 34, 65 L. Ed. 148 (1920). In that case, the contract contained a "no damage for delay" clause that said:

> No claim shall be made or allowed to the contractor for any damages which may arise out of any delay caused by the United States.

[42] See Broadway Maintenance Corp. v. Rutgers, State University, 90 N.J. 253, 447 A.2d 906 (1982).

[43] Marriott Corp. v. Dasta Const. Co., 26 F.3d 1057 (11th Cir. 1994), reh'g and suggestion for reh'g en banc denied, 37 F.3d 639 (11th Cir. 1994).

[44] Marriott Corp. v. Dasta Const. Co., 26 F.3d 1057, 1068 (11th Cir. 1994), reh'g and suggestion for reh'g en banc denied, 37 F.3d 639 (11th Cir. 1994), quoting from Beach Resort Hotel Corp. v. Wieder, 79 So. 2d 659, 663 (Fla. 1955). This is a harsh result. The dissent makes a case for a different result based on lack of prejudice and active interference. See also Wickwire, et al., Construction Scheduling, 2001 Cumulative Supplement, § 7.27 (2001) (authors describe case as "disturbing" and quote from "[a] well-reasoned" dissent).

the enforcement of the "no damage for delay" clause are founded.[45] The tension between contractual enforcement and exculpation arises in every case.[46] Concern over the unfairness of the "no damage" clause in specific situations has resulted in the creation of statutory[47] and judicial exceptions to enforceability. The judicially created exceptions, albeit expressed somewhat differently from state to state, have a common thread of nonenforcement in the face of delay constituting a breach of the owner's implied obligations of good faith and fair dealing, cooperation and noninterference. As expressed by the New York Court of Appeals in *Corinno Civetta Construction Corp. v. City of New York*:[48]

> Generally, even with such a [no damage for delay] clause, damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4)

---

[45]See U.S. for Use and Benefit of Williams Elec. Co., Inc. v. Metric Constructors, Inc., 325 S.C. 129, 480 S.E.2d 447 (1997).

[46]See J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill. 2d 265, 205 Ill. Dec. 98, 642 N.E.2d 1215, 1222 (1994):

> Contracting parties are generally empowered to define the limits of their respective obligations. And courts may not arbitrarily create exceptions to provisions found in private contracts which effectively supplant that power. (See Underground Const. Co. v. Sanitary Dist. of Chicago, 367 Ill. 360, 371, 11 N.E.2d 361, 115 A.L.R. 57 (1937) (acknowledging the parties themselves had addressed the issue of damages for delay in their contract).) Thus, one measure of any judicially created exception's validity is the extent to which it avoids a harsh result yet honors the notion that merely bad bargains are beyond the concern of the courts.

[47]See California Public Contract Code, § 7102 (1984) (prohibits enforcement of "no damage for delay" clauses in public contracts where delay caused by a public owner is unreasonable under the circumstances and not within the contemplation of the parties at the time they entered into the contract), and California Civil Code, § 2782(b) (invalidates contract terms that would relieve a public agency from the consequences of its active negligence); Colorado Rev. Stat. § 24-91-105.3 (bars enforcement of "no damage" for delay clause in public contracts); Revised Code of Washington § 4.24.360 (1979) (bars enforceability of "no damage for delay" clause in both public and private contracts); Missouri Rev. Stat. § 34.058 (1996); Arizona Rev. Stat. § 41-2617 (1997) (requires delay damages to be negotiated for delays caused by state governmental units which are unreasonable and not within the contemplation of the parties); North Carolina Gen. Stat. § 143-134.3 (1997) (precludes enforcement of "no damage for delay" clause in public contracts with respect to delay "caused solely by the owner or its agent").

