# EXHIBIT "B"



Not Reported in A.2d
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Kenneth V. BRITTINGHAM and Lynn Brittingham
v.
BOARD OF ADJUSTMENT OF THE CITY OF REHOBOTH BEACH
No. Civ.A. 03A-08-002.

Submitted Dec. 29, 2004.
Decided Jan. 14, 2005.

Dear Counsel:

STOKES, J.

*1 Kenneth and Lynn Brittingham have appealed a decision of the Rehoboth Beach Board of Adjustment, which denied their requests for a variance and to reverse a determination made by the Building Inspector. For the reasons set forth herein, the Board's decision is reversed, and the building permit issued March 3, 2003 is reinstated.

STATEMENT OF THE CASE

Kenneth and Lynn Brittingham ("the Brittinghams") reside in an area of Rehoboth Beach zoned R-2 Residential. In October of 2002 they submitted an application for a building permit to the City of Rehoboth Beach ("the City"), requesting permission to renovate a structure, originally a garage, which was not attached to the residential dwelling on the property. The garage had at some point been converted into an efficiency or garage apartment and they wanted to upgrade it. Among other things, they wanted to move an outside shower to the inside and make improvements to their kitchen area.[FN1]

> FN1. It is unclear from the proceedings whether the Brittinghams already have a complete kitchen in the accessory building or not. There was some evidence there was a refrigerator in the building and there was a small amount of discussion as to whether this constituted a kitchen or not.

In a letter ("the September Ruof letter"), dated September 13, 2002, the Building Inspector, Richard J. Ruof ("Ruof"), upon preliminarily reviewing the plans submitted for the building permit, noted that the detached garage had been illegally converted at some point from a garage into a dwelling.[FN2] Thus, its use was nonconforming.[FN3] Ruof pointed out that pursuant to the Rehoboth Beach Zoning Ordinance ("the Zoning Ordinance"), in order to make repairs to a nonconforming structure, the Brittinghams would need a special exception from the Board of Adjustment. In addition, if they were to build a shower on the inside, their unit would be a single-family dwelling. They would then have two single family dwellings on their property and they would be in violation of the lot area per dwelling unit requirement of the Zoning Ordinance.[FN4] For this nonconformity they would need to request a variance.

> FN2. The excerpt from the letter is as follows:
> Pursuant to the City of Rehoboth Beach Zoning Code Section 270-49 "Structural alterations and repairs," internal alterations to a structure devoted to a nonconforming use requires a special exception granted by the Board of Adjustments, if the nonconforming use is being changed to a different nonconforming use. In this case, you possess a structure in the rear of the lot that is an accessory building devoted to a nonconforming use as a partial dwelling unit, as no bathing facilities are provided in the structure. There is no record in the City's files of the issuance of a Building Permit allowing the conversion of the rear structure in to a dwelling unit, or the installation of the existing fixtures. Building Permits issued August 8 and November 13, 1979 refer to this structure as a garage, and on August 8 allowed Linden and Gladys Brittingham to "Install windows for ventilation and cement floor in existing garage for storage space only". The Building Permit issued on November 13 allowed the same owners to "Relocate existing shower on existing lot next to garage". A Building Permit issued August 13, 1982 allowed Gladys and Linden Brittingham to "Install new posts on patio porch and put roof on existing patio". There are indications that at some point the Brittinghams were permitted to perform repairs to this porch under a no fee permit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF    Document 132-3    Filed 08/08/2006    Page 3 of 14

Not Reported in A.2d                                                                                                Page 2
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

> dated only "5/27". The City's tax records refer to an "Apt (apartment) converted from a garage". There is record of a Plumbing Permit issued on November 13, 1991 for a "Powder room" with two fixtures. There is no reference as to in which structures these fixtures were installed. This information, along with an inspection of the property performed on September 23, 2002, indicates that at some point this unit was converted to an area to be used for living or sleeping. Since there is no evidence that this unit was legally converted from a garage to an apartment or dwelling, the number and type of fixtures located in this structure can never be altered from its present form.
>
> Ruof Letter at 2, in Petitioners/ Appellants' App., Ex. B.

FN3. Counsel for the Brittinghams points out that the property was already nonconforming because it did not meet the requirement of the Rehoboth Beach Zoning Code, in § 270-23, of a lot area of at least 5000 square feet for a dwelling unit. The lot area for the Brittingham's dwelling was 3259 square feet. In addition, the garage structure was located in a nonconforming position in the lot. Both nonconformities are legal, however, as the Brittingham lot and the garage structure were in existence prior to the creation of the Zoning Code in 1942. The legal status of the nonconformity with the square foot requirement is confirmed in the transcript of the February 21, 2003 Board of Adjustment Hearing at 25, in Petitioners/ Appellants' App., Ex. F.

FN4. The square footage requirements for dwelling units, including garage apartments and two-family dwellings can be found in § 270-23 of the Rehoboth Beach Zoning Ordinance.

A permit, numbered 4779 ("the November Permit"), was granted on November 7, 2002; however, construction was limited and the structure was "to be used as storage space with lavatory and water closet only." Building Permit in Petitioners/ Appellants' App., Ex. C. The Brittinghams were not permitted to increase the size of the structure nor were they allowed to create a kitchen or install cabinets or a sink for the existing one.

The Brittinghams filed an appeal on November 12, 2002 to the Board of Adjustment ("the Board") to dispute the Building Inspector's findings in the September letter, the permit decision, and in application for a variance or a special exception.[FN5] They filed the request for a variance in order that they could use the structure as a garage apartment or as a dwelling. It was further noted on the form for the appeal that the property had been occupied as two dwelling units for thirty years. Appeal to Board, in Petitioners/ Appellants' App., Ex. D.

FN5. In their Appeal and Application, the Brittinghams put an $x$ in all of the boxes, including the one requesting a special exception; however, only the variance and the appeal of the Inspector's decision were mentioned in the hearings.

