# EXHIBIT "C"

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 160161 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
DIAMOND ELECTRIC, INC.
v.
DELAWARE SOLID WASTE AUTHORITY, et al.
No. 1395-K.

March 15, 1999.

Joshua M. Twilley, Esquire, Jason C. Cohee, Esquire, Twilley & Street, Dover.
Donald L. Logan, Esquire, John F. Thomas, Jr., Esquire, Jos. Scott Shannon, Esquire, Tighe, Cottrell & Logan, Wilmington.
Eric C. Howard, Esquire, Wilson, Halbrook & Bayard, Georgetown.
John W. Noble, Esquire, Parkowski, Noble & Guerke, Dover.

*1 Dear Counsel:

Defendant, Ogden Remediation Services, Inc. ("Ogden"), has filed a motion to dismiss the complaint of plaintiff, Diamond Electric, Inc. ("Diamond"), for failure to state a claim upon which relief can be granted.[FN1] In this Opinion, I find that Diamond's complaint states a claim for breach of contract, but does not state a claim for fraud.

FN1. The other defendants in this action, Delaware Solid Waste Authority ("DSWA"), and Bilbrough's Electric, Inc. ("Bilbrough") have not taken a position on Ogden's motion to dismiss.

I. Background

The following facts are drawn from the amended complaint.

In the fall of 1997, the Delaware Solid Waste Authority ("DSWA") began collecting bids for a construction project involving its Central Solid Waste Management Center in Sandtown, Delaware (the "Project"). (Am.Compl.¶ 5.) Ogden submitted a bid to be the general contractor on the DSWA contract. (Am.Compl.¶ 6.) Before submitting its bid to DSWA, Ogden apparently sent bid instructions which specified the work to be done to prospective subcontractors, including Diamond.[FN2] These materials asked the prospective subcontractors to bid a price to perform specific portions of the work required by DSWA. In ¶ 1:08 of these materials, Diamond was told that "[t]he subcontractors identified in the [winning general contract] bid may be changed only for those reasons set forth in 29 Del. C. § 6962(d)(10)(b)( [3] )[FN3] and only after receiving the written consent of DSWA." Section 6962(d)(10)(b)(3) is part of the State Procurement Act (the "Act") which deals with bidding on state projects.[FN4] It states:

FN2. It is not clear from the complaint whether Ogden itself sent the bid materials to Diamond. However, it is clear from the allegations in the complaint that Diamond received the bid materials and thereafter submitted a bid to Ogden for the Project.

FN3. There appears to be a drafting error in the bid materials and the contract between Ogden and DSWA. Paragraph 1:08 of these documents actually states that subcontractors may only be changed for the reasons set forth in 29 Del. C. § 6962(d)(10)(b)(2). However, this section of the Code deals with when it is permissible for a general contractor to list itself as a subcontractor; it does not address the conditions under which a subcontractor can be changed. Later in the same paragraph of the bid instructions, it states that "the contractor shall not list itself as a subcontractor unless it meets those requirements set forth in 29 Del. C. § 6962(d)(10)(b)(3)." Reading ¶ 1:08 in context with the cited sections of the State Procurement Act, it is clear that the drafters transposed the two sections of 29 Del. C. § 6962.

FN4. There is a dispute among the parties regarding whether DSWA is a state agency within the meaning of the Act and therefore whether the Project was covered by the Act. Diamond contends that DSWA is a state agency within the meaning of the Act and Ogden contends that DSWA is not a state agency under the Act because it does not receive state funds. See 29 Del. C. §

6902(1). That dispute is irrelevant for present purposes since the bid materials and the contract between DSWA and Ogden expressly incorporate 29 Del. C. § 6962(d)(10)(b)(3).

After such contract has been awarded, the successful bidder shall not substitute another subcontractor for any subcontractor whose name was set forth in the statement which accompanied the bid without the written consent of the awarding agency. No agency shall consent to any substitution of subcontractors unless the agency is satisfied that the subcontractor whose name is on the bidders accompanying statement:
A. Is unqualified to perform the work required;
B. Has failed to execute a timely reasonable subcontract;
C. Has defaulted in the performance on the portion of the work covered by the subcontractor; or
D. Is no longer engaged in such business.

