# EXHIBIT "D"



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Ronald J. GILLENARDO, Mearl G. Layton, Jr., and Crystal Layton, Plaintiffs,

v.

CONNOR BROADCASTING DELAWARE COMPANY, a Delaware corporation, J. Parker Connor, individually, Susan C. Connor, Individually, and Great Scott Broadcasting, a Pennsylvania limited partnership Defendants.
**No. C.A. 98C-06-015 WLW.**

Submitted Jan. 10, 2002.
Decided April 30, 2002.

Upon Defendant's Motion for Judgment Notwithstanding the Verdict and/or for Remittitur. Denied in Part and Granted in Part.
Upon Plaintiffs' Motion for Interest and Costs. Granted. Upon Defendant's Motion for Costs. Denied.

Jeffrey J. Clark, of Schmittinger & Rodriguez, P.A., for Plaintiffs.
Stuart M. Grant, and Denise T. DiPersio, of Grant & Eisenhofer, P . A., Wilmington, Delaware for the Defendants.

## MEMORANDUM OPINION

WITHAM, J.
**\*1** After consideration of the submissions of the parties, as well as the record in this case, it appears to the Court that this is the Motion of Connor Broadcasting Delaware Co.[FN1] ("defendant") for Judgment Notwithstanding the Verdict [FN2] and/or for Remittitur. This motion is opposed by Ronald J. Gillenardo, Mearl G. Layton, Jr., and Crystal L. Layton (collectively "plaintiffs"). Plaintiffs have submitted their own Motion for Prejudgment Interest and Costs. That motion is opposed by the defendant with the defendant submitting a Motion for Costs.

FN1. Various agents of the defendant participated in the transactions at issue here. These included: Parker Connor, Principal and Owner; J.P. Connor, Jr., V.P. and

General Manager; Kevin Connor, Attorney for the defendant; and Brad Connor.

FN2. The defendant has submitted a Motion for Judgment Notwithstanding the Verdict; however, Superior Court Civil Rule 50(b) now designates this as a Motion for Judgment as a Matter of Law. The standards are the same. *Mazda Motor Corp. v. Lindahl,* 706 A.2d 526, 529, n.2 (Del.1998).

The Court finds that the defendant is not entitled to judgment as a matter of law and the evidence is sufficient to support an award of damages. In addition, I find that the amount of compensatory damages awarded does not shock the conscience of the Court and I will not remit the award nor grant a new trial on the issue of compensatory damages. I will also grant the plaintiffs' Motion for Prejudgment Interest and Motion for Costs. The plaintiffs would have generated these items if they had simply litigated only the claims on which they have prevailed. As to the punitive damages award, however, I find that the jury's verdict should be reduced from $100,000 to $20,000. The defendant's motion for costs is denied.

### Facts

This case arises out of negotiations for the sale of two Seaford, Delaware radio stations (WSUX-FM and WJPY-AM) owned by the defendant. The parties entered into a letter of intent on January 12, 1998, after several months of negotiating. The letter of intent set forth the purchase price for the potential sale as well as various other financing and negotiating terms designed to help the parties reach agreement on the final Sale Agreement (or Asset Purchase Agreement ("APA")). Before the APA could be finalized further documents needed to be completed. These were the "exhibits" to the APA and included a security agreement, a promissory note, an escrow agreement, a stock pledge agreement, and a lease agreement for the land and buildings associated with the radio stations.

At the time the parties entered into the letter of intent, the defendant was informed that plaintiffs were making material changes in reliance on the agreement. For example, the defendant knew that one

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

of the plaintiffs, Crystal Layton, was resigning from her current job to begin marketing for the new station. Furthermore, the defendant was told that plaintiffs were purchasing another radio station to combine its signal frequency with the defendant's. Defendant also knew that plaintiffs were hiring an employee, Steve Frene, to help in the marketing and management of the new venture. Testimony showed that the defendant worked with plaintiffs' new employee when J.P. Connor and Brad Connor met with Steve Frene, after the letter of intent was signed, to discuss marketing for the new stations. Defendant never objected to these and other preparations made by plaintiffs as unreasonable or unusual.

*2 On January 12, 1998, the letter of intent was signed by the defendant and Kevin Connor, attorney for the defendant, sent plaintiffs' attorney, Thomas Schattenfield ("Schattenfield"), complete drafts of the APA and the above-noted exhibits. Mr. Schattenfield testified that everything the plaintiffs did was motivated by the need to close this deal with the defendant; therefore, they were willing to accept any terms set forth by the defendant. Many of the these terms concerned Schattenfield, however.

Consequently, Schattenfield took it upon himself, for the benefit of his clients, to mark up the APA document with fourteen changes that he thought better protected their interests. On January 27, 1998, Schattenfield sent the revised APA to Kevin Connor with his fourteen mark-ups. On January 29th, Schattenfield faxed further comments on the APA. Kevin Connor testified that these changes surprised the defendant because the plaintiffs had "changed almost every little thing." Parker Connor testified that he agreed to six or seven of the at-least fourteen changes to the APA proposed by Schattenfield.

Schattenfield was preoccupied with the APA. He was less concerned with the exhibit documents because, in his opinion, these could be completed after the APA was signed. He testified that by January 29th he believed everything had been done that was necessary for the completion of the APA, and it could go to signing-thus fulfilling the terms of the letter of intent. Not believing that the security exhibits were crucial to the signing of the APA, Schattenfield focused on these next. He sent his proposed exhibit modifications via FedEx at the end of the day on January 29th.

