# EXHIBIT "E"



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 385545 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Todd HELLER, Plaintiff,
v.
James KIERNAN, Ronnie Moore, Coldwell-Banker Rehoboth Resort Realty, a domestic entity, and Houston Ventures, L.L.C., a Limited Liability Company, Defendants.
No. Civ.A. 1484-K.

Submitted Jan. 29, 2002.
Decided Feb. 27, 2002.

Steven Schwartz, Schwartz & Schwartz, Dover, Delaware, for Plaintiff.
Stephen P. Ellis, Sergovic, Ellis & Shirey, P.A., Georgetown, Delaware, for Defendants.

*MEMORANDUM OPINION*
LAMB, Vice Chancellor.

I.

*1 This post-trial opinion considers the parameters of the relationship that exists, in the absence of any written or express oral contract, between a real estate brokerage company and its principals and employees, on the one hand, and a person who is shopping for real property and uses the services of that company and its employees to identify and inspect candidate properties, on the other.

Plaintiff claims that no person affiliated with the real estate company then assisting him in identifying potential properties had the right to bid on or agree to purchase a property in which plaintiff was expressing some interest but as to which he had not decided to make a bid. As a remedy, he seeks to impose a constructive trust on any profits realized from the subsequent development of such property. The defendants contend that they owed no duty to plaintiff because, they say, no agency relationship had arisen between them and plaintiff when the affiliated person made the offer or when it was accepted by the seller.

The evidence and relevant case law leave little room for doubt that no agency relationship existed between plaintiff and the defendant real estate company at any time. There is also no question, as a matter of fact, that anyone misused or appropriated any information belonging to plaintiff or relating to his possible interest in the property. Thus, there is no basis in law on which either to impose a constructive trust or to award plaintiff any other relief.

II.

Todd Heller, the plaintiff, has considerable experience in buying and selling real estate outside the State of Delaware. But, while he had long held an interest in acquiring real estate in Rehoboth Beach, Delaware, as of the time of the events at issue he had never owned, nor made a bid to purchase, any real estate in that town.

Heller planned a trip to Rehoboth for the weekend of April 7-8, 2001, to look for suitable real estate opportunities. He contacted Harry F. Faust, III, a sales representative for defendant Coldwell-Banker Rehoboth Resorts Realty ("Realty") and asked him to cull through and forward to Heller information about suitable properties listed for sale. Faust complied, sending him a package containing a large number of properties on the market at that time. Heller reviewed this package and told Faust to arrange inspections at several of those properties for Saturday.

On Saturday morning, before he was scheduled to meet with Faust, Heller drove around town making "street inspections" of properties in which he was interested. Among other properties, he looked at 15 Hickman Street, the subject of this litigation. That property consisted of about one-quarter of an acre, on which sat a very large old home used as a rooming house. The lot had a slightly irregular shape, causing Heller to wonder about its potential for subdivision.

Before the time arranged for their meeting, Heller called Faust and asked him about the potential to subdivide 15 Hickman Street. To learn the answer to this question, Faust spoke to defendant James Kiernan in the same office as Faust. Kiernan is a shareholder of Realty and operates as a real estate salesperson. Kiernan told Faust that the land could certainly be subdivided into two lots for single family homes and that it might be possible to erect three

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

townhouses. To get a more definite answer on this point, Kiernan then telephoned the person in charge of the Reboboth Beach zoning department and confirmed that, if one moved quickly, the townhouse development was possible. He also learned that the lot was only a few square feet too small to allow for the development of four townhouses. Kiernan conveyed this information to Faust, who told Heller.

*2 Kiernan is also a partner, together with defendant Ronnie Moore, in defendant Houston Ventures, a developer of real estate in the Rehoboth Beach area. Moore is a builder with considerable experience in construction in Sussex County. Kiernan and Moore were looking for a project for Houston Ventures to work on over the summer. In fact, the two of them met that same morning and discussed the possibility of buying 15 Hickman Street, tearing it down and building two townhouses. It is reasonable to infer that Kiernan's interest in that property was piqued by Faust's call.

To get more information about the property, Kiernan called David Liegey, the listing agent for 15 Hickman Street. Kiernan learned two things: first, that Liegey was expecting an offer that weekend; and second, that the sellers were interested in a September closing. The reasons for the delayed closing related to the use of the house as a rooming house and the existence of early bookings for the summer. Kiernan and Moore were only interested in the property if the sellers would close immediately.

