# EXHIBIT "G"



Not Reported in A.2d
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
MIDDLE STATES DRYWALL, INC.
v.
DMS PROPERTIES-FIRST, INC., et al.
No. CIV. A 95L-01-041 SCD.

Submitted: May 14, 1996.
Decided: May 28, 1996.

Charles M. Oberly, III, Lisa B. Borin, Oberly, Jennings & Drexler, P.A., Wilmington.
Francis J. Trzuskowski, Francis J. Schanne, Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington.
Del PESCO, Judge.

*1 This case was tried non-jury. Plaintiff, Middle States Drywall, Inc. ("Drywall"), a subcontractor, filed an action for a mechanics' lien and breach of contract against defendants DMS Properties-First, Inc. ("DMS-Properties") and DMS Construction Corp. ("DMS"). The following constitutes my findings of fact and conclusions of law as to the claims and counterclaims asserted by the parties.

*A. Background*

DMS-Properties is a real estate development firm, owned by Dennis M. Salter ("Salter"). Salter also owns DMS, a general contracting company. Drywall is a subcontractor specializing in the installation and construction of structural and non-structural steel framing and drywall. Drywall also provides general carpentry services. Coldiron Holdings Corp., a holding company owned by John R. Coldiron ("Coldiron"), and members of Coldiron's family, is Drywall's only shareholder.

This saga began when Mark Fox ("Fox"), a self-described construction manager, came up with the idea of developing an old two-story brick building located on Claymont Street in Wilmington, Delaware. Fox's idea was to demolish and renovate parts of the old building, and to expand it with a new three-story addition. Fox, however, lacked the financial means to develop the project. His search for financial support led him to Salter, who had experience in developing public housing. Salter arranged financing through the Delaware State Housing Authority ("DSHA") pursuant to a program whereby private firms develop public housing projects for the State and for the City of Wilmington. The financing was based upon a set of plans prepared by P.W. Scott & Associates, an architectural firm. DMS-Properties acquired title to the property on April 1, 1994, and remains the record owner to this day. The new building, which has been completed, is now known as the Claymont Street Apartments.

Fox stayed with the project as its construction manager. Fox bore the general responsibility for finding subcontractors and managing the site. Salter, on the other hand, handled the financial end of the business, including making progress and budget reports to DSHA during periodic draw meetings. DSHA lent the funds to DMS-Properties based on a percentage of project completion.

Demolition began in May of 1994. By July of 1994, the project was behind schedule. Salter testified that when part of the original structure was demolished, it became apparent that the original plans were faulty. Specifically, the original plans failed to consider a bearing wall that was present in the old building. Fox began looking for a subcontractor to erect the steel framing for the exterior (structural) and interior (non-structural) aspects of the new addition, and to install drywall. Fox first contacted Leonard Woerner ("Woerner"), project manager for Spacecon, Inc. ("Spacecon") to bid on the work. Fox provided Woerner with the original drawings, the drawings which turned out to be faulty. Woerner consulted with an engineer who provided him with load-bearing requirements for the structural steel frame. Woerner's proposal was priced at $183,500.00 to do the exterior work and $213,126.00 to do the interior work. Fox and Salter considered this proposal too high, and they rejected it.

*2 It was at this point that Fox became interested in Drywall as a prospective subcontractor. Drywall's owner, Coldiron, was well known in the field of steel frame construction as an experienced and competent subcontractor. Salter knew of Coldiron and his company from a different project with which both Salter and Coldiron were involved. Salter told Fox to call Coldiron. On August 1, 1994, Fox contacted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

Coldiron to price the job. Coldiron visited the site, and was given the same faulty drawings that were provided to Woerner. Coldiron began to work on the site before there was any agreement as to price. He sent his son-in-law and job superintendent, Greg Peterson ("Peterson") to manage the work at the site. Peterson was Drywall's primary contact person with DMS. Coldiron, however, retained sole authority to negotiate and enter into contracts on behalf of Drywall.

The testimony of the parties sharply diverges as to what happened after this point. Coldiron testified that in early August, he orally offered to do the work for $135,000.00, an offer that was rejected by Fox as too high. Thereafter, on 8/20/94, he drew up and signed a proposal to do the exterior work for $125,000.00. PX2. He stated that he hand delivered the proposal to Fox, and Fox orally accepted it. It was never signed.

Coldiron further testified that he and Fox then discussed doing the interior work. On September 16, 1994, he drew up a second proposal, PX3, for the interior framing and drywall installation. The amount of that proposal was $224,900.00. That proposal was not signed by Coldiron, due to what he testified was an oversight. He gave the proposal to Peterson for delivery to Fox. Peterson stated that he gave the proposal to Fox, who looked at it in Peterson's presence. Fox did not indicate either acceptance or rejection of that second proposal.

Fox's testimony was entirely different. Fox testified that he was told by Salter that all exterior and interior framing and general carpentry work was budgeted in the amount of $225,000.00. He first discussed the exterior job with Coldiron. Coldiron offered to do the structural framing and install corrugated steel floor decking for the price of $150,000.00. Fox balked at this figure as too high, and stated that he would rather use plywood floor decking, and furthermore, that he would provide his own materials. When the materials were backed out of the proposal, Coldiron's bid became an oral one for $123,000.00 (not $125,000.00), and it specifically *included* the labor for laying the floor decking, labor which was later billed to DMS as an extra. Fox testified that he prepared a standard form AIA [FN1] contract in the amount of $123,000.00, and that Coldiron signed that contract. That contract, however, was not offered into evidence at trial. Fox stated that it had been lost.

> FN1. The American Institute of Architects ("AIA") standard form contract is widely used in the construction industry.

Fox stated that he then discussed with Coldiron that he was left with $102,000.00 to all of the remaining work on the building. This included not only the interior framing and drywall, but also a host of general carpentry tasks which Drywall later billed DMS for as extras. PX4. Fox testified that he told Coldiron that he had only $102,000.00 to pay for the rest of the carpentry work, and that Coldiron responded that he would "figure out how to make it work." Thus, DMS contends that Coldiron agreed to do all of the work on the project for the contract sum of $225,000.00, broken into two separate contracts, an exterior contract of $123,000.00, and an interior and general carpentry contract of $102,000.00. Unlike the exterior contract, however, Fox testified that he never memorialized this agreement in a written contract.

