Not Reported in A.2d                                                                           Page 5
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

allegation does not state a claim for breach of fiduciary duty.

>   FN7. Partnership Agreements § 11.2.

>   FN8. In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

#### 2. Withdrawal Allegations

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds."[FN9]

>   FN9. Pls.'s Resp. Br. at 7.

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence."[FN10] A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives.[FN11]

>   FN10. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *accord Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 66 (Del.1989).

>   FN11. *Citron,* 569 A.2d at 66

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness."[FN12] "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[FN13] In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason."[FN14]

>   FN12. William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 BUS. LAW. 1287, 1300 (2001); *accord Tomczak v. Morton Thiokol, Inc.,* 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' ") (citations omitted).

>   FN13. *In re Walt Disney Co. Derivative Litig.,* 2005 Del. Ch. LEXIS 113, at *162, ___ A.2d. ___, (Del. Ch. Aug. 9, 2005) (internal citations and quotations omitted).

>   FN14. *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.,* 1996 Del. Ch. LEXIS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 6

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

116, at *42 (Del. Ch. Sept. 3, 1996) (citations omitted), aff'd, 692 A.2d 411 (Del.1997) (TABLE); see also Solash v. Telex Corp., 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] sole discretion," [FN15] it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had 'sufficient financial resources' to accomplish their 'investment objectives.'" Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

FN15. Fund I Compl. ¶ 82; Fund II Compl. ¶ 94.

*5 Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

### 3. Active And Competent Management And Disclosure Allegations

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds.[FN16] The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

FN16. See Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds.[FN17] The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                         Page 7

Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

FN17. "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown,* 2005 Del. Ch. LEXIS 100, at *9.

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

*6 The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost nonexistent, meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. *Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing (Counts 5 & 6)*

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.[FN18]

FN18. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

1. *Failure To Provide Financial Statements Allegations*

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

### 2. *Withdrawal Allegations*

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years.[FN19] As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion." [FN20]

> FN19. *See* Partnership Agreements ¶¶ 6.3.
>
> FN20. Fund I Compl. ¶ 82, Fund II Compl. ¶ 94.

*7 This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed.[FN21]

> FN21. In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

### 3. *Active And Competent Management And Disclosure Allegations*

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

### C. *Fraud (Count 3)*

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.[FN22] In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[FN23] Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[FN24]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 9
Not Reported in A.2d, 2005 WL 2130607 (Del.Ch.), 31 Del. J. Corp. L. 267
**(Cite as: Not Reported in A.2d)**

FN22. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

FN23. *Id.*

FN24. *York Linings v. Roach,* 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1's claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

*8 For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to the claims asserted in Count 1 or Count 5.

### D. *Gross Negligence (Count 7)*

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." [FN25] As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

FN25. Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

### E. *Unjust Enrichment (Count 8)*

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.[FN26] It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

FN26. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.