IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CREEDON CONTROLS, INC., ) | |
| ) | |
| Plaintiff ) | |
| ) | C.A. No. 05-CV-300-JJF |
| v. ) | |
| ) | |
| BANC ONE BUILDING ) | |
| CORPORATION, an Illinois corporation, ) | |
| and FOREST ELECTRIC ) | |
| CORPORATION, a New York Corporation, ) | |
| ) | |
| Defendant ) | |

============

**SUPPLEMENTAL APPENDIX OF FOREST ELECTRIC CORP.
IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN RESPONSE TO MOTION OF
BANC ONE BUILDING CORPORATION**

============

MARON & MARVEL, P.A.

Paul A. Bradley (DE Bar #2156)
1201 North Market Street
Suite 900
Wilmington, DE 19801
(302) 425-5177
Counsel for Defendant
Forest Electric Corp

Date: August 8, 2006

{99999.00936 / W0065202}

Page 275

[1] subcontracts on the Banc One CDC I and CDC II
[2] projects."
[3] Can you describe that conversation?
[4] A: I mean, I don't remember it
[5] specifically, but what it looks like to me is that
[6] this document was transmitted to Tom Keane by Juliane
[7] Lynch.
[8] I had a conversation with Tom at some
[9] point between these two dates, March 29th and July —
[10] excuse me, April 12th, and at that point I was
[11] directed by Tishman to use this document and this is
[12] a confirming e-mail.
[13] Q: And what were the details of that
[14] conversation with Tom?
[15] A: It's the question, "Is the document
[16] that we sent to you okay to use for the trade
[17] contractors?"
[18] Q: So, you don't recall any substantive
[19] comments with Tom about the terms of the contract?
[20] A: No.
[21] Q: Do you ever remember Tom authorizing
[22] Forest Electric to act as an agent for Banc One?
[23] A: I mean, a conversation surrounding it
[24] or just a statement? There was a statement: "You are

Page 276

[1] acting as an agent for the bank."
[2] Q: There was a statement?
[3] A: Yes.
[4] Q: Who made that statement?
[5] A: You know, it may have come up in — it
[6] would have been made by Tom Keane. I don't know the
[7] exact time it was stated, but it would have been in
[8] the context of perhaps signing a document or
[9] confirming a change order.
[10] Q: Was this statement in writing?
[11] A: No.
[12] Q: Is there any statement in writing from
[13] Tishman to Forest stating Forest should act as agent
[14] for the bank?
[15] A: Other than acceptance of the agreement
[16] that we ultimately signed, the master agreement that
[17] we signed, that I believe states that.
[18] Q: And the master agreement, what do you
[19] mean by that?
[20] A: I mean the agreement that engages
[21] Forest as the trade manager for the bank, for the
[22] electrical trades on the Banc One CDC projects.
[23] Q: So, to your knowledge, if Forest
[24] contracts with the bank, it gives Forest permission

Page 277

[1] to act as agent for the bank?
[2] A: Yes.
[3] Q: And did any representative of Banc One
[4] Building Corporation ever authorize Forest to act as
[5] an agent?
[6] MR. BRADLEY: Objection to the
[7] form.
[8] THE WITNESS: That's my
[9] understanding based on the agreement.
[10]             BY MR. CHOA:
[11] Q: Based on which agreement?
[12] A: On the agreement authorizing Forest to
[13] proceed as the trade manager for the electrical
[14] trades.
[15] Q: Besides that document, you never saw
[16] anything else in writing from the bank to Forest
[17] authorizing Forest to act as agent?
[18] MR. BRADLEY: Objection. You mean
[19] other than what's in these exhibits we've
[20] already marked?
[21] MR. CHOA: Well, actually Paul is
[22] saying that he thinks that's contained in
[23] the agreement between Forest and Tishman.
[24] We haven't marked any of those —

Page 278

[1] these agreements have all been proposed
[2] subcontracts between Forest and its sub
[3] trades.
[4] MR. BRADLEY: I know — well, but
[5] some of these e-mails are writings that
[6] go to Tishman, is my point.
[7] MR. CHOA: Oh, okay, I see what
[8] you're saying.
[9]             BY MR. CHOA:
[10] Q: Besides the exhibits we've — and I'm
[11] actually talking about from the bank now, and I
[12] haven't seen any e-mails to or from the bank
[13] introduced here today.
[14] Is there any writing from the bank,
[15] other than this agreement that we've discussed,
[16] authorizing Forest to act as the bank's agent?
[17] A: Not that I'm aware of.
[18] Q: Did you have any discussions with any
[19] representatives of the bank regarding the agency of
[20] Forest?
[21] MR. BRADLEY: You mean anyone
[22] other than he's already talked about.
[23] MR. CHOA: Right.
[24] MR. BRADLEY: The problem is,

A- 000321

Paul Angerame
Vol. 2, June 14, 200Case 1:05-cv-00300-JJF  Document 136  Filed 08/15/2006  Page 3 of 4
Creedon Controls, Inc., et al v.
Banc One Building Corp., et al

Page 299

[1] THE WITNESS: Just that they had
[2] represented that there is an issue, and I
[3] hoped that we could resolve the issue
[4] without going down this path.
[5]     BY MR. CHOA:
[6] Q: How would you have liked to resolve
[7] the issue?
[8] MR. BRADLEY: Objection to the
[9] form.
[10] THE WITNESS: Well, we were having
[11] discussions with Creedon, and we had
[12] hoped that there was some course of
[13] action that could have resolved —
[14] satisfied their concerns and not had to
[15] become a legal claim.
[16] MR. CHOA: Okay.
[17]     BY MR. CHOA:
[18] Q: What kind of course of action did you
[19] contemplate at the time?
[20] A: Well, in discussions with the bank
[21] over this issue, one of the courses of action was to
[22] give Creedon some additional work and an opportunity
[23] to help their financial status.
[24] Q: Did Forest Electric ever do that?

