## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CREEDON CONTROLS, INC., a Delaware
corporation,

                    Plaintiff,

      v.

BANC ONE BUILDING CORPORATION, an
Illinois corporation, and FOREST ELECTRIC
CORPORATION, a New York corporation,

                    Defendants.

C.A. NO. 05-CV-300-JJF

JURY TRIAL DEMANDED

---

### DEFENDANT BANC ONE BUILDING CORPORATION'S REPLY BRIEF
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**ASHBY & GEDDES, P.A.**

Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

-and-

Of Counsel:

**PAUL, HASTINGS, JANOFSKY
& WALKER LLP**

75 East 55th Street
New York, New York 10022
(212) 318-6000

*Attorneys for Defendant Banc One Building
Corporation*

Dated:  August 21, 2006

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY ..................................................... 1

II.    ARGUMENT ........................................................................................ 2

    A.    Forest Expressly Agreed to Contract in Its Own Name Under
Forest's Trade Manager Agreement with BOBC ........................ 2

        1.    Parol Evidence Is Inadmissible to Alter, or Contradict, the
Terms of the Controlling Trade Manager Agreement
between Forest and BOBC.............................................. 3

        2.    Under the Trade Manager Agreement, Forest Was Not, and
Could Not Become, BOBC's Agent ............................... 4

            (a).    Forest's "Self Help" Effort to Create a Facade of
Agency Does Not Create A Factual Issue.......... 5

        3.    CCI Understood It Would Be Bound to Forest by
Subcontract, Intended to Be So Bound, and Entered into
Such Subcontract ...................................................... 12

III.    CONCLUSION............................................................................. 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Borel v. United States Cas. Co.*, 233 F.2d 385 (5th Cir. 1956) ....................................10, 11

*Brittingham v. Bd of Adjustment of City of Rehoboth,* No. C.A. 03A-08-002, 2002
WL 170690 (Del. Super. Ct. Jan. 14, 2005) ...........................................................16, 17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ....................................1, 14

*Consol. Rail Corp. v. Providence & Worcester Co.*, 540 F. Supp. 1210 (D. Del. 1982) ....9

*Cont'l Ins. Co. of New York v. Sherman*, 439 F.2d 1294 (5th Cir. 1971)...........................10

*Delaware v. Mass. Bonding & Ins. Co.*, 49 F. Supp. 467 (D. Del. 1943).........................11

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228 (Del. 1986)...................4

*Finnegan Constr. Co. v. Robino-Ladd Co.*, 354 A.2d 142 (Del. Super. Ct. 1976)............11

*Friel v. Jones*, 206 A.2d 232 (Del. Ch. 1964)......................................................................18

*Fuller v. King*, 204 F.2d 586 (6th Cir.  1955)........................................................................9

*Giannone v. U.S. Steel Corp.*, 238 F.2d 544 (3d Cir. 1956), cited by CCI.......................10

*Haft v. Dart Group Corp.*, 841 F. Supp. 549 (D. Del. 1993)..............................................11

*Hornberger Mgmt. Co. v. Hawes & Tingle Gen. Contractors*, 768 A.2d 983
(Del. Super. 2000).......................................................................................................15, 16

*Indus. Am., Inc. v. Fulton Indus.*, 285 A.2d 412 (Del. Super. 1971) ...................................4

*In re Murphy Marine Servs.*, 2002 WL. 1000146 (Bankr. D. Del. 2002) .........................18

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (U.S. 1945) .....11

*Rodgers v. Erickson Air-Crane Co. L.L.C. v Gallagher-Kaiser Corp*, No. 98C-07-
014-WTQ, 2000 WL. 1211157 (Del. Super. Ct. 2000) ...................................................4

*Ross v. Phillip Morris & Co.*, 328 F.2d 3 (8th Cir. 1964) ....................................................9

## TABLE OF AUTHORITIES
(continued)

**Page**

### STATUTES

UCC § 2-207 ...............................................................................................................18

### MISCELLANEOUS

17 C.J.S. Contracts § 43 (2006) ......................................................................................18

Defendant Banc One Building Corporation ("BOBC") submits this Reply Brief in support of its motion for summary judgment.

## I.    INTRODUCTION AND SUMMARY

BOBC's Motion for Summary Judgment and the supporting exhibits establish that in October 2003, Plaintiff Creedon Controls Inc. ("CCI") entered into a subcontract with Defendant Forest Electric Corporation ("Forest") to perform certain work at a site owned by BOBC. The contemporaneous documents – including Forest's Award Letter to CCI, CCI's execution (on two separate occasions) of the Award Letter specifically referencing terms binding on CCI, and Forest's own obligations under its separate Trade Management Agreement with BOBC – are all to be interpreted by the Court as a matter of law, not fact, and under applicable law, the contemporaneous documents establish that CCI has no privity with BOBC, and that Forest specifically undertook to contract in its own name and not as agent for BOBC.

