EXHIBIT "3"

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

**H**
In re Kirkwood Kin Corp. v. Dunkin' **Donuts**, Inc.Del.Super.,1997.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
RE: **KIRKWOOD KIN** CORP. and John O'Connor
v.
DUNKIN' **DONUTS**, INC., Sean O'Hanlon and O'Hanlon, Inc.
**No. 94C-03-189-WTQ.**

Jan. 29, 1997.

Letter Opinion and Order on Defendant Dunkin' **Donuts**, Inc.'s Motion for Summary Judgment on all Claims against it and on its Counterclaim-GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Second Amended Complaint; DENIED with respect to Counts III, IV, V, VII, and VIII of the Second Amended Complaint; and DENIED with respect to the Counterclaim.

James S. Green, Duane, Morris & Heckscher, Wilmington.
Edward F. Eaton, Connolly, Bove, Lodge & Hutz, Wilmington.QUILLEN, Associate J.

Dear Counsel:

*1 This is the Court's opinion on multiple motions by defendant Dunkin' **Donuts**, Inc., seeking summary judgment, pursuant to Superior Court Civil Rule 56, on all claims brought against it by plaintiffs **Kirkwood Kin** Corporation and John O'Connor, and on its counterclaim against plaintiffs. _ For the reasons herein stated, the Motions are GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Complaint, DENIED with respect to Counts III, IV, V, VII, and VIII, and DENIED with respect to the counterclaim.

*FACTUAL BACKGROUND*

As the Court stated in its opinion of June 30, 1995, this case involves a dispute between plaintiffs **Kirkwood Kin** Corp. and John O'Connor (collectively "plaintiffs" or "the franchisee"), as the

former operators of two donut shop franchises; defendant Dunkin' **Donuts**, Inc. ("Dunkin' " or "the franchisor"), as the franchisor; and defendants Sean O'Hanlon and O'Hanlon, Inc. (collectively "O'Hanlon"), as a competing franchise.

Plaintiffs purchased a Dunkin' **Donuts** franchise, located on Kirkwood Highway, from Dunkin' in 1984. In August 1986, plaintiffs renewed their franchise. As part of this renewal, plaintiffs executed an amendment to the sublease which contained provisions for the payment of a percentage rent and what purports to be a general release. The base rent was $35,747.64. The percentage rent provision required plaintiffs to pay Dunkin', in addition to the base rent, 7% of gross sales over $165,000. In August 1987, plaintiffs again renewed the franchise, executing an amendment to the sublease which maintained the rent terms and contained another purported general release. Plaintiffs estimate that from 1985 to 1990 the retail sales at their Kirkwood shop grew at an average annual rate of 8%.

In November 1990, a newly-licensed Dunkin' shop in Pike Creek was opened by another franchisee, approximately 1.5 miles from plaintiffs' Kirkwood shop. Plaintiffs claim that Dunkin' made no effort to ascertain the potential impact on plaintiffs' store prior to opening the Pike Creek shop. They also claim that their sales dropped by 13% in the following year. In what plaintiffs assert was an attempt to recover from the "blow" dealt by the opening of the Pike Creek shop and an attempt to get out from under the "oppressive" percentage rent provision, plaintiffs sought and Dunkin' granted a second franchise. This was a satellite shop [FN1] located on the corner of 9th and Orange Streets in downtown Wilmington and opened in January 1993.

> FN1. A satellite shop is a store where sales are permitted to be made but preparation and production of the foods is done off premises, i.e., at the Kirkwood shop.

In that same month, Dunkin' created another Dunkin' franchise on the same side of Kirkwood Highway, about 1.3 miles east of plaintiffs' shop. This franchise was owned by the O'Hanlon defendants. Dunkin' had purchased the Mister Donut chain of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

donut shops approximately three years prior to this conversion. At that time, the O'Hanlon defendants had been operating a Mister Donut franchise. In January 1993, pursuant to a nationwide program instituted by Dunkin' to convert as many Mister Donut franchises to Dunkin' **Donuts** franchises as was possible, Dunkin' converted O'Hanlon's Mister Donut shop to a Dunkin' **Donuts** shop. Plaintiffs claim that their retail sales after the conversion dropped precipitously and that the O'Hanlon Dunkin' franchise's sales increased dramatically.

*2 By February 1993, plaintiffs were no longer able to meet all of their financial obligations. They stopped paying the percentage rent due under the amended sublease to Dunkin'. By May 1993, plaintiffs had also stopped paying the base rent and franchise and advertising fees which they owed to Dunkin'. On July 16, 1993, Dunkin' issued a notice of default to plaintiffs based on their nonpayment of contractual obligations. These alleged defaults were not cured by plaintiffs. Dunkin' issued a notice of termination of the franchise agreements on August 24, 1993. However, plaintiffs assert that O'Connor contacted a Dunkin' business consultant to discuss plaintiffs' various financial problems and to solicit assistance in reaching a resolution of these issues. Plaintiffs assert that Dunkin' refused to even discuss the problems with them, although they allegedly were required to address at least the "proximity related problems," unless and until plaintiffs paid the money which they owed to Dunkin'.

Plaintiffs did not turn over the franchises and instead remained in possession of the franchises, operating under the Dunkin' **Donuts** trademark. In the meantime, Dunkin' had sued plaintiffs in the Court of Chancery seeking to terminate the franchise agreements and in the Justice of the Peace Court seeking to have plaintiffs relinquish possession of the premises. Plaintiffs then instituted this action in Superior Court. Plaintiffs finally settled the Justice of the Peace Court action by turning over possession of the businesses to Dunkin' in October 1994. The Court of Chancery action has been stayed pending the outcome of this action.

*PROCEDURAL BACKGROUND*

On March 21, 1994, Kirkwood filed a nine count Complaint in Superior Court against Dunkin' alleging violations of Delaware's Franchise Security Law, 6 *Del. C.* ch. 25, and various derivative contract and tort claims. Dunkin' counterclaimed against

Kirkwood for breach of contract based on Kirkwood's purported defaults under the rental and fee agreements with Dunkin'. On August 19, 1994, plaintiffs filed an Amended Complaint, adding an additional count against Dunkin' and adding the O'Hanlon defendants as a party.

On March 20, 1995, this Court (Judge Silverman) heard Defendants' Motion to Dismiss and for Partial Summary Judgment. In an opinion dated June 30, 1995, the Court, recognizing the early stage of the litigation, attempted to give the parties guidance and help define the scope of the case. In particular, the Court permitted Kirkwood to amend the complaint a second time and to "narrow their claims so that the Court can focus on the essence of their dispute." Plaintiffs did not pay much heed to this request, as they then filed an *eighteen* count Second Amended Complaint on August 31, 1995. Several of the claims are repetitive in that the alleged basis for liability is the same but the alleged facts specifically giving rise to the liability differ. Plaintiffs alleged that Dunkin' committed the following unlawful acts:
*3 (1) violated *6 Del. C. §  2552* by charging excessive rent in light of Dunkin's interests and purposes (Count I);
(2) violated *6 Del. C.* § 2552(j) by refusing to renew the franchise except upon payment of excessive rent (Count II);
(3) violated *6 Del. C.* § § 2552(g) and 2553(a) by attempting to unjustly terminate plaintiffs' franchise (Counts III, V, and VII);
(4) violated *6 Del. C.* § § 2552(g) and 2553(a) by unjustly terminating plaintiffs' franchise (Counts IV, VIII);
(5) violated *6 Del. C.* § § 2552(i) and 2553(b) by unjustly refusing to deal with plaintiffs (Count VI);
(6) violated a contractual obligation to offer mediation in order to resolve their dispute (Count IX);
(7) engaged in intentional misrepresentations by giving false assurances that it would help plaintiffs promote the business (Count X);
(8) engaged in intentional interference with existing business relationships (Count XI) and with prospective business advantages (Count XII);
(9) violated an implied covenant of good faith and fair dealing (Count XIII); and
(10) obtained unjust enrichment by charging and collecting unreasonable rent fees (Count XIV).