[48]Corinno Civetta Const. Corp. v. City of New York, 67 N.Y.2d 297, 502 N.Y.S.2d 681, 493 N.E.2d 905 (1986), reargument denied, 68 N.Y.2d 753, 506 N.Y.S.2d 1038, 497 N.E.2d 710 (1986).

delays resulting from the contractee's breach of a fundamental obligation of the contract.[49]

These exceptions are applied in whole or in part in most jurisdictions[50] by courts acting viscerally to basic notions of fundamental fairness without altogether clear legal analysis of complex facts. As a result, there has been substantial confusion in the rationale underlying application of these exceptions. Some cases apply basic breach of contract concepts to hold that breaches, such as "unreasonable delay," "abandonment," "active interference," and violation of implied duties, will trump all but the most clearly written clauses allocating the risk of delay.[51] Other cases apply exceptions derived from basic contract formation principles of intent and mutual agreement to bar enforcement of clauses allocating risks "beyond the contemplation" of the parties. Yet other cases articulate that fundamental implied obligations, such as the implied duty of good faith and fair dealing cannot, as a matter of policy, be read out of even the most clearly written "no damage" clause. The "hodgepodge" of overlapping and somewhat

[49]Corinno Civetta Const. Corp. v. City of New York, 67 N.Y.2d 297, 502 N.Y.S.2d 681, 493 N.E.2d 905, 910 (1986), reargument denied, 68 N.Y.2d 753, 506 N.Y.S.2d 1038, 497 N.E.2d 710 (1986). An earlier expression of applicable exceptions, which has found its way into numerous judicial decisions throughout the United States, was enunciated by the United States District Court for the Southern District of Iowa in Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F. Supp. 376, 399 (S.D. Iowa 1973), in which existing law as of that date required that a "no damage" clause would "not be enforced where the delay is the result of fraud or active interference on the part of one who seeks the benefits thereof; or the delay is of such a duration as to justify the contractor in abandoning the contact." That court defined "active interference" to mean: "Some affirmative, willful act, in bad faith, to unreasonably interfere with [the contractor's compliance with the terms of [the] construction contract," as distinguished from mere "simple mistake, error in judgment, lack of total effort or lack of complete diligence" on the part of the owner.

[50]See Fifty State Monograph on the Enforceability of "No Damages for Delay Clauses" (R. Lowe ed., 1998); Validity and construction of "no damage" clause with respect to delay in building or construction contract, 74 A.L.R. 3d 187. See also U. S. Steel Corp. v. Missouri Pac. R. Co., 668 F.2d 435 (8th Cir. 1982); E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas, 551 F.2d 1026, 21 U.C.C. Rep. Serv. 1061 (5th Cir. 1977), opinion modified on other grounds on reh'g, 559 F.2d 268 (5th Cir. 1977); U.S. for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp., 95 F.3d 153, 45 Fed. R. Evid. Serv. 745 (2d Cir. 1996).

[51]See Howard Contracting, Inc. v. G.A. MacDonald Construction Co., Inc., 71 Cal. App. 4th 38, 83 Cal. Rptr. 2d 590 (2d Dist. 1998), as modified, (Jan. 20, 1999) and review denied, (Mar. 31, 1999) (holding "no damage" clause vitiated by owner breaches of contract, including failure to disclose known *restrictions* on site access and availability, and contract performance and failure to obtain necessary permits).

duplicative exceptions expressed in *Corinno* and other cases requires careful individual analysis.

## § 15:76 ———"Fraud, misrepresentation or other bad faith" exception

This exception expressing common-law grounds for vitiation of any contract and for breach of the implied duty of good faith and fair dealing is recognized in every jurisdiction.[1] Just what constitutes fraud, misrepresentation or bad faith sufficient to warrant nonenforcement of a "no damage for delay" clause under the circumstances is left to the judicial finders of fact. "Bad faith" is found in any misconduct that is deliberate, willful, intentional, and clearly wrongful or unacceptable to society.[2] Examples include fraud, gross negligence amounting to fraud or other willful, malicious conduct,[3] arbitrary and capricious conduct,[4]