A Board of Adjustment hearing was held on February 21, 2003 ("the February hearing"). It was cut short when the City's lawyer, Building Inspector Ruof, and the Brittingham's attorney agreed that they could have a building permit which would allow them to use the garage apartment as a dwelling. Before the settlement was reached, however, Brittingham's counsel argued that, while the garage, which was considered an accessory building under the Zoning Ordinance, could not be renovated as a dwelling unit, it could be renovated into a dwelling. Counsel noticed that there were distinct definitions in the Ordinance for dwelling and dwelling unit, and that each designation was used in different sections, resulting in different requirements for the two. Thus, if the Brittinghams agreed not to renovate the kitchen, the unit could be considered a dwelling for their personal use, and not a dwelling unit, for rentals, and the minimum square footage requirement would not apply. Counsel for the Board recognized the distinctions and characterized the language of the Ordinance on this subject as a "mess." BOA App. No. 0203-05, May 30, 2003 Hr'g Tr. at 58.

*2 At the end of the hearing, it was stipulated that the Brittinghams were withdrawing their application for a variance. The terms of the settlement were placed on the record, and it was approved by the attorney for the City. The Chairman adjourned the hearing without taking a formal vote. The settlement agreement was put in writing by hand on February 21, 2003 and signed by Ruof and Counsel for the Brittinghams, on their behalf.

Thereafter, a new permit, numbered 4934 ("the March Permit"), was issued on March 3, 2003. It

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-3   Filed 08/08/2006   Page 4 of 14

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 3

incorporated the settlement agreement and modified the November Permit. The new permit allowed the Brittinghams to move the outside shower to the inside and to replace the existing water closet lavatory and plumbing. They were not, however, permitted to build a kitchen or replace the cabinets or other fixtures in the kitchen already in existence. The settlement recognized the distinctions between dwelling and dwelling unit.

On March 5, 2003, Counsel for the Board wrote to the Brittinghams to inform them that pursuant to the Board rules, an application for a variance and an appeal could only be withdrawn with the approval of a majority of the members of the Board. Similarly, the City Building Inspector, Mr. Ruof sent a letter on March 13, 2003 ("the March Ruof letter"), reiterating this same position. He pointed out in the letter that the February 21st agreement could only be valid if the Board of Adjustment voted to allow the application to be withdrawn. The letter also noted: "the status of Building Permit 4934 may be disputed. If the Board chooses to not allow a withdrawal of your application, it may choose to render a decision to uphold the appeal, overturn the appeal or grant a variance." March Ruof letter at 1, in Petitioners/Appellants' App., Ex. K.

Counsel for the Brittinghams argued in a response letter that the point had been rendered moot by the February 21st agreement. The Brittinghams agreed to attend the Board's hearing to resolve the closing of its record. A hearing was held on April 25, 2003, at which the Board refused to allow the withdrawal of the application. No record of this hearing was provided to the Court. It was recorded, but the Court Reporter was unable to create a transcript because the audio tape was inaudible. A briefing schedule was ordered in the written decision of the Board. The decision was signed only by Counsel for the Board and was not signed by the Chairman. Allegedly, during this unrecorded hearing the March Permit was considered revoked, although this was not stated in the written decision of the Board.[FN6]

> FN6. The parties in this case, in response to a letter from the Court, dated November 29, 2004, contend that they have no accurate recollection of what occurred during the April 25th hearing. They have agreed, however, that although the written decision was not signed by the Chairman, they are willing to have it considered as part of the record. Counsel for the Brittinghams recalls that during the hearing, the Board took the position that in agreeing to settle, Building Inspector Ruof and the City Solicitor had overstepped their bounds and had usurped the power of the Board to grant variances.

On May 30, 2003, another hearing was held to review the application for appeal of the Building Inspector's decision. The Brittingham's attorney appeared, but did not participate in the hearing, to preserve his position that the controversy had been settled. During the hearing, the Board denied the variance request and the appeal, both of which it had not permitted the Claimants to withdraw.

*3 The Brittinghams filed this appeal of the Board of Adjustment's decision. They argue that the Board's action improperly interfered with the settlement agreement, and that its May decision to uphold the original restrictions was contrary to the provisions of the City of Rehoboth's Zoning Ordinance. In response, the Board argues that only it has the jurisdiction to decide appeals of decisions of the Building Inspector, and not the Inspector himself. In addition, it argues that it correctly applied the Rehoboth Beach Zoning Ordinance and did not err as a matter of law in affirming the decision of the Building Inspector.

### STANDARD OF REVIEW

The Supreme Court and this Court repeatedly have emphasized the limited appellate review of the factual findings of an administrative agency. The Court's review on appeals from a Board of Adjustment decision is limited to determining whether substantial evidence exists to support the Board's decision and to correct errors of law. *Janaman v. New Castle County Board of Adjustment,* 364 A.2d 1241, 1242 (Del.Super.Ct.1976), *aff'd,* 379 A.2d 1118 (Del.1977) (Table); *In re Beattie,* 180 A.2d 741, 744 (Del.Super.Ct.1962). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Oceanport Ind. v. Wilmington Stevedores,* 636 A.2d 892, 899 (Del.1994); *Battista v. Chrysler Corp.,* 517 A.2d 295, 297 (Del.), *app. dism.,* 515 A.2d 397 (Del.1986).

When substantial evidence exists, the court may not reweigh it and substitute its own judgment for the Board's. *Hellings v. City of Lewes Board of Adjustment,* 734 A.2d 641 (Del.1999) (Table), 1999 WL 624114, at *2. Where, however, the issue is one

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF    Document 132-3    Filed 08/08/2006    Page 5 of 14

Not Reported in A.2d                                                                                              Page 4
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

of the application of the law to undisputed facts, the Court's review is plenary. *Public Water Supply Co. v. DiPasquale*, 735 A.2d 378, 381 (Del.1999). The Superior Court may not remand the Board's decision for further proceedings. It may only "reverse or affirm, wholly or partly, or may modify the decision brought up for review." *Hellings* at *2; 22 *Del. C.* § 328(c). Accord *Mitchell v. Board of Adjustment of Sussex County*, 1997 WL 364071, at *3 (Del.Super.Ct.) (discussing appeals from the Sussex County Board of Adjustment and 9 *Del. C.* § 1353(f)).