29 Del. C. § 6962(d)(10)(b)(3). However, the bid instructions did not incorporate § 6962(d)(10)(b)(4) of Title 29 which requires public works contracts to include provisions to penalize general contractors who violate § 6962(d)(10)(b)(3) by improper substitution.

On October 28, 1997, Ogden notified Diamond that Ogden had been awarded the Project and that Diamond was listed as the electrical subcontractor in its bid. (Am.Compl.¶ 9.) On November 21, 1997, representatives from Ogden and Diamond met to negotiate the final subcontract. (Am.Compl.¶ 10.) At that time, Ogden suggested that Diamond reduce its bid. (Id.) Ogden also informed Diamond that it was still evaluating other electrical subcontractors and might contract with a different electrical contractor. (Id.)

On December 4, 1997, Ogden proposed a subcontract that required work and materials which were not part of Diamond's bid and that did not provide for additional compensation in exchange for the additional work and materials. (Am.Compl.¶ 11.) Diamond complained about these "discrepancies." (Id.) Ogden and Diamond negotiated to resolve their differences from December 8, 1997 to December 15, 1997. (Am.Compl.¶ 12.) They were unsuccessful.

*2 During the next few weeks, Ogden and Diamond shared a flurry of correspondence with DSWA regarding their dispute. (Am.Compl.¶¶ 13-17.) Each attempted to get DSWA to resolve the dispute in its favor under § 6962(d)(10)(b)(3)-- Diamond by attempting to persuade DSWA to prohibit Ogden to substitute another subcontractor, Ogden by attempting to get DSWA to give written consent for such a substitution.

In a letter dated January 9, 1998, DSWA found that Ogden had not sustained its burden of proof to show that Diamond had acted unreasonably in refusing to execute the subcontract. (Am.Compl.¶ 18.) DSWA's letter also informed Ogden that a formal hearing could be held at Ogden's request. (Id.) Ogden never requested a hearing. (Id.)

On January 14, 1998, Ogden informed DSWA by letter that it would execute a contract with another electrical subcontractor, Bilbrough's Electric, if it did not receive contrary instructions from DSWA. (Am.Compl.¶ 20.) The next day DSWA reiterated its view that Ogden "ha[d] not set forth a persuasive argument in support of its position that Diamond failed to execute a reasonable subcontract in a timely fashion" but indicated that "it [could not] force [Ogden] and Diamond into an agreement." (Am.Compl.¶ 21.) DSWA notified Diamond on January 16, 1998 that Ogden intended to contract with Bilbrough. (Am.Compl.¶ 22.) Diamond responded in writing on January 30, 1998 to demand that DSWA follow its bidding instructions and not allow the substitution. (Am.Compl.¶ 22.)

Thereafter, DSWA neither consented to the substitution of Bilbrough for Diamond, nor did it take action to stop the substitution. Instead, it punted, apparently in order to let the Project proceed.

Diamond filed a complaint in this court seeking to enjoin the substitution on March 19, 1998. The court denied Diamond's motion for a preliminary injunction on April 16, 1998. As a result, Ogden used Bilbrough as its electrical subcontractor on the Project.

II. *Legal Analysis*

In deciding a motion to dismiss, the court will assume all allegations in the complaint to be true and it will draw all reasonable inferences from the complaint in the plaintiff's favor. *In re USACAFES, L.P. Litig.,* Del. Ch., 600 A.2d 43, 47 (1991). The court may dismiss the complaint if there are no facts in the pleadings from which the court could infer that the plaintiff could prevail. *Id.*

In the amended complaint, Diamond alleges that Ogden: i) breached its contractual obligations to Diamond by entering into a subcontract with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bilbrough, rather than Diamond; and ii) defrauded Diamond during the contract negotiations.