The exhibits were the important documents to the defendants, however. Defendant received them on January 30th. The exhibit changes requested by

Schattenfield included: (1) a grace period for late payments; (2) that the Promissory Note be nonnegotiable; (3) eliminating Connor Broadcasting's right to declare a default until ninety days after the filing of involuntary bankruptcy against plaintiffs; (4) that Connor Broadcasting wait until a receiver had been appointed for plaintiffs' assets before declaring a default; (5) elimination of the insolvency of the Guarantor on the Note as an event of default; and (6) restrictions on Connor Broadcasting's ability to declare a default under the Note when a default occurred under the Security Agreement.

The changes Schattenfield proposed to the Security Agreement would have: (1) required notice and a thirty-day waiting period before a default could be acted upon by the defendant; (2)required a ninety-day waiting period before involuntary bankruptcy could be declared a default; and (3) required a thirty-day waiting period before and unpaid judgment would constitute a default. Schattenfield sought to include similar restrictions and waiting periods in the Stock Pledge Agreement.

Needless to say, Schattenfield's requested changes, especially to the exhibits, caused extreme concern to the defendant. In the defendant's view, the exhibits were critical security documents because the transaction was being seller-financed (with the proceeds to be used to finance a retirement fund). Plaintiffs were only putting a small security deposit down in the transaction.

*3 After the 29th, Parker Connor began to lose faith in the deal. It bothered him that plaintiffs took their time with the documents that were most important to the defendant. The plaintiffs had them on January 12th, but never returned them until the 30th. Parker Connor testified that he "got a bad feeling" after the return of Schattenfield's mark-ups. He said he was "fed up with the stresses." He said he was "upset" because the plaintiffs had "gutted his security," and the sole purpose of this sale was to fund his retirement. Moreover, Parker Connor felt that the parties had been negotiating for two months prior to signing the letter of intent; therefore, he felt that plaintiffs knew his terms, knew they were set, and now were changing everything. Parker Connor said that he had been prepared to sign the documents that had been sent to Schattenfield-that is before they came back all marked-up.

After receipt of the marked-up exhibits, Kevin Connor communicated to Schattenfield that the defendant would not sign the APA without the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

security documents executed and in place. On or about January 29th or 30th, Kevin Connor agreed to extend the deadline on the letter of intent until February 6, 2002, for the reason that defendant was closing on the sale of other radio stations and could not give this deal the time necessary to get the paperwork done. Kevin Connor testified that plaintiffs were never informed that the deal was at risk and that Parker Connor was upset with all the document changes. Plaintiffs were simply told that this other settlement was delaying their closing. (This other settlement actually did not occur until much later.)

On February 3, 1998, the defendant next learned that plaintiffs' employee, Steve Frene, had solicited one of defendant's advertisers. Apparently, Frene made derogatory remarks concerning the defendant's operation of the radio station. The advertiser then ceased doing business with the defendant. Parker Connor thought this was unethical and at this point told Kevin Connor to break off negotiations with the plaintiffs. J.P. Connor called Mearl Layton and angrily told plaintiffs to "cease and desist" but provided no explanations to the plaintiffs as to what that meant.

Plaintiffs testified that they did not know what had occurred, and did not know about the incident with their employee. They were never given the opportunity to address or correct the matter. Schattenfield testified that after January 29th or 30th, he never heard from Kevin Connor again, although Schattenfield tried to make contact. Moreover, the defendant never expressed any concerns to plaintiffs regarding the document mark-ups sent during the negotiations on January 29th.

After January 30th the plaintiffs tried to contact the defendant several times to find out what was happening. Defendant would not respond. As a result of the breakdown in bargaining, the letter of intent expired at 5:00 p.m. on February 6, 1998, without the finalization of the APA or any of the exhibits.

*4 Meanwhile, on February 4, 1998, another interested buyer ("Great Scott") called Kevin Connor in order to inquire if the stations at issue in the letter of intent were still for sale. Approximately one year earlier Great Scott had sought to buy these same stations. Kevin Connor called Great Scott back and informed Great Scott that the stations were under negotiation pursuant to the letter of intent and could not be discussed until February 6th. Kevin Connor also testified that he jokingly told Great Scott that it

was stupid not to have bought the stations sooner because the price had gone up. Kevin Connor stated that he asked Parker Connor what it would take to consider selling to Great Scott, and said that he got a floor price. Kevin Connor was discussing numbers for a new sale before the expiration of the letter of intent.

On February 7, 1998, Kevin Connor had the authority to talk to Great Scott. Negotiations for the sale of the stations to Great Scott occurred quickly and an agreement was reached in about thirty to forty minutes. On February 23, 1998, the defendant completed the sale of the stations to Great Scott at a significantly higher price than the deal with plaintiffs would have afforded. Moreover, Great Scott was a cash buyer. Defendant did not have to provide a purchase money mortgage.

Mearl Layton testified that he was shocked when he found out his deal was not going forward. Since the defendant would not return any calls, Mearl Layton went looking for Parker Connor at his place of business. When plaintiff finally found Parker, plaintiff was told that the defendant had a buyer for cash and that, "You win some. You lose some." On the basis of the foregoing facts, plaintiffs allege that the defendant breached its contractual obligations under the letter of intent.