Kiernan spoke to Faust and informed him of all these facts, including the fact that Houston Ventures (i.e. Kiernan and Moore) was considering making an offer. Kiernan asked if Faust was preparing to make an offer. Faust told Kiernan that Heller was looking at a number of properties and that he was not due to inspect 15 Hickman Street until 5:30 p.m. Faust conveyed all of this information to Heller except for the fact that Kiernan was considering making an offer. Kiernan submitted an offer later that afternoon conditioned on immediate settlement but did not tell Faust.

In the early evening, Heller and Faust met with Liegey at the property. At that time, Liegey told them that an offer "within 75% of the asking price" had been received. Liegey also told Faust that the offer looked good to the sellers and that Heller should move quickly. The record is clear that Heller learned about the offer and discussed it with Faust. Heller denies ever hearing Liegey say that he should move quickly or being so advised by Faust. Faust testified credibly that he related this advice to Heller. Given Faust's undoubted interest in seeing Heller make an offer on the property, it is likely that Faust did convey this information.

Liegey did not tell either Heller or Faust that the offer in hand was from Kiernan.

After the inspection, Heller and Faust stood in the parking lot and discussed 15 Hickman Street. There is some evidence that they discussed the possibility of Heller making an offer at $950,000. Although Heller testified at trial that he actually authorized Faust to submit such a bid, Faust strongly denies that this ever happened.

I conclude that Heller's testimony on this point is fabricated. The evidence pointing to this conclusion may be summarized as follows:

1. The complaint filed on June 5, 2001, and verified by Heller, does not allege that Heller ever authorized Faust to make an offer. On the contrary, it alleges that on Sunday, April 8, 2001, Heller met with Faust and "told him that he would make an offer but would think about it until Monday to decide upon the amount of his opening price offer." The Pretrial Stipulation and Order also does not contain any contention that Heller ever authorized Faust to make an offer.

*3 2. Heller and Faust parted company on Saturday evening after the discussion in the parking lot, planning to meet the next day in order to inspect other properties. Faust did not prepare a written contract for Heller's signature, but spent Saturday evening preparing a work-up of the costs and expected profits to be derived from building either 2 houses or 3 townhouses. Faust testified that if Heller had decided to make an offer, he would have taken Heller back to his office immediately to prepare a written contract for immediate submission to Liegey.

3. The two men met on Sunday, but Heller neither looked at the written work-up nor asked Faust about the "offer" he claims to have authorized the night before.

4. Heller left Rehoboth later that day and, on Monday, discussed with his lawyer legal issues bearing on appropriate ownership structure Heller should use in bidding on property in Rehoboth Beach.

On Monday, April 9, 2001, the sellers accepted the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

offer from Houston Ventures for $1.1 million with an immediate settlement.

Heller brought suit on June 8, 2001.

### III.

Plaintiff brings this action to impose a constructive trust on the property at issue. A constructive trust is a remedy that proceeds on the theory that equitable title to property properly lies in the plaintiff and, as a result, the court will deem the defendant to have been simply holding the property as a constructive trustee for the plaintiff.[FN1]

> FN1. *Sannini v. Casscells,* 401 A.2d 927, 931 (Del.1979).

If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it and who is considered in equity as the beneficial owner....[FN2]

> FN2. *Adams v. Jankouskas,* 452 A.2d 148, 152 n. 4 (Del.1982) (quoting 1 Pomeroy's Equity Jurisprudence § 166, at 210-11 (5th ed.1941)).

A constructive trust may be imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him or her to be unjustly enriched at the expense of another.[FN3] Thus, the question is whether Kiernan owed a duty to Heller to refrain from bidding himself on 15 Hickman Street. If so, it is clear from the facts that he knowingly breached his duty and profited thereby.

> FN3. *Bird's Constr. v. Milton Equestrian Ctr.,* 2001 Del. Ch. LEXIS 140 at *10.

### IV.

The elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty.[FN4] On the facts of this case, no fiduciary duty existed between either Faust or Kiernan and Heller. Thus, there is no need to reach the second prong of the analysis.

> FN4. *York Linings v. Roach,* 1999 Del. Ch. LEXIS 160 at *5.

This court has traditionally been hesitant to expand the definition of fiduciary relationship, requiring that a "special trust in another" or a "special duty" exists between parties rising to the level that "[t]he relationship connotes a dependence."[FN5] As this court has noted, "attention must be paid to the word "special" lest the statement be thought to describe too broadly Chancery's concerns with relationships where an element of trust, as commonly understood, is present."[FN6] The relationship between a realtor and customer is not one that ordinarily qualifies as a fiduciary relationship until an agent/principal relationship arises.

> FN5. *Cheese Shop Int'l, Inc. v. Steele,* 303 A.2d 689, 690 (Del. Ch.1973), *rev'd on other grounds,* 311 A.2d 870 (Del.1973).
>
> FN6. *McMahon v. New Castle Associates,* 532 A.2d 601, 604 (Del.1987).