*3 Fox further stated that he was never given Coldiron's first proposal, the one for $125,000.00. He did, however, receive from Peterson the second proposal in early September. Contrary to Peterson's recollection, Fox stated that he rejected the proposal out of hand as being too high. Curiously, Fox did not tell Peterson that he and Coldiron had already agreed to a figure of $102,000.00 to do all of the work contained in the second proposal as well as all of the extra carpentry work.

Salter testified that he spoke with Coldiron one time on the telephone in mid-August 1994. During that conversation, according to Salter, Coldiron agreed to do the work for the specified budget amount of $225,000.00. Salter explained that Coldiron assented to the what both men recognized as a low figure because of three concessions made by DMS: 1) DMS would pay Drywall's invoices within two weeks; 2) DMS would not retain ten percent of the contract price until completion; and 3) DMS would use Drywall on other projects. He stated that Coldiron said he was absolutely sure he could come within the forecasted budget. Unlike Fox, however, Salter testified that he did not discuss specifics with Coldiron in terms of what jobs would be expected of Drywall. Coldiron told him that he had worked out the scope of the work with Fox.

As the work progressed on the project, Drywall invoiced DMS on an estimated completion basis. Peterson hand delivered the invoices to Fox, who brought them to Salter. Salter made out the checks,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Page 3
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

and gave them to Fox for delivery back to Peterson. Initially, DMS paid the invoices within two weeks, a very quick turn-around for the construction industry. When Fox gave the check to Peterson, he also had Peterson execute a partial release of mechanics' lien in the amount of the check. The following chart tracks the billings and payments of the parties:

| Invoice Date | Amount | Check Date | Amount |
|---|---|---|---|
| 8/25/94 | $31,090.00 | 9/16/94 | $31,090.00 |
| 9/9/94 | $15,000.00 | 9/19/94 | $15,000.00 |
| 9/25/94 | $140,050.00 | 10/5/94 | $140,050.00 |
| 10/10/94 | $169,200.00 | 10/24/94 | $169,200.00 |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                        Page 4
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

| Invoice Date | Invoice Amount | Payment Date | Payment Amount |
|---|---|---|---|
| 4.00 10/25/94 | $35,000.00 | 4.00 11/18/94 | $35,000.00 |
| 4.00 11/14/94 | $145,900.00 | 4.00 12/29/94 | $10,000.00 |
| 4.00 11/25/94 | $140,900.00 | NOT PAID | |
| 4.00 12/10/94 | $134,000.00 | NOT PAID | |
| 4.00 12/27/94 | $127,148.00 | NOT PAID | |

The total amount invoiced by Drywall but not paid by DMS is $179,148.00. The total amount paid by DMS to Drywall is $200,000.00. DMS received mechanics' lien

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 5
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

releases totaling $200,000.00 that were signed by Peterson.

One of the discrepancies between the releases and the invoices however, is in the dating of each. Although the invoices contained no notation to this effect, it was testified by Peterson and Drywall's accounts clerk, (Peterson's wife and Coldiron's daughter), Brenda Peterson ("Ms. Peterson"), that the invoices represented an estimate of labor and materials provided as of the date of the invoice. However, the releases were dated as of the date of the check. For example, Peterson signed a partial release of mechanics' lien on 9/6/94 in the amount of $31,000.00 which purported to represent payment for all labor and materials provided as of 9/6/94, rather than the invoice date of 8/25/94.

*4 Drywall's argument in this regard, however, was contradicted by the testimony of its own witness, Coldiron. During Drywall's rebuttal case, Coldiron testified that his company typically bills in advance of the invoice, based on when his company expects to get paid. If the Court accepts this testimony, the lien releases would be accurate, because there would be no discrepancy between the date of the invoice and the date of the check.

The releases read, in pertinent part,

PARTIAL RELEASE OF MECHANICS LIEN

WHEREAS the undersigned has performed labor and/or furnished materials to property ... known as *Claymont Street Apartments* hereinafter called the "Property" ...
WHEREAS the undersigned has, on this day received a check in the amount of $[*amount of check*] representing payment for labor performed and materials furnished to the property through [*date of check*].
NOW THESE PRESENTS WITNESS that the undersigned, for and in consideration of payment for said labor and/or materials and other goods (sic) and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby waives and releases and any all claim, right or entitlement it may have for a mechanic's lien on the Property with respect to labor performed and/or materials furnished at or to the Property for which said payment is made.
IN WITNESS THEREOF, and intending to be legally bound hereby, the undersigned has hereto set its hand this ____ day of _____, 1994.
CONTRACTOR: *Middle States Drywall, Inc.* BY: [*Signature of Gregory Peterson*] (SEAL) DATE: [*Date*]

The parties encountered no problems in their business relationship for the first couple of months. The work performed was satisfactory, indeed, to this day, defendants have offered no complaint as to the quality of work performed by Drywall. Furthermore, DMS paid the invoices as they were billed, and paid them relatively quickly. The first sign of trouble came when Drywall delivered the 10/25/94 invoice in the amount of $35,000.00. Salter explained that he felt this invoice placed Drywall's billings far ahead of its progress. He testified that he told Peterson that he would hold on to the check to allow Drywall's work to catch up to its billing. Peterson denies having this conversation. It is clear, however, that DMS tendered the $35,000.00 check on 11/18/94, approximately ten days later than previous checks had been paid.

On 11/14/94, Peterson delivered another invoice in the amount of $45,000.00. Fox testified that when he received it, he immediately told Peterson that it was too much because it exceeded what Fox thought to have been the percentage of work completed by Drywall. Peterson denied this, and stated that Fox accepted the invoice without comment, and he expected full payment on the invoice. Peterson, therefore, was surprised when DMS paid only $10,000.00 on that invoice, but he accepted it anyway, and signed a partial mechanics' lien release in the amount of $10,000.00 on 12/9/94.

*5 At that point, the parties knew they were in disagreement. Peterson stated that he "accidentally" glanced at the project's budget numbers that were laid out in Fox's office. He then learned for the first time that Drywall was expected to complete all of the work, including the carpentry work, within the allotted amount of $225,000.00, a figure that Drywall had long since surpassed. Fox contended, however, that both Peterson and Coldiron had been told by him that $225,000.00 was the budgeted amount for their work.