Page 300

[1] A: We did.
[2] Q: I just want to back for a little bit
[3] and then we'll be done.
[4] You testified earlier that your
[5] understanding that Forest was authorized to act as
[6] agent for Banc One came from Forest's contract giving
[7] it the responsibility to be the electrical trade
[8] manager; is that correct?
[9] MR. BRADLEY: I'm going to object
[10] to form. I don't think that's what his
[11] testimony was.
[12] MR. CHOA: Okay, we can —
[13] MR. BRADLEY: Well, whatever it
[14] was, it stands, but you can answer the
[15] question, if you can.
[16] THE WITNESS: I think that
[17] formalized it. That formalized it.
[18]     BY MR. CHOA:
[19] Q: And did your understanding come from
[20] your own reading of the contract, or were you told
[21] that?
[22] MR. BRADLEY: I'm going to object
[23] to the form.
[24] THE WITNESS: (No response)

Page 301

[1] MR. CHOA: Do you understand the
[2] question?
[3] THE WITNESS: Yes.
[4] THE WITNESS: It's hard to say
[5] that I was told, but yes, I believe that
[6] I was told.
[7] Can I point to a point in time
[8] where someone said "You're agent for the
[9] bank," no, but it was — it became clear.
[10] MR. CHOA: Okay.
[11] THE WITNESS: And ultimately
[12] formalized by the agreement that was
[13] signed.
[14]     BY MR. CHOA:
[15] Q: Do you know who would have told you?
[16] A: Again, it just became apparent during
[17] the course of the job.
[18] Q: And when you say it became apparent
[19] during the course of the job, is that from your
[20] interactions with Forest people?
[21] A: No, it was interaction between the
[22] bank, Tishman and Forest —
[23] Q: And these were — I'm sorry, go ahead.
[24] A: Onsite.

Page 302

[1] Q: And these were interactions that you
[2] personally witnessed?
[3] A: Yes.
[4] Q: So, while the express authorization
[5] might never have happened, from observing their
[6] behavior is how you came to the understanding that
[7] Forest was able to act as agent for the bank?
[8] MR. BRADLEY: Objection to the
[9] form.
[10] THE WITNESS: Again, I don't know
[11] that it's a specific point in time, but
[12] you're us.
[13] In other words, the bank is
[14] saying, "You are us. You're acting as
[15] agent for us," and of course that was how
[16] I acted, with the bank's interests.
[17]     BY MR. CHOA:
[18] Q: And the bank was saying this to you?
[19] A: Yes.
[20] Q: Is it possible the bank was saying
[21] those type of things because the bank was the
[22] ultimate owner of the building and whatever was built
[23] would belong to the bank?
[24] A: No, it was clearly a direction as far

A - 000322

Page 303

[1] as how we were to relate to the trade contractors on
[2] the job.
[3]   Q: And who from the bank told that to
[4] you?
[5]   A: Karl Auwarter would be the person that
[6] I would get that information from.
[7]   Q: Do you remember any specific
[8] conversations with Karl Auwarter?
[9]   A: And of course it would be reinforced
[10] by discussions with Tom Keane of Tishman. Specific
[11] conversations, no.
[12]   Q: So, you don't remember any specific
[13] point in time where Karl Auwarter said to you Forest
[14] Electric should act as the bank's agent?
[15]   A: No.
[16]   Q: And did you ever see any specific
[17] documents from Karl Auwarter to you saying that?
[18]   A: No.
[19]   Q: Was there anyone else at the bank that
[20] you had these conversations with?
[21]   A: He was the principal person I would
[22] interact with on the site from the bank.
[23]   Q: Did you ever ask to see documentation
[24] to support his position?

Page 304

[1]   A: Well, there was no documentation. We
[2] were six months into the project by the time the
[3] agreement was formalized in writing.
[4]   Q: And at that point did you ask to see
[5] the formal agreement?
[6]   A: Yes, I've seen it.
[7]   Q: And to your knowledge, in that
[8] agreement the bank authorizes Forest to act as agent?
[9]   A: To my understanding.
[10]   Q: And that's from your own reading of
[11] the contract?
[12]   A: Among the other things we've discussed
[13] and my understanding and reading of the contract,
[14] yes.
[15]   Q: I just want to get — nobody said,
[16] "Hey, Paul, this provision right here in this
[17] contract, this means that Forest can act as agent for
[18] the bank"?
[19]   A: No, no one said that.
[20]   Q: Sorry to skip around. I have a
[21] follow-up.
[22]   You had said earlier, on day one of
[23] your deposition, that Creedon kept its picnic tables
[24] in the administration area?

Page 305

[1]   A: Yes.
[2]   Q: And that that was just symbolic of
[3] their overall problems on the job. What did you mean
[4] by that?
[5]   A: I just think it shows a lack of
[6] control and discipline.
[7]   Q: Was that an ongoing problem for
[8] Creedon?
[9]   A: Like I said, I think it was symbolic
[10] of the way that they were running the job, and
[11] perhaps indicative of their lack of control over the
[12] workforce.
[13]   Q: Was this something that you observed
[14] directly, lack of control?
[15]   A: No, I am inferring it from the
[16] information that they have given us after the fact.
[17]   MR. CHOA: That's everything I
[18] have.
[19]   MR. BRADLEY: We'll read and sign.
[20]   (The deposition was concluded at
[21] 7:20 p.m.)
[22]
[23]
[24]

A - 000323