In the face of the express provisions of the contemporaneous documents, CCI and Forest raise a smoke screen of irrelevant, unsupported, and ultimately futile assertions in an effort to persuade the Court that there is a *genuine* issue of *material* fact. The Supreme Court made clear in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) that the court is obligated to pierce the veil of advocacy and determine whether the arguments in opposition to summary judgment are based on admissible, material and relevant evidence. In the light of that standard, CCI's and Forest's oppositions evaporate. BOBC's motion is well based and should be granted.

-1-

## II.    ARGUMENT

### A.    Forest Expressly Agreed to Contract in Its Own Name Under Forest's Trade Manager Agreement with BOBC.

Forest's role at the Core Data Center ("CDC") Project, and its authority in that role, are grounded in its Trade Manager Agreement with BOBC. That agreement, by its terms:

- expressly prohibited the creation of any contractual obligation between BOBC, the owner, and CCI, a subcontractor ("Nothing contained in the Contract Documents shall create any contractual obligation between any subcontractor and Owner.");

- expressly required Forest, the electrical trade manager, to enter into a subcontract agreement with CCI, binding only Forest and CCI – *not BOBC* ("By appropriate agreement, Electrical Trade Manager shall require each subcontractor, to the extent of the Work to be performed by such subcontractor, (i) to be bound to Electrical Trade Manager by the terms of the Contract Documents."); and

- "represent[ed] the entire and integrated agreement between Owner [BOBC] and Electrical Trade Manager [Forest] and shall be deemed to supersede all prior negotiations, representations or agreements, whether written or oral."

*See* BOBC-Forest Trade Manager Agreement (the "Trade Manager Agreement ") at §§ 1.03, 4.04 (Ex. E[1]). The executed, integrated Trade Manager Agreement, as a matter of law, compels the finding that Forest lacked any authority as agent of BOBC.

Forest's response to the express, binding provisions of the Trade Manager Agreement is two-fold. First, Forest argues that its C.E.O., Philip Altheim, had a different intent. But Forest's own case law citations in its own summary judgment motion, discussed *infra*, demonstrate that Mr. Altheim's pre-execution "recollections" are both inadmissible and irrelevant. The Trade Manager Agreement stands on its own, and one party's effort to alter the plain terms by parol evidence is unavailing. Second, Forest

---

[1] References to exhibits designated by an alphabetical character correspond to those exhibits submitted as part of BOBC's Mem. of Law in Supp. of Its Mot. for Summ. J., Vols. I and II.

argues that, by dint of its own machinations in breach of its express obligations under the Trade Manager Agreement, Forest "acquired" agency authority – not by amendment of the Trade Manager Agreement and not by separate and specific grant from BOBC, but by Forest's unilateral insertion of a separate line in the signature block of a form of agreement which Forest first showed to CCI seven months *after* CCI had executed the Award Letter specifically referencing a subcontract with Forest, and after performance was 90% complete, and which form of agreement, in any event, was never executed.

For its part, CCI, rather than addressing the specific issues, throws up a fog of unsupported conclusions. That mish-mash, which cannot justifiably be dignified with the label of evidence, is similarly irrelevant. CCI asks this Court to ignore the specific and contemporaneous documentation that CCI sought, received and executed when it entered into a subcontract with Forest.

### 1. Parol Evidence Is Inadmissible to Alter, or Contradict, the Terms of the Controlling Trade Manager Agreement between Forest and BOBC.

CCI and Forest cite to Forest C.E.O. Philip Altheim's deposition testimony to assert, "Mr. Altheim's understanding of this arrangement was that, as an electrical trade manager, Forest was not to be at risk with the electrical contractors, and was not to be contractually bound individually, to any of the electrical trade contractors,"[2] and Altheim "understood that to mean Forest was '… acting as agents, similar to the way a construction manager [Tishman].'"[3] Altheim admitted that his alleged "understanding" was *never* memorialized. *See* Altheim Dep. at 41:11-49:8 (attached hereto as Ex. 1).

---

[2] Answering Br. of Creedon Controls, Inc. in Opp'n to Banc One Building Corp.'s Mot. for Summ. J. ("CCI Opposition Brief") at 3.

[3] Br. of Def. Forest Electric Corp. in Resp. to Banc One Building Corp.'s Mot. for Summ. J. ("Forest Opposition Brief") at 5.