Plaintiffs alleged that the O'Hanlon defendants committed the following unlawful acts:(1) engaged in intentional interference with existing business relationships (Count XV) and with prospective

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

business advantages (Count XVI);

(2) engaged in intentional interference with the contractual relationship between plaintiffs and Dunkin' (Count XVII); and

(3) conspired with and knowingly and wilfully aided and abetted Dunkin' in Dunkin's breaches of covenants, representations, and warranties (Count XVIII).

On August 27, 1996, Dunkin' filed a new Motion for Partial Summary Judgment. While the Motion was pending, Dunkin' filed, on November 22, 1996, a Motion for Summary Judgment on all claims against it. On November 25, 1996, Dunkin' filed its Motion for Summary Judgment on its Counterclaim. Oral argument was scheduled for December 11, 1996. Shortly before oral argument, counsel for plaintiffs informed the Court that it had reached a resolution of its dispute with the O'Hanlon defendants and that a stipulation of dismissal would be forthcoming.[FN2] This is the Court's decision after oral argument.

> FN2. The stipulation was filed with the Prothonotary and signed by the Court on January 17, 1997. This dismisses Counts XV through XVIII, those alleged against the O'Hanlon defendants, and the Court will not discuss them further. For obvious reasons, the Court will not discuss the O'Hanlon Defendants' Motion for Summary Judgment. (Docket No. 117.)

### STANDARD ON SUMMARY JUDGMENT

When considering a motion for summary judgment under Superior Court Civil Rule 56, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973). If, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment is appropriate. *Id.* The Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is "potentially possible." *Rochester v. Katalan,* Del.Super., 320 A.2d 704 (1974). All reasonable inferences must be drawn in favor of the non-moving party. *Sweetman v. Strescon Indus.,* Del.Super., 389 A.2d 1319 (1978). Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it

seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962).

### COUNT I

**\*4** In Count I of the Second Amended Complaint, plaintiffs contend that Dunkin' violated 6 Del. C. § 2552(j) by charging excessive rent in light of Dunkin's interests and purposes in the property:
Notwithstanding any terms of the franchise agreement to the contrary, no franchisor who leases real or personal property to a franchised distributor may charge the franchised distributor a rent or other charge for the use or occupancy of such real or personal property which is unreasonable or excessive in light of the franchisor's interest in such real or personal property, and the purpose to which the real or personal property is being used. The refusal of the franchisor to renew a lease for real or personal property except upon the payment of a rent or other charge which is unreasonable or excessive in light of the use to which the property has been placed by the franchisor and/or the interest of the franchisor in the real or personal property shall be deemed to be an unjust termination of the franchise.

*Id.* Dunkin' asserts that summary judgment is appropriate with respect to on this count on any of several grounds.

The first ground put forth by Dunkin' is that charging unreasonable and excessive rent alone is not a violation of the Franchise Security Law. Specifically, Dunkin' argues that the "remedies" section of the statute does not provide a cause of action based on the charging of unreasonable or excessive rent:
(a) If a franchisor (1) unjustly terminates a franchise, or (2) unjustly fails or refuses to renew a franchise, or (3) threatens, or attempts, or gives notice that it intends to attempt unjustly to terminate a franchise, or (4) threatens, or attempts, or gives notice that it intends to attempt unjustly to refuse to renew a franchise, then the franchised distributor whose franchise is threatened shall be entitled to recover damages from the franchisor....
(b) [...] if a franchisor unjustly refuses to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years, the franchised distributor shall be entitle to recover damages from the franchisor pursuant to subsection (a) of this section plus all other damages ... allowed under the law of this State....

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 4

6 *Del. C.* § 2553. Dunkin' argues that a claim for the payment of unreasonable or excessive rent only accrues when it is charged in conjunction with a refusal or threatened refusal to renew.     Plaintiffs argue that Dunkin's reading "totally emasculates" the statute and that it is absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if demanded in the initial term.     In other words, the dispute between the parties centers on whether the first sentence of subsection (j) confers an independent cause of action, since plaintiffs in Count I only allege the charging of an excessive and unreasonable rent.

The Court concludes that the statute is meant to confer protection against the charging of an unreasonable or excessive rent only in the context of an already-existing franchise agreement or an accompanying sublease.     That is, contrary to plaintiffs' assertions, it is not at all absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if demanded in the initial term.     The preamble to the Franchise Security Act indicates otherwise.
*5 AN ACT ... TO PROTECT FRANCHISED DISTRIBUTORS FROM UNJUST TERMINATION OF, OR FAILURE OR REFUSAL TO RENEW THEIR FRANCHISES.
WHEREAS, the relationship between franchised distributors and their suppliers and licensors is marked by economic dependence of the franchised distributor; and
WHEREAS, the suppliers and licensors of franchised distributors have terminated franchises on short notice without just cause, and have threatened and continued to threaten such termination; and
WHEREAS, such unjustified terminations unfairly deprive franchised distributors of their equity and the fruits of their labor after they have created a favorable market for the products, trademarks, and trade names of their suppliers and licensors; and
WHEREAS, such terminations eliminate jobs, eliminate the productivity of going concerns and otherwise adversely affect the economic stability of this state; and
WHEREAS, such terminations interrupt the free and continuous flow of communication and information to the people of this state when the franchised distributor is a wholesaler of publications, and thereby interfere with the ability of the people to keep informed on public issues; and
WHEREAS, these conditions are detrimental to the public interest and general welfare of this state; and
WHEREAS, these detrimental conditions cannot be

remedied through bargaining because of the franchised distributors' lack of bargaining power.

57 *Del. Laws* ch. 693.

As the title and preamble make clear, the protections of this statute are intended to protect franchised distributors only from "unjust termination of, or failure or refusal to renew their franchises."     The General Assembly was concerned with the unjust, inequitable, and coercive practices of franchisors in the context of an already-existing franchise relationship, that is, at a time when the economic balance of power rests with the franchisor.     *See Globe Liquor Co. v. Four Roses Distillers Co.,* Del.Supr., 281 A.2d 19, 23, *cert. denied,* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971) (recognizing that the purpose of the Act was to protect a franchisee who is "economically dependent upon the sale of the [franchisor's] products and who has used his efforts in promoting them"); *Paradee Oil Co. v. Phillips Petroleum Co.,* Del. Ch., 320 A.2d 769, 775 (1974), *aff'd,* Del.Supr., 343 A.2d 610 (1975) (citing *Globe Liquor* and the preamble to the Act).

Once the franchise is in place, the franchisee presumably goes to great lengths and expends great amounts of time and money to ensure the success of his venture and to create a "favorable market" for the franchisor.     It is in this sense that the franchisee builds up the "equity" and "fruits of [his] labor" from the franchise relationship.     Prior to entering into that relationship, there is no huge inequity in the balance of power.     Any potential franchisee from whom an unreasonable and excessive rent is charged as a condition of entering into the franchise relationship is free to walk away from the bargaining table.     In fact, the simple laws of economics would suggest that any franchisor who constantly charges unreasonable and excessive rents as a condition of granting the franchise will quickly discover that it has few takers.     Charging excessive and unreasonable rents, alone, may violate some other law, but it does not violate the Franchise Security Act.