---

**[Section 15:76]**

[1] See Mississippi Transp. Com'n v. Ronald Adams Contractor, Inc., 753 So. 2d 1077 (Miss. 2000); Owen Const. Co., Inc. v. Iowa State Dept. of Transp., 274 N.W.2d 304 (Iowa 1979); Jensen Const. Co. v. Dallas County, 920 S.W.2d 761 (Tex. App. Dallas 1996), writ denied, (Oct. 18, 1996) and reh'g of writ of error overruled, (Dec. 13, 1996); Newberry Square Development Corp. v. Southern Landmark, Inc., 578 So. 2d 750 (Fla. Dist. Ct. App. 1st Dist. 1991), cause dismissed, 584 So. 2d 999 (Fla. 1991); J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill. 2d 265, 205 Ill. Dec. 98, 642 N.E.2d 1215 (1994); White Oak Corp. v. Department of Transp., 217 Conn. 281, 585 A.2d 1199 (1991); State Highway Admin. v. Greiner Engineering Sciences, Inc., 83 Md. App. 621, 577 A.2d 363 (1990); U.S. for Use and Benefit of Williams Elec. Co., Inc. v. Metric Constructors, Inc., 325 S.C. 129, 480 S.E.2d 447 (1997); Phoenix Contractors, Inc. v. General Motors Corp., 135 Mich. App. 787, 355 N.W.2d 673 (1984); Gherardi v. Board of Ed. of City of Trenton, 53 N.J. Super. 349, 147 A.2d 535 (App. Div. 1958); Psaty & Fuhrman v. Housing Authority of City of Providence, 76 R.I. 87, 68 A.2d 32, 10 A.L.R.2d 789 (1949); Anthony P. Miller, Inc. v. Wilmington Housing Authority, 165 F. Supp. 275 (D. Del. 1958); Western Engineers, Inc. v. State By and Through Road Commission, 20 Utah 2d 294, 437 P.2d 216 (1968); S.L. Rowland Const. Co. v. Beall Pipe & Tank Corp., 14 Wash. App. 297, 540 P.2d 912 (Div. 1 1975); Blake Const. Co., Inc. v. C. J. Coakley Co., Inc., 431 A.2d 569 (D.C. 1981); Marsch v. Southern New England R. Corp., 230 Mass. 483, 120 N.E. 120 (1918).

[2] See Mississippi Transp. Com'n v. SCI, Inc., 717 So. 2d 332 (Miss. 1998) (state's refusal to grant time extensions justified finding of bad faith).

[3] See J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill. 2d 265, 205 Ill. Dec. 98, 642 N.E.2d 1215, 1222 (1994), in which the Supreme Court of Illinois said:

> The most widely recognized exception to a no-damage-for delay clause encompasses bad faith, fraud, concealment or misrepresentation on the part of the party asserting the clause's operation. (See [ Validity and construction of "no damage" clause with respect to delay in building or construction contract, 74 A.L.R. 3d 187, 215-16].) The exception arises from duties of good faith and fair dealing implied in every contract.

"inexcusable ignorance or incompetence,"[5] or conduct that otherwise "smacks of intentional wrongdoing."[6] Intentional and material misrepresentations, in the form of either affirmative statements or wrongful concealment amounting to "constructive fraud," fall within this exception.[7] A classic illustration of vitiation of a "no damage for delay" clause by bad faith conduct is *U.S. for Use and Benefit of Evergreen Pipeline Construction Co. Inc. v. Merritt Meridian Construction Corp.*,[8] in which the United States Court of Appeals for the Second Circuit upheld a jury award of delay damages in favor of a subcontractor against a contractor in the face of a "no damage for delay" clause based on this record:

> The record provides a clear basis for the jury's refusal to enforce the no damage for delay clause, as there was substantial testimony about bad faith and malicious conduct by [the prime contractor], particularly [the prime's owner]. The evidence of bad faith included, among other things, the following: [The subcontractor's owner]

(See [ Validity and construction of "no damage" clause with respect to delay in building or construction contract, 74 A.L.R. 3d 187 215].) Its operation is, in that respect, essential to judicial enforcement of the legitimate objects of any agreement.