## DISCUSSION

With this appeal, the Court is presented with a unique situation. The facts are undisputed. A settlement was made during the February Hearing. The Board adjourned without a vote. A permit was delivered in compliance with the settlement. Then, because the application and appeal had not been formally withdrawn by a majority vote of the Board at the February Hearing, it held a second hearing in April, ostensibly to apply its procedural rule. The withdrawal was denied, and the appeal and request for a variance were refused at a subsequent hearing in May.

The issue before the Court is narrow. It is not a question, as counsel for the Board argues, of whether the City Building Inspector can divest the Board of Adjustment of its jurisdiction by agreement. That is not what happened here. Nor does the Court need to exhaustively review the Rehoboth Beach Zoning Ordinance. Instead the question to resolve is whether a settlement agreement presented before the Board can be equivalent to a final decision, binding on all parties, when there was no withdrawal of the application and no formal approval by the members of the Board. This Court thinks it can.

### 1. When the time is ripe, the Board has a duty to speak.

*4 The Board of Adjustment is required to follow certain rules and procedures, adopted by it in accordance with Chapter 3 of Title 22 of the Delaware Code and with the Rehoboth Beach Zoning Ordinance. 22 *Del. C.* § 323; Zoning Ordinance § 270-76.[FN7] In its February 21, 2003 hearing, the Board departed from those rules when it permitted the City and the Brittinghams to settle the dispute over a building permit.

FN7. 22 Del. C. § 323 provides that "a board of adjustment shall adopt rules in accordance with any ordinance adopted pursuant to [the] chapter." Section 270-76 of the Zoning Ordinance states: "[t]he Board of Adjustment shall adopt rules as to the manner and time of filing appeals and applications for special exceptions, for a variance from the terms of this chapter, for the conducting of hearings and for the giving of such notice or notices as may be required or deemed advisable by the Board."

The settlement was reached before the Board, at which point the Board should have either approved it or not. Instead, the hearing ended as follows:

MR. SERGOVIC [counsel for the Brittinghams]: For purposes of the Board, the applicant, on the appeal and request for variance, and the City, through their respective counsel, have agreed that the appeal is settled. The City agrees that we can have a building permit pertaining to the structure in the rear of the lot which is a one-story structure, ... that the settlement is sui generis, meaning that it is not meant as precedent for any other property in the City. There will be no further expansions of the existing dimensions of the rear structure on this lot in any direction. The City will authorize the movement, by building permit, the movement of the shower from the outside to the inside. There will be no additional fixtures, for example kitchen fixtures, installed; but we may replace any existing water closet lavatory or any other existing plumbing. There will be no rental of the rear structure now or in the future, and the rear structure may only be used for the occupation by the property owner or the property owner's extended family. And we have agreed to accept the building permit under those terms and with those limitations.

...

MR. KARSNITZ [counsel for the Board]: And the City accepts this proposal?
MR. SPEAKERMAN [counsel for the City]: Yes. And I just want to put for the record that sui generis means one of a kind, unique, and that reinforces that there is absolutely no precedent to this whatsoever.
MR. KARSNITZ: And you're withdrawing any application for a variance?
MR. SERGOVIC: Right.
CHAIRMAN EVANS: With that then, we are adjourned.

February 21, 2003 Hr'g Tr. at 60-62.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-3   Filed 08/08/2006   Page 6 of 14

Not Reported in A.2d                                                                                                       Page 5
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

The Board is the arbiter of zoning disputes and the enforcer of the zoning laws. Under the circumstances of this case, however, it had a duty to speak when it was presented with a resolution to the appeal and the withdrawal of the variance application. The Board did not object to the settlement, nor did it reserve judgment on the agreement for a later date. In fact, as evidenced in the transcript, everyone, including the Board, felt the issue was resolved. In other words, despite the fact that the Board did not follow its procedure and approve the agreement by motion and vote, to all involved it appeared there had been a final disposition of the issue. *See* City of Rehoboth Rules and Procedures for Zoning Board of Adjustment at 3 [FN8] ("Board Rules"), in Respondent/Appellee's Answering Brief, Ex. A.

FN8. The Rules provide:
The order of business at all public hearings of the Board shall be as follows:
(a) Reading of the public notice for the application by the Chairperson or the Chairperson's designee.
(b) Presentation of the report by the Building Inspector.
(c) Presentation by appellant, legal counsel, and witnesses in support of the application.
(d) Presentation by official representatives or witnesses in opposition to the application.
(e) Presentation from the public attending both for and against the application.
(f) Questions from the Board: of the Building Inspector, those in favor of and those in opposition to the application.
(g) Rebuttals.
(h) Motion by a Board member and second either for or against the application.
(i) Vote by the Board.

*5 For sure, the members knew that there was ambiguity and uncertainty in various provisions of the Ordinance, which would have had to have been resolved. The legal arguments and positions of the attorneys were presented. It heard Counsel for the Brittinghams state the terms of the agreement. The Brittingham's Counsel then agreed to withdraw the request for a variance. The Board was aware of its own rules. Yet it did not take a vote, and it did not reserve judgment. Nor did it request Counsel for the Brittinghams to withdraw the appeal. Only later did the Board attempt to reconsider the issue by taking a second bite at the proverbial apple.

When a duty to speak exists, it is said that "silence gives consent." [FN9] The idea is illustrated by the principle of adoptive admissions in criminal cases. In *Swan v. State*, 820 A.2d 342, 353 (Del.2003), for example, the Court upheld the Trial Court's admission of testimony given by a codefendant's wife as to what the codefendant told her about the murder in the presence of the defendant:

FN9. The phrase "silence gives consent" has been attributed to several sources. It is quoted in the play, A Man for all Seasons, by Robert Bolt. It is expressed during a scene depicting the trial of Sir Thomas More during the reign of King Henry VIII:
MORE: The maxim is "Qui tacet consentiret": the maxim of the law is "Silence gives consent." If therefore you wish to construe what my silence betokened, you must construe that I consented, not that I denied.
In addition it was quoted in Oliver Goldsmith's The Good-natured Man, Act II:
"I tell you, sir, the lady is not at liberty. It's a match. You see she says nothing. Silence gives consent."
It has also been attributed to the Decretals of Pope Boniface VIII.