The complaint is not a model of clarity. For example, in the complaint Diamond states that there was never a contractual relationship between it and Ogden, (Am.Compl.¶ 26), and then it includes a count for breach of contract. (Am.Com pl.¶ ¶ 28-40.) [FN5]

> FN5. The motion papers were also a bit confusing and both parties submitted materials not incorporated into the complaint. I declined to treat the motion as one for summary judgment because the documentary evidence I received was highly incomplete; for example, I did not receive copies of the DSWA-Ogden contract or the complete bid materials.

However, Delaware follows a simple notice pleading standard. *Byrne v. Lord,* Del. Ch., C.A. No. 14824, ltr. op. at 5, Chandler, V.C. (June 11, 1996). To satisfy this standard, there must be notice pleading of facts which may give rise to a potential claim. *Merck & Co., Inc. v. SmithKline Beecham Pharmaceuticals Co.,* Del. Ch., C.A. No. 15443, ltr. op. at 5, Chandler, C. (Jan. 27, 1999). A party's pleadings shall be construed to do substantial justice. Ch. Ct. R. 8(f). When deciding a 12(b)(6) motion, the "court is under a duty to examine the complaint [in order] to determine if the allegations provide for relief on any possible theory."5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (1990).

*3 Because the complaint is confusing and ambiguous regarding whether Diamond bases its contract claim on its direct relationship with Ogden or on its status as a third party beneficiary of Ogden's contract with DSWA, I will examine whether the facts pled in the complaint potentially can sustain a recovery under either theory. I begin with the direct contract theory.
A.
In Delaware, the test for whether a contract has been formed is an objective one. *Leeds v. First Allied Conn. Corp.,* Del. Ch., 521 A.2d 1095, 1097 (1986). A contract is formed if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms. *Leeds,* 521 A.2d at 1101.

The complaint alleges facts that could support a finding that the parties had entered into a contract which required Ogden to consummate a final subcontract with Diamond unless an exception to § 6962(d)(10)(b)(3) excused performance. Diamond received a bid packet identifying the work for which bids were sought and informing prospective subcontractors that they could only be replaced for a reason set forth in § 6962(d)(10)(b)(3) and with the written consent of DSWA. Diamond sent Ogden a bid specifying at what price it would do specific electrical work required by DSWA. Thereafter, Ogden selected Diamond and incorporated Diamond's bid in the general contract bid to DSWA. Ogden won the Project contract.

As a result of these exchanges, I believe it can be said that Ogden and Diamond owed each other contractual duties. That is, I believe that when Ogden won the general contract, in part because of its reliance on Diamond's subcontract, a relationship of legal significance arose between Ogden and Diamond. At that point, Diamond had a legal duty to perform in accordance with its bid or face liability to Ogden in the event that Ogden suffered damages as a result of Diamond's failure to perform. *See, e.g., Jaybe Constr. Co. v. Beco, Inc.,* 216 A.2d 208 (Conn.1965) (general contractor had a breach of contract claim against subcontractor when the subcontractor refused to act in accordance with its bid). Likewise, Ogden was not free at that point to negotiate with whatever subcontractors it wished. Rather, it was bound to deal with Diamond and to live up to its promise to enter into a final subcontract with Diamond unless one of the exceptions set forth in § 6962(d)(10)(b)(3) applied.

The only § 6962(d)(10)(b)(3) exception Ogden claims is applicable is that Diamond "failed to execute a timely reasonable subcontract."[FN6] The ultimate resolution of this contention will turn largely on the actual facts regarding the bids, the negotiating positions of the parties, and the bid materials. At the pleading stage, however, Diamond need only allege facts which, if true, would sustain a finding that Ogden did not present Diamond with a "timely reasonable subcontract." In determining what is reasonable, the work and price specified by Diamond in its subcontract bid-- which was accepted by Ogden and incorporated in its general contract bid-- are of crucial significance.

> FN6. There is no allegation that Diamond violated the other three conditions in 29 *Del. C.* § 6962(d)(10)(b)(3).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*4 Here, Diamond has pled that Ogden added material amounts of additional work and asked it to assume potential liabilities not specified in the bid materials without commensurate additional consideration. (Am.Compl.¶ 11.) It has also pled that DSWA did not give Ogden written consent to substitute. (Am.Compl.¶ 33.) As a result, Diamond has sufficiently pled that Ogden breached its duty.