### Letter of Intent Provisions

Although numerous issues were presented for trial, the matter relevant to the defendant's current motion concerns whether or not the letter of intent constituted a valid agreement and, if so, did the defendant breach its terms. Pertinent provisions of the letter of intent are set forth below:
Subject to the execution of a definitive purchase and sale agreement [the APA] and any related agreements reasonably satisfactory to Buyer [plaintiffs] ... and Seller [defendant] ... Buyer offers to buy certain assets used or useful in the operation of Radio Stations WSUX-FM ... and WJPY-AM.
*Paragraph 5. Initial Escrow Deposit.* ... At the time of Seller's execution of this letter, Buyer will deposit Five Thousand Dollars ($5,000.00) (the "Initial Deposit") in an escrow account.... If a definitive Sale Agreement is not completed by January 30, 1998 [later extended to February 6, 1998], the deposit monies with interest shall be returned to Buyer.
*Paragraph 7. No Solicitation of Offers.* Seller will not solicit, accept or entertain any other offers for the Stations while this Letter of Intent is in effect.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 4

*5 *Paragraph 8. Expiration of Letter of Intent.* This document is a Letter of Intent only, and the final terms of the acquisition of the Stations by Buyer from Seller remain to be negotiated. Accordingly, while Buyer and Seller will attempt in good faith to finalize the Sale Agreement on the terms and conditions as outlined herein, no party has or shall have any obligation to the other after 5:00 p.m. ET on January 30, 1998 [later extended to February 6], after which time this Letter of Intent shall automatically terminate and expire regardless of whether or not the Sale Agreement has been negotiated or entered into by the parties, and regardless of any act or failure to act by any party.

*Paragraph 9. Sale Agreement.* Immediately following execution of this Letter of Intent, Buyer and Seller shall work diligently towards completion of the Sale Agreement and all other documents and applications required for filing with the FCC in order to consummate this transaction ...

### Procedural Posture

Following a seven-day jury trial, after each party presented its case in chief to the jury, defendant moved for Judgment as a Matter of Law under Superior Court Civil Rule 50(a).[FN3] Defendant argued *inter alia* that viewing the evidence in the light most favorable to plaintiffs, even if the letter of intent was an enforceable contract a reasonable jury could not find that the defendant breached its terms.

> FN3. Super. Ct. Civ. R.50(a)(1) states in pertinent part that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court may determine the issue against the party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot, under the controlling law, be maintained or defeated without a favorable finding on that issue."

Ruling on the defendant's motion, this Court could not agree that the facts were only susceptible to that one inference. Under the facts presented, it could not be said, as a matter of law, that the defendant had no duty to negotiate in good faith under the letter of intent or, alternatively, that the defendant did not breach its duty to negotiate in good faith. Because the

evidence was not susceptible to only *one* of these inferences, the defendant's motion for Judgment as a Matter of Law on the issue of breach of the letter of intent was denied.

Accordingly, the case was submitted to the jury which found that the defendant breached a contractual obligation to the plaintiffs. The jury awarded plaintiffs $118,815.13 in compensatory damages (the amount of out-of-pocket costs plaintiffs sustained in reliance on the letter of intent). Additionally, the jury awarded plaintiffs $100,000 in punitive damages.

Defendant now renews its Motion for Judgment as a Matter of Law pursuant to Superior Court Civil Rule 50(b). In the alternative, the defendant seeks remittitur of the damages awarded by the jury. The Court will treat this alternative motion as a Motion for New Trial on the Issue of Damages or for Remittitur under Superior Court Civil Rule 59.[FN4]

> FN4. Judicial economy weighs in favor of remittitur over a new trial on the issue of damages should the Court consider a reduction in the jury verdict necessary; however, remittitur is at the plaintiffs' election. *See e.g. Ripsom v. Beaver Blacktop, Inc.,* 1998 WL 32071 at *2 (Del.Super.Ct.) (Citing *Coldiron v. Gaster,* 278 A.2d 328, 330 (Del.1971)). Otherwise, if the plaintiffs do not accept remittitur the Court must grant a new trial on the issue of damages. For this reason the Court will treat the defendant's alternative Motion for Remittitur as a Motion for New Trial *or* Remittitur Under Rule 59. Rule 50(b) permits a motion for new trial on damages under Rule 59 to be joined with a renewal of the motion for judgment as a matter of law.

### Judgment as Matter of Law

Superior Court Civil Rule 50(b) states in pertinent part:
Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the Court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.... If a verdict was returned, the Court may ... allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

**\*6** This standard requires this Court to view the evidence in the light most favorable to the nonmoving party, questioning whether under any reasonable view of the evidence the jury could justifiably find in favor of plaintiffs. [FN5] "[T]he factual findings of a jury will not be disturbed if there is *any* competent evidence upon which the verdict could reasonably be based." [FN6]

FN5. *Mazda Motor Corp.*, 706 A.2d at 530.

FN6. *Delaware Elec. Co-op., Inc. v. Pitts*, 1993 WL 445474 at \*1 (Del.).