*4 The distinguishing feature of an agent is that he represents his principal contractually.[FN7] An agent normally binds not himself but his principal by the contracts he makes.[FN8] The ability to so bind his principal results from the agent having been authorized, or appearing to an unsuspecting third party to have been authorized, with the power to do so. In this context, "real authority" is:

> FN7. Mechem Outline of the Law of Agency, § 12(A), (4th Ed.1952).
>
> FN8. *Id.* § 19.

[S]imply the fact presupposed in the ordinary concept of agency, namely that a person called a principal has manifested to another person, called an agent, his willingness that the agent act on his behalf in some specified way in some specified transaction.[FN9]

> FN9. *Id.* § 35.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Because Heller never manifested to either Realty or Faust "his willingness that [they] act on his behalf in some specified way in some specified transaction" neither Realty nor Faust were ever vested with the power necessary to make them agents of Heller.

Heller relies on *Sannini v. Casscells* to support the finding of an agency relationship between Heller and Realty. That case did recognize that, where a real estate firm has agreed to act on behalf of a buyer in presenting a contract for purchase and sale of real property, an agency relationship comes into existence. Such a relationship was found to have been breached in *Casscells,* where

[Casscells] was aware that the offer against which she was competing was being made by her employing agent on behalf of an existing principal even if she did not know the identity of the latter. Despite this, she proceeded to obtain for herself ... a property which her employer's principals were still willing to buy, and at a higher price, had they known all the facts.[FN10]

FN10. *Sannini v. Casscells,* 1975 Del. Ch. LEXIS 189 at *15.

Thus, when Casscells learned information about the principal's bid in the course of her employment by the agent, she was not free to use that information or to compete herself against her employer's principal. When she did so, she violated her fiduciary duty, thus justifying the imposition of a constructive trust on the property so acquired for the benefit of her employer's principal. Notably, the rationale of *Casscells* depended on the finding of an agency relationship from which fiduciary duties arose.

*Casscells* reasonably assumed that an agency relationship existed because the real estate company that employed Casscells was acting for Sannini in presenting a bid. However, there is nothing in *Casscells* to support a finding that an agency relationship arose between Heller and Realty based solely on Heller's use of Faust as a source of information. In this case, Heller never told Faust that he wanted to make an offer on 15 Hickman Street and never reached the point of authorizing Realty to act on his behalf in "some specified way in some specified transaction." Because no agency relationship existed between Heller and Realty, Faust owed no fiduciary duty to Heller.

It is useful to look for guidance regarding the threshold for the creation of such a relationship to the rules that govern the realty business.[FN11] These rules confirm that Heller's interest in 15 Hickman Street had not advanced to the point that a fiduciary relationship with Realty (or, through Realty, with Kiernan) had arisen. Under the rules, any realtor "who has any personal interest in a transaction, must disclose his or her status ... to all persons with whom he or she is transacting such business, *prior to the execution of any agreements.*"[FN12] A broker's duty to a buyer includes a written disclosure acknowledging the broker's fiduciary responsibilities to be made in any contract prepared for the purchase of real estate.[FN13] It is uncontested that no agreement was ever drawn up for Heller to bid on 15 Hickman Street. As a result, the relationship between Heller and Realty simply had not progressed to the point that any disclosure was necessary under the applicable rules.

FN11. Delaware Administrative Code, tit. 24, Professional Regulation, 2900 Real Estate Commission, § 10.0 Disclosure (2001), promulgated under the authority of 24 *Del. C.* § 2905.

FN12. *Id.* § 10.1 (emphasis added).

FN13. *Id.* § 10.3.1.2 ("With respect to agent for buyer: 'This broker, and any salesperson working for this broker, is representing the buyer's interests and has fiduciary responsibilities to the buyer, but is obligated to treat all parties with honesty. The broker, and any salesperson working for the broker, without breaching the fiduciary responsibilities to the buyer, may, among other services, provide a seller with information about the transaction. The broker, and any salesperson working for the broker, also has the duty to respond accurately and honestly to a seller's questions and disclose material facts about the transaction, submit promptly all offers to purchase through proper procedures, and serve without unlawful discrimination.' ").

V.

*5 For the foregoing reasons, I find that there is no basis in law on which either to impose a constructive trust or to award plaintiff any other relief. The enclosed Order entering judgment in favor of defendants as to all claims has been entered this day.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Del.Ch.,2002.
Heller v. Kiernan
Not Reported in A.2d, 2002 WL 385545 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.