For their part, Fox and Salter also came to realize that Drywall did not believe that it was bound by the figure of $225,000.00, because it had submitted invoices in excess of that amount. Fox called Peterson and arranged to meet with him to discuss a resolution of their difficulties. At some point, Fox and Peterson sat down to negotiate the remainder of their contractual arrangement. Fox stated that he believed this discussion occurred in late November of 1994. This must be wrong, however, because the document generated at their meeting, PX17, contains reference to the check disbursed on 12/9/94. This meeting must have occurred after 12/9/94.

At the meeting, Fox disclosed his budgetary constraints to Peterson. They attempted to reach agreement as to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amount of money that Drywall had in the job at that point. Fox estimated that Drywall had approximately $256,623.00 invested in materials and labor. Peterson stated that Fox's estimate of labor costs was low by approximately $40,000.00, because Fox used only the gross payroll figures, without taking into consideration labor overhead. They then tried to estimate the amount necessary to complete the job, most of which consisted of time to hang drywall. They estimated approximately $43,000.00 would be necessary to finish the work.

The two men came to an agreement in principle that DMS would pay an additional $55,000.00 to Drywall in exchange for a completion of the work. However, the two did not agree on what that $55,000.00 represented. Fox contended that the agreement was $55,000.00 above what had already been paid to Drywall, for a total contract price of $255,000.00. Peterson, on the other hand, testified that his understanding was that the $55,000.00 represented payment above and beyond what had already been *invoiced*. As of the time of the meeting, there was $109,000.00 in outstanding invoices (including $35,000.00 from the partially paid invoice of 11/14/94). Thus, Drywall expected to receive $164,000.00 more from DMS, for a total contract price of $364,000.00.

Another problem arose in that DMS was out of money. Fox told Peterson that any more payments would have wait until March of 1995, at which time he expected to receive some grant money. Fox did offer to arrange to "factor" the $55,000.00 payment because he was aware that Peterson needed funds to make his payroll. I understand "factoring" to be essentially the sale of a receivable to an outside agency. Drywall would sell $55,000.00 of the DMS account to the factoring agency, which in turn would collect the money from DMS at later date and at a marked-up price. On 12/21/94, Ms. Peterson received a factoring form from Fox. She filled out the form, and listed a total of $55,000.00 as the amount she wanted to factor from the DMS account. She also typed a total of $109,000.00 in receivables outstanding from DMS, representing the amount of the unpaid invoices. The factoring worksheet was signed by Peterson, but was never returned to Fox.

*6 On 12/22/94, Fox faxed a standard form AIA contract to Peterson. The contract was back-dated to 12/9/94, and was in the principal amount of $55,000.00. When Peterson received this contract, he recognized that he and Fox had different views about what agreement had been reached. Ms. Peterson testified that she also became very concerned about the status of Drywall's receivables. Peterson decided not to sign the contract. By letter written on 12/23/94, Fox told Peterson to discontinue work at the project. Then, on 12/29/94, Fox advised Peterson that Drywall and its employees would be considered trespassers on the job site. On that same date, Drywall sent an invoice to DMS in the amount of $70,148.00 representing charges for "extras," that is, labor performed by Drywall on jobs that were not within the scope of what Drywall understood to be the two agreed-upon contracts. Peterson tallied the hours spent on the extras, broke the hours down by job and memorialized the hours in a memorandum dated 12/30/94. PX4.

Fox sought out other contractors to complete the work. At first he contacted Woerner. Woerner testified that he was not interested in working for DMS because "rumors on the street" suggested that DMS was not paying its subcontractors. Nonetheless, Woerner did give Fox the name and phone numbers of other companies that might do the work. Fox contacted P & B Partitions, Inc. ("P & B"), a drywall subcontractor. P & B's project manager, Edward Wandling ("Wandling") visited the site and determined what work had to be done in order for the project to be complete. Wandling used updated plans [FN2] and prepared an estimate of $110,300.00 to complete the job. DMS and P & B entered into a contract in that amount on 2/13/95. This time, DMS had the subcontractor execute a standard form AIA contract.

> FN2. The initial architectural drawings were inaccurate and had to be scrapped. Thereafter, the project was designed as it was being built. DSHA's project engineer, Emily Genoese ("Genoese") stated that the building was being designed only one-day ahead of its construction.

*B. The Parties' Contentions*

Drywall's complaint asserts three counts: a mechanics' lien, breach of contract, and *quantum meruit.* It contends that it is entitled to a mechanics' lien on the Claymont Street Apartments by virtue of the fact that it provided materials and labor to the structure for which it has not been paid. Drywall further argues that two contracts existed for the erection of the exterior and interior frames of the building, and that the interior contract ($249,900.00) was breached by DMS. On the interior contract, Drywall claims that it is entitled to the value of its unpaid invoices, $109,000.00, plus lost profit of $6,135.00. Drywall also claims the reasonable value of the labor performed on what it considers extras, $61,517.03.

Defendants claim that there was one contract for $225,000.00 to do all of the work on the project, a contract that was breached by Drywall. DMS paid

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 7

Drywall $200,000.00, but also had to pay P & B $97,500.00 by virtue of Drywall's alleged breach. Thus, by way of counterclaim, defendants assert that they are entitled to breach damages in the amount of $74,000.00.[FN3] Defendants also deny that Drywall is entitled to payment for its alleged extras, and deny that Drywall is entitled to a mechanics' lien on the property.

> FN3. Defendants claim to have paid out a total of $297,500.00 to complete a job that it allegedly contracted with Drywall for $225,000.00. Mysteriously, defendants also seek to hold Drywall liable for engineered shop drawings worth $1,500.00. Def. Post-Trial Memo. ¶ 76. $297,500.00 less $225,000.00 plus $1,500.00 equals $74,000.00.

### C. Discussion

1. There was no contract for the exterior framing.

*7 The Court finds that the parties failed to come to an agreement concerning the exterior framing. There is no writing evidencing a contract either in the amount of $125,000.00 or $123,000.00. Only extrinsic evidence is available to determine whether a contract existed between the parties.