Because Altheim signed and executed the Trade Manager Agreement, which directly contradicts his alleged "understanding," his putative testimony is parol evidence "inadmissible to vary, alter, or contradict a written instrument or the terms thereof where the instrument is complete, integrated, final, unambiguous and valid." *Rodgers v. Erickson Air-Crane Co. L.L.C. v Gallagher-Kaiser Corp*, No. 98C-07-014-WTQ, 2000 WL 1211157, at *4 (Del. Super. Ct. 2000); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1986) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); see also *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 454 (Del. 1982) (stating "an agency created by agreement is subject to contract rules.").

Neither CCI nor Forest has asserted any legal basis for the admissibility of parol evidence to alter or contradict the Trade Manager Agreement. Forest's urging this Court to entertain parol evidence is particularly disingenuous as Forest, in its own motion for summary judgment, argues – *correctly* – that CCI is bound by the Subcontract Agreement attached to the October 2, 2003 Award Letter, countersigned by CCI President, Patricia Creedon, because *ex post facto* rationalizations, "cannot defeat the terms of the agreement to which Creedon gave written assent, as overt manifestation of assent, not subjective intent, controls formation of a contract."[4]

---

[4] Br. of Def. Forest Electric Corp. in Supp. of Its Mot. for Partial Summ. J. at 10 (citing *Indus. Am., Inc. v. Fulton Indus.*, 285 A.2d 412, 415 (Del. Super. 1971)).

2.      **Under the Trade Manager Agreement, Forest Was Not, and Could Not Become, BOBC's Agent.**

Forest and CCI argue that even though the Trade Manager Agreement is express, Forest nonetheless somehow subsequently became BOBC's agent, although the purported evidence establishes that Forest's own conduct, and CCI's rejection of terms, could never form the basis for the issue they seek to create.

(a)      **Forest's "Self Help" Effort to Create a Facade of Agency Does Not Create A Factual Issue.**

Forest clearly understood that the Trade Manager Agreement expressly prohibited the creation of any contractual obligation between BOBC and CCI, and, conversely, expressly required Forest to enter into a subcontract agreement with CCI, binding only Forest and CCI, and *not* BOBC. Forest in fact complied with the requirements of the Trade Manager Agreement by presenting a subcontract agreement to CCI, attached to the October 2, 2003 Award Letter. *See* Forest-CCI Subcontract Agreement (Ex. L). The cover letter expressly announces Forest is awarding a subcontract to CCI, and asks CCI to confirm its agreement to enclosed terms. That Forest-CCI Subcontract Agreement, by its own terms, states, "SUBCONTRACTOR agrees to be bound and obligated to FEC [Forest]" – *not BOBC* – and nowhere purports to identify, or designate, Forest as an agent of BOBC. *Id.* § I at CL 1144.[5]

Despite the clarity of these terms, Forest employees sought to limit Forest's exposure. In an October 15, 2003 internal email exchange, Forest paralegal Donna Lucas and Forest Vice President Paul Angerame recognized that, "[w]ith the sample

---

[5] Indeed, Forest sought consent to enter into the subcontract with CCI (as required by the Trade Manager Agreement), and the BOBC consent given was expressly to a subcontract between Forest and CCI. *See* Award Recommendation (Ex. K). Forest could have had no different contemporaneous understanding.

Subcontracts being use[d], we [Forest] have exposure" – that is, under the Forest-CCI

Subcontract Agreement presented to CCI two weeks earlier, on October 2nd, Forest had

exposure for any damages claimed by CCI. *See* Lucas-Angerame Email of 10/15/03 at

FE 014334 (attached hereto as Ex. 2). But, "[i]f we [Forest] are to have no exposure, we

could use Bank One's form of agreement and place us as Agent for Owner." *Id.*

Although the Forest staff identified the issue in October 2003, the executed Trade

Manager Agreement – signed by Forest's C.E.O. Philip Altheim three months later –

expressly put Forest at risk and gave no room for any agency role. Nonetheless, four

months after Forest's C.E.O. executed the Trade Manager Agreement, Forest circulated

to CCI a form of agreement based on the Trade Manager Agreement (the very agreement

that prohibited the designation of Forest as an agent of BOBC), in which Forest

unilaterally included a single reference to Forest as "agent" above Forest's signature line.

This single reference to Forest as "agent" was entirely contradicted by, and inconsistent

with, the operative terms of the 60-page form of agreement, including, without limitation:

- "This Single Project Construction Services Agreement ... is between Electrical Trade Manager [Forest] and Construction Contractor [subcontractor];" and

- "Nothing contained in the Contract Documents shall create any contractual obligation between any subcontractor and Owner."

*See* Forest May 2004 Proposed Agreement at 006114, 006141 (§ 4.04) (Ex. B).