*6 This reasoning is supported by the language of all of § § 2552 and 2553.     First, § 2552 is titled "Unjust termination of, or failure to renew, a franchise."     Second, the entire tenor of § 2552 is to speak consistently of either the termination of or the failure to renew a franchise.     To attribute to the first sentence of § 2552(j) the independent cause of action which plaintiffs propose would render that sentence out of place with the remainder of the section,

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 5

especially since the lead-in "Notwithstanding" clause appears to refer to an existing agreement. Third, nowhere in § 2553, the "remedies" portion of the subchapter, is a remedy given for only the charging of unreasonable or excessive rent. *See* 6 *Del. C.* § 2553, quoted *supra*. Rather, the damages recoverable pursuant to this chapter, described in part in subsection (c), employ phrases such as "used with respect to the terminated or unrenewed franchise" and "loss of profits ... by virtue of the terminated franchise." 6 *Del. C.* § 2553(c)(1), (3).

In the Court's opinion, the language of §§ 2552 and 2553, read in conjunction with the title and preamble of 57 *Del. Laws* ch. 693 and relevant case law, does not grant a franchisee a cause of action for the charging of unreasonable or excessive rent absent threatened, attempted, or actual termination or nonrenewal of the franchise. Since Count I of the Second Amended Complaint does not plead or allege the charging of such rent under any of those circumstances, it fails to state a cause of action under the Franchise Security Law. Summary judgment as to Count I of the Second Amended Complaint is therefore GRANTED.[FN3]

> FN3. This ruling makes it unnecessary to consider Dunkin's argument that plaintiffs released any claims against Dunkin' by the signing of a general release in the sublease amendments executed in 1986 and 1987. *See* Ex. 1C at ¶ 4, Ex. 1D at ¶ 3, Dunkin' Mot. for Summ. J. (Docket No. 115). This applies to Count II as well, in light of the fact that Dunkin' makes this argument with respect to Count II.

### COUNT II

In Count II of the Second Amended Complaint, plaintiffs allege that Dunkin' violated 6 *Del. C.* § 2552(j) by refusing to renew the sublease in 1986 and 1987 except upon payment of unreasonable and excessive rent, which constitutes an unjust termination entitling plaintiffs to damages under 6 *Del. C.* § 2553. Such a claim clearly states a cause of action under the statute.

Dunkin's first defense on this count is that the claim is time-barred by 10 *Del. C.* § 8106, the general three-year statute of limitations. As Dunkin' argues, the 1986 and 1987 sublease agreements were formed more than three years prior to the institution of this action and, therefore, claims relating to them are

time-barred. In response, plaintiffs argue several grounds for the inapplicability of 10 *Del C.* § 8106. First, they argue that it is "undisputed" that the agreements in question are contracts under seal. This issue was addressed by Judge Silverman in his thoroughly-researched and well written opinion on Dunkin's earlier Motion for Summary Judgment. *See Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.,* Del.Super., C.A. No. 94C-03-189, Silverman, J. (June 30, 1995), mem. op. at 13-18 (Docket No. 63). In that opinion, Judge Silverman concluded the following:

Except where mortgages are concerned, the simple use of formalities and boilerplate unaccompanied by substantive evidence of the parties' intent to seal it is not enough to turn an ordinary contract into a specialty. *American Tel. & Tel.* [*Co. v. Harris Corp.,* Del.Super., C.A. No. 92C-01-27, Jacobs, V.C. (Sept. 9, 1993)], Mem. Op. at 14 n. 6; *but see Peninsula Methodist Homes and Hosp., Inc. v. Architect's Studio, Inc.,* Del.Super., C.A. No. 83C-AV-118, Gebelein, J. (Aug. 28, 1985) Let. Op. at 3 (contract bearing testimonium clause and printed "seal" near signatures is under seal even without language in the body or extrinsic evidence of parties' intent).... *[T] he Court will allow discovery to develop extrinsic evidence of the parties' intent with respect to sealing the documents ....* Plaintiffs must remember that evidence of any intent on Plaintiffs' part to seal the agreements is insufficient unless they communicated their desire to Dunkin'. *American Tel. & Tel.,* Mem. Op. at 12-13.

*7 *Id.* at 17-18 (emphasis added). Judge Silverman's statement is the law of the case.

In a deposition taken July 18, 1996, O'Connor testified that he never discussed sealing the agreements with Dunkin', that he just assumed that the language in the agreements would have the effect of sealing those agreements. *See* Ex. A at 126-27, Dunkin' Mot. for Partial Summ. J. (Docket No. 97); Ex. C at 126-27, Pl. Resp. to Dunkin' Mot. (Docket No. 120). This apparent lack of communication would appear to foreclose the possibility of the necessary communication of the intent to seal, and with it plaintiffs' argument that the contracts are under seal. Nevertheless, plaintiffs argue that the mere fact that the agreements themselves contain the required seal language and the fact that each party forwarded the agreements to each other satisfies the requirement that they communicate their desire to seal the agreements. *See* Pl. Resp. to Dunkin' Mot. at 3-4 (Docket No. 120). Stripped to its particulars, plaintiffs' argument is that the seal language in the

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

lease agreements demonstrates the parties' intent to make valid the seal language in the lease agreements. Yet Judge Silverman had those documents before him and rejected them as being insufficient. He specifically granted plaintiffs additional discovery to develop *extrinsic* evidence of intent. The lease agreements clearly are not *extrinsic* evidence, and plaintiffs have therefore failed to present the evidence which this Court stated was necessary in order to demonstrate the parties' intent to seal the agreements. In view of plaintiffs' complete failure to offer the necessary extrinsic evidence after having been told what was needed, the Court adheres to Judge Silverman's ruling and holds that the lease agreements are not under seal and are therefore not for that reason exempt from 10 Del C. § 8106.

Plaintiffs' second argument for the inapplicability of the statute of limitations is that Dunkin' charging of an allegedly unreasonable and excessive rent were monthly, "continuing" abuses that toll the statute of limitations. As with the contracts under seal claim, Judge Silverman ably addressed this issue in his opinion on Dunkin' first motion:

Plaintiffs in the instant case provide no evidence of the chronology underlying their claims. They simply serialize Dunkin' alleged wrongs-calling Dunkin's charging of allegedly excessive rent, and operation of the Pike Creek and O'Hanlon franchises, "monthly" and "daily" abuses, respectively-and demand application of the continuing wrong doctrine. This begs the question, as "continuing wrong" status turns on the substantive nature of the contract and the alleged wrongs.... The Court will allow the parties to provide additional facts directed towards resolving whether Plaintiffs' claims challenge the initial formation of the franchise and lease agreements, or subsequent events (or both). If it turns out that Plaintiffs' claims involve nothing more than complaints regarding the formation of the contracts, they will be considered time-barred, pursuant to *Kahn [v. Seaboard Corp.,* Del. Ch. 625 A.2d 269 (1993) [FN4]....

> FN4. In *Kahn,* the plaintiffs alleged that defendants forced one of the parties into an agreement, and then interfered with the structuring of that agreement such that it was not negotiated at arm's length. In response to a motion to dismiss the claim as being beyond the statute of limitations, plaintiffs argued that the wrongs were not time-barred because they were continuing.