[4]See Housing Authority of City of Dallas v. Hubbell, 325 S.W.2d 880, 891 (Tex. Civ. App. Dallas 1959), writ refused n.r.e., (Oct. 28, 1959), in which the Court of Civil Appeals of Texas, Dallas ruled that the bad faith exception was broad enough to cover any "willful" arbitrary or capricious action as follows:

> [T]he "no-damage-for-delay" provision did not give the Owner a license to cause delays "willfully" by "unreasoning action," "without due consideration" and in "disregard of the rights of other parties," nor did the provision grant Owner immunity from damages if delays were caused by Owner under such circumstances."

[5]See First Savings & Trust Co. v. Milwaukee County, 158 Wis. 207, 148 N.W. 22 (1914), opinion modified on other grounds on denial of reh'g, First Savings & Trust Co. v. Milwaukee County, 158 Wis. 207, 148 N.W. 1093 (1914), in which the Supreme Court of Wisconsin held:

> The [no damage for delay] clause . . . in our judgment should not be construed to prevent recovery of damages for delays caused (1) by fraudulent conduct of the engineer, (2) by reason or orders made in bad faith and to hamper the contractor, and (3) by reason or orders unnecessary in themselves and detrimental to the contractor, and which were the result of inexcusable ignorance or incompetence on the part of the engineer. No good reason is apparent why an order which is traceable to any of the causes enumerated and which resulted in damage to the contractor should not constitute a valid basis of a claim for damages, as well as other acts done by the engineer which were the result of ignorance, bad faith, or fraudulent conduct.

[6]See Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413, 416 (1983).

[7]See Com., Dept. of Highways v. S. J. Groves & Sons Co., 20 Pa. Commw. 526, 343 A.2d 72 (1975).

[8]U.S. for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp., 95 F.3d 153, 45 Fed. R. Evid. Serv. 745 (2d Cir. 1996).

testified that [the prime] failed to honor its repeated promises to provide surveyors that [the subcontractor] required to begin its trench work. Both [the subcontractor's owner and superintendent] testified that [the prime] "spoon-fed" payments to [the subcontractor]; [the subcontractor] was delayed in part because of a crippling lack of capital, which prevented [the subcontractor] from hiring sufficient personnel to advance its work expeditiously. [The prime] grossly inflated backcharges, in what the jury could have reasonably viewed as a willful, malicious attempt to "break" [the subcontractor]. [The subcontractor's owner] also testified that [the prime] stole from [the subcontractor] excavated [stockpiled] material worth $20,000.[9]

## § 15:77 ———"Active interference" exception

The "active interference" exception arises from the implied obligations of good faith and fair dealing, cooperation and nonhindrance.[1] Although some courts have defined "active interference" to include "some affirmative, willful act, in bad faith which unreasonably interferes with the contractor's compliance with the contract terms."[2] Yet, the existence of a specific exception for bad faith in those jurisdictions also recognizing active interference would appear to make a showing of bad faith for invocation of the active interference exception to be redundant.[3] Whether or not a showing of bad faith is required, use of the term "active" to modify "interference" has been recognized universally to imply more than "a simple mistake, error in judg-

[9]U.S. for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp., 95 F.3d 153, 167, 45 Fed. R. Evid. Serv. 745 (2d Cir. 1996).

[Section 15:77]

[1]See Scoccolo Const., Inc. v. City of Renton, 102 Wash. App. 611, 9 P.3d 886 (Div. 1 2000)) (holding that owner's failure to timely relocate utilities constituted a breach of its implied duty of cooperation); Mississippi Transp. Com'n v. Ronald Adams Contractor, Inc., 753 So. 2d 1077 (Miss. 2000).

[2]See Edwin J. Dobson, Jr., Inc. v. State, 218 N.J. Super. 123, 526 A.2d 1150, 1153 (App. Div. 1987); Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F. Supp. 376, 399 (S.D. Iowa 1973).