The trial judge properly allowed Bridget Phillips to relay Swan's adopted admissions pursuant to D.R.E. 801(d)(2)(A) & (B). Phillips testified that Norcross admitted that he and Swan were involved in the murder of Kenneth Warren. With Swan present, Norcross told Phillips that Swan was shot during the scuffle with the victim. Norcross pointed to a scar on Swan's shoulder and stated that the scar was the result of a gunshot wound that occurred during the robbery. Swan, present at the time Norcross made the statement, confirmed it. Swan then stated that the bullet is still in there, gesturing with his hand toward the scar. These statements and actions manifested Swan's adoption of belief of the truth of Norcross' statements made while Phillips was present.
*Id.*

Silence also manifests consent in some contracts cases. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del.Super.Ct.2000) (finding offeree accepted terms of fee agreement when he made no response but took action on the offer). The Restatement (Second) of Contracts § 69 (1981) provides:
(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF    Document 132-3    Filed 08/08/2006    Page 7 of 14

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 6

following cases only:
(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.
(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.
(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

In equity, this concept of silent consent is called the doctrine of acquiescence. In *Brandywine Development Group, L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch.), the Court explained that under the doctrine, "a party may be precluded from asserting a claim where it has knowledge of an improper act by another, yet stands by without objection and allows the other party to act in a manner inconsistent with the claimant's property rights." *See also Bay Newfoundland Co. v. Wilson & Co.*, 37 A.2d 59, 63-64 (Del. Ch.1944) (finding that shareholder silence when the time for dissent arose implied assent to the corporate actions).[FN10] Acquiescence is an equitable defense and because the Brittinghams are not seeking to estop the Board from taking any action, it is not directly applicable in this case. The policy behind it is informative, however. As the Court stated in *Frank v. Wilson & Co., Inc.*, 32 A.2d 277, 283 (Del. Ch.1943), "[k]nowledge, actual or imputed, of all material facts is an essential; but ratification may be implied from conduct, as well as expressed by words.... Where the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it, his ratification is implied through his acquiescence."

FN10. The complainant was under duty to the corporation and the stockholders to make known its dissent at a time when its objection might have had effect. Having elected the course of silence and inaction when it was its duty to speak or to act, equity will now withhold its aid. It is, we think, within the doctrine of acquiescence to hold that assent to a proposed corporate act will be inferred in a case where a stockholder, with full knowledge of an intended invasion of his rights and an opportunity to dissent, stands by during the progress of a proceeding which, although unauthorized, is ratifiable, and allows, without objection, his stock to be dealt with in a manner inconsistent with his rights of ownership.
(Citation omitted).

*6 Of course, there are limits to the implications of silence, most notably in criminal cases where a defendant asserts his privilege against self incrimination, or where the waiver of a protected right is concerned. In such cases, the Constitution trumps the implication of silence. In addition, in *Mickewicz v. United States*, 4 F.2d 48, 49 (3d Cir.1925), the Court when faced with "silence gives consent" as a rule of evidence, pointed out that its breadth is limited and "[i]t applies to declarations made in the presence of a person under circumstances which naturally call for serious admission or denial on his part."

Here, however, the Constitution is not implicated, and in all of the cases where silence is said to impute consent there lies a common thread. Circumstances arose in which a party would naturally have been expected to object or to speak but did not. Because of the lack of objection it appeared to all parties present that the silent party assented to what was being said or done. Similarly, in this case, circumstances dictated that the time for the Board to speak up was during the February Hearing before it adjourned. In this context, it was reasonable that the Board notify the parties immediately if the settlement was not acceptable to it for any reason. Since it remained silent, while knowing better, it should not have reheard the appeal under the masquerade of correcting a procedural defect.

2. The settlement was final and thus withdrawal of the application and appeal was unnecessary.

The Board Rules provide that "[a]n application which has been submitted to the Board for consideration, may not be withdrawn prior to a final decision thereof unless a majority of the members of the Board shall vote to allow the withdrawal." Board Rules at 3. While this rule may have been applicable if the application were still open and pending, it cannot be said to apply here, as the settlement is like a final decision.

Since the Board's actions did not conform to its rules, it did not formally make a final decision. The Court finds, however, that the settlement resolved the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF    Document 132-3    Filed 08/08/2006    Page 8 of 14

Not Reported in A.2d                                                                Page 7
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

application so that the issue of withdrawal was inapplicable. To say that something different occurred is to put form over substance, in order that the Board may change its mind on a matter that the parties believed had already been resolved. *See, e.g., Testa v. Jarvis*, 1994 WL 30517, at *10 (Del. Ch.) ("In this circumstance the reason for the rule does not exist and the rule itself should not apply. Indeed to apply the rule ... would have the very reverse effect than that intended by the rule."). This Court will not allow the Board to use its own procedural device alternately as a sword, when it failed at the appropriate time to use it properly as a shield. *See Riedinger v. Board of Adjustment of Sussex County*, 2000 WL 33114345, at *6 (Del.Super.Ct.) (discussing a party's attempt to have a say in a suit through an *amicus curiae* brief when they refused to exercise their right to intervene).