This conclusion is supported by this court's decision in a case with very similar facts. In *Heaco v. Del. Technical & Community College,* Del. Ch., C.A. No. 13310, ltr. op., Hartnett, V.C. (Mar. 21, 1994), Heaco submitted a bid to Bancroft Construction Company, a general contractor, for the mechanical portion of a project for the construction of an industrial training building for Delaware Technical & Community College ("Del Tech"). Bancroft incorporated Heaco's bid into its project bid. The contract was awarded to Bancroft. A dispute arose regarding Heaco's base bid price. Bancroft insisted on a contract at a level $30,000 below that proposed by Heaco. Heaco refused to sign the subcontract agreement at that amount. Work on the project was delayed by Heaco's failure to sign the contract. Bancroft submitted a request to Del Tech for permission to substitute a subcontractor for Heaco. Heaco sought a preliminary injunction to prevent Del Tech from approving the substitution under the predecessor to § 6962(d)(10)(b)(3), then § 6911. Like current § 6962(d)(10)(b)(3), that statute permitted substitution only when the subcontractor failed to sign a timely, reasonable subcontract.

The court dealt with Heaco's injunction motion in a deft manner which balanced two important, but potentially conflicting, public policy interests at issue in the public contracting arena: the need for the prompt completion of public works projects and the need to protect subcontractors from bid shopping. The court protected the former interest by denying Heaco's request to enjoin Del Tech from permitting substitution of another subcontractor. In so ruling, the court refused to determine whether Bancroft or Heaco was in the right regarding their dispute, saying the record "prevent[ed] resolution of this material factual dispute." Ltr. op. at 7. Although the passage of the opinion dealing with the merits is a little confusing, the court explained its meaning later in the opinion:
Heaco may not use 29 Del. C. § 6911 as a weapon to preclude Del Tech from completing work on its Project. Del Tech should be able to protect itself by approving a substitute mechanical subcontractor following a review of all the relevant facts and circumstances. Under the facts that are not disputed, Del Tech may reasonably conclude that Heaco, regardless of the reason, has 'failed to execute a timely reasonable subcontract.' Heaco's dispute is with Bancroft, not Del Tech. Heaco cannot be permitted to hold Del Tech hostage while it attempts to extract a favorable resolution of its dispute with Bancroft.

*5 *Id.* at 10.

In thus holding, the court did not ignore the General Assembly's intent to "prevent the evil of bid shopping by general contractors."*Id.* at 5. Rather, the court held that this interest would be protected in the absence of an injunction because:
Heaco ... can still proceed with its claims against Bancroft and can still collect damages from Bancroft in its breach of contract action even if a substitute contractor is approved and performs the mechanical work on the Project.

*Id.* at 9.

*Heaco* thus reached a sensible balance that protects the public's interest in the expeditious completion of public works contracts and that protects subcontractors from bid shopping. The logic of its teaching applies with full force here. Diamond was denied preliminary injunctive relief to prevent Ogden from utilizing Bilbrough. At that time, Ogden argued that Diamond did not need an injunction because it had an adequate remedy at law. (Ogden's Answer at ¶¶ 25, 29.) *This court thereafter denied Diamond's motion, at least in part, because a remedy at law was available. Diamond Elec., Inc. v. Del. Solid Waste Auth.,* Del. Ch., C.A. No. 1395, ltr. op. at 4, Balick, V.C. (Apr. 16, 1998).

However, on this motion, Ogden has changed its position and now contends that Diamond's exclusive remedy was to convince DSWA to prevent Ogden from substituting another subcontractor or to get this court to mandatorily enjoin DSWA to prevent that occurrence.[FN7] Having failed in those regards, Diamond is, according to Ogden, out of luck.