*Discussion-Contract Formation*

In this case, the jury found that there was a contract formed between Connor Broadcasting ("defendant") and the Gillenardo-Layton Group ("plaintiffs"). There is competent evidence to uphold this finding and the law supports this conclusion. The jury was instructed:

For a legally binding contract to exist, there must be (1) an offer of a contract by one party; (2) an acceptance of that offer by the other party: (3) consideration for the offer and acceptance; and (4) sufficiently specific terms that determine the obligations of each party.

"[W]hether [an] enforceable contract arises from preliminary negotiations and letter of intent or must await formal agreement depends on the intent of the parties." [FN7] "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." [FN8] Here there is competent evidence to allow a reasonable jury to conclude the parties intended to enter into a contract to negotiate in good faith. This is true "[g]iven the highly detailed nature of the [letter of intent], the important commercial circumstances in which it was negotiated, and the fact that the [letter of intent] appears in all respects to be a binding contract as to certain promises." [FN9]

FN7. *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156, n.6 (Del.1998) (citing *Itek Corp. v. Chicago Aerial Indus., Inc.*, 248 A.2d 625, 629 (Del.1968)).

FN8. *Spruill v. The Body Beaute Inc.*, 2001 WL 1456872 at \*1 (Del.Super.Ct.) (citations omitted).

FN9. *RGC Int'l Investors, LDC v. Greka Energy Corp.*, 2001 WL 984689 at \*13 (Del. Ch.).

In the instant case there is competent evidence showing it was the parties' intention to agree to negotiate in good faith. There was an express offer to negotiate in good faith to buy the defendant's radio stations. This offer was accepted by the defendant upon execution of the letter of intent. Among other things, consideration may be found from the plaintiffs' escrow deposit, and from the agreement of the defendant to take the stations off the market during the time period of the agreement. The letter of intent also set forth sufficiently specific terms outlining various obligations of the parties including: (1) the duty to attempt in good faith to finalize the Sale Agreement (paragraph 8); (2) the duty to work diligently to complete the Sale Agreement (paragraph 9); and (3) the duty not to solicit, accept or entertain any other offers for the Stations while the letter of intent was in effect (paragraph 7). Viewing the evidence in the light most favorable to the plaintiff, the Court finds that there is competent evidence whereby a jury could reasonably have found a contract to negotiate existed under the instant letter of intent.

Defendant argues that this finding is incorrect as a matter of law because the letter of intent was an unenforceable "agreement to agree," in that it expressly stated that if the parties failed to reach a final agreement before the letter expired, "no party shall have any obligation to the other ... regardless of any act or failure to act by any party." Defendant cites *VS & A Communications Partners, L.P. v. Palmer Broadcasting L.P.*, [FN10] for the proposition that under a letter of intent similar to the one in this case, the obligation of good faith does not go so far as to forbid a seller to change its mind concerning the disposition of its property before it agrees to bind itself legally to sell. Defendant submits other cases to show that a party can depart from sale negotiations once conditions to the sale are not satisfied.

FN10. 1992 WL 339377 (Del. Ch.).

**\*7** The Court does not disagree with these propositions; however, they are not dispositive here because the breach in the present case was not a

Not Reported in A.2d                                                    Page 6
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

failure *to sell* assets, but a breach of the duty *to negotiate* in good faith.[FN11] *VS & A Communications Partners, L .P.,* in particular, may be distinguished from the present case on both the law and the facts.

> FN11. The other cases cited by the defendant can also be distinguished on this basis because they too dealt with breach of contracts for the *sale of assets.* Moreover, the recovery sought in all those cases was specific performance *to complete the sale.* In contrast, the issue here is the breach of *a negotiation agreement* and a failure to negotiate in good faith. Plaintiffs also do not seek to complete the sale, but rather seek reliance damages.
> To distinguish the other cases cited by the defendant, *Recreation Ctrs. of America v. Sheppard,* 1974 WL 6345 (Del. Ch.) is given to show that an agreement was enforceable allowing a buyer to operate a boatyard during the negotiation period, but once the negotiation period was up, buyer had to 'depart the premises'. This case tends to support the *plaintiffs'* position here, in that the court *allowed recovery for damages* incurred during the time period of the negotiations. Defendant also cites *Transamerican S.S. Corp. v. Murphy,* 1989 WL 12181 (Del. Ch.) for the proposition that a party could withdraw from negotiations because a condition to the sale had not been satisfied. This case is also not dispositive because in that case there was *no contract to negotiate* in good faith, let alone a contract for the sale of assets.

Factually, *VS & A* is different because there the letter of intent had no express provision regarding the duty to work diligently towards completion of a sale agreement. Nor did it have an express provision requiring good faith attempts to finalize the Sale Agreement.[FN12] To the contrary, the *VS & A* letter of intent implied that there was no such duty because it expressly stated that it *"merely* represents our present understanding with respect to the intended transaction described herein, *and is not binding upon and creates no rights,* express or implied in favor of any party." [FN13] There is no such limiting provision in the letter of intent in the instant case.[FN14] This contract has absolutely no express or explicit provision limiting liability for a bad-faith failure to negotiate.[FN15]

> FN12. *VS & A* at *4. The express duty to negotiate in good faith unforeseen acquisition issues in the *VS & A* letter of intent kicked in *only if* the parties had to split the acquisition of the TV stations from the sale of the radio stations because the purchaser could not arrange timely and satisfactory assurance of its financial qualifications to purchase both in one acquisition (it was expected that both would be sold in the transaction under negotiation).