Although Coldiron drew up and delivered a proposal of $125,000.00 to Fox, there is no evidence that the proposal was ever accepted by DMS. Certainly the work that was contained in the proposal was satisfactorily completed. But I do not find that DMS ever agreed to accept performance in exchange for $125,000.00.

On the other hand, Salter testified that Coldiron agreed to one contract for $225,000.00, which Coldiron wanted to break into two parts, one for $123,000.00 and one for $102,000.00. But Salter's testimony is contradicted by that of Fox. Fox stated that he and Coldiron first agreed to an exterior contract in the amount of $123,00.00, and it was only after that agreement that Coldiron assented to do all of the rest of the work for $102,000.00.

Salter's testimony is further contradicted by defendants' insistence that a written agreement was drawn up in a form contract in the amount of $123,000.00, which was signed by Drywall. This written contract, which has never been found, begs the question: if DMS had an agreement from Coldiron to do the entire project for $225,000.00, why would it draw up an agreement to do just the exterior for $123,000.00?[FN4] That question has not answered to my satisfaction by either Salter or Fox.

> FN4. In saying this, I do not mean to imply that I believe that this written contract was ever drawn up or executed by the parties. In fact, I find the whole story quite dubious. DMS executed other form contracts for other subcontractors. Why was it unable to produce the Drywall contract? Salter suggested that Drywall purposely misplaced its copy of the contract. But there was only a $2,000.00 discrepancy between what each party believed to be the contract price. Given the large sums at issue here, I decline to draw the inferences suggested by Salter. Instead, I accept the testimony of both Coldiron and Peterson that no such contract was ever presented to Drywall.

Even though their individual subjective beliefs as to the price were quite similar, I find that Drywall and DMS never agreed upon a definite price term. Furthermore, there was marked disagreement as to the scope of the work that was subsumed within the exterior bid.

Defendants argue that the exterior bid included labor charges for floor decking and exterior sheathing. The proposal which Coldiron gave to Fox contained no reference to those items. Although there was some discussion of floor decking, Coldiron testified that no agreement was reached on that item because DMS had yet to decide what type of flooring it was going to install. Defendants concede that a contract price of $125,000.00 to do load-bearing framing is on the low end. Spacecon's exterior bid was $183,500 and did not include time for floor decking or exterior sheathing. I consider this bid the most relevant in determining the reasonableness of Coldiron's proposals because it was closest in time and market conditions to Coldiron's bid, and Spacecon worked off of the same drawings as Drywall. I do note that the other witnesses who were asked by counsel to draw up proposals after-the-fact also did not include these items in their exterior bids, and, with one exception, still bid the exterior job higher than Drywall.

Thus, the evidence indicates that the parties failed to reach agreement as to both the price and the scope of the work within the context of the exterior framing. It is a fundamental precept of contract law that the terms of a contract must be reasonably certain in order to be enforceable. *See In re Radiology Assoc., Inc.,* Del.Ch., C.A. No. 9001, Chandler, V.C. (May 16, 1990) 1990 WL 67389 at *7. The Restatement of Contracts provides the following framework:
*8 § 33. Certainty
(1) Even though a manifestation of intention is intended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-8   Filed 08/08/2006   Page 9 of 15

Not Reported in A.2d                                                                                      Page 8
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement (Second) of Contracts, § 33 (1981). In this case it cannot be said that the terms of the exterior framing contract were reasonably certain because there was no agreement as to either the price or the scope of the work to be performed thereunder.

The dispute over the scope of the project is the main problem. The price discrepancy is relatively small, and price disputes generally can be resolved by fact-finding. See AROK Const. Co. v. Indian Const. Serv., Ariz.App., 848 P.2d 870, 877 (1993). But the scope of the work provides the basis whereby the Court can determine the existence of a breach, and therefore, it is a term that must be reasonably certain. Here, the parties have gone to great lengths to prove that the floor decking and exterior sheathing either were or were not included in the exterior framing agreement. Between these two jobs, Drywall seeks over 720 hours worth of labor as extras. "It is less likely that a reasonably certain term will be supplied by construction as to a matter which has been the subject of controversy between the parties than as to one which is raised only as an afterthought." Restatement, supra, § 33, cmt. b. The only way to harmonize the evidence presented at trial is to conclude that the minds of the parties never met as to whether the floor decking and exterior sheathing were part of the exterior framing job. Their failure to agree on this essential term is fatal to an enforcement of the contract.

2. There was no contract for the interior framing and drywall.

Both defendants and Drywall contend that there was an agreement concerning the interior framing and drywall. Defendants argue that the agreement was to do the interior work, as well as all other general carpentry items for $102,000.00. Defendants offer two competing theories of how this came about. First, as previously stated, Salter claims that Coldiron agreed to do everything for $225,000.00 to be broken up as Coldiron saw fit. Second, Fox stated that after he and Coldiron reached agreement on the exterior job, Coldiron thereafter agreed to do everything else, including the general carpentry items, for $102,000.00, an absurdly low figure.[FN5] The contradictions inherent in defendants' theory of its case are strong evidence that there was actually little communication occurring between Salter and Fox. Drywall, on the other hand, argues that Peterson gave a proposal in the amount of $224,900.00 to Fox, just for the interior framing and drywall, and that Fox accepted it through his silence.

> FN5. Even Wandling, defendants' expert witness, testified on cross-examination that $102,000.00 could not possibly be adequate consideration for all of the work Fox believed it encompassed.

*9 As a factual finding, the Court rejects the testimony of both Fox and Salter on this issue as unreliable. Fox admitted that he received the $224,900.00 proposal from Peterson, but he stated that he rejected it when Peterson gave it to him. The proposal is dated 9/16/94. Both Fox and Salter, however, also testified that in August they had received an agreement by Coldiron to do *everything*, including the interior and exterior work, for $225,000.00. The receipt of this second proposal should have come as a shock to Fox and Salter, but the evidence shows that they did absolutely nothing about it.[FN6] It strains reason to believe that Fox and Salter, when faced with this obvious discrepancy between what they believed to be the contractual arrangement, and what Drywall obviously believed it to be, did not, at the very least, write Coldiron demanding an explanation or some other assurance.

> FN6. Fox testified that he gave the proposal back to Peterson, telling him it was "overbudget." But the fact that Drywall was making any proposal at all at that time should have rung some bells in Fox's head, particularly if, as he testified at trial, he already had an agreement with Coldiron by that time.