While Forest apparently intended that its single reference to Forest as "agent"

would effectively breach its Trade Manager Agreement with BOBC, Forest never

specifically drew BOBC's, or Tishman Construction Corp.'s. ("Tishman"), attention to

this single reference in the 60-page form of agreement that otherwise appeared identical

to the Trade Manager Agreement that, by its terms, prohibited the designation of Forest

as an agent of BOBC. To the contrary, it is apparent that, as part of its deceit, Forest specifically sought to bury this single reference to agency in the Trade Manager Agreement form that it altered. The Trade Manager Agreement form *as authored by BOBC*, was *never* intended by BOBC, or Tishman, to convey agency authority.[6] *Compare* BOBC-Tishman Construction Manager Agreement at Banc One 07807, 07817 (Ex. D) ("Owner desires to engage Construction Manager [Tishman] as its agent.").[7]

In any event, Forest's and CCI's argument regarding the May 2004 Proposed Agreement loses any shred of credibility in light of the undisputed fact that CCI rejected it, and it was never in fact executed. Forest first presented CCI with the May 2004 Proposed Agreement, altered by Forest without BOBC's informed consent, only after CCI first claimed six months into the job that it had damages for which Forest would have "exposure" under both the Trade Manager Agreement and the Forest-CCI Subcontract Agreement. CCI did not sign the May 2004 Proposed Agreement, but, instead, proposed 16 pages of changes (171 amendments), all of which Forest rejected.[8]

---

[6] Similarly, change orders never conveyed agency authority. First, the standard form of change order – like the standard form of agreement – did not include any reference to Forest as an agent. Forest unilaterally added a single reference to "agency" above the Forest signature line – just as Forest did in altering the Trade Manager Agreement – as demonstrated by the fact that in 32 of the change orders in Ex. 15 of CCI's App., the "agency" language is added to the form *in handwriting*. *See* CCI App. at B-0423-54. Second, no change order contained operative language conveying agency authority. Third, in any event, the requirement that the Owner sign each change order renders an assertion of agency authority related to the change order process incongruous and redundant, further demonstrating that the change order process was never intended to convey agency authority.

[7] Moreover, the BOBC-Tishman Construction Manager Agreement expressly limits the form of contracts available for use in subcontracting - "Schedule C-1, Schedule C-2, or Schedule C-3"- none of which, by its terms, could designate Forest as an agent of BOBC. *See* BOBC-Tishman Construction Manager Agreement ¶ 6 at Banc One 07821-22 (Ex. D) ("No Construction Service Agreement shall be entered into by Construction Manager unless and until Construction Manager has ... included in the applicable Bid Package the form of agreement Owner desires to utilized for such bid (which shall be one of the forms attached hereto as Schedule C-1, Schedule C-2, or Schedule C-3") The form of contract actually used in this case – "Schedule C-2" - strictly prohibited the creation of any such obligation binding on BOBC under § 4.04. *Id.* at Banc One 07867-919 ("Nothing contained in the Contract Documents shall create any contractual obligation between any subcontractor and Owner.")

[8] Even if, *arguendo*, CCI had signed it, the May 2004 Proposed Agreement could not bind BOBC because, among other things, Forest would have exceeded its authority and breached the Trade Manager Agreement.

*See* Angerame-Lucas Email of 08/04/04 at FE 014207 (Ex. V) ("I informed Creedon that no changes would be accepted."); and Creedon-Link Email of 06/16/04 at CL 0844 (Ex. W) ("I received a phone call from Paul [Angerame] this morning telling me that I had to be kidding over the 16 pages of changes to the contract.").[9]

Forest employees' final deception occurred after the filing of this lawsuit. Before BOBC became aware of the conflict of interest between Forest and BOBC, BOBC and Forest were jointly represented by Forest's counsel. Forest's counsel prepared both BOBC and Forest's initial Answers and Affirmative Defenses, and the accompanying Affidavits, relying upon Forest employees' representations. Forest's counsel then presented Scott A. Capaldi, then Assistant Vice President at JPMorgan Chase & Co., with BOBC's Answer and Affidavit for his signature, containing misrepresentations obtained from Forest employees: (1) *denying* CCI's allegation that, "CCI made its contract with Forest," *see* Compl. ¶ 13 (Ex. 1 of CCI's App. at B-0003), and, instead, *admitting* that "Forest Electric Corp. acted as Electrical Trade Manager and agent for Banc One," *see* Forest Counsel-Drafted Answer of BOBC ¶ 13 (Ex. 2 of CCI's App. at B-0016) and (2) *admitting* that, "[t]he applicable contract between the parties, Creedon Controls, Inc. ("CCI") and Banc One Building Corporation ("Banc One") is the Single Project Construction Services Agreement Contract No. 6B (the "Agreement")." *See* Forest Counsel-Drafted Aff. of Scott A. Capaldi at ¶ 2 (June 8, 2005) (Ex. 3 of CCI's App. at B-0023). Capaldi was not responsible for contracting matters related to the CDC and had no

---

Even then, the operative terms of the May 2004 Proposed Agreement, including § 4.04, still expressly prohibited creation of any obligation binding on BOBC and Forest's putative "agency" signature would only have established that if the contract were binding, it could not bind BOBC.