The Court rejected this argument and distinguished those wrongs that occur at the contract-formation stage from those that occur later in the contractual relationship, and held that as to the former, the injured party has three years from the date of formation within which to bring the claim.

*8 Mem. op. at 21-22 (Docket No. 63). However, neither party has provided any additional evidence with respect to this count regarding the nature of the 1986 and 1987 lease agreements.

Plaintiffs nonetheless argue (1) that the monthly charging of unreasonable or excessive rent constitutes a continuing wrong sufficient to toll the statute of limitations applicable to its Franchise Security Law claim in Count II, and (2) that the claims involve "the very essence of contracts." Given Judge Silverman's ruling, plaintiffs' argument must be rejected, and the Court does so here. As the Court noted with respect to Count I, charging an unreasonable or excessive rent, without more, is not a violation of the Franchise Security Law and therefore cannot be the substantive basis of these contracts. It is, instead, the refusal to renew the franchise, except upon payment of such rent, that is the wrongful act at issue in Count II. That wrongful act occurs at the time of the alleged refusal to renew, since plaintiffs' real complaint concerns what Dunkin' allegedly did, that is, demanded, at the time of renewal. *Accord Simmons v. Mobil Oil Corp.,* 9th Cir., 29 F.3d 505, 511 (1994) (holding "[i]t is the nonrenewal of [the franchise agreement] that [[plaintiff] complains of, because his claim arises from what he alleges Mobil did at the time of renewal," and rejecting as time-barred the franchisee's excessive rent claim). Consequently, under the Court of Chancery's decision in *Kahn,* and consistent with the law of this case, the Court rules that the wrongs alleged here occurred at the contract formation stage. As a result, plaintiffs have failed to bring their claim within the three-year statute of limitations period of 10 Del C. § 8106. Count II is consequently time-barred. Summary judgment is GRANTED as to Count II of the Second Amended Complaint.[FN5]

> FN5. Since Dunkin' has at least tacitly accepted plaintiffs' continuing wrong theory as *conceptually* valid, the Court has proceeded to treat it as such. There is something odd, however, with the notion that a breach of contract can constitute a continuing wrong. The theory itself is more

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

a creature of tort law. *See* Mem. op. at 19 (Docket No. 63). It would seem to the Court that contracts are rarely, if ever, really susceptible to the continuing wrong theory. With respect to contracts, the cause of action, that is, the wrong, generally accrues at the time of the breach, not when the damage is sustained. 51 AM. JUR. 2D *Limitations of Actions* § 126. Contrary to plaintiffs' assertions, here the *wrong* is the alleged refusal to renew the franchise; the *damage* is the allegedly unreasonable or excessive amount. The repeated payments of allegedly unreasonable or excessive rent are not so much continuing wrongs as they are continuing damages.

### *COUNTS III, IV, V, VII, & VIII*

Counts III, IV, V, VII, and VIII of the Second Amended Complaint allege that Dunkin' engaged in attempted and actual unjust terminations of the franchise in violation of the Franchise Security Law. Plaintiffs allege attempted unjust terminations by (1) granting nearby franchises when Dunkin' knew or should have known that granting these franchises would harm plaintiffs' business (Count III); (2) granting special incentives and exception to the O'Hanlon shop which Dunkin' knew or should have known would harm plaintiffs' business (Count V); and (3) granting nearby franchises and charging unreasonable and excessive rents, which caused a decline in business, which in turn caused plaintiffs' nonpayment, which in turn caused Dunkin's attempted termination (Count VII). Plaintiffs allege actual unjust termination by (1) granting nearby franchises and charging unreasonable and excessive rent, which caused a decline in business, which in turn caused nonpayment, which in turn caused Dunkin's unjust termination (Count IV); and (2) the same as (1), except that the downtown satellite site is included (Count VIII).

**\*9** The gist of these counts concerns not so much Dunkin's actual "termination" of the franchise, but rather its actions before then. In other words, Dunkin' never actually tried to "terminate" the franchise by word, that is "officially" until August 1993, but the effect of its prior deeds was to terminate plaintiffs' franchise. This may best be described as a "constructive" or "*de facto* " termination.

This Court, in its earlier opinion on Dunkin's prior motion, assumed without deciding that an unjust termination could be effected constructively, finding

that there was insufficient evidence in the record to decide at that time. Upon further review, the Court concludes that the Franchise Security Law does permit a cause of action for constructive or *de facto* termination. Admittedly, 6 *Del. C.* § § 2552 and 2553 appear to concern, as Dunkin' argues, only actual, attempted, or threatened termination or non-renewal of the franchise relationship. This might suggest that only an affirmative termination, such as the August 24, 1993 letter from Dunkin', qualifies, since nowhere in the Franchise Security Law is a cause of action expressly given for a constructive termination or an attempted constructive termination.

Such a position, however, exalts form over substance and in many respects does violence to the intent of the General Assembly in enacting the Franchise Security Law. The Franchise Security Law's purpose, generally speaking, is to remedy the imbalance of power in the franchise relationship by adding a few statutory pounds to the franchisee's side of the scales. To hold that only a formal termination affords a franchisee the protections of the Franchise Security Law would very well render those protections illusory. It "otherwise would allow franchisors to accomplish indirectly that which they are prohibited from doing directly." *Petereit v. S.B. Thomas, Inc.,* 2d Cir., 63 F.3d 1169, 1182 (1995), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1986) (construing Connecticut's franchise law). Actions sanctified by such a holding would "epitomize the very abuse of power which the statute seeks to prevent." *Id.*

In the Court's opinion, the question that the Franchise Security Law really asks is whether the actions alleged are so egregious as to amount to a repudiation of the contract. This will permit a factual review of each claim on its merits, with particular attention paid both to the motivations *and* the actions of the franchisor. It seems to the Court that if, in fact, Dunkin' did undertake to destroy plaintiffs' franchise, causing plaintiffs to lose so much money that they were forced to default and give Dunkin' a pretext for terminating the franchise, the Franchise Security Law not only gives, but *demands* that plaintiffs be afforded a remedy.

The Court reaches this conclusion notwithstanding the holding of the Court of Chancery in *Dave Greytak Enterprises v. Mazda Motors of American, Inc.,* Del. Ch., 622 A.2d 14, *aff'd without op.,* Del.Supr., 609 A.2d 668 (1992). Since the Court of Chancery's decision concerned Delaware's Motor Vehicle Franchise Protection Act, 6 *Del C.* ch. 49, its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

application to the Franchise Security Law is questionable. In that decision, the Court of Chancery declined to recognize a cause of action for "effective termination" with respect to Delaware's Motor Vehicle Franchise Protection Act, 6 Del C. ch. 49. The Court of Chancery held that the express terms of 6 Del C. § 4906 [FN6] concerned only actual or express terminations or cancellations, and that the plaintiff's claim for "effective termination" was nowhere used in the statute and thus failed to state a cause of action under the section.[FN7] It also held that the motor vehicle franchise in question here was not a franchise within the meaning of the Franchise Security Law. This Court is not certain the extent to which the Court of Chancery sought to foreclose the possibility that an automobile manufacturer/franchisor could ever effect a constructive termination of a motor vehicle franchise, but suspects, given the short nature of the Court of Chancery's treatment of this issue and the factual context of that case, that such uniform, absolute foreclosure may not have been intended. [FN8]

> FN6. In pertinent part, 6 Del C. § 4906 states the following: (a) Notwithstanding the terms, provisions or conditions of any franchise or notwithstanding the terms or provisions of any waiver, no manufacturer shall cancel, terminate or fail to renew any franchise with a licensed new motor vehicle dealer....