[3]See U.S. for Use and Benefit of Williams Elec. Co., Inc. v. Metric Constructors, Inc., 325 S.C. 129, 480 S.E.2d 447 (1997), in which the Supreme Court of South Carolina recognized the "active interference" exception but with this caveat:

> As there is already a specific exception for bad faith, we decline to adopt so much of this definition as requires a showing of bad faith.

ment, lack of total effort, or lack of complete diligence."[4] "Active" has even been interpreted to imply "a deliberate intent to delay."[5] An excellent illustration of the "active interference" exception is *Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park*,[6] in which a public owner represented in its specifications for excavation work that a lake at the site would be drained and would remain in "draw down" condition until all silt had been excavated. The lake, however, remained filled for much of the contractor's performance and delayed completion. In upholding application of the "active interference" exception to vitiate the "no damage for delay" clause, the Supreme Court of Pennsylvania said:

> The rule in Pennsylvania is that exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act in some essential manner necessary to the prosecution of the work.[7]

The court did not regard bad faith intent as a necessary element of proof, and stated this exception in terms otherwise constituting a breach of the implied obligations of cooperation and nonhindrance.[8]

A willful or knowing delay of job progress was sufficient to invoke the "active interference" exception in *Southern Gulf Utilities, Inc. v. Boca Ciega Sanitary District*,[9] in which an owner was found to have "negligently, willfully, and for a long time after

[4]See Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F. Supp. 376, 399 (S.D. Iowa 1973).

[5]See Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983); Phoenix Contracting Corp. v. New York City Health and Hospitals Corp., 118 A.D.2d 477, 499 N.Y.S.2d 953 (1st Dep't 1986).

[6]Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park, 509 Pa. 553, 506 A.2d 862 (1986).

[7]Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park, 509 Pa. 553, 506 A.2d 862, 865 (1986).

[8]See Harry Pepper & Associates, Inc. v. Hardrives Co., Inc., 528 So. 2d 72, 74 (Fla. Dist. Ct. App. 4th Dist. 1988), in which the Florida District Court of Appeals applied the "active interference" exception as follows:

> It is one of the most basic premises of contract law that where a party contracts for another to do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing the agreed thing. Indeed if the situation was such that co-operation of one party is a prerequisite to performance by the other, there is not only a condition implied in fact qualifying the promise of the latter, but also an implied promise by the former to give the necessary co-operation.

[9]Southern Gulf Utilities, Inc. v. Boca Ciega Sanitary Dist., 238 So. 2d 458 (Fla. Dist. Ct. App. 2d Dist. 1970).

[the contractor] commenced work . . . not take[n] the reasonable and necessary steps to acquire the rights-of-way." As a result, the contractor was significantly delayed. Although the owner argued that its interference was not "active," the Florida District Court of Appeal ruled that the "active interference" exception was invoked by the owner's "knowing delay . . . which transcends mere lethargy or bureaucratic bungling."[10]

Premature issuance of a notice to proceed with knowledge that work cannot go forward was found to constitute "active interference" with the contractor's work schedule in *United States Steel Corp. v. Missouri Pacific Railroad Co.*,[11] in which the owner contracted for alteration of the superstructure of two railroad bridges across the Arkansas River. The substructure contractor, whose work preceded the superstructure contractor's work, was delayed by differing site conditions, of which the owner had notice at the time it issued its notice to proceed to the superstructure contractor. Although the contract expressly provided that "failure of the substructure contractor to complete his work on a specified date or dates shall not form a basis for claim for extra compensation by the superstructure contract," the United States Court of Appeals for the Eighth Circuit invoked a bad faith version of the "active interference" exception as follows:

> The active interference exception arises from the notion that in a contract such as the one in the instant case—wherein time is of the essence, yet the contractee's liability for delay is limited through a no damage clause—there is implied an obligation on the part of the contractee to refrain from anything that would unreasonably interfere with the contractor's opportunity to proceed with its work in the manner provided by the contract and to permit the contractor to carry on the work with reasonable economy and dispatch. Liability, however, is not created merely because of claimed interference caused by the delay of another contractor employed by [the owner]; after all, this is precisely the type of liability which the no damage clause seeks to prevent. Nor is [the owner] liable for delay resulting from "a simple mistake, error in judgment, lack of total effort, or lack of complete diligence." As the name implies, active interference requires a finding that [the owner] committed some affirmative, willful act in bad faith which unreasonably interfered with the contractor's compliance with the terms of the construction

[10] Southern Gulf Utilities, Inc. v. Boca Ciega Sanitary Dist., 238 So. 2d 458, 459 (Fla. Dist. Ct. App. 2d Dist. 1970). See also Gasparini Excavating Co. v. Pennsylvania Turnpike Commission, 409 Pa. 465, 187 A.2d 157 (1963); Grant Const. Co. v. Burns, 92 Idaho 408, 443 P.2d 1005 (1968); Hallett Const. Co. v. Iowa State Highway Commission, 261 Iowa 290, 154 N.W.2d 71 (1967); Western Engineers, Inc. v. State By and Through Road Commission, 20 Utah 2d 294, 437 P.2d 216 (1968).

[11] U. S. Steel Corp. v. Missouri Pac. R. Co., 668 F.2d 435 (8th Cir. 1982).

contract. Courts have found active interference where the contractee, despite knowledge of delay-causing conditions, has issued notice to proceed to the contractor resulting in increased costs because of the contractor's premature initiation of its work. In such a case, the affirmative willful act is the issuance of the notice to proceed . . .[12]

## § 15:78 ———"Unreasonable delay" exception

The exception for "unreasonable delay" caused by events within the "control" of the owner has its origins in basic breach of contract principles. It has been frequently noted, however, that the very purpose of the "no damage for delay" clause is to remove owner delay as an event constituting a breach of contract.[1] To avoid making the "no damage" clause meaningless, most jurisdictions have come around to either rejecting the "unreasonable delay" exception altogether or construing it to mean an owner delay so lengthy as to constitute owner abandonment of the contract.[2] Outright refusal to recognize the "unreasonable" delay exception is illustrated in *Broadway Maintenance Corp. v. Rutgers*,[3] in which the Supreme Court of New Jersey observed:

> Such a construction [excepting "unreasonable delay"] would subject [the public entity] in almost every case to the question of whether the delay was reasonable, thereby rendering the provision meaningless. See Psaty & Fuhrman, Inc. v. Housing Auth., 76 R.I. 87, 68 A.2d 32 (1949). The very purpose of the clause was to avoid that type of exposure and, though a contractual provision should generally be construed narrowly against the drafter (citation omit-

---

[12] U. S. Steel Corp. v. Missouri Pac. R. Co., 668 F.2d 435, 438-439 (8th Cir. 1982) (citations omitted).

[Section 15:78]

[1] See Mississippi Transp. Com'n v. Ronald Adams Contractor, Inc., 753 So. 2d 1077 (Miss. 2000) (holding that a three-month delay due to untimely utility relocation was unreasonable and barred invocation of "no damage for delay" clause as a defense); U.S. for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp., 95 F.3d 153, 167, 45 Fed. R. Evid. Serv. 745 (2d Cir. 1996) ("Lest the exceptions swallow the rule, delay clauses proscribe damages for a broad range of both reasonable and unreasonable delays.").

[2] In a sense, just as some courts treat the active interference exception as a subset of the bad faith exception, the unreasonable delay exception is easily viewed as a type of uncontemplated delay and thus a subclass of the "beyond the contemplation of the parties" exception. These exceptions have blurred boundaries. If the adjective "unreasonable" has a normative or fault connotation, then this exception falls along the "bad faith-abandonment" end of exception continuum; if not, then it is more closely aligned to an expectation concept, i.e., contemplation of the parties.

[3] Broadway Maintenance Corp. v. Rutgers, State University, 90 N.J. 253, 447 A.2d 906 (1982).