*7 A settlement is an agreement between the parties to end a dispute. *See, e.g., Mares v. Baughman*, 112 Cal.Rptr.2d 264, 268 (Cal.Ct.App.2001). Just as it would in Court, a settlement before a Board acts as a final disposition. *See, e.g., Schlaeppi v. Delaware Trust Co.*, 525 A.2d 562, 565 (Del. Ch.1986) ("A settlement which is approved by a court has the same *res judicata* effect as a final judgment on the merits."); 19 Del. C. § 2344 (providing settlements agreed to and approved by the Industrial Accident Board are "final and binding unless modified as provided in § 2347"). Although the Zoning Ordinance and the Delaware Code do not explicitly grant the Board of Adjustment the ability to approve settlements, as the Code does for the Industrial Accident Board, the language in both is broad enough to allow such a resolution.

Under 22 Del. C. § 327,[FN11] the Board of Adjustment is granted the power to hear and decide appeals of decisions of administrative officials, to decide special exceptions, and to authorize variances. Pursuant to § 270-74 of the Zoning Ordinance, it also has the power to grant changes from one nonconforming use to another. The Board may "reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination appealed from and may make such order, requirement, decision or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken." 22 Del. C. § 327(d).

FN11. 22 Del. C. § 327 provides:
(a) The board of adjustment may:
(1) Hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by an administrative official in the enforcement of this chapter or of any ordinance adopted pursuant thereto;
(2) Hear and decide special exceptions to the terms of the ordinance upon which the board is required to pass under such ordinance;
(3) Authorize, in specific cases, such variance from any zoning ordinance, code or regulation that will not be contrary to the public interest, where, owing to special conditions or exceptional situations, a literal interpretation of any zoning ordinances, code or regulation will result in unnecessary hardship or exceptional practical difficulties to the owner of property so that the spirit of the ordinance, code or regulation shall be observed and substantial justice done, provided such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of any zoning ordinance, code, regulation or map.
(b) In exercising the powers provided in subsection (a) of this section the board may, in conformity with this chapter, reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination appealed from and may make such order, requirement, decision or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.

While the Board's acquiescence to a settlement agreement is not specifically provided for in the Zoning Code, nor in its rules, its ability to approve a settlement clearly falls within the scope of its vested powers. It has the power to grant special exceptions, variances and to modify decisions of the Building Inspector. In addition it can make such decisions or determinations as "ought" to be made. In determining the appeal, the Board has "all the powers of the Building Inspector from whom the appeal is taken." Zoning Ordinance § 270-75. Thus, the methods available to the Board for deciding an appeal leave sufficient flexibility to allow it to accept a settlement made in front of it between the Building Inspector and the Claimants. Although it was Inspector Ruof who made the agreement with the Brittinghams at the hearing, the settlement was presented in front of the Board. At that time, it could have objected, reserved judgment or voted on motion of one of the members. It acquiesced. Certainly, if the Board's powers are

Not Reported in A.2d                                                                                                     Page 8
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

those of the Building Inspector, it also has the power to acquiesce in the conducting of a settlement agreement by that Inspector.

The Board argues that once the Brittinghams filed their appeal, power to determine the issue was ceded to it, and was no longer vested in the Building Inspector. *See* Zoning Ordinance §§ 270-74 and 270-75 (prescribing powers of the Board in conformity with 22 *Del. C.* § 327). They claim that the Board's power to decide the appeal was divested from it by the Building Inspector when he entered into the agreement. The Court finds this argument unconvincing for two reasons: 1) the agreement was presented to it, at which point it could have exercised its power to decide the appeal differently (see discussion *supra*); and 2) the Building Inspector is not divested of his power to enforce the Zoning Ordinance by §§ 270-74 and 270-75.

*8 As stated above, pursuant to § 270-75 of the Ordinance, in modifying decisions, the Board has "all the powers of the Building Inspector from whom the appeal is taken." In § 270-82,[FN12] the Building Inspector is vested with the power to enforce the Zoning Ordinance. The reason for the rule in § 270-75 is not to shift power from the Building Inspector to the Board, but is rather to grant the Board power it did not otherwise have. The Board has no power to order a public official to act, so the statutory grant gives it the authority to act in the place of that public official. 4 Anderson's Am. Law. Zoning § 22:8 (4th ed.1997), *citing* the Standard State Zoning Enabling Act § 7 (1926) ("While the Board is without power to require an administrative officer from whom a matter has been appealed to act, it has authority to 'make such an order, requirement, decision, or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.' "). Its purpose is not to cede the power of the Building Inspector, but to grant the Board power it would not otherwise have to take action when an appeal is presented to it.

FN12. "The Building Inspector shall enforce the provisions of this chapter."

In sum, the Board's acquiescence to the settlement amounted to a final decision in substance. It had the power to approve a settlement agreement between the Building Inspector and the Brittinghams. Therefore, its decision to require the Brittinghams to withdraw their appeal and application was arbitrary and unreasonable. *See Mobil Oil Corp. v. Board of Adjustment of Newport,* 283 A.2d 837, 839 (Del.Super.Ct.1971) ("Generally, the zoning authorities, acting within their prescribed legislative powers, have a wide and liberal discretion. One who attacks a decision as arbitrary and unreasonable has the burden of showing that it is so."). The Board abused its discretion when it reheard the appeal and application after a settlement had been concluded.

3. There is merit to the argument that the Ordinance was ambiguous, such that the March permit would not have been invalid as illegal.

While a permit that is issued in violation of a zoning ordinance would be subject to revocation,[FN13] the March permit was not illegal.[FN14] At the hearings, there was valid disagreement over whether the Ordinance's treatment of dwelling and dwelling unit created confusion and multiple possible interpretations. Generally, the Court's interpretation of a zoning ordinance is a question of law to be reviewed de novo. *Di's, Inc. v. McKinney,* 673 A.2d 1199, 1204 (Del.1996). " 'Where the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls.' " *Id., citing Spielberg v. State,* 558 A.2d 291, 293 (Del.1989). Where, however, the zoning ordinance is ambiguous, "[t]he Board's interpretation ... should be given great weight." *4th Generation Ltd v. Board of Adjustment of Rehoboth Beach,* 1987 WL 14867, at *3 (Del.Super.Ct.) (noting also that judicial deference to administrative construction is inappropriate where the language of the statute is clear and unambiguous). *See also Bethany Beach Volunteer Fire Company v. Board of Adjustment of Bethany Beach,* 1998 WL 733788, at *4 (Del.Super.Ct.) ("The Board has discretion in interpreting the intent of the Code.").