FN7. In *Light & Power Const. Co. v. McConnell,* Del. Ch., 181 A.2d 86, 90 (1962), this court issued injunctive relief against an agency to compel performance of its duties under the predecessor to § 6962(d)(10)(b)(3).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The facts of this case demonstrate the inequity of Ogden's position and the wisdom of *Heaco.* Here, ¶ 1:08 did not incorporate the penalty provisions of § 6962(d)(10)(b)(4). *See* Def.'s Br. at 8. It simply said that "subcontractors identified in the bid may be changed only for those reasons set forth in 29 Del. C. § 6962(d)(10)(b)[ (3) ] and only after receiving written consent from DSWA." According to Ogden's logic, Ogden could therefore--without fear of liability to Diamond or penalties from DSWA-- blatantly violate ¶ 1:08 and substitute another subcontractor without written permission so long as DSWA did not *prevent* the substitution. Neither the language of ¶ 1:08 nor the public policy inherent in § 6962(d)(10)(b)(3) are consistent with Ogden's harsh and one-sided view of the general contractor-subcontractor relationship.

Nothing in ¶ 1:08 indicates an intention to preclude a subcontractor from suing a general contractor who breached its promise to comply with that provision. Nor does § 6962(d)(10)(b)(3) purport in any way to abridge the common law rights of subcontractors. Therefore, Diamond's common law rights cannot be said to have been impaired by the statute's incorporation in ¶ 1:08. *See Makin v. Mack*, Del. Ch., 336 A.2d 230, 234 (1975) ("It is not to be presumed that a change in the common law was intended beyond that which is clearly indicated by express terms or by necessary implication from the legislative language used.").

*6 As a matter of public policy, Ogden's position makes even less sense. Forcing subcontractors to rely solely upon the written consent process of § 6962(d)(10)(b)(3) and prospective injunctive relief for protection would compel agencies and courts to make high-stakes and conclusive determinations in a hasty manner, and would create a zero-sum game between the public policy favoring timely completion of projects and the public policy opposing bid shopping. *See Diamond Elec.,* ltr. op. at 4 (impractical and unnecessary to issue mandatory injunction when merits were unclear, an expedited project was in process, and damages were an adequate remedy). *Heaco* suggests a better approach to reconciling these policies, an approach which allows a public project to go forward when a general contractor-subcontractor dispute threatens delay but which also provides the subcontractor with a contractual remedy to prevent bid shopping and ensure fairness. The equity of this approach is especially appealing in this case where the DSWA found that Ogden had not demonstrated its entitlement under ¶ 1:08 to substitute another contractor for Diamond and did not give Ogden written consent to use another subcontractor.

B.

Alternatively, Diamond claims that it is a third party beneficiary of the contract between Ogden and DSWA. A third party has rights under a contract when the contracting parties intend by their contract to confer a benefit on the third party. *Insituform of N. Am., Inc. v. Chandler*, Del. Ch., 534 A.2d 257, 268 (1987); *Ins. Co. of N. Am. v. Waterhouse*, Del.Super., 424 A.2d 675, 679 (1980).

In addressing its claim, I assume ¶ 1:08 of the bid materials shared with subcontract bidders also became a part of DSWA's contract with Ogden. The parties' papers suggest this was in fact the case. Diamond contends that the execution of the Bilbrough subcontract breached ¶ 1:08 because Ogden did not provide Diamond with a reasonable subcontract to execute and because Ogden did not obtain the written consent of DSWA to substitute Bilbrough for Diamond. (Am.Compl.¶ ¶ 30, 32-33.) FN8

FN8. Ogden contends that ¶ 2:08 of the contract between it and DSWA forecloses Diamond from making a third party beneficiary claim. *The language of ¶ 2:08 addresses only the lack of any contractual relationship between DSWA and subcontractors.* Its language protects DSWA. However, it does not prevent Diamond Electric from relying upon ¶ 1:08 as between itself and Ogden.