> FN13. *Id.* (emphasis added). *See* discussion *infra* notes 14, 19. The contract provisions in *VS & A* were held to be binding with respect to some duties to act; however, none of these were the duty *to negotiate* in good faith. The limited binding contractual duties were: for the buyer to obtain financing commitments; duties for transaction fees; duties as to confidentiality; duties regarding access to facilities for inspections; cooperation in meeting FCC requirements; duties to run the business properly while negotiations were ongoing; and a stand-still provision not to shop the stations while the letter of intent was in effect.

> FN14. *See e.g. J.W. Childs Equity Partners, L.P. v. Paragon Steakhouse Restaurants, Inc.,* 1998 WL 812405 at *3 (noting that where such language was missing-i.e. letter of intent did not state " 'this letter is not intended to be a contract' or anything similar," then the duty "to negotiate further terms of the Agreement in good faith" was binding, and the breach of that duty entitled a party to damages).

> FN15. *Id.* (emphasis added).

Legally, *VS & A* is inapposite because it applies New York law which may not be consistent with Delaware law regarding the intent of the parties to create good faith duties to negotiate under a letter of intent.[FN16] "While courts applying New York law have, on occasion, enforced contractual obligations to negotiate in good faith, an absolute precondition to such enforcement has been the existence of a binding agreement between the parties as to all of the essential terms of the contract .... [n]otwithstanding the *intention of the parties at the time....*" [FN17]

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 7

FN16. *See e.g* E. Allan Farnsworth, *Contracts,* § 3.26 (2d ed.1990) (noting that *Itek Corp.,* a case with a "substantial following," is a seminal example of parties agreeing to bargain in good faith under letters of intent; however, federal courts applying *New York* law decline to follow *Itek* ); *see also* Anchor Motor Freight 716 A.2d 154, 156, n.6 (citing *Itek Corp.*(decided under Illinois law) for the proposition that it is *in accord* with Delaware law as to the effect of a letter of intent depending on the intent of the parties); *e.g.* J.W. Childs Equity Partners, L.P., 1998 WL 812405, letter of intent not sufficient to create a contract for sale of property, did create a binding agreement to negotiate in good faith under Delaware law.

FN17. VS & A Communications Partners, L.P., 1992 WL 339377 at *9 (emphasis added).

In contrast, in Delaware the intention of the parties controls the creation of a good-faith duty to negotiate under a letter of intent.[FN18] Such a duty may arise out of *express* language.[FN19] Moreover, "[t]he cardinal rule of contract construction is that, where possible, a court should give effect to *all* [express] contract provisions." [FN20] Thus, "a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless." [FN21]

FN18. Anchor Motor Freight, 716 A.2d 154.

FN19. *Id. see also* Restatement (Second) of Contracts § 205 comment (c) (1990); VS & A 1992 WL 339377 at *9 (The court stated that express duties in letter of intent were binding (although none of the express *VS & A* duties included diligently working towards completing a Sale Agreement), and found that the contract "create[d] an implied obligation prior to the expiration of the time stated, most importantly, to keep the Stations off the market and not offer to sell or negotiate with others concerning their sale. In addition, [defendant] was obligated to continue to assist the negotiation process in specific ways: to afford information for example. These obligations are real and they would have value to one negotiating to buy the Stations.").

FN20. Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1184 (Del.1992) (emphasis in original) (citing E.I. du Pont de Nemours & Co. Inc. v. Shell Oil Co., 498 A.2d 1108, 1114 (Del.1985)).

FN21. Sonitrol Holding Co. at 1183 (citing Seabreak Homeowners Ass'n, Inc. v. Gresser, 517 A.2d 263, 269 (Del.Super.Ct.1986), *aff'd,* 538 A.2d 1113 (1988) (TABLE).

Under Delaware law paragraph 8 must be construed to mean that a failure to act by any party must be effected in good faith.[FN22] If the defendant could walk away in unchecked bad faith, then the defendant was never really bound to complete any of the other contractual obligations in the letter of intent. Defendant's interpretation of the language of paragraph 8 (that "no party shall have any obligation to the other ... regardless of any act or failure to act") as having no good-faith requirement, renders the following contractual duties illusory: (1) the duty to attempt in good faith to finalize the Sale Agreement (paragraph 8); (2) the duty to work diligently to complete the Sale Agreement (paragraph 9); and (3) the duty not to solicit, accept or entertain any other offers for the Stations while the letter of intent was in effect (paragraph 7).

FN22. *See e.g.* Cochran v. Stifel Fin. Corp., 2000 WL 1847676 at *7, n. 21 (Del. Ch.) (noting that the good faith requirement (a duty implied into the *Cochran* contract via statute) provides some protection against illusory provisions in corporate employment contract).

**8 The facts show that the parties intended these contractual duties to be real, not illusory, at the time of the signing of the letter of intent. Certainly there was abundant testimony that plaintiffs were eagerly working toward negotiating and closing the deal. Agents of the defendants were doing the same. J.P. Connor and Brad Connor were working with plaintiffs on marketing. J.P. Connor was considering staying on as General Manager once the deal closed. Kevin Connor told Great Scott *he was bound* by the letter of intent not to talk to anyone until after February 6th. It appeared to be everyone's intention to negotiate this deal in good faith when the agreement was signed. Parker Connor testified that he was ready to sign the paperwork to close the deal at the time he signed the letter of intent. It was only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 8
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

after Schattenfield entered the negotiations that Parker Connor became upset and shut down the negotiations.