It is far more reasonable to conclude that Fox and Salter did nothing because there was no express agreement at that time. The Court accepts that Peterson handed the second proposal to Fox. But the testimony is not clear that Fox accepted that proposal. Peterson testified that Fox merely looked at it in silence. Under certain circumstances silence may be construed as acceptance. See, e.g., Pleines v. Franklin Const. Co., Inc, Conn.App., 621 A.2d 759, 762 (1993). However, in this case, the offer that was manifested in the second proposal invited acceptance through the offeree's signature at the bottom of the proposal. PX3. It is unreasonable to expect that silence could qualify as acceptance of the terms of the offer where this obvious signature line remained blank.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-8   Filed 08/08/2006   Page 10 of 15

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 9

Restatement, *supra* § 50(1).

As events turned out, it is clear that neither Fox nor Salter accepted the second proposal. They were dismayed when the 11/14/94 invoice was given to them because it exceeded what they believed to be the $225,000.00 contract price. There is no evidence that they ever believed that they were bound by the second proposal.

Furthermore, the second proposal fails to constitute an agreement for the same reasons that the first fails. It is apparent that the parties had vastly different ideas about both the price and the scope of the work contained in the interior framing job. There was no meeting of the minds of the parties over several essential terms, therefore, there can be no enforceable contract.

I draw the following general inference from the evidence presented at trial: In nearly all respects, this was a sloppy bit of contracting by both parties. Drywall was happy to get the work, and happy to be getting paid in a timely fashion. Defendants were happy to have progress being made on the project in a quality manner. So long as the bills were being paid, and the project was progressing, neither party wanted to do anything to rock the boat including, unfortunately, coming to an express understanding about what work would be performed and for what price. These companies were both experienced and sophisticated in the construction business. They knew how to enter into written contracts. I find it instructive that, beginning in November of 1994, DMS began to make its other subcontractors sign written agreements. I do not believe that it is entirely coincidental that this is about the same time that defendants began having problems with Drywall.

*10 The Court concludes that there was no express contractual undertaking between the parties that was definite and certain enough to be legally enforceable. Accordingly, the breach of contract claim asserted by Drywall, and the breach of contract counterclaim asserted by defendants are both dismissed. Yet, the fact remains that Drywall provided valuable materials and services to the Claymont Street Apartments, and DMS has paid Drywall $200,000.00. Although neither Drywall nor defendants may seek contractual relief, the Court must consider Drywall's claim under the principle of *quantum meruit*.

3. Drywall is entitled to relief under the restitutionary principle of quantum meruit.

*Quantum meruit* literally means, "as much as he deserves." *Marta v. Nepa*, Del.Supr., 385 A.2d 727, 730 (1978). It is a quasi-contractual remedy by which a plaintiff, in the absence of an express agreement, can recover the reasonable value of the materials or services it rendered to the defendant. *Id.* at 729. If there is an enforceable contract between the parties, *quantum meruit* recovery is inapplicable. *Stoltz Realty Co. v. Paul*, Del.Super., C.A. No. 94C-02-208, Del Pesco, J. (Sep. 20, 1995) Mem.Op. at 20.

In construction litigation, *quantum meruit* is a well-known, and even preferred, remedy. Stein, Construction Law ¶ 11.03[2][e] (1993). Recovery in *quantum meruit* is measured by the reasonable value of the subcontractor's performance. *United States v. Western States Mech. Contr., Inc.*, 10th Cir., 834 F.2d 1533, 1539 (1987). The standard for measuring the value of the performance is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered. *Id.* The subcontractor may recover the value of the services and materials it provided irrespective of whether the subcontractor would have lost money on the contract. *Id.*

In this case, defendants do not dispute that Drywall provided the materials and services that it claims to have provided. Defendants do have an argument concerning the reasonableness of some of Drywall's labor charges.

As a starting point, I note that the scope of the work performed by Drywall is contained in its exterior and interior frame proposals, PX2, 3, and its itemized list of extras. PX4. Defendants concede that the work shown on the exterior frame proposal was completed satisfactorily by Drywall. They contend that only about 35% of the work on the interior frame proposal was completed. Defendants take issue with the reasonableness of the hours spent on some of the items shown on the list of extras, but they do not deny that the jobs shown on the list were performed satisfactorily.

Drywall claims that it expended a total of 5,414.5 hours on the Claymont Street Apartments project, at a total gross labor cost of $99,093.76. PX6. Drywall's accountant, John Graham ("Graham") testified that Drywall's statutory overhead in 1994 was 23.4% of gross wages. Statutory overhead is the employers cost of compliance with federal and state laws such as social security and unemployment taxes. Graham also testified that Drywall's general overhead was 28% of gross wages, and that Drywall generally worked a 15% profit margin into its bids. When these items are added into the gross wage figure, the total value of labor provided by Drywall to the project was $179,998.64, a cost of $33.24 per labor hour.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*11 Drywall further claims that it provided $132,600.13 worth of materials to the project. PX8. This figure represents Drywall's cost, after a 12% mark-up by the supplier.[FN7] Graham testified that Drywall receives a 25% mark-up for materials delivered to the job site. The total after this mark-up comes to $165,750.13. Between labor and materials, Drywall claims to have put $345,748.77 worth of value into the project.

> FN7. In this case, the supplier was a supply company also owned by Coldiron. According to Graham, the supply company does not turn a profit. Its 12% mark-up is used to cover its overhead.

Defendants, on the other hand, claim to have received only a $183,109.00 value from Drywall. They compute this figure in the following manner: 1) they assume the fair value for exterior framing (plus floor decking and exterior sheathing) was $123,000.00; 2) they extrapolate a fair value of interior framing and drywall was $171,740.00 using the same overhead and profit ratio contained in the $123,000.00 figure; 3) they contend that Drywall completed only 35% of the interior work, which, when multiplied by $171,740.00 comes out to $60,109.00; 4) they add $123,000.00 to $60,109.00 for a total of $183,109.00; 5) they apparently ignore many of the extras performed by Drywall.