[9] CCI's naked assertion in CCI's Opposition Brief, at 32-3, that an "unrejected" proposed amendment would become the binding contract is not merely fanciful. The position taken by CCI is fatally contradicted

independent knowledge of the statements made in the answer and affidavit, drafted by Forest's counsel and Forest's counsel did not provide him with relevant documents to review – such as the Trade Manager Agreement, Forest-CCI Subcontract Agreement (attached to the October 2, 2003 Award Letter), and the non-executed May 2004 Proposed Agreement. *See* Corrected Aff. of Scott A. Capaldi at ¶ 3 (March 6, 2006) (attached hereto as Ex. 3). Forest's counsel assured Capaldi, based upon representations that Forest employees had made to Forest's counsel, that the statements were true and accurate. *Id.*

It was only after BOBC became aware of Forest employees' conduct in violation of the Trade Manager Agreement, and of the resulting conflict of interest, that BOBC retained separate counsel, who collected the relevant documents for Capaldi to review. *Id* at ¶ 4. Based upon Capaldi's review of the relevant documents – including the Trade Manager Agreement, which expressly prohibited the creation of any contractual obligation between BOBC and CCI, and, conversely, required Forest to enter into a subcontract agreement with CCI, binding only Forest and CCI, and not BOBC – Capaldi concluded that the prior Answer and Affidavit, drafted by Forest's counsel, had no evidentiary support, had been in error, and should be withdrawn. *Id.*

In any event, BOBC's Answer, and Affidavit of Capaldi, drafted by Forest counsel – made in reliance upon the misrepresentations of Forest employees to then joint counsel, rather than upon the relevant documents – does not raise an issue of fact sufficient to preclude summary judgment. Several of the cases cited by Forest and CCI for the proposition that Forest's ill-gotten "admissions" from Capaldi preclude summary judgment

---

by CCI President Patricia Creedon's own testimony and by the documented record. CCI's brief neglects to

in actuality do not support that proposition at all. *See Consol. Rail Corp. v. Providence & Worcester Co.*, 540 F. Supp. 1210 (D. Del. 1982); *Ross v. Phillip Morris & Co.*, 328 F.2d 3 (8th Cir. 1964) (finding no error in the exclusion of an affidavit by defendant on the matters at issue, but submitted in another case); *Fuller v. King*, 204 F.2d 586, 591 (6th Cir. 1953) (holding that trial court was in error in permitting the jury to consider statements made in pleadings in prior cases, that had since been renounced). Indeed, in *Giannone v. U.S. Steel Corp.*, 238 F.2d 544, 548 (3d Cir. 1956), cited by CCI, the Court upheld the trial court's dismissal of the case, noting: "Rule 8(e)(2) ... which allows inconsistent, alternative and hypothetical pleading.... would tend to be defeated if allegations in the pleadings are admissible as evidence. Parties will hesitate to make notice giving allegations at the risk of their being used as evidence...." *See also Cont'l Ins. Co. of New York v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971) (citing *Giannone*, and holding that it was prejudicial error, necessitating a new trial, to admit defendant's answer and cross-pleading as an admission).

The *Giannone* Court further noted that "legal conclusions are not admissions." *Giannone*, 238 F.2d at 548. In the instant case, allegations regarding the controlling contract and Forest's agency authority are legal issues. Thus, even if this Court were to decide that BOBC's Answer, and Affidavit of Capaldi, drafted by Forest counsel were admissible, the allegations regarding these legal conclusions are not admissions and cannot raise and issue of material fact.

On this point, *Borel v. United States Cas. Co.*, 233 F.2d 385 (5th Cir. 1956), another case cited by CCI, is instructive. In *Borel*, the court upheld the grant of a directed verdict in favor of the defendant after finding that a purported admission in an original answer – filed

---

cite any factual support. CCI's wishful thinking is no substitute for issues based on actual facts.

"before [defendant] had sufficiently informed themselves of the facts," and subsequently amended – was "in the nature of a legal conclusion rather than an admission of fact helpful in reconciling contradictory evidence." *Id.* at 388.  The *Borel* Court concluded that, "to give much weight to [the 'admission' in the original answer] where the facts are uncontroverted would … place too great an emphasis on the formalities of pleading and run counter to the policy of the Federal Rules." *Id.*  Similarly, the documentary evidence in the instant case cannot be overcome by the legal conclusions drawn in BOBC's original Answer, and original Affidavit of Capaldi, drafted by Forest counsel, which, after further investigation were determined to have been incorrect and were properly amended.  Just as the *Borel* Court upheld the directed verdict in favor of the defendants, this Court should not allow Forest and CCI to turn a formality of pleading into a genuine issue of material fact where none exists.