> FN7. Of particular value to the Court in reaching its decision on that issue was the fact that the franchise agreement, like here, did not purport to give the franchisee any guaranteed territory.

> FN8. Based on the foregoing discussion, it is obvious that this Court disagrees with the general holdings of those cases cited by Dunkin' in which the courts declined to find a cause of action for constructive termination. See Corp v. Atlantic-Richfield Co., Wash.Supr., 122 Wash.2d 574, 860 P.2d 1015, 1020 (1993); Adolph Coors Co. v. Rodriguez, Tex. Ct.App., 780 S.W.2d 477, 480 (1989). This disagreement is limited simply to the general issue of constructive termination. The Court, of course, takes no position regarding the interpretation of the franchise laws at issue there.

*10 That being said, the Court has grave doubts concerning whether plaintiffs will in fact be able to recover. There are a fair number of anomalies in plaintiffs' position. For example, if Dunkin' were indeed perpetrating a "scheme to obtain Plaintiffs' business" [FN9] by charging excessive rent and granting competing franchises, then why would Dunkin' grant plaintiffs the opportunity to open a satellite franchise in downtown Wilmington? Why would Dunkin' tell O'Connor to pay himself a more generous salary as a reward for his hard work if Dunkin' was trying to drive him out of business? If the impact of the other shops' openings was, as O'Connor testified, "dramatic and immediate," then why did plaintiffs not attempt to invoke the adverse impact procedures Dunkin' had in place? If plaintiffs are convinced that Dunkin' had a scheme to force them into default, then why did O'Connor answer "no" when asked if he had any evidence to suggest that Dunkin' was, in fact, attempting to perpetrate just such a scheme? [FN10] How could a national plan to convert all Mr. Donut franchises to Dunkin' franchises be undertaken with the purpose of destroying plaintiffs' franchise? Plaintiffs may have a tough row to hoe, but they will get their chance. Summary judgment with respect to each of the unjust attempted and actual termination claims in Counts III, IV, V, VII, and VIII of the Second Amended Complaint is hereby DENIED.

> FN9. Plaintiff Opp. to Mot. for Summ. J. at 1 (Docket No. 120).

> FN10. Consider the following colloquy:
> Q: Do you have any fact[s] to substantiate that Dunkin' had some intention to harm your business?
> A: No facts that I am aware of.
> O'Connor Dep. at 338, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115).

### COUNT VI

Plaintiffs allege in Count VI of the Second Amended Complaint that Dunkin' engaged in an "unjust refusal to deal" with them in violation of 6 Del. C. § 2552(i) of the Franchise Security Law. Specifically, plaintiffs allege that O'Connor requested a meeting with Dunkin' to discuss and resolve the rent and competing shop problems plaintiffs were experiencing, but Dunkin' allegedly refused to meet with plaintiffs and instead terminated the franchise agreements, brought the termination actions, and refused to allow plaintiffs to sell all or part of the business.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 9
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Section 2552(i) states that "[n]o franchisor may unjustly refuse to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years." The Court of Chancery has interpreted this subsection to "cover a situation where the franchisor has not taken specific action to terminate the franchise but is attempting to purge itself of the relationship simply by refusing to deal with the franchise distributor any longer ." *Del-Way Petroleum Co. v. Phillips Petroleum Co.,* Del. Ch., C.A. No. 4802, Brown, V.C., 3 Del. J. Corp. L. 565, 1977 WL 2568 at *4 (Mar. 10, 1977). This reasoning comports with the title to § 2552: "Unjust termination of, or failure to renew, a franchise." It also makes sense as a practical matter, since it would seem pointless to require a franchisor to continue to deal with a franchisee against whom it has already chosen to pursue the ultimate remedy of terminating the franchise.

A review of this case indicates that Dunkin' did not, in fact, refuse to deal with plaintiffs within the meaning of the Franchise Security Law. O'Connor himself testifies by affidavit that he did not contact Tom McHugh, his representative at Dunkin', to discuss and resolve the rent and competing shop issues until *after* he had received Dunkin's termination notices in August 1993. *See* O'Connor Aff. at 13 (Docket No. 123). Since this section is meant to cover situations where Dunkin' has *not* taken specific action to terminate a franchise, the fact that the actions alleged here all occurred *after* that specific action was taken renders them insufficient to support a cause of action for violation of 6 Del. C. § 2552(i). In light of plaintiffs' failure to offer any other evidence indicating that Dunkin' unjustly refused to deal with plaintiffs prior to its taking specific action to terminate the franchises, they have failed to state a claim under § 2552(i). Summary judgment as to Count VI of the Second Amended Complaint is GRANTED.

### COUNT IX

*11 In Count IX of the Second Amended Complaint, plaintiffs allege that Dunkin' failed to offer plaintiffs the opportunity to mediate their dispute prior to resorting to the courts, as they were contractually obligated to do under a Mediation Agreement between Dunkin' and the Center for Public Resources, Inc. ("CPR"), to which plaintiffs are third-party beneficiaries. Pursuant to the Mediation Agreement, Dunkin' voluntarily agreed to a

mediation process designed to help franchisors and franchisees resolve disputes without resorting to litigation. According to plaintiffs, Dunkin' did not inform plaintiffs of the existence of this agreement, nor did Dunkin' ever offer plaintiffs the opportunity to mediate their dispute even after O'Connor first made contact with Tom McHugh in August 1993. As a result, plaintiffs allege that they suffered damages, including attorney's fees, costs, and expenses incurred in defending this litigation.

The Court dealt with this claim in its June 30, 1995 opinion. In that opinion, the Court noted that Dunkin's own evidence indicated that Dunkin' did not notify plaintiffs of the possibility of mediation through the CPR program until the time when this litigation was filed. The Court assumed without deciding that Dunkin' did not notify plaintiffs of the opportunity to mediate in a timely fashion, but ruled nevertheless that summary judgment was appropriate with respect to that claim:

This count] essentially is a damage claim for Plaintiffs' having lost an opportunity to mediate certain complaints before they filed suit. Only through speculation could damages be awarded on that basis. Specifically, for Plaintiffs to recover, the fact-finder would have to conclude that Plaintiffs would have succeeded in mediation, Dunkin' would have accepted the result and would not have exercised its appeal rights, or [if it did] that such an appeal would have failed, since the mediation process contemplated by the CPR program is non-binding.... Damage claims cannot rest on such a tenuous foundation. *See, e.g., American Gen. Corp. v. Continental Airlines Corp.,* Del. Ch., 622 A.2d 1, 7 (1992), *aff'd,* [Del. Supr.,] 620 A.2d 856 (1992). Moreover, while the Court will not weigh the evidence now, Dunkin's contention that the parties eventually tried mediation without success lends support to the notion that Plaintiffs cannot establish a claim in [this count].

Mem. op. at 10-11 (Docket No. 63). In light of the fact that no additional evidence has been presented with respect to this claim, the Court has no reason to depart from its prior holding. For the same reasons expressed in that opinion, summary judgment is GRANTED with respect to Count IX of the Second Amended Complaint.

### COUNT X

Count X of the Second Amended Complaint alleges a claim of fraudulent misrepresentation against

Not Reported in A.2d                                                    Page 10
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

Dunkin'. Plaintiffs claim that Dunkin' fraudulently misrepresented to them that it would help them "promote and further the business and profitability of Kirkwood" and also "not take any action detrimental to Kirkwood's business interests." At deposition, O'Connor was asked to describe these alleged representations with more specificity and replied with the following.