FN13. "Permits ... issued under zoning laws, may be revoked by municipal authorities for good cause.... Generally, permits issued in violation of zoning ordinances are subject to revocation." 8 Eugene McQuillin, *The Law of Municipal Corporations* § 25.158 (3d ed.1991). "The general rule ... is that a permit issued illegally, or in violation of the law, or under mistake of fact does not confer a vested right upon the person to whom it is issued, even though that person has made substantial expenditures in reliance thereon." *Miller v. Board of Adjustment of Dewey Beach,* 521 A.2d 642, 647 (Del.Super.Ct.1986).

Case 1:05-cv-00300-JJF    Document 132-3    Filed 08/08/2006    Page 10 of 14

Not Reported in A.2d                                                                                    Page 9
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN14. Allegedly, before their request for the permit at issue, the Brittinghams had already renovated their accessory building into a impermissible non-conforming use under the Zoning Ordinance. *See* Ruof Letter, *supra* n. 1. What the Brittinghams may have done twenty or thirty years ago is inapposite to this case, however. Those were enforcement issues which were never previously addressed by the City. They are not at issue in this appeal.

*9 The question that arises is not whether the Board's interpretation of the Ordinance was contrary to law. Nor does the Court need to determine the correct construction of the Ordinance. Rather, the pertinent inquiry is whether there was ambiguity in the Ordinance, such that the Board could have construed the relevant sections in favor of the Brittinghams. If not, then the Board would have been permitted to revoke the March permit, since it would have been illegal. On the other hand, if there was ambiguity, there was finality to the appeal with the settlement agreement, and the Board improperly attempted to rescind it.

In § 270-4 of the Zoning Ordinance, dwelling is defined as "[a] building or structure which is wholly or partly used or intended to be used for living or sleeping by human occupants." A dwelling unit is defined as "[a] room or group of rooms located within a dwelling and forming a single habitable unit with facilities which are used or intended to be used for living, sleeping, cooking and eating." Section 270-23, the square footage requirement was entitled, "Lot area per dwelling unit." The Brittinghams argued, therefore, that, if they did not build a kitchen, their structure was a dwelling and not a dwelling unit. Since § 270-23 addressed only dwelling units, the square footage minimum requirement would not apply to their dwelling.

In addition, the structure was considered an accessory building. Accessory Building is defined in § 270-4 as "[a] building subordinate to the main building on a lot and used for purposes customarily incidental to those of the main building or a structure which does not share a wall in common with the main building." Accessory Use is defined in the same section as:
A use on the same lot with and customarily incidental to any permitted uses. "Accessory use" shall not include any use that by its nature could result in noise, smoke, dust, smell or unsightliness objectionable in a residential district. In an R-1 and R-1 (S) District, excepting legal nonconforming uses existing on the date of this chapter, use of a structure other than the main building on a lot, either in whole or in part as a dwelling or a dwelling unit is not permitted accessory use.

The Brittingham's property was in an R-2 district. They argued that there was nothing in the Zoning Ordinance which prohibited them from putting a shower and a bathroom in their accessory building and using it as an extra bedroom.

The Brittingham's argument has merit. Dwelling unit and dwelling have distinct definitions in the code. One (dwelling unit) requires cooking and eating facilities, while the other does not. In addition, there is nothing in the Ordinance which prohibits an Accessory Building in a district zoned R-2 from being used as a dwelling. As Counsel for the Brittinghams pointed out, why, for example, should a family not be able to allow its adult children to sleep in a separate building on the same property?

*10 The second hurdle facing the Brittinghams in their effort to renovate their accessory building was the 5,000 square foot lot area requirement. As noted above, § 270-23 FN15 of the Ordinance provides those lot area requirements. It is entitled, "Lot area per dwelling unit." The section begins, "[t]he minimum number of square feet per dwelling unit shall be given in the following table: ..." The section appears to apply only to dwelling units, however, this application is made ambiguous by the fact that the list of uses includes two-family dwellings.FN16

FN15. § 270-23. Lot area per dwelling unit. The minimum number of square feet per dwelling unit shall be given in the following table:

| District and Use | Minimum Lot Area Per Dwelling Unit |
|---|---|
| R-1(S) | 34,500 |
| R-1 | 5,000 |
| R-2 | 5,000 |
| Uses permitted in R-1 | 5,000 |

Case 1:05-cv-00300-JJF   Document 132-3   Filed 08/08/2006   Page 11 of 14

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

| District and Use | Minimum Lot Area Per Dwelling or Dwelling Unit (square feet) |
|---|---|
| Single-family semidetached | 5,000 |
| Two-family dwelling | 5,000 |
| Single-family attached | 5,000 |
| Apartment | 5,000 |
|   Garden apartment | 5,000 |
|   Garage apartment | 5,000 |
| Commercial Districts | |
| Single-family detached | 5,000 |
| Single-family semidetached | 4,000 |
| Two-family dwelling | 4,000 |
| Single-family attached | 3,300 |
| Apartment | 3,300 |
| Garden apartment | 3,300 |
| Garage apartment | 3,300 |
| Mid-rise apartment | 3,300 |
| Tourist, rooming house or boarding | 800 |
| Hotel, motel, inn | 300 |
| All other commercial uses | Not applicable |

> FN16. The Ordinance itself was later amended to resolve the ambiguity and confusion created by the inconsistent use of the words dwelling and dwelling unit. The resolution proposing the amendment, stated:
> Whereas, it is deemed desirable to consider amending Chapter 270, Section 270-23, of the Municipal Code of The City of Rehoboth Beach, Delaware, 2001, relating to Zoning; in order to clarify that the provisions of Section 270-23 have and do apply both to dwelling units and dwellings, as well as to accessory structures that are dwellings or dwelling units;....
> Ordinance to Amend Chapter 270, in Petitioners/Appellants' App., Ex. N at 3.
> Section 270-23, as amended now begins:
> § 270-23. Lot area per dwelling or dwelling unit.
> The minimum number of square feet per dwelling or dwelling unit shall be given in the following table:

| District and Use | Minimum Lot Area Per Dwelling or Dwelling Unit (square feet) |
|---|---|
| R-1(S) including accessory structures such as dwellings or dwelling units | 34,500 |
| R-1 including accessory structures used as dwellings or dwelling units | 5,000 |

> ...
> Rehoboth Beach Code § 270-23, in Respondent/Appellees' Answering Brief, Ex. H at 5.