According to Diamond, the inclusion of ¶ 1:08 was meant to protect subcontractors from bid shopping and thereby directly to benefit them. *See Tower Const., Inc. v. Christina Dist. Sch. Bd.,* Del. Ch., C.A. No. 7332, ltr. op. at 8, Hartnett, V.C. (Nov. 16, 1983) (the purpose of § 6911, § 6962(d)(10)(b)(3)'s predecessor, is to prevent bid shopping). Its inclusion does suggest that the parties intended to protect subcontractors named in the winning general contract bid from replacement except for a reason set forth in § 6962(d)(10)(b)(3). At this pleading stage, Diamond's claim is therefore sufficient to survive a motion to dismiss. *Insituform*, 534 A.2d at 268 (if parties intended to confer a direct benefit on a third party then such third party has an "enforceable right under [the] contract to require the promisor to perform or respond in damages").

C.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*7 Diamond's complaint includes claims for fraud and equitable fraud. To state a fraud claim, Diamond must allege facts which show that there was: 1) a material misrepresentation of fact; 2) defendant's knowledge or belief that the representation was false; 3) an intent to induce the plaintiff to act or refrain from acting; 4) detrimental reliance on the misrepresentation; and 5) damages. Zirn v. VLI Corp., Del.Supr., 681 A.2d 1050, 1060-1061 (1996). There is no scienter requirement for equitable fraud; otherwise the elements are the same. Id. at 1061.

Diamond does not allege any misrepresentations of fact by Ogden. Instead, the complaint states that Ogden was quite straightforward in its actions. The paragraph of the complaint which alleges material misrepresentations says:
These actions by Defendant Ogden were unreasonable and under the circumstances the tendered subcontract and the short time period given to revise its proposal constitute a material misrepresentation of what the bid instructions required as well as a misrepresentation of what is required under the State Procurement Act ...

(Am.Compl.¶ 46.) "These actions" refer to Ogden's knowledge of the requirements of the bid instructions, the circumstances under which a subcontractor could be replaced, and the activities between the parties between November 21, 1997 and December 11, 1997. (Am.Compl.¶¶ 42-45.)

Ogden may have acted improperly, but the complaint does not allege that Ogden acted dishonestly. At the first meeting to discuss the subcontract on November 21, 1997, Ogden made its intentions clear. At that meeting, Ogden requested that Diamond "reduce its bid" and stated that Ogden "was still evaluating bids from other electrical subcontractors and may contract with a different electrical subcontractor." (Am.Compl.¶ 10.) Later, Ogden also disclosed its view that § 6962(d)(10)(b)(3) was not incorporated into the DSWA contract. (Am.Compl.¶ 19.)

These facts are not characteristic of a fraud case. Typically, victims of fraud were content with the story they were told at the time they were told it. That is not the case here. Diamond was fully apprised of Ogden's position and did not rely upon any of Ogden's assertions to its detriment. T.P., Inc. of Del. v. J & D's Pets, Inc ., Del.Super., C.A. No. 98C-01-205-WTQ, mem. op. at 8, Lamb, V.C. (Feb. 26, 1999) ("Fraud, in all its permutations, has the requirement that the plaintiff must have justifiably relied upon the representation ... at issue ... [I]t is hornbook law that the plaintiff must rely upon the truthfulness of the representation at issue"). To the contrary, Diamond disputed Ogden's assertions and sought relief from DSWA and, thereafter, this court.

Nor can Diamond save its fraud claim by arguing that Ogden never intended to execute a subcontract with Diamond and that Ogden accepted Diamond's bid without disclosing this illicit intent. A breach of contract claim cannot be turned into a fraud claim simply by alleging that the other party never intended to perform. Iotex Communications, Inc. v. Defries, Del. Ch., Cons. C.A. No. 15817, mem. op. at 12, Lamb, V.C. (Dec. 21, 1998) (finding that a "false promise" was the basis for a breach of contract claim rather than a fraud claim).
*Conclusion*
*8 For the foregoing reasons, Ogden's motion to dismiss is granted as to Diamond's fraud claims, but denied as to Diamond's breach of contract claims.

Del.Ch.,1999.
Diamond Elec., Inc. v. Delaware Solid Waste Auth.
Not Reported in A.2d, 1999 WL 160161 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.