For the foregoing reasons the court finds that the letter of intent is an enforceable agreement as to the above-noted duties to negotiate in good faith, to work diligently to complete the APA, and to not shop the stations; therefore, as to these duties, any failure to act by the defendant under paragraph 8 must have been conducted in good faith.

### Breach of Contractual Duty of Good Faith

The Court will not disturb the verdict if there is any competent evidence upon which the jury could reasonably find that the defendant's acts or failures to act with respect to the above-referenced duties occurred without good faith. The jury was instructed that " 'Good faith' may be defined as refraining from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."[1]

"A finding of 'bad faith' is necessarily a fact-intensive inquiry." [FN23] It "is not simply bad judgement or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." [FN24]

> FN23. *RGC Int'l Investors, LDC,* 2001 WL 984689 at *11 (citations omitted).

> FN24. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 624 A.2d 1199, 1208, n.16 (citing Black's Law Dictionary 72 (5th ed.1983)).

In the present case, the evidence viewed in the light most favorable to the plaintiffs shows that the defendant stopped negotiating in anger after plaintiff lawyer sent marked-up documents to them gutting his security. There is competent evidence that a reasonable jury could find that the defendant made no attempt in good faith to finalize the sale agreement after that time. Nor was there any attempt thereafter to work diligently to complete the Sale Agreement.

Parker Connor testified that he was willing to sign the documents related to the sale agreement until

Schattenfield's changes "gutted" his security. Interestingly, we don't know whether Schattenfield's changes were critical to plaintiffs because plaintiffs were never told that the defendant was unhappy with them. Schattenfield testified that the plaintiffs were solely motivated to complete the deal and would have accepted all of the defendant's terms-that is, if he hadn't inserted protective measures on their behalf. Testimony from Parker Connor shows that Plaintiffs where aware of his preferred security terms due to negotiations prior to the signing of the letter of intent. It is likely, therefore, that plaintiffs were fully prepared to accept completely the defendant's security terms if the negotiations had continued. There was testimony that Kevin Connor asked Parker Connor what it would take to consider selling to another buyer, Great Scott, and said that he got a floor price. This discussion occurred before the expiration of the letter of intent. This evidence would allow a reasonable jury to conclude that Kevin Connor entertained other offers for the Stations while the letter of intent was in effect.

**\*9** The Court has no reservation concluding that the letter of intent in this case created an enforceable obligation on the defendant's part to attempt in good faith to finalize the Sale Agreement, to work diligently to complete the Sale Agreement, and not to solicit, accept or entertain any other offers for the Stations. "Regardless of whether [the defendant] had reserved to itself the right not to consummate the [Sale Agreement] if the parties failed to reach accord on documentation ... it had clearly not reserved the right to thwart final agreement by [cutting off negotiations or considering other buyers]. [FN25]

> FN25. *RGC Int'l Investors LDC,* 2001 WL 984689 at *13.

Further, the facts here would allow a reasonable jury to find the requisite ill will, anger and moral obliquity.[FN26] Kevin Connor's responses to the plaintiffs' attorney, explaining that another closing prevented the settlement in this case, appears disingenuous in light of the fact that the other stations closed much later. Further, there was no direct explanation to plaintiffs regarding why negotiations were breaking down. Parker Connor's testimony showed that he was very angry, and he did not seem to care about the substantial preparations incurred by plaintiffs up to that point in time, after all "you win some and you lose some."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN26. *Desert Equities, Inc.*, 624 A.2d 1199.

The Court has determined that a reasonable jury could find that the defendant breached the duty to attempt in good faith to finalize the Sale Agreement, as well as the duty to work diligently to complete the Sale agreement, and the duty not to solicit, accept or entertain any other offers while the letter of intent was in effect. Thus, the defendants are entitled to relief for injury caused by the breach. It is the defendant's position, however, that plaintiffs have not established a right to either compensatory or punitive damages as a matter of law.

*Damages*

Defendant contends that plaintiffs are not entitled to compensatory reliance damages because their reliance on a non-existent sales contract was unreasonable as a matter of law. Even if plaintiffs are eligible for reliance damages, the defendant believes plaintiffs were only entitled to those damages incurred during the time period that Connor Broadcasting did not operate in good faith. Defendant submits that the only credible time period for which plaintiffs are entitled to damages is the week from January 30-February 6, 1998 (the date the letter of intent expired). At the very least, the defendant seeks remittitur of compensatory damages to those sustained during this time period.

Plaintiffs do not agree that the reasonableness of the reliance damages may be reviewed by the Court at this juncture. Rather, it is argued that reasonableness is an issue of fact for the jury's determination. Moreover, at trial the *uncontroverted* evidence established that Plaintiffs incurred the expenses submitted. Defendant did not cross-examine any damage item.