I give very little weight to defendants' computation. For one thing, it has at its first presumption that Coldiron agreed to do the exterior framing plus the floor decking and exterior sheathing for $123,000.00. As stated above, I do not find that to be the case. Furthermore, I reject the equation used by defendants to come up with the $171,740.00 figure in favor of the actual time and materials that were expended on the job. I also am persuaded that Drywall completed more than 35% of the interior framing and drywall work, and that Drywall completed the extras for which it claims a right to compensation.

Moreover, defendants base their figure on the assumption that there was a general agreement between the parties. *Quantum meruit* case law is clear, however, that the reasonable value of services rendered is to be calculated independent any alleged agreement. _Western States_, 834 F.2d at 1539. Even if Coldiron agreed to do the exterior work plus decking and sheathing for $123,000.00 (I find he did not), that figure is irrelevant for the purposes of determining fair value. *Quantum meruit* is a retrospective remedy which looks at what was *actually* received by the defendant, rather than a prospective remedy which looks at what the defendant *expected* to receive.

The question, therefore, is what did defendants receive from Drywall? Excluding the general carpentry tasks, Drywall completed all of the exterior framing, and a portion of the interior framing and drywall. The value of these services, assuming 100% completion, was the subject of several witness' testimony. Woerner's company, Spacecon, priced this work at $403,008.00. Drywall claims to have bid $349,900.00. Plaintiff's expert Robert Williams ("Williams") testified that $381,755.00 was a reasonable price for the work. Plaintiff's other expert, Robert Coupe ("Coupe"), came up with a figure of $357,561.00. Defendants' expert, Wandling, used a figure of $338,343.00 which contemplated 25% profit and overhead.[FN8]

> FN8. I reject Wandling's price which assumed a 0% profit and overhead as patently unreasonable.

*12 Although Woerner's bid is the best indicator of what a reasonable proposal may have been in August, 1994, the fact is that the plans he bid on were changed as the project was being built. Woerner's bid, therefore, must be discounted as it is not an accurate measurement of the value of the work that was put into the project. Both Williams' and Coupe's estimates can likewise be discounted for the same reason. Only Wandling's estimate purports to take into consideration the actual work that was done on the building because Wandling used the updated plans. I find, therefore, that the reasonable value of the services to complete both the exterior and interior framing and drywall was $338,343.00, based on a 25% combined overhead and profit ratio.

From this figure, I will subtract the value of the work that was not completed by Drywall. P & B was hired by DMS to complete the work that Drywall started. DMS' contract with P & B was for $110,000.00. Of that price, DMS paid $97,500.00. According to Salter, this $12,500.00 discrepancy was a result of "back charges" which DMS took to compensate for substandard work. There is no evidence that the $110,000.00 subcontract with P & B was unreasonable, or that P & B performed any duplicative work.[FN9] I am persuaded that the entire $110,000.00 must be backed out of the $338,343.00 price to do the framing and drywall work, leaving a subtotal of $228,343.00.

> FN9. In fact, Drywall asserts that P & B's estimate was reasonable, albeit for a different reason. *See, e.g.,* Pl. Post-Trial Memo. ¶ 17

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-8   Filed 08/08/2006   Page 12 of 15

Not Reported in A.2d                                                                                           Page 11
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

("there was no evidence that P & B charged a premium to finish the work").

None of the bids provided by the various experts and witnesses included the work charged by Drywall as "extras." Even Wandling's estimates did not include any of the work which were listed by Drywall on PX4, the list of extras. There is no dispute that the extras were completed satisfactorily by Drywall, the only question is whether the hours charged were reasonable.

Defendants presented the testimony of Glenn M. Carey ("Carey") in an attempt to show that some of the work charged as extras by Drywall was unreasonable. Carey examined eight specific tasks found on the list of extras, and estimated labor hours for those tasks using estimating books entitled, *The National Construction Estimator and Means Repair & Remodeling Cost Data*. Carey estimated that the total number of labor hours to complete the extras should have been 990.5 hours rather than the 1,851 hours shown on Drywall's list of extras. PX4.

I reject Carey's testimony for several reasons. First, Carey's estimates were based on estimating books rather than real-world experience. Although such books may be helpful in establishing an estimate before-the-fact, they fail to consider many of the obstacles that Drywall encountered on this job-site, given the fact that the project was being designed as it was being built. The project underwent changes on an almost daily basis, and resulted in cost overruns of approximately $600,000.00. Estimating books fail to account for such chaos. Second, much of Carey's information was based on what Fox told him, rather than his own personal observation. For example, Carey estimated the time to set the windows based on an assumption that Drywall set only 70% of the windows. However, James Floyd, the subcontractor brought in to finish the windows, testified that he installed only ten to fifteen windows. There were 148 windows in the project, so Drywall actually installed approximately 90% of the windows. Lastly, Carey's books were in some cases incompatible with the actual work that was done. The plywood deck, for example, had to be screwed into metal floor joists. But the *Means* book which Carey used estimated the installation into wooden floor joists, which would entail nailing rather than screwing.

*13 Plaintiff's expert, Coupe, also provided an estimate on some of the extras that were performed by Drywall. For the most part, his estimates were slightly higher in terms of labor hours than the work actually done by Drywall.

The most compelling evidence going to the reasonableness of Drywall's work at the site, however, is that DMS never complained about its quality. At no time did either Fox or Salter tell Peterson that his employees were wasting time or otherwise making unsatisfactory progress. To the contrary, the evidence suggests that both Fox and Salter were pleased with Drywall's work. It is true that defendants apparently believed that there was a fixed contract, and therefore may have had less reason to monitor Drywall's labor costs. However, it is equally true that defendants were behind on the project, and were up against a time squeeze. One would surmise that DMS would have made sure that its subcontractors were not wasting time on the job, and that the project was being efficiently run.

The evidence preponderates in favor of a finding that the hours spent by Drywall on the extras were reasonable given the complexities with which it was faced. However, the evidence indicates that two Drywall employees, R. Leid and G. Coldiron, performed a combined total of thirteen hours of labor on Tuesday, 12/27/94, working on extras. PX5. This work was done after DMS told Drywall to cease work on the site on December 23. PX21. Drywall has failed to present evidence that it reasonably expected to be paid for services it rendered after it was told to stop working, therefore, these thirteen hours must be subtracted from the claimed amount. I find, therefore, that Drywall is entitled to compensation for 1,838 labor hours it claims as extras.