Because the Trade Manager Agreement establishes conclusively that Forest could not be an agent of BOBC, and was obligated to use a form of contract that did not include agency language, CCI's and Forest's efforts to create material issues of fact must fail.  Indeed, at best, Forest's and CCI's "evidence" shows only Forest's efforts to unilaterally designate itself as an agent, without the informed consent of BOBC, which falls on three grounds.  First, as discussed *supra*, well-settled contract law requires enforcement of the Trade Manager Agreement.  Second, settled agency law holds agency authority cannot be derived from unilateral acts of the purported agent.  *See Finnegan Constr. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976); *Delaware v. Mass. Bonding & Ins. Co.*, 49 F. Supp. 467, 471 (D. Del. 1943).  And last, equitable principles compel the denial of relief based upon such bad faith and unclean hands.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 (1945) ("[H]e who comes into equity

-11-

must come with clean hands. This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief...."); *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 576 (D. Del. 1993).

      **3.**      **CCI Understood It Would Be Bound to Forest by Subcontract, Intended to Be So Bound, and Entered into Such Subcontract.**

In bidding, in accepting the award, in commencing work and performing work, CCI clearly understood that it was a subcontractor bound to Forest, not BOBC:

- The October 2, 2003 Award Letter, signed and executed by CCI President Patricia Creedon, "acknowledge[d] our [Forest and CCI] mutual desire to enter into a Subcontract Agreement." *See* Forest-CCI Subcontract Agreement at CL 1143 (Ex. L). While this Award Letter stated that "it is the intent of the parties to begin Work and [they] will endeavor to enter into and execute a definite Subcontract Agreement defining the construction services," this Award Letter also specifically required "Subcontractor agrees to be bound to the terms and conditions of the Subcontract Agreement as attached hereto as Exhibit 1." *Id.* The Subcontract Agreement attached as Exhibit 1, by its terms, states, "SUBCONTRACTOR agrees to be bound and obligated to FEC [Forest]" – *not BOBC* – and nowhere purports to identify, or designate, Forest as an agent of BOBC. *Id.* § I at CL 1144

- CCI's President Patricia Creedon testified in deposition that CCI began work on the basis of the Award Letter which she had executed. Creedon Dep. Vol. I at 142:4-11 (Ex. H).

- CCI's President Patricia Creedon testified in deposition that CCI reported to its creditor, Wilmington Trust: "At bid time, Forest represented that CCI's contract was with them." Creedon Dep. Vol II at 252:1-15 (Ex. H). In that same testimony, Patricia Creedon acknowledged that CCI began work with the expectation that it would be a subcontractor to Forest. *Id.*

- CCI Foreman Fred Street testified in deposition that, "[It] [w]as my understanding that Creedon worked for Forest Electric." Street Dep. at 62:10-11 (Ex. M).

- When, on April 6, 2004, CCI first informed Forest of "issues" that CCI alleged hindered its timely completion of the project and caused CCI to suffer damages – *six months after CCI began its work in October 2003, and after the scheduled completion date of April 5, 2004* – CCI Project Manager Charles Doble again "acknowledged our [CCI's] intent to enter into an arrangement with FEC [Forest]." *See* CCI Notice to Forest of 04/06/04 at 005675 (Ex. Q).

- When, on May 4, 2004, Forest presented CCI with the 60-page May 2004 Proposed Agreement, CCI recognized that such an arrangement, binding CCI to BOBC through Forest as agent of BOBC, had **not** been the agreement governing CCI's performance dating back to October 2003. In a June 1, 2004, email from CCI to Forest, the attached CCI letter notes at Item # 3:

  > In May 2004, we [CCI] were given a 60 page contract.... This contract bears no relationship to the 9 page sample contract [the CCI-Forest Subcontract Agreement] presented with the bid package.... Additionally the nine page contract was a subcontract between Forest Electric Corporation and the sixty page is a prime contract between Banc One Building Corporation and Creedon.

  *See* CCI Email to Forest of 06/01/04 at FE 000717-18 (Ex. T).

- CCI did not sign the Forest May 2004 Proposed Agreement, but, instead, proposed 16 pages of changes – 171 amendments – which Forest rejected. CCI President Patricia Creedon's email correspondence with Dennis Link further suggests that CCI never expected the Forest May 2004 Proposed Agreement to be operative nearly 8 months after CCI began its work: "I received a phone call from Paul [Angerame] this morning telling me that I had to be kidding over the 16 pages of changes to the contract.... He also said it was a time when they were winding down and how it hardly made any sense to have this many conditions. To which I replied that I felt the same way (even more so) when I received their 60 pages." Creedon-Link Email of 06/16/04 at CL 0844 (Ex. W).