*12 I remember sitting down in my living room with Allen Lauer, who the title then was district sales manager.... I was very apprehensive over the extent to which I could remodel, the impact of this percentage rent.... [H]e took my sales up to that point and with a modest percent increase each year, which I had been more than doing to that point, he extrapolated on up past $2, 000 [A.D.2000] and said, I can remember the quotes, Look at where you will be so many years down the road. And the other comment I can remember hearing was you were the only one on Kirkwood Highway. Really trying to reassure me that I could handle both of these.

O'Connor Dep. of July 18, 1996 at 29, Ex. 1F, Dunkin' Mot. for Summ. J. (Docket No. 115).But they had advice for you. They can give you help while you are working for them. So I felt secure in that. That was the first of what I would consider representations. And the second one was when Allen Lauer gave me his projection and I can still hear the words, it will be on my gravestone: You will be the only one on Kirkwood Highway.

O'Connor Dep. of July 18, 1996 at 461, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115).

In response to a question asking for every representation, especially by a Dunkin' employee, that plaintiffs' business would grow and continue to be profitable, O'Connor stated the following:
I can't give times, dates, and places. But there were times when every district sales manager I had was optimistic about with hard work and honesty that you can make a business really grow into something and make it a family business.... Rich Markell, totally forgot that he was one of the early characters back in '84. Might have been my first district sales manager.... Then there was John Campbell before it from Concord Pike, Allen Lauer, Tom McHugh, Bob Nelson. I could be leaving somebody else out. I mean, there were times when they all talked about being a Dunkin' Donut franchisee. I mean you go to ad committees meetings. This is what you can do. This what you can do to be profitable and all of that. We are here to help you. Other than that, I can't give specifics on it.

O'Connor Dep. of July 18, 1996 at 463-64, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115). Plaintiffs claim that it was the representations and assurances made by Dunkin's employees that caused them to execute the lease and franchise agreements. Additionally, plaintiffs allege that these statements were false because Dunkin' charged plaintiffs unreasonable and excessive rent, licensed two competing Dunkin' franchises, failed to consult with plaintiffs about the impact of these new franchises, failed to offer those franchises to plaintiffs, granted special concessions to O'Hanlon, and terminated plaintiffs' franchise in bad faith and without good cause.

One of Dunkin's arguments in favor of summary judgment on this claim is that the integration clauses of the franchise agreements bar the use of parol evidence regarding representations or assurances relating to the contract matter. While this general statement of the law is correct, it omits a well-recognized exception to the parol evidence rule. When a party alleges fraud or misrepresentation, evidence of oral promises or representations made *prior* to the written agreement will be admitted. *Anglin v. Bergold,* Del.Supr., 565 A.2d 279 (1989) (ORDER) at 4-5 (citing *Scott-Douglas Corp.,* 304 A.2d at 317). Since at least some of the statements appear to have been made prior to the execution of the franchise and lease agreements, the Court will not grant summary judgment solely on the basis of the parol evidence rule and the integration clauses.

*13 Nevertheless, the Court finds that plaintiffs fail to state a claim for fraudulent misrepresentation. The Delaware Supreme Court has repeatedly laid out the elements of this common law cause of action:
(1) a false representation, usually one of fact, made by the defendant;
(2) the defendant's knowledge or belief that the representation was false, or made with reckless indifference as to the truth;
(3) an intent to induce the plaintiff to act or refrain from acting;
(4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
(5) damage to the plaintiff as a result of such reliance.

*Gaffin v. Teledyne, Inc.,* Del.Supr., 611 A.2d 467, 472 (1992) . [FN11] The Court has also held that mere expressions of opinion as to probable future events cannot be deemed fraud or misrepresentation. *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* Del.Supr., 112 A.2d 30, 37 (1955).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 11
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Furthermore, "any complaint alleging fraud must as a consequence include the circumstances involved, i.e., the time, place, and contents of any misrepresentation made, the identity of the person making the same and the benefit sought to be obtained." *Stutchen v. Duty Free Int'l, Inc.,* Del.Super., C.A. No. 94C-12-194, Toliver, J., 1996 Del.Super. LEXIS 187 (Apr. 22, 1996), mem. op. at 12 (citing *Nutt v. A.C. & S., Inc., Del.Super., 466 A.2d 18, 23 (1983), aff'd, Mergenthaler v. Asbestos Corp. of America, Del.Supr., 480 A.2d 647 (1984)).* This is an extension of the requirement of Superior Court Civil Rule 9(b) that "in all averments of fraud, negligence, or mistake, the circumstances constituting fraud, negligence, or mistake shall be stated with particularity."

> FN11. Note that the common law provides a remedy only for intentional misrepresentations. That is its great distinction from equitable fraud, which allows the Court of Chancery to provide a remedy for negligent or innocent misrepresentations. *Stephenson v. Capano Dev., Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983). The Consumer Fraud Act provides similarly sweeping coverage for misrepresentations. *See* 6 Del. C. § 2513.

Count X on its face fails to satisfy the requirements of Rule 9(b) and the Court's opinion in *Stutchen.* Plaintiffs did not allege the time or place of the misrepresentation *or* the identity of the person making it. Dunkin' did not move to strike the claim, and plaintiffs have since supplemented the claim with selections from O'Connor's deposition testimony. However, even this testimony fails to state a claim. With regard to Mr. Lauer's alleged statements, the Court does not understand exactly how Mr. Lauer could have known in 1987 that Dunkin' would purchase the Mister Donut corporation in 1990 and convert the O'Hanlon shop to a Dunkin' shop in 1993. Such knowledge is necessary in order to render knowingly false, *when made,* his alleged statement to O'Connor that plaintiffs would be the only ones on Kirkwood Highway. Additionally, the Court does not see how Lauer's calculation of the percentage rent payments, using the formulas agreed to and clearly stated in the contracts, could have been false. Finally, Lauer's projections as to the growth of plaintiffs' business clearly were nothing more than expressions of opinion as to future events based upon the extrapolation of past data.

The statements alleged to other persons are similarly non-actionable. First, O'Connor himself admits that he does not have the time, dates, or places of these alleged misrepresentations. All three are required in order to state a cause of action for fraud. While plaintiffs finally do put some names to the persons making representations, the representations O'Connor has testified to them making are nothing more than puffery, a verbal pat on the back from the franchisor meant to encourage the franchisee. *Accord W & G Milford Assocs. v. Jeffcor, Inc.,* Del.Super., C.A. No. 89C-JN-161, Herlihy, J., 1991 Del.Super. LEXIS 229 (Apr. 12, 1991), letter op. at 4 (regarding statements made to a shopping center tenant). At best, they could perhaps be stated as opinion, which, as the Court has pointed out, is similarly non-actionable.

**\*14** In conclusion, Count X fails to state a cause of action for fraudulent misrepresentation as a matter of law. Summary judgment is GRANTED as to Count X of the Second Amended Complaint.