The Board's acceptance of and confusion from these ambiguities was discussed at length, as represented by this excerpt from the February hearing:

MR. SPEAKMAN: Yeah. The problem with that argument is if you look at the things described [referring to the § 270-23 square foot lot area requirement], they're all dwellings, too, that requires 5,000 square feet; garage apartment, et cetera and 23, is that right-

MR. KARSNITZ: So you're saying that the code was not particularly artfully drafted in this section-

MR. SPEAKMAN: Correct.

...

CHAIRMAN EVANS: I mean the word dwelling has an English meaning, it also has a definition in the Code.

MR. KARSNITZ: Right

CHAIRMAN EVANS: And they're not necessarily the same thing.

MR. KARSNITZ: We can define red as blue, if that's what we decide to do.

...

MR. HILDERLY: As I read it, and as we know from past experience, there's a lot of sloppiness or oversight. Dwelling unit is redundant, it's like saying garage building or house building or-

CHAIRMAN EVANS: It should have come up with

Not Reported in A.2d    Page 11
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

different words for things....

...

MR. SERGOVIC:.... Under the definition of dwelling, as opposed to dwelling unit, as long as it's within a permissible accessory building, it is-and, again, there's nothing that says you can't use an accessory building for sleeping and bathing. So it's not-I'm not trying to argue a position that doesn't have strict support inside the code provisions.
CHAIRMAN EVANS: So by your argument, any garage that is an accessory structure on any lot could have a shower and bathroom in it and legally be used as an extra bedroom?
MR. SERGOVIC: There's nothing that prohibits that.
CHAIRMAN EVANS: You're saying there's nothing that prohibits that in the Code?
MR. SERGOVIC: I'm saying there's nothing that prohibits it. And if that's what the City wants, then they have to go back and rewrite some of this language.

February 21, 2003 Hr'g Tr. at 34, 35, 36, 45.

Even at the May Hearing, Counsel for the Board felt the defined distinctions between dwelling and dwelling unit was "controlling," as seen in this passage:
CHAIRMAN EVANS: And what do you think, Mr. Solicitor? It's what we pay you for.
MR. KARSNITZ: You know, it's a-I'll give you an answer, but I'll qualify it by saying it's a really close question to me. When I first looked at this issue, I leaned fairly strongly towards what Mr. Sergovic said; I though Mr. Speakman made a fairly good case in analyzing the whole code as to why it should be read together. But if you look at 270-23, it applies to dwelling units, and there is a distinction, the code specifically has a defined distinction between dwellings and dwelling units, and I think that's controlling.
*11 CHAIRMAN EVANS: So you're saying that since it never had a kitchen, it was never a dwelling unit?
MR. KARSNITZ: Correct. And they never-they have told us that it's not, nor is it ever intended to be a dwelling unit; it's a dwelling.

May 30, 2003 Hr'g Tr at 51-52.

Upon review of the record, the Court believes the Brittinghams presented to the Board a legitimate argument that the Ordinance was capable of an interpretation allowing them to legally renovate their accessory building as a dwelling. If the Board had reservations about the interpretation of the Ordinance endorsed by the settlement agreement, it had a duty to voice those doubts in the February Hearing.

As the Court stated in _Kollock v. Sussex County Board of Adjustment, 526 A.2d 569, 572 (Del.Super.Ct.1987)_:
The rules regarding the finality of decisions in zoning cases are no different from such rules in other areas of the law. In particular, the principles of res judicata and collateral estoppel apply in zoning cases and have resulted in the rule that ordinarily a board of appeals or adjustment has no power to reopen or review its own decision by vacating, revoking, rescinding or altering if after it has been made.

citing, 3 A. Rathkopf and D. Rathkopf, *The Law of Zoning and Planning* § 48.01 (4th ed.1986).

4. The Board abused its discretion by failing to carry out its role in an impartial manner.

On a final note, the Board overstepped its role of neutral arbiter in the April and May hearings. As the Court stated in _In re Blackstone, 190 A. 597, 607 (Del.Super.Ct.1937)_:
The power granted to the Board can only be exercised within the spirit of the Ordinance impartially and with reasonable discretion. It is not an uncontrolled power to do as the Board desires, but is a circumscribed power to be exercised by the Board in accordance with evidence of physical facts and circumstances.

The Zoning Board is a quasijudicial agency and as such it must act with impartiality, as a neutral arbiter and not as an advocate for one position or another. See 4 Anderson's Am. Law. Zoning § 22:8 n. 87 (4th ed. 1997) ("Zoning hearing Board is quasijudicial agency and has statutory power which lies in law and which includes only remedial powers expressly granted to it by statute or ordinances or which are implied by conferral of express powers."). Granted, it also has the obligation to protect the public interest, but this cannot be carried out at the expense of a fair proceeding for all involved.

In addition to *Blackstone*, Delaware courts have applied this principle of impartiality in other decisions. A Board's reliance on ex parte communications may deny the parties a fair hearing. *See, e.g., _Green v. County Council of Sussex County_, 1994 WL 469167, at \*3 (Del. Ch.)*. In _Blake v. Sussex County Council, 1997 WL 525844, at \*7 (Del. Ch.)_, for example, the Court noted that ex parte communication must be discouraged because it "suggests precisely the sort of impropriety that undermines the public's faith in the integrity of the public process." Although the *Blake* Court did note the serious concerns surrounding ex parte communications, it refused to invalidate the action of the Council.