The jury was instructed that if the "defendant committed a breach of contract, the plaintiffs are entitled to out-of-pocket expenses spent in reasonable anticipation of performance of the letter of intent. The measure of damages is the loss actually sustained as a result of the breach of the contract." The reliance damages in this case may be awarded on an estoppel theory to avoid injustice, so that plaintiffs are restored to the *status quo ante*.[FN27] To be successful under a promissory estoppel theory,

FN27. *Chaplake Holdings, Ltd. v. Chrysler Corp.*, 2002 WL 148088 at *43

(Del.Super.Ct.); *see* *Sheehan v. Hepburn,* 138 A.2d 810, 812 (Del. Ch.1958) (restoring party to position *status quo ante* after the other party repudiated the contract); *see also RGC International Investors, LDC,* 2001 WL 984689 at *15 (noting that courts may award expectancy or reliance damages under doctrine of promissory estoppel).

*10 plaintiff must prove that defendant made a promise with the intent to induce action or forbearance, that plaintiff actually relied on the promise, and that he suffered an injury as a result. Equitable estoppel is based on similar principles. To make out a claim of equitable estoppel, plaintiff must show that he was induced to rely detrimentally on defendant's conduct. [FN28]

FN28. *VonFeldt v. Stifel Fin. Corp.,* 714 A.2d 79, 87 (Del.1998).

In the present case there was testimony that Parker Connor at least verbally promised to sell plaintiffs the stations and to work diligently in good-faith toward completing the sale. Although that may not have established a contract for the sale, there is evidence that the promise to negotiate in good faith toward a sale, obtained for the defendant the benefit of a ready, willing and able buyer which, as it later turned out, the defendant didn't need.

There was a commitment on both sides to negotiate in good faith, and to work diligently towards the completion of the Sale Agreement. Plaintiffs testified that they thought they had a contract for the sale of the radio station and relied on the defendant's promise to negotiate the deal in good faith. Defendant knew of the substantial, material changes in position being taken by plaintiffs on the basis of the defendant's promises to negotiate the sale. Whether or not the plaintiffs were justified in relying on those promises was a question of fact for the jury.

Under Rule 50(b), on the above-noted evidence, a reasonable jury could resolve this question in favor of plaintiffs. The factual findings of the jury as to the reasonableness of the damages will not be disturbed if there is *any* competent evidence upon which the verdict could reasonably be based; therefore, the defendant is not entitled to judgment as a matter of law as to compensatory damages.

As to remittitur, the jury was provided uncontroverted evidence as to the actual out-of-

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 10

pocket damages sustained by the defendant in reliance on the letter of intent and upon promises that were made by the defendant (testified to by the plaintiffs). At trial the defendant did not cross-examine the reasonableness of each expense line-item, nor the time period in which each occurred. The defendant cannot now interject factual matters into the discussion. The Court will not engage in fact-finding as to each line-item expense.

The legal standard to be applied as to remittitur is undisputed.[FN29] This Court may order remittitur or set aside a jury verdict only if it "is so grossly out of proportion as to shock the Court's conscience." [FN30] The award here is not "manifestly and palpably against the weight of the evidence." [FN31] Nor would justice miscarry if this verdict were allowed to stand.[FN32] The jury had before it uncontroverted evidence that would enable it to conclude that plaintiff incurred these expenses in reliance on the defendant's promises to sell the station and negotiate in good faith. Thus, after reviewing the evidence in the light most favorable to the plaintiff (looking at each uncontroverted reliance damage line-item) the expenses do not appear unreasonable. Nor do they shock the Court's conscience. For the above-noted reasons, the award of compensatory damages will be upheld. I will not remit the award, nor grant a new trial on compensatory damages.

> FN29. *See e.g. Broderick v. Wal-Mart Stores, Inc.,* 2002 WL 388117 (Del.Super.Ct.).

> FN30. *Kiana v. K-Mart Corp.,* 1997 WL 537174 at *1 (Del.) (citing *Mills v. Telenczak,* 345 A.2d, 424, 426 (Del.1975)).

> FN31. *McCloskey v. McKelvey,* 174 A.2d 691, 693 (Del.Super.Ct.1961).

> FN32. *Id.*

### Punitive Damages

*11 Lastly, the defendant argues that plaintiffs are not entitled to punitive damages because the jury utilized the wrong legal standard in making its award. Moreover, the punitive damages award is patently unjust because there was no outrageous conduct by the defendant. The jury instructions were legally deficient because they allowed the jury in this case to award punitive damages for intentional behavior. The jury should have been required to find outrageous

conduct, evil motives or reckless indifference. Finally, even if punitive damages were deemed proper, the defendant seeks remittitur on the basis that they are excessive. The defendant argues that if the punitive damages award is compared with only the "reasonable" reliance damages occurring during the time period of January 30-February 6, 1998, then it becomes shockingly excessive.

Upon reviewing the jury instructions, this Court has determined that there may be an issue regarding the proper legal standard for an award of punitive damages in this contract case. "In actions arising *ex contractu,* punitive damages may be assessed if the breach of contract is characterized by willfulness or malice." [FN33] "[W]here the defendant's actions are similar in nature to that of a tort," [FN34] or it appears that the defendant has committed a "willful wrong, in the nature of deceit," the Court will award punitive damages under a contract.[FN35]

> FN33. *Littleton v. Young,* 1992 WL 21125 at *2 (Del.) (citing *Casson v. Nationwide Ins. Co.,* 455 A.2d 361 (Del.Super.Ct.1982)).

> FN34. *Smith v. New Castle Co. VoTech School Dist.,* 574 F.Supp. 813, 826 (D.Del.1983).