The next is issue is the rate that was charged. The original invoice for extras provided on the job site was for $70,148.00. Drywall seeks compensation for 1,851 hours. This comes to $37.90 per hour. However, Drywall has changed its position, and now seeks to be compensated for extras at the rate of $33.24 per hour, the figure that applies to all of the work it completed at the project. Pl. Post-Trial Memo. ¶ 21. Peterson testified that Drywall typically charges anywhere between $36.00 and $42.00 per hour when it bills for extras on a time and materials basis. Thus, the $33.24 rate would seem to be a significant discount. One of plaintiff's experts, Coupe, used a cost per man hour of $27.90 in calculating his estimate for general carpentry tasks. PX28. This figure presumably does not include profit, which, at 15%, would increase the labor rate to $32.09 per hour.

Defendants presented very little evidence concerning the reasonableness of the labor rate. Fox testified that he believed the statutory overhead should only be 15% as opposed to the 23.4% claimed by Drywall. Using that figure, instead of Drywall's, the labor rate would equal $30.98 per hour. I consider the testimony of Graham, Drywall's accountant, more persuasive on this issue than Fox's testimony, therefore, I reject Fox's estimate of the statutory overhead. Based upon the evidence, I conclude

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 12

that $33.24 per hour is a reasonable labor rate for general carpentry work of the sort performed by Drywall at the Claymont Street Apartments. In performing the extras, Drywall provided $61,095.12 worth of services to DMS.

*14 In all, the work performed by Drywall for the exterior and interior framing and drywall installation had a reasonable value of $228,343.00, and the work performed on the extras had a reasonable value of $61,095.12. The total of these two numbers is $289,438.12. DMS has already paid Drywall the sum of $200,000.00. Therefore, I find the principle amount of $89,438.12 to be due and owing to Drywall.

### 4. DMS Properties is not liable to Drywall in quantum meruit.

Although Drywall asserted a *quantum meruit* claim against DMS-Properties in its second amended complaint, it now appears that Drywall has abandoned that claim. In its post-trial memorandum, Drywall specifically limits its prayers for *in personam* relief, including *quantum meruit*, to DMS. Drywall asserts only *in rem* rights, pursuant to the mechanics' lien, against DMS-Properties.

### 5. Mechanics' Lien.

Defendants raise three arguments to defeat Drywall's mechanics' lien. First, defendants argue that the lien was improperly pled in the plaintiff's complaint. Second, defendants contend that the lien was improperly assigned from the Drywall that is incorporated in Delaware to the Drywall that is incorporated in Pennsylvania (assuming there is a difference between the two). Lastly, defendants argue that Drywall is estopped from asserting that it did not release its mechanics' lien. The Court will address these arguments *seriatim*.

#### a. Drywall properly pled its mechanics' lien.

Defendants' first argument is that Drywall failed to properly plead its mechanics' lien. The mechanics' lien statute reads, in pertinent part:
(a) Every person entitled to the benefits conferred by this chapter and desiring to avail himself of the lien provided for in this chapter, shall ... file a statement of claim, which may also serve as a complaint....
(b) The complaint and/or statement of claim shall set forth:

(5) The time when the doing of the labor or the furnishing of the materials was commenced;
(6) The time when the doing of the labor or the furnishing of the materials was finished;

25 *Del.C.* § 2712. Defendants contend that the complaint filed by Drywall failed to accurately state the starting or ending date.

The complaint states that the beginning date was 8/10/94, and the ending date was 12/27/94. Sec.Am.Comp. ¶ 6. The time sheets provided by Drywall indicate that the first date its employees were on site was 8/16/94 and the last date was 12/27/94. PX5, 10. Thus, the complaint is obviously wrong as to the beginning date. As for the ending date, defendants assert that it must also be wrong because Drywall was formally told to stop work on 12/23/94. PX21.

The averment of the dates required by the mechanics' lien statute is essential to the existence of the lien. *Poole v. Oak Lane Manor*, Del.Super., 118 A.2d 925, 926 (1955) *aff'd* 124 A.2d 725 (1956). In *Poole,* the plaintiff supplied the first and last date of delivery of materials to a housing development, but plaintiff was unable to show the dates the materials were used for each individual house. The Court granted summary judgment in favor of the defendant on the mechanics' lien, finding that the plaintiff's inability to give exact dates for each house was fatal to the existence of the liens on those structures. *Id.* at 927.

*15 In this case, Drywall furnished exact dates for one structure, but the dates are either wrong (the beginning date) or arguably wrong (the ending date).[FN10] I am not persuaded that Drywall's errors in this regard are fatal to its claim for a mechanics' lien. The necessity of giving exact dates of commencement and completion is akin to the necessity of pleading certain matters with particularity. *See* Super.Ct.Civ.R. 9. The necessary averments must be made as a matter of fairness to the opposing party. If the averments are proven untrue at trial, that does not make the complaint deficient, although it may effect the merits of the dispute.

> FN10. I do not believe the ending date was erroneous, for the time records submitted by Drywall show that its employees worked at the site on 12/27, despite the fact it was told by DMS to cease work on 12/23. It is unclear why Drywall's employees continued to work at the project.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-8   Filed 08/08/2006   Page 14 of 15

Not Reported in A.2d                                                                                                 Page 13
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

This Court has recognized that the mechanics' lien statute requires these dates for two specific purposes: 1) the commencement date determines the priority of competing liens, and 2) the completion date determines if the lien was filed within the required time period. *Joseph Rizzo & Sons v. Christina Momentum, L.P.,* Del.Super., C.A. No. 88L-AP-15, Babiarz, J. (Feb. 21, 1992) 1992 WL 51850 at *3. Neither of these purposes are implicated in the present matter. Defendants have not, in any way, been prejudiced by Drywall's use of the dates in its second amended complaint. I find, therefore, that the dates given by Drywall in the complaint, though possibly erroneous, fulfill the requirements of the statute.

b. Drywall's mechanics' lien was filed by the improper entity.