- When CCI contacted BOBC to inform BOBC of CCI's dispute with Forest, it did so in the hope of involving BOBC as an "objective party" to mediate its dispute with Forest – not as a counter-party to a contract dispute – and CCI never once suggested that BOBC had any contractual obligation to CCI. For example, CCI President Patricia Creedon wrote to BOBC:

  > As owner of the referenced property we make another appeal for you to provide an individual from Bank One, not involved in the referenced project, knowledgeable in construction and claim settlement to, in effect, mediate this change order claim. We respect your selection of someone that will be fair and open-minded. [It is because of] [o]ur comfort with our position on this project, [Forest's] failure to address any of the issues of our change order claim and Bank One's ability to be objective, that we would make such an offer to settle this matter using a Bank One mediated forum.

*See* CCI Letter to BOBC of 08/11/04 at Banc One 00043 (Ex. Y).

CCI never once "believed," let alone suggested, that BOBC had any contractual obligation to CCI until it was convenient to do so in this lawsuit in order to pursue an apparent "deep pocket" litigation strategy. CCI consultant and expert Dennis Link admitted in deposition that CCI, "believed [BOBC] had control of the purse strings," and that, in CCI's view:

> basically it's [BOBC's] project, and [BOBC] determines whether money is paid or not paid, and we felt that if we could get a decision at that level, then problem is solved because [BOBC] would merely say this money is for [CCI], pay it to them. And that's really what's going on here.

Link Dep. at 217:18-219:2; 221:3-222:9 (Ex. C).

CCI's efforts here to obfuscate the simple truth that Forest did not have agency authority to bind BOBC to CCI founders on CCI's inability to point to a single shred of admissible evidence to support it. Indeed, in its support of Forest's deceit, CCI asserts that the testimony of Forest representatives – self-serving, and wholly contradicted by documentary evidence – somehow, "provides the most persuasive evidence that Forest was BOBC's agent." *See* CCI Opposition Brief at 24.

CCI not only cynically hopes to benefit from Forest's deceptive conduct, but also engages in its own deception in a desperate effort to maintain its "deep pocket" litigation strategy against BOBC. It is clear from CCI's conduct, and deposition testimony, discussed *supra*, that CCI believed and understood that it was bidding on and accepted an award of a subcontract, and performed its work as a subcontractor bound to Forest, not BOBC. Nonetheless, CCI now asserts that, "when Creedon executed the October 2, 2003 Letter of Intent, and returned it to Forest, if a contractual relationship was created, it was with the understanding that the contract would be between Creedon and BOBC, not between Creedon and Forest, and that Forest was simply acting as BOBC's agent." CCI

-14-

Opposition Brief at 24.  The Court will look in vain for any citation to evidence –

documentary or testimonial – to support CCI's assertion.  Indeed, the available evidence,

after full discovery, flatly and completely contradicts it.  The Supreme Court in *Celotex*

made clear that opposition to a summary judgment must rest on admissible evidence, not

a non-movant's wishes, arguments or outright inventions.

CCI's effort to bolster its legally flawed argument that the May 2004 Proposed

Agreement, as amended by CCI's 16 pages of proposed changes, constitutes the operative

contract must also fail.  It is undisputed that the May 2004 proposed agreement, and CCI's

171 proposed amendments, were never executed.  Indeed, the documents and testimony

are undisputed that Forest rejected CCI's proposed amendments, and CCI understood that

its proposed amendments were rejected.  Nonetheless, CCI insists a contract could be

formed without a "meeting of the minds" and without mutual assent.  First, CCI's assertion

that Forest  failed to reject CCI's 16 pages of proposed changes is simply untrue. Forest

Vice President Paul Angerame explained, "I informed Creedon that no changes would be

accepted."  *See* Angerame-Lucas Email of 08/04/04 at FE 014207 (Ex. V).  Patricia

Creedon confirmed Angerame's rejection of CCI's "counteroffer" in her own email

exchange with CCI consultant and expert Dennis Link.  Creedon-Link Email of 06/16/04

at CL 0844 (Ex. W).  CCI nowhere cites any evidence – as opposed to its wishes and

inventions – to counter those undisputed facts.