### COUNTS XI & XII

Counts XI and XII of the Second Amended Complaint purport to state claims for tortious interference with existing business relationships and prospective business advantage. They do not, however, identify a specific contract or potential business opportunity allegedly compromised by Dunkin'. As the Court *explicitly* told plaintiffs in its earlier opinion, these specifics are a prerequisite to proceeding under these tort theories. *See* June 30, 1995 Mem. op. at 24-25 (Docket No. 63). The Court also told plaintiffs in no uncertain terms that they would have to "cite to actual or potential contracts, other than between themselves, possibly affected by Dunkin's behavior." *Id.* at 25. The Court then allowed plaintiffs to amend their complaint so as to provide these specifics. *Id.*

Unfortunately, plaintiffs do not appear to have understood what the Court meant by use of the phrase "specific contract or potential business opportunity." All that plaintiffs' new but certainly not-improved tortious interference counts do is give a slightly less vague but equally uninformative general description of plaintiffs' operation of the shop. As this Court told plaintiffs, more is required under Delaware law. In another case, the Court of Chancery cogently explained it in the following manner:
[I]nterference with an existing contract requires (a) an intent to induce a breach (b) of an existing

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

contract, (c) proximate causation, and (d) damages....
[A] showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with opportunity, (c) proximate causation, and (d) damages....

_DeBonaventura v. Nationwide Mut. Ins. Co._, Del. Ch., 419 A.2d 942, 947 (1980), aff'd, Del.Super., 428 A.2d 1151 (1981).

Here, plaintiffs have failed to demonstrate to the Court the existence of one single contract or prospective business opportunity. Citations to sales records of plaintiffs' and O'Hanlon's shops are useless because, while they _might_ show damages, they do not show the existence of the contract or prospective business opportunity. This Court told plaintiffs that they needed to provide specific examples, yet plaintiffs failed to do so. As such, plaintiffs have failed (twice) to state a cause of action for either tortious interference with existing contracts or with prospective business opportunities. Summary judgment as to Counts XI and XII of the Second Amended Complaint is GRANTED.

#### COUNT XIII

Count XIII of the Second Amended Complaint alleges a veritable multitude of violations of an implied covenant of good faith and fair dealing. Plaintiffs assert that Dunkin' violated this covenant by (1) charging unreasonably and excessive rent for the Kirkwood Highway shop, (2) awarding competitive franchises in close proximity to the Kirkwood Highway shop, (3) failing to consult with plaintiffs about the impact of those franchise prior to granting them, (4) failing to offer those franchise to plaintiffs, (5) failing to investigate whether the new franchises would have an adverse impact on plaintiffs, (6) granting special privileges and concessions to the O'Hanlon franchise, which conferred a competitive advantage on O'Hanlon to plaintiffs' detriment, (7) refusing to meet with plaintiffs to discuss and resolve plaintiffs' perceived problems, (8) terminating plaintiffs' franchise, and (9) bringing these termination actions in the courts.

**\*15** An implied covenant of good faith and fair dealing generally exists in every contract. _Katz v. Oak Indus., Inc._, Del. Ch., 508 A.2d 873, 880 (1986). As the Court of Chancery has held, "[t]his obligation requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." _Wilgus v. Salt Pond Inves. Co._, Del. Ch., 498 A.2d 151, 159 (1985). It is simply a reflection of the fact that in many respects the purpose of contract law is to attempt to give effect to the reasonable expectations of the parties. _See_ RESTATEMENT (SECOND) CONTRACTS § 205. One common way of analyzing this covenant "is to ask what the parties likely would have done if they had considered the issues involved." _E.I. DuPont de Nemours & Co. v. Pressman_, Del.Super., 679 A.2d 436, 443 (1996). _See also Katz_, 508 A.2d at 880 (asking "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter?"). However, it is also true that "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty does not come into play." _Dave Greytak Enters._, 622 A.2d at 23.

After some reflection upon the issue and consideration of the actions which plaintiffs allege constitute violations of the covenant, the Court concludes that with respect to at least some of the alleged actions, the implied covenant of good faith and fair dealing does not provide a remedy independent of the Franchise Security Law. In the Court's opinion, this common law _implied_ covenant of "good faith" and "fair dealing" does not state an independent cause of action with respect to the actual, threatened, or attempted failure to renew or termination of a franchise relationship because the General Assembly _expressly_ wrote that covenant into the Franchise Security Law.

The Franchise Security Law expressly prohibits unjust terminations and failures to renew, whether actual, threatened, or attempted, as well as unjust refusals to deal. _See_ 6 _Del. C._ § § 2552(g), (h), (i). It defines "unjust" as being without "good cause" or in "bad faith." _See_ 6 _Del. C._ § § 2552(a), (b). An "unjust refusal to deal" by its very terms cannot be said to be either good faith or fair dealing. To the extent, therefore, that plaintiffs make any of these allegations as breaching an implied covenant of good faith and fair dealing, these allegations are part and parcel of the General Assembly's statutory enactment. This encompasses the second, sixth, seventh, eighth, and ninth grounds listed above. Each of these grounds is separately alleged in other counts of the Complaint dealing with the Franchise Security

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 13
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
(Cite as: Not Reported in A.2d)

Law,[FN12] and any remedy which plaintiffs seek must be sought under that law.

> FN12. The second ground appears to be covered by Count III; the sixth by Count V; the seventh by Count VI; the eighth by Counts IV and VIII; and the ninth by Count VII.

*16 Some of the grounds alleged by plaintiffs, however, are not expressly covered by the Franchise Security Law. As such, application of the covenant as to those grounds is not precluded by the actions of the General Assembly. The Court will address each in turn.

*Ground 1. Charging Unreasonable and Excessive Rent.* Simply stated, the Court cannot find that the mere charging of excessive and unreasonable rent violates the covenant. First, the Franchise Security Law covers all aspects of the charging of unreasonable and excessive rent once the franchise relationship exists.[FN13] In this respect, the Franchise Security Law covers and precludes this ground. Second, as the Court stated in its treatment of Count I, there is no law or public policy that prevents a potential franchisor from charging whatever rent it wishes to charge, *ab initio,* that is, as a precursor to entering into the franchise relationship. And the covenant certainly cannot be said to apply here, since no contract yet exists between the two parties. The Court is of the opinion that, as a matter of law, the first alleged ground cannot state a claim for a violation of the covenant.

> FN13. See the discussion with respect to Count I, *supra.*

*Ground 3. Failure to Consult Prior to Granting the Competing Franchises.* As a matter of law, the Court is unable to conclude that the parties, had they discussed this issue prior to entering into the relationship, would have agreed that Dunkin' would have to consult with plaintiffs prior to granting competing franchises. *See Pressman,* 679 A.2d at 443; *Katz,* 508 A.2d at 880. First, an opposite conclusion is evident from the arguments presented by Dunkin' in this case. Second, the Franchise Agreement specifically states areas in which Dunkin' agrees to maintain an advisory relationship with the franchisee.[FN14] Third, even if they had consulted, the parties would have had to agree on a definition of "competing franchise." This obviously entails some

notion of territoriality, and it is by no means clear that the parties would have agreed as to a specific territorial radius within which a new franchise would be deemed "competing." [FN15] Fourth, there is little need to consult on the granting of a competing franchise if such consultation would be of little use. If the existing franchisee has no say or "veto power" over the proposed franchise, what good would prior consultation do, other than perhaps assuage any fears the existing franchisee might have? The Court is unable to conclude that this parental "hand holding" is a requirement of the covenant. For all four reasons the Court concludes that this ground cannot state a claim for a violation of the covenant.

> FN14. "[Dunkin' **Donuts** agrees] To maintain a continuing advisory relationship with the FRANCHISEE, including consultation in the areas of marketing, merchandising, and general business operations...." Franchise Agreement at ¶ 3A, Ex. A, Dunkin' Mot. for Summ. J. (Docket No. 115).

> FN15. Perhaps tellingly, the franchise agreement between Dunkin' and plaintiffs makes no mention of any exclusive territory for the franchisee.