*12 The public's faith in the integrity of the political process may also be placed at risk in other ways. "[T]he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF    Document 132-3    Filed 08/08/2006    Page 13 of 14

Not Reported in A.2d                                                                                            Page 12
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

board of adjustment, like Caesar's wife, should be above suspicion...." 4 Am. Law. Zoning § 22:48 (4th ed.1997), citing Montgomery County Bd. of Appeals v. Walker, 180 A.2d 865, 869 (Md.Ct.App.1962) ("Or, as it was put in a terse quotation centuries ago by an eminent biographer, 'Caesar's wife must be above suspicion.'" (citation omitted)). Here, there is some evidence that the Board strong-armed the attorney for the City into taking a position against the settlement. The Brittinghams allege that at the April Hearing, the Board instructed the City to write a brief in opposition to the Brittinghams' position. In addition, in the May hearing the fact that the Counsel for the City had been reprimanded in the previous hearing for his position was discussed:

MR. SPEAKMAN:.... After the scolding I got here the last time about the withdraw, I'm certainly not going to take any other position than you should deny the motion to withdraw in this case.

...

MR. SARGENT: It seems to me the issue is that when we're in the midst of something that's essentially a variance request, which is our power, can an official of the City who has no right or responsibility to issue that variance interrupt our process and-
MR. KARSNITZ: That's what we've decided.
MR. SPEAKMAN: You have already scolded me that that could not happen.
MR. KARSNITZ: That was decided last time.
MR. SPEAKMAN: Yes.
CHAIRMAN EVANS: We said you got to come back here, we said that.
MR. KARSNITZ: Right.
CHAIRMAN EVANS: We already scolded him and said you can't do that.
MR. SARGENT: I know we scolded him, but the-
CHAIRMAN EVANS: You say we scolded you; I don't remember that.
MR. SARGENT: Yes, I remember.
MR. SPEAKMAN: It's pretty clear it was a scolding.

May 30 2003 Hr'g Tr at 18, 24.

It is impossible to determine exactly what happened during the April Hearing. There is no transcript on the record from it. It was during that hearing that the Board allegedly asked the City Solicitor to write a brief in opposition to the Brittinghams' position. In addition, it scolded him for the position he had earlier taken. This pressure had the desired effect of swaying the City Solicitor to make an argument consistent with the Board's stance, even though the Board had its own lawyer. The Brittinghams also claim that the Building Inspector conceded during the hearing that the March Permit was legal and valid, and that the settlement agreement followed the Ordinance.

As the Court stated in Tate v. Miles, 503 A.2d 187, 191 (Del.1986), "[u]nless Council creates a record or states on the record its reasons for a zoning change, a court is given no means by which it may review the Council's decision." The Board is ultimately responsible for ensuring a record is created and for providing a transcript to the Court. "If judicial review is to be an efficient bulwark against arbitrary conduct, such records must be accurate, and reasonably complete." 4 Anderson's Am. Law. Zoning § 22:27 (4th ed.1997).

*13 Typically, failure of a board of adjustment to keep a record of its proceedings is grounds for reversal or remand. 4 Anderson's Am. Law. Zoning § 22:27 (4th ed.1997). In Delaware, however, in cases involving Boards of Adjustment, the Court does not have the freedom to remand the case in order to allow the Board to hold further hearings, to make specific fact findings or to reconstruct the record. See Mellow v. Board of Adjustment of New Castle County, 565 A.2d 947, 950-51 (Del.Super.Ct.1988). Reversal would be the Court's only option. In this instance, however, the Court will not reverse the decision of the Board solely on the grounds that there is no record of the April Hearing.

With the transcripts from the other two hearings and with the decision from the second hearing, there is enough of a record provided for a decision to be rendered on the main issue-whether the settlement agreement was binding so as to bar further proceedings on the appeal and application.[FN17]

FN17. The Brittinghams argue that they were prejudiced by the loss of the record and should receive a favorable inference from that loss. They cite the case Welsh v. Voshell, 1989 WL 40920 (Del.Super.Ct.1989) in support of this proposition. In that case, when the Division of Motor Vehicles negligently lost the tape of a probable cause hearing, the Court reversed the decision and reinstated the appellant's driving privileges. It found that the interests of justice, fairness and due process dictated that the State should bear the responsibility for its negligent handling of the tape of the hearing. Id. at *2.
This Court agrees with the reasoning of Welsh that the Board must bear the responsibility for providing the Court with a complete record of the proceedings below. The Court does not find, however, that it is necessary to make any assumptions favorable to the Brittinghams.

In addition, the Board's actions in this case were arbitrary

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 13

and unreasonable. The Court is aware that:

> Members of the board are not attorneys subject to the ethical restraints of the legal profession or trained in its concepts of fair conduct.... Rather they are citizens assigned to discharge a difficult task without guidelines which mark out the distinctions between interests which conflict with impartial decision and those which do not.

4 Anderson's Am. Law. Zoning § 22:47 (4th ed.1997) (discussing specifically conflict of interest and the appearance of fairness). Here, the evidence indicates that the Board did not act impartially. It did not play fairly when it required the Brittinghams to return for a second hearing, under the guise of tying up procedural loose ends, only to pull the rug out from them and rehear the case in a third hearing. It failed to follow its own rules, and then penalized the Brittinghams for a procedural oversight that was equally its own. Such sleights of hand suggest the sort of impropriety that undermine the public's faith in the integrity of the public process.

Accordingly, the Board's decision is reversed. The validity of the settlement agreement is upheld, and it is the final decision on this appeal and application. Moreover, since no challenge has been made to the March Permit, it is still valid.

## CONCLUSION

Considering the foregoing, the decision of the Board is reversed, and the building permit issued March 3, 2003 is resinstated.

*IT IS SO ORDERED.*

Del.Super.,2005.
Brittingham v. Board of Adjustment of City of Rehoboth Beach
Not Reported in A.2d, 2005 WL 170690 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.