> FN35. *Standard Distrib. Co. v. NKS Distrib., Inc.,* 1996 WL 944898 at *6 (Del.Super.Ct) (concluding that defendant's conduct in bargaining in secret with another party constituted a breach of the express contract terms as well as the implied covenant of good faith, "and that the breach was aggravated by a clear factor of deceit, a false representation with scienter intended to produce reliance and in fact producing reliance to plaintiff's damage").

With the correct legal standard being enunciated, however, the Court is satisfied that the error was harmless because there is a preponderance of evidence by which "a reasonable juror could conclude that [the defendant] acted with the requisite state of mind in breaching the contract so as to support the award of punitive damages." [FN36]

> FN36. *Ripsom,* 1988 WL 32071 at *18 (finding requisite ill will when prime contractor refused to inform sub contractor of its decision not to use it while the sub

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 11

stood by ready to perform).

As plaintiffs make clear, the "evil-motive" standard is supported in this case by trial evidence. Parker Connor knew that Plaintiffs had contracted to buy an otherwise unviable station, in reliance on its promises, and continued to objectively indicate that he intended to contract with plaintiffs. Parker Conner also knew that Crystal Layton had left her job in reliance on his promises, but at the end felt he treated her as she deserved. For these reasons the Court does not believe that the defendant is entitled to judgment as a matter of law on the issue of punitive damages under Rule 50(b).

The Court is shocked, however, at the amount of the punitive damages awarded, and believes this may be an indication that in setting the amount of the award, the jury may have considered intentional behavior, rather than the ill will and malice shown at the end of the negotiations. Viewing the facts in the light most favorable to plaintiffs, Parker Connor angrily broke off the negotiations and Kevin Connor cavalierly misled the plaintiffs regarding the breakdown. For this behavior they should face a penalty.[FN37] The Court finds that a remittitur of the punitive damage award to $20,000 is appropriate.

> FN37. See e.g. Standard Distrib. Co., 1996 WL 944898 at *12 (internal citations omitted) (finding punitive damages available, even though "punitive damages are not generally awarded for breach of contract, [when] there is in this case a willful wrong, in the nature of deceit, that calls for an accounting ... [because] a real opportunity [was] intentionally taken away with cruel indifference and real damage was incurred by the plaintiff.)

### Motion for Costs

**\*12** Before the Court is plaintiffs' motion for costs pursuant to Delaware Superior Court Civil Rule 54.[FN38] Rule 54 allows the prevailing party to make an application to the Court within ten days of the entry of a final judgment to assess costs upon the adverse party. Defendants have also sought costs for the claims on which they assert they "prevailed"-i.e. those claims which were successfully defended. The decision of whether to grant costs to the prevailing party is left to the sole discretion of the Court.[FN39]

> FN38. Rule 54(d) Judgment; Costs. Except when express provision therefor is made either in a statute or in these Rules or in the Rules of the Supreme Court, costs shall be allowed as of course to the prevailing party upon application to the Court within ten (10) days of the entry of final judgment unless the Court otherwise directs.

> FN39. Donovan v. Delaware Water & Air Resources Comm'n, 358 A.2d 717 (Del.1976).

Defendants object to the full amount of costs submitted by the plaintiffs since plaintiffs did not prevail on all claims alleged in their complaint; therefore, the defendant believes costs should be pro-rated according to the number of "prevailing" counts. Regardless of whether or not this is a correct legal argument, because the plaintiff would have incurred these same costs if they had only pled the one "prevailing" claim, the Court does not accept the defendant's argument. Plaintiffs' motion for $455.00 in costs is granted. Plaintiffs are entitled, as a matter of right to interest as stated at the legal rate. An award of $40,288.22 in interest is granted.

"The defendants' Motion for Costs, being the motion of the non-prevailing party, as that term is customarily used, is denied." [FN40] It is denied without prejudice, however, since it is a valid motion albeit incorrectly brought before the Court. In essence, the defendant's motion is one for expenses on failure to admit under Super. Ct. Civ. R. 37(c). This motion must be brought separately so that the plaintiffs have an opportunity to respond with Rule 37(c) defenses it may have.

> FN40. Q-Tone Broad. Co. v. Musicradio of Maryland, 1996 WL 494177 at *2-3 (Del.Super.Ct.).

WHEREFORE, Plaintiffs' Motion for Prejudgment Interest and Costs is GRANTED. Defendant's motion for costs is DENIED without prejudice. Defendant's Motion for Judgment as a Matter of Law is DENIED. Defendant's Motion for New Trial or Remittitur is GRANTED as to the punitive damages awarded and DENIED in all other respects. If plaintiffs Ronald J. Gillenardo, Mearl G. Layton, Jr., and Crystal Layton do not accept a reduction of judgment to $179,588.35 inclusive of prejudgment interest and costs ($118,815.13 compensatory damages; $20,000.00 punitive damages; $40,288.22 interest; $455.00

Not Reported in A.2d                                                    Page 12
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

costs) [FN41] within 20 days, a new trial limited to the
issue of punitive damages will be ordered.

> FN41.   The    amounts    awarded    for
> compensatory damages, interest, and costs
> incurred by plaintiff will not be re-litigated.

IT IS SO ORDERED.

Del.Super.,2002.
Gillenardo v. Connor Broadcasting Delaware Co.
Not Reported in A.2d, 2002 WL 991110 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.