Defendants next assert that the mechanics' lien was filed by the wrong entity. The complaint avers that Drywall is incorporated in Pennsylvania ("Drywall-PA"). Sec.Am.Comp. ¶ 1. Defendants state that the Drywall it did business with was a Delaware corporation, and has submitted into evidence a certificate of incorporation from Delaware bearing Drywall's name ("Drywall-DE"). DX54. Drywall's accountant, Graham, testified that Drywall is a single corporation that is incorporated in both states.

Believing that there is a legal distinction between Drywall-DE and Drywall-PA, defendants claim that Drywall-DE made an illegal assignment of its mechanics' lien claim to Drywall-PA for the purposes of pursuing this action. This Court has held that unperfected (i.e. unfiled) mechanics' lien claims are not assignable. *Gould, Inc. v. Dynalectric Co.,* Del.Super., 435 A.2d 730, 733 (1981). For its part, Drywall denies that any such assignment was made because Drywall is one company, not two.

Leaving aside the legal issue of whether one entity may be incorporated in two states [FN11], I find that the course of dealing between the parties indicates that they drew no distinction between the two. DMS had no reason to believe it was dealing with a Delaware corporation. Drywall was located in Pennsylvania. Drywall's employees were Pennsylvanians. PX10. Drywall's proposals and invoices listed its address as Avondale, Pennsylvania. The subcontractor list provided to DSHA by DMS-Properties listed "Coldiron, Inc." as the subcontractor, with a Pennsylvania telephone number. PX36. It was not until after litigation began that defendants even learned that Drywall had set up a Delaware corporation. It is instructive that in their first Answer, defendants did not even raise the issue. In their Answer to the Second Amended Complaint, they did.

> FN11. *Compare* 8 Fletcher, Cyclopedia of Corporations § 4031 (1992 rev.) ("When a corporation incorporates in more than one state, it becomes a citizen of each state of incorporation ...") *with* Drexler, Black & Sparks, Del.Corp.Law & Prac. § 8.02 (1996) ("The creation of a corporation by the filing of a certificate of incorporation and the holding of an organizational meeting brings into existence a separate independent jural entity").

*16 By and large, Drywall's principals, notably Coldiron and Peterson, completely disregarded any corporate distinction between Drywall-DE and Drywall-PA.[FN12] There were no separate books or records for the two companies. There were no separate shareholder meetings. The two entities ostensibly shared the same directors and officers. In the factoring worksheet, typed by Brenda Peterson, she referred to Drywall as having been in business for twelve months, roughly the amount of time that Drywall-DE had been in existence. PX11. This suggests that at least she may have been aware of and abided the difference between Drywall-DE and Drywall-PA. However, this evidence is very thin and does not change my conclusion that DMS had no reason to question that it was dealing with Drywall-PA.

> FN12. This is not surprising. The Court is well aware that small, closely-held corporations frequently fail to adhere to corporate formalities, often to their distress. In this case, Coldiron and Peterson may have genuinely believed that they were still just one company, but with two "homes."

Because the parties drew no distinction between Drywall-DE and Drywall-PA in their dealings, it would be arbitrary and inequitable for the Court to now draw such a distinction. The fact is that the work was done. It would subvert the intended protection of the mechanics' lien statute to deny Drywall the relief it now seeks.

c. Drywall is not estopped to assert its mechanics' lien.

Lastly, defendants argue that Drywall is estopped from disclaiming its alleged waiver of its mechanics' lien, as shown in the lien releases. As stated above, Drywall provided $289,438.12 worth of materials and services to defendants. DMS secured lien releases from Drywall in the amount of $200,000.00. The mechanics' lien statute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00300-JJF   Document 132-8   Filed 08/08/2006   Page 15 of 15

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 14

provides that lien waivers are enforceable only if "executed and delivered ... simultaneously with or after payment for the labor performed and the materials supplied...." 25 Del.C. § 2706(b). Thus, lien waivers are only effective to the extent that they reflect payment for services and materials. See Middle States Drywall, Inc. v. DMS Properties-First, Inc., Del.Super., C.A. No. 95L-01-41, Quillen, J. (May 10, 1995) Let.Op. at 3 (Court will not honor release on a basis other than labor performed and materials furnished).

The lien waivers are only effective to release $200,000.00 of Drywall's claim. This would seem to leave $89,438.12 remaining as a lien on the property. However, defendants claim that Drywall is estopped from asserting that it still has a lien on the property. They rely on the rule of law set forth in the case of G.R. Sponaugle & Sons, Inc. v. McKnight Const. Co., that "where a subcontractor gives a receipt or waiver of mechanics' lien under circumstances under which an owner might be expected to rely thereon and the owner does in fact rely thereon by changing his position, the subcontractor is estopped to assert the lien." Del.Super., 304 A.2d 339, 346 (1973).

The facts of this case do not support an estoppel. By 12/9/94, the time DMS paid $10,000.00 on the 11/14 invoice for $45,000.00, DMS had already received another invoice for $40,000.00 from Drywall. It should have been clear to DMS that Drywall did not expect that $10,000.00 to be full and final payment for the job. Furthermore, Drywall kept working at the site, and kept submitting invoices, thus there is no evidence that DMS in any way changed its position after the final release was signed. Indeed, Fox and Salter both testified that they expected to pay Drywall another $25,000.00 for the remainder of what they considered to be a $225,000.00 contract price. As late as 12/23/94, Fox continued to be concerned about what he called "further liability" arising out of Drywall's continuing work at the project. PX21. Based on these facts, I find that defendants did not detrimentally change their position in reliance on the waivers given by Drywall. Therefore, Drywall is not estopped from asserting its lien in the amount of $89,438.12.

d. Conclusion

*17 Based on the foregoing, I find that Drywall is entitled to receive $89,438.12 representing the reasonable value of the labor and materials it provided to DMS for which it has not yet been compensated. I award pre-judgment interest on this amount, calculated at the legal rate from 12/23/94, the date which DMS formally told Drywall to discontinue work. Furthermore, judgment is entered in favor of Drywall and against defendant DMS-Properties on Drywall's claim for a mechanics' lien on the property. Costs will be paid by defendants. The parties are directed to submit an order consistent with this opinion within ten (10) days.

Del.Super.,1996.
Middle States Drywall, Inc. v. DMS Properties-First, Inc.
Not Reported in A.2d, 1996 WL 453418 (Del.Super.)

END OF DOCUMENT