Moreover, even if, *arguendo*, Forest had not rejected CCI's proposed

amendments, silence could not transform the May 2004 Proposed Agreement, as

amended by CCI's 16 pages of proposed changes, into the operative contract.  The sparse

case law that CCI cites does not support its contention that silence in response to a

-15-

counteroffer should be deemed acceptance. *Hornberger Mgmt. Co. v. Hawes & Tingle Gen. Contractors,* 768 A.2d 983 (Del. Super. 2000), relied upon by CCI, did not involve a counteroffer at all, but instead dealt with an executive placement agency that sent a referral, along with a fee arrangement contract, to a company. The company hired the candidate so referred, but claimed that it was not bound by the fee arrangement. There, the defendant, by consenting to receive resumes from the plaintiff, knew that the plaintiff would expect to be compensated and only argued about the value of the service provided. There was no other offer at issue, nor had there been performance prior to the referral. The Court held that "acceptance was by silence," and the defendant was made to pay for the benefit it received. *Id.* at 991. CCI began work on the basis of the October 2, 2003 Award Letter and Subcontract Agreement between Forest and CCI, Creedon Dep. Vol. I at 142:4-11 (Ex. H), and CCI had been performing services at the Project, and had been paid for services rendered, for over eight months when CCI first proposed amendments to the Forest May 2004 Proposed Agreement. Importantly, CCI proposed amendments after CCI and Forest had begun to dispute the matters at the center of this lawsuit. Under such circumstances, where the parties had been at odds prior to the proposed amendments, only affirmative assent could be construed as acceptance.

CCI's reliance on *Brittingham v. Bd. of Adjustment of City of Rehoboth*, No. C.A. 03A-08-002, 2005 WL 170690 (Del. Super. Ct. Jan.14, 2005) is similarly misplaced. In *Brittingham*, a local government body failed to notify the parties that it found a settlement agreement objectionable, and instead allowed the settlement to go forward and undermined the settlement on rehearing of an appeal under the guise of correcting a procedural defect. In holding that the government's silence when it had a duty to speak

-16-

would bind it to the settlement agreement, the Court enumerated the narrow circumstances under which silence will operate as an acceptance:

a)   where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation,

b)   where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer, and

c)   where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

The court goes on to say that silence imputes consent where a party would naturally have been expected to object but did not, and the lack of objection gave the appearance to all the parties that the silent party assented to what was being said or done. *Id.* at *22.

Neither the rationale set forth by the *Brittingham* court, nor any of the exceptions to the normal requirement of offer and acceptance, apply to the instant case. To reiterate, CCI began work on the basis of the October 2, 2003 Letter of Intent and CCI-Forest Subcontract Agreement, Creedon Dep. Vol. I at 142:4-11 (Ex. H), and CCI had been performing at the Project, and had been paid for services rendered, for over eight months when CCI first proposed amendments to the Forest May 2004 Proposed Agreement. In its proposed amendments, CCI did not offer any additional benefit to be compensated in any manner different from the parties' performance during the prior eight months, and CCI did not claim, let alone conduct itself as though, "silence" in response to the proposed amendments constituted acceptance. To the contrary, CCI and Forest had already begun to dispute the matters in this lawsuit such that only affirmative assent could be construed as acceptance.

-17-

CCI seems to be urging this Court to enforce something akin to the common law "last shot rule," wherein the terms of the party who last sends a counteroffer become the terms of the contract. This method of deciding a "battle of the forms" was rejected by the UCC, and even under the UCC, which no party asserts is applicable to the instant case, the terms of CCI's counteroffer which conflict with the original offer would not become part of the agreement. *See* UCC § 2-207. Further, performance was ongoing under the agreement terms reached in October of 2003, and did not require execution of the May 2004 Proposed Agreement. Thus, even if Forest had not responded and reject CCI's proposed amendments – which, as discussed *supra*, Forest most certainly did - silence could not function as assent to CCI's proposed amendments, and CCI's proposed amendments are unenforceable as a matter of law. *In re Murphy Marine Servs.,* No. 01-926 (MFW), 2002 WL 1000146 (Bankr. D. Del. Apr. 5, 2002) (finding that a reply to an offer which purports to accept but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counteroffer); *see also Friel v. Jones*, 206 A.2d 232, 233 (Del. Ch. 1964) (noting that it is an elementary principle of contract law that an acceptance of an offer, in order to be effectual, must be identical with the offer and unconditional) (citing 17 C.J.S. Contracts § 43).

-18-

## III.  CONCLUSION

For all of the foregoing reasons, and those fully set forth in BOBC's Memorandum of Law in Support of Its Motion for Summary Judgment, incorporated herein by reference, this Court should find that the Trade Manager Agreement is dispositive, precluding any rational finding that, *in direct contradiction to this fully integrated contract*, Forest had been an agent of BOBC with authority to create any contractual obligation between BOBC and CCI, and compelling the conclusion that neither CCI nor Forest can recover damages from BOBC in this matter.

Respectfully submitted,

ASHBY & GEDDES, P.A.

Philip Trainer, Jr. (I.D. #2788)
Ricardo Palacio (I.D. #3765)
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Of Counsel:

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**

75 East 55th Street
New York, New York 10022
(212) 318-6000

Attorneys for Defendant Banc One Building Corporation

Dated:  August 21, 2006