*Ground 4. Failure to Offer Competing Franchises to Plaintiffs.* The Court is similarly unable to conclude, as a matter of law, that the parties, had they discussed the issue, would have agreed that Dunkin' should give plaintiffs what is effectively a right of first refusal on all competing franchises. First, the parties would have had to agree on the definition of a "competing franchise," which, as the Court stated above, involves other issues upon which the parties would have had to agree. Second, it would have been impossible for Dunkin' to offer the franchises to plaintiffs. The O'Hanlon shop was already owned by Sean O'Hanlon and was not a "new franchise" as the term is generally used, since it became a Dunkin' franchise through the Mr. Donut conversion program. The Pike Creek shop was similarly unavailable to plaintiffs, since the eventual franchisee already had the lease for that site before approaching Dunkin' about opening a franchise. These facts fail to state a claim under the covenant.

*17 *Ground 5. Failure to Investigate Impact.* As a matter of law, this ground fails to constitute a violation of the covenant. The Franchise Agreement contains the procedures by which Dunkin' conducts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an adverse impact analysis.[FN16] Dunkin's adverse impact analysis cannot begin until the existing franchisee makes a call to his business consultant concerning the decline in sales. Since the issue is expressly covered by the contract, the implied duty does not come into play. *See Dave Greytak Enters., 622 A.2d at 23.* However, even assuming, *arguendo,* that this implied duty did come into play if Dunkin' failed to implement those procedures, the result here is not changed. Plaintiffs claim that O'Connor attempted to invoke the procedures by calling Tom McHugh in August 1993 and that Dunkin' thereafter refused to invoke the designated procedures. It is undisputed, however, that O'Connor did not make that "attempt" until *after* Dunkin' sent the first notice of termination to plaintiffs. Apparently plaintiffs believe that Dunkin' has a contractual duty to make an adverse impact analysis even after plaintiffs have failed to pay rent due (for whatever reason) and Dunkin' has begun termination proceedings. Suffice it to say that the Court does not share that belief.

> FN16. The Franchise Agreements themselves are silent on the issue, but the agreements clearly refer to manuals which Dunkin' is to provide the franchisee. One such manual, the Dunkin' **Donuts** Site Development Guidelines Summary, describes all of the procedures for investigating adverse impact claims.

Since the Franchise Agreement contained procedures for investigating possible adverse impact, there is no implied covenant imposing such a duty. Moreover, since plaintiffs themselves admit that they did not attempt to invoke those procedures until after termination proceedings began, Dunkin' cannot be held responsible for any failure to investigate.

*Summary.* By way of summation on this count, a review of all nine grounds alleged by plaintiffs as constituting a violation of an implied covenant of good faith and fair dealing leads the Court to the conclusion that plaintiffs have failed to state a claim for application of the covenant. Summary judgment on Count XIII of the Second Amended Complaint is GRANTED.

### COUNT XIV

In Count XIV of the Second Amended Complaint, plaintiffs allege that Dunkin's obtaining and retaining

unreasonable and excessive rental fees constitutes an unjust enrichment for which plaintiffs should be compensated. However, unjust enrichment is a quasi-contract theory of recovery meant to remedy the absence of a formal contract. *ID Biomedical Corp. v. TM Technologies, Inc.,* Del. Ch., C.A. No. 13269, Steele, V.C., 1995 Del. Ch. LEXIS 34 (Mar. 16, 1995), mem. op. at 26 (citing *Freedman v. Beneficial Corp.,* D. Del., 406 F.Supp. 917, 923 (1975)). If a contract "is the measure of [the] plaintiffs' right," the parties cannot recover under a theory of unjust enrichment. *See Wood v. Coastal States Gas Corp.,* Del.Supr., 401 A.2d 932, 942 (1979); *Chrysler Corp. v. Airtemp Corp.,* Del.Super., 426 A.2d 845, 854 (1980); *ID Biomedical Corp.,* mem. op. at 26-27. Here we have a formal contract between Dunkin' and plaintiffs which governs the relationship between them. As such, no claim for unjust enrichment can exist. Summary judgment is GRANTED as to Count XIV of the Second Amended Complaint.

### DUNKIN'S COUNTERCLAIM

**\*18** As the Court indicated in its earlier opinion, Dunkin's counterclaim essentially repudiates plaintiffs' entire complaint. The crux of Dunkin's Motion for Summary Judgment on the counterclaim is that there is no genuine issue of material fact that plaintiffs stopped making payments for rent and fees under the Franchise Agreements and subleases in 1993. This failure to pay money owed placed them in default under the franchise agreements and their failure to cure the defaults provided grounds for termination.

As Dunkin' argues, plaintiffs' first "excuse" for nonpayment, that Dunkin' breached its obligations to plaintiffs, is not a defense to termination because "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor." *S & R Corp. v. Jiffy Lube, Int'l, Inc.,* 3d Cir., 968 F.2d 371, 375 (1992). In other words, Dunkin' argues that any breach it may have committed against plaintiffs is a separate offense that does not entitle plaintiffs to avoid their own obligations under the agreement. That is, assuming that plaintiffs were the non-breaching party, they may not stop their performance and yet continue to take advantage of the contract's benefits. *Id.* at 376 (citing *Burger King, Inc. v. Austin,* S.D. Fla., Bus. Fin. Guide (CCH) ¶ 9788 at 22,089 (Dec. 26, 1990), in which the federal district court ruled against defendants on their allegation that Burger

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 15
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

King's failure to give them required real estate
assistance entitled them to stop paying royalties but
continue to use the Burger King trademark).

The Court notes that both the *S & R Corp.* and
*Burger King* cases cited here are somewhat
inapposite, as each involved suits brought for
trademark infringement under the Lanham Act.
Furthermore, neither case appears to have presented a
situation, such as the one here alleged, where the
default by the franchisee was alleged to be directly
due to the franchisor's breach.   Consequently, while
the language of these opinions could perhaps be read
as widely as Dunkin' reads them, the Court doubts
that they really mean to include a situation such as
the one alleged by plaintiffs here.[FN17]

>    FN17. Dunkin' also argues that plaintiffs'
>    second "excuse," that they ran out of money,
>    is similarly not a defense to nonpayment. It
>    argues that the undisputed evidence shows
>    that plaintiffs' inability to pay was the direct
>    result of O'Connor's misappropriation of
>    company funds, which is clearly no defense
>    to nonpayment.   While the Court is mindful
>    of this argument, it turns on the facts of this
>    case regarding the books and records of the
>    company and O'Connor's salary and
>    expenditures, such as the so-called "salary
>    supplements."     Since the Court does not
>    weigh the evidence at this stage, it is
>    unpersuaded that no genuine issue of
>    material fact exists regarding the reason for
>    plaintiffs' nonpayment of fees.

Additionally, since the counterclaim is essentially a
repudiation of the complaint, summary judgment is a
particularly inappropriate remedy when the Court has
already denied Dunkin's Motion for Summary
Judgment with respect to some of the counts of the
complaint. For either reason, summary judgment on
the counterclaim must be and hereby is DENIED.

*CONCLUSION*

For all of the foregoing reasons, Dunkin's Motions
for Summary Judgement are GRANTED with respect
to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of
the Second Amended Complaint;   DENIED with
respect to Counts III, IV, V, VII, and VIII of the
Second Amended Complaint;   and DENIED with
respect to the counterclaim.  IT IS SO ORDERED.

Del.Super.,1997.
In re Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.
Not Reported in A.2d, 1997 WL 529587 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.